**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| LISA RANIERI and MEGAN CORNELIUS, individually and on behalf of a class of similarly situated persons,<br><br>             Plaintiff,<br><br>    vs.<br><br>ADVOCARE INTERNATIONAL, L.P., DANIEL MCDANIEL, JENNY DONNELLY, CRYSTAL THURBER, WES BEWLEY, DAWN FUNK, and TYLER DEBERRY,<br><br>             Defendants. | CASE NO. _____ |

## CLASS ACTION COMPLAINT

Plaintiffs Lisa Ranieri and Megan Cornelius ("**Plaintiffs**"), individually, and on behalf of all others similarly situated, plead as follows against Defendants AdvoCare International, L.P. ("**AdvoCare**"), Daniel McDaniel, Jenny Donnelly, Crystal Thurber, Wes Bewley, Dawn Funk, and Tyler DeBerry (collectively, "**Defendants**").

### I.    PRELIMINARY STATEMENT

1.    AdvoCare is one of the largest multi-level marketing companies ("**MLMs**") in the world, reportedly generating $719 million in net revenues in 2015.  It also operates a pyramid scheme.  AdvoCare's many millions in revenues are primarily derived from bilking hundreds of thousands of individuals, known as "**Distributors**," who participate in AdvoCare's business opportunity.

2.    In a classic pyramid scheme, participants pay money into the scheme for the right to receive compensation from the scheme based, in large part, on bringing new participants into

the scheme.  Each participant's money is used to pay others in the scheme, as well as the scheme promoter.  The more recruits a participant has under him, and the closer to the top of the pyramid he is, the more money he might make.  Participants will lose their money unless they recruit enough new participants, who will also lose their money unless they recruit enough new participants, and so on.  Because there is little or no money flowing into the scheme from non-participants, and since payments are shared with the promoter and disproportionately with the persons closer to the top of the pyramid, the vast majority of participants are doomed to lose most or all of their money.

3.      Some MLMs (like AdvoCare) are pyramid schemes with a twist—rather than simply selling participants a right to share in the money paid in by other participants, the MLM sells participants a product **and** the right to share in the money paid in by other participants.  The sale of the product is just a mask to obfuscate the true nature of the scheme.

4.      For example, if the promoter of the classic pyramid scheme "sold" participants $100 toothpicks and the right to compensation from bringing in new participants to purchase $100 toothpicks (who would also bring in more toothpick-buying participants), the scheme is no less a pyramid scheme because the participants purchased toothpicks.  The sale of toothpicks merely provides a mask of legitimacy to the pyramid scheme, allowing the promoter to claim he is a multilevel marketer of toothpicks instead of a pyramid scheme promoter.  Here, rather than selling overpriced toothpicks to disguise its scheme, AdvoCare sells overpriced nutritional supplements.

5.      Participants in the pyramid scheme operated by AdvoCare are its Distributors.  AdvoCare requires Distributors to purchase start-up packages and pay annual dues, and the AdvoCare system makes it a virtual necessity that the Distributors regularly purchase AdvoCare products.  In return, the Distributors get the right to receive compensation based in primary part on their recruitment of new Distributors (who pay fees, pay dues, and purchase product).  Just like

2

a classic pyramid scheme, the more recruits a Distributor brings into the AdvoCare program (and the more money those recruits pay AdvoCare), the more money that Distributor can make.

6.     Unlike participants in a classic pyramid scheme, the AdvoCare Distributors receive products—nutritional supplements—in return for the money they pay into the scheme, which the Distributors can theoretically consume or sell.  But that fact makes AdvoCare no less a pyramid scheme.  The Distributors can sell little product at retail, at least for any amount above the wholesale price they pay AdvoCare (just as the $100 toothpicks are unlikely to be sold for a profit).  The Distributors may use some of the product they buy, or they sell it for deep discounts, or they give it away for free as part of their recruiting efforts.  But selling the product to non-Distributors for a profit is not a real income-generating possibility.

7.     The Distributors cannot sell the AdvoCare product for a profit for many reasons.  Products just as good, if not better, are widely available for cheaper on Amazon, eBay, and at GNC.  The protein powder, amino acids, supposedly nutritional shakes, and other products AdvoCare sells have the same principal ingredients as cheaper alternatives widely available.  In addition, AdvoCare prohibits Distributors from selling goods on e-commerce platforms and in almost all brick-and-mortar businesses, so there is no realistic way for Distributors to sell the overpriced products.  Moreover, because the Distributors get stuck with AdvoCare product they cannot sell for a profit, some Distributors ignore AdvoCare's prohibition on e-commerce sales and sell the products on the internet for the wholesale price or less, further frustrating other Distributors' efforts at selling for a profit.

8.     Other than the theoretical possibility of selling AdvoCare products for a profit to retail customers, all of AdvoCare's business incentives depend on recruiting—just like a classic pyramid scheme pays based on recruiting.  The primary financial incentives in AdvoCare's

compensation plan are bonuses based on purchases made by junior Distributors. And without recruiting, there are no junior Distributors. Thus, AdvoCare's compensation system strongly encourages recruiting, and it provides very little reward for retail sales.

9.      Moreover, AdvoCare's system strongly encourages Distributors to buy more and more product, regardless of whether they need it for retail sales or would otherwise buy it for personal use. Distributors must achieve certain levels of purchases by themselves or in conjunction with junior Distributors to maintain their eligibility for each type of bonus from AdvoCare. This pressure to maintain their statuses incentivizes the Distributors to purchase product they do not need. Indeed, AdvoCare specifically designed its system to incentivize Distributors to purchase product they do not need.

10.      AdvoCare claims to have over 600,000 Distributors, but the vast majority of AdvoCare's Distributors lose money. According to AdvoCare's 2015 Income Disclosure Statement, AdvoCare paid 71.5% of its Distributors *$0* in 2015. It paid 93% of its Distributors $500 or less. These are gross income numbers that do not account for the money the Distributors paid AdvoCare in fees and product purchases. On information and belief, at least 95% of AdvoCare's Distributors pay AdvoCare more money than AdvoCare pays them.

11.      The only people who make money from the AdvoCare pyramid scheme are the very few at the top of the pyramid. These few—including Defendants McDaniel, Donnelly, Thurber, Bewley, Funk, and DeBerry (collectively, the "**Individual Defendants**")—have gotten rich from defrauding the 90+% of Distributors who lose money. The Individual Defendants promote the pyramid scheme. Moreover, they, like AdvoCare, misrepresent the financial rewards available to Distributors and falsely argue that AdvoCare is a legitimate, legal enterprise. Plaintiffs seek to hold them liable as some of the principal promoters and profiteers from the illegal scheme.

12.     Perhaps most damning is the fact that AdvoCare and the Individual Defendants do not prey on those who seek a get-rich-quick or idle investment scheme.  Rather, they market the scheme to good people willing to work hard to make better lives for themselves and their families.  They prey on people in tight financial circumstances looking for some extra income.  They tell their victims that, with enough hard work, they can help themselves financially by growing their AdvoCare business.  They tell unsuccessful Distributors (and the overwhelming majority are unsuccessful) that their lack of success is due to their not working hard enough at growing their AdvoCare business (*i.e.,* recruiting more Distributors).  AdvoCare thus uses its victims' good natures to encourage them to join and stay in the scheme.

13.     AdvoCare and the Individual Defendants have formed a fraudulent, criminal enterprise with the purpose and effect of defrauding hundreds of thousands of Distributors.  On their own behalves and on behalf of a class of similarly injured Distributors, Plaintiffs seek to hold Defendants financially liable for the operation and promotion of a pyramid scheme.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs bring claims under federal law, specifically 18 U.S.C. §§ 1961, 1962, and 1964 ("**RICO**").  Pursuant to 28 U.S.C. § 1367, this Court may exercise jurisdiction over Plaintiffs' state law claims because those claims and the RICO claims form a part of the same case or controversy under Article III.

15.     Federal subject matter jurisdiction also arises under 28 U.S.C. § 1332(d) because (i) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (ii) members of the proposed Class are citizens of different states from AdvoCare, (iii) there are more than 100

members of the proposed Class, and (iv) fewer than one-third of the members of the proposed Class are residents of Texas.

16.     The amount in controversy far exceeds $5,000,000.   AdvoCare reportedly generated $719 million in revenues in 2015 and $494 million in 2014.  Most of these revenues came from sales of product to AdvoCare's Distributors.

17.     There are far more than 100 members of the proposed Class.  AdvoCare claims that in 2015, it had more than 623,000 Distributors.  More than 90% of those Distributors lost money.

18.     Fewer than one-third of AdvoCare's Distributors are Texas residents.  AdvoCare markets itself nationally, and its Distributors are located nationwide.

19.     AdvoCare is subject to the personal jurisdiction of this Court.  AdvoCare is a Delaware limited partnership with its principal place of business in Plano, Texas.

20.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1).

### III.     PARTIES

**A.     Plaintiffs**

21.     Plaintiff Lisa Ranieri is, and at all material times was, an individual who resides in the county of Alexandria, in the Commonwealth of Virginia.

22.     Plaintiff Megan Cornelius is, and at all material times was, an individual who resides in the county of San Diego, in the State of California.

**B.     Defendants**

23.     Defendant AdvoCare is a Delaware limited partnership with its principal place of business in Plano, Texas. AdvoCare was founded by Charles Ragus in 1993.  Immediately before founding AdvoCare, Ragus was an officer of Omnitrition International, Inc. ("**Omnitrition**"), a MLM which the U.S. Court of Appeals for the Ninth Circuit determined, based on the summary judgment evidence in the record, bore the characteristics of a pyramid scheme.  *See Webster v.*

6

*Omnitrition Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996). Before Omnitrition, Ragus was one of the top distributors at Herbalife International, Inc. ("**Herbalife**"), a MLM company that recently agreed with the Federal Trade Commission to a $200 million settlement and injunctive relief to remedy and prevent Herbalife's operation of a pyramid scheme.

24.     Defendant Jenny Donnelly is an individual residing in or near Portland, Oregon. She is at or near the top of the pyramid operated and promoted by the Defendants, and she actively participates in, promotes, and profits from AdvoCare's pyramid scheme.

25.     Defendant Tyler DeBerry is an individual residing in Tucson, Arizona. He is at or near the top of the pyramid operated and promoted by the Defendants, and he actively participates in, promotes, and profits from AdvoCare's pyramid scheme.

26.     Defendant Wesley Bewley is an individual residing in Bee Cave, Texas. He is at or near the top of the pyramid operated and promoted by the Defendants, and he actively participates in, promotes, and profits from AdvoCare's pyramid scheme.

27.     Defendant Daniel McDaniel is an individual residing in Coppell, Texas. He is at or near the top of the pyramid operated and promoted by the Defendants, and he actively participates in, promotes, and profits from AdvoCare's pyramid scheme.

28.     Defendant Dawn Anderson Funk is an individual residing in Cincinnati, Ohio. She is at or near the top of the pyramid operated by the Defendants, and she actively participates in, promotes, and profits from AdvoCare's pyramid scheme.

## IV.     PLAINTIFFS' CLAIMS ARE NOT ARBITRABLE

29.     At all times that Plaintiffs were associated with AdvoCare, the AdvoCare "**Distributor Agreement**" set forth the terms and conditions of the contractual relationship between AdvoCare and its Distributors. The Distributor Agreement incorporated by reference

AdvoCare's "Policies, Procedures and the Compensation Plan" (the "**Policies**").  The Distributor

Agreement and the Policies were uniform as to all Distributors.  They were take-it-or-leave-it

documents, and the Distributors (including Plaintiffs) had no opportunity to bargain regarding their

terms.

      30.    The Distributor Agreement provided that the Distributor Agreement and the

Policies together constituted the "**Contract**" between the parties, provided that AdvoCare could

change the Policies (and thus the Contract) as it wished, and provided that the Policies controlled

in the face of a conflict with the Distributor Agreement:

> **Policies Incorporated into Distributor Agreement**.  This Agreement
> incorporates by reference the AdvoCare [Policies], in their current form and as
> amended periodically at the sole discretion of AdvoCare.  Together the Distributor
> Agreement and the Policies, as they may be amended, constitute the contractual
> agreement ("Contract") between AdvoCare and each Distributor. …  By executing
> this Agreement, Distributor agrees to abide by all terms of the Contract, including
> the current version of the Policies and all modifications and amendments thereto.
> It is the responsibility of each Distributor to read, understand, adhere to, and ensure
> that he or she is aware of and operating under the most current version of the
> Policies.  The most current version of the Policies is available online through the
> Distributor Microsite and is effective upon posting by AdvoCare.  AdvoCare
> reserves the right to amend the Policies in its sole discretion.  The continuation of
> a Distributor's AdvoCare business following the posting of amended Policies,
> including but not limited to Distributor's acceptance of compensation under the
> Compensation Plan, shall constitute acceptance of all amendments to the Policies.
>
> . . .
>
> The Contract may not be altered or amended except as provided in the Policies as
> amended from time to time or by other written notice by AdvoCare. . . . Should any
> discrepancy exist between the terms of the AdvoCare Distributor Agreement and
> the Policies, the terms of the Policies will prevail.[1]

---

[1] Distributor Agreement at 1 [Appx. P. 0001].  AdvoCare may have used an earlier version of the Distributor
Agreement at some point during the period four years preceding the filing of this Complaint, but, on
information and belief, the earlier version is identical in every relevant respect to the version included in the
Appendix accompanying this Complaint.

31.     AdvoCare used at least four versions of the Policies within four years of the filing of this Complaint and while the Plaintiffs were active AdvoCare Distributors.  These versions were dated October 6, 2011 (Appx. P. 0011-36); January 25, 2013 (Appx. P. 0037-64); May 21, 2015 (Appx. P. 0065-97); and March 11, 2016 (Appx. P. 0098-130).    Each version confirmed AdvoCare's ability to amend the Contract as it wished.  The October 6, 2011, and January 25, 2013, versions of the Policies provided, "The Contract may not be altered or amended except as provided in the [Policies] as amended from time to time or by other written notice by AdvoCare."[2]

32.     The May 21, 2015, and March 11, 2016, versions of the Policies had a similar provision allowing AdvoCare to change its contract with the Distributors as AdvoCare wished:

> The [Policies], in their current form and as amended periodically at the sole discretion of [AdvoCare], are incorporated into the AdvoCare Distributor Agreement.  It is the responsibility of each AdvoCare Independent Distributor ("Distributor") to read, understand, adhere to, and ensure that he or she is aware of and operating under the most current version of these Policies.  The most current version of the Policies is available online through your Distributor Microsite . . . and is effective upon posting by AdvoCare.  AdvoCare reserves the right to amend the Policies in its sole discretion.  By executing the AdvoCare Distributor Agreement, each Distributor agrees to abide by all amendments or modifications AdvoCare makes.  The continuation of a Distributor's AdvoCare business following the posting of amended Policies, including but not limited to a Distributor's acceptance of compensation under the Compensation Plan, shall constitute acceptance of all amendments to the Policies.
>
> . . .
>
> Any violation of the Policies may result in disciplinary action including probation, suspension and/or termination at the sole discretion of AdvoCare.[3]

33.     The Distributor Agreement in place at all times during the class period contained a provision (the "**Arbitration Provision**") that purported to require that all disputes between AdvoCare and any Distributor be arbitrated:

---

[2] *See* Policies, Procedures and the Compensation Plan (10/6/11) ("**Policies (10/6/11)**") at 15 [Appx. P. 0025]; Policies, Procedures and the Compensation Plan (1/25/13) ("**Policies (1/25/13)**") at 17 [Appx. P. 0053].

[3] Policies, Procedures and Compensation Plan (3/11/16) ("**Policies (3/11/16)**") at 5 [Appx. P. 0102].

EXCEPT AS MAY BE PROVIDED OTHERWISE BY THESE POLICIES, ANY CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THE CONTRACT, WHETHER SUCH CLAIM ARISES IN TORT, CONTRACT, EQUITY, OR OTHERWISE, SHALL BE RESOLVED BY BINDING AND CONFIDENTIAL ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION IN ACCORDANCE WITH ITS THEN EXISTING COMMERCIAL ARBITRATION RULES BEFORE A SINGLE ARBITRATOR.[4]

34.    The May 21, 2015, and March 11, 2016, versions of the Policies included a provision identical to the Arbitration Provision found in the Distributor Agreement.[5] Prior to the May 21, 2015, version of the Policies, only the Distributor Agreement addressed dispute resolution.

35.    On May 18, 2016, after Plaintiffs' distributorships were suspended or terminated, AdvoCare changed the Arbitration Provision in the Policies to provide that amendments to the Arbitration Provision (unlike amendments to other parts of the Policy), would apply only prospectively, not retrospectively, would be effective fourteen days after posting, and would not apply to any claim for which a Distributor has provided AdvoCare written notice.[6] This limitation on AdvoCare's ability to amend the arbitration provision was not in any prior version of the Policies.  The Contracts as defined by the Distributor Agreement and the October 6, 2011, January 25, 2013, May 21, 2015, and March 11, 2016, versions of the Policies all allowed AdvoCare to change the Contract, including the Arbitration Provision, at will, without notice, prospectively, and retrospectively.

36.    Because AdvoCare had the ability to modify its Contract, including the Arbitration Provision, as it wished until May 18, 2016, the Arbitration Provision set forth in the Distributor

---

[4] Distributor Agreement at 7 [Appx. P. 0007].
[5] *See* Policies, Procedures and Compensation Plan (5/21/15) ("**Policies (5/21/15)**") at 21-23 [Appx. P. 0085-87]; Policies (3/11/16) at 21-23 [Appx. P. 0118-120].
[6] *See* Policies, Procedures and Compensation Plan (5/18/16) ("**Policies (5/18/16)**") at 20 [Appx. P. 0153].

Agreement and in the May 21, 2015, and March 11, 2016, versions of the Policies is illusory and unenforceable.

## V.    FACTUAL ALLEGATIONS

### A.    ADVOCARE OPERATES A PYRAMID SCHEME

37.     The essential characteristic of a pyramid scheme is the compensation of participants primarily derived from participants' payments into the scheme and based on participants' recruitment of new participants into the scheme.  Little outside money comes into the scheme.  The participants, knowingly or not, just feed off each other's money and are highly incentivized to bring new participants into the scheme. AdvoCare's business model fits this description perfectly.

38.     AdvoCare's Contract contains a "**Compensation Plan**."[7]  The Contract requires Distributors to pay AdvoCare initial and annual fees to access the Compensation Plan, and through its bonuses, the Compensation Plan encourages and, as a practical matter, requires Distributors to pay AdvoCare more money through the purchase of products to receive compensation.  This is how AdvoCare entices its pyramid scheme participants to pay money into the scheme.  *See infra* Section V.A.1.

39.     In addition, for reasons discussed herein, Distributors are unable to make any significant retail sales directly to non-Distributors, and extremely few retail sales are made directly by AdvoCare.  Thus, the only meaningful source of compensation for AdvoCare and the Distributors is other Distributors' money.  *See infra* Section V.A.2.

40.     To avoid scrutiny from the Federal Trade Commission and similar state regulators, and to avoid liability in court, AdvoCare has adopted a few rules it hopes will obscure the fact that

---

[7] The March 11, 2016, version of the Policies, Procedures and Compensation Plan sets forth the Compensation Plan at pages 25-33 [Appx. P. 0122-130].  The rules and structure of the Compensation Plan are identical in every significant way in the four versions of the Policies at issue in this Complaint.  Unless otherwise noted, for ease of reference, the Complaint herein cites to the March 11, 2016, version.

its Distributors are simply feeding off each other.  But these rules are just smokescreens that cannot change the fact that AdvoCare operated a pyramid scheme.  *See infra* Section V.A.3.

41.    The fact is that the large majority of Distributors lose money from their participation in AdvoCare's pyramid scheme, while a few Distributors at the top of the pyramid—like the Individual Defendants here—and AdvoCare grow rich.  *See infra* Section V.A.4.

**1.    AdvoCare's Complicated Compensation Plan Requires Distributors to Pay Fees and Incentivizes Distributors to Purchase Unneeded Product and to Recruit New Distributors**

**a.    AdvoCare requires Distributors to pay fees to participate in AdvoCare's Compensation Plan**

42.    To become an AdvoCare Distributor, a person must purchase a "**Distributor Kit**" and sign a Distributor Agreement.[8]  During the time relevant to the Complaint, the Distributor Kit cost either $59 or $79.  A person cannot become a Distributor without purchasing a Distributor Kit.

43.    Distributors receive the following rights and privileges:

(1)  To purchase products directly from AdvoCare at a discounted price;

(2)  To participate in the AdvoCare Compensation Plan (receive commissions and bonuses, if eligible);

(3)  To sponsor other individuals as Distributors, and build a downline organization;

(4)  To receive AdvoCare communications and literature;

(5)  To participate in AdvoCare-sponsored training, motivational and recognition events upon meeting qualifying criteria and payment of appropriate charges, if applicable;

(6)  To participate in AdvoCare-sponsored incentive trips and programs, if eligible;

(7)  To earn a profit on Retail Sales, if eligible;

---

[8] Policies (3/11/16) at 6 [Appx. P. 0103].

(8)  To earn a profit from Wholesale Commissions, if eligible; and

(9)  To have an opportunity to advance to the Advisor level and be eligible to earn Overrides and Leadership Bonuses upon fulfilling requirements set forth in Section II: Compensation Plan.[9]

44.    AdvoCare's Policies also require the payment of a $50 annual "**Renewal Fee**."[10] If a Distributor fails to renew, AdvoCare can terminate the Distributor, precluding him from participating in the AdvoCare Compensation Plan.[11]  Termination results in the Distributor's loss of his status earned prior to termination, and if the Distributor reenrolls, he does so at the bottom of the pyramid.[12]

### b.    Basic terminology relevant to understanding AdvoCare's Compensation Plan

45.    The payments made for the Distributor Kit and the Renewal Fee, however, represent only a small portion of the payments Distributors make to AdvoCare.  The primary tool AdvoCare uses to bilk Distributors is the sale of its products to Distributors.  The structure of AdvoCare's Compensation Plan encourages Distributors to purchase more product than they can profitably sell at retail so that the Distributors will remain eligible for various forms of AdvoCare compensation.  Understanding how AdvoCare manipulates and incentivizes its Distributors requires understanding how AdvoCare's complicated Compensation Plan works.

46.    A basic concept in AdvoCare (and any MLM) is the "**Downline**": the branching stream of junior Distributors whose entry into AdvoCare ultimately links back to a particular Distributor.

47.    One of the key distinctions in the Compensation Plan is between run-of-the-mill Distributors and "**Advisors**."  Most of the income-generating opportunities supposedly offered by

---

[9] *Id.* at 6 [Appx. P. 0103].
[10] *Id.* at 7 [Appx. P. 0104].
[11] *Id.*
[12] *Id.* at 21 [Appx. P. 0118].

AdvoCare are available only to Distributors at the Advisor level. Distributors can graduate to Advisor level in the AdvoCare system upon generating a certain level of product purchases (personally or through junior Distributors). Distributors will lose their Advisor status if they fail to maintain these levels. All Advisors are Distributors, but not all Distributors are Advisors.

48.     The Compensation Plan offers three primary types of bonuses, each of which encourages purchasing more product than a Distributor wants for personal consumption or can sell profitably, and each of which encourages recruiting: "**Wholesale Commissions,**" "**Overrides,**" and "**Leadership Bonuses**." Each of these is discussed herein. The amount of Wholesale Commissions, Overrides, and Leadership Bonuses available to a Distributor depends upon their ranking within the AdvoCare compensation structure, and a Distributor's ranking is tied to the amount of product sales attributable to a Distributor over particular time periods. In general, the more a Distributor purchases, and the more a Distributor's Downline purchases, the more money AdvoCare pays the Distributor.

49.     The complicated formulas AdvoCare uses to calculate a Distributor's compensation are based on four approaches to measuring the amount of product purchases attributable to a Distributor:[13]

- **P/GV** is Personal Volume and Group Volume combined. P/GV is essentially the retail value of the products purchased by a Distributor and the Distributor's Downline, excluding purchases by junior Advisors and their Downlines.

- **Personal Volume** is the total suggested retail value of the product purchases made by a Distributor, any retail sales made through the Distributor's AdvoCare webpage (known as a "**Microsite**"), and the purchases of each Downline Distributor with a total retail price less than $500 (*i.e.,* purchases by Distributors not trying to become Advisors), excluding purchases by junior Advisors and their Downlines.

---

[13] *See id*. at 26 [Appx. P. 0123].

- **Group Volume** is the total suggested retail value of the product purchases made by Downline Distributors with a retail price of more than $500 (*i.e.*, purchases by Distributors trying to become Advisors), excluding purchases by junior Advisors and their Downlines.

- **Business Volume** is the sum of the purchases made by junior Advisors and their Downlines, measured by values assigned to the purchases by AdvoCare. The Business Volume value is approximately half a product's suggested retail price.

Each of these is generally measured over two-week pay periods.

50.     Finally, one of the harmful effects of pyramid schemes disguised as MLMs is that they encourage participants to purchase more product than they can sell at retail, or to purchase product they otherwise would not, to advance within the MLM ranks to qualify for bigger bonuses. This is known as "**Inventory Loading**."

> c.     **AdvoCare encourages Distributors to recruit and to Inventory Load through its "Wholesale Commissions"**

51.     Upon first entering the AdvoCare system, Distributors are eligible to purchase AdvoCare products at a 20% discount, but the discount can grow to 40%, depending on the Distributor's P/GV.

52.     When a Distributor and her Downline purchases the following amounts of product over any one-to-three pay periods (two to six weeks), measured by P/GV, the following discounts apply:[14]

| P/GV Volume | Discount |
| --- | --- |
| $0-$499 | 20% |
| $500-$1,499 | 25% |
| $1,500-$2,999 | 30% |
| $3,000 or more | 40% |

53.     The ability to purchase product at a greater discount is of little consequence, in and of itself, because Distributors are unable to sell much product at retail for a profit, even with a 40% discount. However, the greater discount may lead to Wholesale Commissions.

---

[14] *Id.* at 27 [Appx. P. 0124].

54.     Wholesale Commissions are based on the idea that AdvoCare will ultimately sell its products to Distributors at a 40% discount off the suggested retail price, but the Wholesale Commission bonus spreads that 40% discount across Distributors.  So, if Distributor A is entitled to a 35% discount, and her junior Distributor B purchases products with his 20% discount, AdvoCare pays Distributor A 15% of the suggested retail value for the products Distributor B purchased.  Some Distributor above Distributor A who is eligible to purchase products at a 40% discount will then get a 5% Wholesale Commission on Distributor B's purchase so that AdvoCare has effectively given a 40% discount on Distributor B's purchase.[15]

55.     The prospect of Wholesale Commissions obviously encourages recruiting: the more recruits a Distributor has, the more potential there is for a Wholesale Commission.

56.     The prospect of Wholesale Commissions also encourages Distributors to purchase product they do not otherwise need or want to increase their P/GV so that they can be eligible for greater discounts and thus greater Wholesale Commissions.

57.     It is theoretically possible that a Distributor can qualify for higher discounts solely through his Downline's purchases.  But the way AdvoCare calculates P/GV ensures that most Distributors must purchase product themselves to qualify for higher discounts.  As explained above, P/GV includes:

- PV:
    - A Distributor's own purchases;
    - The retail sales made at a Distributor's Microsite;
    - The purchases made by Downline Distributors for less than $500 in retail value (excluding purchases by Downline Advisors and their Downlines' purchases); and

- GV:  the purchases made by Distributors for $500 or more in retail value and who are seeking to qualify for Advisor status (excluding purchases by Downline Advisors and their Downlines' purchases).

---

[15] *See generally id.* at 27-28 [Appx. P. 0124-125].

58.     There are very few retail purchases made at Distributors' Microsites.  These are AdvoCare webpages that allow retail customers to order directly from AdvoCare and attribute the purchase to a particular Distributor (much like a customer informing the cashier at a department store which clerk helped him find the sweater he is purchasing).  The customer does not receive a discount for purchasing through a particular Distributor's Microsite, so the customer has little incentive to order through the Microsite.  As for the Distributors, they will want to make retail sales directly to retail customers so they can offload product that they have already purchased from AdvoCare.  In addition, for reasons described herein, few profitable retail sales are made at all, via the Microsites or otherwise.  Thus, retail sales through a Distributor's Microsite is not a reliable source of P/GV.

59.     Distributors may look to purchases by junior Distributors for less than $500 to increase their PV (and thus their P/GV).  However, these purchases exclude those made by Advisors (the people who are most committed to the business and are likely buying the most product) and Distributors in junior Advisors' Downlines.  (AdvoCare compensates Distributors based on the purchases made by junior Advisors and their Downlines via Overrides and Leadership Bonuses, discussed herein.)  Moreover, AdvoCare products range in retail price from $5.95 to $79.95, with most products priced in the $30-$50 range.  Thus, it will require many individual purchases by many Distributors purchasing less than $500 to give a Distributor sufficient P/GV to qualify for the higher discount levels.  It is unlikely that a Distributor can meaningfully fulfill his P/GV requirements to advance to higher discount levels by relying on purchases by junior Distributors, not in a junior Advisor's Downline, purchasing less than $500.

60.     Distributors may look to purchases of $500 or more by junior Distributors who are not already Advisors, and who are not in a junior Advisor's Downline, to increase their GV (and

thus their P/GV). These are purchases by "up-and-comers." This is a limited source of P/GV because it depends on catching Distributors in this transitional phase between Distributor and Advisor.

61. The only reliable source of P/GV for the majority of Distributors is their own purchases. Purchases for normal consumption will be insufficient to meet the thresholds required to qualify for bigger discounts. Reaching just the 30% discount level requires P/GV of $1,500 (measured by the retail price) of AdvoCare products, which is far more than any person could be expected to consume over six weeks. For example, $1,500 purchase of AdvoCare products could include:

| | |
|---|---|
| 3 boxes of AdvoBars (36 bars) | $96 |
| 3 boxes of Slam amino acid supplement (36 bottles) | $107.85 |
| 2 canisters of Muscle Gain protein powder (50 servings) | $159.90 |
| 2 boxes of BioCharge amino acid vitamin (60 servings) | $85.90 |
| 2 canisters of Arginine Extreme supplement (60 servings) | $79.90 |
| 2 canisters of Post-Workout Recovery drink mix (50 servings) | $159.90 |
| 2 canisters of AdvoGreens Powder (40 servings) | $65.90 |
| 1 box of Herbal Cleanse System (10 day supply) | $36.95 |
| 4 boxes of AdvoCare Core supplement (56 day supply) | $203.80 |
| 4 boxes of SleepWorks supplement (48 servings) | $143.80 |
| 6 boxes of Spark supplement (84 servings) | $137.70 |
| 2 pouches of V100 Tropical Chews (120 chews) | $69.90 |
| 4 boxes of AdvoCare Slim appetite suppressant (56 servings) | $119.80 |
| 1 bottle of Fibo-Trim fiber supplement (180 capsules) | $37.95 |
| **Total** | **$1505.25** |

62. Thus, AdvoCare's Wholesale Commissions financially incentivize the Distributors to Inventory Load—to make purchases **not** for the purpose of fulfilling retail demand, and **not** to satisfy their normal desire for nutritional supplements, but rather so that they can increase their P/GV, qualify for greater discounts, and qualify for Wholesale Commissions.

### d. AdvoCare encourages Distributors to recruit and Inventory Load through its Advisor incentives and qualifications

63.     While all Distributors can earn Wholesale Commissions from their recruited Distributors' purchases, becoming an Advisor allows a Distributor to access AdvoCare's most significant bonuses: Overrides and Leadership Bonuses.  AdvoCare's Policies state bluntly that Overrides and Leadership Bonuses are available only to Advisors.

64.     AdvoCare Distributors make the importance of achieving Advisor status clear:

- One website explains that becoming an Advisor "is really the most important step you can make if you are serious about earning an income in AdvoCare."[16]

- One high-ranking Advisor explained that Advisors are individuals "who want life on their terms;"[17] who can earn "anywhere from $1,000 a month to $2,000, $3,000, $5,000 a month really just depending on what their goals are for their family."[18]

- Another high-ranking Advisor states that becoming an Advisor is "the first step to financial freedom."[19]  "Advisor is a starting point."[20]

- Yet another high-ranking AdvoCare Participant explains that "[w]e don't really consider people serious about AdvoCare from a business perspective until they get to the Advisor level."[21]

- An AdvoCare presentation demonstrates that about 98% of AdvoCare earnings is from bonuses based on recruiting, not simply selling AdvoCare products to retail customers—"[i]t is clearly very important if you want to make a lot of money in AdvoCare to have a bunch of Advisors who are working the business."[22]  "There's a saying in AdvoCare:  he with the most Distributors wins."[23]

- As Defendant Crystal Thurber states, Advisor "puts you on the bench to be able to get on the playing field."[24]

---

[16] http://thechampionsvision.blogspot.com/2012/04/our-business-model-is-duplication.html.
[17] https://www.youtube.com/watch?v=rWSWUfT0PEM&t=36s, posted Aug. 23, 2012 (around 3:00 mark).
[18] *Id*. (around 3:00 mark).
[19] https://www.youtube.com/watch?v=8aoFePVEKsA, posted May 11, 2011 (4:30 mark).
[20] https://www.youtube.com/watch?v=WaOAg1plCXc, posted Feb. 23, 2012 (around 2:30 mark).
[21] https://www.youtube.com/watch?v=HQMum2vx2Bc, posted Oct. 13, 2014 (around the 13:20 mark).
[22] *Id*. (around the 16:50 mark).
[23] *Id*. (around the 11:00 mark).
[24] https://www.youtube.com/watch?v=s1mc9zhWDi8, posted on Sept. 3, 2015 (around the 36:00 mark).

65.     The requirements for reaching Advisor ensure, as a practical matter, that Distributors trying to become Advisors must purchase AdvoCare products, and the requirements highly incentivize Distributors to recruit new Distributors (who will purchase products).

66.     To become an Advisor, a Distributor must achieve $3,000 in P/GV over one to three consecutive pay periods.[25]  The same difficulties in achieving P/GV discussed above in relation to earning greater product discounts apply to achieving P/GV for the sake of making Advisor (*see supra* ¶¶ 56-61), but with the Advisor requirement there is an additional hurdle: for every pay period in which the Distributor is seeking to qualify as an Advisor, $500 of the P/GV must be PV. Thus, even if a Distributor had an up-and-comer below him who purchased $3,000 in product to achieve Advisor status in one pay period, that Distributor would still need $500 in PV—meaning the Distributor would likely need to purchase a substantial amount of product himself.

67.     AdvoCare has expressly admitted in its Policies that the Advisor qualification requirements incentivize Distributors to purchase product solely to qualify for Advisor.  In the January 25, 2013, version of the Policies, AdvoCare provided the following examples of how a Distributor can achieve Advisor status (emphases added):[26]

> **Example 1:**  You personally made $400 worth of purchases.  Your down-line Distributor ("Joe") made $450.  Because Joe purchases less than $500 retail value, his Personal Volume rolls into yours, giving you $850.  Since you need at least $500 in Personal Volume to be in qualification for Advisor, you've fulfilled the criteria for this pay period.

> **Example 2:**  At some point during the pay period, Joe figures out he's so close to qualification that he makes a $75 order at 11:30 p.m. the night of the pay period close.  Now Joe is in an Advisor qualifying period ($500 or more in Personal Volume), and his Personal Volume rolls up into your Group Volume, not your Personal Volume.  Your P/GV is $925, but you're not in Advisor qualification.  Why?  Because your Personal Volume is less than $500!  You'll have to start your qualification all over in the next pay period.

---

[25] Policies (3/11/16) at 28 [Appx. P. 0125].
[26] Policies (1/25/13) at 23[Appx. P. 0059].

**Example 3:**  <u>In the previous example, you "lost" $925 toward Advisor qualification because you didn't have at least $500 in Personal Volume.</u>  ***<u>One way to insure this doesn't happen is to purchase at least $500 yourself, as in this example, if you are striving to reach Advisor status.</u>***

**Example 4:**  Here's another way to drive home the point.  In this example, you have $499 in Personal Volume.  But now Joe gets on a hot streak and purchases $2,500 worth of product.  His Personal Volume rolls up to your Group Volume, not your Personal Volume.  You "lose" the value of his $2,500 toward your own qualification because you're a dollar shy of the required $500 in Personal Volume.  ***Just one more dollar and you would have qualified in one period by utilizing Joe's burst of energy!***

You may choose any method you like to achieve Advisor status.  ***These examples point out the practical reasons why you always want to track your volume if you think you're close to qualifying [for] Advisor status <u>– and if necessary, cover the $500 Personal Volume with your own purchases.</u>***

68.    Thus, AdvoCare's own statements explain how the Advisor qualifications, together with the complicated requirements for calculating P/GV, encourage Advisors to purchase product they do not need, solely so that they can qualify as an Advisor.  The bold and italicized portions of the quotes above are express encouragement of Inventory Loading.

69.    The text quoted above comes from the January 25, 2013, version of the Policies, and the same statements are found in the October 6, 2011, version.[27]  However, the May 21, 2015, version attempted to sanitize the examples and removed the portions underlined above, apparently to make it less explicit that the AdvoCare Compensation Plan encourages purchases for the sake of rank advancement.[28]  The March 11, 2016, version of the Policies omitted the examples altogether.[29]  Despite removing the examples, the requirements for advancing to Advisor remained the same, and at all times the Advisor requirements encouraged Distributors to Inventory Load.

---

[27] Policies (10/6/11) at 21 [Appx. P. 0031].
[28] Policies (5/21/15) at 28-29 [Appx. P. 0092-93].
[29] Policies (3/11/16) at 28 [Appx. P. 0125].

70.     The requirements for advancing to Advisor also encourage recruiting.  The more populous a Distributor's Downline, the more likely that the Distributor's P/GV requirements will be met, at least in part, by purchases by junior Distributors.

71.     The Advisor requirements are recurring.  Once a Distributor reaches Advisor, he must requalify every year.  The requirements for requalification are similar to the requirements for initial qualification.[30]

### e.     AdvoCare encourages recruiting and Inventory Loading through its Override bonuses

72.     Once a Distributor becomes an Advisor, she is eligible to earn compensation through Overrides.[31]  As discussed above, Wholesale Commissions allow Distributors to earn income based on their junior Distributors' purchases, but only as to junior Distributors who are entitled to a lower discount.  All Advisors are entitled to a 40% discount, so Distributors cannot earn Wholesale Commissions on junior Advisors' purchases.  Overrides are a way for Distributors with Advisor status to earn money based on purchases made by junior Advisors and their Downlines.

73.     An Override bonus is based on two metrics: the Override percentage to which the Advisor is entitled, and her Downline's Business Volume.

74.     The Override percentage is based on the Advisor's total P/GV per two-week pay period:

| Total P/GV per Pay Period | Override Percentage |
| --- | --- |
| $1,000 and up | 7% |
| $750-999 | 6% |
| $500-749 | 5% |
| $0-499 | 0% |

---

[30] *Id.* at 6 [Appx. P. 0103].
[31] *Id.* at 29 [Appx. P. 0126].

75.     The Override percentage P/GV requirements encourage recruiting and Inventory Loading for the same reason that the P/GV requirements for Wholesale Commissions and Advisor status encourage recruiting and Inventory Loading. *See supra* ¶¶ 56-61, 65-57.   The Override percentage requirements are in one respect more onerous because they require that certain levels of P/GV be reached every two weeks.

76.     An Advisor's Business Volume is based on the purchases of junior Advisors and their Downlines.   For Overrides, Business Volume is calculated for up to three generations of junior Advisors.  AdvoCare assigns a value to these purchases that is roughly half the retail price of the products purchased.[32]   AdvoCare provides the following example:[33]



77.     The way AdvoCare calculates Business Volume encourages recruiting.   The more populous a Distributor's Downline, the more opportunity there is for a junior Distributor to become an Advisor and accumulate Business Volume.   Because the bonus only extends through three generations

---

[32] https://advocarecorporate.s3.amazonaws.com/microsite/downloads/pdf/
PresentationGuideCompensation201504.pdf (slide 12).
[33] https://advocarecorporate.s3.amazonaws.com/microsite/downloads/pdf/
PresentationGuideCompensation201504.pdf (slide 13).

of Advisors, Advisors are encouraged to consistently keep recruiting Advisors directly under them, each time creating a new generation.

### f. AdvoCare encourages recruiting and Inventory Loading through its Leadership Bonuses

78.    Through Leadership Bonuses, like Overrides, AdvoCare rewards Distributors based on the product purchased by junior Advisors and their Downlines.  Unlike Overrides, Leadership bonuses can be paid over a Distributor's whole Downline (not just through three levels).

79.    There are eleven levels of Leadership Bonuses,[34] and AdvoCare's requirements for achieving each of these levels encourage recruiting and/or Inventory Loading.   The first requirement is that a Distributor must be an Advisor.  As discussed above (*see supra* ¶¶ 64-69), the requirements for making Advisor status encourage recruiting and Inventory Loading.

80.    The second requirement is that a Distributor accrues P/GV of $1,000 or more in the pay period for which a Leadership Bonus is sought.  As discussed above (*see supra* ¶¶ ¶¶ 54-61), accumulating P/GV encourages both recruiting and Inventory Loading.

81.    The third requirement regards the amount of Override the Distributor is entitled to, and the fourth requirement regards the number of "legs" contributing at least $100 of Override to the Distributor's Override bonus.  A "**Leg**" is an immediately junior Distributor and his Downline. A Distributor can have multiple Legs in his Downline, depending on how many Distributors he has directly recruited.   The following slide used to train Distributors shows a top Distributor ("You") with three Legs in a Downline:[35]

---

[34] *See* Policies (3/11/16) at 29-32 [Appx. P. 0126-129] (describing Leadership Bonus structure).
[35] https://www.youtube.com/watch?v=HQMum2vx2Bc, posted Oct. 13, 2014 (around 27:30 mark).



82.     A Leadership Bonus is a percentage of the Business Volume of all Downline Advisors.  So, for example, the "Ruby 6 Star Leadership Bonus" entitles a qualifying Advisor to 11 percent of the Business Volume of all Downline Advisors, with one caveat: if a Downline Advisor is also entitled to a Leadership Bonus, then that Advisor's Leadership Bonus will reduce the senior Advisor's Leadership Bonus by the amount of the junior Advisor's Leadership Bonus. (So, if Advisor A is entitled to an 11 percent Leadership Bonus, but Downline Advisor B is entitled to a 7 percent Leadership Bonus, then Advisor A earns 11 percent on all Advisor Business Volume "upline" of Advisor B but only 4 percent Downline from Advisor B.)

83.     The Override and Leg requirements, and the bonus percentages, for the different Leadership Bonuses are as follows:

| Name | Override Requirement | Number of Legs Contributing at Least $100 to Override | Bonus |
|------|---------------------|------------------------------------------------------|-------|
| Silver | $100 | None | 3% |
| Gold | $500 | None | 5% |
| Gold 3 Star | $500 | 3 | 7% |
| Ruby | $1,000 | 3 | 9% |
| Ruby 6 Star | $1,000 | 6 | 11% |
| Emerald | $2,000 | 6 | 13% |
| Emerald 9 Star | $2,000 | 9 | 15% |
| Diamond | $4,000 | 12 | 19% |
| Platinum | $8,000 | 18 | 19.25% |
| Double-Diamond | $12,000 | 24 | 19.50% |
| Triple-Diamond | $24,000 | 36 | 19.75% |

84.     The Override requirements for the Leadership Bonuses encourage Inventory Loading because Override is driven in part by a Distributor's P/GV, which is driven in part by the Distributor's personal purchases.  *See supra* ¶¶ 50-61.  The possibility of Leadership Bonuses provides a strong incentive for Distributors to buy product to increase their P/GV so that they can have the highest Override percentage, which will lead to higher Leadership Bonuses.

85.     The Override requirements for the Leadership Bonuses also strongly encourage recruiting, and not just recruiting of Distributors, but the recruiting of and encouraging of Distributors who will themselves become recruiters.

86.     The same is true of the Leg requirements, but even more so.  To achieve the higher Leadership Bonus levels, a Distributor must have many Distributors at the Advisor level working beneath her and developing their Downlines that contribute at least $100 to the Distributor's Override bonus.  This encourages the Distributor to not only recruit, but also to encourage junior Distributors to achieve Advisor status and to recruit.

        **g.     AdvoCare encourages recruiting and Inventory Loading through promotional bonuses**

87.     From time to time, AdvoCare runs promotional bonuses to further incentivize Distributors to recruit more Distributors.  During the Class Period, AdvoCare offered Distributors

the ability to earn a $500 "**Rookie Bonus**" by (1) reaching Advisor level, (2) recruiting three new Distributors during the Distributor's first six pay periods, and (3) accumulating $3,000 in P/GV over these first six pay periods, excluding the Distributor's personal purchases.



88.    Defendant McDaniel explained with the help of the chart below that the point of Rookie Bonuses was to increase a Distributor's downline quickly by providing financial incentives directly and explicitly for recruiting.  The Rookie Bonus encouraged Distributors to become Advisors and recruit quickly, and also encouraged Downline Distributors to become Advisors and recruit quickly (and so on):



89.    Defendant Thurber called the Rookie Bonus "ingenious" because "AdvoCare is about multiplication," which the Rookie Bonus incentivizes.[36]    Because only Advisors were eligible for the Rookie Bonus, the Rookie Bonus also encouraged Inventory Loading, for the same reasons the qualifications for Advisor encouraged Inventory Loading.

90.    In the Spring of 2014, AdvoCare offered a "line of two" promotion, specifically to "add advisors."    This promotion allowed two Distributors to achieve the Advisor rank if one Distributor bought $1,500 of product in one order and recruited another Distributor to do the same during the same pay period.

**h.    AdvoCare's and the Individual Defendants' statements confirm that AdvoCare's business is based on recruiting**

91.    As discussed above, AdvoCare's Compensation Plan overwhelmingly rewards recruiting and encourages Distributors to Inventory Load.  AdvoCare's own training materials explain that the key to succeeding in AdvoCare is recruiting:

---

[36] https://www.youtube.com/watch?v=H9uZm5ePZnI, posted Dec. 23, 2014 (around the 50:00 mark).



92.     Charlie Ragus, AdvoCare's founder, stated in an article about the AdvoCare business that "[w]ithout question, recruiting new, quality distributors into your AdvoCare organization is the single most important aspect of distributorship building."[37]

93.     Defendant McDaniel has instructed AdvoCare Distributors on the nature of the business: "We get paid for width and depth as we recruit and help Advisors build their businesses."[38]

       **i.      AdvoCare's Income Disclosure Statement confirms the importance of recruiting**

94.     The fact that recruiting is the focus of AdvoCare's business model is further evidenced by the company's 2014 Income Disclosure Statement:

---

[37] Charlie Ragus, "Developing Your Natural Market," at p. 2
     (http://advoarmy.com/schedule/02261716pm_Developing%20your%20Warm%20Market%20%20Charlie%20R agus.pdf).
[38] https://www.youtube.com/watch?v=ok458Q5dHks&t=2237s, posted Aug. 24, 2014 (30:20 mark).

## Income
## Disclosure Statement

| | Distributors by Pay Level | | Monthly Income by Pay Level[‡] | | | Yearly Income by Pay Level[‡] |
|---|---|---|---|---|---|---|
| Pay Level[*] | % of Active Distributors[**] | Average Months to Reach | Top 10% | Average | Bottom 10% | Annualized Average[††] |
| Distributor | 34.52% | - | $280 | $69 | $6 | $831 |
| Advisor | 58.04% | - | $747 | $183 | $16 | $2,190 |
| Silver | 4.70% | 14 | $2,225 | $1,068 | $430 | $12,817 |
| Gold | 1.34% | 25 | $8,110 | $3,204 | $1,615 | $38,444 |
| Gold 3 Star | 0.31% | 26 | $5,086 | $3,509 | $2,341 | $42,104 |
| Ruby | 0.58% | 34 | $13,154 | $7,154 | $4,466 | $85,848 |
| Ruby 6 Star | 0.06% | 39 | $11,449 | $8,787 | $6,340 | $105,447 |
| Emerald | 0.21% | 49 | $27,819 | $16,567 | $11,197 | $198,801 |
| Emerald 9 Star | 0.09% | 60 | $41,057 | $24,745 | $15,269 | $296,935 |
| Diamond | 0.12% | 71 | $91,411 | $53,079 | $30,620 | $636,953 |
| Platinum & Above | 0.03% | 134 | $319,598 | $98,796 | $68,206 | $1,185,555 |

[*] Pay Level is sorted by Discount Level and/or Leadership Pin Level. Distributor compensation is outlined further in the AdvoCare Policies, Procedures, and Compensation Plan.
[**] Active Distributor is anyone that earned a check in 2014 (154,819 total Distributors). The overall number of Distributors on December 31, 2014 was 517,966.
[‡] AdvoCare pays Distributors who earn a check semi-monthly. Distributors may receive up to 24 checks per year. The numbers represent the average monthly earnings as well as the average top and bottom 10% earnings of that Pay Level in 2014.
[††] The Annualized Average earnings are calculated based on the assumption that the Distributor gets paid at this Pay Level. The average annual income for all Active Distributors in 2014 was $1,610.

| Total Payments from AdvoCare in 2014 | $1 - $1,000 | $1,001 - $5,000 | $5,001 - $10,000 | $10,001 - $25,000 | $25,001 - $50,000 | $50,001 - $100,000 | $100,001 - $250,000 | > $250,000 | Total |
|---|---|---|---|---|---|---|---|---|---|
| No. of Distributors | 131,141 | 18,327 | 2,545 | 1,597 | 588 | 303 | 205 | 113 | 154,819 |

NOTE: This includes earnings from pay periods ending between 1/1/14 and 12/31/14
AdvoCare Distributors can earn compensation pursuant to the AdvoCare Compensation Plan in the form of wholesale commissions, overrides, and leadership bonuses. The amounts above do not include the income realized by Distributors from the retail sale of products or incentive bonuses, so the actual compensation earned may be higher.
The earnings shown above are not necessarily representative of the income, if any, that an AdvoCare Distributor can or will earn through his or her participation in the AdvoCare Compensation Plan. These figures should not be considered as guarantees or projections of your actual earnings or profits. Success with AdvoCare results only from successful sales efforts, which require hard work, diligence, and leadership. Your success will depend upon how effectively you exercise these qualities.

95.     The average monthly gross income (not counting money paid to AdvoCare and any earnings from theoretical retail sales) of "active" Distributors (Distributors who had received some compensation from AdvoCare in 2014) yet to reach the rank of Advisor was only $69. Even Advisors received only $183 on average.

96.     But once a Distributor reaches the Silver level, his income jumps significantly because a Distributor cannot obtain the Silver level without earning Override bonuses (*see supra* ¶¶ 71-76), and there are no Override bonuses without recruiting. The escalation in the average monthly incomes tracks the requirements for advancement relating to recruiting—the increase in Leg requirements and Override bonus requirements for receiving Leadership Bonuses. *See supra* ¶¶ 77-85.

97.    These advancements in income are completely unrelated to increases in a Distributor's retail sales.  As discussed above, the P/GV requirements are the same for all Leadership Bonus levels from the bottom level—Silver—on up: a P/GV accumulation of $1,000 per pay period.  Thus, how much product a Distributor buys (and thus how much product a Distributor theoretically sells) has no bearing on advancement up the Leadership Bonus ranks. These salary increases are all tied to recruiting.

98.    One of AdvoCare's own high-ranking Distributors illustrates the break-down in high-ranking Distributors' AdvoCare income:[39]



99.    This slide shows that 98% of an average Diamond-level Distributor's earnings come from Overrides and Leadership Bonuses.  And as discussed above, Overrides and Leadership Bonuses are driven primarily by recruiting.  Thus, AdvoCare incentivizes recruiting far more than it rewards retail sales.

---

[39] https://www.youtube.com/watch?v=HQMum2vx2Bc, posted Oct. 13, 2014 (around 11:40 mark).

2.    **Distributors Make Few Retail Sales**

100.    As discussed above, AdvoCare's Compensation Plan requires and incentivizes Distributors to pay AdvoCare more and more money.  AdvoCare requires Distributors to purchase Distributor Kits and pay Annual Fees.  Then every form of compensation paid by AdvoCare to Distributors—Wholesale Commissions, Advisor qualifications, Overrides, Leadership Bonuses, and even promotional bonuses—encourage Distributors to purchase enough product so that they will retain their statuses.  Indeed, to achieve these bonuses, as a practical matter Distributors must purchase more product.

101.    Moreover, as discussed above, every form of compensation paid by AdvoCare incentivizes recruiting—bringing more Distributors into the scheme.   In fact, Wholesale Commissions, Overrides, and Leadership Bonuses are payable only if a Distributor has recruited new Distributors.

102.    Thus, just like a classic pyramid scheme, the AdvoCare scheme requires participants to put money into the scheme and rewards participants who bring in new participants.

103.    And as discussed in this section, just like a classic pyramid scheme, AdvoCare pays Distributors with other Distributors' money.  This is undeniably true because AdvoCare itself makes few retail sales.  During the class period, the overwhelming majority of the money flowing in to AdvoCare came from the Distributors, so the overwhelming majority of the money AdvoCare used to pay Distributors came from the Distributors.

104.    It is theoretically possible that Distributors could sell the product they purchased at retail for a profit, just as it is theoretically possible that the hypothetical participant in the toothpick scheme described above could sell individual toothpicks for more than $100 each.  But, for the

reasons discussed herein, only in rare circumstances are AdvoCare Distributors able to profitably sell the products they purchased from AdvoCare.

105.    And, in fact, AdvoCare has little interest in retail sales.  The compensation it pays its Distributors is tied to the Distributors' purchases, not the Distributors' retail sales.  AdvoCare has little interest in retail sales because its true customers are the Distributors—the people willing to pay the price AdvoCare charges for its overpriced, non-special products so that they can access AdvoCare's Compensation Plan.

### a.    Virtually all the money AdvoCare paid Distributors came from other Distributors

106.    AdvoCare has recently begun selling its product to non-Distributors at a 20% discount off retail prices (after these retail customers pay a $19.95 annual fee).  But before that program began in late 2016, the only sales AdvoCare made directly to non-Distributors came when customers ordered product through Distributors' Microsites.

107.    As discussed above, sales through Distributors' Microsites are minimal.  *See supra* ¶¶ 56-57.  AdvoCare has no significant sources of income other than payments from Distributors.  Thus, virtually all its cash comes from Distributors, and virtually all the money it pays to Distributors comes from the Distributors.

### b.    Very few Distributors can profitably sell AdvoCare products to retail customers under the restrictions AdvoCare places on Distributors

108.    Plaintiffs were not able to profitably sell the AdvoCare products they purchased.  Their experiences are consistent with the experiences of many other Distributors.  An ESPN article also indicates that profitable retail sales are rare:

> Like many distributors, [Lori] Crossan found it hard to sell the products. She says she moved only three 24-Day Challenges over the course of a year, two of which went to her sister, so she tried to recruit other advisors.

33

…

Several distributors told ESPN that they did sell some products. But most said they—and their superiors—put far more effort into recruiting. "It's absolutely 100 percent the business opportunity. No one falls in love with the product," says [Shereef] Kamel, who estimates that less than 5 percent of his downline turned a profit.[40]

109.    Distributors are unable to consistently sell AdvoCare products for a profit for many reasons.  First, the products are overpriced.  Interchangeable products are available online or in brick-and-mortar stores for amounts far less than AdvoCare's suggested retail price, and even lower than its wholesale prices.  For example:

- AdvoCare's Muscle Gain protein powder has a retail price of $79.95 a canister, which supposedly provides 25 servings, with 25 grams of protein in each serving ($3.20 per serving).  Low-level Distributors may buy the canister at a 20% discount for $63.96 ($2.56 per serving).  Higher-level Distributors with a 40% discount pay $47.97 ($1.92 per serving).

  Mutant PRO 100 protein powder retails at $29.99 a canister on Amazon.  It purports to provide 25 grams of protein per serving, and its canister contains 71 servings ($0.42 per serving).

  Muscle Pharm Combat Powder retails at $33.13 per canister on Amazon.  It purports to provide 25 grams of protein per serving, and its canister contains 52 servings ($0.63 per serving).

  Jym Pro Protein retails at $57.99 per canister at GNC.  It purports to provide 24 grams of protein per serving, and its canister contains 51 servings ($1.14 per serving).

- AdvoCare's AdvoBar DB9 has a retail price of $32.95 for a box of 12 ($2.75 each). Low-level Distributors may buy the box at $23.36 with their 20% discount ($1.95 per bar).  Higher-level Distributors may buy the box at $19.77 with their 40% discount ($1.65 per bar). AdvoCare claims these bars provide 7 grams of fat, 23 grams of carbohydrate, and 12 grams of protein.

  thinkThin High Protein Bars retail at $14.60 on Amazon for a box of 10 ($1.46 per bar).  The nutritional information provided states that these bars provide 9 grams of fat, 24 grams of carbohydrate, and 20 grams of protein.

---

[40] Mina Kims, "Drew Brees Has a Dream He'd Like to Sell You" (March 15, 2016) (http://www.espn.com/espn/feature/story/_/id/14972197/questions-surround-advocare-nutrition-empire-endorsed-saints-qb-drew-brees) (the "**ESPN Article**").

Simply Protein Bars retail at $24.99 on Amazon for a box of 15 ($1.67 per bar). The nutritional information provided states that these bars provide 5 grams of fat, 16 grams of carbohydrate, and 15 grams of protein.

GNC Total Lean Bars retail for $6.99 for a box of 5 ($1.40 per bar). The nutritional information provided states that these bars provide 6 grams of fat, 24 grams of carbohydrate, and 15 grams of protein.

- AdvoCare's BioCharge amino acid vitamin supplement has a retail price of $42.95 for a box of 30 servings ($1.43 per serving). Low-level Distributors may buy the box at $34.26 with their 20% discount ($1.14 per serving). Higher-level Distributors may buy the box at $25.77 with their 40% discount ($0.86 per serving). AdvoCare claims these each serving contains 3 grams of BCAAs.

Infinite Labs BCAA supplement retails at GNC for $26.99 a canister. Each canister contains 40 servings ($0.67 per serving). The nutritional information provided states that each serving provides 3 grams of BCAAs.

Muscle Pharm's BCAA supplement retails on Amazon for $16.58 per canister. Each canister contains 30 servings ($0.55 per serving). The nutritional information provided states that each serving provides 6 grams of BCAAs.

110.    Second, AdvoCare's products themselves are available online for the wholesale price or less.

| Product | Retail | Distributor | Advisor | Ebay (Sold Price) | Craigslist |
|---|---|---|---|---|---|
| MNS® 3 14 day supply | $45.95 | $36.76 | $27.57 | $26.00 | $20.00 |
| MNS® C (control)† | $43.95 | $35.16 | $26.37 | $20.50 | $20.00 |
| MNS® E (energy)† | $43.95 | $35.16 | $26.37 | $30.99 | $20.00 |
| Carb-Ease® Plus | $37.95 | $30.36 | $22.77 | $29.99 | $19.00 |
| ThermoPlus® | $31.95 | $25.56 | $19.17 | $18.50 | $16.00 |
| AdvoCare Slim® | $29.95 | $23.96 | $17.97 | $16.00 | |
| Meal Replacement Shake | $44.95 | $35.96 | $26.97 | $1.00 | $10.00 |
| Fibo-Trim™ | $37.95 | $30.36 | $22.77 | $14.50 | $19.00 |
| Spark®(pouches) | $22.95 | $18.36 | $13.77 | $8.50 | $10.00 |
| Spark (can) | $51.95 | $41.56 | $31.17 | $39.00 | $13.00 |
| AdvoCare Rehydrate®(14) | $19.95 | $15.96 | $11.97 | $2.99 | $11.00 |
| V16™ | $38.95 | $31.16 | $23.37 | $22.00 | |
| AdvoBar® Meal | $31.95 | $25.56 | $19.17 | $18.00 | |
| Coffeccino® | $38.95 | $31.16 | $23.37 | $20.00 | |
| AdvoGreens™ Snack Shake | $39.95 | $31.96 | $23.97 | $21.99 | |

| Product | Retail | Distributor | Advisor | Ebay (Sold Price) | Craigslist |
|---|---|---|---|---|---|
| AdvoGreens™ Greens Powder | $32.95 | $26.36 | $19.77 | $7.00 | |
| AdvoCare® Fiber | $16.95 | $13.56 | $10.17 | $8.50 | |
| OmegaPlex® | $21.95 | $17.56 | $13.17 | $10.50 | $11.00 |
| SleepWorks® | $35.95 | $28.76 | $21.57 | $20.00 | |
| AdvoCare Oasis™ | $27.95 | $22.36 | $16.77 | $10.50 | |
| Arginine Extreme™ | $39.95 | $31.96 | $23.97 | $18.50 | |
| BioCharge® | $42.95 | $34.36 | $25.77 | $12.50 | |
| O2 GOLD® | $38.95 | $31.16 | $23.37 | $16.99 | $19.50 |
| Muscle Strength™ | $41.95 | $33.56 | $25.17 | $19.50 | |
| Post-Workout Recovery | $79.95 | $63.96 | $47.97 | $39.00 | |
| AdvoCare Workout Series CU24™ Level 2 | $39.95 | $31.96 | $23.97 | $9.99 | |

111.    That these products are sold at or below the Advisor price makes it difficult for Distributors to sell the products for a profit.  AdvoCare has brought legal actions to try to stop its Distributors and others from selling product on Ebay and other platforms, but the fact remains that AdvoCare products are available at or below even the 40% discount price.  Moreover, many of these sales are likely made by current or former Distributors desperately trying to offload excess product at whatever price they can get, which further supports the propositions that Distributors Inventory Load and that the AdvoCare products are overpriced.

112.    Third, AdvoCare contractually prohibits Distributors from selling the products in the only fora where Distributors could reasonably expect to sell enough product to make a meaningful profit: the internet.  The March 11, 2016, version of the Policies provide as follows:

> In order to maintain AdvoCare's premium brand images [*sic.*] and business goodwill, as well as to preserve the unique aspects of the sales channels in which AdvoCare's products are sold, including person-to-person interaction that is essential to AdvoCare's business model, Distributors are prohibited from selling or advertising the sale of Products on e-commerce sites or auction sites, websites trading in products or services using the internet.  Some examples of these prohibited websites include, but are not limited to: eBay, Amazon or Craigslist.[41]

---

[41] Policies (3/11/16) at 14 [Appx. P. 0111].

36

113.    In addition, AdvoCare forbids its Distributors from selling AdvoCare products at almost all brick-and-mortar establishments.[42]  AdvoCare seeks to limit the Distributors to one-on-one situations in private locations (such as the Distributor's or a friend's home), but achieving significant, profitable retail sales by this method is extremely difficult.

114.    The Policies further provide that "Distributors are prohibited from selling Products on social media sites or their personal website."[43]  These prohibitions bar Distributors from accessing the most obvious and effective means of selling AdvoCare products.

115.    Plaintiffs do not contend that Distributors make no profitable retail sales at all.  But Plaintiffs do allege that relatively little of the funds used to compensate Distributors—including both money paid them by AdvoCare and proceeds from retail sales—comes from retail sales, and the vast majority comes from Distributors' payments to AdvoCare.  Thus, the Distributors are primarily feeding off each other.

c.    AdvoCare has little interest in retail sales

116.    AdvoCare's disinterest in retail sales is evident in several ways.  First, as discussed at length above, AdvoCare rewards its Distributors based on how much they and their Downlines buy.  AdvoCare's payment structure is not tied to retail sales.

117.    Second, AdvoCare does not track retail sales.  If AdvoCare cared about retail sales, it would have some way to track them, such as by requiring all retail sales to be made through the Distributors' Microsites.  AdvoCare's bonuses and compensation structure could then be tied to the Distributors' verifiable retail sales.  But instead, AdvoCare sells its product to the Distributors and has no ability to verify that Distributors are actually making retail sales.

---

[42] *See id*. at 19 [Appx. P. 0116].
[43] *Id*. at 14 [Appx. P. 0111].

118.     Third, its prohibition on Distributor sales through e-commerce platforms confirms that AdvoCare has little interest in retail sales.  Dozens of producers of nutritional supplements sell their products on e-commerce platforms.  If AdvoCare really wanted its Distributors to sell to retail customers, it would allow them to sell through e-commerce sites.  But in fact, AdvoCare has brought numerous lawsuits to prevent Distributors from selling on e-commerce platforms and from selling product to others who will sell the products on e-commerce platforms.

119.     AdvoCare has limited interest in whether its Distributors sell its products to retail purchasers because AdvoCare's true customers are its Distributors.  AdvoCare is able to sell its overpriced products to its Distributors because AdvoCare is selling them something more than products: it sells them the dream of making money by participating in AdvoCare's Compensation Plan.  AdvoCare restricts the ways in which its Distributors can sell its products so that the Distributors must meet face-to-face with potential customers where they, too, can sell the "business opportunity," as well as the product.

### 3.     AdvoCare Operates a Pyramid Scheme Despite its Smokescreen Policies

120.     As discussed above, just like a classic pyramid scheme, AdvoCare requires and incentivizes its Distributors to pay it money for the opportunity to receive compensation from AdvoCare and incentivizes its Distributors to recruit new people into the scheme.  And as in a classic pyramid scheme, the majority of Distributors' compensation comes from contributions to the scheme made by other Distributors and not from legitimate operations (*i.e.,* retail sales).

121.     Recognizing that its business bears all the traits of a pyramid scheme, AdvoCare has adopted several policies in an effort to avoid the pyramid scheme label without changing its business practices: (1) the "Retail Sales Compliance" forms ("**RSC Forms**") requirement; (2) the

70% certification requirement; and (3) two refund policies. Each of these are mere smoke-screens designed to obscure the fact that AdvoCare is a pyramid scheme.

### a.    The requirement that Distributors submit RSC Forms is a sham

122.    AdvoCare requires Distributors to submit RSC Forms before they can receive an Override or Leadership Bonus during any pay period. On these RSC Forms, Distributors are to list five retail sales made to five different customers, including contact information for the customers, made within the pay period.[44]

123.    But Distributors routinely falsified the information in the forms. They have to because making true retail sales is so difficult, and they are taught to do this by higher-level Distributors. On information and belief, AdvoCare knows much of the information in the forms is false, and AdvoCare rarely, and never systematically, audited the forms, at least during the Class period.

### b.    The 70% certification requirement is a sham

124.    AdvoCare requires Distributors to be able to certify that at least 70% of products previously purchased were sold or consumed by the Distributor (the "**70% Requirement**"):

> In order to keep the integrity of the Compensation Plan intact, at any time a Distributor must be able to certify that he or she has sold or consumed at least 70 percent of all products previously purchased prior to placing a new order.[45]

125.    The Federal Trade Commission, in a well-known decision referred to as the *Amway* decision, determined that an MLM might avoid the pyramid scheme label if its distributors actually sold to retail customers or consumed 70% of the products they purchased.[46] AdvoCare plainly had the *Amway* decision in mind when it adopted the 70% Requirement.

---

[44] *Id*. at 27 [Appx. P. 0124].
[45] *Id*. at 13-14 [Appx P. 0110-111].
[46] *In the Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979).

126.    Because AdvoCare does not track retail sales, AdvoCare has no way to determine if a Distributor has complied with the 70% Requirement.  Regardless of the 70% Requirement, Distributors routinely purchase more product than they need for personal consumption or to meet retail sales demand.

<b>c.    The refund policies do not prevent the conclusion that AdvoCare operates a pyramid scheme</b>

127.    AdvoCare offers two refund policies, but neither of these prevent the conclusion that AdvoCare operates a pyramid scheme.  First, AdvoCare allows Distributors to return up to $500 in retail value of products within a calendar year.  The products must be unopened, undamaged, and submitted for a refund within 30 days of purchase. (the "**30-Day Refunds**").[47] Second, AdvoCare allows Distributors to return all unopened product purchased within one year of purchase, but Distributors must resign from AdvoCare at the time they make the returns (the "**Resignation Refunds**").[48]

128.    AdvoCare's refund policies are woefully inadequate to prevent the conclusion that AdvoCare is a pyramid scheme.  As discussed above, the essential reasons why AdvoCare is a pyramid scheme are that it (a) requires and incentivizes Distributors to pay money to participate in the Compensation Plan, (b) rewards recruiting far more than retail sales, and (c) primarily compensates Distributors with other Distributors' money.  Only a complete and entire refund policy would impact the first reason why AdvoCare operates a pyramid scheme, and no refund policy can impact the second and third reasons why AdvoCare operates a pyramid scheme.

129.    AdvoCare's refund policies do not affect the conclusion that AdvoCare requires and incentivizes Distributors to pay money to participate in the Compensation Plan.

---

[47] Policies (3/11/16) at 16 [Appx. P. 0113].
[48] *Id*. at 25 [Appx. P. 0122].

130.    First, both refund policies are limited in time, so Distributors who purchased product outside the 30-day and one-year windows cannot receive refunds.

131.    Second, they are limited to a return of unopened product.

132.    Third, they provide no protection for Distributors who sold the product for less than the wholesale price, who gave away product in an effort to recruit new Distributors, or who consumed product they never would have purchased absent the incentives in the Compensation Plan.

133.    Fourth, the 30-Day Refunds do not apply to either Distributor Kits or Annual Fees, and the Resignation Refunds do not apply to Annual Fees.

134.    Fifth, Distributors must resign before they are eligible for Resignation Refunds. Far from protecting Distributors, the requirement that Distributors resign punishes Distributors who have purchased more product than they need.  Eligibility for Resignation Refunds requires Distributors to give up their places in the AdvoCare compensation structure, which AdvoCare has encouraged the Distributors to achieve through hard work, recruiting, and product purchases.

135.    Sixth, both refund policies, and certainly the Resignation Refund policy, put the Distributor at risk that AdvoCare will invoke the 70% Requirement to reduce any Wholesale Bonus, Override, Leadership Bonus, or other bonus otherwise owed.  The return of product necessarily means that the Distributor did not consume or sell at least that much product. AdvoCare threatens its Distributors that if it learns that a Distributor did not actually sell or consume 70% of the products the Distributor purchased,

> AdvoCare may deduct the amount of the Override, Leadership Bonus or other bonus or incentive previously paid from compensation due to you in subsequent pay periods, or AdvoCare may deny payment of any Override, Leadership Bonus or other bonus or incentive in addition to any disciplinary action that may be taken, including suspension or termination.[49]

---

[49] *Id*. at 29 [Appx. P. 0126].

41

Moreover, a Distributor might fear that a Resignation Refund could result in threatened or actual litigation by AdvoCare to recover previously paid bonuses.

### 4. The vast majority of Distributors lose money

136.    Very few Distributors make any money at all from their participation in AdvoCare, and the vast majority lose money.   AdvoCare's website provides a 2015 Income Disclosure Statement that provides some information regarding the number of Distributors and the amounts AdvoCare paid them.[50]

**2015 ANNUAL INCOME RANGES**

| RANGE | % OF ACTIVE DISTRIBUTORS | % OF ALL DISTRIBUTORS |
|---|---|---|
| $0 | - | 71.52% |
| $0.01 - $50.00 | 31.86% | 9.07% |
| $50.01 - $250.00 | 31.88% | 9.08% |
| $250.01 - $500.00 | 12.16% | 3.46% |
| $500.01 - $1,000.00 | 9.91% | 2.82% |
| $1,000.01 - $2,500.00 | 7.93% | 2.26% |
| $2,500.01 - $5,000.00 | 2.96% | 0.84% |
| $5,000.01 - $7,500.00 | 1.01% | 0.29% |
| $7,500.01 - $10,000.00 | 0.54% | 0.15% |
| $10,000.01 - $15,000.00 | 0.52% | 0.15% |
| $15,000.01 - $20,000.00 | 0.28% | 0.08% |
| $20,000.01 - $30,000.00 | 0.29% | 0.08% |
| $30,000.01 - $50,000.00 | 0.25% | 0.07% |
| $50,000.01 - $75,000.00 | 0.13% | 0.04% |
| $75,000.01 - $100,000.00 | 0.06% | 0.02% |
| $100,000.01 - $150,000.00 | 0.08% | 0.02% |
| $150,000.01 - $200,000.00 | 0.04% | 0.01% |
| $200,000.01 + | 0.10% | 0.03% |

137.    However, AdvoCare does not adjust these ranges based on the amount of money the Distributors paid AdvoCare for product, Annual Fees, or Distributor Kits.   Without this

---

[50] http://www.advocare.com/opportunity/

information, it is impossible to tell what percentage of Distributors received more money from AdvoCare than they paid to AdvoCare. But even the limited information AdvoCare provides demonstrates that becoming an AdvoCare Distributor is a losing proposition for all but the very few.

138. AdvoCare reports on the same webpage where it posted the 2015 Income Disclosure Statement that it had 623,003 Distributors in 2015. Of those Distributors, it paid 71.52% of them nothing at all. All of those Distributors lost money because to be considered a Distributor in the 2015 Income Disclosure Statement, a Distributor had to have bought something or received a check, and because in every year a Distributor must purchase a Distributor Kit (in her first year) or pay Annual Fees (in subsequent years). But the percentage of "net losers" is undeniably over 80% because an additional 9.07% earned $50 or less, and every Distributor paid either the $50 Annual Fee or purchased the Distributor Kit. Moreover, because of the incentives discussed above to purchase product, it is very likely that the percentage of Distributors paying AdvoCare more than AdvoCare pays them exceeded 95%, once product purchases, Distributor Kits, and Annual Fees are taken into account. But even at the undisputed 80% failure rate, that equals at least *498,402* people who received less from AdvoCare than they paid AdvoCare in 2015.

139. Moreover, AdvoCare and the Individual Defendants lure in new Distributors with the dream of a sizable income. *See infra* Section VI. But according to AdvoCare's own numbers, AdvoCare pays only *0.12%* of all Distributors $50,000-or-more per year. Thus, of AdvoCare's 623,003 Distributors in 2015, only *747 people* made anything close to the financial success AdvoCare and the Individual Defendants promote. And of the 623,003 Distributors, only *0.35%* (or 2,180 people) made more than what a full-time minimum wage job would pay.

43

140.    These statistics are consistent with the Plaintiffs' own experience.  Plaintiffs received less from AdvoCare than they paid AdvoCare, and their experiences are consistent with the other Distributors with whom they have spoken.

141.    These statistics and Plaintiffs' own experience are consistent with other anecdotal evidence.  According to the ESPN Article:

> One former distributor, who spoke on the condition of anonymity, says she did make a decent income through AdvoCare. But she acknowledges that almost no one in her downline made money. "It nauseates me to think of the people who spent $3,000 and didn't make a dime, because they believed me -- and the goal, and the dream," she says. "You catch people in a bad spot who maybe have hope that this could be a way for them to pay for their credit card and their kids, and you exploit them. That's the bottom line."

142.    Because AdvoCare pays the people at the top of the pyramid exorbitant incomes and because little non-Distributor money comes into the scheme to pay Distributors, the Distributors at the bottom of the pyramid must lose money.  These losses are borne out by AdvoCare's own financial disclosures and the experiences of the Plaintiffs and multiple other Distributors.

**B.    The Individual Defendants and AdvoCare Promote the Pyramid Scheme**

143.    The Individual Defendants are persons at the top of AdvoCare's pyramid.  All of the Individual Defendants achieved ranks of Platinum or higher.  They are in the top 2% of Distributors who make the most lucrative bonuses.  They actively participate in the AdvoCare pyramid scheme, and they profit from the Compensation Plan at the expense of the vast majority of Distributors.

**1.    AdvoCare and the Individual Defendants promote the pyramid scheme and make misleading claims of financial success**

144.    In coordination with AdvoCare, the Individual Defendants have flooded the internet with promotional materials designed to lure in new Distributors.  AdvoCare and the

44

Individual Defendants promote the scheme as a lawful program that, with sufficient hard work, virtually guarantees financial success.  AdvoCare is different from many pyramid schemes in that it and its promoters do not promote the program as a "get rich quick" scheme.  Instead, AdvoCare and the Individual Defendants promote AdvoCare as a reliable source of significant income, should the participant determine to work hard enough at the business.

145.    Indeed, AdvoCare stated in the March 11, 2016, Policies that AdvoCare required hard work:

> Success in AdvoCare is dependent upon successful sales efforts, which require hard work, diligence and leadership.[51]
>
> …
>
> The Compensation Plan is a work plan, and your compensation will depend on how much effort you expend, and to some extent, what area of the country you live in.[52]

146.    To sell the financial-success promise, AdvoCare and the Individual Defendants flaunt the wealth of the highest-ranked Distributors and those few insiders at the top of the pyramid, as examples of the riches that await new participants, if only they will work hard enough (*i.e.,* tirelessly recruit new Distributors).

### a.    The Individual Defendants' own promotional materials

147.    All of the Individual Defendants have produced videos and made statements via the internet knowingly promoting AdvoCare's pyramid scheme and touting the financial rewards supposedly available to participants.  Each of these statements furthered the pyramid scheme by

---

[51] Policies (3/11/16) at 23 [Appx. P. 0120].
[52] *Id*. at 25 [Appx. P. 0122].

encouraging persons to become Distributors and by encouraging Distributors to remain Distributors and pursue the AdvoCare business opportunity.

148.    The similarity of the statements made by the Individual Defendants indicates a collusive effort to promote the AdvoCare scheme.  The following paragraphs set forth publicly broadcast statements made by the Individual Defendants to promote the AdvoCare "business opportunity."

### i.    Defendant McDaniel

149.    Defendant McDaniel is one of the most successful AdvoCare promoters.  Scores of videos on YouTube and other public internet platforms feature him promoting, touting, and explaining the AdvoCare business opportunity.  He owns a website with the address www.championmakerstraining.com on which he promotes AdvoCare and explains the AdvoCare marketing system in many videos.

150.    Defendant McDaniel made the statement quoted below in a promotional video available on YouTube.  As of the date of this Complaint, the video has received approximately 2,171 views:

> I was making you know making $35,000 a year working 80 to 90 hours a week living in this $400 a month rent house…. [McDaniel claims he ran home after first trying the AdvoCare products and told his wife,] "Honey, get ready because we're about to be rich."  [McDaniel goes on to tout the tremendous financial success he was able to obtain through AdvoCare with hard work.][53]

151.    Defendant McDaniel made the statement quoted below in a promotional video entitled "D&D Updated Story" on his "Vimeo" channel.  The video has, as of the date of this Complaint, received approximately 3,381 views.    The video was filmed in September 2015.

> By our fourth year in AdvoCare we earned our first million dollars in a year and we went on to earn a consistent seven figure income from there.[54]

---

[53] https://www.youtube.com/watch?v=0MagWBoG9Bc, posted Sept. 10, 2012 (around the 1:00 mark).
[54] https://vimeo.com/138351120, posted Sept. 4, 2015  (around the 3:10 mark).

…

We have a world class business model and a system that accompanies that that allows you the independent distributor if you so choose to go to work and if your dream is only to earn another $500 a month then you can certainly do that here at AdvoCare. But if your dream is to build a business you know by building a marketing organization that is moving products throughout America and eventually you know throughout the world then that business can move just as fast today or even faster today.[55]

152. Defendant McDaniel published a promotional video entitled "Intro to AdvoCare" on or about April 12, 2013. The video is on YouTube and has received about 10,045 views. Therein, Defendant McDaniel explains that the way to make money in AdvoCare is by recruiting:

This is a relationship business where if I recruit someone like Katie Weathers who I just showed you her story. Katie's got a sister named Torie and we're gonna say "hey Katie let's talk to Torie for you" and she's gonna sign Torie up and Torie's got friends and family, Torie's gonna recuit those people. So the point I'm trying to make to you is as you recruit people that's called width and as we help those other people recruit people through their friends and family and their warm market of social networking they're going to recruit their friends and family as well and there's a sales compensation plan that is built to reward you for all of that and it's powerful and you saw that with the stories. And today my wife and I earn really over $300,000 a month in AdvoCare, we have distributors, you know that, on our own team that earn over $100,000 a month, we have distributors on our own team that earn 90 something thousand a month, 80 something thousand a month, 60 and 70 thousand a month, 50 thousand a month, all the way down. We have multitudes of distributors that are on incomes on all types of those levels. In these last 16 years as we've been helping them and so you just gotta decide is there something here for me and if there is will I go for it.[56]

153. Defendant McDaniel made a promotional video entitled "Maybe It's Our Fault" on or about June 2013.[57] The video is available on YouTube and has, as of the date of this Complaint, received approximately 6,184 views at the link footnoted above. The video shows multiple images demonstrating McDaniel's success—diamond jewelry, watches, commendations, etc. In a voice-

---

[55] *Id.* (around the 4:00 mark).
[56] https://www.youtube.com/watch?v=EM-gcNt8kX4, posted Apr. 12, 2013 (around the 25:50 mark).
[57] https://www.youtube.com/watch?v=zioQHG7wBCM.

over, McDaniel says: "Maybe it's my fault. Maybe I led you to believe it was easy when it wasn't… Maybe I led you to believe that AdvoCare was a God-given gift and not something I work for every single day…" The last shot is of McDaniel speaking to a group of young Distributors: "Or maybe, you're just making excuses."

## ii.    Defendant Donnelly

154.    Over a dozen videos featuring Defendant Donnelly can be found on YouTube and other public platforms on the internet in which she promotes AdvoCare.

155.    On or about February 2012, Defendant Donnelly made a promotional web video entitled "Mixer Insights With—Jenny Donnelly." The video is available on YouTube and has, as of the date of this Complaint, received approximately 31,978 views at the link footnoted above. In the video, Donnelly says, *inter alia*:

> AdvoCare is like jumping in a new Lamborghini and with no speed limit on the freeway and you are just zipping as fast as you want to go because your foot's on the gas pedal. And you can go as slow or as fast as you want to go.[58]
>
> …
>
> AdvoCare as a powerful way to earn income.[59]

156.    Defendant Donnelly made a promotional video entitled "Jenny and Bob Donnelly—AdvoCare Testimonial." It was posted to YouTube on March 7, 2009, and has had approximately 32,590 views. Therein, Donnelly says, *inter alia*:

> I wanted to be a stay-at-home mom. I wanted to not be scraping by every single month financially. I didn't want to be constantly balancing the check book, hoping the checks didn't bounce. I didn't want to have that lifestyle. To me, that was extremely stressful. And so, when we found AdvoCare, it became our way to live at the next level.[60]

---

[58] https://www.youtube.com/watch?v=nnJNkXS4_7g, posted Feb. 20, 2012 (around the 11:20 mark).
[59] *Id*. (around 8:20 mark).
[60] https://www.youtube.com/watch?v=vCpYCLJ9nPs&t=30s, posted March 7, 2009 (0:10 second mark).

157.    Defendant Donnelly participated in an AdvoCare promotional video entitled "Bob and Jenny Donnelly."  The video was uploaded to YouTube on August 16, 2013, and has been viewed approximately 1,527 times as of the date of the filing of this Complaint.  Therein, Donnelly says, *inter alia*:

> The last three years each year we've made over a million dollars in income from AdvoCare.  I never set out to be a millionaire.  I set out to have great purpose, to bring a family together, to have more time with him, and just to live life without the limitations of money dictating our schedule.
>
> …
>
> And so what's so exciting about AdvoCare, what drives me today to still help other families, is to free up time, they can still get paid a lot of money but have time and the freedom financially to do that, and we have not found a better vehicle than AdvoCare to help people.[61]

158.    Defendant Donnelly participated in the making of an AdvoCare promotional video entitled "Bob & Jenny Donnelly Washington 360p."  The video was uploaded to YouTube on February 22, 2013, and has had approximately 1,319 views as of the date of the filing of this Complaint.  Therein, Donnelly says, *inter alia*:

> At the end of our first year, we were earning $10,000 a month.  And that's when it struck us that we don't have anything so unique and so special that other people couldn't do this.  We knew that anybody, our friends, family, or anybody that we met really could duplicate this success.
>
> …
>
> I couldn't envision $90,000 a month when I started.  There's no way.  I could, for some reason, I could see $10,000 a month, because I met a couple named Danny and Diane McDaniel making $80,000 a month, and I thought, well, if they can make eighty, I can make ten.  I mean, I don't know, I just felt like, I can do something. And the greatest thing about AdvoCare is they taught us step, by step, by step… exactly, a formula, and formula of how this business would come and how a paycheck would follow because of that.  And so we decided to follow a formula, and we did it consistently.  You know, and that was a key, consistency, and

---

[61] https://www.youtube.com/watch?v=Z-ptnX5NZZ4, posted Aug. 16, 2013 (0:13 second mark; 2:00 minute mark).

discipline, but it pumped out a paycheck, I'm telling you.  There is so much money that AdvoCare has been able to pay people.[62]

### iii.    Defendant Thurber

159.    Defendant Thurber appears in dozens of apparently self-made videos in which she promotes AdvoCare and explains the AdvoCare marketing system.  Thurber owns a website with the address "www.workwithchampions.com" on which she posts videos of herself and others promoting AdvoCare.  She also posts videos explaining the AdvoCare Compensation Plan prepared by Defendant McDaniel.

160.    Defendant Thurber spoke to a crowd of AdvoCare Distributors and a video recording of her speech is posted in a video on YouTube entitled, "Crystal Thurber Testimony." The video was posted on July 5, 2009, by Defendant McDaniel, and as of the filing of this Complaint, it has had approximately 1,786 views.  In the video, Thurber says, *inter alia*:

> [Before AdvoCare she and her husband] had over $300,000 in debt, a 75-hour workweek, an hour commute every day, and I cried every single morning before I went to work.
>
> We looked at this [AdvoCare] as a business.  Went straight to the Advisor level, didn't think anything about it except for what it would bring us.  And you guys I had two hours a week to work this business.  Two hours.  But I was willing to do what it took in those two hours.  I was willing to let Marci teach me, and she did.  I made an extra $1,500 in the first month, I quickly found more time. …  And long story short, if you fast forward now it's been seven years, we've earned a million dollars with the company, earn an average of $30,000 a month.  We are on track for that to double in the next 90 days.
>
> …
>
> No more burdens, only choices now.  Choices to help others win and that's what AdvoCare is all about.[63]

---

[62] https://www.youtube.com/watch?v=mZlGj78TAQs, posted Feb. 22, 2013 (1:25 minute mark).
[63] https://www.youtube.com/watch?v=S_Qq5DziUqc, posted July 5, 2009 (0:40 second mark).

161.    Defendant Thurber prepared a video entitled, "All in Training With Platinum Leader Crystal Thurber" and posted it to her YouTube channel on December 23, 2014.  It has had approximately 583 views as of the date of the filing of this Complaint.  Therein, Thurber states, *inter alia*:

> You have nothing that you can blame for not having the business you want. Champions!  We have got to look in the mirror because see I can motivate you from the outside and I can inspire you, but I cannot make you have the desire to pick up the phone, to put shoes on your feet, to get out the door to talk to people.[64]

### iv.    Defendant Funk

162.    Defendant Funk has made and appeared in dozens of videos promoting AdvoCare and providing instruction to Distributors in how to build their AdvoCare distributorships.  She has her own YouTube channel where she has posted many such videos.[65]

163.    Defendant Funk appeared in an AdvoCare promotional video entitled "Dawn and Brett Funk discuss life before and after AdvoCare.  The video was posted to YouTube on December 15, 2012.  As of the filing of this Complaint, it has had approximately 8,556 views. Therein, Funk states, *inter alia*:

> When I think about our life before AdvoCare, it was truly a life, a secret life, it was a life of struggle, of daily struggle.  [But after becoming involved with AdvoCare, she and her husband] are now averaging, about, you know, sixteen to twenty thousand dollars a month as a family.  I can't tell you what that has done for us.[66]

164.    On August 13, 2015, Defendant Bewley posted a video to YouTube of a presentation by Funk in which she discusses how to recruit new Distributors into AdvoCare.  As of the filing of this Complaint, the video has had approximately 14,996 views.  Therein, Funk says, *inter alia*:

---

[64] https://www.youtube.com/watch?v=H9uZm5ePZnI, posted Dec. 23, 2014 (around 15-minute mark).
[65] https://www.youtube.com/user/Funky5TV.
[66] https://www.youtube.com/watch?v=F3K6pQTxkU8, posted Dec. 2012 (around the 0:15 mark).

By…sharing AdvoCare and not letting anything or anyone get in the way, we have been able to travel the world.[67]

165.    On December 13, 2013, Defendant Funk posted a video to YouTube entitled, "AdvoCare … so not a pyramid scheme!!"  As of the filing of this Complaint, the video has had approximately 14,996 views.  Therein, Funk says, *inter alia*:

The beauty of AdvoCare, is that you, there's no lid to what you can earn and achieve.[68]

### v.    Defendant Bewley

166.    Defendant Bewley has many AdvoCare promotional videos publicly available online.  In these videos he promotes the business of AdvoCare and provides instruction on how Distributors can recruit more Distributors to grow their distributorships.

167.    Bewley prepared a video entitled, "Why AdvoCare? Quick Overview by Wes Bewley."  The video was posted to YouTube on October 18, 2014, and as of the filing of this Complaint, has had approximately 1,279 views.  Therein, Bewley says, *inter alia*:

Diligent part time efforts have led to full-time income. And as a result today my wife and I average $40,000 monthly with AdvoCare at the time of this recording. It allows us to have a life of choice.  A life of freedom.  You know we don't have alarm clocks. We don't have to drive in traffic.  We don't have bosses. We don't have to look at prices on a menu.  We don't have to cut coupons when we go to the grocery store.  And we're able to design a life on our terms.  And certainly AdvoCare can help you do the same thing.[69]

168.    Bewley gave an AdvoCare testimonial on June 15, 2009, to an audience of potential recruits.  The video is available on YouTube and has had approximately 2,724 views as of the filing of this Complaint:

I treated AdvoCare like a business from day one.  And you know what it started paying me like a business.  First month made $1,200 bucks and next month—that's when I was a full-time student athlete—never earned less than $2,000 and month

---

[67] https://www.youtube.com/watch?v=5nx0uedpixY, posted Aug. 30, 2015 (around the 5:30 mark).
[68] https://www.youtube.com/watch?v=rUtjgCial5g, posted Dec. 13, 2013 (2:30 minute mark).
[69] https://www.youtube.com/watch?v=dAz2DjVQ53o, posted Oct. 18, 2014 (around the 1:30 mark).

all year long … which was a dream come true at the time.  And within a year I was making over $5,000 a month with it.

…

You can't get along with the greatest opportunity in the world and be realistic. That's an oxymoron.  So, you know, I just started dreaming big and AdvoCare gave me the opportunity to dream big.[70]

### vi.    Defendant DeBerry

169.    Defendant DeBerry is touted in some AdvoCare promotional materials as AdvoCare's youngest diamond-level Distributor.  He appears in many videos on the internet promoting the AdvoCare business.

170.    DeBerry appeared in an AdvoCare promotional video entitled, "Success Story—Tyler DeBerry."  This video was uploaded to YouTube on April 30, 2012, and as of the filing of this Complaint has had approximately 2,530 views.  In the video, DeBerry says, *inter alia*:

I didn't know the degree of success that could be expected, but I knew that success [in AdvoCare] could be expected because I was willing to work.

…

Currently, I'm 27 years old and average anywhere from $20,000 and $30,000 a month.

…

I have always felt that, when I saw AdvoCare as an opportunity, I realized very quickly that with some sacrifice now, to be able to design a life for my future family that really took my parents about thirty years of their lives to design.  … For me, I had a desire to compress time, and based on intentional effort over four-and-a-half years, was able to compress what took my parents thirty years to build income-wise …[71]

---

[70] https://www.youtube.com/watch?v=UWRZAT1dqfI&spfreload=5, posted July 5, 2009 (0:30 minute mark; 1:15 minute mark).

[71] https://www.youtube.com/watch?v=4FR-KQOi14g, posted Apr. 30, 2012 (1:20 minute mark; 2:45 minute mark).

171.    DeBerry appeared in an AdvoCare promotional video entitled, "Intro to AdvoCare with Tyler DeBerry." The video was uploaded to YouTube on September 1, 2014, and as of the filing of this Complaint has been viewed approximately 1,305 times. In the video, DeBerry says, *inter alia*:

> [After touting the money he is earning with AdvoCare:] But this is about you. … And no doubt, you know, there are things that you desire that AdvoCare can potentially unlock for you.
>
> I was really looking to be able to live a 'yes' life. Be able to say yes to things that most people have to say no to. You know I look back at some of the reasons I said yes to AdvoCare. And really it comes down to extra finances, extra time, significance and escaping mediocrity.
>
> Advocare is paying people incredible incomes all according to what you desire.[72]

*        *        *

172.    These promotional videos that the Individual Defendants participated in and/or prepared all promote the AdvoCare "business opportunity." The Individual Defendants plainly made or participated in these videos for the purpose of recruiting more Distributors and thereby perpetuating the AdvoCare pyramid scheme.

173.    Moreover, these statements by the Individual Defendants imply, if not state explicitly, that Distributors can achieve significant financial success if they work hard enough at growing their AdvoCare distributorships. But the truth is that only the tiniest minority of Distributors achieve the sort of financial success the Individual Defendants tout, no matter how hard they work.

174.    The Individual Defendants are well aware of this fact, but they seek to intentionally mislead people (a) so that people will agree to sign up as new Distributors in the Individual

---

[72] https://www.youtube.com/watch?v=BI45nAm130c, posted Sept. 1, 2014 (around the 4:20, 28:00, and 29:20 marks).

Defendants' Downlines and (b) so that current Distributors will continue to participate in the AdvoCare system, which requires the purchasing of product and recruiting, all to the benefit of AdvoCare and the Individual Defendants.  It is the continued hard work of the Distributors at recruiting that will affect the ability of AdvoCare and the Individual Defendants to continue to reap financial rewards.

175.    In addition to all promoting the AdvoCare "business opportunity," and promoting it in a similar manner, the Individual Defendants often participate in each other's promotions or use the promotional material produced by each other.    For example, Defendant McDaniel's YouTube page contains videos of Defendants Thurber and Bewley promoting AdvoCare.[73] Defendant McDaniel's "ChampionMakers" website includes a link to a "training call" he did with Defendant Donnelly.[74]  Defendant Thurber's "AdvoCareFreedom" YouTube channel links to Defendant Funk's YouTube channels.[75]

b.    **AdvoCare and the Individual Defendants work in concert to promote Advocare**

176.    Each of the Individual Defendants has an AdvoCare Microsite.  These are webpages regarding the Individual Defendants, authored by the Individual Defendants, and describing the Individual Defendants' supposed AdvoCare experiences.  The webpages are hosted by AdvoCare itself.  Internet searches for the Individual Defendants frequently lead to the Microsites, and a search box on AdvoCare's website allows a user to find the Individual Defendants' Microsites.  In

---

[73] https://www.youtube.com/user/advocarenuggets/videos.

[74] http://www.championmakerstraining.com/downloads/mcdaniel-team-calls/.

[75] https://www.youtube.com/user/advocarefreedom

this way, AdvoCare and the Individual Defendants are expressly working together to broadcast the content on the Micosites and promote the pyramid scheme.

177.    The content on the Microsites, like that in the Individual Defendants' own videos described above, promotes the AdvoCare business opportunity and the financial benefits supposedly available to Distributors:

| Individual Defendant | Excerpts From Microsite |
|---|---|
| Daniel McDaniel[76] | "Advocare is a life-changing company in many ways. We help people look better, feel better, have extra energy, and lose weight. We also help people who choose to a part of Advocare, earn extra income with a part time business that can very well lead to full time income.  I was a high school football coach working 80 hours per week, while Diane was working 60 hours per week for a mortgage company, and day care was raising our kids. Although I loved coaching, I had to ask myself if I was really worth more than $35,000 per year of income.   That answer was easy.  Advocare became the vehicle that we chose to get out of debt obtain financial freedom.  We eliminated our $35,000 of debt in one year, earned a six-figure income, and began to build a life on "our terms."  Advocare has given us the freedom to take our 3 boys to school, pick them up from school, and attend all of their school and athletic events.  We don't have to answer to other people's demands for our lives, over our family's priorities." |
| | "We have been able to take vacations from Australia/New Zealand to Hawaii, to Alaska, to the mountains, to the Caribbean, and to the Bahamas.  Today, we help people get started with their dreams, just like someone helped us in 1997. We introduce people to a powerful earning potential, with a business that pays 5 different ways.  Where else in America can you earn income 5 different ways with one concentrated effort. This is what makes Advocare such an amazing part time business for anyone who has a need to become debt free, or has a desire to earn what their true value is in the market place today." |
| Jenny Donnelly[77] | "ROBERT   (BOB)   AND   JENNY   DONNELLY-   THE DONNELLY TEAM |

---

[76] https://www.advocare.com/9701221/
[77] https://www.advocare.com/99091840/

| | |
|---|---|
| | "As AdvoCare distributors, my wife and I earn **over \$100,000 every month**." |
| | "If you live in the Portland Oregon area, and are interested in trying **AdvoCare products**, or **becoming an AdvoCare distributor** yourself, we would love to help you. We have been involved with AdvoCare since 1999, are experienced with all of the products, and have helped thousands of people around the Portland Metro area find financial success through a relationship with AdvoCare. |
| | "OUR PROGRESSION AS ADVOCARE DISTRIBUTORS |
| | "I used to work 60 hours a week at an engineered wood products mill and Jenny was a registered dietitian. We initially got excited about AdvoCare because of the nutritional products. I lost 25 pounds and my pant size went from a 36 to a 32 in the first two months. Jenny was skeptical at first, but was sold after looking at AdvoCare's Scientific & Medical Advisory Board. …We started sharing our excitement with family and friends and earned \$4,000 our first month. AdvoCare opened our eyes to our priorities and helped us have more choices. We realized that our lives weren't going to magically get better without us choosing a new path. |
| | "Within one year, we were averaging \$10,000 a month. Currently, approximately \$20 million of product moves through our business annually. |
| | "AdvoCare has afforded us to both be stay-at-home parents and has truly been a blessing in our lives. |
| | "We also embrace the opportunity to help other families get healthy and to have the lifestyle and freedom that we have today. It's an opportunity to work hard and play hard... life on your terms." |
| Crystal Thurber[78] | "In my first month using the Success System ADVOCARE has in place- I earned an extra 1500.00 with a VERY part Time effort. I was looking for a more productive day and loved the energy of the products, Mark lost 17 pounds of body fat in 6 weeks and has since put it back on in lean muscle! My first full year in AdvoCare- we earned \$20,000. 2003-\$45,000, 2004-\$73,000, 2005-\$100,000 and … just had our largest year in |

| | |
|---|---|
| | 2012- Nearly $1 Million in Income. I worked this mostly by myself Since Jan of 2002 and recently my husband who has owned his own business for 32 years just jumped on board! Using the FREE DebtBuster System we have paid off over $500,000 worth of debt and enjoy of life of debt freedom. TRUE FREEDOM only comes when you are Debt Free! We have been so blessed in our journey and now earn $85,000-$90,000 per month and are on pace for this to double in the next 12 months… thanks to the Wellness Revolution.<br><br>…<br><br>We love pouring our lives into others to help them achieve their goals. Our passion is to help others who are where we were, searching desperately for a solution to debt- either time debt or financial debt... and help them break free!"<br><br>The Microsite then provides contact information for Defendant Thurber. |
| Dawn Funk[79] | "We both turned forty in the last year and have been doing a lot of reflecting on our lives from a health and financial perspective. With four children to keep up with as far as energy and expenses, we decided it was time to take advantage of our good friends' advice and look to Advocare to fulfill our many needs. … Advocare has truly changed our lives in the last nine months and is allowing me to leave public education and be a stay at home mom at the end of this school year! If you want to learn more about our incredible team of CHAMPIONS, please call us directly at 937-545-2908. We would love to paint a picture of what Advocare can do for you and your family!" |
| Wes Bewley[80] | "I was introduced to Advocare in the later part of 2000! I was 18 years old and found myself working 4 jobs. I grew up knowing how to work hard, but not neccessarily smart. Needless to say I was looking for a better way! I was introduced to Advocare and what I saw was amazing...a chance to create leverage and to own my own business. I got started on the metabolic nutrition system, catalyst, and spark the first day. I knew because the products worked so well, that I was going to be able to earn some serious income here as a result of sharing these products with other people! I became a distributor. |

---

[79] https://www.advocare.com/11088077/
[80] https://www.advocare.com/00062193/

| | "Advocare is great for someone who truly has a heart to help others!" |
|---|---|
| Tyler DeBerry[81] | "I am excited to help not only athletes, but anyone reach their fitness and health goals.  I am equally as passionate about Advocare's opportunity though, and as a 31 year old post collegiate athlete, I was able to build a 6 figure income with part time consistent effort, in less than 4.5 years.  Advocare offers world class products, a business opportunity that is second to none, and builds champions in all areas of life! Feel free to call me at 520-609-2500." |

178.    The meaning of these statements, implied or express, is that the Individual Defendants achieved financial success through AdvoCare, and people can achieve the same financial success if they will sign up as Distributors and pursue the AdvoCare "business opportunity."  As discussed above, these statements are misleading if not outright false.  In addition, these statements are made for the purpose of luring new people into the AdvoCare program.

179.    AdvoCare and the Individual Defendants work together to promote the AdvoCare "business opportunity" in other ways.  Every year AdvoCare hosts a "Success School" where thousands of AdvoCare Distributors are taught how to operate and promote their AdvoCare distributorships.  The Individual Defendants are regular presenters there.  Defendant DeBerry spoke at Success School the weekend of August 9-11, 2013.  Defendants Donnelly and McDaniel spoke in 2012.  Defendant Bewley spoke in 2013.  On information and belief, the Individual Defendants have appeared on multiple other occasions, and every time they encourage Distributors to continue to recruit new Distributors and pursue the AdvoCare "business opportunity."

---

[81] https://www.advocare.com/04035255/

### c.    AdvoCare's own promotional materials are misleading

180.    AdvoCare and many Distributors use the tactic of comparing supposed Distributor income to the incomes earned at more conventional jobs.[82]  The following chart was produced by AdvoCare, and Distributors use the chart (or similar versions prepared for other years) to lure in new recruits:



181.    This is a misleading chart.  As discussed above, only a tiny minority of AdvoCare Distributors earn even as much as AdvoCare claims Medical Assistants earn—the lowest level in the payscale AdvoCare presents.  And the vast majority of Distributors lose money.  Moreover, the chart is misleading because it equates promoting the AdvoCare pyramid scheme with normal

---

[82] http://advocare.betteryourselfnow.com/distributor-promo.html

jobs in which the employees, professionals or workers are not feeding off the money others contribute to the system.

182.    Other AdvoCare promotional materials are misleading.    After the Income Disclosure Statement on its website (*see supra* ¶ 135), AdvoCare offers the following "disclaimer":

> AdvoCare pays no compensation for recruiting new Distributors. Instead, compensation is based upon product sales, which varies based upon a number of factors, including how effectively Distributors exercise key traits like diligence, leadership, time and effort in selling products. There is no guarantee of success or short cut to success. Distributors establish their own working hours, conduct the day-to-day business, determine and pay for their own costs of doing business, and choose when and how much they would like to engage in their AdvoCare business.

183.    The first sentence of the "disclaimer" is false, as is the independent clause in the second sentence.  Recruiting and product purchases made by Downline Distributors is the primary basis for AdvoCare's compensation, as discussed in detail above.  The remainder of the disclaimer is misleading.  Certainly a Distributor's success or failure depends to some degree on "key traits like diligence, leadership, time and effort in selling products," but the implication from the disclaimer is that any diligent person willing to devote time and effort to AdvoCare will be financially successful.  Unless only 0.35% of AdvoCare's Distributors have these "key traits," the implication from the disclaimer is belied by the numbers in AdvoCare's Income Disclosure Statement.

## 2.    AdvoCare and the Individual Defendants Falsely Claim That AdvoCare Does Not Operate a Pyramid Scheme

184.    In addition to generally promoting the pyramid scheme and making false and misleading claims regarding the financial prosperity participants may attain, AdvoCare and the

Individual Defendants make false claims and omissions regarding the lawful nature of AdvoCare's scheme.

185.    Defendant McDaniel has publicly claimed in marketing materials that AdvoCare does not operate a pyramid scheme: "When you don't have a pyramid scheme, and when you gear your sales compensation plan to pay people for their work effort, and for what they genuinely do to build other people's lives, that's when you know it doesn't matter, you know, whether you're at the top of some food chain."[83]    In another promotional video, he claimed: "We don't have a pyramid scheme.  We don't have some little deal for you.  This is the most exciting, legitimate, financial opportunity you have probably laid your eyes on in your entire adult life."[84]

186.    Defendant Bewley has also defended AdvoCare against the pyramid scheme charge in a promotional video.  Therein, Bewley and another person dressed and acted like uneducated hillbillies to ridicule the idea that AdvoCare could be considered a pyramid scheme.  Bewley defended AdvoCare on the basis that Distributors can earn as much as they want, depending on how many lives they want to change.[85]

187.    Defendant Funk has posted an internet video directly addressing the subject.  From the beaches of Bora Bora, she explained that AdvoCare has ignored pyramid scheme allegations for years and "to think if we would have let those skeptics and critics steal our dreams with that question in the beginning I wouldn't be standing here right now in Bora Bora."[86]  She reassured her listeners that AdvoCare was not a pyramid scheme, that those are illegal, and that "there's no such thing as a pyramid scheme in the United States."[87]

---

[83] https://www.youtube.com/watch?v=7WKs9GaF3so, posted Feb. 20, 2012 (around 1:14 minute mark).
[84] https://www.youtube.com/watch?v=EM-gcNt8kX4, posted Apr. 12, 2013 (around 1:00 minute mark).
[85] https://www.youtube.com/watch?v=eghDHm7HVfo, posted June 11, 2104 (beginning at the 1:12 mark; Bewley is the taller character).
[86] https://www.youtube.com/watch?v=rUtjgCial5g, posted Dec. 13, 2013 (0:55 minute mark).
[87] *Id*. (1:33 minute mark).

188.    AdvoCare itself proclaims that it is not a pyramid scheme.  According to the ESPN Article, "When asked point-blank if the company is a pyramid scheme, Levy [AdvoCare's General Counsel] responds: 'Absolutely not.  AdvoCare is a business based on terrific real nutritional products that are sold through a direct-sales channel.'"  At one of AdvoCare's annual "Success Schools," AdvoCare presented a panel of diamond-level Distributors who entertained the issue of what to do when someone asks if AdvoCare is a pyramid scheme.[88]  The panelists claimed that AdvoCare was not a pyramid scheme because, *inter alia,* pyramid schemes are illegal, pyramid schemes do not involve the exchange of real products, Drew Brees would not associate himself with a pyramid scheme, and in AdvoCare you can earn as much as you want.

189.    AdvoCare's and the Individual Defendants' claims that AdvoCare is not a pyramid scheme are false, for all the reasons set forth in Section V.A, *supra*.  The most common reason offered by the Individual Defendants for why AdvoCare is not a pyramid scheme does not hold water and is misleading.  AdvoCare and the Individual Defendants argue that AdvoCare is less a pyramid scheme than is a job in a normal corporate organization.  In those companies, they argue, the CEO or a comparable figure sits at the top of the pyramid making the most money, with other executives beneath the CEO making less, and other levels within the company having progressively more people at the level, with each person in each level making less money than each person in the level above.[89]  These organizations, they claim, are more pyramidal in shape than AdvoCare.

---

[88]    http://www.championmakerstraining.com/training-videos/diamond-panel-with-diane-mcdaniel/   (beginning   at 12:00 mark).

[89]    *See* https://www.youtube.com/watch?v=7WKs9GaF3so, posted Feb. 20, 2012 (McDaniel; around 2:00 minute mark); https://www.youtube.com/watch?v=rUtjgCial5g, posted Dec. 13, 2013 (Funk; around 2:00 minute mark); https://www.youtube.com/watch?v=eghDHm7HVfo, posted June 11, 2014 (Bewley; around the 3:10 mark)

190.    This facile explanation ignores what a pyramid scheme is.  A pyramid scheme is an enterprise in which participants are rewarded based on bringing in new participants to the enterprise, and are rewarded with other participants' money, not with the proceeds of the legitimate operations of the enterprise.  AdvoCare fits this description perfectly.  Normal companies do not.

C.    **Plaintiffs Are Victims of AdvoCare's Pyramid Scheme**

191.    Lisa Ranieri is a retired Air Force Sargent who served as a guard at the Arlington National Cemetery.  She joined AdvoCare as a Distributor in 2007 and lost thousands of dollars trying to be a successful Distributor.

192.    Plaintiff Ranieri paid AdvoCare $20,000-$25,000 in fees and product purchases between 2007 and January 2016.  Plaintiff Ranieri's last payment to AdvoCare was in January 2015.  Over the course of her association with AdvoCare, Plaintiff Ranieri received approximately $5,000 in payments from AdvoCare.

193.    Plaintiff Ranieri was unable to make many retail sales, and she lost money in the AdvoCare scheme even considering retail sales.

194.    AdvoCare terminated Plaintiff Ranieri for failure to pay Annual Fees in or about January 2016.

195.    Megan Cornelius joined AdvoCare as a Distributor in February 2014 and lost thousands of dollars trying to be a successful Distributor.

196.    AdvoCare locked Plaintiff Cornelius out of her AdvoCare MicroSite in February 2016, thereby preventing Plaintiff Cornelius from accessing the AdvoCare documents posted there, including whatever version of the Policies was then current.  AdvoCare never provided Plaintiff Cornelius with access to her AdvoCare MicroSite after February 2016.

197.    AdvoCare suspended Plaintiff Cornelius on April 29, 2016, and informed her on that day that she was not allowed to work on her AdvoCare business during her suspension, and informed her that she was not entitled to compensation or incentives during her period of suspension.

198.    On August 2, 2016, AdvoCare formally terminated Plaintiff Cornelius.  On August 3, 2016, sent Plaintiff Cornelius a check in the amount of $329.66 as payment for Wholesale Commissions earned through February 16, 2016.  AdvoCare did not pay Plaintiff Cornelius for any Wholesale Commissions or other bonuses or incentives earned after February 16, 2016.

199.    Plaintiff Cornelius paid AdvoCare approximately $12,000 in fees and product purchases between February 2014 and February 2016 and received approximately $3,000 from AdvoCare over this same period.  Plaintiff Cornelius also paid AdvoCare more than she received from AdvoCare between March 9, 2015, and February 2016.

## VI.    CLASS ACTION ALLEGATIONS

200.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23.

201.    Plaintiffs seek relief on behalf of themselves and the following class (the "**Four-Year Class**"):

> Distributors who paid Annual Fees, purchased a Distributor Kit, and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare scheme, and whose distributorships were suspended without reinstatement or terminated before May 17, 2016.

202.    Plaintiff Cornelius seeks relief on her on behalf and on behalf of the following class (the "**Two-Year Class**"):

Distributors who paid Annual Fees, purchased a Distributor Kit, and/or purchased products from AdvoCare between March 9, 2015, and May 10, 2016, who lost money from their participation in the AdvoCare scheme, and whose distributorships were suspended without reinstatement or terminated before May 10, 2016.

203.    The Defendants are excluded from the Four-Year Class and the Two-Year Class (collectively, the "**Classes**").

204.    The members of the Classes (the "**Class Members**") number in the tens of thousands, making joinder of all Class members in a single action impracticable.

205.    There are common questions of law and fact common to the Classes, including, but not limited to, the following:

- Whether the Arbitration Provision is enforceable;

- Whether AdvoCare was an illegal pyramid scheme;

- Whether Defendants promoted the illegal pyramid scheme;

- Whether Defendants made materially false representations that AdvoCare was legal;

- Whether Defendants engaged in acts of mail fraud and wire fraud in violation of RICO;

- Whether Defendants conspired to defraud the Class Members through the use of a pyramid scheme;

- Whether AdvoCare has been unjustly enriched by the operation and promotion of a pyramid scheme;

- Whether AdvoCare's Contracts with the Class Members are void as illegal or against public policy; and

- Whether and to what extent Defendants' conduct has injured the Class Members.

206.    These and other questions of law and/or fact are common to the Class Members, and predominate over any question affecting only individual Class Members.

207.    The Plaintiffs' claims are typical of the claims of the Four-Year Class Members in that Plaintiffs were Distributors (a) who paid Annual Fees, purchased a Distributor Kit, and/or

purchased products from AdvoCare between March 9, 2013, and May 10, 2016, (b) who lost money from their participation in the AdvoCare scheme, and (c) whose distributorships were suspended without reinstatement or terminated before May 10, 2016.

208.    Plaintiff Cornelius' claims are typical of the claims of the Two-Year Class Members in that Plaintiff Cornelius was a Distributor (a) who paid Annual Fees, purchased a Distributor Kit, and/or purchased products from AdvoCare between March 9, 2015, and May 10, 2016, (b) who lost money from her participation in the AdvoCare scheme, and (c) whose distributorship was suspended without reinstatement or terminated before May 10, 2016.

209.    The Plaintiffs will fairly and adequately represent the interests of the Classes in that Plaintiffs' claims are typical of the Class Members and Plaintiffs' interests are fully aligned with those of the Classes.  The Plaintiffs have retained counsel who are experienced and skilled in class action litigation.

210.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

211.    The Plaintiffs know of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.    CAUSES OF ACTION

### Count One:
### Judgment Declaring the Arbitration Provision Unenforceable
### (Against all Defendants)

212.    Plaintiffs re-allege paragraphs 29-36 and 191-211 as though fully set forth herein.

213.    AdvoCare's Contract contains an Arbitration Provision.  The Contract also grants AdvoCare the power to unilaterally modify the terms of the Contract, including the Arbitration Provision, at any time and without prior notice, thereby rendering the Arbitration Provision illusory, lacking consideration, and therefore unenforceable.

214.    Accordingly, the Court should declare that the Arbitration Provision is illusory, lacks consideration, and unenforceable, and that the Plaintiffs' claims and the Classes' claims are properly before this Court.

215.    In addition, by its terms the Arbitration Provision does not apply to disputes between Distributors.[90]  Accordingly, the Court should declare that the Arbitration Provision does not apply to the Plaintiffs' and the Classes' claims against the Individual Defendants and that at least as to claims against the Individual Defendants, Plaintiffs' and the Classes' claims are properly before this Court.

### Count Two:
### Racketeering Activity in Violation of 18 U.S.C. §§ 1961(5) and 1962(c)
### (Against All Defendants)

216.    Plaintiffs re-allege paragraphs 1-211 as though fully set forth herein.

---

[90] *See* Policies (3/11/16) at 22 [Appx. P. 0119].

68

**A.      All Defendants Were Associated With a Racketeering Enterprise.**

217.    Each Defendant is a "person" for purposes of RICO, 18 U.S.C. § 1962, because each Defendant is, and was at all relevant times, an individual or entity capable of holding legal or beneficial interest in property.

218.    All of the Defendants in this action collectively form an "enterprise" under 18 U.S.C. § 1962, in that they are a group of individuals and entities associated in fact, although they are not a legal entity, with the shared purpose of perpetrating, operating, and promoting a pyramid scheme.

219.    The association-in-fact has a longevity sufficient to permit those Defendants to pursue the enterprise's purpose—the perpetuation of an unlawful pyramid scheme.  AdvoCare was formed in 1993.  The Individual Defendants joined AdvoCare on the following dates and are presently still part of the AdvoCare enterprise:

        Crystal Thurber:      1995
        Daniel McDaniel:      1997
        Jenny Donnelly:       1999
        Wes Bewley:           2000
        Dawn Funk:            2010

220.    There is an identifiable hierarchy and framework within the enterprise.  It is directed by AdvoCare, which promulgates the Policies and the Distributor Agreement.  The Individual Defendants adhere to and promote the Policies and the Distributor Agreement, and the Individual Defendants recruit new Distributors into the AdvoCare pyramid scheme.  The Individual Defendants and AdvoCare work in concert to promote the pyramid scheme.

**B.      Defendants Willfully and Knowingly Engaged in Racketeering Activity by Participating in a "Scheme and Artifice" to Defraud**

221.    The Defendants have used false and fraudulent pretenses to obtain money and property from the Plaintiffs and the Class.

69

222. <u>First</u>, each Defendant has promoted and/or operated the pyramid scheme, which, by its very nature, is a *per se* scheme and artifice to defraud under the mail and wire fraud statutes.

223. <u>Second</u>, the Defendants have promoted the pyramid scheme through numerous false representations, all to obtain profit. The Defendants' false representations include misleading statements regarding the financial opportunity presented by AdvoCare and false statements that AdvoCare's marketing scheme is legal and is not a pyramid scheme. The misleading and false statements Defendants have made in furtherance of the pyramid scheme are more specifically described in paragraphs 143-175, *supra*.

224. <u>Third</u>, Defendants promoted AdvoCare's pyramid scheme by omitting material facts for the purpose of and with the intention of defrauding and obtaining money from the victims. For example, Defendants:

- represented that AdvoCare was a legitimate MLM without disclosing that AdvoCare is really an illegal pyramid scheme;

- represented that AdvoCare was based on retail sales to non-Distributors when, in fact, few sales are made to non-Distributors;

- claimed that Distributors could make significant amounts of money by selling AdvoCare products at retail, when in fact very few Distributors are able to profitably sell products at retail; and

- implied that Distributors could achieve the top ranks of AdvoCare with sufficient effort and hard work, when in fact it is virtually impossible to achieve the top ranks of AdvoCare.

225. Each of the Defendants acted with specific intent to perpetrate and operate a pyramid scheme. Each of the Defendants were well aware that their operation and/or promotion of AdvoCare would result in the recruitment of more Distributors who would pay money into the AdvoCare scheme, which money would be used to pay the Defendants and other persons in the pyramid. Each of the Defendants specifically desired Distributors to pay money in the AdvoCare scheme, which money would be used to pay the Defendants and other persons in the pyramid.

**C.    Defendants Engaged in a Pattern of Racketeering Activity.**

226.    The Defendants' numerous acts of mail fraud and wire fraud amount to a pattern of racketeering activity because they are continuous and related.

227.    <u>Continuity of Activity</u>:  The pyramid scheme began in 1993 with the creation of AdvoCare and each Individual Defendant joined the racketeering enterprise on or about when each joined AdvoCare as listed above.  All Defendants continue to the present to promote and/or operate the pyramid scheme.  All Defendants have engaged in multiple acts to promote and/or operate the pyramid scheme, and all Defendants are actively working now to perpetuate the pyramid scheme into the future.

228.    <u>Relatedness of Activity</u>:  The predicate acts of mail and wire fraud are related because they had the same or similar purpose:  to convince new Distributors to pay to join the AdvoCare pyramid scheme, to convince those Distributors to recruit new Distributors, and to perpetuate the pyramid scheme.  These predicate acts had the same result:  convincing Distributors to join AdvoCare's pyramid scheme by paying money, having those Distributors recruit new Distributors to do the same, and perpetuating the pyramid scheme.  The predicate acts had the same participants, the Defendants, AdvoCare's executives, and other high-level Distributors in the AdvoCare organization, each of whom operated and/or promoted AdvoCare's pyramid scheme.  The predicate acts had the same victims:  Distributors who participated in AdvoCare's pyramid scheme and received less money from AdvoCare than they paid AdvoCare.  Finally, the predicate acts had similar methods of commission:  fraudulent representations concerning numerous aspects of AdvoCare's operations made via online presentations, video and telephonic conference calls, in-person gatherings, written materials, and blog posts, and the operation of the pyramid scheme, using the wires and mail.  In sum, the predicate acts of wire and mail fraud committed by the

Defendants constitute an intricately related set of predicate acts sufficient to meet the relatedness standard.

**D.    Effect on Interstate Commerce**

229.    The pyramid scheme affected interstate commerce by reason of, at least, each of the Defendants' numerous acts or omissions constituting use of the mail or interstate wire communication facilities in furtherance of their scheme to defraud.  Additionally, each enterprise affected interstate commerce because the members comprising it engaged in business in several states and made use of the mail and interstate communications facilities in the process of doing so by causing marketing and promotional materials for AdvoCare, as well as images, videos, and information to be communicated through regular mail and via the internet.

**E.    Mail and Wire Fraud**

230.    The Defendants committed racketeering acts by operating and promoting an illegal pyramid scheme through the use of the mail or private or commercial carriers, such as UPS, and by transmitting and causing others to transmit, by means of wire in interstate commerce, writing, signs, signals, pictures, and sounds, all in furtherance of and for purposes of executing a scheme or artifice to defraud, namely an illegal pyramid scheme.

231.    AdvoCare distributed many hundreds of thousands of pieces of promotional literature, statements, checks, and other mailings to many people by commercial carriers or USPS since its inception.  Defendants used the internet to disseminate, publish, and spread the pyramid scheme throughout the United States for the purpose of executing their scheme or artifice to defraud in violation of RICO.

232.    AdvoCare maintains its own website as well as an internet portal where Distributors gain access to exclusive AdvoCare information and the ability to purchase AdvoCare products by

72

inputting credit card information. In addition, the Defendants use outlets like YouTube, Facebook, Twitter, and other websites to disseminate information about AdvoCare's pyramid scheme or transmission of signals, pictures, or information. Each such transmission is a separate act of wire fraud.

**F.    Injury**

233.    As a direct and proximate result of the Defendants' acts of mail and wire fraud, Plaintiffs and the Class Members were injured in their business or property. Plaintiffs and the Class Members spent more money than they have obtained in commissions and/or bonuses as a result of their involvement with AdvoCare. The precise amount lost by the Classes has not yet been determined, but is estimated at over $100 million. The precise amounts that each and every participant in the pyramid scheme has (i) spent on costs associated with the Distributor "business opportunity" and (ii) received in commissions or bonuses or other payments from AdvoCare as a result has been tracked, maintained, and accounted for by AdvoCare. Thus, the precise loss of every Class Member is capable of being easily ascertained in this litigation, and the total business injury capable of being computed for the Classes.

234.    The Plaintiffs and the Class Members are the foreseeable victims of the pyramid scheme and Defendants' acts of mail and wire fraud. The Plaintiffs and the Class Members are all Downline recruits who were unable to recoup their payments into the scheme. The Plaintiffs and the Class Members are necessary to the pyramid scheme and are the direct victims of the pyramid scheme.

**<u>Count Three</u>:**
**Racketeering Activity in Violation of 18 U.S.C. §§ 1961(5) and 1962(d)**
**(Against All Defendants)**

235.    Plaintiffs incorporate by reference paragraphs 1-234 as if fully set forth herein.

236.    Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

237.    Each of the Defendants intentionally and willfully participated in a conspiracy to engage in Count Two.  Each Defendant knew about and agreed to facilitate the pyramid scheme.

238.    Each of the Defendants has participated in the AdvoCare pyramid scheme and their participation is necessarily a combination of more than two individuals. Each of the Defendants have committed one or more overt acts to achieve or further the unlawful objects and purposes of the pyramid scheme detailed herein.

239.    Each of the Defendants had a meeting of the minds on the object or course of action, specifically to create, support and maintain the pyramid scheme for their financial benefit as evidenced by each Defendant's voluntary and knowing participation in the pyramid scheme, and the similarity and consistency of their conduct.

240.    The Defendants creation, support, and maintenance of the pyramid scheme is illegal.

241.    Each of the Defendants has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the Plaintiffs and the Class Members by his, her, or its actions.

**Count Four:**
**Federal Securities Fraud**
**(Against AdvoCare)**

242.    Plaintiffs reallege paragraphs 1 through 211 as if fully set forth herein.

243.    In the alternative to Counts Two and Three, and without prejudice to their position that Counts Two and Three are not preempted by the PSLRA,[91] Plaintiffs in Count Four alleges violations of the securities laws.

244.    Only to the extent Defendants contend that Plaintiffs' purchases of Distributor Kits, payment of Annual Fees, and purchases of AdvoCare products constitute investments in unregistered securities (the sale of which would be a past and continuing violation of federal securities laws), and only if Defendants are successful in obtaining a dismissal of or judgment against Plaintiffs' RICO claims on the grounds that the PSLRA preempts their RICO claims, Plaintiffs contend that their purchases of Distributor Kits, payment of Annual Fees, and purchases of AdvoCare products constitute investments in securities.

245.    AdvoCare made numerous material omissions in its Policies regarding retail sales.

- AdvoCare claimed as follows in the 10/6/11 and 1/25/13 version of the Policies:

    Retail sales are the foundation of a successful Distributorship. (p.16 in the 10/6/11 version; p.18 in the 1/25/13 version).

    …

    This is the simplest way to earn income at AdvoCare.  As a Distributor, you purchase products directly from the company at a discount ranging from 20 to 40 percent.  You then sell the products at suggested retail value to your retail customers.  The difference between what you paid for the products (at your discount) and what you sell them for at retail (what your customer pays you) is your immediate profit. (p.18 in the 10/6/11 version; p.20 in the 1/25/13 version).

- AdvoCare claimed as follows in the 5/21/15 and 3/11/16 versions of the Policies:

---

[91] *See* 18 U.S.C. § 1964(c).

Retail sales are the foundation of a successful Distributorship. (p.25).

…

Retail sales are the simplest way to earn income with AdvoCare. As a Distributor, you purchase products directly from the company at a discount ranging from 20 to 40 percent. You then sell the products at suggested retail value to your retail customers. The difference between what you paid for the products (at your discount) and what you sell them for at retail (what your customer pays you) is your immediate profit.

… [A] "retail sale" is defined as the sale of a single unopened product in its original packaging purchased by an AdvoCare Independent Distributor and sold to a retail customer at the suggested retail price. A "retail customer" is defined as a person who is not a current participant in the AdvoCare compensation plan. (p.26-27 in 5/21/15 version; p. 27 in 3/11/16 version).

246.    These statements are misleading because they fail to inform Distributors that "retail sales," particularly as defined in the Policies, are not a true viable way of earning income because Distributors are extremely unlikely to make significant "retail sales" and because the only realistic way to make money in the AdvoCare scheme is through recruiting.

247.    AdvoCare made material omissions in its Policies regarding Distributors' ability to earn money. In the Policies, AdvoCare informed its Distributors, "The Compensation Plan is a work plan, and your compensation will depend on how much effort you expend, and to some extent, what area of the country you live in."[92]

248.    This statement is misleading because it fails to inform Distributors that very few Distributors are likely to earn any profit from participating in AdvoCare, regardless of how much work they put in and regardless of what part of the country they live in.

---

[92] Policies (10/6/11) at 16 [Appx. P. 0026]; Policies (1/25/13) at 18 [Appx. P. 0054]; Policies (5/21/15) at 25 [Appx. P. 0089]; Policies (3/11/16) at 25 [Appx. P. 0122].

249.    By making affirmative statements regarding retail sales and the ability of Distributors to earn income, AdvoCare undertook an affirmative obligation to make the disclosures necessary to make such statements not misleading.

250.    AdvoCare made the then-current version of the Policies available to Plaintiffs and the Class Members through AdvoCare's website at all times.  AdvoCare contractually required Plaintiffs and the Class Members to acknowledge that they had read and reviewed the current version of the Policies at the time they joined AdvoCare, to abide by the terms of the current version of the Policies, and to read, understand, and adhere to the current version of the Policies.[93]

251.    AdvoCare made these omissions knowing that doing so was false and misleading. AdvoCare benefitted in a concrete and substantial way from the operation of the pyramid scheme, the recruitment of new Distributors, and new Distributors' reliance on AdvoCare's omissions.

252.    AdvoCare made these omissions with the specific intent that Distributors rely on them.

253.    Plaintiffs' and the Class Members' reliance on the omissions may be presumed.

**Count Five:**
**Unjust Enrichment**
**(Against AdvoCare)**

254.    Plaintiffs re-allege paragraphs 1 through 211 as though fully set forth herein.

255.    The AdvoCare Compensation Plan is a pyramid scheme under Tex. Bus. & Com. Code § 17.461(a).

256.    The AdvoCare Compensation Plan is a plan or operation by which Distributors give cash consideration for the opportunity to receive compensation derived primarily from recruiting, rather than from the sale of AdvoCare products by the Distributors.

---

[93] Distributor Agreement at 1 [Appx. P. 0001].

257.    A substantial percentage of AdvoCare products sold to Distributors is not used or consumed by the Distributors.  As discussed herein, most of the AdvoCare products purchased by Distributors are purchased because of the financial incentives offered by the AdvoCare Compensation Plan.

258.    Operating and promoting a pyramid scheme is a felony.  Tex. Bus. & Com. Code § 17.461(c).

259.    The Compensation Plan is an integral part of the Contracts.  The Contracts are illegal and contrary to public policy.  As such, the Contracts are void.

260.    Plaintiffs and the Class Members paid AdvoCare money pursuant to AdvoCare's perpetration of an illegal pyramid scheme.

261.    AdvoCare has been unjustly enriched by its perpetration of an illegal pyramid scheme and by Plaintiffs' and the Class Members' payments of money to AdvoCare.

262.    It would be unconscionable to allow AdvoCare to retain the benefits of its illegal conduct.

263.    AdvoCare should be required to return to Plaintiffs and each Class Member all the money each paid AdvoCare pursuant to its illegal pyramid scheme, less any money AdvoCare paid Plaintiffs and Class Member.

## VIII.    PRAYER FOR RELIEF

Plaintiffs and Class request the following relief:

a.    Certification of the Class;

b.    A declaration that the Arbitration Provision in the Plaintiffs' and the Class Members' Contracts is unenforceable;

c.    A judgment against each of the Individual Defendants on Counts One, Two, and Three;

d.    A judgment against AdvoCare on all Counts;

e.  As to Counts Two and Three, an award of damages in the amount of Plaintiffs' and each Class Member's financial loss as a result of Defendants' conduct and for injury to Plaintiffs' and the Class's business and property, all as a result of Defendants' violation of 18 U.S.C. § 1962(c) and (d) and that such amounts be tripled in accordance with 18 U.S.C. § 1964(c);

f.  As to Count Four, and in the alternative to Counts Two and Three, an award of damages in the amount of Plaintiffs' and each Class Member's out-of-pocket loss caused by AdvoCare's violation of the federal security laws;

g.  As to Count Five, an award of damages in the amount by which AdvoCare has been unjustly enriched at Plaintiffs' and each Class Member's expense;

h.  Pre-and post-judgment interest; and

i.  For all other relief, at law or equity, to which Plaintiffs and the Class Members are entitled, including such other damages and relief as the Court may deem just and proper.

## IX.    JURY DEMAND

Plaintiffs, on their own behalf and on behalf of the Class Members, demand a trial by jury on all issues triable by a jury.

Dated March 9, 2017                          REID COLLINS & TSAI LLP

                                             /s/ R. Adam Swick
                                             J. Benjamin King (SBN 24046217)
                                             1601 Elm St., Suite 4250
                                             Dallas, Texas 75201
                                             Tel.: 214-420-8900
                                             bking@rctlegal.com

                                             R. Adam Swick (SBN 24051794)
                                             1301 S. Capital of Texas Hwy.
                                             Bldg. C, Suite 300
                                             Austin, Texas 78746
                                             Tel.: 512-647-6100
                                             aswick@rctlegal.com