# United States District Court

## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| LISA RANIERI and MEGAN CORNELIUS, individually and on behalf of a class of similarly situated persons | § § § § § § | |
| v. | § § § | CIVIL ACTION NO. 3:17-CV-0691-S |
| ADVOCARE INTERNATIONAL, L.P., DANIEL MCDANIEL, JENNY DONNELLY, CRYSTAL THURBER, WES BEWLEY, DAWN FUNK, and TYLER DEBERRY | § § § § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This Order addresses the Motion to Dismiss filed by Defendant AdvoCare International, L.P. ("AdvoCare") [ECF No. 34] and the Motion to Dismiss filed by Defendants Wes Bewley, Tyler Deberry, Jenny Donnelly, Dawn Funk, Daniel McDaniel, and Crystal Thurber (collectively, the "Individual Defendants") [ECF No. 35]. For the reasons set forth below, the Court grants in part and denies in part the motions.

## I. BACKGROUND

Pursuant to Special Order 3-318, this case was transferred from the docket of Judge Jane J. Boyle to the docket of this Court on March 8, 2018.

This class action lawsuit arises out of allegations that AdvoCare, a company that distributes health and nutritional products, is a pyramid scheme. Plaintiffs Lisa Ranieri ("Ranieri") and Megan Cornelius ("Cornelius") allege that AdvoCare is a pyramid scheme "with a twist" because it sells participants both a product and the right to share in the money paid by other participants.

Compl. ¶ 3. The participants in AdvoCare's system are called "Distributors." *Id.* ¶ 5. Plaintiffs are former Distributors. *Id.* ¶¶ 191-98. Defendants are AdvoCare and certain individuals that are at or near the top of AdvoCare's alleged pyramid. *Id.* ¶¶ 11, 23.

To become a Distributor, one must purchase a kit, which cost either $59 or $79 during the relevant time. *Id.* ¶ 42. Distributors have two opportunities to earn money through AdvoCare: selling products and recruiting other Distributors into their downline.[1] *Id.* ¶¶ 3, 5-6. Distributors earn commissions and bonuses through their own sales and those of their downlines. *Id.* ¶¶ 8, 48. AdvoCare receives money from Distributors in the form of fees and product purchases. *Id.* ¶ 45. In their Complaint, Plaintiffs review at length the commission, bonus, and discount opportunities available to Distributors. *See, e.g., id.* ¶¶ 48, 51, 72. Plaintiffs allege that all of these opportunities require Distributors to purchase more product than they can consume or sell and/or that they prioritize recruiting over retail sales. *See, e.g., id.* ¶¶ 50, 55-56.

Once a Distributor has generated a certain level of product purchases, either personally or through junior Distributors in his or her downline, he or she can graduate to the Advisor level. *Id.* ¶ 47. Many of the bonuses and incentives Plaintiffs discuss are only available to Advisors. *Id.* ¶ 63.

According to Plaintiffs, there is no real opportunity to profit from retail sales, and recruiting is the only way to succeed as a Distributor. *Id.* ¶¶ 6, 8. They allege that very few people actually make money through AdvoCare, and that the vast majority end up paying more money to AdvoCare than they ever receive in profits. *Id.* ¶ 10. Further, Plaintiffs contend that most of the

---

[1] A downline is "the branching stream of junior Distributors whose entry into AdvoCare ultimately links back to a particular Distributor." Compl. ¶ 46.

money paid out to Distributors comes not from sales to non-Distributors but from the investments made by other Distributors. *Id.* ¶ 107.

The Individual Defendants represent individuals that have made it to the top of the AdvoCare pyramid and thus have profited from the alleged pyramid scheme. *Id.* ¶ 11. All of the Individual Defendants have produced videos and made statements on the Internet promoting AdvoCare and touting the benefits of joining. *Id.* ¶ 147. Plaintiffs detail specific statements made by each Defendant in promotional videos and on their AdvoCare microsites (individual websites hosted by AdvoCare) and explain why they are misleading. *Id.* ¶¶ 149-75, 177-78. Finally, Plaintiffs allege that the Distributor Defendants work in concert with AdvoCare to promote the company. *Id.* ¶¶ 176, 179.

Plaintiffs Ranieri and Cornelius joined AdvoCare in 2007 and 2014, respectively, and both were terminated in 2016. *Id.* ¶¶ 191, 194-98. Ranieri and Cornelius, individually and on behalf of a putative class of similarly situated persons, sued AdvoCare on five counts and the Individual Defendants on three. First, they seek a declaratory judgment declaring the arbitration provision in their contracts unenforceable.[2] Second, they allege that both Advocare and the Individual Defendants violated Sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs allege both primary RICO violations[3] and conspiracy to violate RICO. Third, they allege that AdvoCare committed federal securities fraud.[4] The

---

[2] On December 27, 2017, an arbitrator determined that Ranieri and Cornelius's claims are not arbitrable, but the parties disagree as to whether this decision will apply to the future class. The parties initially disputed this count in their briefing, but AdvoCare stated that it "withdraw[s] its motion to dismiss as to the declaratory judgment claim." Def. AdvoCare's Reply Br. 10. The Individual Defendants did not address the issue in their briefing but joined and adopted AdvoCare's reply in support of its Motion to Dismiss. Individual Defs.' Reply Br. 1. Thus, this Court will not consider the declaratory judgment claim at this time.

[3] Specifically, Plaintiffs allege that Defendants have committed numerous acts of mail fraud and wire fraud.

[4] This claim is in the alternative and is only viable if the Court ultimately concludes that Plaintiffs' RICO claims are preempted.

Complaint does not indicate on which provision(s) of the federal securities laws Plaintiffs' claims are based. Fourth, Plaintiffs bring a claim for unjust enrichment against AdvoCare.

## II.   LEGAL STANDARDS

### A.   *Rule 12(b)(6)*

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not require probability, but a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

In ruling on a Rule 12(b)(6) motion, the court limits its review to the face of the pleadings. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99

4

(5th Cir. 2000). However, the court may also consider documents outside of the pleadings if they fall within certain limited categories. First, the "court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Second, the "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). Third, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (internal citations omitted); *see also, e.g., Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "the district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand." (internal citations omitted)).

The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). At the motion to dismiss stage, the court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

## B.   *Rule 9(b)*

Because Plaintiffs' Complaint alleges fraud, Plaintiffs must plead the elements of their claims with the heightened particularity required by Rule 9(b). *See, e.g., Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 914 (N.D. Tex. 1998). Rule 9(b) requires that "[i]in

5

alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992). Put simply, Rule 9(b) requires the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

### C.    *The Private Securities Litigation Reform Act ("PSLRA")*

Pleadings in federal securities fraud actions must also comply with the strictures imposed by the PSLRA. *See* 15 U.S.C. § 78u-4(b). "The PSLRA has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways." *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Circ. 2017) (quoting *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Doides, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)). "First the plaintiff must specify each statement alleged to have been misleading." *Id.* (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u-4(b)(1). "Second, for each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *Neiman*, 854 F.3d at 746 (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u-4(b)(2)(A).

## III. ANALYSIS

### A. *PSLRA Preemption*

As an initial matter, the Court must determine whether the PSLRA bars Plaintiffs' RICO causes of action. The PSLRA disallows "civil RICO claims based on 'any conduct that would have been actionable as fraud in the purchase or sale of securities.'" *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 189 (5th Cir. 2010) (quoting 18 U.S.C. § 1964(c)). This bar applies regardless of whether a plaintiff can plead a cause of action under the federal securities laws. *See id.* at 189-91, 191 n.5. Commercial arrangements classified as "investment contracts" are covered by the securities laws and thus cannot form the basis of a civil RICO claim. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 297 (1946) ("*Howey*"). "An investment contract is a . . . scheme whereby (1) a person invests his money, (2) in a common enterprise, and (3) is led to expect profits solely from the efforts of the promoter or a third party." *Nunez v. Robin*, 415 F. App'x 586, 588 (5th Cir. 2011) (citing *Howey*, 328 U.S. at 298-99; *Williamson v. Tucker*, 645 F.2d 404, 417 (5th Cir. 1981)).

Here, the parties do not dispute the first two prongs. Thus, the Court will restrict its analysis to the third prong. The Fifth Circuit does not apply the "solely from the efforts of others" prong literally, but instead asks "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Nunez*, 415 F. App'x at 589 (quoting *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir. 1986)). In applying the "solely from the efforts of others" prong, courts ask what a

"reasonable investor" would believe when presented with the promoter's "standardized presentation." *Piambino v. Bailey*, 610 F.2d 1306, 1320 (5th Cir. 1980).

Defendants argue that, in the Fifth Circuit, a pyramid distribution system is a security as a matter of law. *See id.* at 1316. Because Plaintiffs repeatedly assert that AdvoCare is operating a pyramid scheme, they continue, the PSLRA prohibits Plaintiffs from bringing a RICO cause of action. However, the *Howey* test for whether a scheme constitutes an investment contract "is to be applied in light of 'the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties.'" *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 558 (1979) (quoting *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 851-52 (1975)).

Even if AdvoCare's system is a pyramid scheme, the Court is not convinced that *Piambino* is as unequivocal as Defendants claim. In support of its declaration that "a pyramid distribution system is a security," the *Piambino* court cited one of the seminal Fifth Circuit cases on the issue, *SEC v. Koscot Interplanetary, Inc.* ("*Koscot*"). *Piambino*, 610 F.2d at 1316 (citing *Koscot*, 497 F.2d 473 (5th Cir. 1974)). However, rather than hold that all pyramid schemes are securities, the *Koscot* court analyzed whether the specific pyramid scheme at issue was an investment contract and found that it was. 497 F.2d at 484-85; *see also Piambino*, 610 F.2d at 1317 ("*As applied to the facts in Koscot*, it was held that efforts of the promoters . . . were the 'essential managerial efforts' without which the enterprise would fail." (emphasis added)). The court expressly "confine[d its] holding to those schemes in which promoters retain immediate control over the essential managerial conduct of an enterprise and where the investor's realization of profits is

inexplicably tied to the success of the promotional scheme."[5] *Koscot*, 497 F.2d at 485. Far from finding that all pyramid schemes are securities as a matter of law, the *Koscot* court advocated a fact-intensive analysis.

Applying that fact-intensive analysis, the Court finds that this case is distinguishable from *Koscot*. First, the *Koscot* court expressly disregarded the portion of the scheme whereby participants sold cosmetics, as the SEC did "not contend that the distribution of cosmetics is amenable to regulation under the federal securities laws." 497 F.2d at 475. Following a line of precedent not cited by AdvoCare in the instant case, the *Koscot* court fragmented the case and focused solely on whether "the marketing . . . and recruitment aspects of Koscot's enterprise . . . [were] within the definition of a security." *Id.* at 475. Thus, the *Koscot* holding is inapplicable to the portion of the AdvoCare scheme whereby participants sell nutritional supplements.

Second, the scheme at issued in *Koscot*, like the Dare to be Great scheme previously analyzed by the Ninth Circuit in *SEC v. Glen W. Turner Enters., Inc.* ("*Glen W. Turner*"),[6] involved very little effort by participants. In both *Koscot* and *Glen W. Turner*, scheme participants were tasked with "lur[ing] prospects to meetings." *Koscot*, 497 F.2d at 484. The meetings were either run by participants according to a script from which they could not deviate (*Koscot*) or were run by "[t]he Dare People" rather than the participants (*Glen W. Turner*). *Id.* at 484-85 (quoting *Glen W. Turner*, 474 F.2d at 479). On the facts of the case before it, the *Koscot* court determined that the "critical determinant of the success" of the enterprise was the meetings, which required only

---

[5] The court also noted that "the definition of securities 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Koscot*, 497 F.2d at at 486 (quoting *Howey*, 328 U.S. at 299). Thus, the court cautioned that it was "merely endors[ing] a test which is resilient enough to encompass the egregious promotional scheme purveyed by Koscot." *Id.*

[6] 474 F.2d 476 (9th Cir. 1973).

nominal effort from the investors. *Id.* at 485. There are no such meetings at issue here. In the AdvoCare scheme, Distributors themselves must recruit new participants, and they must do so primarily through their own recruiting and marketing activities. As evidence of the individual effort involved, one need only look to the Plaintiffs' allegations regarding the Individual Defendants. These Defendants, who are not part of AdvoCare management, rely extensively on, inter alia, promotional videos and websites to market AdvoCare products and attract new recruits. These Defendants do more than simply invite potential participants to meetings, and they appear to expend significant personal effort to recruit new members into the AdvoCare scheme.

The instant case is more akin to *Piambino*, another seminal Fifth Circuit decision on the issue. The *Piambino* court, at the summary judgment stage, found that a genuine dispute of material fact existed as to whether the distributorships at issue were securities. 610 F.2d at 1319-20. The court focused mainly on the "solely from the efforts of" others requirement. The *Piambino* court held that the analysis must be conducted from the standpoint of a "reasonable investor," which will normally require "determination by the trier of fact." 610 F.2d at 1320.

Here, the Complaint contains ample evidence of the efforts required of Distributors. As in *Piambino*, AdvoCare tells its Distributors that it will be "necessary for [them] to 'work,'" AdvoCare "constantly emphasize[s] the retail aspects of its business," and "the promise of greatest profits [is] linked to becoming a [high-level] Distributor." *Id.* at 1319; *see also, e.g.*, Compl. ¶ 145 ("Success in AdvoCare is dependent upon successful sales efforts, which require hard work, diligence and leadership." (quoting Pls.' App. 120)). Notably, AdvoCare also tells Distributors that they are "independent contractors," a description that is at odds with the notion that they are merely passive participants. Pls.' Br. 15 (citing Pls.' App. 3 (AdvoCare Distributor Agreement)). Plaintiffs have adequately pleaded that a reasonable investor would expect to contribute more than

10

"a nominal menial effort." *Koscot*, 497 F.2d at 481; *see also Bell v. Health-Mor, Inc.*, 549 F.2d 342, 346 (5th Cir. 1977) (finding that "who did the convincing and arranging" was a question of fact rendering dismissal inappropriate).

For the foregoing reasons, Plaintiffs' pleadings are sufficient to defeat a finding that AdvoCare distributorships are securities, and, at this stage, the Court holds that the PSLRA does not bar Plaintiffs' RICO claims.

## B. *RICO Violations*

"RICO makes it unlawful for 'any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015) (quoting 18 U.S.C. § 1962(c)). Regarding causation, RICO provides civil remedies to individuals injured "by reason of" a violation of Section 1962. 18 U.S.C. § 1964(c). Under this standard, the plaintiff must plead that "the violation was the but-for and proximate cause of the injury." *Plambeck*, 802 F.3d at 676. Finally, to establish a RICO claim based on a pattern of mail or wire fraud, the plaintiff must plead that the defendant "act[ed] knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005).

RICO also prohibits conspiring to violate § 1962(c). *See* 18 U.S.C. § 1962(d). To plead a RICO conspiracy claim, a plaintiff must show: (1) an agreement between two or more people to commit a substantive RICO offense; and (2) that defendants knew of and agreed to the overall objective of the RICO offense. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010). An actionable conspiracy requires that the alleged conspirator "at least know of the conspiracy and adopt the goal of furthering or facilitating the criminal endeavor." *Chaney*, 595 F.3d at 239. The

11

plaintiff must plead specific facts "implying [an] agreement to commit predicate acts of racketeering." *Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir. 1995).

### i.        *AdvoCare – RICO Scienter*

Advocare spends no more than a single footnote contesting the merits of Plaintiffs' RICO claims. In discussing Plaintiffs' securities fraud claims, AdvoCare argues that "[t]he Complaint's failure to adequately allege scienter also dooms Plaintiffs [sic] RICO claims . . . . Civil RICO claims based on mail and wire fraud violations require allegations that the defendants acted 'with the specific intent to deceive or to defraud.'" Def. AdvoCare's Br. 16 n.4 (quoting *Heden v. Hill*, 937 F. Supp. 1230, 1243 (S.D. Tex. 1996)). AdvoCare's cursory argument fails to account for the differences between RICO scienter allegations and securities fraud scienter allegations. The Court finds that Plaintiffs' scienter allegations are sufficient.[7]

With regard to Plaintiffs' primary RICO claim,[8] the scienter allegations must meet the heightened pleading requirements of Rule 9(b). *See Marriott Bros. v. Gage*, 704 F. Supp. 731, 740 (N.D. Tex. 1988), *aff'd* 911 F.2d 1105 (5th Cir. 1990). Thus, while "intent can be averred generally . . . a RICO mail fraud averment must nonetheless provide some 'factual basis for conclusory allegations of intent,' which must, in turn, give rise to a 'strong inference' of fraudulent intent." *Id.* "[P]yramid schemes are *per se* mail fraud, which include inherent concealment about the deceptive payment scheme . . . ." *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 639 (5th Cir. 2016) (en banc). While the Court expresses no opinion on whether AdvoCare is in fact operating

---

[7] Because neither Plaintiffs nor AdvoCare addressed any other elements of claims based on a primary RICO violation or a RICO conspiracy, the Court expresses no opinion on the adequacy of Plaintiffs' pleadings as to any element other than scienter.

[8] The Court uses the terms "primary RICO violation" and "primary RICO claim" to refer to the claim that Defendants engaged in a pattern of mail and wire fraud.

a pyramid scheme, the Complaint includes sufficient allegations, taken as true, to establish a strong inference of fraudulent intent. For example, Plaintiffs outline attempts made by AdvoCare to distinguish its model from that of a pyramid scheme and contradict each attempt with factual allegations. First, AdvoCare requires Distributors to submit Retail Sales Compliance Forms, on which Distributors must list five retail sales made to five different customers, before they can receive a bonus for a given pay period. Compl. ¶ 122. However, Plaintiffs claim that AdvoCare has never systematically audited these forms to ensure their accuracy. *Id.* ¶ 123.

Second, AdvoCare requires Distributors to certify that at least 70 percent of products previously purchased were either sold or consumed by the Distributor.[9] *Id.* ¶ 124. However, Plaintiffs note that AdvoCare does not track retail sales and thus has no means of determining whether any Distributors comply with the 70 percent requirement. *Id.* ¶ 126. Finally, AdvoCare offers two refund policies. One allows for the refund of up to $500 worth of products so long as the products are unopened, undamaged, and submitted for a refund within 30 days of purchase. Compl. ¶ 127. The other allows for the refund of the value of all unopened product within one year of purchase so long as the Distributor resigns at the time he or she returns the product. *Id.* Plaintiffs point to several deficiencies in these policies, including the fact that they are limited in time, are limited to unopened product, and provide no protection for Distributors who are forced to sell heavily discounted products, to give away products, or to consume unwanted products. *Id.* ¶¶ 130-32.

In addition, Plaintiffs point to statements and promotional materials that give rise to a strong inference of fraudulent intent. For example, they point to an outright denial by the General

---

[9] This requirement comes from a Federal Trade Commission ruling on how a multilevel marketing company might avoid the pyramid scheme label. *See In re Amway Corp.*, 93 F.T.C. 618 (1979).

Counsel for AdvoCare that AdvoCare is a pyramid scheme. Compl. ¶ 188. Further, they discuss various promotional materials indicating that success in AdvoCare is both realistic and achievable through hard work. Taking the allegations that AdvoCare is a pyramid scheme as true, as the Court must do, these statements are indicative of an intent to defraud. On the whole, Plaintiffs' allegations suffice to satisfy the strictures of Rule 9(b).

Regarding Plaintiffs' RICO conspiracy claim, Plaintiffs have not sufficiently pleaded that AdvoCare "knew of or agreed to the overall objective of the RICO offense." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 (5th Cir. 2010). "[T]he core of a RICO civil conspiracy is an agreement to commit predicate acts," and the plaintiff must "allege specifically such an agreement." *Tel-Phonic Servs.*, 975 F.2d at 1140-41. "Direct evidence of agreement is unnecessary," and "proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence . . . ." *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978) (quoting *United States v. Morado*, 454 F.2d 167, 174 (5th Cir. 1972)). Plaintiffs have provided insufficient evidence of any sort of agreement, as is discussed more fully below. *See infra* Section III.B.iii.

### ii.      *Individual Defendants – Primary RICO Violation*

The Individual Defendants argue that the Complaint does not plausibly allege that any of them participated in the operation or management of the enterprise or had any supervisory involvement. The Court agrees. To satisfy the "conduct or participate" requirement, the plaintiff must set forth facts plausibly establishing that the defendant "participated in the operation or management of the enterprise itself," meaning that the defendant had "some part in directing the enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179, 183 (1993). In the Fifth Circuit, the proper RICO defendant must have some sort of supervisory involvement. *See Plambeck*, 802

14

F.3d at 675 ("It is evident that [Defendants] participated in managing the enterprise with their supervisory roles in their respective parts of the scheme, even if [someone else] was in charge."); *Reves*, 507 U.S. at 179 (holding that "*some* part in directing the enterprise's affairs is required.").

In support of their argument that the Individual Defendants participated in the alleged RICO enterprise, Plaintiffs note that the Individual Defendants have reached the top two percent of Distributors, have brought in massive downlines, have maintained websites and produced training and recruiting videos, and have been defined as AdvoCare "Leadership."

As to the training and recruiting videos, RICO liability does not arise from promoting an enterprise in the course of conducting one's own affairs. *See Reves*, 507 U.S. at 185. As to the Individual Defendants' success in the AdvoCare scheme, both in terms of making money and recruiting downlines, neither allegation suffices to show that any of the Individual Defendants had the power to direct the enterprise's affairs or had any kind of supervisory involvement. Finally, the argument that the Individual Defendants are AdvoCare "Leadership" is misleading. In support of this proposition, Plaintiffs cite to a portion of AdvoCare's Policies, Procedures, and Compensation Plan (the "Policies") detailing "Leadership Bonuses," which are "a way to recognize Advisors who build and support downline teams who sell AdvoCare products." Pls.' App. 93. Nothing in this definition suggests that the recipients of Leadership Bonuses have any ability to operate or manage the enterprise.[10]

While a Court may find that "lower rung participants" operate an enterprise, those participants must do so "under the direction of upper management." *Reves*, 507 U.S. at 184. There

---

[10] Notably, Plaintiffs' response to the Individual Defendants' argument on this point does not contain a single citation to a case in which a Court has imposed RICO liability on successful participants in an alleged pyramid scheme.

is no evidence in the instant case, aside from Plaintiffs' conclusory allegations, that the Individual Defendants were acting under the direction of anyone in AdvoCare's management. Thus, the Court finds that Plaintiffs have failed to adequately allege that the Individual Defendants' actions satisfy the "conducted or participated" requirement.

Additionally, Plaintiffs' allegations are insufficient to satisfy the causation element. A RICO plaintiff must allege that the predicate acts are both the but-for and proximate cause of the injury. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). Proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* First-party reliance is not required. *Id.* at 661.

In the instant case, Plaintiffs have not shown that creating and disseminating promotional materials (one alleged predicate act) caused Plaintiffs' injuries, and they have not shown that the Individual Defendants operated the alleged pyramid scheme (the other alleged predicate act). Plaintiffs allege neither that they saw the Individual Defendants' promotional materials nor that they were lured into becoming Distributors because of them. Nor do they allege that any of the harms they suffered during their time as Distributors were in any way linked to the Individual Defendants' promotional activities.

Plaintiffs assert, "[F]acts necessary to prove that Defendants operated a fraudulent pyramid scheme will . . . suffice to show under *Bridge* that the fraud caused the Plaintiffs' injuries." Pls.' Br. 7 (quoting *Torres*, 838 F.3d at 641). Under *Torres*, Plaintiffs must show that their losses were caused "by reason of" the operation of the pyramid scheme. 838 F.3d at 638. However, there is one fatal issue with Plaintiffs' reliance on *Torres*: the *Torres* defendants (allegedly) operated a pyramid scheme. *See id.* (noting that the "by reason of" showing "could flow directly from a jury's finding that the Defendants are *operating* a pyramid scheme as opposed to a lawful multi-level

16

marketing program" (emphasis added)). As discussed above, the Court holds that the Individual Defendants did not operate the pyramid scheme. Thus, Plaintiffs must show some direct connection between their asserted injuries and the Individual Defendants' conduct. Because the Complaint does not contain any evidence of such a connection, Plaintiffs have not adequately alleged causation.

Finally, to show scienter, a plaintiff must plead that the defendant "act[ed] knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *Akpan*, 407 F.3d at 370. The factual pleadings must "give rise to a 'strong inference' of fraudulent intent." *Marriott Bros. v. Gage*, 704 F. Supp. 731, 740 (N.D. Tex. 1988). The Individual Defendants argue that Plaintiffs have not proved that they knew AdvoCare was an illegal pyramid scheme and promoted it anyway, with the intent to defraud others. Intent to deceive "may be alleged generally" through "evidence of a scheme to defraud by false or fraudulent representations." FED. R. CIV. P. 9(b); *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000). Plaintiffs contend that, in the Fifth Circuit, pyramid schemes are inherently fraudulent. *Torres*, 838 F.3d at 638-39. Thus, they argue, allegations that the Individual Defendants supervised the pyramid scheme suffice to show scienter. As noted above, however, the Court finds that Plaintiffs have failed to plead that the Individual Defendants supervised or operated the alleged pyramid scheme. Accordingly, *Torres* does not support Plaintiffs' position.

Because the Complaint is devoid of any other facts giving rise to a strong inference of fraudulent intent, the Court finds that Plaintiffs have not adequately pleaded scienter as to the Individual Defendants. Plaintiffs claim that the Individual Defendants are "well aware of" the fact that very few Distributors achieve financial success through AdvoCare, but they do not allege how

17

the Individual Defendants would have gained this knowledge. Compl. ¶ 174. Nor do Plaintiffs explain how the knowledge that few people succeed as AdvoCare Distributors would translate into knowledge that AdvoCare is an illegal pyramid scheme. Plaintiffs spend several pages detailing how the Individual Defendants defended AdvoCare from pyramid scheme allegations but provide no facts or circumstances from which the Court can infer that they knew or showed reckless disregard for the truth of these assertions. In fact, Plaintiffs note that, in the quintessential pyramid scheme, "participants, *knowingly or not*, just feed off each other's money and are highly incentivized to bring new participants into the scheme." Compl. ¶ 37 (emphasis added). Plaintiffs' allegations provide no support for the idea that the Individual Defendants possessed knowledge about the alleged AdvoCare pyramid scheme not possessed by lower-level Distributors. The fact that they have made significant profits and have risen within the ranks of AdvoCare participants is not enough to establish scienter.

Because the Court has identified multiple flaws with Plaintiffs' RICO pleadings as to the Individual Defendants' alleged primary RICO violations, it grants the Individual Defendants' Motion to Dismiss as to this claim.

### iii.    *Individual Defendants – RICO Conspiracy*

There are two central issues with Plaintiffs' RICO conspiracy claims. First, for the reasons discussed above, Plaintiffs have not pleaded a primary RICO violation with regard to the Individual Defendants. Second, Plaintiffs have not sufficiently alleged an agreement.

Plaintiffs argue that the Individual Defendants' participation in the scheme, along with the similarity and consistency of the Individual Defendants' and Advocare's conduct, suffice to show an agreement. Specifically, Plaintiffs point to the allegations surrounding the Individual Defendants' microsites and their promotional videos and materials. Because the microsites are

hosted and promoted by AdvoCare, Plaintiffs argue, they are evidence that the Individual Defendants and AdvoCare are "expressly working together to . . . promote the pyramid scheme." Compl. ¶¶ 176-77. This argument is unavailing. According to Plaintiffs, all Distributors have AdvoCare-provided microsites. *See id.* ¶¶ 49, 58. Plaintiffs fail to distinguish the Individual Defendants from the plethora of other Distributors who take advantage of the microsite platform. Without such differentiation, it is unclear to the Court how the Individual Defendants' use of their microsites manifests any sort of agreement among the Individual Defendants and/or between the Individual Defendants and AdvoCare.

For similar reasons, the alleged consistency and similarity of Defendants' conduct is insufficient evidence of an agreement. Plaintiffs again attempt to rely on the Individual Defendants' success to argue that they must have some role in AdvoCare's alleged pyramid scheme. However, their allegations do not explain why not every Distributor who promotes AdvoCare would be in violation of RICO. According to the Complaint, 747 participants made $50,000 or more per year, yet Plaintiffs only sued six of them. Compl. ¶ 139. The pleadings do not explain what differentiates these six, and they do not provide evidence that they entered into an agreement with AdvoCare.

Because Plaintiffs have failed to allege specifically a facially plausible agreement to commit predicate acts, the Court grants the Individual Defendants' Motion to Dismiss on this ground.

## C.  *Securities Fraud*

Plaintiffs bring securities fraud claims solely against AdvoCare. Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. *See Neiman*, 854 F.3d at 746. The PSLRA requires that the complaint specify each statement alleged to have

been misleading and, for each such statement, state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind. *Id.* Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate . . . ." 15 U.S.C. § 78j. Rule 10b-5(b), promulgated under Section 10(b), pertains to deceptive statements and omissions. To state a claim under Rule 10b-5(b), "a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

Rules 10b-5(a) and (c) govern "scheme liability" claims and require allegations "that the defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase of sale, and (4) that the defendant's actions caused the plaintiff's injuries." *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 678 n.45 (S.D. Tex. 2006) (citing *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 491-92 & n.90 (S.D.N.Y. 2005)). Because AdvoCare does not address Plaintiffs' Rule 10b-5(a) and (c)

claims in its Motion to Dismiss, the Court will not consider the merits of these claims at this time.

Thus, the Court turns to Plaintiffs' Rule 10b-5(b) claim.

In accordance with the PSLRA, the Complaint specifies certain allegedly misleading statements. First, Plaintiffs take issue with the following statement in the Policies (the "Retail Statement"):

> Retail sales are the foundation of a successful Distributorship. . . . [Earning income from retail sales] is the simplest way to earn income at AdvoCare. As a Distributor, you purchase products directly from the company at a discount ranging from 20 to 40 percent. You then sell the products at suggested retail value to your retail customers. The difference between what you paid for the products (at your discount) and what you sell them for at retail (what your customer pays you) is your immediate profit.[11]

Compl. ¶ 245. Plaintiffs argue that this statement is misleading because it does not inform Distributors that retail sales are not actually a viable source of income. Next, Plaintiffs take issue with a statement in the Policies that "The Compensation Plan is a work plan, and your compensation will depend on how much effort you expend, and to some extent, what area of the country you live in" (the "Effort Statement"). Compl. ¶ 247. Plaintiffs argue that this statement is misleading because it "fails to inform Distributors that very few Distributors are likely to earn any profit from participating in AdvoCare, regardless of how much work they put in and regardless of what part of the country they live in." Id. ¶ 248.

AdvoCare argues that Plaintiffs' pleadings fall short as to three elements of a Rule 10b-5(b) claim: materiality, reliance, and scienter. As to materiality, AdvoCare argues that the Retail Statement is not misleading when read in context. The Court disagrees. However, the Court reaches a different conclusion with regard to the Effort Statement. Plaintiffs attack this statement

---

[11] Plaintiffs take issue with the version of this statement found in the 2015 and 2016 Policies as well. The language is substantially the same, and no differences between the two versions affect the Court's analysis.

on the ground that it does not indicate that very few Distributors are likely to earn any profit, but the statement does not contain any express or implied promise of a profit. Thus, it does not conflict with the alleged actual state of affairs. *See R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (finding no actionable misstatement or omission where alleged true state of affairs did not make statement untrue or misleading). Thus, while the Retail Statement satisfies the materiality requirement, the Effort Statement does not.

Next, AdvoCare argues that Plaintiffs have not adequately alleged reliance. Reliance "generally requires that the plaintiff have known of the particular misrepresentation . . ., have believed it to be true[,] and because of that knowledge and belief purchased or sold the security in question." *Nathenson*, 267 F.3d at 413. Plaintiffs argue that they are entitled to a presumption of reliance because AdvoCare represents that it is a "legal multi-level marketing program, when it is in fact a fraudulent pyramid scheme." *Torres*, 838 F.3d at 643. However, *Torres* is a RICO case, and RICO does not always require proof of first-party reliance. *See id.* at 639. Securities fraud, by contrast, expressly requires a showing of reliance. *See Nathenson*, 267 F.3d at 407. This Court declines to extend the *Torres* presumption of reliance to the securities fraud context. Without the assistance of a presumption, the Court finds that Plaintiffs' pleadings are inadequate to show that they relied on any alleged misrepresentations.

Finally, as to scienter, AdvoCare argues that Plaintiffs' allegations fail because they do not link any specific individual to any of the challenged statements. Further, AdvoCare argues that where Plaintiffs did plead scienter, they did so in a conclusory fashion.[12] *See, e.g.*, Compl. ¶ 251

---

[12] As to the conclusory scienter pleadings, the Court agrees that such boilerplate allegations are plainly insufficient. *See, e.g.*, *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) ("[P]laintiffs must set forth *specific facts* supporting an inference of fraud." (emphasis in original)).

("AdvoCare made these omissions knowing that doing so was false and misleading."). The required state of mind for scienter is "an intent to deceive, manipulate, defraud, or severe recklesness." *Owens v. Jastrow*, 789 F.3d 529, 535-36 (5th Cir. 2015).

> [Severe recklessness] is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Neiman*, 854 F.3d at 747 (quoting *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014)).

The Fifth Circuit has stated that "allegations of motive and opportunity standing alone" are not enough to establish scienter, but such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." *Ind. Elec. Workers' Pension Tr. Fund IBEW*, 537 F.3d at 533. The Fifth Circuit has also rejected the group pleading approach to scienter, which would allow a plaintiff to prove a state of mind through the collective knowledge of all the corporation's officers and employees. *Id.* Instead, a court looks only to the state of mind of the corporate officials who made or issued the alleged misleading statement to determine whether a complaint sufficiently pleads scienter. *Id.*

"For purposes of determining whether a statement was made by the corporation was made by it with the requisite Rule 10(b) scienter," courts "look to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366. Plaintiffs argue that "a corporate defendant will itself be charged with unattributed statements made in public documents that further the interests of the corporation," but this argument is unpersuasive. Pls.' Br. 21 (citing *Southland*, 365 F.3d at 365

23

(treating the corporation as having made press releases and public statements issued by authorized officers on the corporation's behalf and in furtherance of its interests)).

First, Plaintiffs argue that, because the statements at issue come from AdvoCare's Policies, the statements should be attributed to AdvoCare. However, internal policies are distinguishable from the public disclosures at issue in *Southland*. Further, the *Southland* court knew which individual defendants made the complained-of statements and knew that the defendants were "executive officers of [the corporate defendant] whose actions were intended to benefit [the corporate defendant]." 365 F.3d at 365. In the instant case, Plaintiffs have not provided the Court with the identity of the individuals responsible for creating AdvoCare's Policies.

Second, Plaintiffs rely on an out-of-circuit case to argue that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). The *Tellabs* court created this exception for situations in which an announcement is issued that is so "dramatic" that it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* Courts applying the *Tellabs* exception within the Fifth Circuit have interpreted it narrowly. *In re BP p.l.c. Sec. Lit.*, 843 F. Supp. 2d 712, 789 (S.D. Tex. 2012); *In re Dell Sec. Lit.*, 591 F. Supp. 2d 877, 899 (W.D.

Tex. 2008).[13] In the instant case, the Court finds that the allegedly false or misleading statements are not sufficiently "dramatic" that the statements should be attributed to AdvoCare.

Finally, Plaintiffs argue that the persons in AdvoCare's management responsible for the text of the Policies knew that the statements about retail sales were misleading because they knew that (1) sales of retail products rarely happen; (2) the real purpose of AdvoCare is to re-allocate Distributors' money; and (3) all but a small percentage of Distributors will be net losers. Without evidence of who those persons are, however, the Court cannot conduct a scienter analysis. Thus, the Court grants AdvoCare's Motion to Dismiss as to Plaintiffs' Rule 10b-5(b) claim.

### D. *Unjust Enrichment*

Plaintiffs' final cause of action is for unjust enrichment. The parties dispute whether unjust enrichment is an independent cause of action in Texas. *Compare Adams v. Wells Fargo Bank N.A.*, No. 5:17-cv-73-JRG-CMC, 2018 WL 1100965, at *4 (E.D. Tex. Mar. 1, 2018) ("Texas courts have not recognized a claim for unjust enrichment as an independent cause of action . . . ."), *with Banion v. Geovera Specialty Ins. Co.*, No. H-15-1595, 2016 WL 7242536, at *3 (S.D. Tex. Dec. 15, 2016) ("Texas courts recognize unjust enrichment as an independent cause of action.").

Courts in the Northern District of Texas tend to agree that unjust enrichment is not a standalone cause of action, finding instead that it is a "theory of liability that a plaintiff can pursue through several equitable causes of action." *Hancock v. Chi. Title Ins. Co.*, 635 F. Supp. 2d 539, 560 (N.D. Tex. 2009) (collecting cases); *see also Chapman v. Commonwealth Land Title Ins. Co.*, 814 F. Supp. 2d 716, 725 (N.D. Tex. 2011). The reasoning of these courts is persuasive, and this

---

[13] It is true, as AdvoCare argues in its reply brief, that the Fifth Circuit has rejected "the group pleading approach to scienter." *In re BP*, 843 F. Supp. 2d at 749 (citing *Southland*, 365 F.3d at 366). However, the Fifth Circuit has not yet considered the narrow *Tellabs* exception, and *Tellabs* was issued four years after *Southland* was decided.

Court adopts their approach. Therefore, the Court dismisses Plaintiffs' unjust enrichment claim with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part both motions to dismiss. The Court denies both motions with regard to the argument that the PSLRA bars Plaintiffs' RICO causes of action, and the Court denies AdvoCare's motion to dismiss Plaintiffs' claims predicated on primary RICO violations. In all other respects, both motions are granted. The Court grants AdvoCare's motion to dismiss Plaintiffs' RICO conspiracy claim, securities fraud claim predicated on Rule 10b-5(b), and unjust enrichment claim. The Court grants the Individual Defendants' motion to dismiss all RICO causes of action.

The Court dismisses Plaintiffs' unjust enrichment cause of action with prejudice. With regard to all other claims, the Court dismisses Plaintiffs' causes of action without prejudice. Plaintiffs must seek leave to file an amended complaint by September 11, 2018. If a motion for leave to file, with the proposed amended complaint attached, is not filed by this date, Plaintiffs' claims will be dismissed with prejudice. Although the Court will allow Plaintiffs to amend their complaint, the Court notes that amendment may be futile with regard to the Individual Defendants. Plaintiffs should be mindful of the requirement that claims must be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." FED. R. CIV. P. 11(b)(2).

**SO ORDERED.**

SIGNED _August 27_, 2018.

_____

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**