**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| LISA RANIERI and MEGAN CORNELIUS, Individually and on Behalf of a Class of Similarly Situated Persons, | |
| Plaintiffs, | |
| v. | Case NO. 3:17-cv-00691-S |
| ADVOCARE INTERNATIONAL, L.P., | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO ADVOCARE INTERNATIONAL, L.P.'S**
**MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.        INTRODUCTION ................................................................................................. 1

II.       ALLEGATIONS IN THE AMENDED COMPLAINT ......................................... 2

III.      ARGUMENT ...................................................................................................... 3

          A.    The Distributors Had a Common Purpose ............................................... 6

          B.    The Amended Complaint Alleges a Person Distinct From a RICO Enterprise .... 11

          C.    Nothing about the Alleged Enterprise's Purpose Disqualifies it from RICO ....... 14

IV.       CONCLUSION ................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*Allstate Ins. Co. v. Michael Kent Plambeck, D.C.*
No. 3:08-CV-388-M, 2014 WL 1303000 (N.D. Tex. Mar. 31, 2014) ...................................... 6

*Allstate Ins. Co. v. Plambeck*
802 F.3d 665 (5th Cir. 2015) ..................................................................... 4, 5, 6, 15

*Armendairz v. Chowaiki*
No. EP-14-CV-451-KC, 2016 WL 8856919 (W.D. Tex. Mar. 31, 2016) .............................. 16

*Bennett v. Berg*
685 F.2d 1053 (8th Cir. 1982) ................................................................................ 5

*Bennett v. U.S. Trust Co. of N.Y.*
770 F.2d 308 (2nd Cir. 1985) .............................................................................. 10

*Boyle v. U.S.*
556 U.S. 938, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009) ............................................ passim

*Cedric Kushner Promotions, Ltd. v. King*
533 U.S. 158, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001) ................................................... 6, 10

*Conte v. Newsday, Inc.*
703 F. Supp. 2d 126 (E.D.N.Y. 2010) ................................................................... 12

*County of El Paso, Texas v. Jones*
No. EP-09-CV-00119-KC, 2009 WL 4730303 (W.D. Tex. Dec. 4, 2009) ............................ 16

*Dirt Hogs Inc. v. National Gas Pipeline Co. of America*
210 F.3d 389 (10th Cir. 2000) .............................................................................. 10

*Enzo Biochem, Inc. v. Johnson & Johnson*
No. 87 CIV. 6125 (KMW), 1990 WL 136038 (S.D.N.Y. Sept. 13, 1990) .............................. 6

*Escamilla v. City of Dallas*
No. 3-03-CV-0848-D, 2003 WL 22770197 (N.D. Tex. July 28, 2003)
*report and recommendation adopted*, No. CIV.A.3:03-CV-0848-D
2004 WL 51328 (N.D. Tex. Jan. 5, 2004) ............................................................... 10

*Fortier v. Yeager*
No. CIV. A. 94-496, 1994 WL 658455 (E.D. La. Nov. 21, 1994) ......................................... 10

*Gunther v. Dinger*
547 F. Supp. 25 (S.D.N.Y. 1982) ............................................................................ 5

ii

*Handeen v. Lemaire*
   112 F.3d. 1339 (8th Cir. 1997) ............................................. 5

*Kerrigan v. Visalus, Inc.*
   No. 14-CV-12693, 2016 WL 892804 (E.D. Mich. Mar. 9, 2016) ........................................... 12

*LaSalle Bank Lake View v. Seguban*
   937 F. Supp. 1309 (N.D. Ill. 1996) ....................................... 9

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*
   431 F.3d 353 (9th Cir. 2005) ............................................. 11

*Marriott Bros. v. Gage*
   911 F.2d 1105 (5th Cir. 1990) ............................................ 10

*McCullough v. Suter*
   757 F.2d 142 (7th Cir. 1985) ............................................. 5

*Migliaccio v. Midland Nat. Life Ins. Co.*
   No. CV 06-1007 CASMANX, 2007 WL 316873 (C.D. Cal. Jan. 30, 2007) ......................... 14

*Moore v. A.G. Edwards & Sons, Inc.*
   631 F. Supp. 138 (E.D. La. Mar. 1986) ................................... 10

*National Organization for Women, Inc. v. Scheidler*
   510 U.S. 249, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994) ....................... 4, 6

*Negrete v. Allianz Life Ins. Co. of N. Am.*
   926 F. Supp. 2d 1143 (C.D. Cal. 2013) .................................. 14

*Parker & Parsley Petroleum Co. v. Dresser Indus.*
   972 F.2d 580 (5th Cir. 1992) ............................................. 11

*Ranieri v. AdvoCare Int'l, L.P.*
   --- F. Supp. 3d ---, No. 3:17-CV-0691-S, 2018 WL 4078270 (N.D. Tex. Aug. 27, 2018)....... 10

*Rhoades v. Powell*
   644 F. Supp. 645 (E.D. Cal. 1986) ....................................... 5

*Roberts v. C.R. England, Inc.*
   318 F.R.D. 457 (D. Utah 2017) ..................................... 10, 14

*Russello v. United States*
   464 U.S. 16, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983) ......................... 4

*S.E.C. v. ConnectAJet.com, Inc.*
   No. 3:09-CV-142-B, 2010 WL 2484280  (N.D. Tex. June 17, 2010) ....................... 4

*Sabrina Roppo v. Travelers Commercial Ins. Co.*
    869 F.3d 568 (7th Cir. 2017) ........................................................................... 11

*Sedima, S.P.R.L. v. Imrex Co.*
    473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985) ................................... 4

*Sharif v. Wellness Int'l Network Ltd.*
    No. CV 06-1007 CASMANX, 2007 WL 316873 (C.D. Cal. Jan. 30, 2007) ........ 14

*Three Crown Ltd. P'ship v. Caxton Corp.*
    817 F. Supp. 1033 (S.D.N.Y. 1993) .................................................................... 5

*TransFirst Holdings, Inc. v. Phillips*
    No. 3:06-CV-2303-P, 2010 WL 11537522 (N.D. Tex. Jan. 19, 2010) ................. 6

*United States v. Goldin Indus., Inc.*
    219 F.3d 1271 (11th Cir. 2000) .......................................................................... 9

*United States v. Hutchinson*
    573 F.3d 1011 (10th Cir. 2009) ........................................................................ 15

*United States v. Turkette*
    452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) ................................... 6

*United States v. Warner*
    498 F.3d 666 (7th Cir. 2007) ....................................................................... 5, 10

*West Hills Farms, LLC v. ClassicStar Farms, Inc.*
    *(In re ClassicStar Mare Lease Litig.)*
    727 F.3d 473 (6th Cir. 2013) ........................................................................... 11

*Zastrow v. Houston Auto Imports Greenway Ltd.*
    789 F.3d 553 (5th Cir. 2015) ..................................................................... 15, 16

**Statutes**

18 U.S.C. § 1961(4) ............................................................................................ 1, 4

18 U.S.C. § 1962(c) ............................................................................................ 1, 4

**Other Authorities**

G. Robert Blakely
    *The RICO Civil Fraud Action in Context:  Reflections on Bennett v. Berg*
    58 Notre Dame L. Rev. 237 (1982) ..................................................................... 9

G. Robert Blakey & Kevin P. Roddy
    *Reflections on Reves v. Ernst & Young:  Its Meaning and Impact on Substantive,*

iv

*Accessory, Aiding and Abetting and Conspiracy Liability*
33 Am. Crim. L. Rev. 1345 (1996) ............................................................................ 9

Plaintiffs Lisa Ranieri and Megan Cornelius ("**Plaintiffs**") respectfully oppose AdvoCare International, L.P.'s ("**AdvoCare**") Motion to Dismiss the First Amended Class Action Complaint [Dkt. No. 57] (the "**Motion**").  Plaintiffs respectfully request that to the extent the Court grants any portion of the Motion, the Court allow Plaintiffs leave to amend the First Amended Class Action Complaint (the "**Amended Complaint**" or "**Am. Compl.**").

## I.   INTRODUCTION

Before the Court is AdvoCare's second motion to dismiss.  In neither its first nor second motions to dismiss has AdvoCare contested that Plaintiffs' allegations, if true, establish that AdvoCare operated a pyramid scheme.  Instead, then as now (and as with its earlier attempt to compel arbitration), AdvoCare hopes to avoid paying for its misconduct for reasons that have nothing to do with whether AdvoCare did anything wrong.

Plaintiffs have brought claims under 18 U.S.C. § 1962(c), which makes it unlawful for a RICO "person" associated with a RICO "enterprise" to "conduct such enterprise's affairs through a pattern of racketeering activity."  By statute, a RICO enterprise can be not only individuals and legal entities, but also "any group of individuals associated in fact."  18 U.S.C. § 1961(4).

AdvoCare's only challenge to the sufficiency of the Amended Complaint is that the allegations do not establish a "group of individuals associated in fact."  But the Distributors (as defined below) are plainly a group of associated individuals—they are all related to one another through, and incentivized by, AdvoCare's Compensation Plan.[1]  The AdvoCare system creates not a dispersed bunch of unrelated retailers, but rather a **network** of financially co-dependent and cooperating recruiters who share a common purpose—to make money by recruiting new Distributors and growing the network.

---

[1] Capitalized terms herein have the same meanings ascribed to them in the Amended Complaint.

1

AdvoCare asks this Court to apply a cribbed interpretation of "association-in-fact" and impose limitations not found in the statute so that the network of Distributors, while plainly a group of individuals associated in fact, is somehow not. This Court should reject AdvoCare's argument entirely.

## II.     ALLEGATIONS IN THE AMENDED COMPLAINT

AdvoCare sells nutritional supplements through what it represents to be a valid multi-level marketing business model. Am. Compl. ¶¶ 1-10. But, in reality, AdvoCare has orchestrated a pyramid scheme that is dependent on and run through a network of individuals and companies, known as "**Distributors**." *Id.* ¶¶ 1-10, 150-152.

While AdvoCare provides a framework for Distributors to operate under, AdvoCare mandates that Distributors remain independent from AdvoCare. AdvoCare defines "Distributor" to mean "Independent Distributor." *Id.* ¶ 27. And Distributors are "independent contractors, not employees of AdvoCare" who are not allowed "to do anything that would lead someone to believe that he or she is an **employee or an agent** of AdvoCare." *Id.* ¶¶ 27, 150 (emphasis added).

This independence is essential because AdvoCare's role is fundamentally different from Distributors' role. AdvoCare makes and sells nutritional supplements; Distributors purchase those supplements and recruit other Distributors to also purchase supplements and recruit. *Id.* ¶¶ 1-10. AdvoCare encourages product purchases through compensation incentives. *Id.* ¶¶ 50-89. The more a Distributor purchases, the greater in number and amount are the bonuses he can receive. *Id.* Most bonuses are not available at all, as a practical matter, unless a Distributor purchases AdvoCare's product. *See id.*

AdvoCare encourages its Distributors to recruit new Distributors. *Id.* ¶¶ 50-98. The more Distributors a Distributor recruits, the greater in number and amount are the bonuses he can receive

from AdvoCare.  *Id.*  Most bonuses are not available at all unless the Distributor recruits new Distributors.  *See id.*  And the new Distributors will be presented with the same encouragements to purchase product and recruit yet more Distributors.  *Id.*

If this structure ultimately resulted in product sales to non-Distributors, such that the Distributors were primarily paid with the proceeds of retail sales, AdvoCare and the Distributors likely would not be involved in a pyramid scheme.  But AdvoCare and the Distributors sell relatively little product (at least for a profit) to anyone other than Distributors.  *Id.* ¶¶ 99-118.  Also, nearly all the money coming into AdvoCare comes from Distributors.  Thus, most of the money that compensates Distributors comes from other Distributors.  *Id.*

Of course, most Distributors do not make a profit because the only people who make money are AdvoCare and the very few at the top of the pyramid.  *Id.* ¶ 149.  These few—including the Scheme Beneficiaries—have gotten rich from defrauding the 90+% of Distributors who lose money.  *Id.* ¶¶ 135-80.  Thus, most Distributors necessarily and expectedly, just as a matter of math, lose money.  *See id.*

AdvoCare and the Scheme Beneficiaries, obviously, do not announce that they are really involved in a pyramid scheme.  Rather, they present AdvoCare as a legitimate seller of nutritional supplements.  *See*, *e.g.*, *id.* at ¶ 182.  The contract documents between AdvoCare and its Distributors—the Distributor Agreement and the Policies and Procedures—emphasize retail sales and describe a multitude of rules and regulations relating to retail sales, as if retail sales were actually a significant part of the AdvoCare system.  *See id.* ¶¶ 119-34.

## III.    ARGUMENT

This Court has often noted that motions to dismiss under Fed. R. Civ. P. 12(b)(6) are "viewed with disfavor and [are] rarely granted."  *S.E.C. v. ConnectAJet.com, Inc.*, No. 3:09-CV-

142-B, 2010 WL 2484280, at *2 (N.D. Tex. June 17, 2010) (citation and internal quotation marks omitted).  AdvoCare's Motion is not the rare sort that justifies dismissal.

RICO makes it "unlawful for *any person* employed by or associated with *any enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) (emphasis added). AdvoCare does not dispute that its operation of a pyramid scheme, as alleged in the Amended Complaint, constitutes a "pattern of racketeering activity."   Nor does AdvoCare dispute that it qualifies as a "person" under Section 1962(c).  Rather, AdvoCare claims that Plaintiffs have not identified an "enterprise."

18 U.S.C. § 1961(4) defines "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  According to the U.S. Supreme Court, the term is to be interpreted broadly and expansively:

> This enumeration of included enterprises is obviously broad, encompassing "*any* ... group of individuals associated in fact.  The term "any" ensures that the definition has a wide reach and the very concept of an association in fact is expansive. In addition, the RICO statute provides that its terms are to be "liberally construed to effectuate its remedial purposes."[2]

An enterprise includes any "group of persons associated together for a common purpose of engaging in a course of conduct."   *Boyle*, 556 U.S. at 944 (internal quotations and citations omitted).  *See also Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015).  Such an

---

[2] *Boyle v. U.S.*, 556 U.S. 938, 944, 129 S. Ct. 2237, 2243, 173 L. Ed. 2d 1265 (2009) (internal quotations and citations omitted).  The *Boyle* Court went on (*see id.*) to cite other Supreme Court precedent confirming that "enterprise" should be interpreted broadly: *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 257, 114 S. Ct. 798, 803, 127 L. Ed. 2d 99 (1994) ("RICO broadly defines 'enterprise'"); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S. Ct. 3275, 3285, 87 L. Ed. 2d 346 (1985) ("RICO is to be read broadly"); *Russello v. United States*, 464 U.S. 16, 21, 104 S. Ct. 296, 300, 78 L. Ed. 2d 17 (1983) (noting "the pattern of the RICO statute in utilizing terms and concepts of breadth").

enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle*, 556 U.S. at 945; *Plambeck*, 802 F.3d at 673. Indeed, courts have found a myriad of different types of enterprises, including: (i) an investment broker, his supervisors, and brokerage firms[3]; (ii) relevant markets in United States Treasury notes[4]; (iii) an estate[5]; (iv) a bankruptcy estate[6]; (v) a retirement community[7]; (vi) governmental entities;[8] and (vii) a sole proprietorship.[9] An association-in-fact enterprise must have three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946; *Plambeck*, 802 F.3d at 673-674.

Here, Plaintiffs have alleged that the "enterprise" with which AdvoCare associates is the network of Distributors. These Distributors have a purpose, driven by AdvoCare's Compensation Plan—to make money by recruiting new Distributors, which benefits the network as a whole and (supposedly) the individual Distributors. There are relationships among the Distributors— pursuant to AdvoCare's Compensation Plan, every Distributor is linked to and associated with every Distributor downline and upline of that Distributor. And the network has existed for many years—AdvoCare does not challenge the longevity of the enterprise.

However, AdvoCare argues that the Amended Complaint fails to properly plead the existence of a RICO "enterprise" for three reasons: (1) the Distributors are not alleged to have a

---

[3] *Rhoades v. Powell*, 644 F. Supp. 645, 673 (E.D. Cal. 1986).

[4] *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1045 (S.D.N.Y. 1993).

[5] *Gunther v. Dinger*, 547 F. Supp. 25, 27 (S.D.N.Y. 1982).

[6] *Handeen v. Lemaire*, 112 F.3d. 1339, 1353 (8th Cir. 1997).

[7] *Bennett v. Berg*, 685 F.2d 1053, 1060 (8th Cir. 1982).

[8] *United States v. Warner*, 498 F.3d 666, 695-96 (7th Cir. 2007).

[9] *McCullough v. Suter*, 757 F.2d 142, 43 (7th Cir. 1985).

common purpose; (2) the Distributors are not sufficiently distinct from AdvoCare; and (3) the

purported purpose of the enterprise is identical to the alleged racketeering activity.  AdvoCare's

arguments all fail.

## A.     The Distributors Had a Common Purpose

The "common purpose" of a RICO enterprise need not be an illegal purpose:

> RICO both protects a legitimate "enterprise" from those who would use unlawful
> acts to victimize it, and also protects the public from those who would unlawfully
> use an "enterprise" (whether legitimate or illegitimate) as a "vehicle" through
> which "unlawful ... activity is committed."[10]

The "common purpose" of a RICO enterprise can be as simple as to make money.[11]  All the

members of the enterprise need not share all the same purposes.  *See Enzo Biochem, Inc. v. Johnson*

*& Johnson*, No. 87 CIV. 6125 (KMW), 1990 WL 136038, at *6 (S.D.N.Y. Sept. 13, 1990) ("The

Court thus declines to create a new requirement that members of RICO association-in-fact

enterprises share the same purposes.").

The Amended Complaint plausibly alleges an enterprise with a common purpose: to make

money by selling AdvoCare products, recruiting new Distributors, and growing the network of

Distributors.   Am. Compl. ¶¶ 36, 38, 44-98.   All Distributors have executed a Distributor

Agreement and paid AdvoCare fees, giving them the opportunity to participate in AdvoCare's

Compensation Plan.   *Id.* ¶¶ 41-43.   The common purpose of the enterprise—the Distributor

---

[10] *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164, 121 S. Ct. 2087, 2092, 150 L. Ed. 2d 198
(2001) (quoting *United States v. Turkette*, 452 U.S. 576, 591, 101 S. Ct. 2524, 2533, 69 L. Ed. 2d 246
(1981) and *Scheidler*, 510 U.S. at 259).  *See also TransFirst Holdings, Inc. v. Phillips*, No. 3:06-CV-2303-P, 2010
WL 11537522, at *25 (N.D. Tex. Jan. 19, 2010) (holding that the common purpose of a RICO enterprise can be
legitimate or illegitimate).

[11] *See Allstate Ins. Co. v. Michael Kent Plambeck, D.C.*, No. 3:08-CV-388-M, 2014 WL 1303000, at *3 (N.D. Tex.
Mar. 31, 2014) ("A shared 'desire to make money' is sufficient to satisfy RICO's common purpose requirement.")
(citation omitted), *aff'd sub nom. Plambeck*, 802 F.3d at 674 (rejecting defendants' argument that no common purpose
had been shown where plaintiff presented sufficient evidence to conclude that the defendants' "shared the goal of
making money through the scheme").

network—is to make money.  The Amended Complaint explains that by joining AdvoCare, the

Distributors obtain the rights to make money in various ways: to—

    (1)   purchase products directly from AdvoCare at a discounted price;
    (2)   **participate in the AdvoCare Compensation Plan (receive commissions and bonuses, if eligible);**
    (3)   **sponsor other individuals as Distributors, and build a downline organization**;
    (4)   receive AdvoCare communications and literature;
    (5)   participate in AdvoCare-sponsored training, motivational and recognition events upon meeting qualifying criteria and payment of appropriate charges, if applicable;
    (6)   **participate in AdvoCare-sponsored incentive trips and programs, if eligible**;
    (7)   earn a profit on Retail Sales, if eligible;
    (8)   **earn a profit from Wholesale Commissions, if eligible**; and
    (9)   **have an opportunity to advance to the Advisor level and be eligible to earn Overrides and Leadership Bonuses upon fulfilling requirements set forth in Section II: Compensation Plan**.

*Id.* ¶ 42 (emphasis added); Policies (3/11/16) at 6 [Appx. P. 0103]; Policies (5/21/15) at 6 [Appx.

P. 0070].  These are all (supposedly) money-making opportunities, and every Distributor pays

money to AdvoCare and receives those opportunities in return.  Moreover, the bolded items in the

list above all depend on recruiting—bringing new Distributors into the network—and as described

in the Amended Complaint, the only realistic way to make money in AdvoCare is through

recruiting.  Am. Compl. ¶¶ 44-98.

      Moreover, because of the nature of the AdvoCare "opportunity," the Distributors have

common interests and not simply parallel interests.  Every real financial incentive the Distributors

have depends on their own work and the efforts of other Distributors.  *Id.*  The more Distributors

recruited, the more money made by everyone upline of the new recruits.  *Id.* ¶¶ 35-114.  The more

product one Distributor buys, the more money made by the upline Distributors.  *Id.* ¶¶ 35-114,

155-156.  The more the network grows, the more money everyone can (supposedly) make.  *Id.*  As

Scheme Beneficiary McDaniel explained:

This is a relationship business where if I recruit someone like Katie Weathers who I just showed you her story. Katie's got a sister named Torie and we're gonna say "hey Katie let's talk to Torie for you" and she's gonna sign Torie up and Torie's got friends and family, Torie's gonna recruit those people. So the point I'm trying to make to you is as you recruit people that's called width and as we help those other people recruit people through their friends and family and their warm market of social networking they're going to recruit their friends and family as well and there's a sales compensation plan that is built to reward you for all of that and it's powerful and you saw that with the stories. And today my wife and I earn really over $300,000 a month in AdvoCare, we have distributors, you know that, on our own team that earn over $100,000 a month, we have distributors on our own team that earn 90 something thousand a month, 80 something thousand a month, 60 and 70 thousand a month, 50 thousand a month, all the way down. We have multitudes of distributors that are on incomes on all types of those levels. In these last 16 years as we've been helping them and so you just gotta decide is there something here for me and if there is will I go for it.[12]

The Distributors are thus unlike individual retailers of the same product, because each retailer may not profit from the success of another retailer.  In fact, the opposite may be true, because a product sold by one retailer may reduce demand for another retailer's goods.  But the AdvoCare Compensation Plan dictates that compensation of each individual Distributor depends upon not just the efforts and work of that Distributor, but also the ability of other Distributors to recruit new Distributors into the (pyramid-shaped) network.

Not only is the common purpose of making money alleged, but also the Amended Complaint is filled with allegations indicating that the Distributors work together in a coordinated manner.  More senior Distributors instruct junior Distributors on, for example, the benefits of moving up to the "Advisor" level (*see* Am. Compl. ¶ 63) or of pursuing a "Rookie Bonus."  *Id.* ¶¶ 87-88.  The Scheme Beneficiaries operate their own teams of Distributors.  *Id.* ¶¶ 150-51.  And, of course, the Scheme Beneficiaries instruct junior Distributors on why they should and how they

---

[12] *Id.* ¶ 156 (quoting https://www.youtube.com/watch?v=EM-gcNt8kX4, posted Apr. 12, 2013 (around the 25:50 mark)).

can become more successful Distributors through recruiting.  *Id.* ¶¶ 152-80.  Thus, the Amended

Complaint alleges cooperative action toward a common goal.  *Id.* ¶¶ 35-114, 155-156.

AdvoCare further argues that the common purpose requirement is not met because most of

the Distributors are victims of the fraud.  *See* Motion at 6-7.  Naturally, the Distributors would not

intentionally victimize themselves, and, of course, the Distributors did not have the common

purpose of victimizing themselves.  But they had the common purpose of making money by

growing the AdvoCare network, even if a few (the Scheme Beneficiaries) may have had a separate

purpose of making money by defrauding other Distributors.[13]

AdvoCare's argument that victims cannot be members of the RICO enterprise is contrary

to the majority of cases and scholarly material.[14]  Professor G. Robert Blakely, RICO's

acknowledged architect and principal draftsman, has explained that:  "[a]n association-in-fact is

not a . . . conspiracy; it may include the *victim*";[15] in fact, a member of an enterprise can be a

"prize, investment, *victim*, or perpetrator."[16]  In addition, many courts in the Fifth Circuit have

required plaintiffs to file RICO case statements identifying whether or not members of an alleged

---

[13] Am. Compl. ¶¶ 35-114, 155-156.  In fact, far from being a factor against the existence of an enterprise, the ability of each member of an enterprise "to act independently and advance its own interests contrary to those" of the other members supports the existence of an enterprise because it shows that the members were sufficiently independent of AdvoCare.  *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1277 (11th Cir. 2000).  *See supra* at 11-13.

[14] *E.g.*, *LaSalle Bank Lake View v. Seguban*, 937 F. Supp. 1309, 1322 (N.D. Ill. 1996) (observing that an enterprise is often a victim of the racketeering activity).

[15] G. Robert Blakey & Kevin P. Roddy, *Reflections on Reves v. Ernst & Young:  Its Meaning and Impact on Substantive, Accessory, Aiding and Abetting and Conspiracy Liability*, 33 Am. Crim. L. Rev. 1345, 1647 (1996) (emphasis added).

[16] G. Robert Blakely, *The RICO Civil Fraud Action in Context:  Reflections on Bennett v. Berg*, 58 Notre Dame L. Rev. 237, 307 (1982) (emphasis added); *see* United States Sentencing Commission Primer RICO Guideline, May 2018, available at https://www.ussc.gov/sites/default/files/pdf/training/primers/2018_Primer_RICO.pdf ("Thus . . . under Section 1962(c) and (d) a legitimate enterprise may be the victim of racketeering activity.").

RICO enterprise were "perpetrators, passive instruments, or *victims*," which strongly implies that victims can be members of an enterprise.[17]

No one doubts that a RICO enterprise can also be a victim of the unlawful scheme.[18]  And the law is clear that the common purpose shared by members of an enterprise can be a legal purpose.  *See supra* at 6.  With these two principles in mind, there is no reason why the broad remedial reach of RICO would not extend to protect members of a RICO enterprise who shared a common, legitimate purpose and who were also victims of the RICO defendant's illegal conduct of the enterprise's affairs.

The two cases AdvoCare cites do not compel a different conclusion.  The court in *Dirt Hogs Inc. v. National Gas Pipeline Co. of America*, did not hold that victims could not be members of a RICO enterprise. 210 F.3d 389 (10th Cir. 2000) (unpublished).  Rather, the court merely questioned, in footnote dicta, whether they could be. *See id.* at *4, n.2.  Further, *Roberts v. C.R. England, Inc.*, is at odds with logic and the weight of authority. 318 F.R.D. 457 (D. Utah 2017).[19]

Alternatively, even if AdvoCare were right (it is not) that victims *per se* cannot be members of a RICO enterprise, this Court should still not dismiss the RICO claims because the Amended

---

[17] *E.g.*, *Marriott Bros. v. Gage*, 911 F.2d 1105, 1110 (5th Cir. 1990) (emphasis added); *Escamilla v. City of Dallas*, No. 3-03-CV-0848-D, 2003 WL 22770197, at *3 (N.D. Tex. July 28, 2003), *report and recommendation adopted*, No. CIV.A.3:03-CV-0848-D, 2004 WL 51328 (N.D. Tex. Jan. 5, 2004).

[18] *See Cedric Kushner*, 533 U.S. at 164; *see also Warner*, 498 F.3d at 696 (explaining that a governmental entity can be a RICO enterprise and "a victim of the overall scheme, as are many RICO enterprises); *Fortier v. Yeager*, No. CIV. A. 94-496, 1994 WL 658455, at *8 (E.D. La. Nov. 21, 1994) ("Nothing in the RICO case law or jurisprudence precludes 'an entity from functioning  . . . as an "innocent victim" of certain racketeering activity, and thus be the enterprise under section 1962(c)'"); *Moore v. A.G. Edwards & Sons, Inc.*, 631 F. Supp. 138, 145 (E.D. La. Mar. 1986) ("The law is clear . . .the enterprise itself is often a passive instrument or victim of the racketeering activity.") (citing *Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 315 (2nd Cir. 1985)).

[19] AdvoCare suggests that this Court's ruling denying in part AdvoCare's prior motion to dismiss establishes that the Distributors worked individually and without coordination.  *See* Motion at 10 (citing *Ranieri v. AdvoCare Int'l, L.P.*, --- F. Supp. 3d ---, No. 3:17-cv-0691-S, 2018 WL 4078270, at *5 (N.D. Tex. Aug. 27, 2018)).  But this Court's opinion did not address whether the Distributors worked alone and without coordination with other Distributors.  The Court did find, correctly, that AdvoCare promotes itself as a work plan and that Distributors are told they will need to work hard to be successful.  That says nothing about whether there is coordination or co-dependence between the Distributors.

Complaint sets forth sufficient facts to support a claim that the Scheme Beneficiaries alone—those Distributors at the top of the pyramid who had to have known that AdvoCare operated a pyramid scheme—constitute an enterprise.   Am. Compl. ¶¶ 11, 149-193.

**B.      The Amended Complaint Alleges a Person Distinct From a RICO Enterprise**

AdvoCare argues that the Distributors are mere agents of AdvoCare, engaging in AdvoCare's usual course of business and thus not distinct for the purposes of a RICO enterprise. Motion at 10-12.  Plaintiffs do not dispute that a RICO person is not sufficiently distinct from the RICO enterprise when the enterprise is just "functioning through its employees in the course of their employment."  *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 583 (5th Cir. 1992).  However, that is not what Plaintiffs alleged.

Where the RICO enterprise performs a different function from the RICO person (even when the RICO person is a corporation), the distinctness requirement can be met.  *See West Hills Farms, LLC v. ClassicStar Farms, Inc. (In re ClassicStar Mare Lease Litig.)*, 727 F.3d 473, 492 (6th Cir. 2013) ("corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity"). Courts also consider the amount of independence the members of the enterprise have from the corporation in assessing distinctness.[20]

Here, the Distributors perform different and essential functions from those performed by

---

[20] *See Sabrina Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 588–89 (7th Cir. 2017) (holding that a corporation can be sufficiently distinct from an enterprise consisting of a corporation and its outside counsel);  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361–62 (9th Cir. 2005) (holding that the DuPont corporation was sufficiently distinct from an enterprise consisting of the corporation, its attorneys, and the expert witnesses the attorneys retained, because the attorneys, although working for the corporation, retained professional independence); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 136, n. 6 (E.D.N.Y. 2010) (refusing to grant a motion to dismiss arguing that independent contractor were merely agents of a corporation since plaintiff alleged facts that independent contractors were in fact independent from the corporation).

AdvoCare.  For one, the Distributors recruit new Distributors.  Am. Compl. ¶¶ 50-98.  AdvoCare certainly encourages Distributors to recruit new Distributors—indeed, the whole structure of its Compensation Plan is designed to encourage recruiting—but it is the Distributors who are the engines of recruiting.  *Id.* ¶¶ 35-98, 150-176.  Not only did the Distributors do the essential task of recruiting, but also (according to AdvoCare's Policies in effect at the end of the Class Period) they were the sole means of selling AdvoCare product:  "AdvoCare Independent Distributors are the exclusive distribution channel for AdvoCare's products" (Policies (5/18/16) at 2 [Appx. P. 0135]), and "Only Distributors may sell Products" (Policies (3/11/16) at 14 [Appx. P. 0111]).  Further, certain Distributors, like the Scheme Beneficiaries, provide examples of wealth used to entice new Distributors to participate in the pyramid scheme.  Am. Compl. ¶¶ 149-176, 188.

The court in *Kerrigan v. Visalus, Inc.*, considered and rejected the same argument raised by the defendants there in another RICO, pyramid scheme case:

> The allegations in the First Amended Complaint satisfy [RICO's] "distinctiveness" requirement.  Plaintiffs have alleged that the enterprise consisted of ViSalus, its officers, and numerous *independent outside* promoters (the IPs).  Importantly, Plaintiffs allege that the IPs played a role in the enterprise that was wholly distinct from that of ViSalus.  Plaintiffs claim that IPs promoted ViSalus products and the ViSalus lifestyle to unwitting recruits. . . . Meanwhile, ViSalus, the corporate entity, provided the overall structure for the ViSalus Program and was responsible for the company's day-to-day operations, such as mailing out weight-loss products to customers and IPs who purchased them. . . . That ViSalus and the IPs played different roles is the alleged scheme underscores that the overall enterprise was distinct from ViSalus.

No. 14-CV-12693, 2016 WL 892804, at *10 (E.D. Mich. Mar. 9, 2016) (emphasis in original). *See also id.* (noting that the "IPs" "added a critical 'air of legitimacy' to the ViSalus Program by posing as false success stories and promoting the idea that anybody could become rich through the ViSalus Program").  Just as ViSalus was sufficiently distinct from the IPs, AdvoCare is sufficiently distinct from the Distributors.

Moreover, AdvoCare's Policies mandate and emphasize the Distributors' independence from AdvoCare. The Policies define "Distributor" to mean "Independent Distributor" (Policies (10/6/11) at 2 [Appx. P. 0012]; Policies (1/25/13) at 2 [Appx. P. 0038]; Policies (5/21/15) at 6 [Appx. P. 0070]; Policies (3/11/16) at 6 [Appx. P. 0103]) yet still, to drive the point home, use the term "Independent Distributor" twenty-four times in the Policies. The Policies explain that Distributors are "independent contractors, not employees of AdvoCare" who are not allowed "to do anything that would lead someone to believe that he or she is an employee or an agent of AdvoCare."[21] And because Distributors are not AdvoCare's agents, they:

> are responsible for the following:
> (1) Setting retail prices for Products sold . . .;
> (2) Establishing working hours;
> (3) Conducting the day-to-day business; and
> (4) Reporting to the IRS any income earned from the Distributorship.

(Distributor Agreement at 3 [Appx. P. 0003]).

Further, Distributors must identify themselves as "Independent Distributors." *See* Policies (3/11/16) at 6 [Appx. P. 0103]. AdvoCare explains that it has its own confidential information regarding "*AdvoCare's business*" that AdvoCare may share with Distributors to help "run and grow the *Distributor's business*." *Id.* at 12 [Appx. P. 0109] (emphasis added). The Distributor's business—since it is different from AdvoCare's business—can even be passed on to heirs. Policies (3/11/16) at 23-24 [Appx. P. 0120-121]. Distributors often operate through their own registered business entities and setup and maintain their own websites. Am. Compl. ¶¶ 150-152. They can also participate in other network marketing ventures. Policies (3/11/16) at 11 [Appx. P. 0108].[22]

---

[21] Distributor Agreement at 3 [Appx. P. 0003]; Policies (10/6/11) at 2 [Appx. 012]; Policies (1/25/13) at 2 [Appx. P. 0038]; Policies (5/21/15) at 10 [Appx. P. 0074]; Policies (3/11/16) at 10 [Appx. P. 0107].

[22] *Negrete v. Allianz Life Ins. Co. of N. Am.*, 926 F. Supp. 2d 1143, 1151 (C.D. Cal. 2013) (refusing to grant summary judgment on distinctiveness grounds since enterprise members were allowed to sell products from different

Thus, the Distributors were not just doing AdvoCare's business. They did their own business. They were not AdvoCare's agents. AdvoCare had only limited controls over to whom the Distributors sold product, where they sold product, when they sold product, or how much product they sold. Am. Compl. ¶¶ 149-176, 188. These factors differentiate this case from *Roberts v. C.R. England, Inc.*, where the "drivers' participation in the enterprise was subject to Defendants' control." 318 F.R.D. at 486. Unlike the drivers in *Roberts*, the Distributors performed different and essential functions over which AdvoCare had only limited control, which places this case on all fours with the only case to consider the distinctiveness issue in a RICO/pyramid scheme case— *ViSalus*.[23]

## C.    Nothing about the Alleged Enterprise's Purpose Disqualifies it from RICO

AdvoCare's final argument is that Plaintiffs "are required to plead specific facts that establish that the association exists for purposes other than simply to commit the predicate acts." Motion at 13. The Court should reject this argument.

A RICO enterprise does not have to exist for purposes other than to commit the wrongful acts complained of. In *Boyle*, the U.S. Supreme Court addressed the argument that an enterprise needs a purpose beyond that inherent in the pattern of racketeering activity. 556 U.S. at 944-49. The Court noted that "evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." *Id.* at 947. And the Court held that

---

companies); *Migliaccio v. Midland Nat. Life Ins. Co.*, No. CV 06-1007 CASMANX, 2007 WL 316873, at *4 (C.D. Cal. Jan. 30, 2007) (holding that where independent contractors are allowed to sell products or services from different companies, they are distinct from the corporate defendant).

[23] In *Sharif v. Wellness Int'l Network Ltd.*, the alleged enterprise consisted of the multi-level marketing company ("WIN"), its general partner ("WINNI") and WIN executives (its president, secretary, director of distributor relations). No. CV 06-1007 CASMANX, 2007 WL 316873, at *1, *8 (C.D. Cal. Jan. 30, 2007) (describing defendants; describing alleged association-in-fact). None of the WIN distributors were alleged to be part of the enterprise. Thus, the pleadings in that case did not satisfy the person/enterprise distinction. *See id.* at *8. Obviously, the Amended Complaint here alleges that the Distributors form the RICO enterprise, not any AdvoCare executives.

"a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise. *Id.* at 951. The Court even noted that "a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." *Id.* at 948.

In *Plambeck*, the Fifth Circuit, citing *Turkette*, specifically overruled the argument that "there must be a different purpose because the RICO enterprise cannot be the pattern of racketeering itself." 802 F.3d at 674-675. The *Plambeck* court explained:

> Even with wholly illegitimate enterprises such as an illegal gambling business or a loan-sharking operation the government must still satisfy different legal standards to show the existence of the enterprise and the pattern of racketeering. Although the evidence proving the two will sometimes coalesce, the government still has to satisfy the organizational metric of the enterprise (including continuity and common purpose) and the statutorily enumerated predicate offenses. There is thus no impermissible collapsing of the distinction between the enterprise and the pattern of racketeering.

*Id.* at 674. Consequently, AdvoCare's argument—that the enterprise must have a different *purpose* than the racketeering activity—is inconsistent with this controlling authority.

Plaintiffs acknowledge, however, that there are cases supporting the proposition that an enterprise must exist apart from just the commission of a racketeering activity. *See Zastrow v. Houston Auto Imports Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015).[24] The enterprise alleged in the Amended Complaint meets this requirement (if there even is such a requirement). At least part of the object of enterprise was, at least theoretically, to sell AdvoCare product at retail. Am. Compl. ¶¶ 44-65, 99-102, 120-125. Plaintiffs have alleged that relatively few retail sales were actually made, but certainly selling at retail was a supposed money-making opportunity. *Id.* There is nothing wrongful about selling AdvoCare product at retail. Indeed, there is nothing wrongful

---

[24] The Tenth Circuit in *United States v. Hutchinson,* 573 F.3d 1011 (10th Cir. 2009), recognized that the Supreme Court in *Boyle* resolved a circuit split and held that a RICO association-in-fact could exist even though the association was formed solely for the purpose of performing the alleged racketeering activity. *Id.* at 1021.

about multi-level marketing, so long as retail sales are actually achieved such that the participants are not simply being paid with each other's money (just as in a pyramid scheme).  And, of course, while it was certainly AdvoCare's intent—at least during the Class Period—to defraud the Distributors, the Amended Complaint does not establish that defrauding Distributors was every Distributor's intent.  Thus, this is not a case like *Armendairz v. Chowaiki*, or *Zastrow v. Houston Auto Imports Greenway Ltd.*, where the alleged enterprise was just an alleged group of knowing conspirators who joined together for the sole purpose of committing the alleged misconduct. *Armendairz*, No. EP-14-CV-451-KC, 2016 WL 8856919, at *2 (W.D. Tex. Mar. 31, 2016); *Zastrow*, 789 F.3d at 562.  Rather, this case is more like *County of El Paso, Texas v. Jones*, in which the court found that an organization that engaged in legitimate and illegitimate activities could constitute a RICO enterprise.  No. EP-09-CV-00119-KC, 2009 WL 4730303, at *22 (W.D. Tex. Dec. 4, 2009).[25]

## IV.     CONCLUSION

Plaintiffs respectfully request that the Court deny AdvoCare's Motion. To the extent the Court determines to grant any portion of the Motion, Plaintiffs request leave to amend.

---

[25] The *County of El Paso* court also examined *Boyle* and questioned whether alleging the existence of an enterprise separate and apart from the alleged racketeering activities was even necessary, so long as the allegations established an ongoing association-in-fact.  *See id.*

16

Dated: November 14, 2018

By: /s/ *J. Benjamin King*_____
    J. Benjamin King (SBN 24046217)
    REID COLLINS & TSAI LLP
    1601 Elm St., Suite 4250
    Dallas, Texas 75201
    Tel.: 214-420-8900
    bking@rctlegal.com


    R. Adam Swick (SBN 24051794)
    REID COLLINS & TSAI LLP
    1301 S. Capital of Texas Hwy.
    Bldg. C, Suite 300
    Austin, Texas 78746
    Tel.: 512-647-6100
    aswick@rctlegal.com

    *Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I certify that on November 14, 2018, a copy of the foregoing document was served on the parties to this action by electronically filing true and correct copies with the Clerk of the Court using the ECM/ECF system which automatically sent notification by e-mail of such filing to all counsel of record.

    */s/ J. Benjamin King*_____
    J. Benjamin King

17