**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| LISA RANIERI and MEGAN CORNELIUS, Individually and on Behalf of a Class of Similarly Situated Persons, | |
| Plaintiffs, | |
| v. | Case NO. 3:17-cv-00691-S |
| ADVOCARE INTERNATIONAL, L.P., | |
| Defendants. | |

**PLAINTIFF'S UNOPPOSED MOTION FOR
PRELIMINARY SETTLEMENT CLASS CERTIFICATION,
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT,
APPOINTMENT OF CLASS COUNSEL,
APPOINTMENT OF CLASS REPRESENTATIVE,
APPROVAL OF CLASS NOTICE PROGRAM, AND
SCHEDULING OF FAIRNESS HEARING**

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................................... 2

II.  BACKGROUND ........................................................................................................ 6

    A.  Summary of the Case ......................................................................................... 6

    B.  Procedural History ............................................................................................ 8

        1.  Arbitrating Arbitrability............................................................................ 8

        2.  Motions to Dismiss ................................................................................... 9

        3.  Discovery ................................................................................................ 10

        4.  The FTC Settlement ............................................................................... 11

    C.  Settlement Negotiations .................................................................................. 12

    D.  Primary Terms of the Settlement .................................................................... 15

        1.  Class Definition ...................................................................................... 15

        2.  Cash Awards ........................................................................................... 16

        3.  Timing..................................................................................................... 18

III. ARGUMENT ........................................................................................................... 20

    A.  The Court Should Conditionally Certify the Settlement Class ....................... 21

        1.  The Proposed Class, the Plaintiff, and her Counsel Satisfy the
           Requirements of Rule 23(a). ................................................................... 22

        2.  The Requirements of Rule 23(b)(3) Are Satisfied ................................. 27

    B.  The Court Should Appoint Plaintiff's Counsel to be Class Counsel and Appoint
       Plaintiff as Class Representative...................................................................... 30

    C.  The Court Should Preliminarily Approve the Settlement................................. 33

        1.  The Settlement Agreement Is the Product of Serious, Informed,
           Non-collusive Negotiations ................................................................... 34

        2.  The Settlement Agreement Does Not Improperly Grant Preferential
           Treatment to the Class Representative or Segments of the Class............... 35

        3.  The Settlement Agreement Falls Well Within the Range of Reasonableness........... 35

    D.  The Court Should Approve the Notice Program.............................................. 39

    E.  The Court Should Schedule a Fairness Hearing ............................................. 42

IV. CONCLUSION......................................................................................................... 42

## TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*
  521 U.S. 591 (1997) ................................................................................. 21, 22, 27, 30

*Arata v. Nu Skin Int'l, Inc.*
  5 F.3d 534 (9th Cir. 1993) ................................................................................. 22

*Bostick v. Herbalife Int'l of Am., Inc.*
  2015 WL 3830208 (C.D. Cal. June 17, 2015) ................................................... 22

*Caligiuri v. Symantec Corp.*
  855 F.3d 860 (8th Cir. 2017) ............................................................................. 40

*Camp v. Progressive Corp.*
  2004 WL 2149079 (E.D. La. Sept. 23, 2004) .................................................... 35

*Cotton v. Hinton*
  559 F.2d 1326 (5th Cir. 1977) ........................................................................... 33

*Del Carmen v. R.A. rogers, Inc.*
  2018 WL 4701824 (W.D. Tex. April 25, 2018) (magistrate report and recommendation),
  *adopted at* 2018 WL 4688774 ........................................................................... 20

*Diaz v. Panhandle Maintenance, LLC,*
  2020 WL 587644 (N.D. Tex. Feb. 6, 2020) ....................................................... 33

*Duncan v. JPMorgan Chase Bank, N.A.*
  2015 WL 11623393 (W.D. Tex. Oct. 21, 2015) ................................................. 33

*Eatmon v. Palisades Collection, LLC*
  2010 WL 1189571 (E.D. Tex. March 5, 2010) ................................................... 24

*Feder v. Elec. Data Sys. Corp.*
  429 F.3d 125 (5th Cir. 2005) ............................................................................. 24

*French v. Essentially Yours Indus., Inc.*
  2008 WL 2788511 (W.D. Mich. July 16, 2008) ................................................. 22

*Frey v. First Nat. Bank Southwest*
  602 Fed. Appx. 164 (5th Cir. 2015) .............................................................. 27, 29

*Hackler v. Tolteca Enterprises, Inc.*
  2019 WL 1159523 (W.D. Tex. Sept. 9, 2019) ................................................... 26

*Hanrahan v. Britt*
  174 F.R.D. 356 (E.D. Pa. 1997) ........................................................................ 22

*Hays v. Eaton Group Attorneys, LLC*
  2019 WL 427331 (M.D. La. Feb. 4, 2019) ........................................................ 33

*In re Domestic Airline Antitrust Litig.*
  322 F. Supp. 3d 64 (D.D.C. Aug. 22, 2018) ...................................................... 40

*In re Heartland Payment Sys.*
  851 F. Supp. 2d 1040 (S.D. Tex. 2012) ................................................................. 21

*In re Katrina Canal Beaches Litig.*
  628 F.3d 185 (5th Cir. 2010) ...................................................................... 33, 41

*In re Nissan Motor Corp. Antitrust Litig.*
  552 F.2d 1088 (5th Cir. 1977) ............................................................................ 41

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*
  910 F. Supp. 2d 891 (E.D. La. 2010) ............................................................ 21, 27

*In re Pool Prods. Dist. Market Antitrust Litig.*
  310 F.R.D. 300 (E.D. La. 2015) ......................................................................... 40

*James v. City of Dallas*
  254 F.3d 571 (5th Cir. 2001) ............................................................................. 24

*Kelly v. Phiten USA, Inc.*
  277 F.R.D. 564 (S.D. Iowa 2011) ...................................................................... 40

*Kemp v. Tower Loan of Mississippi*
  2017 WL 3426240 (S.D. Miss. Aug. 8, 2017) ................................................... 29

*Klein v. O'Neal, Inc.*
  705 F. Supp. 2d 632 (N.D. Tex. 2010) ............................................................... 36

*Lightbourn v. County of El Paso*
  118 F.3d 421 (5th Cir. 1997) ............................................................................. 23

*McNamara v. Bre-X Minerals Ltd.*
  214 F.R.D. 424 (E.D. Tex. 2002) ................................................................. 20, 21

*Mullen v. Treasure Chest Casino, LLC*
  186 F.3d 620 (5th Cir. 1999) ............................................................................. 27

*Nguyen v. FundAmerica, Inc.*
  1990 WL 165251 (N.D. Cal. Aug. 16, 1990) ..................................................... 22

*Pokorny v. Quixtar Inc.*
  No. 07-0201 SC, slip op. at 1 (N.D. Cal. Feb. 21, 2012) ................................... 22

*Ranieri v. AdvoCare Int'l, L.P.*
  2019 WL 3207501 (N.D. Tex. July 16, 2019) ................................................... 10

*Ranieri v. AdvoCare Int'l, L.P.*
  336 F. Supp. 3d 701 (N.D. Tex. 2018) ............................................................... 10

*Reed v. Gen. Motors Corp.*
  703 F.2d 170 (5th Cir. 1983) ............................................................................. 36

*Roberts v. First Finan. Planners, Inc.*
  2006 WL 8444265 (N.D. Miss. June 26, 2006) ................................................. 20

*Serna v. Transp. Workers Union of Am., AFL-CIO*
  2014 WL 7721824 (N.D. Tex. Dec. 3, 2014) ..................................................... 24

iii

*Thrower v. Universal Pegasus, Int'l Inc.*
   --- F. Supp. 3d ---, 2020 WL 5258521 (S.D. Tex. Sept. 3, 2020)............................................ 40

*Torres v. S.G.E. Mgmt. LLC*
   2014 WL 129793 (S.D. Tex. Jan. 13, 2014) ("*Torres I*")........................................... 23, 24, 36

*Torres v. S.G.E. Mgmt., L.L.C.*
   838 F.3d 629 (5th Cir. Sept. 30, 2016) (*en banc*) ("*Torres II*")........................................ passim

*Welsh v. Navy Federal Credit Union*
   2018 WL 7283639 (W.D. Texas Aug. 20, 2018).................................................................... 35

**Statutes**

18 U.S.C. § 1961 ............................................................................................................................. 8

Tex. Bus. & Com. Code § 17.46(b)(21) ................................................................................... 10

Tex. Bus. & Com. Code § 17.461 ............................................................................................. 10

Tex. Bus. & Com. Code § 17.50(a)(1) ..................................................................................... 10

**Other Authorities**

54 AMERICAN LAW REPORTS (THIRD) § 217(1)(c), *Introduction—Description of a Pyramid Distribution Plan* (1973).................................................................................................... 7

**Rules**

Fed. R. Civ. P. 23 .................................................................................................................. passim

Plaintiff Megan Cornelius[1] hereby moves for preliminary settlement class certification, preliminary approval of a class action settlement agreement, appointment of class counsel, appointment as class representative, approval of a proposed class notice program, and scheduling of a fairness hearing. AdvoCare International, L.P. ("**AdvoCare**")[2] has agreed to the relief sought in this motion.

Should the Court grant the requested relief, the following schedule of key dates should apply:

| | |
|---|---|
| **77 days before Fairness Hearing** | Deadline for Settlement Administrator to provide initial notice to Putative Class Members. |
| **42 days before Fairness Hearing** | Deadline for Class Counsel to move for an award of fees and expenses.<br><br>Deadline for Plaintiff to move for a service award.<br><br>Deadline for Plaintiff to move for final approval of Settlement Agreement. |
| **21 days before Fairness Hearing** | Deadline for Class Members to object to the Settlement Agreement, motion for fee award, and motion for a service award.<br><br>Deadline for Putative Class Members to opt out of the Class. |
| **14 days before Fairness Hearing** | Deadline for Plaintiff to respond to objections to pending motions. |
| **[DATE To be set by Court, at least 105 days after granting this motion]** | Fairness Hearing |

---

[1] The "**Parties**" are, on the one hand, Megan Cornelius ("**Plaintiff**"), on behalf of herself and the putative class described herein, and, on the other hand, AdvoCare International, L.P. ("**AdvoCare**"). Lisa Ranieri is a named plaintiff, but she does not join this motion. Her claims against AdvoCare are being settled separately.

[2] At the time of filing of this Motion, AdvoCare is operating as AdvoCare International, LLC.

1

## I.   INTRODUCTION

From its founding until May 2019, AdvoCare was a multi-level marketer (a "**MLM**") of nutritional supplements and nutritional products.  AdvoCare's business model ostensibly allowed its "**Distributors**" (the persons who participated in AdvoCare's compensation and sales program) to purchase AdvoCare products at wholesale prices and sell them at higher retail prices. AdvoCare's system also offered the potential for financial rewards to each Distributor based on how many new Distributors (the "**Recruits**") the Distributor recruited into the program, how much product each Distributor's Recruits purchased, how much product Recruits further downline of the Distributor purchased, and how much product the Distributor purchased herself.  Plaintiff contends that AdvoCare operated an illegal pyramid scheme because few retail sales (sales to non-Distributors) actually occurred, and a Distributor's only chance at making money was to bring in Recruits, who purchased more product (and who also brought in yet more Recruits who purchased more product).[3]  Further, the system highly incentivized Distributors to purchase product they did not want and could not sell to maintain or move up within AdvoCare's Distributor ranks.

On March 9, 2017, Plaintiff Cornelius and Lisa Ranieri filed this case, bringing claims on their own behalves and seeking to bring claims on behalf of all Distributors who lost money during the class period through their participation in AdvoCare (meaning, all Distributors who paid AdvoCare more money than AdvoCare paid them).  The case then proceeded to arbitration for a determination of arbitrability, multiple rounds of motion to dismiss briefing, class certification discovery, and three mediations.  The litigation history of the case is detailed more thoroughly below.

---

[3] AdvoCare is unopposed to the relief requested in the Motion, but disputes and does not agree with all of the factual allegations and assertions herein, including but not limited to any such allegations that AdvoCare operated as a pyramid scheme.

While this case was pending, on May 17, 2019, AdvoCare publicly announced that it was abandoning its MLM business model in light of negotiations it had been having with the Federal Trade Commission (the "**FTC**"). AdvoCare would no longer reward Distributors for bringing in Recruits or based on the Recruits' purchases. On October 2, 2019, the FTC and AdvoCare announced that they were settling the FTC's (previously non-public) claims that AdvoCare operated a pyramid scheme. In addition to AdvoCare's previously announced abandonment of the MLM business model, AdvoCare also agreed to pay $150,000,000.00 to the FTC as "equitable monetary relief," which money would be used to pay "redress" to victims of AdvoCare's pyramid scheme.[4] In a complaint filed on October 2, 2019, the FTC described its pyramid scheme claims against AdvoCare. The basis for those claims was similar to the basis set forth in Plaintiff's original complaint, filed back in March 2017.

AdvoCare contends in this action and contended to the FTC that it did not operate a pyramid scheme. Rather, AdvoCare argues that it was a legitimate MLM of nutritional supplements. While certainly AdvoCare rewarded Distributors for bringing in new Recruits, and based on the purchases made by those Recruits, there is nothing improper about that system. AdvoCare disputes Plaintiff's contention that retail sales rarely happened, and AdvoCare contends that many Distributors participated in the AdvoCare system simply so that they could purchase AdvoCare's products at discounted prices for their personal consumption. Thus, according to AdvoCare, even if some Distributors did not sell the AdvoCare products for more than they paid for them, the Distributors consumed and enjoyed the products.

---

[4]*See* Stipulated Order for Permanent Injunction and Monetary Judgment Against Defendants AdvoCare International, L.P. and Brian Connolly, *F.T.C. v. AdvoCare Int'l, L.P.,* Case No. 4:19-cv-00715-SDJ (E.D. Tex., Oct. 2, 2019) ("**FTC Settlement**") (Ex. 1) [Appx P. 1].

Although disputed issues of fact and law remain in this case, particularly in light of AdvoCare's settlement with the FTC, the case is far enough developed that Plaintiff and her counsel can reasonably and objectively assess the strengths and weaknesses of her positions and negotiate a settlement. The parties engaged in a full day of mediation before U.S. District Court Judge Royal Furgeson (Ret.) ("**Judge Furgeson**") on October 18, 2019, and another full day on September 3, 2020. The parties reached an agreement-in-principle at the second mediation. After the second mediation, the parties encountered multiple points of contention in negotiating the settlement details, which necessitated a third all-day mediation on January 7, 2021. Continued negotiations after the third mediation eventually resulted in the completed Settlement Agreement (Ex. 2) [Appx P. 20].

The settlement is a settlement of a class action, and the Federal Rules of Civil Procedure (the "**Rules**") require class plaintiffs to seek a variety of relief to obtain ultimate approval of a class action settlement. The Parties have negotiated a proposed Preliminary Approval Order (Exhibit A to the Settlement Agreement), which addresses the relief described below.

**First**, Plaintiff asks that the Court preliminarily approve the Settlement Agreement as fair and reasonable. The Settlement Agreement is fair to the Class Members and provides substantial benefits to them while avoiding the expense and uncertainty of further litigation. The Settlement Agreement, described in more detail herein, requires AdvoCare to pay $10.5 million into a Settlement Fund.[5] Cash awards will be paid to Class Members based on the amount of their net losses from their participation in the AdvoCare business model, measured by the difference between the amount of money they paid AdvoCare and the amount of money AdvoCare paid them, with a credit for the value of the product Class Members received from AdvoCare. Administration

---

[5] Unless otherwise noted, capitalized terms have the meaning assigned in the Settlement Agreement.

4

expenses and fees, notice expenses, attorneys' fees and expenses, and any service award will also be paid from the Settlement Fund. In return, the Class Members will release any claims they may have against AdvoCare arising from its alleged operation of a pyramid scheme. Should the Court grant preliminary approval, the Court will be asked to later determine whether to grant final approval in light of responses and objections (if any) of Class Members to the Settlement Agreement.

As noted above, the FTC also resolved claims against AdvoCare for allegedly operating a pyramid scheme, and AdvoCare paid $150 million to settle the FTC's claims. It is expected that the FTC will distribute this $150 million to former Distributors, including many Class Members, so Class Members may receive compensation both from the FTC and from distributions from the Class Settlement Fund. The claims process set forth in the Settlement Agreement provides for a reduction in individual Class Member claims based on recoveries individuals have from the FTC, so that Class Members do not recover twice for the same damage, and so that the Class awards complement and do not duplicate the recovery provided by the FTC settlement.

**Second,** Plaintiff requests that the Court preliminarily approve certification of the Class for settlement purposes pursuant to Rule 23(a) and Rule 23(b)(3). As discussed herein, the claims of the numerous Class Members share common questions of law and fact, and the Plaintiff is typical of and will adequately represent (and has adequately represented) the interests of the Class. Common questions of fact predominate over individual questions, and a class action is superior to other methods to adjudicate the rights of the Class Members. The Court may consider whether final certification is appropriate at the Fairness Hearing, again with the benefit of any objections from Class Members. Plaintiff also requests that the Court appoint Plaintiff's counsel as Class Counsel and appoint Plaintiff as the Class Representative.

**Third,** should the Court grant the preceding requested relief, the Settlement Administrator will provide notice to the Class Members by a combination of email, U.S. Mail, and telephone. The notice will advise the putative Class Members that they may opt out of the Class, may file a claim against the proposed Settlement Fund, or may formally object so that this Court may consider their objection. Plaintiff asks the Court to approve the proposed notice and manner of providing notice described more fully herein.

**Fourth,** Plaintiff requests that the Court schedule a Fairness Hearing at which objecting Class Members may appear and at which the Court may consider whether to formally approve the Settlement Agreement and related issues. Plaintiff requests that the Court schedule the Fairness Hearing for a date **at least 105 days** from the date it preliminarily approves the Settlement Agreement.

The Parties have zealously litigated this case for three-and-a-half years and have finally reached a settlement, memorialized in the Settlement Agreement. Fully apprised of the risks facing Plaintiff and the Class, Plaintiff's counsel firmly believes that approval of this Settlement Agreement is in the best interests of the Class. Accordingly, Plaintiff respectfully seeks entry of the Preliminary Approval Order in substantially the form as attached as Exhibit A to the Settlement Agreement.

## II.     BACKGROUND

### A.     Summary of the Case

AdvoCare was a MLM of nutritional supplements.[6] MLMs operate by rewarding existing distributors for bringing in new distributors.[7] AdvoCare Distributors (like all MLM distributors)

---

[6] *See* Second Amended Complaint ("**SAC**") at ¶¶ 7, 9, 193, 216, 218.

[7] *See* SAC at ¶¶ 4, 16, 45-126.

were encouraged to develop a "downline" of Distributors, all of whom purchase products from AdvoCare.[8]  AdvoCare Distributors were rewarded for bringing in new Distributors (*i.e.*, Recruits) and based on how much product the Recruits in their downlines purchase.[9]

MLMs are not necessarily pyramid schemes, although all MLMs bear some traits of pyramid schemes.[10]  In a pyramid scheme, participants pay money to a scheme proponent, and participants (as in MLMs) are rewarded based on their bringing new participants into the scheme.[11] But the pyramid scheme has no (or minimal) outside investments and no income other than participant contributions, and it simply redistributes the participants' contributions amongst the participants (keeping a healthy portion for the operators).[12]

A supposed MLM operates as a pyramid scheme when there is no or little retail sales of the marketer's product by the distributors taking place, so that the primary income the distributors receive is just a redistribution of payments made by other distributors to the marketer.[13]  The product purchases are more a means for disguising pyramid scheme contributions than true product purchases for the purpose of reselling the product at a retail price.[14]

---

[8] *See* SAC at ¶¶ 4, 8, 12, 45-126.

[9] *See* SAC at ¶¶ 12-13, 45-126.

[10] *See generally Don't Get Caught in a Pyramid Scheme*, OFFICE OF ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL FOR NEW YORK, http://www.ag.ny.gov/consumer-frauds/pyramid-schemes (Ex. 3) [Appx P. 85]; Aditi Javeri, *The telltale signs of a pyramid scheme*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION (May 13, 2014), https://www.consumer.ftc.gov/blog/telltale-signs-pyramid-scheme (Ex. 4) [Appx P. 89]; *Multi-Level Marketing or Illegal Pyramid Scheme?* CONSUMER ALERT, OFFICE OF BILL SCHUETTE, ATTORNEY GENERAL FOR MICHIGAN, http://www.michigan.gov/ag/o,4534,7-164-17337_20942-208400--,00.html (Ex. 5) [Appx P. 92].

[11] *See generally* 54 AMERICAN LAW REPORTS (THIRD) § 217(1)(c), *Introduction—Description of a Pyramid Distribution Plan* (1973) (discussing characteristics of a pyramid distribution scheme).

[12] *Id*.

[13] *See* materials cited at *supra* note 10.

[14] *See id*.

Plaintiff was an AdvoCare distributor and who received less money from AdvoCare than she paid it in fees and product purchases.[15]  Plaintiff alleged that AdvoCare operated as a pyramid scheme because AdvoCare's Distributors made few, if any, retail sales.[16]  AdvoCare Distributors were compensated, if at all, through the payments other Distributors made to AdvoCare for the chance to participate in the scheme.[17]  Plaintiff alleged that while AdvoCare was ostensibly a legitimate MLM, it actually operated a pyramid scheme.

AdvoCare denies that it operated as a pyramid scheme.  AdvoCare argues that AdvoCare Distributors do actually sell AdvoCare's product at retail, and many of AdvoCare's Distributors joined the program not to make an income, but rather to receive discounts on AdvoCare's products. AdvoCare argues that even if AdvoCare were a pyramid scheme in some respect, the thousands of people who became AdvoCare Distributors to simply get discounts on products they consumed and enjoyed have no cause of action against AdvoCare, and certainly no damages.

## B.    Procedural History

### 1.    Arbitrating Arbitrability

On March 9, 2017, Plaintiff and Lisa Ranieri filed their original Complaint (the "**OC**") in this action.[18]  Defendants to the Complaint were AdvoCare and numerous individual defendants. These "**Individual Defendants**" were Distributors at the top of the alleged AdvoCare pyramid who made millions of dollars at the expense of the vast majority of downline Distributors who lost money.  Plaintiff alleged individual and class claims under the federal Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq.* ("**RICO**"), federal securities laws, and Texas' state

---

[15] *See* SAC at ¶¶ 228-232.

[16] *See* SAC at ¶¶ 111-130.

[17] *See* SAC at ¶¶ 45-110.

[18] Dkt. No. 1.

law against unjust enrichment.[19]   Plaintiff also sought declaratory relief that the arbitration provision in AdvoCare's contracts with its Distributors were not enforceable against Plaintiff or against similarly situated Class Members.[20]

On May 15, 2017, AdvoCare and the Individual Defendants moved to dismiss the OC for failure to state a claim.[21]   They also moved to compel arbitration.[22]   On July 5, 2017, pursuant to the parties' agreement, the Court stayed proceedings in the case pending a determination of arbitrability by an arbitrator.[23]   Plaintiffs, AdvoCare, and the Individual Defendants proceeded to arbitration.  After full briefing on arbitrability and a live hearing before the arbitrator, the arbitrator determined that Ms. Ranieri was not bound by the arbitration provision in the relevant AdvoCare contracts.[24]   The parties had previously agreed that whatever decision the arbitrator reached regarding Ms. Ranieri's claims would also apply to Plaintiff Cornelius.

### 2.     Motions to Dismiss

After the arbitrator determined that the case was not arbitrable, AdvoCare and the Individual Defendants then filed amended motions to dismiss the OC.[25]   After briefing and a lengthy hearing before the Court, on August 27, 2018, the Court denied the motions in part and granted them in part.  The Court dismissed Plaintiff's securities fraud and unjust enrichment claims and dismissed Plaintiff's RICO claim against the Individual Defendants.  However, the Court

---

[19] *See* OC at ¶¶ 216-263.

[20] *See* OC at ¶¶ 212-215.

[21] Dkt. Nos. 19, 22.

[22] Dkt. Nos. 18, 20-21.

[23] Dkt. No. 30.

[24] Dkt. No. 32.

[25] Dkt. Nos. 34, 35.

rejected the bases for dismissal of the RICO claim against AdvoCare.  *See Ranieri v. AdvoCare Int'l, L.P.,* 336 F. Supp. 3d 701 (N.D. Tex. 2018).

The Court also allowed Plaintiff leave to amend.  On September 12, 2018, the Court granted Plaintiff's motion for leave to file an amended complaint, ordering that Plaintiff's First Amended Complaint (the "**FAC**") was deemed filed as of September 11, 2018.  The FAC did not include claims against the Individual Defendants but alleged RICO claims and sought a declaration that the arbitration provision in AdvoCare's contractual documents was unenforceable.

On October 3, 2018, AdvoCare moved to dismiss the FAC.  On July 16, 2019, the Court granted the motion but gave Plaintiff leave to amend her complaint again.  *See Ranieri v. AdvoCare Int'l, L.P.,* Case 17-cv-691-S, 2019 WL 3207501 (N.D. Tex. July 16, 2019).

On July 31, 2019, Plaintiff and Ms. Ranieri filed their Second Amended Complaint (the "**SAC**").[26]  They brought RICO claims and a declaratory judgment claim regarding arbitrability, and they also brought a claim under Texas' Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.50(a)(1), 17.46(b)(21); 17.461.  AdvoCare remained the only named defendant.  On November 19, 2019, AdvoCare moved to dismiss the SAC.[27]  That motion is fully briefed and was pending before the Court prior to the Court's September 4, 2020, order terminating all pending motions.[28]

### 3.      Discovery

While the motions to dismiss the FAC and the SAC were pending, the Parties engaged in written discovery targeted to class certification issues.  The Parties exchanged initial disclosures,

---

[26] Dkt. No. 77.

[27] Dkt. No. 83.

[28] Dkt. No. 91.

and each Party propounded interrogatories and requests for production.[29]   The Parties have responded to those discovery requests and also made multiple informal productions of documents to further settlement discussions.[30]

Prior to the Court's vacating the scheduling order, the schedule in this case was dependent on when the Court ruled on the pending motion to dismiss, so that the deadline for class discovery and other deadlines expired based on when the Court rules.[31]   Plaintiff intended to pursue additional class certification-targeted discovery, including depositions, once the Court ruled on the pending motion to dismiss.[32]

### 4.     The FTC Settlement

On May 17, 2019 (two years after Plaintiff initiated this action), AdvoCare publicly announced that it was abandoning its MLM business model and moving to direct-to-consumer sales and single-level marketing compensation.[33]   AdvoCare further noted that it had "been in confidential talks with the Federal Trade Commission about the AdvoCare business model and how AdvoCare compensates its Distributors."[34]

On October 2, 2019, AdvoCare and the FTC provided more information regarding why AdvoCare had agreed to change its business model.  The FTC announced that AdvoCare had agreed to pay $150 million to settle the FTC's claim—identical to Plaintiff's—that AdvoCare

---

[29] Declaration of J. Benjamin King in Support of Plaintiff Cornelius's Motion for Preliminary Approval of Class Action Settlement and Related Relief ("**King Decl**.") ¶ 18 (Ex. .6) [Appx P. 105].

[30] King Decl. ¶ 18 [Appx P. 105-106].

[31] *See* Am. Sch. Order (Dkt. No. 82).

[32] King Decl. ¶ 19 [Appx P. 105-106].

[33] Direct Selling News, AdvoCare Announces Revision of Business Model (May 17, 2019) (Ex. 7) [Appx P. 125].

[34] *Id.*

operated a pyramid scheme.[35]  The FTC further announced that AdvoCare had agreed to cease its MLM business structure as part of its settlement with the FTC.[36]

Also on October 2, 2019, the FTC initiated an action in the U.S. District Court for the Eastern District of Texas (the "**EDTX**"): *F.T.C. v. AdvoCare Int'l, L.P.,* Case No. 19-cv-715 (E.D. Tex.).[37]  The FTC Complaint alleges that AdvoCare operated a pyramid scheme, and the reasons offered in the FTC Complaint for why AdvoCare operated a pyramid scheme are very similar to the reasons set forth in the SAC (as well as Plaintiff's OC).  The FTC also brought suit against several individual defendants, including Daniel McDaniel, who was an Individual Defendant to the OC.

In addition to filing the FTC Complaint on October 2, the FTC also filed the settlement documents memorializing the FTC's settlement with AdvoCare and requested that the EDTX enter an agreed permanent injunction and monetary judgment against AdvoCare and one individual defendant.[38]  On October 9, 2019, the EDTX approved the FTC Settlement.

## C.    Settlement Negotiations

On October 15, 2018, the Parties filed a Joint Report/Case Management Plan.[39]  Therein, the Parties proposed that they attend a mediation in the case by December 12, 2019, which was when they then expected class certification discovery to be complete and briefing on class certification completed.

---

[35] FTC Press Release, Multi-Level Marketer AdvoCare Will Pay $150 Million To Settle FTC Charges it Operated an Illegal Pyramid Scheme (Oct. 2, 2019) (Ex. 8) [Appx P. 133].

[36] *Id.*

[37] A copy of the FTC's Complaint for Permanent Injunction and Other Equitable Relief (the "**FTC Complaint**") is submitted as Exhibit 9 [Appx P. 137].

[38] *See* FTC Settlement (Ex. 1) [Appx P. 1].

[39] Dkt. No. 58.

On October 16, 2018, the Court approved the schedule proposed in the Joint Report/Case Management Plan and further ordered that Judge Furgeson would serve as mediator in the case, unless the Parties determined to use another mediator.[40]

In early August 2019 (after Plaintiff filed her SAC and before AdvoCare moved to dismiss the SAC) the Parties began discussions regarding resolution of the case.[41]  They agreed to mediate with Judge Furgeson and eventually set a date for a first mediation on October 18, 2019.[42]  In advance of the mediation, Plaintiff's counsel and AdvoCare had one in-person meeting regarding settlement possibilities, and Plaintiff's counsel and AdvoCare participated in a conference call with Judge Furgeson in advance of the mediation.[43]

Plaintiff submitted lengthy confidential mediation materials to Judge Furgeson in advance of the first mediation.[44]  Plaintiff Cornelius and Ms. Ranieri flew from their homes in Virginia and California to attend the mediation, held in Dallas, along with their counsel.[45]  Although the Parties spent most of the day mediating on October 18, they did not reach a resolution (or even come close).[46]

Judge Furgeson continued to confer with the Parties after the October 18 mediation, including multiple phone calls and emails with Plaintiff's counsel.[47]  On August 13, 2020—while the fully briefed motion to dismiss the SAC was pending—the Court ordered the Parties to mediate

---

[40] Dkt. No. 59.

[41] King Decl. ¶¶ 20-22 [Appx P. 106].

[42] King Decl. at ¶ 22 [Appx P. 106].

[43] King Decl. ¶ 25 [Appx P. 107].

[44] King Decl. ¶ 27 [Appx P. 107-108].

[45] King Decl. ¶ 27 [Appx P. 107-108].

[46] King Decl. ¶ 27 [Appx P. 107-108].

[47] King Decl. ¶ 28 [Appx P. 108].

by September 4, 2020.[48]  Plaintiff submitted a mediation statement that supplemented her original statement, submitted prior to the first mediation.[49]  Plaintiff Cornelius, Ms. Ranieri, and their counsel, AdvoCare, and AdvoCare's insurers attended a full-day mediation (via Zoom) on September 3.[50]  After many hours of arms' length negotiations through Judge Furgeson, the mediation resulted in an agreement-in-principle, subject to negotiating a complete class action settlement agreement.[51]

In the process of drafting a complete settlement agreement, Plaintiff Cornelius, Ms. Ranieri, and AdvoCare discovered that they had several points of disagreement that needed to be resolved before a settlement agreement could be executed and a settlement proposed to this Court.[52]  Most importantly, the Parties disagreed about how to calculate individual Class Member claims.[53]  After multiple phone calls, emails, and a third mediation on January 7, 2021, the Parties were able to reach an agreement settling the Parties' disputes, and the Parties executed the Settlement Agreement on January 25, 2021.[54]  Ms. Ranieri's claims are being settled separately because, under the formula the Parties ultimately agreed to regarding the calculation of Class Member damages, Ms. Ranieri did not incur compensable damages.[55]  Only Distributors who incurred compensable damages under this formula can be in the Class.

---

[48] Dkt. No. 90.

[49] King Decl. ¶ 29 [Appx P. 108].

[50] King Decl. ¶ 29 [Appx P. 108].

[51] King Decl. ¶ 29 [Appx P. 108].

[52] King Decl. ¶ 30 [Appx P. 108].

[53] King Decl. ¶ 30 [Appx P. 108].

[54] King Decl. ¶¶ 31-34 [Appx P. 109].

[55] King Decl. ¶ 33 [Appx P. 109].

**D.      Primary Terms of the Settlement**

**1.      Class Definition**

Plaintiff seeks certification of the following Class:

All Distributors who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme, and whose distributorships were suspended without reinstatement or terminated by May 17, 2016. Distributors who made no purchases from AdvoCare after May 17, 2016, and paid no dues after May 17, 2016, will be considered terminated as of May 17, 2016. Distributors will be considered to have lost money if the sum of the fees they paid AdvoCare, the money they paid AdvoCare for sales aids, and the money they paid AdvoCare for product (net of refunded amounts), reduced by 65% of the amount paid for product, is greater than the money they received from AdvoCare (other than for product refunds). Excluded from the Class are Distributors who were not, at the time they were Distributors, residents of the United States or its territories or U.S. military stationed overseas.[56]

The Class definition excludes Distributors who continued as Distributors after May 17, 2016 or made any other indication of consent to AdvoCare's Distributor Agreement amended after that date. This exclusion relates to the arbitration provision in AdvoCare's Distributor Agreement.[57] Prior to May 17, 2016, the Distributor Agreement's arbitration provision was subject to attack as being illusory and unenforceable under Texas law.[58] But AdvoCare amended its Distributor Agreement on May 17, 2016, such that it was no longer subject to those same attacks.[59] Thus, AdvoCare was much more likely to be successful in requiring Distributors subject to the amended Distributor Agreement to arbitrate any claims they may have.[60] In arbitration, classwide treatment is not realistically possible.

---

[56] SA at IV.C [Appx P. 28].

[57] King Decl. ¶ 40 [Appx P. 40].

[58] King Decl. ¶ 41 [Appx P. 111].

[59] King Decl. ¶ 41 [Appx P. 111].

[60] King Decl. ¶ 41. [Appx P. 111]

The start of the Class period (March 9, 2013) is four years prior to the date Plaintiff filed the OC.  Plaintiff's primary claim is for violation of the civil RICO statute, which has a four-year limitations period.[61]

Only Distributors who lost money from their participation in AdvoCare are members of the Class.  Distributors are determined to have lost money if the difference between (a) the amount they paid AdvoCare for fees, sales aids, and product (net of refunds) over the course of their full experience with AdvoCare (not just during the Class Period) is greater than (b) the amount AdvoCare paid them plus 65% of the amount they paid AdvoCare for product.[62]  This 65% calculation provides AdvoCare with a credit to recognize that the product it sold Distributors had some tangible value.[63]  The 65% number was the subject of intense negotiation between the Parties.[64]

In addition, Distributors must have paid money to AdvoCare during the Class Period to be class members.  These calculations and determinations are based solely on AdvoCare's internal records.[65]

### 2.   Cash Awards

The Settlement Agreement requires the creation of a Settlement Fund in total amount of $10,500,000 to compensate Class Members who submit claims.[66]  The Settlement Fund will also

---

[61] King Decl. ¶ 42 [Appx P. 111].

[62] SA § IV.C [Appx P. 28].

[63] King Decl. at ¶ 43 [Appx P. 111-112].

[64] King Decl. at ¶ 43 [Appx P. 112].

[65] King Decl. at ¶ 60 [Appx P. 116].

[66] SA § II.A [Appx P. 26].

pay administration expenses, any Fee Award to Class Counsel, and any Service Award to Plaintiff.[67]

Class Members' cash awards will be based on the same calculation as the determination for class membership, with three adjustments. A Class Member's net loss is the difference between (a) the amount they paid AdvoCare (for fees, sales aids, and product) over the course of their full experience with AdvoCare (not just during the Class Period) and (b) the amount AdvoCare paid them plus 65% of the amount they paid AdvoCare for product.[68] Although the net loss considers the Class Member's full experience with AdvoCare, to recognize the effect of the statute of limitations, a Class Member can only recover his net loss to the extent the Class Member made payments to AdvoCare during the Class Period.[69]

Each Distributor's award may be reduced by any amount the Distributor received from the FTC Settlement.[70] As noted above, AdvoCare paid the FTC $150 million. The FTC Settlement provides that the FTC may use the money for consumer redress.[71] The Settlement Agreement provides that if the FTC has distributed its money by the FTC Distribution Deadline (discussed further below), and if AdvoCare is able to obtain information from the FTC regarding to whom it has distributed money, and in what amounts, each Class Member's cash award will be reduced by the amount they received from the FTC.[72]

---

[67] SA § XIII.F.5 [Appx P. 48-49].

[68] SA § XIII.F [Appx P. 44-50].

[69] SA § XIII.F.1.b [Appx P. 44-45]; King Decl. ¶ 47 [Appx P. 112-113].

[70] King Decl. ¶¶ 48-51 [Appx P. 113-114].

[71] FTC Settlement at § VI.G [Appx P. 8-9]. *See also* FTC Settlement, Att. A ("The FTC will use the money to provide refunds.") [Appx P. 18-19].

[72] King Decl. ¶¶ 48-52, 63 [Appx P.113-114, 117]. Plaintiff has further agreed to cooperate reasonably with AdvoCare in efforts to obtain the data from the FTC. SA § XIII.F.2.a. [Appx P. 46-47]

After cash awards are adjusted for distributions by the FTC, or if AdvoCare cannot obtain information regarding the FTC's distribution by the FTC Distribution Deadline, each Class Member's cash award may be reduced on a pro rata basis so that the total amount of cash awards does not exceed the "**Net Settlement Fund**" (the amount left in the Settlement Fund after payment of any Fee Award to Class Counsel, any Service Award to Plaintiff, and administration expenses).[73]  Once any pro rata reduction is made, Plaintiff and the Settlement Administrator will present to the Court data regarding claims and anticipated disbursements to obtain a Distribution Order.[74]  Once the Court approves the Distribution Order, the Settlement Administrator will send checks to Class Members.[75]

Any money remaining in the Net Settlement Fund after payment of cash awards to Class Members, any Fee Award to Class Counsel, any Service Award to Plaintiff, and administration expenses will revert to AdvoCare.[76]

### 3.    Timing

The relationship of the expected distributions from the FTC and from the Class Settlement Fund may impact the timing of distributions to Class Members and the timing of AdvoCare's funding of the Settlement Fund.

AdvoCare required, as a condition of settlement, that verified FTC payments to Class Members will reduce Class Member awards.[77]  Accounting for these payments in calculating Class Member claims awards is also fairer between the Class Members because this action and the FTC

---

[73] King Decl. ¶ 52 [Appx P. 114]; SA § XII.D [Appx P. 42].

[74] SA § XIII.G [Appx P. 50-51].

[75] SA § XIII.G [Appx P. 50-51].

[76] SA § XIII.G.4 [Appx P. 50-51].  The King Declaration provides further discussion of how Class Member awards are to be calculated, including two examples.  King Decl. ¶¶ 45-53 [Appx P. 112-114].

[77] King Decl. ¶ 49 [Appx P. 113].

Settlement are based on the same alleged wrongdoing.[78]  However, neither Plaintiff nor AdvoCare

has control over when the FTC will distribute money or to whom the FTC will distribute money

and in what amounts, and administration of the Class settlement cannot be held up indefinitely.[79]

To balance these interests, the Settlement Agreement gives AdvoCare until the FTC Distribution

Deadline to obtain reliable information from the FTC regarding which Distributors received

payments from the FTC, and in what amounts.[80]  The FTC Distribution Deadline is originally set

at September 22, 2022, but it may be extended in three-month increments, if AdvoCare can show

that it has reasonably sought to obtain information from the FTC and has a reasonable expectation

that it will get the information in three months.[81]  AdvoCare may not, however, unreasonably delay

in seeking the information, and may not sit on the information once it has it, to delay distributions

from the Settlement Fund to Class Members.[82]  Class Counsel and the Settlement Administrator

may move forward with distributing funds to Class Members after the FTC Distribution Deadline,

even if AdvoCare is unable to obtain the necessary information from the FTC.[83]  Thus, a

distribution from the Settlement Fund to Class Members could take place soon after the Court

finally approves the Settlement, or a delay may be required, depending on when the FTC makes

its distribution.

       In addition, AdvoCare will fund the Settlement Fund in four installment payments.  The

first (in the amount of $4,000,000) will be paid within 14 days of the Court's granting the

Preliminary Approval Order.  AdvoCare will pay the other three installments between September

---

[78] King Decl. ¶ 49 [Appx P. 113].

[79] King Decl. ¶¶ 63-64 [Appx P. 18].

[80] King Decl. ¶¶ 63-64 [Appx P. 18].

[81] King Decl. ¶¶ 63-64 [Appx P. 18].

[82] King Decl. ¶¶ 63-64 [Appx P. 18].

[83] SA § XIII.F.2, G [Appx P. 46-48, 50-51].

2022 and January 2023 **or** seven days after this Court enters a Distribution Order, whichever comes first.[84]  Thus, the Settlement Fund will be fully funded when necessary to pay awards to Class Members.  Along with the initial $4 million payment, AdvoCare will also provide an irrevocable letter of credit that will secure its making the last three installment payments. [85]

## III.    ARGUMENT

Rule 23(e) requires judicial approval of any class action settlement.  "Trial court review of a class action settlement proposal is a two-step process: preliminary approval and final approval after a fairness hearing."[86]  At the preliminary approval stage, the court "makes a preliminary fairness evaluation of the proposed terms of settlement submitted by counsel."[87]  This step also typically includes a conditional certification of the proposed class and approval of the form of notice.[88]  The court may also consider whether to conditionally appoint proposed class counsel and the proposed class representatives.

Plaintiff requests that the Court (A) certify the Class for purposes of settlement; (B) appoint Plaintiff's counsel to serve as Class Counsel and appoint Plaintiff to serve as the Class Representative; (C) preliminarily approve the Settlement Agreement; (D) approve the Notice Plan described in the Settlement Agreement; and (E) schedule a Fairness Hearing.

---

[84] SA § X.C [Appx P. 36-37].

[85] SA § X.C [Appx P. 36-37].  *See also* King Decl. ¶ 36 [Appx P. 110].

[86] *Del Carmen v. R.A. rogers, Inc.,* SA-16-CA-971-FB (HJB), 2018 WL 4701824, at *5 (W.D. Tex. April 25, 2018) (magistrate report and recommendation), *adopted at* 2018 WL 4688774.

[87] *McNamara v. Bre-X Minerals Ltd.,* 214 F.R.D. 424, 426 (E.D. Tex. 2002).

[88] *See, e.g., Roberts v. First Finan. Planners, Inc.,* No. 1:05CV38-D-D, 2006 WL 8444265, at *1 (N.D. Miss. June 26, 2006); *Del Carmen,* 2018 WL 4701824, at *6.

## A.    The Court Should Conditionally Certify the Settlement Class

Prior to granting preliminary approval of a class action settlement, the Court must consider whether the proposed class is a proper class for settlement purposes.[89]   The Court has great discretion is determining whether to certify a class.[90]   "Settlement classes are a typical feature of modern class litigation, and courts routinely certify them, under the guidance of" *Amchem*.[91]

The certification requirements of Rule 23 generally apply even when certification is for settlement purposes.[92]   The one exception is that a district court need not consider "whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."[93]

A class action can only be maintained if the proposed class meets the requirements of Rule 23(a) and one section of 23(b).[94]   Plaintiff respectfully submits that the Court should certify the Class because the requirements of Rule 23(a) and (b)(3) are satisfied.   Several courts (including the *en banc* Fifth Circuit) have certified class actions arising out of pyramid schemes where the

---

[89] *McNamara,* 214 F.R.D. at 426-27.

[90] *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 624 (1997).

[91] *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010,* 910 F. Supp. 2d 891 (E.D. La. 2010).

[92] *See AmChem,* 521 U.S. at 614.

[93] *Id.*at 620.  *See also In re Heartland Payment Sys.,* 851 F. Supp. 2d 1040, 1059-1060 (S.D. Tex. 2012).

[94] *See Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629 (5th Cir. Sept. 30, 2016) (*en banc*) ("***Torres II***").

issue of class certification was both contested[95] and uncontested pursuant to a settlement agreement.[96]

### 1. The Proposed Class, the Plaintiff, and her Counsel Satisfy the Requirements of Rule 23(a).

"Rule 23(a) states four threshold requirements applicable to all class actions," including class actions subject to a proposed settlement agreement: numerosity, commonality, typicality, and adequacy.[97] Each of the four requirements is satisfied here.

### a. The Proposed Class is So Numerous That Joinder of All Class Members is Impracticable.

Class certification requires that the class be "so numerous that joinder of all members is impracticable."[98] Based on data provided by AdvoCare, the Class consists of 419,265 former

---

[95] *See Torres II,* (reversing panel decision and affirming certification of a class alleging damages caused by a pyramid scheme and bringing claims under RICO); *French v. Essentially Yours Indus., Inc.*, No. 1:07-CV-817, 2008 WL 2788511, at *7 (W.D. Mich. July 16, 2008) (certifying Rule 23(b)(3) class relating to a pyramid scheme); *Nguyen v. FundAmerica, Inc.*, No. C 90 2090 MHP, 1990 WL 165251, at *2 (N.D. Cal. Aug. 16, 1990) (granting provisional class certification and stating "federal courts have upheld the predominance of common issues, and lack of disabling conflict in the pyramid scheme context, and have granted certification to comprehensive plaintiff classes in cases arising from similar multi-level pyramid schemes," and listing cases).

[96] *See* Order Granting Final Approval of Class Action Settlement, Settlement Class Certification and Judgment, *Martinez v. MXI Corp.,* Case 3:15-cv-00243-MMD-VPC (D. Nev. Feb. 28, 2017) (granting final approval of a settlement class relating to a MLM/pyramid scheme) (Ex. 10) [Appx P. 167]; Order Granting Final Approval of Class Action Settlement and Final Judgment, *Kerrigan v. Visalus, Inc.,* Case No. 14-cv-12693 (E.D. Mi. Oct. 1, 2019) (granting preliminary approval of a settlement class relating to a MLM/pyramid scheme) (Ex. 11) [Appx P. 176]; *Arata v. Nu Skin Int'l, Inc.*, 5 F.3d 534 (9th Cir. 1993) (affirming district court's certification of a settlement class relating to a MLM/pyramid scheme despite objection to class certification); *Bostick v. Herbalife Int'l of Am., Inc.*, No. CV 13-02488 BRO RZX, 2015 WL 3830208, at *1 (C.D. Cal. June 17, 2015) (certifying settlement class relating to an alleged MLM/pyramid scheme pursuant to Rule 23(b)(2) and (b)(3)); *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997) (certifying Rule 23(b)(3) settlement class relating to a pyramid scheme); *Pokorny v. Quixtar Inc.*, No. 07-0201 SC, slip op. at 1 (N.D. Cal. Feb. 21, 2012) (same).

[97] *See, e.g.,* Rule 23(a); *Amchem*, 521 U.S. at 613.

[98] Rule 23(a)(1).

AdvoCare Distributors.[99]  The Settlement Class is clearly so numerous that joinder of all members is impracticable.

      **b.**      **Questions of Law and Fact Are Common to Members of the Proposed Class**

Rule 23(a)(2) requires there to be "questions of law or fact common to the class."[100]  The commonality requirement is met where "there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."[101]

Here, Plaintiff asserts, on behalf of the Class and herself, two causes of action for money damages based on one central contention: AdvoCare operated a pyramid scheme.  Whether or not AdvoCare operated a pyramid scheme will not vary from one Class Member to another because the inquiry focuses on how AdvoCare operated, not any single Class Member's behavior.  AdvoCare either took money from Distributors and redistributed it across the network of Distributors based on how many Recruits and how much money those Recruits brought into the network, or it did not.[102]  All of the Class Members' claims are based on the same legal theories, arise from a common core of salient facts, and feature a common contention capable of class-wide resolution.  Accordingly, commonality is satisfied.

      **c.**      **The Proposed Class Representative's Claims Are Typical of Those of the Class**

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Typicality merely requires that "the class representative's

---

[99] King Decl. ¶ 45 [Appx P. 112].

[100] Rule 23(a)(2).

[101] *Lightbourn v. County of El Paso,* 118 F.3d 421, 426 (5th Cir. 1997).

[102] *See Torres v. S.G.E. Mgmt. LLC,* Civ. A. No. 4:09-CV-2056, 2014 WL 129793, at *3 (S.D. Tex. Jan. 13, 2014) ("***Torres I***") (commonality prong met because issue of whether defendant perpetrated a pyramid scheme was common to all class members), *aff'd on en banc review, Torres II,* 838 F.3d 629.

claims have the same essential characteristics of those of the putative class."[103]   "Like commonality, the threshold for demonstrating typicality is low."[104]

In this case, Plaintiff's claims are almost identical to those of the Class Members.  Like all members of the proposed Class, Plaintiff claims AdvoCare operated its business in such a way that it operated a pyramid scheme, that operating a pyramid scheme constituted a violation of RICO and Texas' DTPA, and that Plaintiff was damaged from AdvoCare's operation of that pyramid scheme, entitling Plaintiff to recover treble damages.  Nothing in Plaintiff's claims depend upon any facts particular to her (although Plaintiff and every Class Member will differ in their individual damages calculations), and Plaintiff is not aware of any defenses AdvoCare may have that are particular to Plaintiff.

Under these circumstances, the typicality requirement is met.[105]

### d.    The Proposed Class Counsel and the Class Representative Will Fairly and Adequately Protect the Interests of the Class

Finally, Rule 23(a)(4) requires the Court to determine whether "the representative parties will fairly and adequately protect the interests of the class."[106]   In the Fifth Circuit, to show adequacy of representation,

> a plaintiff must show that (1) the plaintiff's counsel has the zeal and competence to represent the class; (2) the proposed class representative is willing and able to take an active role in controlling the litigation; and (3) the absence of conflict and antagonism between the named plaintiffs and the interest of the class.[107]

---

[103] *James v. City of Dallas,* 254 F.3d 571 (5th Cir. 2001).

[104] *Eatmon v. Palisades Collection, LLC,* 2010 WL 1189571, at *6 (E.D. Tex. March 5, 2010).

[105] *See Torres I,* 2014 WL 129793, at *3 ("The Court finds that the claims of the representative plaintiffs are typical of those of the proposed class. The representatives, like all class members, allegedly suffered an economic loss as a result of their unwitting participation in an allegedly illegal pyramid scheme.").

[106]  Rule 23(a)(4).

[107] *Serna v. Transp. Workers Union of Am., AFL-CIO,* No. 3:13-CV-2469-N, 2014 WL 7721824, at *4 (N.D. Tex. Dec. 3, 2014) (citing *Feder v. Elec. Data Sys. Corp.,* 429 F.3d 125, 130 (5th Cir. 2005)).

i.      **Proposed Class Counsel has the zeal and competence to represent the class**

Class Counsel has vigorously prosecuted this litigation.  They have devoted hundreds of hours and over $30,000 of their own out-of-pocket cash in pursuing this action.[108]  They have interviewed dozens of witnesses regarding their experiences with AdvoCare, scoured the internet for every scrap of evidence supporting the class's claims, interviewed potential experts, drafted lengthy and detailed complaints, appeared at hearings before this Court and the arbitrator, prepared for and appeared at three mediations, counseled their clients, litigated against one of the preeminent defense firms in Texas, litigated against two defense firms preeminent in MLM representation, and thoroughly researched and briefed complicated issues regarding the enforceability of AdvoCare's arbitration provision and stating a claim under RICO. [109]  In addition, Class Counsel took a huge risk in bringing this case.  They have had to pay every dime of expense and devote significant time to this case that could have been spent on other cases with no guarantee of success.[110]

Class Counsel also has the competence to represent the Class.  Their CVs are submitted as exhibits herewith.[111]  Class Counsel is experienced in class action litigation and have been appointed class counsel in other cases.[112]  In fact, Class Counsel represented a class in another case against a MLM company they alleged to have operated a pyramid scheme.[113]

---

[108] King Decl. ¶ 65 [Appx P. 118].

[109] King Decl. ¶ 66 [Appx P. 118].

[110] King Decl. ¶ 69 [Appx P. 119].

[111] Ex. 12 [Appx P. 194-199].

[112] King Decl. ¶¶ 4-6, 68 [Appx P. 101, 118].

[113] King Decl. ¶¶ 4-6, 68 [Appx P. 101, 118].

### ii. The Proposed Class Representative is willing and able to take an active role in controlling the litigation

Plaintiff Cornelius has taken an active role in controlling Class Counsel's prosecution of this litigation.  She (as well as Ms. Ranieri) provided details regarding her participation in AdvoCare's business model, produced relevant documents, and directed Class Counsel to potential witnesses.[114]  She reviewed the factual allegations in the drafts of the complaints and discussed strategy with Class Counsel regarding various significant decisions.[115]  She prepared for and appeared at the first two mediations (traveling from her home in California for the first mediation) and consulted with Class Counsel at every step during the settlement negotiations.[116]

### iii. There is no conflict between the Proposed Class Representative and the Class Members

"Differences between named plaintiffs and class members do not necessarily make the plaintiffs inadequate representatives. … The named plaintiffs are only inadequate if those differences create conflicts between the named plaintiffs' interests and the class members' interests."[117]  Here, there are no conflicts between the Class Representative and the Class Members.  The Class Representative has the same claims as the Class Members, and the Class Representative and the Class Members all have the same incentive: proving the AdvoCare operated a pyramid scheme and obtaining a settlement at the greatest amount possible to compensate Class Members.[118]

---

[114] King Decl. ¶ 70 [Appx P. 119].

[115] King Decl. ¶ 70 [Appx P. 119].

[116] King Decl. ¶ 70 [Appx P. 119].

[117] *Hackler v. Tolteca Enterprises, Inc.,* Civ. A. No. SA-18-CV-911-XR, 2019 WL 1159523, at *4 (W.D. Tex. Sept. 9, 2019).

[118] *See id.* at *5 (finding adequacy of representation for similar reasons); *Torres I,* 2014 WL 129793, at *4 (finding plaintiffs adequate in pyramid scheme case where plaintiffs alleged RICO claims identical to all class members).

26

## 2.    The Requirements of Rule 23(b)(3) Are Satisfied

Plaintiff seeks certification of the Class pursuant to Rule 23(b)(3), which provides that

courts may certify a class where the requirements of Rule 23(a) are met, and

> the court finds that the questions of law or fact common to class members
> predominate over any questions affecting only individual members, and that a class
> action is superior to other available methods for fairly and efficiently adjudicating
> the controversy. The matters pertinent to these findings include:

> (A)   the class members' interests in individually controlling the prosecution or
> defense of separate actions;

> (B)   the extent and nature of any litigation concerning the controversy already
> begun by or against class members;

> (C)   the desirability or undesirability of concentrating the litigation of the claims
> in the particular forum; and

> (D)   the likely difficulties in managing a class action.[119]

The requirements of Rule 23(b)(3) are frequently referred to as predominance and superiority.[120]

These requirements are met here.

### a.    Common issues predominate over individual issues

The "'predominance inquiry tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation.'"[121] "'[C]ommon issues must constitute a significant part

of the individual cases.'"[122] "This is a matter of weighing, not counting, issues."[123]  The Fifth

Circuit found in *Torres* that the predominance requirement was satisfied on a contested motion for

---

[119] Rule 23(b)(3).

[120] *Frey v. First Nat. Bank Southwest,* 602 Fed. Appx. 164, 168 (5th Cir. 2015).

[121] *Torres II,* 838 F.3d at 636 (quoting *Amchem Prods.,* 521 U.S. at 623).

[122] *In re oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010,* 910 F. Supp. 2d 891, 912 (E.D. La. 2012) (quoting *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 626 (5th Cir. 1999)).

[123] *Id.*

class certification in a case involving RICO fraud claims based on pyramid scheme allegations,[124] and Plaintiff requests that the Court find predominance satisfied here for this settlement class.

Here, as discussed above, Plaintiff's claims are all based on the alleged operation of a pyramid scheme. "Pyramid schemes are 'inherently fraudulent' and are *per se* mail fraud, a RICO predicate act."[125] The Class Members' claims all rise and fall based on the legal and factual propositions at issue in the Plaintiff's individual claims:

- Plaintiff must establish that AdvoCare operated a pyramid scheme to recover on her claims. This same proposition undergirds the Class Members' claims, and AdvoCare's status as a pyramid scheme is not dependent on any individual issues relating to each Class Member.

- AdvoCare's contractual agreements with all of its Distributors were uniform, and AdvoCare's compensation structure applied uniformly to all Distributors.

- Reliance may be presumed and proven on a classwide basis, such that proof of individual reliance by Class Members is not required.[126]

- Plaintiff contends that if she established that AdvoCare operated a pyramid scheme, she would be entitled to recover damages equal to the difference between any amounts Plaintiff paid and received from AdvoCare. If Plaintiff is entitled to those damages, all Class Members should be entitled to a similar damage measurement.

- AdvoCare contends in its motion to dismiss that Plaintiff's claims fail because Plaintiff's pleadings do not meet certain requirements for establishing the existence of a RICO enterprise.[127] Whether or not AdvoCare's argument is correct does not vary based on any Class Member's individual circumstances.

Thus, even if some individual issues regarding damages assessments could arise with respect to the individual Class Members' claims, common issues predominate over individual

---

[124] *Torres II,* 838 F.3d at 641, 646 (finding that causation did not raise individual issues under two separate theories of reliance).

[125] *Id.* at 638.

[126] *Torres II,* 838 F.3d at 641, 646 (finding that causation did not raise individual issues under two separate theories of reliance).

[127] AdvoCare International, L.P.'s Motion to Dismiss the Second Amended Class Action Complaint and Brief in Support Thereof (Nov. 19, 2019) [Dkt. No. 83].

issues.[128]  "[C]ommon questions present a significant aspect of the case and can be resolved for all [s]ettlement Class Members in a single common judgment."[129]

      **b.**    **A class action is superior to other available methods of adjudication**

If predominance is met, a court must then ask whether a class action suit is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3).  All four of the specific factors that Rule 23(b)(3) requires the Court to consider support class certification.

**First**, Class Members do not have any interest in individually controlling the prosecution or defense of separate actions.  The cost of litigating against AdvoCare dwarfs any individual plaintiff's potential recovery.[130]

**Second**, despite diligent searching, Plaintiff is are not aware of any individual actions against AdvoCare in which Distributors seek to recover their net losses from participation in the AdvoCare MLM business.[131]  Thus, granting class certification will not wrench away from individual Class Members any ongoing litigations.[132]  Moreover, the lack of such actions further supports the conclusion that Class Members have no interest in controlling their own litigations.

**Third**, Plaintiff's and the Class Members' principal claims arise under federal RICO law, so there is no advantage in having courts in different states handle the cases.

---

[128] *Frey v. First Nat. Bank Southwest,* 602 Fed. Appx. 164, 170 (5th Cir. 2015) (plaintiff "must show that common issues predominate, not that there are no individual issues to be resolved").

[129] *Kemp v. Tower Loan of Mississippi,* No. 3:15CV499-CWR-LRA, 2017 WL 3426240, at *3 (S.D. Miss. Aug. 8, 2017).

[130] King Decl. ¶ 71 [Appx P. 119].

[131] King Decl. ¶ 72 [Appx P. 119].

[132] King Decl. ¶ 72 [Appx P. 119].

The **fourth** factor references manageability, which is assessed differently in the context of a class settlement, when there will be no trial.[133]  Here, the claims administration will be handled by a neutral settlement administrator pursuant to a detailed claims process described in the Settlement Agreement, and the likelihood that the Court will be called to intervene to resolve individual disputes is small.

*      *      *

For all the reasons described above, the Court should preliminarily certify the Class for settlement purposes.

**B.      The Court Should Appoint Plaintiff's Counsel to be Class Counsel and Appoint Plaintiff as Class Representative**

"A court that certifies a class must appoint class counsel."[134]  The Court must appoint counsel capable of "fairly and adequately" representing the class.[135]  In making the appointment, a court must consider:

(i)      the work counsel has done in identifying or investigating potential claims in the action;

(ii)      counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii)      counsel's knowledge of the applicable law; and

(iv)      the resources that counsel will commit to representing the class.[136]

---

[133] *See Amchem,* 521 U.S. at 620.

[134] Rule 23(g)(1).

[135] Rule 23(g)(4).

[136] Rule 23(g)(1)(A)(i)-(iv).

30

Additionally, the Court may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]"[137]  Each factor weighs in favor of appointing Reid Collins & Tsai, LLP ("**RCT**") as Class Counsel.

Prior to initiating this litigation, RCT spent hundreds of hours investigating the potential claims, including factual research regarding AdvoCare's business model and legal research regarding potential claims and which claims could be certified for class treatment.[138]  RCT is very familiar with this area of the law, as it has brought claims against two MLM companies before AdvoCare based on the allegation that those companies operated pyramid schemes.[139]  RCT was able to use the knowledge it gained in pursuing these other cases in deciding whether to bring claims against AdvoCare and in litigating this case.[140]

RCT's J. Benjamin King has served as class counsel in three prior certified class actions (including one against an MLM), has served as plaintiff's counsel in other putative class actions, and has defended against class action claims.[141]  He has also served as counsel to objectors in other class actions.[142]  R. Adam Swick, also of RCT, has served as class counsel in a prior action against an MLM, has substantial complex litigation experience, and has successfully defended multiple class actions.[143]  In addition, Plaintiff's counsel handles large, complex litigations outside the class

---

[137] Rule 23(g)(1)(B).

[138] King Decl. ¶ 67 [Appx P. 118].

[139] King Decl. ¶ 68 [Appx P. 118].

[140] King Decl. ¶ 67 [Appx P. 118].

[141] King Decl. ¶¶ 4-6, 68 [Appx P. 101, 118].

[142] King Decl. ¶¶ 4-6, 68 [Appx P. 101, 118].

[143] King Decl. ¶¶ 4-6, 68 [Appx P. 101, 118].

31

action context involving breach of contract, breach of fiduciary duty, fraud, and multiple other types of matters.[144]

Plaintiff's counsel's knowledge of the applicable law is evident from their experience, discussed above, and their success in this case in obtaining a ruling allowing the case to be litigated outside of arbitration, their briefing on AdvoCare's motions to dismiss, and their obtaining a favorable settlement for the Class in this action.

Finally, Plaintiff's counsel has already devoted to this case substantial time and out-of-pocket resources. Plaintiff's counsel has paid over $34,000 in unreimbursed, out-of-pocket expenses,[145] and Plaintiff's counsel will be obligated to cover half the costs the Settlement Administrator incurs prior to the Fairness Hearing, should the Court decline to approve the Settlement Agreement.[146]

For these reasons, Plaintiff submits that her counsel is capable of fairly and adequately representing the Class and respectfully moves the Court to appoint RCT as Class Counsel.

Plaintiff also requests that the Court appoint her as class representative for purposes of the settlement class. As discussed above, Plaintiff satisfies the adequacy requirements under Rule 23(a)(4), and she has been an active and attentive participant in the litigation. Thus, her appointment as class representative is appropriate.

---

[144] King Decl. ¶¶ 7, 68 [Appx P. 102, 118].

[145] King Decl. ¶ 65 [Appx P. 118].

[146] SA at § IX.C [Appx P. 36].

**C.      The Court Should Preliminarily Approve the Settlement**

In determining whether to approve a settlement, Courts consider the strong judicial policy favoring pretrial settlement of complex class action lawsuits.[147]  Indeed, there is "a presumption in favor of finding a settlement fair and the overriding public interest in favor of settlement."[148]

Final approval of a settlement at the formal fairness hearing requires a finding that the settlement is "fair, reasonable, and adequate."[149]  Preliminary approval of a settlement, however, does not require the court to answer the ultimate question of whether a proposed settlement is fair, reasonable, and adequate.  Rather, preliminary approval of a class action settlement is simply a determination that the settlement is within the "range of reasonableness"[150] and, therefore, warrants notice to the class of the settlement's terms and the scheduling of a formal fairness hearing.  Preliminary approval is appropriate where

> the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible judicial approval.  Settlement negotiations that involve arm's-length, informed bargaining with the aid of experienced counsel support a preliminary finding of fairness."[151]

The decision to approve or reject a proposed settlement is committed to the district court's sound discretion.[152]

---

[147] *See, e.g., Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977).

[148] *Diaz v. Panhandle Maintenance, LLC,* 2:18-CV-097-Z, 2020 WL 587644, at *2 (N.D. Tex. Feb. 6, 2020).

[149] Rule 23(e)(2).

[150] *Duncan v. JPMorgan Chase Bank, N.A.,* Civ. A. No. SA-14-CA-00912-FB, 2015 WL 11623393, at *3 (W.D. Tex. Oct. 21, 2015).

[151] *Duncan* at *3.  *See also Hays v. Eaton Group Attorneys, LLC,* Civ. A. No. 17-88-JWD-RLB, 2019 WL 427331, at *8 (M.D. La. Feb. 4, 2019) (citing similar standard).

[152] *In re Katrina Canal Beaches Litig.,* 628 F.3d 185, 194 (5th Cir. 2010).

1.      **The Settlement Agreement Is the Product of Serious, Informed, Non-collusive Negotiations**

The Parties reached the Settlement Agreement only after three lengthy mediations and the relentless work of the mediator between the mediations to move the case toward resolution. Although the Parties have only engaged in written discovery thus far, the Parties have engaged in three-and-a-half years of litigation before this Court and in arbitration.[153]   Class Counsel—experienced in similar cases against MLM companies—has sufficient information to fairly and responsibly negotiate on behalf of the Class.[154]   The parties also exchanged a significant amount of information outside the discovery process through information negotiations and disclosures in support of the settlement efforts.[155]

No fraud or collusion was involved in reaching this Settlement Agreement in any way.[156] This litigation has been hard fought.  Negotiations on all important matters were carried on through Judge Furgeson.[157]   Indeed, the Settlement Agreement does not provide for any particular amount of fees and expenses for Class Counsel.  The Settlement Agreement puts a cap on the amount of fees Class Counsel may request but does not preclude AdvoCare from challenging Class Counsel's fee request.  Class Counsel anticipate applying for a reasonable and conservative award of 30% of the Settlement Fund (less than the cap in the Settlement Agreement), which their work created for the benefit of the Class, but the Settlement Agreement does not specify any amount of award or even that any award will be paid.[158]

---

[153] King Decl. ¶ 73 [Appx P. 120].

[154] King Decl. ¶ 73 [Appx P. 120].

[155] King Decl. ¶ 73 [Appx P. 120].

[156] King Decl. ¶ 74 [Appx P. 120].

[157] King Decl. ¶ 74 [Appx P. 120].

[158] King Decl. ¶ 74 [Appx P. 120].

2.       **The Settlement Agreement Does Not Improperly Grant Preferential Treatment to the Class Representative or Segments of the Class**

The Settlement Agreement provides no benefit to Plaintiff that is special or unique to her, as compared to the absentee Class Members.[159]  Plaintiff will recover from the Settlement Fund for her damages based on the same metrics and mathematical calculations as all other Class Members.[160]  Plaintiff will apply to this Court for a reasonable service award to be paid from the Settlement Fund that is standard in class action cases in the Fifth Circuit.[161]  Such service awards are paid to reflect the risk, time, and expense class representatives incurred to pursue the rights of the Class Members.[162]  However, the Settlement Agreement does not provide for any specific award and, in fact, puts a cap on the potential award.[163]

Every Class Member is treated identically under the Settlement Agreement.  Each Class Member who files an approved claim will be paid based on their net losses from their participation in AdvoCare (including any recovery from the FTC Fund), based on the formula described in the Settlement Agreement, and nothing else.[164]

3.       **The Settlement Agreement Falls Well Within the Range of Reasonableness**

When a settlement is negotiated at arm's length by experienced counsel, there is a presumption that it is fair and reasonable.[165]  The Settlement Agreement here was reached at arm's length by experienced counsel, and there is no basis to disturb the presumption that the Settlement

---

[159] King Decl. ¶ 75 [Appx P. 120].

[160] King Decl. ¶ 75 [Appx P. 120].

[161] King Decl. ¶ 76 [Appx P. 121].

[162] King Decl. ¶ 76 [Appx P. 121].

[163] King Decl. ¶ 76 [Appx P. 121].

[164] King Decl. ¶ 77 [Appx P. 121].

[165] *See Welsh v. Navy Federal Credit Union,* No. 5:16-CV_1062-DAE, 2018 WL 7283639, at *12 (W.D. Texas Aug. 20, 2018); *Camp v. Progressive Corp.,* No. Civ. A. 01-2680, 2004 WL 2149079, at *7 (E.D. La. Sept. 23, 2004).

Agreement is fair and reasonable.  "Although the court must weigh the facts and law of the case to determine the fairness of the settlement, this does not mean that the court should reach conclusions as to the ultimate merits of the claims or defenses. … 'The court … must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial.'"[166]

Particularly given AdvoCare's decision to settle the FTC's claims for $150 million, Class Counsel believes it is likely that they could establish that AdvoCare operated a pyramid scheme. However, establishing that AdvoCare operated a pyramid scheme depended upon establishing that Distributors made few retail sales (retail sales is the key factual inquiry for determining whether a MLM is really a pyramid scheme), and discovery could have revealed that Distributors actually made significant retail sales.[167]

A significant risk in this case was framing AdvoCare's operation of a pyramid scheme in a legal cause of action that would be likely to achieve class certification.[168]  The *Torres II* case was extremely important to the Class claims here.[169]  There, the Fifth Circuit established that RICO fraud claims against an alleged MLM/pyramid scheme were subject to class certification because the element of causation could be proven on a classwide basis.[170]  However, neither the district court in *Torres I* nor the Fifth Circuit in *Torres II* considered significant arguments (raised by AdvoCare here but not by the defendant there) as to whether a proper RICO fraud claim could be

---

[166]*Klein v. O'Neal, Inc.,* 705 F. Supp. 2d 632, 648 (N.D. Tex. 2010) (quoting *Reed v. Gen. Motors Corp.,* 703 F.2d 170, 172 (5th Cir. 1983)).

[167] King Decl. ¶¶ 78-79 [Appx P. 121].

[168] King Decl. ¶ 80 [Appx P. 121].

[169] King Decl. ¶ 80 [Appx P. 121].

[170] King Decl. ¶ 80 [Appx P. 121].

alleged against a MLM/pyramid scheme.[171]  Plaintiff here has received mixed rulings from this Court on her RICO allegations, and she faced risk on the pending motion to dismiss the SAC.[172] If Plaintiff could not state a proper RICO fraud claim, the odds of obtaining class certification declined significantly under Fifth Circuit and Texas precedent regarding the other potential claims, such as the Texas Deceptive Trade Practices Act or common law fraud.[173]  When the Parties reached a settlement-in-principle, Plaintiff expected the Court's decision on the pending motion to dismiss to be issued any day.[174]  That ruling had the potential to gut the case of any value to the Class, unless reversed on appeal.[175]

Plaintiff also faced risk in light of the FTC Settlement.[176]  Class Counsel was obviously gratified to learn that AdvoCare had agreed to pay $150 million to settle the FTC's claims, which were based on similar allegations that Plaintiff had made publicly years before the FTC Settlement.[177]  This fact was something of a "stamp of approval" on Plaintiff's allegations, and it was heartening to learn that AdvoCare's victims (including Plaintiff) were likely to receive some compensation through the FTC.[178]  However, the FTC Settlement was also bad news for Plaintiff and the Class in that AdvoCare obviously now had less money to resolve the Class claims.[179]

---

[171] King Decl. ¶ 80 [Appx P. 121].

[172] King Decl. ¶ 81 [Appx P. 122].

[173] King Decl. ¶ 81 [Appx P. 122].

[174] King Decl. ¶ 81 [Appx P. 122].

[175] King Decl. ¶ 81 [Appx P. 122].

[176] King Decl. ¶ 82 [Appx P. 122].

[177] King Decl. ¶ 82 [Appx P. 122].

[178] King Decl. ¶ 82 [Appx P. 122].

[179] King Decl. ¶ 82 [Appx P. 122].

Plaintiff and the Class also faced risk on the issue of whether the PSLRA precluded Plaintiff from bringing a claim under RICO.[180]  Although Class Counsel firmly believe this Court reached the correct decision in its original motion to dismiss ruling on the preclusion issue, certainly the Class faced risk on appeal.[181]

In addition, absent a settlement, this case might not result in a positive ruling for the Class for years.[182]  A trial would happen in 2022, at the earliest, and even if Plaintiff was successful at trial, AdvoCare could appeal on multiple issues, preventing Class Counsel from making a distribution to Class Members for years.[183]

The total estimated claims of all Class Members (pursuant to the formula described in the Settlement Agreement) was $129,072,358, or $308 on average.[184]  As discussed, this formula includes a 65% product value credit.[185]  Plaintiff would have argued for a lower product value credit at trial, but it is likely that the jury would have assigned some product credit.  Particularly when considered in light of the FTC Settlement, which will bring additional recovery to the Class Members, the $10.5 million settlement is reasonable.  The settlement is even more favorable when considered on a per-Class Member basis.  Not every Class Member will file a claim, and based on the claims rate in prior cases and the anticipated Net Settlement Fund, Class Members who file claims may receive, on average, $234.  This is a great return on Class Member claims that faced the significant obstacles described herein.[186]

---

[180] King Decl. ¶ 83 [Appx P. 122].

[181] King Decl. ¶ 83 [Appx P. 122].

[182] King Decl. ¶ 84 [Appx P. 122].

[183] King Decl. ¶ 84 [Appx P. 122].

[184] King Decl. ¶¶ 45, 85 [Appx P. 112, 123].

[185] King Decl. ¶¶ 85 [Appx P. 123].

[186] King Decl. ¶¶ 85 [Appx P. 123].

In light of these risks, and others, Plaintiff and Class Counsel determined that a $10.5 million settlement was a very good result for the Class.[187]

Moreover, based on the contentious and extended settlement negotiations, Class Counsel has no doubt that this is the maximum amount of money that AdvoCare would agree to pay absent additional positive litigation developments, such as a denial of the pending motion to dismiss and a grant of a contested motion for class certification.[188]

Plaintiff respectfully requests that the Court preliminarily approve the Settlement Agreement. The Court will be able to consider more fully the fairness of the Settlement at the Fairness Hearing, then having the benefit of any objections to the Settlement submitted by Class Members.

**D.    The Court Should Approve the Notice Program**

Rule 23(e)(1) requires the Court "to direct notice in a reasonable manner to all class members who would be bound by the proposal." Rule 23(c)(2)(B) provides that for a Rule 23(b)(3) class (like that proposed here) "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23(c)(2)(B) further provides that notice may be provided by "one or more of the following: United States mail, electronic means, or other appropriate means." The proposed Notice Plan meets these requirements.

The Settlement Agreement provides that the following steps will be taken to provide notice to Putative Class Members.[189]

---

[187] King Decl. ¶ 86 [Appx P. 123].

[188] King Decl. ¶ 87 [Appx P. 123].

[189] S.A. § VI [Appx P. 30-33]. Persons who fall within the Class definition but opt out of the Class are not Class Members.

- The Settlement Administrator will email the Notice and Claims Form to Putative Class Members. The email addresses used will be provided by AdvoCare, which maintained email addresses for all Distributors.

- When an email "bounces back," the Settlement Administrator will send copies of the Notice and Claims Form to Distributors via U.S. Mail at the last mailing address maintained by AdvoCare.

- For Putative Class Members whose emails did not bounce and who have not filed a Claims Form within 14 days of the Claims Deadline, the Settlement Administrator will send a follow up Notice and Claims Form prior to the Claims Deadline.

- The Settlement Administrator will attempt to contact via telephone and email Putative Class Members when notice documents sent via U.S. Mail are returned as invalid or undeliverable.

- The Settlement Administrator will establish and maintain a website (the "**Settlement Website**") containing the Notice, Claims Form, and other information regarding this action and the proposed settlement.

- Class Counsel will email the hundreds of purported Distributors who have emailed them regarding the Action, directing them to the Settlement Website for information regarding the Settlement.

This email notice supplemented by U.S. Mail and telephone notice meets the requirements of Rule 23. Not only does Rule 23(c)(2)(B) specifically reference electronic notice as a valid form of notice, but also courts in the Fifth Circuit and elsewhere "regularly allow notice by both mail and email."[190] Moreover, given the large number of potential Class Members (over 400,000), providing notice primarily via U.S. Mail would significantly diminish the Settlement Fund and reduce the amount of money available for distribution to Class Members.

---

[190] *Thrower v. Universal Pegasus, Int'l Inc.,* --- F. Supp. 3d ---, 2020 WL 5258521, at *11 (S.D. Tex. Sept. 3, 2020). *See also id.* ("[E]-mail is not the wave fo the future; e-mail is the wave of the last decade and a half") (citation omitted). *See also In re Pool Prods. Dist. Market Antitrust Litig.,* 310 F.R.D. 300, 318 (E.D. La. 2015) (approving class notice plan based primarily on email notice); *In re Domestic Airline Antitrust Litig.,* 322 F. Supp. 3d 64, 71-72 (D.D.C. Aug. 22, 2018) (same); *Kelly v. Phiten USA, Inc.,* 277 F.R.D. 564, 569 (S.D. Iowa 2011) (same); *Caligiuri v. Symantec Corp.,* 855 F.3d 860, 863 (8th Cir. 2017) (noting district court's approval of a notice program that involved sending emails to class members with known e-mail addresses and via postcard to class members with unknown or invalid email addresses); Order Granting Preliminary Approval of Settlement, *Kerrigan v. Visalus, Inc.,* Case No. 2:14-cv-12693, at p. 9 (E.D. Mich. June 14, 2019) (approving of notice program consisting of email notice and supplemental U.S. Mail notice in settlement of MLM/pyramid scheme case) [Appx P. 185-186].

Plaintiff requests that the Court approve the proposed Notice and Claims Form (Exhibits B & C to the Settlement Agreement [Appx P. 66-77]).  Class notices must "contain an adequate description of the proceedings written in objective, neutral terms that, insofar as possible, may be understood by the average absentee class member."[191]  The notice must also "contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment."[192] Rule 23(c)(2)(B) provides a list of requirements for class notices specific to classes certified under Rule 23(b)(3).

The Notice does the following:

- Describes the nature, history, and status of the action;

- Provides the Class definition;

- Describes the Class claims and issues;

- Explains that Class Members may enter an appearance through an attorney if the member so desires;

- Explains that Class Members may object and appear at the Fairness Hearing;

- Explains that Putative Class Members may opt out of the Class (but then be ineligible to recover benefits as Class Members and ineligible to object to the Settlement Agreement);

- Explains the time and manner of requesting to opt out, of submitting an objection to the Settlement Agreement, and of filing a claim;

- Explains that Class Counsel intend to apply for a fee award of 30% of the Settlement Fund and that the Class Representatives intend to apply for service awards of $20,000 each;

- Directs Class Members to a website maintained by the Settlement Administrator that will provide copies of any applications for attorneys' fees and expenses and for service

---

[191] *In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1104 (5th Cir. 1977).

[192] *Id.* at 1105.  *See also In re Katrina Canal Breaches Litig.,* 628 F.3d 185, 197-98 (5th Cir. 2010) ("Notice of a mandatory class settlement, which will deprive class members of their claims, therefore requires that class members be given information reasonably necessary for them to make a decision whether to object to the settlement.").

awards that Plaintiff and Class Counsel will file in advance of the Fairness Hearing; and

- Advises of the binding effect of the Settlement Agreement (including the releases of AdvoCare) on Class Members.[193]

 Plaintiff respectfully requests that the Court approve the Notice Plan and the Notice, which are attached to the Settlement Agreement as Exhibits B and C.

## E.    The Court Should Schedule a Fairness Hearing

Plaintiff requests that the Court schedule a final Fairness Hearing that is at least 105 days from the day the Court grants this motion for preliminary approval.  The dates by which Class Members may object, opt out, or file a claim all depend on the date of the Fairness Hearing.[194] Class Counsel believes that at least a 105-day window is necessary for they and the Settlement Administrator to perform the necessary tasks prior to a Fairness Hearing.  The proposed schedule, based on the date of the Fairness Hearing, is set forth at the beginning of this motion.

## IV. CONCLUSION

For all the reasons set forth above, Plaintiff respectfully requests that the Court: (A) certify the Class for purposes of settlement; (B) appoint Plaintiff's counsel to serve as Class Counsel and appoint Plaintiff to serve as class representative; (C) preliminarily approve the Settlement Agreement; (D) approve the Notice Plan described in the Settlement Agreement; and (E) schedule a Fairness Hearing.

---

[193] The Notice is patterned after the class notice Class Counsel used in a previous MLM/pyramid scheme class action settlement that was approved by the court presiding over that matter.

[194] Dates will be scheduled based on the initial date for the Fairness Hearing.  If the Court changes the date for the Fairness Hearing after the Settlement Administrator sends out the Notice, the Parties will not change the opt out, claims, and objection deadlines because doing so would require re-noticing Putative Class Members.

Dated: January 25, 2021

By:  /s/ *J. Benjamin King*
     J. Benjamin King (SBN 24046217)
     REID COLLINS & TSAI LLP
     1601 Elm St., Suite 4250
     Dallas, Texas 75201
     Tel.: 214-420-8900
     bking@rctlegal.com


     R. Adam Swick (SBN 24051794)
     REID COLLINS & TSAI LLP
     1301 S. Capital of Texas Hwy.
     Bldg. C, Suite 300
     Austin, Texas 78746
     Tel.: 512-647-6100
     aswick@rctlegal.com

     *Counsel for Plaintiff*

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with counsel for Defendant AdvoCare International, L.P., on January 25, 2021, by email, and Defendant does not oppose the relief sought in the foregoing motion.

*J. Benjamin King*
J. Benjamin King

## CERTIFICATE OF SERVICE

I certify that, on January 25, 2021, I caused to be served a copy of the foregoing motion, along with supporting exhibits, on counsel for Defendant AdvoCare International, L.P. via the Court's ECF system.

*J. Benjamin King*
J. Benjamin King

44