**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

LISA RANIERI and MEGAN CORNELIUS,
Individually and on Behalf of a Class of
Similarly Situated Persons,

   Plaintiffs,

   v.

ADVOCARE INTERNATIONAL, L.P.,

   Defendant.

Case NO. 3:17-cv-00691-S

**PLAINTIFF MEGAN CORNELIUS'S MOTION FOR FINAL**
**APPROVAL OF CLASS ACTION SETTLEMENT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................. 3

      A.    CASE OVERVIEW ................................................................................ 3

            1.    Arbitrating Arbitrability ............................................................. 3

            2.    Motions to Dismiss ..................................................................... 4

            3.    Discovery ................................................................................... 5

            4.    The FTC Settlement .................................................................... 5

      B.    SETTLEMENT NEGOTIATIONS ........................................................ 6

      C.    PRIMARY TERMS OF THE SETTLEMENT ...................................... 9

            1.    Class Definition ......................................................................... 9

            2.    Cash Awards ............................................................................. 11

            3.    Releases .................................................................................... 12

III.  ARGUMENT ..................................................................................................... 13

      A.    THE CLASS SHOULD BE FINALLY CERTIFIED FOR SETTLEMENT
            PURPOSES ............................................................................................ 13

      B.    THE COURT SHOULD FINALLY APPROVE THE SETTLEMENT
            AGREEMENT AS FAIR, REASONABLE, AND ADEQUATE TO THE
            CLASS .................................................................................................... 13

            1.    The Class Representative and Class Counsel Have Adequately
                  Represented the Class: Rule 23(e)(2)(A) and *Reed* Factor 3 ...................... 15

            2.    The Settlement Was Negotiated at Arm's Length Through an
                  Experienced and Practiced Mediator: Rule 23(e)(2)(B) and
                  *Reed* Factor 1 ............................................................................... 16

            3.    The Relief Provided for the Class Is Adequate ............................ 18

                  i.    The cost, risks, and delay of trial and appeal: Rule 23(e)(2)(C)(i)
                        and *Reed* factors 2, 4, and 5 ............................................... 18

i

ii.    The effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims: Rule 23(e)(2)(C)(ii) .................................................................. 23

iii.   The terms of any proposed award of attorney's fees, including timing of payment: Rule 23(e)(2)(C)(iii) ............................................. 23

iv.   Any agreement required to be identified under Rule 23(e)(3): Rule 23(e)(2)(C)(iv) ...................................................................................... 24

4.    The Settlement Agreement Treats Class Members Equitably Relative to Each Other: Rule 23(e)(2)(D). ................................................................. 24

5.    The Reactions of all Relevant Parties has Been Positive: *Reed* Factor 6. ... 24

C.    THE NOTICE PROVIDED TO THE CLASS MEMBERS OF THE SETTLEMENT AGREEMENT MEETS THE REQUIREMENTS OF RULE 23(C)(2)(B) AND DUE PROCESS. .................................................................... 25

D.    CLASS COUNSEL REQUESTS THAT THE COURT DIRECT THAT THE SETTLEMENT AGREEMENT RELEASES ARE DEEMED EFFECTIVE AS OF THE EFFECTIVE DATE AND THAT THE COURT DISMISS THE SECOND AMENDED COMPLAINT WITH PREJUDICE WHILE RETAINING JURISDICTION AS TO ALL FURTHER MATTERS RELATING TO THE SETTLEMENT. ................................................................ 28

IV.    CONCLUSION .............................................................................................. 29

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Caligiuri v. Symantec Corp.,*
   855 F.3d 860 (8th Cir. 2017) ................................................... 26

*Claudet v. Cytec Ret. Plan*, No. CV 17-10027,
   2020 WL 3128611 (E.D. La. June 12, 2020) ........................... 15

*Cotton v. Hinton,*
   559 F.2d 1326 (5th Cir. 1977) ........................................... 13, 14

*Diaz v. Panhandle Maint., LLC*, No. 2:18-CV-097-Z,
   2020 WL 587644 (N.D. Tex. Feb. 6, 2020) ............................. 14

*Duncan v. JPMorgan Chase Bank, N.A.*, No. SA-14-CA-00912-FB,
   2016 WL 4419472 (W.D. Tex. May 24, 2016) ........................ 17

*Erica P. John Fund, Inc. v. Halliburton Co.,* No. 3:02-CV-1152-M,
   2018 WL 1942227 (N.D. Tex. April 25, 2018) ........... 17, 18, 21, 24

*In re Chinese-Manufactured Drywall Products Liability Litig.,*
   424 F. Supp. 3d 456 (E.D. La. 2020) ...................................... 17

*In re Domestic Airline Antitrust Litig.,*
   322 F. Supp. 3d 64 (D.D.C. Aug. 22, 2018) ............................ 26

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.,*
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) .................................. 17

*In re Pool Prods. Dist. Market Antitrust Litig.,*
   310 F.R.D. 300 (E.D. La. 2015) ............................................ 26

*Izzio v. Century Gold Partners Mgmt., L.P.,* Civ. A. No. 3:14-cv-03194-M,
   2019 WL 10589568 (N.D. Tex. Feb. 13, 2019) ....................... 24

*Kelly v. Phiten USA, Inc.,*
   277 F.R.D. 564 (S.D. Iowa 2011) .......................................... 26

*Melby v. America's MHT, Inc.,* Cav. A. No. 3:17-cv-155-M,
   2018 WL 10399004 (N.D. Tex. June 22, 2018) ...................... 27

*Miller v. Republic Nat'l Life Ins. Co.,*
   559 F.2d 426 (5th Cir. 1977) ................................................ 14

*Mullane v. Cent. Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) ............................................................ 26

*ODonnell v. Harris Cty., Texas*, No. CV H-16-1414,
2019 WL 6219933 (S.D. Tex. Nov. 21, 2019) ........................................................ 14, 15, 24

*Ranieri v. AdvoCare Int'l, L.P.,* Civ. A. No. 3:17-CV-0691-S
2019 WL 3207501 (N.D. Tex. July 16, 2019) .......................................................... 4

*Ranieri v. AdvoCare Int'l, L.P.*
336 F. Supp. 3d 701 (N.D. Tex. 2018) ...................................................................... 4

*Reed v. General Motors Corp.,*
703 F.2d 170 (5th Cir. 1983) .............................................................................. passim

*Slipchenko v. Brunel Energy, Inc.*, No. CIV.A. H-11-1465,
2015 WL 338358 (S.D. Tex. Jan. 23, 2015) ............................................................ 17

*Thrower v. Universal Pegasus, Int'l Inc.,*
--- F. Supp. 3d ---, 2020 WL 5258521, (S.D. Tex. Sept. 3, 2020) ........................ 26

*Torres v. S.G.E. Mgmt. LLC,* Civ. A. No. 4:09-CV-2056,
2014 WL 129793 (S.D. Tex. Jan. 13, 2014) ............................................................ 19

*Torres v. S.G.E. Mgmt., L.L.C.,*
838 F.3d 629 (5th Cir. 2016) .................................................................................... 19

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
396 F.3d 96 (2d Cir. 2005).......................................................................................... 17

## **Statutes**

18 U.S.C. § 1961 ............................................................................................................ 3
28 U.S.C. § 1715 .......................................................................................................... 28

## **Other Authorities**

4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.41
(4th ed. 2002)................................................................................................................ 14
Class Action Fairness Act............................................................................................ 27

## **Rules**

FED. R. CIV. P. 23 .................................................................................................... passim
FED. R. CIV. P. 41(a)(1)(A)(i) .................................................................................... 29

Class Representative Megan Cornelius[1] respectfully moves this Court for an order finally (1) certifying the Class for settlement purposes, (2) approving the proposed Settlement Agreement[2] and requiring the Parties to comply with the provisions of the Settlement Agreement, (3) approving the Parties' efforts at providing notice to the Class, and (4) deeming the releases in the Settlement Agreement effective as of the Effective Date and dismissing this action with prejudice while retaining jurisdiction to interpret, implement, and enforce the settlement and all orders and judgments entered in connection therewith (the "**Motion**"). The Court previously set a hearing (the "**Fairness Hearing**") for May 21, 2021, to consider these issues.[3] A proposed order granting the Motion is submitted herewith as Exhibit D to the Settlement Agreement. The Parties agree to the relief sought in this Motion.[4]

## I.    INTRODUCTION

This has been a hard-fought case, but, after over four years of litigation, the Parties have reached a settlement that reflects a reasonable compromise of the Parties' positions and allows the Class Representative to resolve, without the risk and expense of further litigation, all issues and claims made in this action on behalf of the Class. Based on a reasoned assessment of the risks and delay involved in continued litigation, the Class Representative and Class Counsel have concluded

---

[1]The "**Parties**" are, on the one hand, Megan Cornelius (the "**Class Representative**"), on behalf of herself and the putative class described herein, and, on the other hand, AdvoCare International, L.P. ("**AdvoCare**"). Lisa Ranieri is a named plaintiff, but she does not join this motion. She settled her claims against AdvoCare separately. "**Plaintiffs**" refers to Ms. Ranieri and Ms. Cornelius together.

[2]A copy of the Settlement Agreement is attached as Ex. A. Unless otherwise noted, capitalized terms have the same meaning herein as ascribed to them in the Settlement Agreement. All exhibits are contained in the Appendix of Exhibits Submitted in Support of Motion for Final Approval and for Attorneys' Fees and Service Award, submitted herewith ("**Appx.**").

[3]*See* Order [Docket No. 99] ("**Preliminary Approval Order**"). Per the Preliminary Approval Order, the Court will also consider at the Fairness Hearing whether to grant Plaintiff's Motion for Attorneys' Fees and Expenses and Class Representative's Motion for a Service Award. Preliminary Approval Order ¶ 11.

[4]*See generally* Settlement Agreement. Although AdvoCare supports the relief sought herein, Class Counsel and the Class Representative submit the briefing in support of the requested relief.

1

that the benefits provided to the Class under the Settlement Agreement render this an excellent settlement.  Should this Court approve the Settlement Agreement, the Settlement Agreement will deliver the Class total financial consideration of $10,500,000.  Approving the Settlement Agreement also protects the Class from all further litigation risks associated with this case— including surviving AdvoCare's motion to dismiss, a contested fight over class certification, a trial on the merits, and potential collectability issues.

On February 3, 2021, the Court preliminarily approved class certification, appointed Ms. Cornelius as Class Representative and appointed her counsel as Class Counsel, preliminarily approved the Settlement Agreement, and directed the Settlement Administrator and the Parties to proceed with the notice program described in the Settlement Agreement.[5]  Since then, the Settlement Administrator and the Parties have provided the notice to the Class required by the Preliminary Approval Order.  Notice was initially sent on March 3, 2021, to 419,328 Class Members.[6]  As of April 7, 2021, 9,957 Class Members have filed Claims Forms and only four have requested to opt-out from the settlement.[7]  Class Counsel will provide updated information on claims and opt-out requests after the deadlines for filing a claim and prior to the Fairness Hearing.  Class Counsel will also respond to any objections to this Motion (the deadline for objections is April 30, 2021).

---

[5] *See generally* Preliminary Approval Order ¶¶ 3-5, 8-10.

[6] *See* Declaration of Richard W. Simmons (April 7, 2021) ¶ 15 ("**Simmons Decl.**") (Ex. B) [Appx. 071].

[7] *See* Simmons Decl. ¶¶ 20-21 [Appx. 072].

## II.    BACKGROUND

### A.    CASE OVERVIEW

#### 1.    Arbitrating Arbitrability

On March 9, 2017, Plaintiffs filed their original Complaint (the "**OC**") in this action.[8] Defendants to the Complaint were AdvoCare and numerous individual defendants (the "**Individual Defendants**").  Plaintiffs alleged individual and class claims under the federal Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq.* ("**RICO**"), federal securities laws, and Texas' state law against unjust enrichment.[9]  Plaintiffs also sought declaratory relief that the arbitration provision in AdvoCare's contracts with its Distributors were not enforceable against Plaintiffs or against similarly situated Class Members.[10]

On May 15, 2017, AdvoCare and the Individual Defendants moved to dismiss the OC for failure to state a claim.[11]  They also moved to compel arbitration.[12]  On July 5, 2017, pursuant to the parties' agreement, the Court stayed proceedings in the case pending a determination of arbitrability by an arbitrator.[13]  Plaintiffs, AdvoCare, and the Individual Defendants proceeded to arbitration.  After full briefing on arbitrability and a live hearing before the arbitrator, on December 27, 2017, the arbitrator determined that Ms. Ranieri was not bound by the arbitration provision in the relevant AdvoCare contracts.[14]  The parties had previously agreed that whatever decision the arbitrator reached regarding Ms. Ranieri's claims would also apply to Ms. Cornelius.

---

[8]Dkt. No. 1.

[9]*See* OC at ¶¶ 216-263.

[10]*See* OC at ¶¶ 212-215.

[11]Dkt. Nos. 19, 22.

[12]Dkt. Nos. 18, 20-21.

[13]Dkt. No. 30.

[14]Dkt. No. 32.

### 2.      Motions to Dismiss

After the arbitrator determined that the case was not arbitrable, AdvoCare and the Individual Defendants then filed amended motions to dismiss the OC.[15]  After briefing and a lengthy hearing before the Court, on August 27, 2018, the Court denied the motions in part and granted them in part.  The Court dismissed Plaintiffs' securities fraud and unjust enrichment claims and dismissed Plaintiffs' RICO claim against the Individual Defendants.  However, the Court rejected the bases for dismissal of the RICO claim against AdvoCare.[16]

On September 12, 2018, the Court granted Plaintiffs' motion for leave to file a First Amended Complaint.  The FAC did not include claims against the Individual Defendants but alleged RICO claims and sought a declaration that the arbitration provision in AdvoCare's contractual documents was unenforceable.

On October 3, 2018, AdvoCare moved to dismiss the FAC.  On July 16, 2019, the Court granted the motion but gave Plaintiffs leave to amend their complaint again.[17]

On July 31, 2019, Plaintiffs filed their Second Amended Complaint (the "**SAC**").[18]  They brought RICO claims and a declaratory judgment claim regarding arbitrability, and they also brought a claim under Texas' Deceptive Trade Practices Act, Tex. Bus. & Com. Code.  AdvoCare remained the only named defendant.  On November 19, 2019, AdvoCare moved to dismiss the SAC.[19]  That motion is fully briefed and was pending before the Court prior to the Court's September 4, 2020 order terminating all pending motions.[20]

---

[15]Dkt. Nos. 34, 35.

[16]*See Ranieri v. AdvoCare Int'l, L.P.,* 336 F. Supp. 3d 701 (N.D. Tex. 2018).

[17]*See Ranieri v. AdvoCare Int'l, L.P.,* Case 17-cv-691-S, 2019 WL 3207501 (N.D. Tex. July 16, 2019).

[18]Dkt. No. 77.

[19]Dkt. No. 83.

[20]Dkt. No. 91.

3.    **Discovery**

While the motions to dismiss the FAC and the SAC were pending, the Parties engaged in written discovery targeted to class certification issues.  The Parties exchanged initial disclosures, and each Party propounded interrogatories and requests for production.[21]  The Parties have responded to those discovery requests and also made multiple informal productions of documents to further settlement discussions.[22]

Prior to the Court's vacating the scheduling order, the schedule in this case was dependent on when the Court ruled on the pending motion to dismiss, so that the deadline for class discovery and other deadlines expired based on when the Court rules.[23]  Plaintiffs intended to pursue additional class certification-targeted discovery, including depositions, once the Court ruled on the pending motion to dismiss.[24]

4.    **The FTC Settlement**

On May 17, 2019 (two years after Plaintiffs initiated this action), AdvoCare publicly announced that it was abandoning its multi-level marketing ("**MLM**") business model and moving to direct-to-consumer sales and single-level marketing compensation.[25]  AdvoCare further noted that it had "been in confidential talks with the Federal Trade Commission [("**FTC**")] about the AdvoCare business model and how AdvoCare compensates its Distributors."[26]

On October 2, 2019, AdvoCare and the FTC provided more information regarding why AdvoCare had agreed to change its business model.  The FTC announced that AdvoCare had

---

[21]*See* April 7, 2021, Declaration of J. Benjamin King ("**King Decl.**") ¶ 20 (Ex. C) [Appx. 113-114].

[22]King Decl. ¶ 20 [Appx. 113-114].

[23]*See* Am. Sch. Order (Dkt. No. 82).

[24]King Decl. ¶ 21 [Appx. 114].

[25]Direct Selling News, AdvoCare Announces Revision of Business Model (May 17, 2019) (Ex. D) [Appx. 248].

[26]*Id.*

agreed to pay $150 million to settle the FTC's claim—identical to Plaintiffs'—that AdvoCare operated a pyramid scheme.[27]  The FTC further announced that AdvoCare had agreed to cease its MLM business structure as part of its settlement with the FTC.[28]

Also on October 2, 2019, the FTC initiated an action in the U.S. District Court for the Eastern District of Texas (the "**EDTX**"): *F.T.C. v. AdvoCare Int'l, L.P.,* Case No. 19-cv-715 (E.D. Tex.).[29]  The FTC Complaint alleges that AdvoCare operated a pyramid scheme, and the reasons offered in the FTC Complaint for why AdvoCare operated a pyramid scheme are very similar to the reasons set forth in the SAC (as well as Plaintiffs' OC).[30]  The FTC also brought suit against several individual defendants, including Daniel McDaniel, who was an Individual Defendant to the OC.

In addition to filing the FTC Complaint on October 2, the FTC also filed the settlement documents memorializing the FTC's settlement with AdvoCare and requested that the EDTX enter an agreed permanent injunction and monetary judgment against AdvoCare and one individual defendant.[31]  On October 9, 2019, the EDTX approved the FTC Settlement.

**B.    SETTLEMENT NEGOTIATIONS**

On October 15, 2018, the Parties filed a Joint Report/Case Management Plan.[32]  Therein, the Parties proposed that they attend a mediation in the case by December 12, 2019, which was

---

[27]FTC Press Release, Multi-Level Marketer AdvoCare Will Pay $150 Million To Settle FTC Charges it Operated an Illegal Pyramid Scheme (Oct. 2, 2019) (Ex. E) [Appx. 255].

[28]*Id.*

[29]A copy of the FTC's Complaint for Permanent Injunction and Other Equitable Relief (the "**FTC Complaint**") is submitted as Exhibit F [Appx. 259-287].

[30] AdvoCare is unopposed to the relief requested in the Motion, but disputes and does not agree with all of the factual allegations and assertions herein, including but not limited to any such allegations that AdvoCare operated as a pyramid scheme.

[31]*See* FTC Settlement (Ex. G) [Appx. 289-306].

[32]Dkt. No. 58.

6

when they then expected class certification discovery to be complete and briefing on class certification completed. On October 16, 2018, the Court approved the schedule proposed in the Joint Report/Case Management Plan and further ordered that former U.S. District Court Judge Royal Furgeson ("**Judge Furgeson**") would serve as mediator in the case, unless the Parties determined to use another mediator.[33]

In early August 2019 (after Plaintiffs filed the SAC and before AdvoCare moved to dismiss the SAC) the Parties began discussions regarding resolution of the case.[34] They agreed to mediate with Judge Furgeson and eventually set a date for a first mediation on October 18, 2019.[35] In advance of the mediation, Plaintiffs' counsel and AdvoCare had one in-person meeting regarding settlement possibilities, and Plaintiffs' counsel and AdvoCare participated in a conference call with Judge Furgeson in advance of the mediation.[36]

Plaintiffs submitted lengthy confidential mediation materials to Judge Furgeson in advance of the first mediation.[37] Plaintiffs flew from their homes in Virginia and California to attend the mediation, held in Dallas, along with their counsel.[38] Although the Parties spent most of the day mediating on October 18, they did not reach a resolution (or even come close).[39]

Judge Furgeson continued to confer with the Parties after the October 18 mediation, including multiple phone calls and emails with Plaintiff's counsel.[40] On August 13, 2020—while

---

[33]Dkt. No. 59.

[34]King Decl. ¶ 24 [Appx. 114].

[35]King Decl. ¶ 24 [Appx. 115].

[36]King Decl. ¶¶ 27-28 [Appx. 115].

[37]King Decl. ¶ 29 [Appx. 116].

[38]King Decl. ¶ 29 [Appx. 116].

[39]King Decl. ¶ 29 [Appx. 116].

[40]King Decl. ¶ 30 [Appx. 116].

the fully briefed motion to dismiss the SAC was pending—the Court ordered the Parties to mediate by September 4, 2020.[41]  Plaintiffs submitted a mediation statement that supplemented their original statement, submitted prior to the first mediation.[42]  Plaintiffs, and their counsel, AdvoCare, and AdvoCare's insurers attended a full-day mediation (via Zoom) on September 3.[43]  After many hours of arms' length negotiations through Judge Furgeson, the mediation resulted in an agreement-in-principle, subject to negotiating a complete class action settlement agreement.[44]

In the process of drafting a complete settlement agreement, Plaintiffs and AdvoCare discovered that they had several points of disagreement that needed to be resolved before a settlement agreement could be executed and a settlement proposed to this Court.[45]  Most importantly, the Parties disagreed about how to calculate individual Class Member claims.[46]  After multiple phone calls, emails, and a third mediation on January 7, 2021, the Parties were able to reach an agreement settling the Parties' disputes, and the Parties executed the Settlement Agreement on January 25, 2021.[47]  Ms. Ranieri's claims are being settled separately because, under the formula the Parties ultimately agreed to regarding the calculation of Class Member damages, Ms. Ranieri did not incur compensable damages and thus was not in the Class.[48]  Only Distributors who incurred compensable damages under this formula can be in the Class.

---

[41]Dkt. No. 90.

[42]King Decl. ¶ 31 [Appx. 116].

[43]King Decl. ¶ 31 [Appx. 116].

[44]King Decl. ¶ 31 [Appx. 116].

[45]King Decl. ¶ 32 [Appx. 116-117].

[46]King Decl. ¶ 32 [Appx. 117].

[47]King Decl. ¶¶ 33-36 [Appx. 117].

[48]King Decl. ¶ 35 [Appx. 117].

C.    **PRIMARY TERMS OF THE SETTLEMENT**

1.    **Class Definition**

Plaintiff seeks certification of the following Class:

> All Distributors who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme, and whose distributorships were suspended without reinstatement or terminated by May 17, 2016. Distributors who made no purchases from AdvoCare after May 17, 2016, and paid no dues after May 17, 2016, will be considered terminated as of May 17, 2016. Distributors will be considered to have lost money if the sum of the fees they paid AdvoCare, the money they paid AdvoCare for sales aids, and the money they paid AdvoCare for product (net of refunded amounts), reduced by 65% of the amount paid for product, is greater than the money they received from AdvoCare (other than for product refunds). Excluded from the Class are Distributors who were not, at the time they were Distributors, residents of the United States or its territories or U.S. military stationed overseas.[49]

The Class definition excludes Distributors who continued as Distributors after May 17, 2016 or made any other indication of consent to AdvoCare's Distributor Agreement amended after that date. This exclusion relates to the arbitration provision in AdvoCare's Distributor Agreement.[50] Prior to May 17, 2016, the Distributor Agreement's arbitration provision was subject to attack as being illusory and unenforceable under Texas law.[51] But AdvoCare amended its Distributor Agreement on May 17, 2016, such that it was no longer subject to those same attacks.[52] Thus, AdvoCare was much more likely to be successful in requiring Distributors subject to the amended Distributor Agreement to arbitrate any claims they may have.[53] In arbitration, classwide treatment is not realistically possible.

---

[49]SA at IV.C [Appx. 009].

[50]King Decl. ¶ 42 [Appx. 119].

[51]King Decl. ¶ 43 [Appx. 119].

[52]King Decl. ¶ 43 [Appx. 119].

[53]King Decl. ¶ 43 [Appx. 119]

The start of the Class period (March 9, 2013) is four years prior to the date Plaintiffs filed the OC. Plaintiffs' primary claim is for violation of the civil RICO statute, which has a four-year limitations period.[54]

Only Distributors who lost money from their participation in AdvoCare are members of the Class. Distributors are determined to have lost money if the difference between (a) the amount they paid AdvoCare for fees, sales aids, and product (net of refunds) over the course of their full experience with AdvoCare (not just during the Class Period) is greater than (b) the amount AdvoCare paid them plus 65% of the amount they paid AdvoCare for product.[55] This 65% calculation provides AdvoCare with a credit to recognize that the product it sold Distributors had some tangible value.[56] The 65% number was the subject of intense negotiation between the Parties.[57]

In addition, Distributors must have paid money to AdvoCare during the Class Period to be class members. These calculations and determinations are based solely on AdvoCare's internal records.[58]

Putative Class Members who request exclusion from the Class prior to the opt-out deadline (April 30, 2021) will not be Class Members. Class Counsel will file a supplemental notice listing the persons who have requested exclusion after April 30 but before the Fairness Hearing.

---

[54]King Decl. ¶ 44 [Appx. 120].

[55]SA § IV.C [Appx. 009].

[56]King Decl. at ¶ 45 [Appx. 120].

[57]King Decl. at ¶ 45 [Appx. 120].

[58]King Decl. at ¶ 59 [Appx. 124].

## 2.    Cash Awards

The Settlement Agreement requires the creation of a Settlement Fund in total amount of $10,500,000 to compensate Class Members who submit claims.[59]  The Settlement Fund will also pay administration expenses, any Fee Award (including expenses) to Class Counsel, and any Service Award to the Class Representative.[60]

Class Members' cash awards will be based on the same calculation as the determination for class membership, with three adjustments.  A Class Member's net loss is the difference between (a) the amount they paid AdvoCare (for fees, sales aids, and product) over the course of their full experience with AdvoCare (not just during the Class Period) and (b) the amount AdvoCare paid them plus 65% of the amount they paid AdvoCare for product.[61]  Although the net loss considers the Class Member's full experience with AdvoCare, to recognize the effect of the statute of limitations, a Class Member can only recover his net loss to the extent the Class Member made payments to AdvoCare during the Class Period.[62]

Each Distributor's award may be reduced by any amount the Distributor received from the FTC Settlement.[63]  As noted above, AdvoCare paid the FTC $150 million.  The FTC Settlement provides that the FTC may use the money for consumer redress.[64]  The Settlement Agreement provides that if the FTC has distributed its money by the FTC Distribution Deadline (discussed further below), and if AdvoCare is able to obtain information from the FTC regarding to whom it

---

[59]SA § II.A [Appx. 007].

[60]SA § X.E [Appx. 019].

[61]SA § XIII.F.1.b [Appx. 025-026].

[62]SA § XIII.F.1.b.v-vii [Appx. 026]; King Decl. ¶ 49 [Appx. 120-121].

[63]King Decl. ¶¶ 50-51 [Appx. 121].

[64]FTC Settlement at § VI.G (Ex. G) [Appx. 295-296].  *See also* FTC Settlement, Att. A ("The FTC will use the money to provide refunds.") [Appx. 305].

has distributed money, and in what amounts, each Class Member's cash award will be reduced by the amount they received from the FTC.[65]

After cash awards are adjusted for distributions by the FTC, or if AdvoCare cannot obtain information regarding the FTC's distribution by the FTC Distribution Deadline, each Class Member's cash award may be reduced on a pro rata basis so that the total amount of cash awards does not exceed the "**Net Settlement Fund**" (the amount left in the Settlement Fund after payment of any Fee Award to Class Counsel, any Service Award to Plaintiff, and administration expenses).[66] Once any pro rata reduction is made, Class Counsel and the Settlement Administrator will present to the Court data regarding claims and anticipated disbursements to obtain a Distribution Order.[67]  Once the Court approves the Distribution Order, the Settlement Administrator will send checks to Class Members.[68]

Any money remaining in the Net Settlement Fund after payment of cash awards to Class Members, any Fee Award to Class Counsel, any Service Award to the Class Representative, and administration expenses will revert to AdvoCare.[69]

### 3.    Releases

Section III.B of the Settlement Agreement provides that the Class Members will provide AdvoCare and related parties with a limited release:

> [All claims, known or unknown] which the Class Members may have or ever had against AdvoCare as of May 16, 2016, arising out of, relating to, or in any way connected with AdvoCare's alleged operation of a pyramid scheme, any tortious

---

[65]King Decl. ¶¶ 52 [Appx. 121-122].  Plaintiff has further agreed to cooperate reasonably with AdvoCare in efforts to obtain the data from the FTC.  SA § XIII.F.2.a. [Appx. 027].

[66]King Decl. ¶ 54 [Appx. 122]; SA § XII.D [Appx. 023].

[67]SA § XIII.G.1 [Appx. 031].

[68]SA § XIII.G.2 [Appx. 031].

[69]SA § XIII.G.4 [Appx. 031-032].  The King Declaration provides further discussion of how Class Member awards are to be calculated, including two examples.  King Decl. ¶¶ 47-54 [Appx. 120-122].

conduct relating to the operation of a pyramid scheme, any consumer fraud, or any misrepresentation or omission. Breach of contract claims for the payment of bonuses or commissions earned but unpaid as of May 16, 2016 are specifically not released. To be clear, persons who opt out of the Class are not Class Members and do not provide releases pursuant to this Settlement Agreement.[70]

The release becomes effective upon the Effective Date—the date when this Court's final approval of the Settlement Agreement becomes non-appealable.[71]

### III.    ARGUMENT

### A.    THE CLASS SHOULD BE FINALLY CERTIFIED FOR SETTLEMENT PURPOSES

The Court already has preliminarily certified the Class,[72] and the Court appointed the Class Representative and Class Counsel to represent the Class.[73] To date, no Class Member has objected to class certification. As set forth in the Preliminary Approval Motion,[74] which pleadings are incorporated herein by reference, the Class satisfies the class certification requirements set forth in Federal Rule of Civil Procedure ("**Rule**") 23(a) and (b)(3). Because class certification is not presently contested, the Class Representative will not repeat those points again here, and the Class Representative requests that the Court finally certify the Class for settlement purposes.

### B.    THE COURT SHOULD FINALLY APPROVE THE SETTLEMENT AGREEMENT AS FAIR, REASONABLE, AND ADEQUATE TO THE CLASS

The Fifth Circuit has long recognized that there is a strong public policy in favor of the pretrial settlement of class action lawsuits.[75] "It is often said that litigants should be encouraged

---

[70]S.A. ¶ III.B [Appx. 007-008].

[71]*See* S.A. ¶ VIII.A [Appx. 015-016].

[72]Preliminary Approval Order ¶¶ 3-5.

[73]Preliminary Approval Order ¶¶ 6-7.

[74]Plaintiff's Unopposed Motion for Preliminary Settlement Class Certification, Preliminary Approval of Class Action Settlement, Appointment of Class Counsel, Appointment of Class Representative, Approval of Class Notice Program, and Scheduling of Fairness Hearing at 21-30 [ECF 96] (the "**Preliminary Approval Motion**").

[75]*See, e.g.*, *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an

13

to determine their respective rights between themselves."[76]  "Because the public interest strongly favors the voluntary settlement of class actions, there is a presumption in favor of finding the settlement fair, reasonable[,] and adequate."[77]  Settlements have the added advantage of saving judicial resources.[78] "The decision to approve a class action settlement is left to the district court's sound discretion."[79]

Under Rule 23(e)(2), the Court should grant final approval of the Settlement if it finds that it is "fair, reasonable, and adequate."  Rule 23(e)(2) provides a list of factors district courts are to consider in assessing whether a proposed class settlement meets this standard:

> (2)  *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> (A)  the class representatives and class counsel have adequately represented the class;
>
> (B)  the proposal was negotiated at arm's length;
>
> (C)  the relief provided for the class is adequate, taking into account:
>
> (i)  the costs, risks, and delay of trial and appeal;
>
> (ii)  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

---

overriding public interest in favor of settlement."); *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977) (settlements of class actions are "highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits") (quotation omitted).

[76]*Cotton*, 559 F.2d at 1330-31.

[77]*ODonnell v. Harris Cty., Texas*, No. CV H-16-1414, 2019 WL 6219933, at *9 (S.D. Tex. Nov. 21, 2019) (citation omitted).

[78]*See* 4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) ("[T]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.").

[79]*Diaz v. Panhandle Maint., LLC*, No. 2:18-CV-097-Z, 2020 WL 587644, at *2 (N.D. Tex. Feb. 6, 2020) (citation omitted).

      (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

      (iv)    any agreement required to be identified under Rule 23(e)(3); and

    (D)    the proposal treats class members equitably relative to each other.

The 2018 amendments to Rule 23 added the factors set forth above. Prior to 2018, courts in the Fifth Circuit considered the six *Reed* factors for assessing the fairness, reasonableness, and adequacy of a class action settlement:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.[80]

The Fifth Circuit has not yet addressed whether the *Reed* factors are still relevant given the applicability of the 2018 Rule 23(e) amendments, but courts in the Fifth Circuit have "consider[ed] the Rule 23 requirements as informed by the *Reed* factors."[81]

Here, the Rule 23(e)(2) factors, as informed by the *Reed* analysis, all weigh heavily in favor of approval.

**1.    The Class Representative and Class Counsel Have Adequately Represented the Class: Rule 23(e)(2)(A) and *Reed* Factor 3**

Class Counsel brought to bear in this action their prior experience in similar class actions against MLM companies alleged to operate pyramid schemes, as well as decades of experience in complex class and other litigations.[82]    Class Counsel thoroughly researched the facts and law

---

[80]*Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir. 1983).

[81]*Claudet v. Cytec Ret. Plan*, No. CV 17-10027, 2020 WL 3128611, at *3 (E.D. La. June 12, 2020). *See also ODonnell,* 2019 WL 6219933, at *9 ("Because the Rule 23 and case-law factors overlap, courts in this circuit often combine them in analyzing class settlements.").

[82]*See* King Decl. ¶¶ 5-12 [Appx. 109-111].

relevant to this action before bringing it, then defeated defendants' attempt to force the case into arbitration (where no class resolution could be had).[83]  Class Counsel successfully defeated critical aspects of AdvoCare's motions to dismiss and amended the complaints to respond to this Court's concerns regarding aspects of the complaints.[84]  Class Counsel engaged in extensive negotiations with AdvoCare during, before, and after three mediations and sought and obtained the discovery necessary to negotiate on behalf of the Class and assess the litigation risks facing the Class.[85]  The Class Representative was a full participant in Class Counsel's evidence gathering, strategizing, and settlement negotiations throughout the case.[86]  Further proof of the adequacy of the representation had by the Class is in the results achieved in this Settlement.

In addition, Judge Furgeson—who was a direct witness to Class Counsel's and the Class Representative's advocacy on behalf of the Class during settlement negotiations—has submitted a declaration confirming the adequacy of the work of Class Counsel and the Class Representative.[87]

### 2. The Settlement Was Negotiated at Arm's Length Through an Experienced and Practiced Mediator: Rule 23(e)(2)(B) and *Reed* Factor 1

Rule 23(e)(2)(B) directs district courts to consider whether a proposed settlement "was negotiated at arm's length."  Similarly, *Reed* directs courts in this circuit to consider whether there was fraud or collusion behind the settlement.  A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between

---

[83] *See* King Decl. ¶¶ 12-15 [Appx. 111-112].

[84] *See* King Decl. ¶¶ 16-18 [Appx. 112-113].

[85] *See* King Decl. ¶¶ 20, 22-36 [Appx. 113-117].

[86] *See* King Decl. ¶¶ 29, 31, 104 [Appx. 116, 136-137].

[87] *See* Declaration of W. Royal Furgeson, Jr. ¶¶ 14, 16, 20 (Ex. H) [Appx. 311-312].

16

experienced, capable counsel after meaningful discovery."[88]  Courts recognize that the "presence of a neutral mediator" is a factor "weighing in favor of a finding of non-collusiveness."[89]

Here, not only was the Settlement reached by experienced counsel after nearly four years of hard-fought litigation, it was also reached only after extensive, arm's-length, settlement negotiations, through *three* mediations presided over by Judge Furgeson, an experienced and well-respected mediator who was originally recommended by the Court, which further demonstrates the first *Reed* factor is satisfied.[90]  Judge Furgeson's declaration submitted herewith confirms that the negotiations leading to this settlement were done at arm's length with no indication of fraud or collusion.[91]

In addition, the Settlement Agreement provides no provision of attorneys' fees.  To the contrary, the Settlement Agreement merely caps the attorneys' fees Class Counsel may seek.[92]  This alleviates any concern of collusion between Class Counsel and AdvoCare.[93]

---

[88] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 116 (2d Cir. 2005) (quoting MANUAL FOR COMPLEX LITIGATION, § 30.42 (3rd Ed. 1995)); *Slipchenko v. Brunel Energy, Inc.*, No. CIV.A. H-11-1465, 2015 WL 338358, at *7 (S.D. Tex. Jan. 23, 2015) (same).

[89] *Erica P. John Fund, Inc. v. Halliburton Co.,* No. 3:02-CV-1152-M, 2018 WL 1942227, at *4 (N.D. Tex. April 25, 2018) (citation omitted).

[90] *See Duncan v. JPMorgan Chase Bank, N.A.*, No. SA-14-CA-00912-FB, 2016 WL 4419472, at *7 (W.D. Tex. May 24, 2016), ("[T]he fact that the parties reached a settlement with the assistance of a qualified mediator followed by three months of negotiations and discovery demonstrates a likelihood that the settlement was the result of informed, good faith, arm's length negotiations rather than fraud or collusion.") *report and recommendation adopted*, No. SA-14-CA-912-FB, 2016 WL 4411551 (W.D. Tex. June 17, 2016); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063 (S.D. Tex. 2012) (describing arm's-length negotiations that led to approved settlement).

[91] *See* Furgeson Decl. ¶¶ 7-20 [Appx. 309-313].

[92] In fact, Class Counsel is requesting less than the maximum allowed.  AdvoCare did, on April 9, 2021, determine not to oppose Class Counsel's motion for fees, with the following statement: "While Defendant denies any of the factual allegations supporting the proposition that AdvoCare operated a pyramid scheme or did anything improper, it is not opposed to" Class Counsel's fee request.

[93] *See In re Chinese-Manufactured Drywall Products Liability Litig.,* 424 F. Supp. 3d 456, 486 (E.D. La. 2020) ("[T]he prospect of fraud or collusion is substantially lessened where, as here, the settlement leaves the determination and allocation of attorney fees to the sole discretion of the trial court.").

### 3.    The Relief Provided for the Class Is Adequate

Rule 23(e)(2)(C) instructs district courts to consider whether "the relief provided for the class is adequate," taking into account a number of subfactors.  Several of the *Reed* factors are subsumed within these subfactors.  All the factors weigh in favor of a ruling that the Settlement Agreement provides adequate relief for the Class.

### i.    The cost, risks, and delay of trial and appeal: Rule 23(e)(2)(C)(i) and *Reed* factors 2, 4, and 5

Rule 23(e)(2)(C)(i) requires the Court to consider the "cost, risks, and delay of trial and appeal."  This essentially incorporates three *Reed* factors: the complexity, expense, and likely duration of the litigation (second factor); the probability of plaintiff's success on the merits (fourth factor); and the range of possible recovery (fifth factor).[94]

The Court must determine whether the terms of the Settlement "falls within the range of reasonableness."[95]  "The Court is not to try the case via the fairness hearing because 'the very purpose of the compromise is to avoid the delay and expense of such a trial.'"[96]

***The Class claims are complex and risky***.  Particularly given AdvoCare's decision to settle the FTC's claims for $150 million, Class Counsel believe they could establish that AdvoCare operated a pyramid scheme.  However, establishing that AdvoCare operated a pyramid scheme depended upon establishing that Distributors made few retail sales (retail sales is the key factual inquiry for determining whether a MLM is really a pyramid scheme), and discovery could have revealed that Distributors actually made significant retail sales.[97]

---

[94]*Reed,* 703 F.2d at 172.

[95]*Erica P. John Fund, Inc.,* 2018 WL 1942227, at *5.

[96]*Id.* (quoting *Reed,* 703 F.2d at 172).

[97]King Decl. ¶¶ 74-75 [Appx. 128].

18

A significant risk in this case was framing AdvoCare's operation of a pyramid scheme in a legal cause of action that would be likely to achieve class certification.[98]  The *Torres II* case was extremely important to the Class claims here.[99]  There, the Fifth Circuit held that RICO fraud claims against an alleged MLM/pyramid scheme were subject to class certification because the element of causation could be proven on a classwide basis.[100]  However, neither the district court in *Torres I* nor the Fifth Circuit in *Torres II* considered significant arguments (raised by AdvoCare here but not by the defendant there) as to whether a proper RICO fraud claim could be alleged against a MLM/pyramid scheme.[101]  The need to frame the Class claims as RICO claims added significant complexity and risk.  Plaintiffs here received mixed rulings from this Court on their RICO allegations, and the Class Representative faced risk on the pending motion to dismiss the SAC.[102]  If the Class Representative could not state a proper RICO fraud claim, the odds of obtaining class certification declined significantly under Fifth Circuit and Texas precedent regarding the other potential claims, such as the Texas Deceptive Trade Practices Act or common law fraud.[103]  When the Parties reached a settlement-in-principle, Class Counsel expected the Court's decision on the pending motion to dismiss to be issued any day.[104]  That ruling had the potential to gut the case of any value to the Class, unless reversed on appeal.[105]

---

[98]King Decl. ¶ 75 [Appx. 128].

[99]King Decl. ¶ 75 [Appx. 128].  *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629 (5th Cir. 2016) (*en banc*) ("***Torres II***").

[100]King Decl. ¶ 75 [Appx. 128].

[101]King Decl. ¶ 75 [Appx. 128].  *Torres v. S.G.E. Mgmt. LLC,* Civ. A. No. 4:09-CV-2056, 2014 WL 129793, at *3 (S.D. Tex. Jan. 13, 2014)  ("***Torres I***").

[102]King Decl. ¶ 76 [Appx. 128].

[103]King Decl. ¶ 76 [Appx.128].

[104]King Decl. ¶ 76 [Appx. 129].

[105]King Decl. ¶ 76 [Appx. 129].

The Class also faced risk in light of the FTC Settlement.[106]  Class Counsel was obviously gratified to learn that AdvoCare had agreed to pay $150 million to settle the FTC's claims, which were based on similar allegations that Plaintiffs had made publicly years before the FTC Settlement.[107]  This fact was something of a "stamp of approval" on Plaintiffs' allegations, and it was heartening to learn that AdvoCare's victims (including Plaintiffs) were likely to receive some compensation through the FTC.[108]  However, the FTC Settlement also added risk in that AdvoCare obviously now had less money to resolve the Class claims and would be less willing to "pay twice" for the same misconduct.[109]

The Class Representative and the Class also faced risk on the issue of whether the PSLRA precluded the Class Representative from bringing a claim under RICO.[110]  Although Class Counsel firmly believe this Court reached the correct decision in its original motion to dismiss ruling on the preclusion issue, certainly the Class faced risk on appeal.[111]

***The case faced a lengthy duration and delay.***  Absent a settlement, this case might not result in a positive ruling for the Class for years.[112]  A trial could happen in 2022, at the earliest, and even if Plaintiff was successful at trial, AdvoCare could appeal on multiple issues, preventing Class Counsel from making a distribution to Class Members for years.[113]

---

[106]King Decl. ¶ 77 [Appx. 129].

[107]King Decl. ¶ 77 [Appx. 129].

[108]King Decl. ¶ 77 [Appx. 129].

[109]King Decl. ¶ 77 [Appx. 129].

[110]King Decl. ¶ 78 [Appx. 129].

[111]King Decl. ¶ 78 [Appx. 129].

[112]King Decl. ¶ 79 [Appx. 129].

[113]King Decl. ¶ 79 [Appx. 129].

***The probability of success and range of possible recovery supports approving the
Settlement Agreement.***  The total estimated claims of all Class Members (pursuant to the formula
described in the Settlement Agreement) was $129,072,358, or $308 on average.[114]  As discussed,
this formula includes a 65% product value credit.[115]  The Class Representative would have argued
for a lower product value credit at trial, but it is likely that the jury would have assigned some
product credit.  Particularly when considered in light of the FTC Settlement, which will bring
additional recovery to the Class Members, the $10.5 million settlement is reasonable.[116]

The settlement is even more favorable when considered on a per-Class Member basis.  Not
every Class Member will file a claim, and based on the claims rate in prior cases and the anticipated
Net Settlement Fund, Class Members who file claims may receive, on average, $234.  This is a
great return on Class Member claims that faced the significant obstacles described herein.[117]  Thus
far, 9,977 Class Members have already filed claims, and the claims deadline is not until May 17,
2021.

***Continued litigation would have greatly increased costs.***  Class Counsel incurred about
$35,000 in out-of-pocket expenses in pursuing the case to this stage, but had the case continued,
Class Counsel would have had to incur hundreds of thousands of dollars in additional cost, and
surely over a million dollars through trial, to pay for deposition costs, travel, and expert fees.[118]

---

[114]King Decl. ¶¶ 47, 80 [Appx. 120, 129-130].

[115]King Decl. ¶ 80 [Appx. 129-130].

[116]*See Erica P. John Fund, Inc.,* 2018 WL 1942227, at *5 (noting that "final approval is frequently given to settlements even when 'the settlement amount is a very small fraction of the damages amount projected by the Plaintiffs'") (quoting *In re Enron Crop. Secs. Derivative & "ERISA" Litig.,* 228 F.R.D. 541, 566 (S.D. Tex. 2005)).

[117]King Decl. ¶ 80 [Appx. 130].

[118]King Decl. ¶ 81 [Appx. 130].

The Class would likely have to ultimately bear these costs (assuming a successful outcome), and reaching a settlement allowed the Class to avoid those costs.[119]

In light of these risks, and others, the Class Representative and Class Counsel determined that a $10.5 million settlement was a very good result for the Class.[120]

Moreover, based on the contentious and extended settlement negotiations, Class Counsel have no doubt that this is the maximum amount of money that AdvoCare would agree to pay absent additional positive litigation developments, such as a denial of the then-pending motion to dismiss and a grant of a contested motion for class certification.[121]   Judge Furgeson agrees with this conclusion.[122]

***The Class release of AdvoCare is limited and fair.***   The Class release is targeted to the claims at issue in this litigation: consumer fraud claims and claims based on AdvoCare's operation of a pyramid scheme.[123]   Other potential claims—such as product defect or based on AdvoCare's failure to pay any compensation owed Distributors based on their purchase or sale of AdvoCare products—are not included.   Also, the release is limited to claims Class Members had as of May 17, 2016.   Any such claims are very likely precluded by any applicable statutes of limitation, anyway, regardless of the Class release.

---

[119]King Decl. ¶ 81 [Appx. 130].

[120]King Decl. ¶ 82 [Appx. 130].

[121]King Decl. ¶ 83 [Appx. 130].

[122]Furgeson Decl. ¶ 18 [Appx. 312].

[123]*See* S.A. § III.B [Appx. 007-008].

**ii.    The effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims: Rule 23(e)(2)(C)(ii)**

The Net Settlement Fund will be allocated to Class Members who submit valid claims. Claims awards are based on a formula equally applicable to all Class Members, which formula is described above.  Base claim amounts will be determined solely by reference to AdvoCare's electronic records, and Class Members need not produce any personal evidence of loss.

Notice has been sent to Class Members at the email addresses maintained by AdvoCare, and to the U.S. Mail addresses maintained by AdvoCare, where the email notices "bounced."[124] The Claims Form asks Class Members to provide updated mailing addresses, where needed, so that checks will be sent to the correct address.  The Settlement Administrator has handled distributions in many class actions.[125]

The Settlement Agreement calls for a delay in sending out distributions to Class Members so that AdvoCare will have the opportunity to obtain information from the FTC regarding distributions from to former Distributors.[126]  If AdvoCare can obtain the information from the FTC, the Settlement Administrator will use that information in adjusting awards to Class Members.

The methodology for processing Class Member claims will be effective and cost-effective.

**iii.    The terms of any proposed award of attorney's fees, including timing of payment: Rule 23(e)(2)(C)(iii)**

Class Counsel is filing, along with this Motion, a Motion for Attorneys' Fees and Costs seeking an award of fees equal to 30% of the Settlement Fund ($3.15 million) and an expense reimbursement of $35,575.11.  As noted above, the Parties did not negotiate any particular fee.

---

[124]*See* Simmons Decl. ¶ 15 [Appx. 071-072].

[125]*See* Simmons Decl. ¶ 2 [Appx. 067-068].

[126]*See* King Decl. ¶¶ 61-62 [Appx. 124-125].

The Settlement Agreement provides that any fee award granted by the Court is to be paid from the Settlement Fund shortly after the expiration of the time to appeal this Court's order approving any fee award.[127]

### iv.    Any agreement required to be identified under Rule 23(e)(3): Rule 23(e)(2)(C)(iv)

Rule 23(e)(3) seeks the disclosure of "'related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages of the class in return for the advantages for others.'"[128]  There are no other agreements affecting any right of the Class Members.[129]

### 4.    The Settlement Agreement Treats Class Members Equitably Relative to Each Other: Rule 23(e)(2)(D).

The Settlement Agreement treats all Class Members the same, awarding damages based on neutral criteria.  Under the plan of allocation, each Class Member who files an accepted claim will receive his or her *pro rata* share of the Net Settlement Fund.  No preferential treatment is provided to any Class Member, any segment of the Class, or to the Class Representative.  This factor thus supports final approval of the Settlement Agreement.[130]

### 5.    The Reactions of all Relevant Parties has Been Positive: *Reed* Factor 6.

The Notice Program has been robust, yet as of the filing of this Motion, no Class Member has objected to the Settlement, and only four have opted out.[131]  The deadlines for objecting and

---

[127]*See* S.A. § XI.E [Appx. 021].

[128]*Izzio v. Century Gold Partners Mgmt., L.P.,* Civ. A. No. 3:14-cv-03194-M, 2019 WL 10589568, at *8 (N.D. Tex. Feb. 13, 2019) (quoting *Erica P. John Fund, Inc.,* 2018 WL 1942227, at *8).

[129]Ms. Ranieri did settle her claims separately because she was not a Class Member under the definition the Parties ultimately agreed on in the Settlement Agreement.  The settlement with Ms. Ranieri did not affect any right of any Class Member.  *See* King Decl. ¶ 35 [Appx. 35]; Furgeson Decl. ¶ 15 [Appx. 311].

[130]*ODonnell*, 2019 WL 6219933, at *14.

[131]*See* Simmons Decl. ¶¶ 20-22 [Appx. 072].

opting out have not yet passed, and Class Counsel will update the Court as to any objections and exclusions received before the Fairness Hearing. Nearly 10,000 Class Members have filed claims,[132] even though the Claims Deadline is presently 37 days away. In addition, despite the Settlement Administrator providing the required notice to governmental authorities of the Preliminary Approval Motion,[133] none have yet contacted Class Counsel to note any disapproval with the Settlement Agreement.

Class Counsel and the Class Representative strongly support this Settlement, as does Judge Furgeson.[134]

## C.    THE NOTICE PROVIDED TO THE CLASS MEMBERS OF THE SETTLEMENT AGREEMENT MEETS THE REQUIREMENTS OF RULE 23(C)(2)(B) AND DUE PROCESS.

Rule 23(e)(1) requires the Court "to direct notice in a reasonable manner to all class members who would be bound by the proposal." Rule 23(c)(2)(B) provides that for a Rule 23(b)(3) class (like that proposed here) "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23(c)(2)(B) further provides that notice may be provided by "one or more of the following: United States mail, electronic means, or other appropriate means." To satisfy federal due process requirements, notice to Class Members must be "reasonably calculated, under all circumstances, to apprise interested parties of the pendency

---

[132] *See* Simmons Decl. ¶ 20 [Appx. 072].

[133] *See* Simmons Decl. ¶ 12 [Appx. 071].

[134] *See* King Decl. ¶ 82 [Appx. 130]; Furgeson Decl. ¶¶ 18-19 [Appx. 312].

of the action and afford them an opportunity to present their objections."[135]  Courts in the Fifth

Circle and elsewhere "regularly allow notice by both mail and email."[136]

The Motion for Preliminary Approval described the Notice Plan set forth in the Settlement

Agreement.[137]  The Court approved the Notice Plan and directed the Parties and the Settlement

Administrator to provide notice in accordance with the Notice Plan.[138]

The Parties and the Settlement Administrator executed the Notice Plan:[139]

- On February 8, 2021, AdvoCare provided the Settlement Administrator with the names, mailing addresses, email addresses, telephone numbers, and other information required by the Settlement Agreement for providing notice.

- On March 3, 2021, the Settlement Administrator established the Class website.  The web address is www.advocaredistributorclassaction.com.

- On March 3, 2021,[140] the Settlement Administrator sent notice via email to 419,328 Class Members.  Prior to sending the emails, the Settlement Administrator designed the email providing notice to reduce the likelihood that it would be filtered out by recipients' "SPAM" filters.  A copy of the specific email sent is submitted as Exhibit 2 [Appx. 100-106] to the Simmons Declaration.

- Of those original 419,328 emails, 48,449 "bounced back" or were otherwise undeliverable.  On March 18, 2021, the Settlement Administrator sent a copy of the approved Notice to those 48,449 Class Members via U.S. Mail at the address provided by AdvoCare.

- Of those Class Members sent notice via U.S. Mail, 8,975 notices were returned as undeliverable.  The Settlement Administrator has sought to contact each of these

---

[135]*Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

[136]*Thrower v. Universal Pegasus, Int'l Inc.,* --- F. Supp. 3d ---, 2020 WL 5258521, at *11 (S.D. Tex. Sept. 3, 2020). *See also id.* ("[E]-mail is not the wave fo the future; e-mail is the wave of the last decade and a half") (citation omitted). *See also In re Pool Prods. Dist. Market Antitrust Litig.,* 310 F.R.D. 300, 318 (E.D. La. 2015) (approving class notice plan based primarily on email notice); *In re Domestic Airline Antitrust Litig.,* 322 F. Supp. 3d 64, 71-72 (D.D.C. Aug. 22, 2018) (same); *Kelly v. Phiten USA, Inc.,* 277 F.R.D. 564, 569 (S.D. Iowa 2011) (same); *Caligiuri v. Symantec Corp.,* 855 F.3d 860, 863 (8th Cir. 2017) (noting district court's approval of a notice program that involved sending emails to class members with known e-mail addresses and via postcard to class members with unknown or invalid email addresses); Order Granting Preliminary Approval of Settlement.

[137]*See* Motion for Preliminary Approval at 39-42.

[138]*See* Preliminary Order at 5.

[139]*See* King Decl. ¶¶ 63-67 [Appx. 125-126]; Simmons Decl. ¶¶ 13-17 [Appx. 071-072].

[140]The deadline for sending these emails was March 5, 2021.  *See* S.A. § VI.B.

individuals by telephone to provide them with notice.  The Settlement Administrator has successfully contacted 284 of these persons to obtain a working email address for them, and this work continues.

- On March 4, 2021, Class Counsel emailed the 560 persons claiming to be AdvoCare Distributors who had contacted Class Counsel about this case.  This email directed the persons to the Class website if they wished to file a claim.

- Immediately after the filing of this Motion, the Settlement Administrator will upload the Motion and the Fee Motion to the Class website so Class Members may review the motions.

Per the Settlement Agreement, the Settlement Administrator will resend notice to the Class Members whose emails did not bounce originally, and who have not filed claims, on May 3, 2021 (14 days before the Claims Deadline).[141]  Class Counsel will provide updated information regarding the number of claims submitted prior to the Fairness Hearing and the Settlement Administrator's further work in fulfilling the approved Notice Program.

The notice provided to the Class Members was substantially the same as that approved by the Court.  The notice provided all the information required by Rule 23(c)(2)(B)(i)-(vii).

The timing of the notice gave Class Members ample time to consider whether to object, opt out, or file a claim.  The Settlement Administrator sent initial notice on March 3, 2021, giving Class Members 56 days to decide whether to object or opt out and 75 days to decide whether to file a claim, and notice was sent 78 days before the Fairness Hearing.  This is more than sufficient.[142]

In addition, on February 4, 2021, the Settlement Administrator provided the notice to the appropriate governmental authorities as required by the Class Action Fairness Act, 28 U.S.C. §

---

[141]*See* S.A. § VI.B.3 [Appx. 013].

[142]*See Melby v. America's MHT, Inc.,* Cav. A. No. 3:17-cv-155-M, 2018 WL 10399004, at *7 (N.D. Tex. June 22, 2018) (approving notice where class members had 61 days between mailing of initial notice and opt out deadline and 75 days before the fairness hearing; citing multiple cases supporting shorter time periods).

1715.[143]    The Settlement Administrator, who is extremely knowledgeable about class action service issues, contends that the notice provided in this case is the best notice practicable under the circumstances, is consistent with historic best practices, and is consistent with the practices employed by federal governmental agencies, such as the FTC, the DOJ, and the SEC, when they communicate with class-like groups.[144]

Class Counsel requests that the Court rule that the notice provided the Class Members was the best notice practicable under the circumstances and is in full compliance with the due process requirements of the United States Constitution and Rule 23.

**D.    CLASS COUNSEL REQUESTS THAT THE COURT DIRECT THAT THE SETTLEMENT AGREEMENT RELEASES ARE DEEMED EFFECTIVE AS OF THE EFFECTIVE DATE AND THAT THE COURT DISMISS THE SECOND AMENDED COMPLAINT WITH PREJUDICE WHILE RETAINING JURISDICTION AS TO ALL FURTHER MATTERS RELATING TO THE SETTLEMENT.**

The consideration provided to AdvoCare for entering the Settlement Agreement is the releases set forth in Section III of the Settlement Agreement.  The Class Representative asks that the Court direct that these releases be deemed effective as of the Effective Date.[145]  The releases will be effective as to all persons who fall within the Class Member definition, except those who have opted out of the Settlement.[146]

Class Counsel further requests the Court dismiss this action with prejudice, but retain jurisdiction to interpret, implement, and enforce the Settlement, and to hear all matters arising out

---

[143]*See* Simmons Decl. ¶¶ 12 [Appx. 071].

[144]*See* Simmons Decl. ¶¶ 19 [Appx. 072].

[145]*See* S.A. § VIII.A [Appx. 015-016].

[146]Class Counsel will submit a list of persons who opted out of the Settlement after the opt-out deadline.  The Proposed Final Order calls for this list to be an exhibit to the Final Order.

of the Settlement.[147]

## IV.    CONCLUSION

For all the reasons set forth above, Class Counsel and the Class Representative respectfully request that the Court enter the Proposed Final Order that is Exhibit D to the Settlement Agreement.  This Final Order will finally (1) certify the Class for settlement purposes, (2) approve the Settlement Agreement and require the Parties to comply with its provisions, (3) approve the Parties' efforts at providing notice to the Class, and (4) deem effective the releases in the Settlement Agreement and dismiss the action with prejudice while retaining jurisdiction to interpret, implement, and enforce the settlement and all orders and judgment entered in connection therewith.

Dated: April 9, 2021

By: */s/ J. Benjamin King*
     J. Benjamin King (SBN 24046217)
     REID COLLINS & TSAI LLP
     1601 Elm St., Suite 4250
     Dallas, Texas 75201
     Tel.: 214-420-8900
     bking@rctlegal.com

     R. Adam Swick (SBN 24051794)
     REID COLLINS & TSAI LLP
     1301 S. Capital of Texas Hwy.
     Bldg. C, Suite 300
     Austin, Texas 78746
     Tel.: 512-647-6100
     aswick@rctlegal.com

     *Counsel for Plaintiff*

---

[147]Ms. Ranieri will submit a notice of dismissal pursuant to Rule 41(a)(1)(A)(i).

## CERTIFICATE OF CONFERENCE

Per the terms of the Settlement Agreement, as discussed above, Defendant does not oppose the relief sought in the foregoing motion.

*J. Benjamin King*
J. Benjamin King

## CERTIFICATE OF SERVICE

I certify that, on April 9, 2021, I caused to be served a copy of the foregoing motion, along with supporting exhibits, on counsel for Defendant AdvoCare International, L.P. via the Court's ECF system.

*J. Benjamin King*
J. Benjamin King