**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| LISA RANIERI and MEGAN CORNELIUS, Individually and on Behalf of a Class of Similarly Situated Persons, | |
| Plaintiffs, | CIVIL ACTION NO. 3:17-CV-0691-S |
| v. | |
| ADVOCARE INTERNATIONAL, L.P., | |
| Defendant. | |

<u>**APPENDIX OF EXHIBITS SUBMITTED IN SUPPORT OF MOTION FOR FINAL
APPROVAL AND FOR ATTORNEYS' FEES AND SERVICE AWARD**</u>

**TABLE OF CONTENTS**

Settlement Agreement.............................................................................Appx. 001

Declaration of Richard W. Simmons (April 7, 2021)...........................Appx. 066

Declaration of J. Benjamin King (April 7, 2021) .................................Appx. 107

Direct Selling News article (May 17, 2019) .........................................Appx. 246

FTC Press Release (October 2, 2019)....................................................Appx. 254

FTC Complaint (October 2, 2019).........................................................Appx. 258

FTC Settlement (October 2, 2019).........................................................Appx. 288

Declaration of W. Royal Furgeson, Jr. (April 7, 2021) ........................Appx. 307

Dated: April 9, 2021

By: /s/ *J. Benjamin King*

J. Benjamin King (SBN 24046217)
REID COLLINS & TSAI LLP
1601 Elm St., Suite 4250
Dallas, Texas 75201
Tel.: 214-420-8900
bking@rctlegal.com

R. Adam Swick (SBN 24051794)
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy.
Bldg. C, Suite 300
Austin, Texas 78746
Tel.: 512-647-6100
aswick@rctlegal.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that, on April 9, 2021, I caused to be served a copy of this Appendix, on counsel for Defendant AdvoCare International, L.P. via the Court's ECF system.

*J. Benjamin King*
J. Benjamin King

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| LISA RANIERI and MEGAN CORNELIUS, Individually and on Behalf of a Class of Similarly Situated Persons,<br><br>v.<br><br>ADVOCARE INTERNATIONAL L.P. | Case No. 3:17-cv-00691-S |

### SETTLEMENT AGREEMENT

This agreement (the "**Settlement Agreement**") is made and entered into pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and contains the terms of a proposed settlement between Megan Cornelius (the "**Class Representative**"), individually and on behalf of a class of similarly situated persons, and AdvoCare International, L.P. ("**AdvoCare**")[1].   The Class Representative and AdvoCare are herein referred to as the "**Parties**."

WHEREAS:

A.    On March 9, 2017, the Class Representative and Lisa Ranieri (together, "**Plaintiffs**") initiated the above-captioned action (the "**Action**").

B.    The original Class Action Complaint alleged, among other things, that AdvoCare and various individuals operated an illegal pyramid scheme, and that Plaintiffs and others similarly situated were damaged by AdvoCare's operation of the pyramid scheme.

C.    On July 5, 2017, the U.S. District Court for the Northern District of Texas (the "**Court**") stayed the Action pending an arbitrator's ruling on whether or not the Action should be arbitrated.

---

[1] As of the date of this settlement agreement, AdvoCare is operating as AdvoCare International, LLC.

D.     On December 27, 2017, an arbitrator appointed by both Plaintiffs and AdvoCare, after receiving extensive briefing and hearing oral argument from the Parties, determined that Plaintiff Ranieri's claims against AdvoCare were not arbitrable. The Parties previously agreed that whatever decision the arbitrator reached as to Plaintiff Ranieri's claims would apply equally to Plaintiff Cornelius' claims.

E.     On September 11, 2018, Plaintiffs filed an Amended Class Action Complaint with AdvoCare as the only defendant.

F.     On July 31, 2019, Plaintiffs filed a Second Amended Class Action Complaint (the "**SAC**").  The SAC (as well as the preceding versions) included claims under the federal Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq.* ("**RICO**").

G.     On October 2, 2019, the Federal Trade Commission (the "**FTC**") filed a complaint against AdvoCare and others in the United States District Court for the Eastern District of Texas (the "**FTC Court**"), Case No. 4:19-cv-00715.  Like Plaintiffs, the FTC alleged that AdvoCare operated an illegal pyramid scheme.

H.     On October 9, 2019, the FTC Court entered the Stipulated Order for Permanent Injunction and Monetary Judgment against AdvoCare and defendant Brian Connolly [Doc. No. 15] ("**FTC Judgment**").  Pursuant to the FTC Judgment, AdvoCare abandoned its multi-level marketing business and paid a $150 million fine (the "**FTC Fine**").  The FTC "may" deposit AdvoCare's FTC Fine in a fund (an "**FTC Fund**") to be used for "equitable relief, including consumer redress."  FTC Judgment at VI(G).  AdvoCare, pursuant to the FTC Judgment, has notified Distributors that "[t]he FTC will use the money [AdvoCare's FTC Fine] to provide refunds."  FTC Judgment at Attachment A.

I.      As of the date of this Settlement Agreement, the FTC has not distributed any portion of the FTC Fine to consumers as redress.

J.      AdvoCare denies the substantive allegations in the SAC and denies any and all liability to both the Plaintiffs and the members of the putative class.

K.      AdvoCare and Plaintiff Ranieri have settled their dispute by a separate agreement.

L.      AdvoCare and the Class Representative now desire to resolve the remaining issues in this Action without further proceedings and without admitting fault or liability.

M.      The Parties and their respective counsel have engaged in lengthy good-faith discussions, including three full-day mediation sessions before the Honorable Judge Royal Furgeson (retired) (the "**Mediator**"), regarding the possibility of settling the Action and have reached an agreement concerning the proposed settlement of the Action as set forth herein.

N.      Plaintiffs' counsel, having made a thorough investigation of the facts and law, believe that the proposed settlement is fair, reasonable, adequate, and in the best interests of the putative class.

NOW THEREFORE, it is hereby STIPULATED AND AGREED, by and among the Class Representative and AdvoCare, subject to final approval of the Court pursuant to Rule 23 of the Federal Rules of Civil Procedure, to conditionally settle the Action on the terms set forth below:

## I.      DEFINITIONS

In addition to the foregoing defined terms, the following terms shall have the meanings set forth below:

A.      "Accepted Claimants" shall have the meaning set forth in Section XIII.D.2.

B.      "Accepted Claims List" shall have the meaning set forth in Section XIII.E.

C.      "Adjusted Base Claims" shall have the meaning set forth in Section XIII.F.3.

D.      "Base Claim" shall have the meaning set forth in Section XII.B.

E.      "Cash Payment" shall have the meaning set forth in Section II.A.

F.      "Claims Deadline" is the deadline by which Class Members must return a Claims Form for the Form to be valid.

G.      "Claims Form" shall mean a document substantially in the form of the document attached hereto as Exhibit B.

H.      "Class" shall have the meaning set forth is Section IV.C.

I.      "Class Counsel" means the law firm Reid Collins & Tsai LLP.

J.      "Class Member" and "Class Members" shall have the meaning set forth in Section IV.C.

K.      "Court" shall mean the United States District Court for the Northern District of Texas.

L.      "Defense Counsel" means Thomas M. Melsheimer, Steven H. Stodghill, John C.C. Sanders, Jr., Rex A. Mann, and Becca Loegering of Winston & Strawn LLP.

M.      "Distribution Order" shall have the meaning set forth in Section XIII.G.1.

N.      "Distributor" refers to persons who contracted with AdvoCare such that they had the right to participate in AdvoCare's multi-level marketing business and/or AdvoCare's Compensation Plan. It does not include individuals who joined AdvoCare as Preferred Customers during the relevant class period.

O.      "Distributor Master List" shall have the meaning set forth in Section VI.A.

P.      "Effective Date" shall have the meaning set forth in Section VIII.A.

Q.      "Estimated Fees and Expenses" shall have the meaning set forth in Section XIII.F.5.

R.      "Execution Date" is the date set forth below and immediately preceding the Parties' signatures.

S.     "Fairness Hearing" shall mean the hearing scheduled by the Court described in Section V.A.1.

T.     "Fee Award" means any award of attorneys' fees and expenses to Class Counsel approved by the Court.

U.     "Final Order And Judgment" shall mean an order substantially in the form as the document attached hereto as Exhibit D.

V.     "Final Claims List" shall have the meaning set forth in Section XIII.F.6.

W.     "Final Claims Payment" has the meaning ascribed in Section XII.A.

X.     "FTC Payment Reduction" shall have the meaning set forth in Section XII.C.

Y.     "Net Settlement Fund" shall have the meaning set forth in Section XIII.F.5.c.

Z.     "Notice Program" shall mean that program for the dissemination of notice set forth in Section VI.

AA.     "Preliminary Approval Order" shall mean an order substantially in the form of the document attached hereto as Exhibit A.

BB.     "Putative Class Members" shall have the meaning set forth in Section VI.A.1.

CC.     "Pro Rata Reduction" shall have the meaning set forth in Section XII.D.

DD.     "Service Award" means any award to the Class Representative ordered by the Court to compensate her for the time, risk, effort, and out-of-pocket expenses she incurred in pursuing the Action for the benefit of the Class.

EE.     "Settlement Account" shall mean the bank account selected by the Claims Administrator and Class Counsel to hold the Settlement Fund, as set forth in Section X.A.

FF.     "Settlement Administrator" shall mean the entity designated in Section IX.A.

GG.    "Settlement Fund" shall mean the Cash Payment, plus any interest earned on the Settlement Account.

HH.    "Settlement Notice" shall mean a document substantially in the form of the document attached hereto as Exhibit C.

II.    "Unpaid Fees and Expenses" shall have the meaning set forth in Section XIII.F.5.

## II.    ADVOCARE'S SETTLEMENT CONSIDERATION

AdvoCare will provide the following consideration in return for the releases set forth in Section III, below.

**A.    Cash Payment:**  AdvoCare will pay $10,500,000.00 (the "**Cash Payment**") into the Settlement Account.  This Cash Payment, together with any interest earned thereon in the Settlement Account, shall constitute the Settlement Fund.  In no event shall AdvoCare be required to pay more than this Cash Payment of $10,500.000.00.

**B.    Settlement Support:**  AdvoCare will support the Settlement Agreement and will not encourage any putative Class Member to opt out of or object to the Settlement Agreement.

## III.    RELEASES

**A.    Plaintiff Releases:**  As of the Effective Date, the Parties, any spouses, and their counsel all release one another of any and all legal claims, known or unknown, suspected or unsuspected, reasonably discoverable or not, present, fixed or contingent, no matter the basis, other than any rights arising under this Settlement Agreement.

**B.    The Class-Released Claims:**  As of the Effective Date, the Class Members will release AdvoCare, including its past, present and future parents, subsidiaries, predecessors, successors, insurers, officers, directors, agents, and employees from any and all legal claims, known or unknown, suspected or unsuspected, reasonably discoverable or not, present, fixed or contingent, which the Class Members may have or ever had against AdvoCare as of May 16, 2016,

arising out of, relating to, or in any way connected with AdvoCare's alleged operation of a pyramid scheme, any tortious conduct relating to the operation of a pyramid scheme, any consumer fraud, or any misrepresentation or omission.  Breach of contract claims for the payment of bonuses or commissions earned but unpaid as of May 16, 2016 are specifically not released.  To be clear, persons who opt out of the Class are not Class Members and do not provide releases pursuant to this Settlement Agreement.

C.    IN ADDITION, EACH CLASS MEMBER HEREBY EXPRESSLY WAIVES AND RELEASES, UPON THIS AGREEMENT BECOMING EFFECTIVE, ANY AND ALL PROVISIONS, RIGHTS, AND BENEFITS CONFERRED BY § 1542 OF THE CALIFORNIA CIVIL CODE AND/OR ANY STATUTE, LAW OR PRINCIPLE OF COMMON LAW, WHICH IS SIMILAR, COMPARABLE, OR EQUIVALENT TO § 1542 OF THE CALIFORNIA CIVIL CODE, WHICH READS:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each Class Member may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims which are the subject matter of this paragraph, but each Class Member hereby expressly waives and fully, finally, and forever settles and releases, upon the Effective Date, any known or unknown, suspected or unsuspected, contingent or non-contingent claims existing as of May 17, 2016, and arising out of or relating to

AdvoCare's alleged operation of a pyramid scheme, any tortious conduct relating to the operation of a pyramid scheme, any consumer fraud, or any misrepresentation or omission, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

## IV.    CLASS CERTIFICATION

A.    Promptly after the Execution Date, the Class Representative will seek, and AdvoCare will not oppose, the Court's preliminary certification of the Class for settlement purposes only pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure.

B.    AdvoCare agrees that the Class Representative will seek to be appointed as representative of the Class and that Class Counsel seek to be appointed to serve as class counsel, and AdvoCare agrees not to oppose these appointments.

C.    The "**Class**" shall be all Distributors who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme, and whose distributorships were suspended without reinstatement or terminated by May 17, 2016.  Distributors who made no purchases from AdvoCare after May 17, 2016, and paid no dues after May 17, 2016, will be considered terminated as of May 17, 2016.  Distributors will be considered to have lost money if the sum of the fees they paid AdvoCare, the money they paid AdvoCare for sales aids, and the money they paid AdvoCare for product (net of refunded amounts), reduced by 65% of the amount paid for product, is greater than the money they received from AdvoCare (other than for product refunds). Distributors who meet this definition and do not opt out from membership in the Class are "**Class Members**" and individually each a "**Class Member.**"  Excluded from the Class are Distributors who were not, at the time they were Distributors, residents of the United States or its territories or U.S. military stationed overseas.

**D.**    The Parties' agreement as to certification of the Class is only for purposes of effectuating this Settlement and for no other purpose.  AdvoCare retains all of its objections, arguments, and defenses with respect to any other request for class certification, and reserves all rights to contest class certification if (i) the Settlement Agreement does not receive the Court's preliminary or final approval, (ii) the Court's approval is reversed or vacated on appeal, or (iii) this Settlement Agreement is terminated as provided herein.

## V.    SETTLEMENT APPROVAL

The Parties agree to take all necessary steps to obtain preliminary and final approval of this Settlement Agreement and take the actions described below.

**A.    Preliminary Approval:**

1.    Promptly after Execution Date, proposed Class Counsel shall make a motion to the Court for entry of a Preliminary Approval Order, substantially in the form annexed hereto as Exhibit A. The requested Preliminary Approval Order will, *inter alia,* preliminarily approve this Settlement Agreement, find that the Class should be certified for settlement purposes, appoint Class Counsel, appoint the Class Representative, and approve the proposed Notice Plan. The requested Preliminary Approval Order will schedule, on such date that is at least 105 days after the Court issues the Preliminary Approval Order, a hearing for final approval (the "**Fairness Hearing**") at which the Court may consider the fairness, reasonableness, or adequacy of the proposed Settlement Agreement, whether it should be finally approved by the Court, and whether to approve any requests for a Fee Award or Service Award;

2.    The Settlement Notice and Claims Form have dates that depend on the date set by the Court for the Fairness Hearing and the date the Court issues the Preliminary Approval Order.  Class Counsel will complete these documents with the addition of the dates derived from

the date set for the Fairness Hearing in the Preliminary Approval Order and the date the Preliminary Approval Order issues.  The dates to be set are as follows:

- Fairness Hearing;
- Deadline for Notice of Appearance by Objecting Class Member or Class Member's Counsel:  14 days prior to Fairness Hearing;
- Objections Deadline and Opt-Out Deadline: 21 days prior to Fairness Hearing;
- Deadline for Mailing Settlement Notices and Claims Forms: 77 days before the Fairness Hearing; and
- Claims Deadline:  postmarked, emailed, or filed via the Settlement Website 75 days after the Settlement Administrator initially emails the Claims Forms.

**B.**    **Final Approval:**  If the Court issues the Preliminary Approval Order, the Class Representative shall move the Court to enter the Final Order And Judgment substantially in the form annexed hereto as Exhibit D.

**C.**    **Appeal:**  In the event of an appeal from a Final Order And Judgment, the Parties will work cooperatively to defend the Final Order And Judgment on appeal.

**D.**    **Cooperation:**  The Parties agree to cooperate fully with one another with respect to the Class Representative seeking (1) the Court's preliminary approval of the Settlement Agreement and class certification; (2) the Court's approval of the Notice Program; and (3) the Court's final approval of the Settlement Agreement.  The Parties agree to promptly agree upon and execute all such other documentation as may be reasonably required to obtain final approval by the Court of the Settlement Agreement.

**VI.    NOTICE PROGRAM**

**A.**    **Distributor Master List:** Within 14 days of the Execution Date, AdvoCare will provide proposed Class Counsel and the Settlement Administrator with an Excel spreadsheet (the "**Distributor Master List**") containing necessary information regarding Distributors.

1.    AdvoCare shall include on the Distributor Master List information regarding all Distributors meeting the following criteria:

- The Distributor paid AdvoCare money for product, fees, or sales aids between March 9, 2013, and May 17, 2016;

- The Distributor did not pay AdvoCare money after May 17, 2016; and

- The Distributor received less money from AdvoCare than the Distributor paid AdvoCare for product (net of refunds), fees, or sales aids over the entire course of the Distributor's relationship with AdvoCare (including transactions pre-dating March 9, 2013), accounting for the 65% product credit.

In assessing these criteria, the calculations will be based on each Distributor's AdvoCare account without regard to the source of the payment.

2.    The Distributor Master List will include the following information for the Distributors, if available in AdvoCare's database:

- Name;
- AdvoCare Distributor ID number;
- Date of birth;
- Mailing address;
- Telephone number(s);
- Email address(es);
- Total payments to AdvoCare made at any time, broken down by purpose (*i.e.,* fees, product, sales aids);
- Total payments from AdvoCare made at any time for refunds;
- Total payments from AdvoCare made at any time for earnings; and
- Total payments to AdvoCare made between March 9, 2013 and May 17, 2016.

3.    The Class Representative and the Settlement Administrator shall keep the aforementioned information confidential except as necessary to comply with the terms of this agreement and otherwise provide notice to the Class consistent with this agreement. AdvoCare will verify in a declaration or affidavit under oath that the information provided on the Distributor Master List is true and accurate to the best of its knowledge.

**B.    Notice by Settlement Administrator:**  No less than 77 days before the Fairness Hearing, and as soon as possible after AdvoCare provides the Distributor Master List, the Settlement Administrator will provide notice to the Distributors in the following manner:

1.    Sending a copy of the Settlement Notice and the Claims Form via email to the Distributors using the email addresses in the Distributor Master List;

2.    Sending a copy of the Settlement Notice and the Claims Form via U.S. regular mail using the mailing addresses in the Distributor Master List to all Distributors whose noticing emails sent pursuant to the previous paragraph "bounced back" or were otherwise undeliverable;

3.    Resending a second copy of the Settlement Notice and Claims Form via email to all Distributors whose emails did not bounce and did not submit a Claims Form 14 days before the Claims Deadline; and

4.    Attempting to contact via telephone and email Distributors to learn updated contact information when the notice documents sent via U.S. Mail are returned as invalid or undeliverable, then providing additional notice as necessary.

**C.    Additional Notice to Certain Distributors by Class Counsel:** No less than 77 days before the Fairness Hearing, in addition to the Notice by the Settlement Administrator, Class Counsel will send notice via email to those Distributors who have contacted Class Counsel previously regarding this Action.  Class Counsel's email will direct Distributors to the Class Action Website for more information regarding the Settlement Agreement and submission of a Claims Form.  Class Counsel will provide AdvoCare with a copy of the email Class Counsel intends to provide to these Distributors in advance of sending the email, and Class Counsel will advise AdvoCare as to the number of Distributors to whom Class Counsel will send the email.

**D.**      **Notice to Government Officials:**   The Settlement Administrator will provide notice to the required state and federal officials as set out in 28 U.S.C. § 1715(b), within 10 days of Plaintiffs filing the motion for entry of the Preliminary Approval Order.

**E.**      **Class Action Website:**   Prior to sending out the initial notice, the Settlement Administrator will prepare and publish a website (the "**Class Action Website**") that will post documents relating to the Action and the Settlement Agreement.   The documents will include the following, as they become available:

- The SAC;
- The FTC Complaint;
- The FTC Judgment;
- The Settlement Agreement;
- The motions for issuance of the Preliminary Approval Order, any Fee Award, and any Service Award;
- Any orders of the Court on the foregoing motions; and
- The Settlement Notice and the Claims Form.

Distributors will be able to fill out and submit their Claims Form via the Class Action Website. They may also opt out through the website.   The Settlement Notice will direct the Distributors to this website.   The Settlement Administrator may publish additional materials on the website to provide the Distributors with updated information regarding the Settlement Agreement, such as various deadlines and the motion for entry of the Final Order And Judgment, as directed by Class Counsel.

## VII.   OBJECTION TO THE PROPOSED SETTLEMENT AGREEMENT

**A.**      Any Class Member who wishes to object to the fairness, reasonableness or adequacy of this Settlement Agreement must, by the date specified in the Settlement Notice (which will be no later than 21 days before the Fairness Hearing or such other time as the Court may direct) deliver to Class Counsel and Defense Counsel and file with the Court a statement of such objection, as well as the specific reasons for each objection, including any legal and evidentiary

Appx. 014

support the Class Member wishes to bring to the Court's attention.  Class Members may object on their own or through counsel hired at their own expense.

    **B.**    Any Class Member who files and serves a written objection and who intends to make an appearance at the Fairness Hearing, either in person or through counsel at that Class Member's expense, must deliver to Class Counsel and Defense Counsel and file with the Court by the date specified in the Settlement Notice, which will be no later than 14 days before the Fairness Hearing, or as the Court may otherwise direct, a notice of intention to appear and a statement identifying any documents the Class Member will seek to introduce or witnesses the Class Member will seek to call at the Fairness Hearing.

    **C.**    Any Class Member who fails to comply with subsections A and B of this Section VII shall waive and forfeit any and all rights that Class Member may have to appear separately or object, or to take any appeal of the orders of judgment in this action, and shall be bound by all terms of this Agreement, should the Court enter the Order And Final Judgment.

    **D.**    Distributors who opt out of the Settlement Agreement are not Class Members and may not object to the Settlement Agreement.

    **E.**    Class Counsel and Defense Counsel will promptly furnish each other with copies of any and all objections to the Settlement Agreement that might come into their possessions and that are not filed with the Court.

## VIII.  EFFECTIVE DATE OF SETTLEMENT; TERMINATION

    **A.**    The "**Effective Date**" of the Settlement Agreement shall be the date when both of the following have occurred:

        1.    Entry by the Court of the Final Order And Judgment, substantially in the form set forth in Exhibit D annexed hereto, or the entry of a final judgment other than the Final

Order And Judgment and none of the Parties hereto elect to terminate the Settlement Agreement (in which case such different judgment becomes the Final Order And Judgment); and

> 2. Expiration of the time for judicial review and, in the event of an appeal, affirmance of the Final Order And Judgment either on appeal or after remand from an appellate court.

**B.** **Termination:** Any Party shall have the right to terminate this Settlement Agreement by providing written notice of their election to do so to all other Parties hereto within 7 days of (a) the Court's denying the motion for entry of the Preliminary Approval Order or modifying it in any material respect, (b) the Court's denial of the motion for entry of the Final Order And Judgment or modifying it in any material respect, (c) denial of certification or modification of the scope of the proposed Class, or (d) an appellate court's reversal of the Final Order And Judgment.

**C.** **Reversion to Status Quo:** Except as otherwise provided herein, in the event the Settlement Agreement is terminated or ultimately fails to become effective for any reason, then the Parties to this Settlement Agreement shall be deemed to have reverted to their respective positions in the Action as of September 5, 2020, and, except as otherwise expressly provided, the Parties shall proceed in all respects as if this Settlement Agreement had not been entered into.

**IX.** **SETTLEMENT ADMINISTRATOR**

**A.** Subject to approval by the Court, Class Counsel will retain Analytics LLC as the neutral settlement administrator (the "**Settlement Administrator**").

**B.** The Settlement Administrator's fees and expenses will be paid out of the Settlement Fund. The Settlement Administrator's fees and expenses will be subject to review and approval by Class Counsel. In the event Class Counsel and the Settlement Administrator are unable to agree

as to the amount of appropriate fees and expenses, either may request resolution of the issue by the Court with each side to bear their own fees and expenses.

C.      The Settlement Administrator's fees and expenses incurred prior to the Effective Date will be paid from the Settlement Account after the Effective Date.  In the event the Court does not issue a Final Order And Judgment, or a Final Order And Judgment is reversed on appeal, Class Counsel and AdvoCare will split the cost of the Settlement Administrator's fees and expenses.

D.      AdvoCare is not liable for settlement administration, or any acts or omissions of the Settlement Administrator and/or Class Counsel in connection with settlement administration.

## X.      SETTLEMENT ACCOUNT

A.      Within 5 days of the entry of the Preliminary Approval Order, Class Counsel and the Settlement Administrator will open an interest-bearing account (the "**Settlement Account**") at a financial institution agreeable to both Class Counsel and the Settlement Administrator.

B.      The Settlement Administrator will have the sole ability to issue checks from or order transfers from the Settlement Account.  However, the Settlement Administrator may only issue checks from or order transfers from the Settlement Account with the approval of Class Counsel.

C.      AdvoCare will make the Cash Payment and provide security towards the funding of the Settlement Account as follows:

1.      Within 14 days after the Court enters the Preliminary Approval Order:

a.      AdvoCare will pay four million dollars ($4,000,000.00) into the Settlement Account; and

b.      AdvoCare will provide to the Class an irrevocable letter of credit (the "**LOC**") to secure the Cash Payment.  The issuing bank will be Comerica Bank, N.A.

("**Comerica**"). The LOC will be in the total amount of $6,500,000.00. Class Counsel, as agent and attorney for Megan Cornelius, on her behalf and on behalf of the Class, will be beneficiary of the LOC. If AdvoCare, for any reason whatsoever, fails to pay, in whole or part, the installment payments toward the Cash Payment described below, the Class (through Class Counsel) shall have the right to present the LOC to Comerica and to receive from Comerica the difference between the amount (if any) AdvoCare paid beyond the initial $4,000,000.00 payment and $6,500,000.00. To be clear, if AdvoCare misses any of the payments described below, Class Counsel may draw down on the LOC to the full extent of the $6,500,000.00, less any payments made beyond the initial $4,000,000.00 payment, even if the date for a payment described below has not yet passed. At the time of the presentation of the LOC by Class Counsel to Comerica, the Class will provide to Comerica a declaration from Class Counsel setting forth the amount of money received from AdvoCare toward the Cash Payment. The LOC shall not expire until (a) February 28, 2023, (b) AdvoCare's fulfillment of its payment obligations described below, as certified in writing by Class Counsel or (c) the termination of this Settlement Agreement pursuant to Section VII.B, above.

2. On the earlier of (a) seven days after the date of entry of the Distribution Order or (b) September 30, 2022, AdvoCare will pay an additional two-million five hundred thousand dollars ($2,500,000.00) into the Settlement Account.

3. On the earlier of (a) seven days after the date of entry of the Distribution Order or (b) November 30, 2022, AdvoCare will pay an additional two-million dollars ($2,000,000.00) into the Settlement Account.

4. On the earlier of (a) seven days after the date of entry of the Distribution Order or (b) January 31, 2023, AdvoCare will pay an additional two-million dollars ($2,000,000.00) into the Settlement Account.

**D.**     Any fees for the maintenance of the Settlement Account will be paid out of the Settlement Account.

**E.**     The Settlement Administrator must make the following payments, and only the following payments, out of the Settlement Account:

1.     The Final Claims Payments to Class Members;

2.     Any Service Award approved by the Court;

3.     Any Fee and Expense Award approved by the Court;

4.     Any fees and expenses incurred by the Settlement Administrator (including notice costs) in performing its obligations under this Agreement and approved by Class Counsel or the Court;

5.     Any fees imposed by the financial institution holding the Settlement Account; and

6.     A reversion of funds to AdvoCare if any remain after all of the above have been paid in full.

**F.     Closing the Account:**  After the balance of the Settlement Account reaches $0, the Settlement Administrator will close the Settlement Account.

**G.     Taxes on Settlement Account:** The Settlement Fund shall constitute a qualified settlement fund within the meaning of Treasury Regulations Sections 1.468B-1 through 1.468B-5, 26 C.F.R. §§ 1.468B-1 through 1.468B-5 (1992).  The Parties shall treat the Settlement Fund as qualified settlement funds for all reporting purposes under the federal tax laws.  For the purpose of Section 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Settlement Administrator, which is acting as an escrow agent.  The Settlement Administrator, as escrow agent, shall timely and properly file

Appx. 019

all informational and other tax returns necessary or advisable with respect to the Settlement Fund (including without limitation, the returns described in Treas. Reg. Sec. 1.468B-2(k)). Such returns shall be consistent with this subsection and in all events shall reflect that all taxes (including any interest or penalties) on the income earned by the Settlement Fund shall be paid out of the income earned by the Settlement Fund. Taxes and tax expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund and paid without prior order from the Court. The Settlement Administrator shall be obligated (notwithstanding anything herein to the contrary) to withhold from the income earned by the Settlement Fund any funds necessary to pay such taxes, including the establishment of adequate reserves for any taxes and tax expenses (as well as any amounts that may be required to be withheld under Treas. Reg. Section 1.468B-2(1)(2)). The Settlement Administrator shall maintain accurate records of all expenditures made pursuant to this subsection, and shall provide the records upon request to Class Counsel, Defense Counsel, and the Court. None of the Parties or any of their counsel shall have any responsibility for the payment of taxes described in this subsection. The Parties agree to cooperate with the Settlement Administrator, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this subsection.

      **H.** The Settlement Fund shall be within the control and jurisdiction of the Court until such time as it is distributed pursuant to this Settlement Agreement.

## XI. ATTORNEYS' FEES AND EXPENSES AND SERVICE AWARD

      **A.** Class Counsel shall apply to the Court for a Fee Award, and the Class Representative shall apply to the Court for a Service Award, prior to the Fairness Hearing with sufficient notice to the Class Members for objections to be filed. The fact of and the amount of

Appx. 020

these requests, as well as the deadline for Class Members to oppose such requests, will be noted in the Settlement Notice provided to Class Members.

B.     Any Fee Award and Service Award will be paid out of the Settlement Fund. AdvoCare will not pay any amount of any Fee Award or Service Award, except that AdvoCare will make the Cash Payment that will fund the Settlement Fund.  The parties agree that the Service Award shall not exceed $20,000.

C.     Class Counsel agree to seek Fee Award of no more than 35% of the amount of the total Cash Payment.  Other than this limitation, the Parties have not made any agreement regarding what amount of Fee Award should be paid, nor whether AdvoCare will object to or support any application for a Fee Award.

D.     Any orders or proceedings relating to any request for a Fee Award or a Service Award shall not operate to terminate or cancel this Settlement Agreement and shall have no effect on the finality of the Final Order And Judgment.

E.     The Settlement Administrator will pay any Fee Award from the Settlement Account by wire transfer as directed by Class Counsel.  Unless the Court directs otherwise, the Settlement Administrator will make that payment within 5 business days of the latter of (a) the expiration of time to appeal the Court's order approving the Fee Award, (b) the Effective Date, and (c) AdvoCare's making the first installment of the Cash Payment.

F.     The Settlement Administrator will pay any Service Award by check, written in the name of the Class Representative, and will deliver that check via Federal Express to:

R. Adam Swick
Reid Collins & Tsai LLP
1301 Capital of Texas Highway, Suite C300
Austin, Texas 78746

Unless the Court directs otherwise, the Settlement Administrator will make that payment within 5 business days of the latter of (a) the expiration of time to appeal the Court's order approving the Service Award, (b) the Effective Date, and (c) AdvoCare making the first installment of the Cash Payment.

## XII.    FINAL CLAIMS PAYMENTS

Class Members submitting a valid Claims Form may receive a payment from the Settlement Fund in the amount of their Final Claims Payment.  Section XIII.G. provides specific details regarding how the Final Claims Payments are to be calculated.

**A.    Final Claims Payments:**  The "**Final Claims Payment**" for each Class Member is the Base Claim, subject to the FTC Payment Reduction and the Pro Rata Reduction.

**B.    Base Claim:**  The Base Claim is the total amount of the Class Member's loss during their entire tenure with AdvoCare, capped by the amount of payments made to AdvoCare during the Class Period, according to the Distributor Master List.  Calculation of the Base Claim amount is described in more detail in Section XIII.F, below.

**C.    FTC Payment Reduction:**  A Class Member's Base Claim will be reduced by the amount paid (if any) to the Class Member from an FTC Fund by the FTC Distribution Deadline to yield the Adjusted Base Claim.  Application of the FTC Payment Reduction depends upon AdvoCare obtaining from the FTC reliable and sufficient data regarding payments from the FTC Fund, as described below in Section XIII.F.2.  The FTC Distribution Deadline is originally set at September 30, 2022.  However, in the event (a) AdvoCare was not reasonably able to obtain data from the FTC regarding payments from the FTC Fund by the existing FTC Distribution Deadline and (b) AdvoCare has good reason to believe it can obtain such data within three months of the existing FTC Distribution Deadline, the Parties may agree to extend the existing FTC Distribution Deadline by three months.  If the Parties are unable to agree whether conditions for changing the

Appx. 022

existing FTC Distribution Deadline are met, AdvoCare may bring the issue to the Mediator for binding resolution. The FTC Distribution Deadline can be extended more than once.

AdvoCare may not unreasonably delay in seeking information regarding FTC distributions from the FTC Fund, nor may it unreasonably delay in providing that information to the Settlement Administrator. If the Parties are unable to agree whether AdvoCare has unreasonably delayed in this respect, Class Counsel may bring the issues to the Mediator for binding resolution.

      **D.**      **Pro Rata Reduction:** If the total amount of Adjusted Base Claims for all Class Members who submit Accepted Claims exceeds the Net Settlement Fund, each Class Member's Adjusted Base Claim will be reduced on a pro rata, proportionate basis, until the total Adjusted Base Claims equals the Net Settlement Fund. The Adjusted Base Claims after any Pro Rata Reductions are the Final Claims Payments.

## XIII. CLAIMS PROCESS

      **A.**      **Claims Deadline:** Class Members must submit a valid and timely Claims Form to be eligible to receive settlement funds as described herein. To be valid, a Claims Form must be submitted by mail, email, or via the Class Action Website to the Settlement Administrator by the Claims Deadline. To be timely, Claims Forms submitted by mail must be postmarked by the Claims Deadline and received by the Settlement Administrator within 10 days of the Claims Deadline.

      Any Class Member who fails to submit a Claims Form before the Claims Deadline will not be entitled to receive any settlement funds but will otherwise be bound by the terms of this Settlement Agreement, including the terms of any Final Order And Judgment and the releases provided for herein.

      **B.**      The Settlement Notice and the Claims Form will request that the Class Member return the Claims Form to the Settlement Administrator. However, if a Class Member returns a

Appx. 023

Claims Form to Class Counsel, Defense Counsel, or AdvoCare, they will forward that Claims

Form to the Settlement Administrator, which will treat the Claims Form as if it were sent to the

Settlement Administrator by the Class Member as of the date received by Class Counsel, Defense

Counsel, or AdvoCare.

      **C.**    **Identifying Information:** The Claims Form will ask the Class Members to provide

the following information:

- Name;
- Name when the Class Member was an AdvoCare Distributor, if different;
- AdvoCare Distributor ID;
- Date of birth;
- Current mailing address;
- Mailing address when the Class Member was an AdvoCare Distributor, if different;
- Current telephone number;
- Telephone number when the Class Member was an AdvoCare Distributor, if different;
- Current email address the Settlement Administrator can use for contacting the Class Member; and
- Email address at the time the Class Member was an AdvoCare Distributor, if different.

This information is requested for identification and communication purposes only. The failure of

a Class Member to provide all of the requested information will not be grounds for a denial of an

award, so long as the Settlement Administrator is reasonably satisfied that the claimant is a Class

Member. The Settlement Administrator may contact claimants by phone or email to attempt to

resolve deficiencies in Claims Forms.

      **D.**    **Excluded Forms:** The Settlement Administrator will exclude all Claims Forms that

(1) were not submitted by the Claims Deadline, (2) did not contain sufficient information for the

Settlement Administrator to become reasonably satisfied that the claimant is a Class Member, or

(3) were submitted by persons who are not Class Members.

1.    Within 14 days of the Effective Date, the Settlement Administrator will provide electronic copies of all excluded Claims Forms to Class Counsel and lists of (a) all claimants whose Claims Forms were excluded; and (b) all claimants whose Claims Forms were not excluded.

2.    If Class Counsel disagrees with any of the Settlement Administrator's exclusion determinations, Class Counsel may confer with the Settlement Administrator regarding the reexamination of a particular exclusion determination.  Class Counsel must do this within 7 days of receipt of the information described in the preceding paragraph.  If Class Counsel and the Settlement Administrator are unable to resolve a question of which forms should be excluded, Class Counsel may bring the issue to the Court for resolution.  The unexcluded claimants will be the "**Accepted Claimants.**"

E.    **Accepted Claims List:**  Within 7 days of the deadline for Class Counsel to instruct the Settlement Administrator to reexamine an exclusion determination, the Settlement Administrator will provide a list of the accepted claims ("**Accepted Claims List**") to Class Counsel.

F.    **Calculating Final Claims Payments**:  The Settlement Administrator will calculate Final Claims Payments using the following process:

1.    The Settlement Administrator will assess the Base Claims for each Class Member on the Accepted Claims List.

a.    The Settlement Administrator will rely on the data provided by AdvoCare regarding Distributor payments and receipts on the Distributor Master List.

b.    The Settlement Administrator will calculate Base Claims as follows:

Appx. 025

i. Total the amount of fees the Class Member paid AdvoCare at any time and the amount the Class Member paid AdvoCare for sales aids at any time.

ii. Total the amount of money the Class Member paid AdvoCare for product at any time (less the amount of fees in (i)). Reduce this amount by the amount of refunds the Class Member received from AdvoCare at any time. Discount this result by 65%. Add the result of (i). This yields the "**Discounted Total Paid**."

iii. Total the amount of money the Class Member received from AdvoCare at any time, other than amounts paid for refunds. This is the "**Total Received**."

iv. Subtract the Total Received from the Discounted Total Paid. This is the Class Member's "**Net Loss**."

v. Total the amount the Class Member paid AdvoCare during the Class Period for fees, sales aids, and product. This is the "**Claim Cap**."

vii. If the Net Loss exceeds the Claim Cap, the Claim Cap becomes the Class Member's **Base Claim**. If the Claim Cap equals or exceeds the Net Loss, the Net Loss becomes the **Base Claim.**

b. The Settlement Administrator will add a column for the Base Claims to the Accepted Claims List and provide it to Class Counsel (who will also promptly provide it to counsel for AdvoCare) within 14 days of Class Counsel and the Settlement Administrator finalizing the Accepted Claims List.

c. If Class Counsel disagrees with any of the Base Claims, Class Counsel may confer with the Settlement Administrator regarding the reexamination of a particular Base Claim calculation. Class Counsel must do this within 7 days of receipt of the information described in the preceding paragraph. If Class Counsel and the Settlement Administrator are unable to resolve a calculation of Base Claims, Class Counsel may bring the issue to the Court for resolution. In addition, if AdvoCare disagrees with any of the Base Claims, within 5 days of

Appx. 026

receipt of the information, it may raise this issue for Class Counsel to confer with the Settlement Administrator, and if AdvoCare and Class Counsel are unable to resolve any issues they may dispute between them on the calculation of Base Claims, then AdvoCare may bring the issue to the Court for resolution.

           d.      Class Counsel provided to AdvoCare a spreadsheet entitled "Anticipated Distributor Base Claims" on January 20, 2021. The Parties agree that the Base Claims as calculated by the Settlement Administrator should exactly or substantially equal the amounts set forth in column M of this spreadsheet. If the Base Claim for any Class Member differs from the amount set forth in column M, Class Counsel, AdvoCare, and the Settlement Administrator will confer to reach a resolution as to what the Base Claim for the Class Member should be based on accurate information consistent with how Base Claims are calculated as set forth above. Any unresolved differential may be raised with the Court per the preceding paragraph.

           2.      Once the Settlement Administrator has established the Base Claims for the Accepted Claimants, the Settlement Administrator will determine whether FTC Payment Reductions are necessary.

           a.      For the Settlement Administrator to apply FTC Payment Reductions, by the FTC Distribution Deadline, AdvoCare must obtain data directly from the FTC establishing which Class Members to whom the FTC directed payments and the amount of those payments from the FTC Fund. Plaintiffs will reasonably cooperate in AdvoCare's efforts to obtain this information, but AdvoCare's inability to obtain the information will not preclude further administration of the Settlement. Should the Parties dispute whether Plaintiffs have reasonably

cooperated in AdvoCare's efforts to obtain the information, they may submit the dispute to binding resolution by the Mediator.

b.      If AdvoCare is able to provide the data described in the preceding paragraph by the FTC Distribution Deadline to the Settlement Administrator and Class Counsel, the Settlement Administrator will apply the FTC Payment Reductions, meaning the Settlement Administrator will reduce each Base Claim by the amount each Accepted Claimant is identified as having been sent an award from the FTC Fund.

c.      After the Settlement Administrator makes its determination based on the applicability of any FTC Payment Reductions, it will provide the information relating to the FTC Payment Reductions to Class Counsel (who will also promptly provide it to counsel for AdvoCare).

d.      If Class Counsel disagrees with any of the FTC Payment Reductions identified by the Settlement Administrator, Class Counsel may confer with the Settlement Administrator regarding the reexamination of a particular FTC Payment Reduction. Class Counsel must do this within 7 days of receipt of the information described in the preceding paragraph. If Class Counsel and the Settlement Administrator are unable to resolve an issue regarding the FTC Payment Reduction, Class Counsel may bring the issue to the Court for resolution. In addition, if AdvoCare disagrees with any of the FTC Payment Reductions, within 5 days of receipt of the information, it may raise this issue for Class Counsel to confer with the Settlement Administrator, and if AdvoCare and Class Counsel are unable to resolve any issues they may dispute between them on the FTC Payment Reductions, then AdvoCare may bring the issue to the Court for resolution.

e.      The Settlement Administrator will not pay any Final Claims Payments to Accepted Claimants until after the FTC Distribution Deadline, or until after AdvoCare provides the data described above regarding distributions from the FTC Fund, whichever comes first.

3.      Once the Settlement Administrator has assessed Base Claims and made any necessary FTC Payment Reductions on the Accepted Claim List, the Settlement Administrator will provide a revised Accepted Claims List to Class Counsel (who will also promptly provide it to AdvoCare).  The Settlement Administrator will include in the List identification and contact information regarding each Class Member on the List, their Base Claim Amounts, their FTC Payment Reductions (if any), and their Base Claim Amounts adjusted for the FTC Payment Reductions (the "**Adjusted Base Claims**").  This spreadsheet will also total the Adjusted Base Claims.

4.      If Class Counsel disagrees with any of the Adjusted Base Claims, Class Counsel may confer with the Settlement Administrator regarding the reexamination of particular Adjusted Base Claims.  If Class Counsel and the Settlement Administrator are unable to resolve an issue regarding the Adjusted Base Claims Amounts, Class Counsel may bring the issue to the Court for resolution.  In addition, if AdvoCare disagrees with any of the Adjusted Base Claims, within 5 days of receipt of the information, it may raise this issue for Class Counsel to confer with the Settlement Administrator, and if AdvoCare and Class Counsel are unable to resolve any issues they may dispute between them on the Adjusted Base Claims, then AdvoCare may bring the issue to the Court for resolution.

5.      Within 7 days of Class Counsel notifying the Settlement Administrator that their review of the Accepted Claims List is complete or resolution of any reexamination, whichever

is later, the Settlement Administrator will prepare an invoice for its incurred but unpaid fees and expenses (the "**Unpaid Fees and Expenses**") and a binding estimate of fees and expenses (the "**Estimated Fees and Expenses**") the Settlement Administrator will incur in distributing Final Claims Payments to the Class Members and otherwise completing its work as Settlement Administrator.

a.    At the time the Settlement Administrator provides this invoice and binding estimate to Class Counsel, the Settlement Administrator will calculate the Net Settlement Fund by subtracting the Unpaid Fees and Expenses and the Estimated Fees and Expenses from the amount then existing in the Settlement Account.

b.    If, for some reason, any Fee Award or Service Award has not yet been paid, the Settlement Administrator will subtract such amount from the amount existing in the Settlement Account, also.  The Settlement Administrator will not distribute Final Claims Payments to Accepted Claimants until any Fee Award and any Service Award has been set by a final, non-appealable order of the Court.

c.    The amount of the Settlement Account less the two subtractions described in the preceding two paragraphs, as well as any unpaid account service fees, will be the "**Net Settlement Fund**."

6.    Seven (7) days after providing Class Counsel with the statement of Unpaid Fees and Expenses and the Estimated Fees and Expenses, the Settlement Administrator will calculate the Final Claims Payments.  If the total of the Adjusted Base Claims does not exceed the Net Settlement Fund, then the amount of the Adjusted Base Claims become the Accepted Claimants' Final Claims.  Otherwise, the Settlement Administrator must reduce each Adjusted Base Claim on a pro rata basis so that the total of the Adjusted Base Claims equals the Net

Appx. 030

Settlement Fund, and those reduced Adjusted Base Claims become the Accepted Claimants' Final Claims.  The Settlement Administrator will provide Class Counsel with a spreadsheet (the "**Final Claim List**") including the Final Claims on the Accepted Claim List.

G.    **Paying Final Claims Payments and Closing the Settlement Account:**

1.    After receiving the Final Claims List, Class Counsel will apply to the Court, on notice to Defense Counsel, for an order (the "**Distribution Order**") approving the Settlement Administrator's administrative determinations concerning: (i) the acceptance and rejection of the claims submitted herein; (ii) the amount of Final Claims Payments; and (iii) approving any fees and expenses not previously applied for.

2.    Within 21 days of the entry of the Distribution Order, the Settlement Administrator will cause checks to be issued payable to the Accepted Claimants from the Settlement Account in the amount of their Final Claims as set forth on the Final Claim List.  The Settlement Administrator will send, via U.S. Mail to the address indicated on the Claims Form, checks to the appropriate recipients.

3.    The checks disseminating the Final Claims Payments will expire 60 days after issuance, and that fact will be noted on the checks.  If any of the checks providing Final Claims Payments are not cashed within 60 days of the Claims Administrator issuing the checks, those uncashed checks will become null and void.

4.    After the expiration date of the issued Final Claims Payment checks, should the Settlement Account contain any funds after the Settlement Administrator has paid in full (1) the Final Claims Payments to the Accepted Claimants, (2) any Fee Award, (3) any Service Award, (4) any fees charged by the financial institution holding the account, and (5) the Settlement

Appx. 031

Administrator's fees and expenses, then the Settlement Administrator will revert those funds to AdvoCare.

**H.      Cooperation:**  Class Counsel and Defense Counsel shall work together in good faith, as necessary, to resolve any disputes regarding the administration of the Settlement Agreement.  AdvoCare agrees to provide reasonable information from its files, as necessary, for Class Counsel and the Settlement Administrator to assess and distribute the appropriate funds to Class Members and otherwise administer the Settlement Agreement.

**I.      Movable Deadlines:**  The deadlines set forth in this "Claims Process" section requiring action by the Settlement Administrator within a particular period of time may be adjusted by agreement of Class Counsel and Defense Counsel as becomes reasonably necessary.  However, the Parties and the Settlement Administrator agree to pursue a prompt distribution of the settlement funds to Class Members.

## XIV.  MISCELLANEOUS

**A.      Privacy:**  The Settlement Administrator shall take reasonable measures to the extent permitted by law to assert and to protect the privacy rights of the Distributors and claimants submitting Claim Forms, including by maintaining the confidentiality and security of, and preventing the unauthorized access or acquisition of, personal information received from AdvoCare or submitted in connection with any claim for benefits pursuant to this Settlement Agreement.  In the event of any unauthorized access to or acquisition of personal information concerning any Distributor or claimant as a direct result of the intentional or negligent acts or omission of the Settlement Administrator, the Settlement Administrator shall be responsible for complying with any privacy, data security, or breach notification obligations under state or federal

law, and will be solely responsible for directly providing notice to state agencies, affected Distributors, and/or other persons or entities.

       **B.**     **Best Efforts to Effectuate this Settlement:** The Parties agree to cooperate fully with one another in seeking Court approval of the Settlement Agreement and to promptly agree upon and execute all such other documentation as reasonably may be required to obtain final approval by the Court of the Settlement Agreement.

       **C.**     **Entire Agreement:** No representations, warranties, or inducements have been made to any of the Parties other than as expressly set forth in this Settlement Agreement. This Settlement Agreement and the exhibits attached hereto constitute the entire agreement between the Parties regarding the subject matter contained herein, and all prior negotiations and understandings between the Parties shall be deemed merged into this Settlement Agreement. The Parties agree that they are not relying on any representation other than those in this Settlement Agreement.

       **D.**     **Governing Law:** This Settlement Agreement shall be governed by and interpreted according to the law of the State of Texas with respect to issues of contractual interpretation. Issues relating to class certification, approval of this Settlement Agreement by the Court, Fee Awards, and Service Awards are subject to federal law.

       **E.**     **Notice:** Except as otherwise set forth herein, whenever this Settlement Agreement requires or contemplates that the Parties, or any of them, shall give notice to the other, notice shall be provided as follows:

           If to Plaintiffs or Class Counsel, then to:

                  J. Benjamin King: bking@reidcollins.com
                  R. Adam Swick: aswick@reidcollins.com

           If to AdvoCare, then to:

                  Thomas M. Melsheimer: tmelsheimer@winston.com

Steven H. Stodghill: sstodghill@winston.com
John C.C. Sanders, Jr.: jsanders@winston.com
Rex A. Mann: rmann@winston.com

**F.     Authority of Signatories:**  The person signing this Settlement Agreement on behalf of each Party represents, warrants, and covenants that he or she has the authority to sign this Settlement Agreement on behalf of that Party and bind that Party to the Settlement Agreement.

**G.     Attorneys Consulted:**  The Parties have fully discussed the terms and meaning of the signing of this Settlement Agreement with their respective attorneys and fully understand all the provisions and effects of this Settlement Agreement.

**H.     No Admission or Waiver:**  AdvoCare does not admit any liability by entering this Settlement Agreement, nor that Plaintiffs' substantive claims have any basis, nor that the proposed class should be certified outside the context of settlement.  By entering this Settlement Agreement Plaintiffs do not admit that any of AdvoCare's defenses or procedural arguments have any basis.

**I.     Admissibility:**  This Settlement Agreement and all drafts thereof are subject to Federal Rule of Evidence 408.

**J.     Confidentiality and Document Destruction:**  Class Counsel and the Settlement Administrator will maintain the Distributor Master List and any individual information received from AdvoCare regarding the Class Members in strict confidence.  The Parties will also maintain this Agreement as confidential until such time as this Agreement is submitted to the Court in support of Plaintiffs' Motion for Preliminary Approval.

Appx. 034

Dated: January 25, 2021

REID COLLINS & TSAI LLP

By: _____

J. Benjamin King (SBN 24046217)
1601 Elm St., Suite 4200
Dallas, Texas 75201
Tel.: 214-420-8900
bking@reidcollins.com

R. Adam Swick (SBN 24051794)
1301 S. Capital of Texas Hwy.
Bldg. C, Suite 300
Austin, Texas 78746
Tel.: 512-647-6100
aswick@reidcollins.com

*Counsel for Megan Cornelius*

WINSTON & STRAWN LLP

By: _____

Thomas M. Melsheimer
Texas Bar No. 13922550
tmelsheimer@winston.com
Steven H. Stodghill
Texas Bar No. 1926110
sstodghill@winston.com
John C.C. Sanders, Jr.
Texas Bar No. 24057036
jsanders@winston.com
Rex A. Mann
Texas Bar No. 24075509
rmann@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Telephone: (214) 453-6500
Facsimile: (214) 453-6400

*Counsel for Defendant*

Appx. 035

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| LISA RANIERI and MEGAN CORNELIUS, Individually and on Behalf of a Class of Similarly Situated Persons, | |
| v. | Case No. 3:17-cv-00691-S |
| ADVOCARE INTERNATIONAL L.P. | **[PROPOSED] ORDER GRANTING PRELIMINARY SETTLEMENT CLASS CERTIFICATION, PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, APPOINTMENT OF CLASS COUNSEL, APPOINTMENT OF CLASS REPRESENTATIVE, APPROVAL OF CLASS NOTICE PROGRAM, AND SCHEDULING FAIRNESS HEARING** |

WHEREAS, Plaintiff Megan Cornelius, individually and on behalf of a class of similarly situated persons ("**Plaintiff**" or "**Class Representative**"), and Defendant AdvoCare International L.P. ("**AdvoCare**" or "**Defendants**") have entered into a Settlement Agreement dated January 25, 2021 (the "**Settlement Agreement**"), after lengthy arms-length negotiations; and

WHEREAS, the Court has received and considered the Settlement Agreement, including the accompanying exhibits; and

WHEREAS, Plaintiff has made an application, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure (the "**Rules**"), for an order preliminarily approving the settlement agreement of this class action; and

WHEREAS, the Court has reviewed Plaintiff's application for such order, and has found good cause for the same.

NOW, THEREFORE, IT IS HEREBY ORDERED:

Appx. 037

## I.     THE CLASS IS CONDITIONALLY CERTIFIED FOR SETTLEMENT PURPOSES

1.     The Court has jurisdiction over the subject matter and parties to this proceeding, including all members of the Class,[1] pursuant to 28 U.S.C. § 1332(d).

2.     Venue is proper in this District.

3.     Pursuant to the class action criteria of Rule 23(a) and 23(b), the Court provisionally certifies, for settlement purposes only, a class consisting of all AdvoCare Distributors who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme, and whose distributorships were suspended without reinstatement or terminated by May 17, 2016.  Distributors who made no purchases from AdvoCare after May 17, 2016, and paid no dues after May 17, 2016, will be considered terminated as of May 17, 2016.  Distributors will be considered to have lost money if the sum of the fees they paid AdvoCare, the money they paid AdvoCare for sales aids, and the money they paid AdvoCare for product (net of refunded amounts), reduced by 65% of the amount paid for product, is greater than the money they received from AdvoCare (other than for product refunds). Distributors who meet this definition and do not opt out from membership in the Class are "**Class Members**" and individually each a "**Class Member.**"  Excluded from the Class are Distributors who were not, at the time they were Distributors, residents of the United States or its territories or U.S. military stationed overseas.

4.     The Court preliminarily finds that the Class meets the prerequisites for a class action under Rule 23(a) in that: (a) the Class is so numerous that joinder of all individual Class Members in the Action is impracticable; (b) there are questions of law and fact common to the Class and those common questions of law and fact predominate over any individual questions; (c) the claims of the Plaintiff are typical of the

---

[1] Unless otherwise noted, capitalized terms shall have the meaning ascribed to them in the Settlement Agreement.

claims of the Class; and (d) Plaintiff and her counsel will fairly and adequately represent the interests of the Class.

5.    The Court also preliminarily finds that the requirements for Rule 23(b)(3) are met in that common questions of law or fact common to the Class Members predominate over any questions affecting only individual Class Members, and that adjudicating the rights of the Class Members as a class is superior to other available methods for fairly and efficiently adjudicating the controversy.  In making this finding, the Court has considered the Class Members' interests in individually controlling the prosecution of their claims against the Defendant; the fact that there appears to be no litigation concerning the controversy already begun by Class Members, other than this Action; that it is desirable to concentrate the litigation of all Class Members' claims before this Court; and the lack of difficulties in managing this Class Action under the procedures set forth in the Settlement.

6.    Pursuant to Rule 23, the Court appoints Plaintiff as the Class Representative for the Settlement Class.

7.    Having considered the factors set forth in Rule 23(g)(1), the Court appoints R. Adam Swick and J. Benjamin King of Reid Collins & Tsai LLP as class counsel.

## II.    THE COURT PRELIMINARILY APPROVES THE CONDITIONAL SETTLEMENT AND SCHEDULES THE FAIRNESS HEARING

8.    The Court hereby preliminarily approves the Settlement and the terms and conditions of settlement set forth in the Settlement Agreement, subject to further consideration at the Fairness Hearing defined and described below.

9.    The Court has conducted a preliminary assessment of the fairness, reasonableness, and adequacy of the Settlement.  Based on this evaluation, the Court preliminarily finds that the Settlement Agreement is fair, reasonable, and adequate, and within the range necessary for preliminary approval and that the Settlement Agreement appears to have been negotiated in good faith at arms' length between experienced attorneys familiar with the legal and factual issues of this case.

10.     The Court therefore preliminarily approves the proposed Settlement.

11.     Pursuant to Rule 23(e) the Court will hold a settlement hearing (the "**Fairness Hearing**") on [**INSERT**], at [**INSERT**] in the Courtroom of the Honorable Karen Gren Scholer, United States District Court for the Northern District of Texas, Courtroom [**INSERT**], 1100 Commerce Street, Dallas TX 75242[2] for the following purposes:

a.     Finally determining whether the Class meets all applicable requirements of Rule 23 and, thus, the Class should be certified for purposes of effectuating the settlement;

b.     Finally determining whether the proposed settlement of the Action on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and should be approved by the Court;

c.     Considering any application of Class Counsel for an award of attorneys' fees and expenses;

d.     Considering any application of the Class Representative for a service award;

e.     Considering whether the Court should enter the Proposed Final Approval of Class Action Settlement, Settlement Class Certification, and Judgment; and

f.     Ruling upon such other matters as the Court may deem just and proper.

12.     The Court may adjourn the Fairness Hearing and later reconvene such hearing without further notice to the Class Members.

13.     The Parties may further modify the Settlement Agreement prior to the Fairness Hearing so long as such modifications do not materially change the terms of the settlement provided thereunder.  The Court may approve the Settlement Agreement with such modifications as may be agreed to by the Parties, if appropriate, without further notice to Class Members.

---

[2] The Court may determine to hold the Fairness Hearing by ZOOM or other videoconference service.

### III. THE COURT APPROVES THE FORM AND METHOD OF CLASS NOTICE

14.    The Court determines that notice should be provided to members of the Class.

15.    The Court approves, as to form and content, the proposed Settlement Notice and Claims Form, which are attached as Exhibits B and C to the Settlement Agreement.

16.    The Court approves the designation of Analytics LLC to serve as the Court-appointed Settlement Administrator for the settlement.    The Settlement Administrator shall disseminate the Settlement Notice and Claim Form and supervise and carry out the Notice Program, the processing of Claims, and other administrative functions described in the Settlement and this Order.

17.    The Court directs AdvoCare to provide to the Settlement Administrator the Distributor Master List within fourteen (14) days of the Execution Date.

18.    The Court approves the proposed Notice Program described in the Settlement Agreement for giving notice to the Class.  The Notice Program, in form, method, and content, complies with the requirements of Rule 23 and due process, and constitutes the best notice practicable under the circumstances.  The Court hereby directs the Parties and the Settlement Administrator to send the initial electronic notices required by the Notice Program no later than 77 days prior to the Fairness Hearing.

19.    Prior to the Fairness Hearing, Class Counsel will file with the Court proof that Notice was provided in accordance with the Settlement Agreement and this Order, as well as proof that notice was provided to the appropriate state and federal officials pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715.

20.    The costs of the Class Notice, processing of Claims, creating and maintaining the Settlement Website, and all other Settlement Administrator and notice and claim administration expenses shall be paid out of the Settlement Fund in accordance with the applicable provisions of the Settlement Agreement.  If the Settlement Agreement is not finally approved, Class Counsel and AdvoCare shall each pay 50% of the notice and administration costs previously incurred.

## IV.  PROCEDURE FOR CLASS MEMBERS TO PARTICIPATE IN THE SETTLEMENT AGREEMENT

21.    All Class Members who do not opt out shall be bound by all determinations and judgments in the Action concerning the Settlement Agreement, whether favorable or unfavorable to the Settlement Class.

22.    The Court approves the Parties' proposed form of the Claims Form.  Any Class Member who does not opt out and wishes to receive a distribution from the settlement shall complete a Claims Form in accordance with the instructions contained therein and submit it to the Settlement Administrator via the Class Action Website, email, or U.S. Mail no later 75 days after the Settlement Administrator sends the initial Notices and Claims Forms.  Claims Forms submitted by U.S. Mail must be postmarked by the Claims Deadline and received by the Settlement Administrator within 10 days of the Claims Deadline.

23.    The Settlement Administrator shall have the authority to accept or reject Claims in accordance with the Settlement Agreement.

## V.  PROCEDURE FOR REQUESTING EXCLUSION FROM THE SETTLEMENT CLASS

24.    Any person falling within the definition of the Class who desires to be excluded from the Class must request exclusion in writing to the Settlement Administrator no later than 21 days before the Fairness Hearing.  The exclusion request must include the person's name, name at the time the person was an AdvoCare Distributor, telephone number, address, and a statement that you wish to be excluded from the Class.

25.    Any Class Member who does not submit a written exclusion request will be deemed to be a Class Member for all purposes and will be bound by all further orders of the Court in this Action and by the terms of the Settlement, if finally approved by the Court.

26.    All persons who submit valid and timely requests for exclusion in the manner set forth in the Settlement Agreement shall not be entitled to receive any award of cash, nor will such persons participate in the releases of the Defendant described in the Settlement.

Appx. 042

27.    A list reflecting all requests for exclusion shall be filed with the Court by the Settlement Administrator at or before the Fairness Hearing.

## VI.    PROCEDURE FOR OBJECTING TO THE SETTLEMENT

28.    Any Class Member who desires to object to either the Settlement, Class Counsel's request for an award of attorneys' fees and expenses, or the Class Representative's request for a service award, must timely file with the Clerk of this Court and timely serve on the Parties' counsel identified below by hand or first-class mail a notice of the objection(s) and the grounds for such objections, no later than 21 days prior to the Fairness Hearing (the "**Objection Deadline**").

29.    A Class Member may not both object and request exclusion.  If a Class Member submits both a request for exclusion and an objection, the request for exclusion will be controlling and the objection will be deemed improperly made.

30.    The Court will consider such objection(s) and papers only if such papers are received on or before the Objection Deadline, by the Clerk of the Court and by Class Counsel and Defendants' counsel. Such papers must be sent to each of the following persons:

| Court | Class Counsel | Defense Counsel |
|---|---|---|
| Clerk of Court<br>U.S. District Court for the<br>Northern District of Texas<br>1100 Commerce Street<br>Room 1452<br>Dallas, TX 75242 | J. Benjamin King<br>1601 Elm St., Suite 4200<br>Dallas, Texas 75201<br><br>R. Adam Swick<br>Reid Collins & Tsai LLP<br>1301 S. Capital of Texas Hwy<br>Suite C300<br>Austin, TX 78746 | Thomas M. Melsheimer<br>Steven H. Stodghill<br>John C.C. Sanders, Jr.<br>Rex A. Mann<br>Becca Loegering<br>Winston & Strawn LLP<br>2121 N. Pearl Street, Suite 900<br>Dallas, TX 75201 |

31.    All objections must include (a) a heading that refers to the Action, *Ranieri, et al. v. AdvoCare International, LP*, Case No. 3:17-cv-00691 (N.D. Tex.); (b) the objector's name, address, telephone number and, if represented by counsel, the address of his/her counsel; (c) a statement that the objector was an AdvoCare Distributor during the Class Period; and (d)  a statement of such objection, as

Appx. 043

well as the specific reasons for each objection, including any legal and evidentiary support the Class Member wishes to bring to the Court's attention. No objection will be valid unless all of the information described above is included.

32. Class Members may object on their own or through counsel hired at their own expense.

33. All objections must be filed with the Clerk and served on the Parties' counsel as set forth above no later than the Objection Deadline. Objections received after the Objection Deadline will not be considered at the Fairness Hearing. A person's failure to submit a written objection in accordance with the procedure set forth above waives any right the person may have to object to the settlement, the award of attorneys' fees and expenses, or Plaintiff's service awards, or to appeal or seek other review of the Final Judgment and Order Approving Settlement.

34. Any Class Member who files a written objection and who wishes to be heard orally with respect to approval of the settlement, the application for an award of attorneys' fees and expenses, or the application for Plaintiff's service award, either in person or through counsel at that Class Member's expense, must deliver to Class Counsel and Defense Counsel and file with the Court by the date specified in the Settlement Notice, which will be no later than 14 days before the Fairness Hearing, or as the Court may otherwise direct, a notice of intention to appear and a statement identifying any documents the Class Member will seek to introduce or witnesses the Class Member will seek to call at the Fairness Hearing.

35. Class Members who do not oppose the settlement, the application for an award of attorneys' fees and expenses, or the application for Plaintiff's service award need not take any action to indicate their approval.

36. Class Counsel and Defense Counsel will promptly furnish each other with copies of any and all objections to the Settlement Agreement that might come into their possessions and that are not filed with the Court.

Appx. 044

37.     Counsel are hereby authorized to use all reasonable procedures in connection with approval and administration of the Settlement Agreement that are not materially inconsistent with this Order or the Settlement Agreement, including making, without further approval of the Court, minor changes to the form or content of the Notice and Claims Form and other exhibits that they jointly agree are reasonable and necessary. The Court reserves the right to approve the Settlement Agreement with such modifications, if any, as may be agreed to by the parties without further notice to the members of the Settlement Class.

38.     Accordingly, the following are the deadlines by which certain events must occur unless otherwise ordered:

| **77 days before the Fairness Hearing** | Deadline for Settlement Administrator to provide initial notice to Class Members. |
| --- | --- |
| **42 days before Fairness Hearing** | Deadline for Class Counsel to move for an award of fees and expenses.<br><br>Deadline for Plaintiff to move for a service award.<br><br>Deadline for Plaintiff to move for final approval of Settlement Agreement. |
| **21 days before Fairness Hearing** | Deadline for Class Members to object to the Settlement Agreement, motion for fee award, and motion for service awards.<br><br>Deadline for Putative Class Members to opt out of the Class. |
| **14 days before Fairness Hearing** | Deadline for Plaintiff to respond to objections to pending motions. |
| [**DATE To be set by Court**] | Fairness Hearing |

Appx. 045

**IT IS SO ORDERED:**

Dated: _____, 2021


_____
United States District Judge

Appx. 046

EXHIBIT B

U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS
Ranieri, et al. v. AdvoCare International, L.P., Case No. 3:17-cv-00691

## CLAIM FORM

**Deadline for Submission: [DATE-75 Days After Settlement Administration Initiates Notice] (the "Claims Deadline")**

Plaintiff Megan Cornelius and AdvoCare International L.P. ("AdvoCare") in the case referred to above have entered into a Settlement Agreement (the "Settlement"). The Court hearing the case has determined that it should proceed as a class action. The Court has not yet approved the Settlement. There will be no payment of awards to anyone until the Court approves the Settlement.

For more information, review the Notice of Settlement accompanying this Claim Form. You can get a copy of the Settlement, read other key case documents, and get more information at [WEBSITE]. You can also call the Settlement Administrator at [PHONE NUMBER] for more information or to receive help filling out this Claim Form. Do not contact the Court, AdvoCare, or AdvoCare's counsel.

You may be able to receive a cash award if you were a Distributor who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme, and whose distributorships were suspended without reinstatement or terminated by May 17, 2016. Distributors who made no purchases from AdvoCare after May 17, 2016, and paid no dues after May 17, 2016, will be considered terminated as of May 17, 2016. Distributors will be considered to have lost money if the sum of the fees they paid AdvoCare, the money they paid AdvoCare for sales aids, and the money they paid AdvoCare for product (net of refunded amounts), reduced by 65% of the amount paid for product, is greater than the money they received from AdvoCare (other than for product refunds). Excluded from the Class are Distributors who were not, at the time they were Distributors, residents of the United States or its territories or U.S. military stationed overseas.

**If you were sent a copy of this Claim Form, AdvoCare's records indicate that you might qualify for an award.** To file a claim to obtain a cash award or a product award, you must do **three** things by the Claims Deadline.

**1.     Provide the following information:** If you do not know some of the information requested, provide as much as you know. All information will be kept confidential and used only for the purposes of administering the settlement.

NAME _____ _____ _____
              FIRST                              MIDDLE                          LAST

PLEASE NOTE ANY NAME CHANGE SINCE LEAVING ADVOCARE:

_____

ADVOCARE DISTRIBUTOR ID: _____

DATE OF BIRTH:_____/_____/_____

QUESTIONS?  CALL [PHONE NUMBER] TOLL FREE
1

Appx. 048

MAILING ADDRESS(ES) WHEN THE CLASS MEMBER WAS AN ADVOCARE DISTRIBUTOR:

_____
PREVIOUS ADDRESS

_____
CITY                    STATE          ZIP

MAILING ADDRESS(ES) NOW, IF DIFFERENT FROM ABOVE:

_____
CURRENT ADDRESS

_____
CITY                    STATE          ZIP

TELEPHONE NUMBER(S) (*Current and when the Class Member was an AdvoCare Distributor, if different*):
_____         _____
CURRENT                                 PREVIOUS

EMAIL ADDRESS(ES) (*Current email address the Settlement Administrator can use for contacting the Class Member*; e*mail address at the time the Class Member was an AdvoCare Distributor, if different*):

_____         _____
CURRENT                                 PREVIOUS

*By providing your email address, you consent to us contacting you regarding your claim by email.*

The Settlement Administrator will calculate Cash Awards using the process described in the Settlement Agreement. Cash Awards will be based solely on the information in AdvoCare's records.

**2.      Attestation and Signature**

I hereby declare under penalty of perjury that the information I have provided is true and correct.

_____         _____
SIGNATURE                               DATE

Appx. 049

3.      **Return this Claim Form to the Settlement Administrator**

The Claim Form can be submitted by **e-file, mail, or e-mail**.  If submitting by mail, the Claim Form must be postmarked no later than the Claims Deadline and received no later than 10 days after the Claims Deadline.  The mailing address is:

AdvoCare Class Action Settlement Administrator
[MAILING INFORMATION]

If submitting by e-mail, send your Claim Form to [**EMAIL ADDRESS**].  You may also fill out the form on the Settlement Website [**WEBSITE**].

**Do not call the Settlement Administrator or Class Counsel to ask how much your award will be or when you will receive it.  We do not know.  We will not know until the claims administration process is complete.  The Settlement Administrator will distribute awards as soon as possible.**

**If you receive a Cash Award, it will very likely be LESS than the difference between the money you paid AdvoCare and the money you received from AdvoCare because all awards will be reduced so that the total of the awards does not exceed the Net Settlement Fund.  Your Cash Award may also be reduced based on any money you receive from the federal government to compensate participants in AdvoCare.**

Appx. 050

EXHIBIT C

U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS
Lisa Ranieri, et al. v. AdvoCare International, L.P., Case No. 3:17-cv-00691

**NOTICE OF PROPOSED SETTLEMENTAND FAIRNESS HEARING**

**If you were a Distributor associated with AdvoCare International, L.P. ("AdvoCare") in the United States, you could get benefits from a class action settlement.**

**A settlement of the case has been proposed. Class Members may object to or opt-out of the settlement, and they may submit a claim to receive a cash payment that will be made in the event the court approves the settlement.**

**Your legal rights may be affected even if you do nothing. Please read this Notice carefully.**

*This is a court-authorized notice. This is **not** a solicitation from a lawyer.*

- A former AdvoCare Distributor has brought a class action against AdvoCare alleging that AdvoCare operated a pyramid scheme contrary to federal law.

- The Court has ordered that this case proceed as a class action for the purposes of settlement. This means that Plaintiff represents a class of AdvoCare Distributors who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme (as defined below), and whose distributorships were suspended without reinstatement or terminated (as defined below) by May 17, 2016. Distributors who meet this definition and do not opt out from membership in the Class are "**Class Members**" and individually each a "**Class Member.**" Excluded from the Class are Distributors who were not, at the time they were Distributors, residents of the United States or its territories or U.S. military stationed overseas.

- The Plaintiff has been appointed by the Court to represent the interests of the class. Certain attorneys—known as "Class Counsel"—have also been appointed by the Court to represent the class. AdvoCare and Plaintiff have recently entered into a Settlement Agreement, but the Settlement Agreement will not become effective until the Court approves it at a Fairness Hearing. The Court has scheduled the Fairness Hearing for _____ on _____, 202_.

- At the Fairness Hearing, the Court will consider the fairness, reasonableness, and adequacy of the Settlement Agreement. The Court may also consider Class Counsel's motion for an award of attorneys' fees and expenses and Plaintiff's motion for a service award, which will be filed in advance of the Fairness Hearing. Class Counsel will request no more than $3,675,000 in attorneys' fees and expenses. Plaintiff will request no more than $20,000 as a service award.

- AdvoCare's records show that you may be a member of the Class. You have received this Notice because Class Members have the right to object to the Settlement Agreement, to Class Counsel's motion for attorneys' fees and expenses, and to the Plaintiff's motion for a service award. You have also received this notice, along with a Claims Form, so that you may submit a claim for compensation in accordance with the Settlement Agreement. You also have the right to opt out of the Class.

QUESTIONS?  EMAIL [EMAIL ADDRESS] OR CALL [PHONE NUMBER] TOLL FREE

Appx. 052

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **MAIL OR EMAIL A CLAIMS FORM OR FILE A CLAIM ON THE CLASS WEBSITE** | This is the only way to receive any compensation. The deadline to submit a Claims Form is [**DATE**]. **See Questions 8-11 below for more information.** |
| **EXCLUDE YOURSELF FROM SETTLEMENT** | Get no payment. This is the only option that allows you to ever be part of any other lawsuit against AdvoCare about the legal claims in this case. The postmark deadline to exclude yourself is [**DATE**]. **See Question 15 below for more information.** |
| **OBJECT** | Write to the Court about why you do not like the settlement. You MAY object to the Settlement Agreement and file a Claims Form. You MAY NOT object to the Settlement Agreement if you excluded yourself from the settlement. The deadline to object is [**DATE**]. **See Questions 12-13 below for more information.** |
| **GO TO A HEARING** | The Court has set the Fairness Hearing on [**DATE**] regarding the fairness of the Settlement Agreement. You may appear at the hearing, but don't have to. You may hire your own attorney to appear for you. **See Question 14 below for more information.** |
| **DO NOTHING** | If the Settlement Agreement is approved and you do nothing, you will receive no compensation from the Settlement Agreement and you will be bound by the settlement terms and judgment and will not be able to later sue AdvoCare about the claims in this lawsuit. To receive payment, you must file a claim. **See Question 16 below for more information.** |

1.      **Why did I get this notice package?**

This notice is being sent to AdvoCare Distributors—individuals or entities—who meet the definition of Class Member: AdvoCare Distributors who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme, and whose distributorships were suspended without reinstatement or terminated by May 17, 2016.

- Distributors who made no purchases from AdvoCare after May 17, 2016, and paid no dues after May 17, 2016, will be considered terminated as of May 17, 2016.

- Distributors will be considered to have lost money if the sum of the fees they paid AdvoCare, the money they paid AdvoCare for sales aids, and the money they paid AdvoCare for product (net of refunded amounts), reduced by 65% of the amount paid for product, is greater than the money they received from AdvoCare (other than for product refunds).

- Distributors are deemed to have lost money based solely on the amount of money they paid AdvoCare and the amount of money AdvoCare paid them. Other money spent or earned based on a Distributor's association with AdvoCare does not count.

- Whether a Distributor made or lost money is determined solely based on reference to a Distributor's own AdvoCare account. Money paid to AdvoCare for or on behalf of another Distributor's account is not considered.

Appx. 053

- Whether a Distributor made or lost money is determined solely based on reference to AdvoCare's internal records.

You were sent this notice because, based on AdvoCare's records, you appear to be a Class Member. Class Members have a right to know about the proposed settlement of this class action lawsuit, and about all of their options, before the Court decides whether to approve the settlement. If the Court approves it, and after objections and appeals are resolved, the benefits provided by the Settlement Agreement will be distributed to the Class Members.

This package explains the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the Northern District of Texas and the case is known as *Ranieri, et al. v. AdvoCare International, L.P.*, Case No. 3:17-cv-00691. Judge Karen Gren Scholer is overseeing this class action.

**2.      What is this lawsuit about?**

The lawsuit was filed on March 9, 2017 on behalf of the two plaintiffs and similarly situated people (the "Class"). The plaintiffs alleged that AdvoCare operated a pyramid scheme contrary to federal law and that they suffered damages because of AdvoCare's operation of a pyramid scheme. Only one of the plaintiffs— Megan Cornelius—remains in the case.

**3.      What is a class action and who is involved?**

In a class action, the plaintiff as class representative sues on behalf of herself and other people who have similar claims. The people who have similar claims together are called a "class" or "class members." The plaintiff represents the interests of the rest of the class. In a class action, one court resolves the issues for everyone in the class—except for those people who exclude themselves from the class.

**4.      Why is this lawsuit a class action?**

The Court decided that this lawsuit can be a class action for the purposes of settlement because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

**5.      Has the Court decided who is right?**

There has been no trial, and the Court has not decided whether Plaintiff or Defendant is right as to whether AdvoCare was a pyramid scheme. Instead, both sides agreed to a settlement. That way, both sides avoid the cost of a trial, and the people affected can get compensation. Unless the Settlement Agreement is approved, Plaintiff must prove her claims at a trial on a date to be determined. By entering into the Settlement Agreement, Defendant has not admitted any wrongdoing.

**6.      Is there any money available now?**

No money or other benefits are available now because the Court has not yet approved the Settlement Agreement. There is no guarantee that the Court will approve the Settlement Agreement or that you are entitled to compensation, even if it is approved. However, if you want to receive compensation from the proposed Settlement Agreement, you must participate as a class member.

Appx. 054

**7.    How do I know if I am part of the settlement?**

The Class Members are described in the Settlement Agreement. Section 1, above, summarizes the criteria for Class membership.

If you are still not sure whether you are included, you can ask for free help by contacting the Settlement Administrator at: [PHONE NUMBER]. You can also visit [WEBSITE] for more information. Or you can fill out and return the Claims Form, to see if you qualify.

**8.    What does the Settlement Agreement Provide?**

The proposed Settlement Agreement provides a cash "Settlement Fund" of $10,500,000 in cash to pay Class Members. This fund will also be used to pay any service award, attorneys' fees and costs, and costs to administer the settlement. The Net Settlement Amount (after deduction of any court-approved attorneys' fees and costs, administrative expenses, and service award to the class representative) will be allocated to valid claims submitted by Class Members according to the proposed Settlement Agreement to be approved by the Court (as explained further under Question 9 below)

Note: The attorneys' fees and costs, settlement administration costs, and other relevant costs will be paid from the cash Settlement Fund. The remainder of the cash Settlement Fund will be used to pay valid claims.

More details on the settlement are available in the Settlement Agreement, which is available at: [WEBSITE].

**9.    How do I get a cash payment from the Settlement Fund?**

To qualify for payment from the cash Settlement Fund, you must submit a Claims Form by [**DATE**]. You may fill out a Claims Form at the class action website ([WEBSITE]) or fill out the form accompanying this Notice and mail or email it in. Read the instructions carefully, fill out the form, and sign and (if not online) mail or email the form postmarked no later than [DATE]. If you need help filling out or filing a Claims Form, please call [PHONE NUMBER]. The Settlement Administrator may ask you for additional information.

The base amount of your cash award will be your net loss from your association with AdvoCare. The calculation of net loss will follow the same procedure as described in Section 1, above, for determining Class membership. However, you may only recover your base claim to the extent you made payments to AdvoCare between March 9, 2013, and May 17, 2016.

AdvoCare paid a $150 million fine to the Federal Trade Commission based on allegations similar to those raised by the plaintiff in this Lawsuit. The FTC may deposit the $150 million into a fund to be distributed to former AdvoCare Distributors. Base claims may be reduced by the amount you receive (if any) from the FTC associated with AdvoCare's $150 million payment to the FTC. Class Counsel has no control over the distribution of the FTC fund and has no information regarding when the FTC will distribute the money.

Your share of the cash Settlement Fund will depend on the base amounts of other Class Members' cash awards, the amount of attorneys' fees and costs awarded by the Court, the amount of any service awards to the Plaintiffs, and the amount of costs incurred by the Settlement Administrator in administering the Settlement. All base cash awards may be reduced on a *pro rata* basis so that the total of the awards is no more than the net amount of the Settlement Fund.

Appx. 055

**10.      When do I get my payment?**

Neither the Court nor the parties have this information yet.  The Court will hold a Fairness Hearing on [DATE] and [TIME], to decide whether to approve the settlement.  If the Court approves the settlement, there may be appeals.  It is always uncertain whether these appeals can be resolved, and resolving them can take time.  Once the Settlement Agreement is finally approved, the parties and the Settlement Administrator will work quickly and efficiently to process claims and issue awards in accordance with the Settlement Agreement.  In addition, the distribution of awards may be delayed until after the FTC distributes its $150 million fund.

**There will be no payments under the Settlement if the Settlement Agreement is terminated.**

**11.      What are you giving up to get a payment and stay in the Class?**

The Class will release AdvoCare of any and all claims based on the alleged operation of a pyramid scheme, any consumer fraud, or any misrepresentation or omission made as of May 17, 2017.

Claims arising out of breach of any written agreement between Class Members and AdvoCare regarding the payment of bonuses or commissions earned but unpaid as of May 17, 2017 are specifically not released.

The entire release language is set forth in the Settlement Agreement, which is available at [website].

**12.      Why would I object?**

If you believe the proposed Settlement Agreement is not in your best interests or the best interests of the Class, you should consider objecting.  However, if the Court does not approve the proposed Settlement Agreement, then the Plaintiffs will have to prove their claims and the Class claims at trial, and there is no guarantee that they will be successful.

**13.      How do I object?**

If you want to object, you must file an objection with the United States District Court for the Northern District of Texas noting the name of the case and the case number.  You must set forth a statement of your objection as well as the specific reasons for each objection, including any legal or evidentiary support for the objection.  An attorney may assist you with your objection, but you will have to hire that attorney at your own expense.  The deadline for filing objections is **[DATE].**  You must also send a copy of your objection to Class Counsel and Defense Counsel.  Here are the addresses you will need:

| Court | Class Counsel | Defense Counsel |
|---|---|---|
| Clerk of Court U.S. District Court for the Northern District of Texas 1100 Commerce St. Dallas, TX 75242 | R. Adam Swick Reid Collins & Tsai LLP 1301 S. Capital of Texas Hwy Suite C300 Austin, TX 78746 | Thomas M. Melsheimer Steven H. Stodghill John C.C. Sanders, Jr. Rex A. Mann Becca Loegering Winston & Strawn LLP 2121 N. Pearl Street, Suite 900 Dallas, TX 75201 |

QUESTIONS?  EMAIL [EMAIL ADDRESS] OR CALL [PHONE NUMBER] TOLL FREE

Appx. 056

14.      **Attending the Court's Fairness Hearing**

The Court will hold a Fairness Hearing to decide whether to approve the Settlement Agreement. You may attend and speak, but you do not have to. The Court has scheduled the Fairness Hearing on **[DATE]** and **[TIME]**, at the United State District Courthouse for the Northern District of Texas, 1100 Commerce Street, Dallas, Texas 75242. At the hearing, the Court will consider whether the Settlement Agreement is fair, reasonable, and adequate. If there are objections, the Court will consider them. The Court may also listen to people who have asked to speak about an objection. At or after the hearing, the Court will decide whether to approve the Settlement Agreement. We do not know when the Court will issue its decision.

If you want to appear at the Fairness Hearing regarding an objection that you made, you must deliver to Class Counsel and Defense Counsel and file with the Court by [DATE], a notice of intention to appear and a statement identifying any documents that the Class Member will seek to introduce or witnesses the Class Member will seek to call at the Fairness Hearing. The date and time of the Fairness Hearing are subject to change by Court Order, but any changes will be posted at [WEBSITE]

15.      **How do I exclude myself from the Class?**

If you don't want a payment from this settlement, but you want to keep the right to sue AdvoCare on your own about the legal claims in this case, then you must take steps to get out of the Class. This is called excluding yourself or "opting out" of the Class. Excluding yourself is different than objecting to the Settlement Agreement. Objecting is simply telling the Court that you don't like something about the Settlement Agreement. Excluding yourself is telling the Court that you don't want to be part of the Class. **If you exclude yourself, you have no basis to object because the case no longer affects you**. **You will not get any settlement payment and you cannot object to the settlement.** You may be able to sue AdvoCare about the legal issues in this case at your own expense.

To exclude yourself, you must provide in writing to the Settlement Administrator your name, address, telephone number, and a statement that you wish to be excluded from the Class. The Settlement Administrator's contact information is [_____]. Your exclusion must be postmarked no later than [**DATE**].

16.      **What happens if I do nothing at all?**

If you do nothing, you will get no distribution from the cash Settlement Fund but you will be bound by the releases in the Settlement Agreement, if the Court finally approves it. And unless you exclude yourself, you will not be able to start a lawsuit, continue a lawsuit, or be part of any other lawsuit against AdvoCare about the legal issues in this case, ever again, except as permitted in the Settlement Agreement.

17.      **Do I have a lawyer in this case?**

The plaintiff and the Class are represented by Reid Collins & Tsai LLP. These lawyers are called Class Counsel. You will not be charged personally for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

18.      **How will the lawyers be paid?**

Class Counsel has worked on this case since late 2016 to the present and have not been paid for their work to date. Class Counsel will file a motion for an award of attorneys' fees and costs,

Appx. 057

administrative expenses, and Class Representative compensation at least 42 days prior to the objection deadline. This motion will be made available at [**website**] and be considered at the Fairness Hearing. Class Counsel will limit their application for attorneys' fees to not more than $3.675 million. Class Counsel also will seek to recover all actual and anticipated litigation costs and administrative expenses associated with the settlement. In addition, Class Counsel will also ask the Court to award the Class Representative a service award not to exceed $20,000. The service award is to compensate the Class Representative for her commitment and effort on behalf of the Class Members in this case.

**19.    How do I get more information?**

This notice summarizes the proposed Settlement Agreement. You can find more details in the Settlement Agreement. You can get a copy of the Settlement Agreement, read other key case documents, and get more information at [WEBSITE]. You can also call [PHONE NUMBER], email [EMAIL ADDRESS], or write the Settlement Administrator at [ADDRESS] for more information. Do not contact the Court, Defendant, or Defendant's counsel.

All papers filed in this lawsuit are also available via the Public Access to Court Electronic Records System (PACER), at http://www.pacer.gov, and may be reviewed in person, as allowed by the Court, during regular business hours at the Office of the Clerk of the United States District Court for the Northern District of Texas, 1100 Commerce St., Dallas, TX 75242.

QUESTIONS? EMAIL [EMAIL ADDRESS] OR CALL [PHONE NUMBER] TOLL FREE

Appx. 058

EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

LISA RANIERI and MEGAN CORNELIUS,
Individually and on Behalf of a Class of
Similarly Situated Persons

v.                                          CIVIL ACTION NO. 3:17-cv-00691-S

ADVOCARE INTERNATIONAL L.P.


### [PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT, SETTLEMENT CLASS CERTIFICATION, AND JUDGMENT

WHEREAS, Plaintiff Megan Cornelius ("**Plaintiff**" or the "**Class Representative**"), individually and on behalf of all others similarly situated, on the one hand, and Defendant AdvoCare International, L.P. ("**Defendant**"), entered into a Settlement Agreement, dated January 25, 2021;

WHEREAS, on [INSERT], 2021, this Court entered an Order Scheduling Fairness Hearing, Granting Preliminary Approval of Class Action Settlement, Conditionally Certifying the Settlement Class, and Providing for Notice (the "**Preliminary Approval Order**") (ECF No. [INSERT]);

WHEREAS, the Class Representative has filed a Motion for Final Approval of the Class Action Settlement;

WHEREAS, on [INSERT], 202_, this Court held a Fairness Hearing[1] to consider the following issues, among others:

      (1)       Whether to finally certify the Class for settlement purposes;

---

[1] Unless otherwise noted, all capitalized terms have the meaning set forth in the Settlement Agreement (ECF No. __).

Appx. 060

(2)     Whether the terms of the Settlement Agreement are fair, reasonable, and adequate for the settlement of the claims being released by the Class, including all claims alleged in the Second Amended Complaint filed in this Action;

(3)     Whether to direct the Parties to consummate the Settlement Agreement pursuant to its terms;

(4)     Whether to find that the notice provided the Class Members constituted due, adequate, and sufficient notice of the Settlement Agreement, meeting the requirements of due process and the Federal Rules of Civil Procedure (the "**Rules**");

(5)     Whether to direct that the releases set forth in the Settlement Agreement be deemed effective as of the Effective Date;

(6)     Whether judgment should be entered dismissing the Second Amended Complaint and on the merits with prejudice, without fees or costs to any party except as the Court may award Class Counsel or the Class Representative from the Settlement Fund, or as the Settlement Administrator may incur in administering the Settlement;

(7)     Whether, without affecting the finality of any order granting final approval of the Settlement Agreement and dismissing the Action, retain jurisdiction as to all matters relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement and this Order, and for any other necessary purpose; and

(8)     Incorporate any other provisions into the Final Order And Judgment that the Court deems necessary and just.

WHEREAS, the Court considered all objections to the Settlement Agreement submitted by Class Members;

WHEREAS, the Court considered all argument and evidence submitted by all Class Members objecting to the Settlement Agreement, as well as all materials submitted by the Parties in support of the Settlement Agreement, and the record as a whole.

NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED as follows:

1.     The Court has jurisdiction over the subject matter and parties to this proceeding, including all members of the Settlement Class, pursuant to 28 U.S.C. § 1332(d).

2.     Venue is proper in this District.

3.     The Court orders that the following Settlement Class is finally certified for

Appx. 061

settlement purposes only: All AdvoCare Distributors who paid Annual Fees, purchased a Distributor Kit, and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare scheme, and whose distributorships were suspended without reinstatement or terminated by May 17, 2016. Distributors who made no purchases from AdvoCare after May 17, 2016, and paid no dues after May 17, 2016, will be considered terminated as of May 17, 2016. Distributors are determined to have lost money if the difference between (a) the amount they paid AdvoCare over the course of their full experience with AdvoCare (not just during the Class Period) is greater than (b) the amount AdvoCare paid them plus 65% of the amount they paid AdvoCare for product.

4.      For the purposes of approving the Settlement Agreement only and for no other purpose, the Court finds that the Class meets the prerequisites for a class action under Rule 23(a) in that: (a) the Class is so numerous that joinder of all individual Class Members in the Action is impracticable; (b) there are questions of law and fact common to the Class and those common questions of law and fact predominate over any individual questions; (c) the claims of the Plaintiff are typical of the claims of the Class; and (d) the Plaintiff and her counsel will fairly and adequately represent the interests of the Class.

5.      For the purposes of approving the Settlement Agreement only and for no other purpose, the Court also finds that the requirements for Rule 23(b)(3) are met in that common questions of law or fact common to the Class Members predominate over any questions affecting only individual Class Members, and that adjudicating the rights of the Class Members as a class is superior to other available methods for fairly and efficiently adjudicating the controversy. In making this finding, the Court has considered the Class Members' interests in individually controlling the prosecution of their claims against the Defendant; the fact that there appears to be

no litigation concerning the controversy already begun by Class Members, other than this action; that it is desirable to concentrate the litigation of all Class Members' claims before this Court; and the lack of difficulties in managing this Class Action under the procedures set forth in the Settlement.

6.      The Court finds that the settlement is the product of serious, informed, non-collusive negotiations conducted at arms' length by the parties and with the initial assistance of a mediator.

7.      The Court finds that the terms of the Settlement Agreement are fair, adequate, and reasonable and comply with Rule 23.  In making these findings, the Court considered, among other factors, the potential damages claimed in the lawsuit on behalf of the Plaintiff and the Class Members, AdvoCare's potential liability, the risks of continued litigation including trial outcome, delay, and potential appeals, the substantial benefits available to the Class as a result of the settlement, and the fact that the proposed settlement represents a compromise of the Parties' respective positions rather than the result of a finding of liability at trial.  The Court further finds that the terms of the settlement have no obvious deficiencies and do not improperly grant preferential treatment to any individual Class Member.

8.      The Court directs the Parties and the Settlement Administrator to consummate the Settlement Agreement according to its terms.

9.      The Court finds that the notice that has been provided to the Class, as well as the means by which it was provided, as described in the submissions by Class Counsel describing the notice provided, was done in accordance with the Court's Preliminary Approval Order, constitutes the best notice practicable under the circumstances and is in full compliance with the due process requirements of the United States Constitution and the requirements of Rule 23.  The

Appx. 063

Court further finds that the notice fully and accurately informed Class Members of all material elements of the lawsuit and proposed class action settlement, of each Class Member's right to be excluded from the settlement, and each Class Member's right and opportunity to object to the proposed class action settlement and be heard at the Fairness Hearing.

10.    The Court orders that the releases set forth in Section III of the Settlement Agreement are effective as of the Effective Date.

11.    The Court finds that the persons listed on Exhibit A to this Order have timely requested exclusion from the Settlement Agreement.  These persons are not Class Members and are not bound by the releases described in Section III of the Settlement Agreement and may receive no awards pursuant to the Settlement Agreement, as described in Sections III and VII of the Settlement Agreement.

12.    Each of the Parties is to bear its own fees and costs except as expressly provided in the Settlement Agreement or in any order the Court may issue regarding an award of attorneys' fees and expenses to Class Counsel, a service award to the Class Representative, and expenses incurred by the Settlement Administrator.

13.    The Court hereby dismisses the Action with prejudice in accordance with the terms of the Settlement Agreement; however, the Court shall retain continuing jurisdiction to interpret, implement, and enforce the settlement and all orders and judgment entered in connection therewith.

14.     The Court directs the Clerk of the Court to enter this Order as a judgment.


**APPROVED AND SO ORDERED:**

Dated: _____, 2021



_____
United States District Judge

Appx. 065

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

LISA RANIERI and MEGAN CORNELIUS,
Individually and on Behalf of a Class of
Similarly Situated Persons,

          Plaintiffs,

          v.

ADVOCARE INTERNATIONAL, L.P.,

          Defendants.

Case NO. 3:17-cv-00691-S

**DECLARATION OF RICHARD W. SIMMONS**

I, Richard W. Simmons, declare as follows:

1.     My name is Richard W. Simmons.  I have personal knowledge of the matters set forth herein, and I believe them to be true and correct.

2.     I am the President of Analytics Consulting LLC ("**Analytics**").  My company is one of the leading providers of class and collective action notice and claims management programs in the nation.  It is my understanding that Analytics' class action consulting practice, including the design and implementation of legal notice campaigns, is the oldest in the country.  Through my work, I have personally overseen court-ordered class and collective notice programs in more than 2,000 matters.

3.     This Declaration summarizes: my experience and qualifications; the efforts

1

Analytics has undertaken to fulfill the Notice Plan[1] described in the proposed Settlement Agreement in the above-captioned matter; and the response received from the Class thus far. The facts in this declaration are based on what I personally know, as well as information provided to me in the ordinary course of my business by my colleagues at Analytics.

**EXPERIENCE RELEVANT TO THIS CASE**

4.    Founded in 1970, Analytics has consulted for 50 years regarding the design and implementation of legal notice and claims management programs relating to class and collective action litigation. These engagements include notice and claims administration involving antitrust, civil rights, consumer fraud, data breach, employment, insurance, product defect/liability, and securities litigation.

5.    Analytics' clients include corporations, law firms (both plaintiff and defense), and the federal government. Analytics' long-term federal contracts include the following:

A.    Since 1998, Analytics has been under contract (five consecutive five-year contracts) with the Federal Trade Commission ("**FTC**") to administer and provide expert advice regarding notice (including published notice) and claims processing in their settlements/redress programs;

B.    In 2012, Analytics was awarded a 10-year contract by the Department of Justice ("**DOJ**") to administer and provide expert advice regarding (including published notice) notice and claims processing to support their asset forfeiture/remission program; and,

C.    Since 2013, Analytics has been appointed as a Distribution Agent (two consecutive five-year terms) by the Securities and Exchange Commission ("**SEC**") to administer and provide expert advice regarding notice (including published notice) and claims processing to support their investor settlements.

6.    I joined Analytics in 1990 and have 31 years of direct experience in designing and

_____

[1] All capitalized terms not defined herein have the same meaning as those defined in the Settlement Agreement (the "Settlement," "Settlement Agreement" or "SA").

implementing class action settlements and notice campaigns. The notice programs I have managed range in size from fewer than 100 class members to more than 40 million known class members, including some of the largest and most complex notice and claims administration programs in history.

7.      I have testified in state and federal courts as to the design and implementation of notice programs, claims processes, and the impact attorney communications has had on claims rates. As has always been my practice, I personally performed or oversaw Analytics' consulting services in each of the cases indicated on my CV, which is attached hereto as **<u>Exhibit 1</u>**.

8.      I have presented to panels of judges and lawyers on issues regarding class notice, claims processing, and disbursement. In 2011, I was a panelist at the Federal Judicial Center's ("**FJC**") workshop/meeting regarding class action notice and settlement administration. In 2014, I was interviewed by the CFPB regarding notice and claims administration in class action litigation as part of their study on arbitration and consumer class litigation waivers. In 2016, I worked with the FTC to conduct research regarding: a) the impact of alternate forms of notice on fund participation rates; and b) the impact of alternate formats of checks on check cashing rates. In 2016, I was an invited participant to the Duke Law Conference on Class Action Settlements regarding electronic notification of class members. In 2017, I was the primary author of the Duke Law Conference on Class Action Settlement's guide to best practices regarding the evaluation of class action notice campaigns (including notice by electronic means). I am currently contributing to George Washington University Law School's forthcoming Class Action Best Practices Checklist, developing recommendation for judges to use when approving a class-action settlement to ensure efficient methods of notice and distribution, compliance with Rule 23, and overall fairness.

9.      I have co-authored and presented CLE programs and whitepapers regarding class notice and class action claims administration.  In 2016, I co-authored a paper titled "*Crafting Digital Class Notices That Actually* Provide *Notice*" (Law360.com, New York (March 10, 2016). My speaking engagements regarding notice include: Risks and Regulations: Best Practices that Protect Class Member Confidentiality, HB Litigation Conference on Class Action Mastery in New York City (2018); *Recent Developments in Class Action Notice and Claims Administration*, Practicing Law Institute in New York City (2017); *The Beginning and the End of Class Action Lawsuits*, Perrin Class Action Litigation Conference in Chicago (2017); *Class Action Administration: Data and Technology*, Harris Martin Target Data Breach Conference in San Diego (2014); *Developments in Legal Notice*, accredited CLE Program, presented at Shook Hardy & Bacon, LLP in Kansas City (2013), Halunen & Associates in Minneapolis (2013), and Susman Godfrey in Dallas (2014); and *Class Actions 101: Best Practices and Potential Pitfalls in Providing Class Notice*, CLE Program, presented to the Kansas Bar Association (March 2009).

10.      In addition to my class action consulting work, I taught a college course in antitrust economics, was a guest lecturer at the University of Minnesota Law School on issues of statistical and economic analysis, was a charter member of the American Academy of Economic and Financial Experts, and was a referee for the Journal of Legal Economics (reviewing and critiquing peer-reviewed articles on the application of economic and statistical analysis to legal issues).

## NOTICE PROVIDED IN THIS CASE

11.      In December 2020, I agreed, on behalf of Analytics, to serve as Settlement Administrator in this matter, subject to this Court's approval.  On February 3, 2021, this Court granted preliminary approval of the Settlement Agreement and approved the appointment of Analytics as Settlement Administrator.

12.    On February 4, 2021, Analytics fulfilled the notice requirements of the Class Action

Fairness Act, 28 U.S.C. § 1715 by sending copies of the following documents to the appropriate

federal and state governmental officials:

- Original Complaint, First Amended Complaint, and Second Amended Complaint, all with supporting appendicies;

- Plaintiff's Unopposed Motion for Settlement Class Certification, Preliminary Approval of Class Action Settlement, Appointment of Class Counsel, Appointment of Class Representative, Approval of Class Notice Program and Scheduling of Fairness Hearing ("**Motion for Preliminary Approval**");

- Appendix to Motion for Preliminary Approval;

- Settlement Agreement;

- [Proposed] Order Granting Preliminary Approval;

- [Proposed] Order Granting Final Approval;

- Class Notice;

- Claim Form;

- Settlement Agreement;

- Names of anticipated class members;

- An estimate of each class member's proportionate share of the Settlement Fund, grouped by state.

13.    On February 8, 2021, AdvoCare provided Analytics with the names, mailing

addresses, email addresses, telephone numbers, and other information required by the Settlement

Agreement for providing notice.

14.    On March 3, 2021, Analytics established the Class website.  The web address is

www.advocaredistributorclassaction.com.

15.     On March 3, 2021, Analytics sent notice via email to 419,328 Class Members at

the email addresses provided by AdvoCare.  Prior to sending the emails, Analytics designed the

email providing notice to reduce the likelihood that it would be filtered out by recipients' "SPAM" filters.  An example of the specific email sent is submitted as **Exhibit 2** to this declaration.

16.    Of those original 419,328 emails, 48,449 "bounced back" or were otherwise undeliverable.  On March 18, 2021, Analytics sent a copy of the approved Notice to those 48,449 Class Members via U.S. Mail at the mailing addresses provided by AdvoCare.

17.    Of those Class Members sent notice via U.S. Mail, 8,975 notices were returned as undeliverable.  Analytics has sought to contact each of these individuals by telephone to provide them with notice.  Analytics has successfully contacted 284 of these persons to obtain a working email address for them, and this work continues.

18.    On May 3, 2021, Analytics will provide supplemental notice to the Class Members, reminding them of the May 14, 2021, deadline for filing claims, as provided in Section VI.B.3 of the Settlement Agreement.

19.    In my opinion, based on my experience and extensive work in the field of class noticing, the notice provided, together with the notice that will be provided, in this case has been the best notice practicable under the circumstances of this litigation.  In addition, the notice provided, together with the notice that will be provided, in this case is consistent with, or exceeds:

A.    historic best practices for class notification;

B.    FJC guidance regarding class notification; and

C.    standards established by federal agencies with notification and distribution funds, such as the FTC, DOJ, and SEC.

### CLASS RESPONSE

20.    As of April 7, 2021, 9,997 Class Members have submitted claims.

21.    As of April 7, 2021, four Class Members have requested exclusion from the Class.

22.    Analytics has not received any objections to the Settlement.

23.     I will update this information prior to the May 21, 2021 Fairness Hearing scheduled by the Court.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 7th day of April, 2021.

Richard W. Simmons

**Exhibit 1**



# Richard W. Simmons

Richard W. Simmons is the President of Analytics Consulting LLC[1].  Mr. Simmons joined Analytics in 1990 and has more than 31 years of experience developing and implementing class action communications and settlement programs.

Mr. Simmons' first legal notice consulting engagement was the *Schwan's Salmonella Litigation* settlement (*In Re: Salmonella Litigation*, Case No. 94-cv-016304 (D. Minn.)).   Since then, he has:

- Developed and implemented notice campaigns ranging in size up to 45 million known class members (and 180 million unknown class members);
- Testified regarding legal notice in building products, civil rights, consumer products, environmental pollution, privacy, and securities litigation settlements;
- Managed claims processes for settlement funds ranging up to $1 billion in value.

As part of Analytics' ongoing class action notice consulting practice, Mr. Simmons:

- testified regarding the adequacy of notice procedures in direct notice cases (including the development of class member databases);
- testified regarding the adequacy of published notice plans;
- has been appointed as a Distribution Fund Administrator by the Securities and Exchange Commission tasked with developing Distribution Plans for court approval;
- has been retained as an expert by the Federal Trade Commission to testify regarding the effectiveness of competing notice plans and procedures; and,
- acted as the primary author for the Duke Law Center's guidelines for best practices regarding the evaluation of class action notice campaigns.
- Assisted in developing the George Washington University Law School's forthcoming Class Action Best Practices Checklist.

In addition to his class action consulting work, Mr. Simmons has taught a college course in antitrust economics, was a guest lecturer at the University of Minnesota Law School on issues of statistical and economic analysis, was a charter member of the American Academy of Economic and Financial Experts and was a former referee for the Journal of Legal Economics (reviewing and critiquing peer reviewed articles on the application of economic and statistical analysis to legal issues).  Mr. Simmons is a published author on the subject of damage analysis in Rule 10b-5 securities litigation.

Mr. Simmons graduated from St. Olaf College with a B.A. in Economics (with a year at University College, Dublin), pursued a PhD. in Agricultural and Applied Economics (with a concentration in

---

[1] In October 2013, Analytics Consulting LLC acquired Analytics Incorporated. I am the former President or Analytics Incorporated.  References to Analytics herein include the prior legal entities.



industrial organization and consumer/behavioral economics) at the University of Minnesota[2], and has received formal media planning training from New York University.

## APPLICATION OF TECHNOLOGY TO CLASS ACTION SETTLEMENTS

Mr. Simmons has been a visionary in the application of the Internet to class action notice campaigns and the management of settlements:

- In 1995, Mr. Simmons was the first in the nation to support class action settlements with an online presence, that included the ability to check online, the status of their claims.
- In 2000, Mr. Simmons invented online claims submission in class action litigation, filing a patent application governing *"Method and system for assembling databases in multiple-party proceedings"* US20010034731 A1.
- In 2002, Mr. Simmons established an online clearinghouse for class action settlements that provided the public with information regarding class action settlements and provided them with the ability to register for notification of new settlements.  This clearinghouse received national press attention as a resource for class action settlements.
- From 2003 through 2013, Analytics' incremental changes in Internet support included class member verification of eligibility, locater services that identified retail outlets that sold contaminated products, secure document repositories, and multi-language support.
- In 2014, Mr. Simmons was the first to utilize and testify regarding product-based targeting in an online legal notice campaign
- In 2014, Analytics, under Mr. Simmons' leadership, released the first-class action settlement support site developed under e-commerce best practices.

## SPEAKER/EXPERT PANELIST/PRESENTER

Mr. Simmons has presented to panels of judges and lawyers on issues regarding class notice, claims processing, and disbursement:

- Mr. Simmons served as a panelist for the Francis McGovern Conferences on "Distribution of Securities Litigation Settlements: Improving the Process", at which regulators, judges, custodians, academics, practitioners and claims administrators participated.
- In 2011, Mr. Simmons was a panelist at the Federal Judicial Center's workshop/meetings regarding class action notice and settlement administration.
- In 2014, Mr. Simmons was invited to be interviewed by the Consumer Financial Protection Bureau as an expert on notice and claims administration in class action litigation as part of their study on arbitration and consumer class litigation waivers
- In 2016, Mr. Simmons presented results of research regarding the impact of forms of notice on fund participation rates to the Federal Trade Commission.

---

[2] Mr. Simmons suspended work on his dissertation to acquire and manage Analytics.



- In 2019, Mr. Simmons was the only claims administration expert invited to be a panelist to the Federal Trade Commission's Workshop on Consumers and Class Action Notices, where he spoke regarding the impact of different forms of notice on settlement participation rates and improving response rates to class action notices.

Mr. Simmons' speaking engagements regarding class notice include:

- *Risks and Regulations: Best Practices that Protect Class Member Confidentiality* presented at the HB Litigation Conference on Class Action Mastery in New York City (2018)
- *Recent Developments in Class Action Notice and Claims Administration* presented at Practising Law Institute in New York City (2017)
- *The Beginning and the End of Class Action Lawsuits* presented at Perrin Class Action Litigation Conference in Chicago (2017);
- *Class Action Administration: Data and Technology* presented at Harris Martin Target Data Breach Conference in San Diego (2014);
- *Developments in Legal Notice*, accredited CLE Program, presented at Susman Godfrey in Dallas (2014)
- *Developments in Legal Notice*, accredited CLE Program, presented at Shook Hardy & Bacon, LLP in Kansas City (2013),
- *Developments in Legal Notice*, accredited CLE Program, presented at Halunen & Associates in Minneapolis (2013),
- *Class Actions 101: Best Practices and Potential Pitfalls in Providing Class Notice*, CLE Program, presented by Brian Christensen and Richard Simmons, to the Kansas Bar Association (March 2009).

Mr. Simmons' writings regarding class notice include:

- Crafting Digital Class Notices That Actually Provide Notice ‑ Law360.com, New York (March 10, 2016).

JUDICIAL COMMENTS AND LEGAL NOTICE CASES

In evaluating the adequacy and effectiveness of Mr. Simmons' notice campaigns, courts have repeatedly recognized Mr. Simmons' work. The following excerpts provide recent examples of such judicial approval in matters where the primary issue was the provision of class notice.

Honorable Stephen J. Murphy III, *Doe 1 v. Deja vu Servs., Inc.*, No. 2:16-cv-10877, ECF No. 77 (E.D. Mich. June 19, 2017):

> *Also, the Plaintiffs certified that notice had been provided in accordance with the Court's preliminary approval order. The notices stated—in clear and easily understandable terms—the key information class members needed to make an informed decision: the nature of the action, the class claims, the definition of the class, the general outline of*



*the settlement, how to elect for a cash payment, how to opt out of the class, how to object to the settlement, the right of class members to secure counsel, and the binding nature of the settlement on class members who do not to opt out.*

* * *

*In addition, the parties took additional steps to provide notice to class members, including through targeted advertisements on social media. The Court finds that the parties have provided the "best notice that is practicable under the circumstances," and complied with the requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act of 2005, and due process.[3]*

Associate Justice Edward P. Leibensberger, *Geanacopoulos v. Philip Morris USA, Inc.*, No. 9884CV06002, Dkt. No. 230 (Mass. Super. Ct. Sept. 30, 2016):

*The Court finds that the plan of Notice as described in paragraphs 12 through 20 of the Settlement Agreement, including the use of email, mail, publication and internet notice, constituted the best notice practicable under the circumstances and constituted due and sufficient notice to the Class.*

Honorable Edward J. Davila, *In re: Google Referrer Header Privacy Litig.*, No. 5:10-cv-04809, ECF No. 85 (N.D. Cal. Mar. 31, 2015):

*On the issue of appropriate notice, the court previously recognized the uniqueness of the class asserted in this case, since it could potentially cover most internet users in the United States. On that ground, the court approved the proposed notice plan involving four media channels: (1) internet-based notice using paid banner ads targeted at potential class members (in English and in Spanish on Spanish-language websites); (2) notice via "earned media" or, in other words, through articles in the press; (3) a website decided solely to the settlement (in English and Spanish versions); and (4) a toll-free telephone number where class members can obtain additional information and request a class notice. In addition, the court approved the content and appearance of the class notice and related forms as consistent with Rule 23(c)(2)(B).*

*The court again finds that the notice plan and class notices are consistent with Rule 23, and that the plan has been fully and properly implemented by the parties and the class administrator.*

---

[3]     Unless otherwise indicated, citations are omitted and emphasis is added.



Honorable Terrence F. McVerry, *Kobylanski. v. Motorola Mobility, Inc.*, No. 2:13-cv-01181, ECF No. 43  (W.D. Pa. Oct. 9, 2014):

> *The Court finds that the distribution of the Notice to Settlement Class Members Re: Pendency of Class Action, as provided for in the Order Granting Preliminary Approval for the Settlement, constituted the best notice practicable under the circumstances to all Persons within the definition of the Class and fully met the requirements of due process under the United States Constitution.*

Honorable Thomas N. O'Neill, Jr., *In re: CertainTeed Fiber Cement Siding Litig.*, No. 2:11-md-02270, ECF No. 119 (E.D. Pa. Mar. 20, 2014):

> *Settlement class members were provided with notice of the settlement in the manner and form set forth in the settlement agreement. Notice was also provided to pertinent state and federal officials. The notice plan was reasonably calculated to give actual notice to settlement class members of their right to receive benefits from the settlement or to be excluded from the settlement or object to the settlement. The notice plan met the requirements of Rule 23 and due process.*

Honorable Robert W. Gettleman, *In re Aftermarket Filters Antitrust Litig.*, No. 1:08-cv-04883, ECF No. 1031  (N.D. Ill. Oct. 25, 2012):

> *Due and adequate notice of the Settlement was provided to the Class. . . . The manner of giving notice provided in this case fully satisfies the requirements of Federal Rule of Civil Procedure 23 and due process, constitutes the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons entitled thereto. A full and fair opportunity was provided to the members of the Class to be heard regarding the Settlements.*

Honorable Marco A. Roldan, *Plubell v. Merck & Co., Inc.*, NO. 04CV235817-01, Final Judgment and Order (Mo. Cir. Ct. Mar. 15, 2013):

> *Under the circumstances, the notice of this Settlement provided to Class Members in accordance with the Notice Order was the best notice practicable of the proceedings and matters set forth therein, including the proposed Settlement, to all Persons entitled to such notice, and said notice fully satisfied the requirements due process and Missouri law.*

Honorable James P. Kleinberg, *Skold v. Intel Corp.*, No. 2005-CV-039231, Order on Motion for Approval (Cal. Super. Ct. Mar. 14, 2013):

> *The Court finds that Plaintiff's proposed Notice plan has a reasonable chance of reaching a substantial percentage of class members.*



Honorable J. Phil Gilbert, *Greenville IL v. Syngenta Crop Prot., Inc.*, No 3:10-cv-00188, ECF No. 325 (S.D. Ill. Oct. 23, 2012):

> *The Notice provided to the Class fully complied with Rule 23, was the best notice practicable, satisfied all constitutional due process requirements, and provides the Court with jurisdiction over the Class Members.*

Appx. 080



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| Antitrust | All Star Carts and Vehicles, Inc., et al. v. BFI Canada Income Fund, et al. | 08-CV-1816 (E.D.N.Y.) |
| | In Re: Aftermarket Filters Antitrust Litigation | No. 1:08-cv-4883, MDL No. 1957 (N.D. Ill.) |
| | In Re: Aluminum Phosphide Antitrust Litigation | Case No. 93-cv-2452 (D. Kan.) |
| | In Re: Beef Antitrust Litigation | MDL No. 248 (N.D. Tex.) |
| | In Re: Bromine Antitrust Litigation | MDL No. 1310 (S.D. Ind.) |
| | In Re: Corrugated Container Antitrust Litigation | MDL. No 310 (S.D. Tex.) |
| | In Re: Industrial Silicon Antitrust Litigation | Case No. 95-cv-2104 (W.D. Pa.) |
| | In Re: Multidistrict Civil Antitrust Actions Involving Antibiotic Drugs | MDL No. 10 (S.D.N.Y.) |
| | In Re: Workers Compensation Insurance Antitrust Litigation | Case No.  4:85-cv-1166 (D. Minn.) |
| | Red Eagle Resources Corporation, Inc., et al. v. Baker Hughes Inc., et al. | Case No. 91-cv-627 (S.D. Tex.) |
| | Rob'n I, Inc., et al. v. Uniform Code Counsel, Inc. | Case No. 03-cv-203796-1 (Spokane County, Wash.) |
| | Sarah F. Hall d/b/a Travel  Specialist, et al. v. United Airlines, Inc., et al., | Case No. 7:00-cv-123-BR(1) (E.D. S.C.) |
| Asset Forfeiture | U.S. v. $1,802,651.56 in Funds Seized from e-Bullion, et al. ("Goldfinger") | No. CV 09-1731 (C.D. Cal.) |
| | U.S. v. $1,802,651.56 in Funds Seized from e-Bullion, et al. ("Kum Ventures") | No. CV 09-1731 (C.D. Cal.) |
| | U.S. v. David Merrick | 6:10-cr-109-Orl-35DAB |
| | U.S. v. Sixty-Four 68.5 lbs (Approx.) Silver Bars, et al. | (E.D. Fla) |
| | United States of America v. $1,802,651.56 in Funds Seized from E-Bullion, et al. | Case No. 09-cv-01731 (C.D. Cal.) |
| | United States of America v. Alfredo Susi, et al. | 3:07-cr-119 (W.D.N.Y.) |
| | United States of America v. David Merrick | 6:10-cr-109-Orl-35DAB |
| | United States of America v. Elite Designs, Inc. | Case No. 05-cv-058 (D.R.I.) |
| | United States of America v. Evolution Marketing Group | Case No. 6:09-cv-1852 (S.D. Fla.) |
| | United States of America v. George David Gordon | Case No. 4:09-cr-00013-JHP-1 (N.D. Okla.) |
| | United States of America v. Regenesis Marketing Corporation | No. C09-1770RSM (W.D. Wash.) |
| | United States of America v. Sixty-Four 68.5 lbs (Approx.) Silver Bars, et al. | (E.D. FL) |
| | United States of America v. Zev Saltsman | Case No. 04-cv-641 (E.D.N.Y.) |
| Biometric Privacy | Anton Tucker et al. v Momence Packing Co. | Case No. 2019-L-000098 (Kankakee County, IL) |
| | Charles Thurman et al. v NorthShore University HealthSystem | Case No. 2018-CH-3544 (Cook County, IL) |
| | Jeremy Webb et al. v Plochman, Inc. | Case No. 2020-L-15 (Kankakee County, IL) |
| | Otilia Garcia et al. v Club Colors Buyers LLC | Case No. 2020 L 001330 (Dupage County, IL) |
| | Trayes v Midcon Hospitality Group, LLC et al. | Case No. 19-CH-11117 (Cook County, IL) |
| | Heard, et al.  v. THC – Northshore, Inc. | Case No. 2017-CH-16918 (Cook County, IL) |
| | Roach v. Walmart Inc. | Case No. 2019-CH-01107  (Cook County, IL) |
| | Sykes v. Clearstaff, Inc. | Case No. 19-CH-03390 (Cook Co. IL) |
| Business | American Golf Schools, LLC, et al. v. EFS National Bank, et al. | Case No. 00-cv-005208 (D. Tenn.) |
| | AVR, Inc. and Amidon Graphics v. Churchill Truck Lines | Case No.  4:96-cv-401 (D. Minn.) |
| | Buchanan v. Discovery Health Records Solutions | Case No. 13-015968-CA 25 (Miami Dade County) |

Appx. 081



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | Do Right's Plant Growers, et al. v. RSM EquiCo, Inc., et al. | Case No. 06-CC-00137 (Orange County, Cal.) |
| | F.T.C. v. Ameritel Payphone Distributors | Case No. 00-cv-514 (S.D. Fla.) |
| | F.T.C. v. Cephalon | Case No. 08-cv-2141 (E.D. Pa.) |
| | F.T.C. v. Datacom Marketing, Inc. | Case No. 06-cv-2574 (N.D. Ill.) |
| | F.T.C. v. Davison & Associates, Inc. | Case No. 97-cv-01278 (W.D. Pa.) |
| | F.T.C. v. Fidelity ATM, Inc. | Case No. 06-cv-81101 (S.D. Fla.) |
| | F.T.C. v. Financial Resources Unlimited, Inc. | Case No. 03-cv-8864 (N.D. Ill.) |
| | F.T.C. v. First American Payment Processing Inc. | Case No. 04-cv-0074 (D. Ariz.) |
| | F.T.C. v. Group C Marketing, Inc. | Case No. 06-cv-6019 (C.D. Cal.) |
| | F.T.C. v. Jordan Ashley, Inc. | Case No. 09-cv-23507 (S.D. Fla.) |
| | F.T.C. v. Medical Billers Network, Inc. | Case No. 05-cv-2014 (S.D.N.Y.) |
| | F.T.C. v. Minuteman Press Int'l | Case No. 93-cv-2496 (E.D.N.Y.) |
| | F.T.C. v. Netfran Development Corp | Case No. 05-cv-22223 (S.D. Fla.) |
| | F.T.C. v. USA Beverages, Inc. | Case No. 05-cv-61682 (S.D. Fla.) |
| | Garcia, et al. v. Allergan, Inc. | 11-CV-9811 (C.D. Cal.) |
| | Gerald Young et al. v. HealthPort Technologies, LLC, et al. | Case No. LACL130175 (Polk County, IA) |
| | Goldberg et al. v. HealthPort Inc. et al. | Case No L-1421-14 (Essex County, NJ) |
| | In Re Google AdWords Litigation | No. 5:08-cv-03369-EJD (N.D. Cal.) |
| | In re Syngenta Ag Mir 162 Corn Litigation | Case No 2:14-md-2591-JWL-JPO (D. Kan.) |
| | Law Offices of Henry E. Gare, P.A., et al. v. Healthport Technologies, LLC | No. 16-2011-CA-010202 (Duval County, FL) |
| | Melby et al. v. America's MHT, Inc., et al. | Case No. 3:17-CV-155-M (N.D. Texas) |
| | Number Queen, Ltd. et al. v. Redgear Technologies, Inc. et al. | Case No. 14-0064 (W.D. Mo.) |
| | Physicians of Winter Haven LLC v. STERIS Corp. | Case No. 1:10-cv-00264 (N.D. Ohio) |
| | Richard P. Console, JR., P.C. v. Medical Records Online Inc. | Docket No. CAM-L-2133-18 (Camden County, NJ) |
| | Sue Ramirez et al. v. Smart Professional Photocopy Corporation | No. 01-L-385 (Peoria County, IL) |
| | Todd Tompkins, Doug Daug and Timothy Nelson v. BASF Corporation, et al. | Case No. 96-cv-59 (D.N.D.) |
| | Waxler Transportation Company, Inc. v. Trinity Marine Products, Inc., et al. | Case No. 08-cv-01363 (E.D. La.) |
| Civil Rights | Bentley v. Sheriff of Essex County | Case No. 11-01907 (Essex County, MA) |
| | Cazenave, et al. v. Sheriff Charles C. Foti, Jr., et al. | Case No. 00-cv-1246 (E.D. La.) |
| | Garcia, et al v. Metro Gang Strike Force, et al. | Case No. 09-cv-01996 (D. Minn.) |
| | Gregory Garvey, Sr., et al. v. Frederick B. MacDonald & Forbes Byron | 3:07-cv-30049 (S.D. Mass.) |
| | McCain, et al. v. Bloomberg, et al. | Case No. 41023/83 (New York) |
| | Minich, et al. v. Spencer, et al. | Civil Action No. 1584cv00278 (Suffolk Superior Court,  Mass.) |
| | Nancy Zamarron, et al. v. City of Siloam Springs, et al. | Case No. 08-cv-5166 (W.D. Ark.) |
| | Nathan Tyler, et al. v. Suffolk County, et al. | Case No. 1:06-cv-11354 (S.D. Mass.) |
| | Nilsen v. York County | Case No. 02-cv-212 (D. Me.) |

Appx. 082



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | Richard S. Souza et al. v. Sheriff Thomas M. Hodgson | 2002-0870 BRCV (Superior Ct., Mass.) |
| | Taha v. County of Bucks | Case No. 12-6867 (E.D. Pa.) |
| | Travis Brecher, et al. v. St. Croix County, Wisconsin, et al. | Case No. 02-cv-0450-C (W.D. Wisc.) |
| Consumer | Adam Berkson, et al. v. Gogo LLC and Gogo Inc., | Case No. 1:14-cv-01199-JBW-LB (S.D.N.Y.) |
| | Andrew J. Hudak, et al. v. United Companies Lending Corporation | Case No.  334659 (Cuyahoga County, Ohio) |
| | Angela Doss, et al. v. Glenn Daniels Corporation | Case No. 02-cv-0787 (E.D. Ill.) |
| | Angell v. Skechers Canada | 8562-12 (Montreal, Quebec) |
| | Anthony Talalai, et al. v. Cooper Tire & Rubber Company | Case No. L-008830-00-MT (Middlesex County, NJ) |
| | Arnett v. Bank of America, N.A. | No. 3:11-CV-01372-SI (D. OR) |
| | Ballard, et al. v. A A Check Cashiers, Inc., et al. | Case No. 01-cv-351 (Washingotn County, Ark.) |
| | Belinda Peterson, et al. v. H & R Block Tax Services, Inc. | Case No. 95-CH-2389 (Cook County, Ill.) |
| | Boland v. Consolidated Multiple Listing Service, Inc. | Case No. 3:19-cv-01335-SB (D.S.C.) |
| | Braulio M. Cuesta, et al. v. Ford Motor Company, Inc., and Williams Controls, Inc. | CIV-06-61-S (E.D. Okla.) |
| | Caprarola, et al. v. Helxberg Diamond Shops, Inc. | Case No. 13-06493 (N.D. Ill.) |
| | Carideo et al. v. Dell, Inc. | Case No. 06-cv-1772 (W.D. Wash.) |
| | Carnegie v. Household International, Inc. | No. 98-C-2178 (N.D. Ill.) |
| | Che Clark v. JPMorgan Chase Bank, N.A.. et al. | Case No. 0:17-cv-01069 (D. Minn.) |
| | Clair Loewy v. Live Nation Worldwide Inc. | Case No. 11-cv-04872 (N.D. Ill.) |
| | Clements, et al. v. JPMorgan Chase Bank, N.A., et al. | No. 3:12-cv-02179-JCS (N.D. Cal.) |
| | Conradie v. Caliber Home Loans | Case No. 4:14-cv-00430 (S.D. Iowa |
| | Consumer Financial Protection Bureau v. Corinthian Colleges, Inc. | Case No. 1:14-cv-07194 (N.D. Ill.) |
| | Consumer Financial Protection Bureau v. Park View Law | Case No. 2:17-cv-04721 (N.D. Cal.) |
| | Consumer Financial Protection Bureau v. Prime Credit, L.L.C., et al. | Case No. 2:17-cv-04720 (N.D. Cal.) |
| | Consumer Financial Protection Bureau v. Prime Marketing Holdings | Case No. 2:16-cv-07111 (C.D. Cal.) |
| | Consumer Financial Protection Bureau v. Prime Marketing Holdings | 1:15-cv-23070-MGC (S.D. Fl) |
| | Consumer Financial Protection Bureau v. Security National Automotive Acceptance | Civil Action No. 1 :15-cv-401 (S.D. Ohio) |
| | Covey, et al. v. American Safety Council, Inc. | 2010-CA-009781-0 (Orange County, FL) |
| | Cummins, et al. v. H&R Block, et al. | Case No. 03-C-134 (Kanawha County, W.V.) |
| | David and Laurie Seeger, et al. v. Global Fitness Holdings, LLC | No. 09-CI-3094, (Boone Circuit Court, Boone County, Ky.) |
| | Don C. Lundell, et al. v. Dell, Inc. | Case No. 05-cv-03970 (N.D. Cal.) |
| | Duffy v. Security Pacific Autmotive Financial Services Corp., et al. | Case No. 3:93-cv-00729 (S.D. Cal.) |
| | Edward Hawley, et al. v. American Pioneer Title Insurance Company | No. CA CE 03-016234 (Broward County, Fla.) |
| | Evans, et al. v. Linden Research, Inc., et al. | Case No. 4:11-cv-1078-DMR (N.D. Cal.) |
| | F.T.C. and The People of the State of New York v. UrbanQ | Case No. 03-cv-33147 (E.D.N.Y.) |
| | F.T.C. v A1 DocPrep Inc. et.al. | Case No. 2:17-cv-07044 SJO-JC (C.D. CA) |
| | F.T.C. v First Universal Lending, LLC et al. | Case No. 9:09-cv-82322 ZLOCH (S.D. FL) |

Appx. 083



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | F.T.C. v Student Debt Doctor, LLC et al. | Case No. 17-cv-61937  WPD (S.D. FL) |
| | F.T.C. v. 1st Beneficial Credit Services LLC | Case No. 02-cv-1591 (N.D. Ohio) |
| | F.T.C. v. 9094-5114 Quebec, Inc. | Case No. 03-cv-7486 (N.D. Ill.) |
| | F.T.C. v. Ace Group, Inc. | Case No. 08-cv-61686 (S.D. Fla.) |
| | F.T.C. v. Affordable Media LLC | Case No. 98-cv-669 (D. Nev.) |
| | F.T.C. v. AmeraPress, Inc. | Case No. 98-cv-0143 (N.D. Tex.) |
| | F.T.C. v. American Bartending Institute, Inc., et al. | Case No. 05-cv-5261 (C.D. Cal.) |
| | F.T.C. v. American International Travel Services Inc. | Case No. 99-cv-6943 (S.D. Fla.) |
| | F.T.C. v. Asset & Capital Management Group | Case No. 8:13-cv-1107 (C.D. Cal.) |
| | F.T.C. v. Bigsmart.com, L.L.C., et al. | Case No. 01-cv-466 (D. Ariz.) |
| | F.T.C. v. Broadway Global Master Inc | Case No. 2-cv-00855 (E.D. Cal.) |
| | F.T.C. v. Call Center Express Corp. | Case No. 04-cv-22289 (S.D. Fla.) |
| | F.T.C. v. Capital Acquistions and Management Corp. | Case No. 04-cv-50147 (N.D. Ill.) |
| | F.T.C. v. Capital City Mortgage Corp. | Case No. 98-cv-00237 (D.D.C.) |
| | F.T.C. v. Centro Natural Corp | Case No. 14:23879 (S.D. Fla.) |
| | F.T.C. v. Certified Merchant Services, Ltd., et al. | Case No. 4:02-cv-44 (E.D. Tex.) |
| | F.T.C. v. Check Inforcement | Case No. 03-cv-2115 (D.N.J.) |
| | F.T.C. v. Chierico et al. | Case No. 96-cv-1754 (S.D. Fla.) |
| | F.T.C. v. Clickformail.com, Inc. | Case No. 03-cv-3033 (N.D. Ill.) |
| | F.T.C. v. Consumer Credit Services | Case No. 96-cv-1990 (S.D. N.Y.) |
| | F.T.C. v. Consumer Direct Enterprises, LLC. | Case No. 07-cv-479 (D. Nev.) |
| | F.T.C. v. Debt Management Foundation Services, Inc. | Case No. 04-cv-1674 (M.D. Fla.) |
| | F.T.C. v. Delaware Solutions | Case No. 1:15-cv-00875-RJA (W.D.N.Y) |
| | F.T.C. v. DeVry Education Group Inc. | Case No. 2:16-cv-579 (C.D. Cal.) |
| | F.T.C. v. Digital Enterprises, Inc. | Case No. 06-cv-4923 (C.D. Cal.) |
| | F.T.C. v. Dillon Sherif | Case No. 02-cv-00294 (W.D. Wash.) |
| | F.T.C. v. Discovery Rental, Inc., et al. | Case No: 6:00-cv-1057  (M.D. of Fla.) |
| | F.T.C. v. EdebitPay, LLC. | Case No. 07-cv-4880 (C.D. Cal.) |
| | F.T.C. v. Electronic Financial Group, Inc. | Case No. 03-cv-211 (W.D. Tex.) |
| | F.T.C. v. Eureka Solutions | Case No. 97-cv-1280 (W.D. Pa.) |
| | F.T.C. v. Federal Data Services, Inc., et al. | Case No. 00-cv-6462 (S.D. Fla.) |
| | F.T.C. v. Financial Advisors & Associates, Inc. | Case No. 08-cv-00907 (M.D. Fla.) |
| | F.T.C. v. First Alliance Mortgage Co. | Case No. 00-cv-964 (C.D. Cal.) |
| | F.T.C. v. First Capital Consumer Membership Services Inc., et al. | Case No. 1:00-cv-00905 (W.D.N.Y.) |
| | F.T.C. v. First Capital Consumers Group, et al. | Case No. 02-cv-7456 (N.D. Ill.) |
| | F.T.C. v. Franklin Credit Services, Inc. | Case No. 98-cv-7375 (S.D. Fla.) |

Appx. 084



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | F.T.C. v. Global Web Solutions, Inc., d/b/a USA Immigration Services, et al. | Case No. 03-cv-023031 (D. D.C.) |
| | F.T.C. v. Granite Mortgage, LLC | Case No. 99-cv-289 (E.D. Ky.) |
| | F.T.C. v. Herbalife International of America | Case No. 2:16-cv-05217 (C.D. Cal.) |
| | F.T.C. v. ICR Services, Inc. | Case No. 03-cv-5532 (N.D. Ill.) |
| | F.T.C. v. iMall, Inc. et al. | Case No. 99-cv-03650 (C.D. Cal.) |
| | F.T.C. v. Inbound Call Experts, LLC | Case No. 9:14-cv-81395-KAM (S.D. Fla.) |
| | F.T.C. v. Information Management Forum, Inc. | Case No. 2-cv-00986 (M.D. Fla.) |
| | F.T.C. v. Ira Smolev, et al. | Case No.  01-cv-8922 (S.D. Fla.) |
| | F.T.C. v. Jeffrey L. Landers | Case No. 00-cv-1582 (N.D. Ga.) |
| | F.T.C. v. Jewelway International, Inc. | Case No. 97-cv-383  (D. Ariz.) |
| | F.T.C. v. Kevin Trudeau | Case No. 98-cv-0168 (N.D. Ill.) |
| | F.T.C. v. Komaco International, Inc., et al. | Case No. 02-cv-04566 (C.D. Cal.) |
| | F.T.C. v. LAP Financial Services, Inc. | Case No. 3:99-cv-496 (W.D. Ky.) |
| | F.T.C. v. Lumos Labs, Inc. | Case No. 3:16-cv-00001 (N.D. Cal.) |
| | F.T.C. v. Marketing & Vending, Inc. Concepts, L.L.C., et al. | Case No. 00-cv-1131 (S.D.N.Y.) |
| | F.T.C. v. Mercantile Mortgage | Case No. 02-cv-5078 (N.D. Ill.) |
| | F.T.C. v. Merchant Services Direct, LLC | Case No.  2:13-cv-00279 (E. D. Wa.) |
| | F.T.C. v. Meridian Capital Management | Case No. 96-cv-63  (D. Nev.) |
| | F.T.C. v. NAGG Secured Investments | Case No. 00-cv-02080 (W.D. Wash.) |
| | F.T.C. v. National Consumer Counsil, Inc., et al. | Case No. 04-cv-0474 (C.D. Cal.) |
| | F.T.C. v. National Credit Management Group | Case No. 98-cv-936 (D.N.J.) |
| | F.T.C. v. National Supply & Data Distribution Services | Case No.  99-cv-128-28 (C.D. Cal.) |
| | F.T.C. v. Nationwide Information Services, Inc. | Case No. 00-cv-06505 (C.D. Cal.) |
| | F.T.C. v. NBTY, Inc. | No. 05-4793 (E.D.N.Y.) |
| | F.T.C. v. NetSpend | Case No. 1:16-cv-04203-AT (N.D. Ga.) |
| | F.T.C. v. NutriMost LLC | Case No. 2:17-cv-00509-NBF (W.D. Pa.) |
| | F.T.C. v. One Technologies, LP | Case No. 3:14-cv-05066 (N.D. Cal.) |
| | F.T.C. v. Oro Marketing | Case No. 2:13-CV-08843 (C.D. Cal.) |
| | F.T.C. v. Pace Corporation | Case No. 94-cv-3625 (N.D. Ill.) |
| | F.T.C. v. Paradise Palms Vacation Club | Case No. 81-1160D (W.D. Wash.) |
| | F.T.C. v. Patrick Cella, et al. | Case No. 03-cv-3202 (C.D. Cal.) |
| | F.T.C. v. Platinum Universal, LLC | Case No. 03-cv-61987 (S. D. Fla.) |
| | F.T.C. v. Raymond Urso | Case No. 97-cv-2680 (S.D. Fla.) |
| | F.T.C. v. Rincon Management Services, LLC | Case No. 5:11-cv-01623-VAP-SP (C.D. Cal.) |
| | F.T.C. v. Robert S. Dolgin | Case No. 97-cv-0833 (N.D. Cal.) |
| | F.T.C. v. Southern Maintenance Supplies | Case No.  99-cv-0975 (N.D. Ill.) |

Appx. 085



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | *F.T.C. v. Star Publishing Group, Inc.* | Case No. 00-cv-023D (D. Wy.) |
| | *F.T.C. v. Stratford Career Institute* | Case No. 1:16-cv-00371 (N.D. Ohio) |
| | *F.T.C. v. Stuffingforcash.com Corp.* | Case No. 02-cv-5022 (N.D. Ill.) |
| | *F.T.C. v. Target Vending Systems, L.L.C., et al.* | Case No. 00-cv-0955 (S.D.N.Y.) |
| | *F.T.C. v. The College Advantage, Inc.* | Case No. 03-cv-179 (E.D. Tex.) |
| | *F.T.C. v. The Crescent Publishing Group, Inc., et al.* | Case No. 00-cv-6315 (S.D.N.Y.) |
| | *F.T.C. v. The Tax Club* | Case No. 13-cv-210 (JMF) (S.D.N.Y.) |
| | *F.T.C. v. The Tungsten Group, Inc.* | Case No. 01-cv-773 (E.D. Va.) |
| | *F.T.C. v. Think Achievement Corp.* | Case No. 2:98-cv-12 (N.D. Ind.) |
| | *F.T.C. v. Think All Publishing* | Case No. 07-cv-11 (E.D. Tex.) |
| | *F.T.C. v. Tracfone* | Case No. 3:15-cv-00392 (N.D. Cal.) |
| | *F.T.C. v. Trustsoft, Inc.* | Case No. 05-cv-1905 (S.D. Tex.) |
| | *F.T.C. v. Unicyber Gilboard, Inc.* | Case No. 04-cv-1569 (C.D. Cal.) |
| | *F.T.C. v. US Grant Resources, LLC.* | Case No. 04-cv-0596 (E.D. La.) |
| | *F.T.C. v. Verity International, Ltd., et al.* | Case No. 00-cv-7422-LAK (S.D.N.Y.) |
| | *F.T.C. v. Wellquest International, Inc.* | Case No. 2:03-cv-05002 (C.D. Cal.) |
| | *F.T.C. v. Wolf Group* | Case No. 94-cv-8119 (S.D. Fla.) |
| | *Fernando N. Lopez and Mallory Lopez, et al. v. City Of Weston* | Case No. 99-8958  CACE 07 (FL 17th Jud Dist) |
| | *Fiori, et al. v. Dell Inc., et al.* | Case No. 09-cv-01518 (N.D. Cal.) |
| | *FMS, Inc. v. Dell, Inc. et al.,* | Case No. 03-2-23781-7SEA (King County, Wash.) |
| | *FTC v Manhattan Beach Venture LLC* | Case No. 2:19cv7849 (C.D. CA) |
| | *Galatis, et al. v. Psak, Graziano Piasecki & Whitelaw, et. al.* | No.  L-005900-04 (Middlesex County, NJ) |
| | *Garcia v. Allergan* | 11-cv-9811 (C.D. Cal.) |
| | *Grabowski v. Skechers U.S.A., Inc.* | No. 3:12-cv-00204 (W.D. Ky.) |
| | *Greg Benney, et al. v. Sprint International Communications Corp. et al.* | Case No. 02-cv-1422 (Wyandotte County, KS) |
| | *Griffin v. Dell Canada Inc* | Case No. 07-cv-325223D2 (Ontario, Superio Court of Justice) |
| | *Haas and Shahbazi vs. Navient Solutions and Navient Credit Finance Corporation* | Case No. 15-35586 (DRJ) (S.D. Texas) |
| | *Harris, et al. v. Roto-Rooter Services Company* | Case No. 00-L-525 (Madison County, IL) |
| | *Harrison, et al. v. Pacific Bay Properties* | No. BC285320 (Los Angeles County, CA) |
| | *Henderson, et al . V. Volvo Cars of North America, LLC, et al.* | 09-04146 (D.N.J.) |
| | *In re H&R Block IRS Form 8863 Litigation* | Case No. 4:13-MD-02474-FJG. (W.D. MO) |
| | *In Re: Bancomer Transfer Services Mexico Money Transfer Litigation* | BC238061, BC239611(Los Angeles County, CA) |
| | *In Re: Certainteed Fiber Cement Siding Litigation* | MDL 2270 (E.D. PA) |
| | *In Re: H&R Block Express IRA Marketing Litigation* | Case No. 06-md-01786 (W.D. Mo.) |
| | *In Re: High Carbon Concrete Litigation* | Case No. 97-cv-20657 (D. Minn.) |
| | *In Re: High Sulfur Content Gasoline Products Liability Litigation* | MDL No. 1632 (E.D. La.) |

Appx. 086



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | *In Re: Ria Telecommunications and Afex Mexico Money Transfer Litigation* | Case No. 99-cv-0759 (San Louis Obispo, Cal.) |
| | *In Re: Salmonella Litigation* | Case No. 94-cv-016304 (D. Minn.) |
| | *Janet Figueroa, et al. v. Fidelity National Title   Insurance Company* | Case No. 04-cv-0898 (Miami Dade County, Fla.) |
| | *Jerome H. Schlink v. Edina Realty Title* | Case No. 02-cv-18380 (D. Minn.) |
| | *Jerome Walls, et al. v. JP Morgan Chase Bank, N.A., et al.* | Case No. 11-00673 (W.D. KY) |
| | *Joel E. Zawikowski, et al. v. Beneficial National Bank, et al.* | Case No. 98-cv-2178 (N.D. Ill.) |
| | *John Babb, et al. v. Wilsonart International, Inc.* | Case No. CT-001818-04 (Memphis, Tenn.) |
| | *John Colin Suttles, et al. v. Specialty Graphics, Inc.,* | Case No. 14-505 (W.D. TX) |
| | *Kenneth Toner, et al. v. Cadet Manufacturing Company* | Case No. 98-2-10876-2SEA (King County, Wash.) |
| | *Kiefer, et al. v. Ceridian Corporation, et al.* | Case No. 3:95-cv-818 (D. Minn.) |
| | *Kobylanski et al. v. Motorola Mobility, Inc. et al.* | No. 13-CV-1181 (W.D. Pa.) |
| | *Lisa Ranieri et al.v AdvoCare International, L.P.* | Case No. 3:17-cv-00691 B (N.D. TX) |
| | *Long et al v. Americredit Financial Services, Inc.* | 0:2011-02752 (Hennepin County, MN) |
| | *Louis Thula, et al. v. Lawyers Title Insurance Corporation* | Case No. 0405324-11 (Broward County, Fla.) |
| | *Lynn Henderson, et al. v. Volvo Cars of North America, LLC, et al.* | No. 2:09-cv-04146-CCC-JAD (D.N.J.) |
| | *Lynnette Lijewski, et al. v. Regional Transit Board, et al.* | Case No. 4:93-cv-1108 (D. Minn.) |
| | *Mark Laughman, et al. v. Wells Fargo Leasing Corp. et al.* | Case No. 96-cv-0925 (N.D. Ill.) |
| | *Mark Parisot et al v. US Title Guaranty Company* | Case No. 0822-cc-09381 (St. Louis Circuit Court, Mo.) |
| | *Mark R. Lund v. Universal Title Company* | Case No. 05-cv-00411 (D. Minn.) |
| | *Marks, et al. v. The Realty Associates Fund X, et al.* | CA No. SUCV2018-00056-BLS1 (Suffolk County, MA) |
| | *Melissa Castille Dodge, et al. v. Phillips College of New Orleans, Inc., et al.* | Case No. 95-cv-2302 (E.D. La.) |
| | *Michael Drogin, et al. v. General Electric Capital Auto Financial Services, Inc.* | Case No.  95-cv-112141 (S.D.N.Y.) |
| | *Michael Sutton v. DCH Auto Group, et al.* | (Essex County, NJ) |
| | *Michael T. Pierce et al v. General Electric Capital Auto Lease* | CV 93-0529101 S |
| | *Mitchem, et al v. Illinois Collection Service, Inc.* | Case No. 09-cv-7274 (N.D. Ill.) |
| | *Northcoast Financial Services v. Marcia Webster* | 2004 CVF 18651 (Cuyahoga County, OH) |
| | *Oubre v. Louisiana Citizens Fair Plan* | No. 625-567 (Jefferson Parish, LA) |
| | *Patricia Faircloth, et a. v. Certified Finance, Inc., et al.* | Case No. 99-cv-3097 (E.D. La.) |
| | *Pistilli v. Life Time Fitness, Inc.* | Case No. 07-cv-2300 (D. Minn.) |
| | *Rawlis Leslie, et al. v. The St. Joe Paper Company* | Case No. 03-368CA (Gulf County, Fla.) |
| | *Regayla Loveless, et al. v. National Cash, Inc, et al.* | Case No. 2001-cv-892-2 (Benton County, Ark.) |
| | *Ricci, et al., v. Ameriquest Mortgage Co.* | Case No. 27-cv-05-2546 (D. Minn.) |
| | *Ronnie Haese, et al. v. H&R Block, et al.* | Case No. 96-cv-423 (Kleberg County, Tex.) |
| | *Sandra Arnt, et al. v. Bank of America, N.A.* | No. 27-cv-12-12279 (Hennepin County, MN) |
| | *Sara Khaliki, et al. v. Helzberg Diamond Shops, Inc.* | 4:11-cv-00010 (W.D. Mo.) |
| | *Shepherd, et al. v. Volvo Finance North America, Inc., et al.* | Case No. 1:93-cv-971 (D. Ga.) |

Appx. 087



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | Skusenas v. Linebarger, Goggan, Blair & Sampson, LLC. | Case No. 1:10-cv-8119 (N.D. Ill.) |
| | Smith v. NRT Settlement Services of Missouri, LLC | Case No. 06-cv-004039 (St. Louis County, MO) |
| | Terrell Ervin v. Nokia Inc. et al. | Case No. 01-L-150 (St. Clair County, Ill.) |
| | The People of the State of California v. Rainbow Light Nutritional Systems, LLC, et al. | Case No. 19STCV28214 (Los Angeles County, CA) |
| | Theresa Boschee v. Burnet Title, Inc. | Case No. 03-cv-016986 (D. Minn.) |
| | Thomas Geanacopoulos v. Philip Morris USA, Inc. | Civil Action No. 98-6002-BLS1 (MA Superior Court) |
| | Thomas Losgar, et al. v. Freehold Chevrolet, Inc., et al. | Case No. L-3145-02 (Monmouth County, NJ) |
| | Tiffany Ellis, et al. v. General Motors LLC | Case No. 2:16-cv-11747 (E.D. Mich.) |
| | Tom Lundberg, et al. v. Sprint Corporation, et al. | Case No. 02-cv-4551 (Wyandotte County, Kan.) |
| | Truc-way, Inc., et al. v. General Electric Credit Auto Leasing | Case No. 92-CH-08962 (Cook County, Ill.) |
| | Trudy Latman, et al. vs. Costa Cruise Lines, N.V., et al | Case No. 96-cv-8076 (Dade County, Fla.) |
| | U.S. v. $1,802,651.56 in Funds Seized from e-Bullion, et al. ("Goldfinger") | No. CV 09-1731 (C.D. Cal.) |
| | U.S. v. $1,802,651.56 in Funds Seized from e-Bullion, et al. ("Kum Ventures") | No. CV 09-1731 (C.D. Cal.) |
| | U.S. v. David Merrick | 6:10-cr-109-Orl-35DAB |
| | U.S. v. Sixty-Four 68.5 lbs (Approx.) Silver Bars, et al. | (E.D. Fla) |
| | United States of America v. Alfredo Susi, et al. | 3:07-cr-119 (W.D.N.Y.) |
| | United States of America v. David Merrick | 6:10-cr-109-Orl-35DAB |
| | United States of America v. Elite Designs, Inc. | Case No. 05-cv-058 (D. R.I.) |
| | United States of America v. Evolution Marketing Group | Case No. 6:09-cv-1852 (S.D. Fla.) |
| | United States of America v. Regenesis Marketing Corporation | No. C09-1770RSM (W.D. Wash.) |
| | United States of America v. Sixty-Four 68.5 lbs (Approx.) Silver Bars, et al. | (E.D. Fla.) |
| | Vicente Arriaga, et al. v. Columbia Mortgage & Funding Corp, et al. | Case No. 01-cv-2509 (N.D. Ill.) |
| | William R. Richardson, et al., v. Credit Depot Corporation of Ohio, et al. | Case No. 315343 (Cuyahoga County, Ohio) |
| | Zyburo v. NCSPlus Inc. | Case No. 12-cv-06677 (S.D.N.Y.) |
| CryptoCurrency | U.S. v. $1,802,651.56 in Funds Seized from e-Bullion, et al. ("Goldfinger") | No. CV 09-1731 (C.D. Cal.) |
| | U.S. v. $1,802,651.56 in Funds Seized from e-Bullion, et al. ("Kum Ventures") | No. CV 09-1731 (C.D. Cal.) |
| | United States of America v. $1,802,651.56 in Funds Seized from E-Bullion, et al. | Case No. 09-cv-01731 (C.D. Cal.) |
| Data Breach | F.T.C. v. Choicepoint | Case No. 06-cv-0198 (N.D. Ga.) |
| | First Choice Federal Credit Union v. The Wendy's Company | Case No. 2:16-cv-00506-NBF-MPK (W.D. Pa.) |
| | Sterling et al. v. Strategic Forecasting, Inc. et al. | No. 2:12-cv-00297-DRH-ARL (E.D.N.Y.) |
| | Veridian Credit Union v. Eddie Bauer LLC | No. 2:17-cv-00356 (W.D. Wash.) |
| Data Breach/Privacy | Anderson, et al. v. United Retail Group, Inc., et al. | Case No. 37-cv-89685 (San Diego County, Cal.) |
| | F.T.C. v. CEO Group, Inc. | Case No. 06-cv-60602 (S.D. Fla.) |
| | In Re: U.S. Bank National Association Litigation | Case No. 99-cv-891 (D. Minn.) |
| Employment | Adam P. Kelly, et al v. Bank of America, N.A., et al. | No. 10-CV-5332 (E.D. Ill.) |
| | Alequin, et al. v. Darden Restaurants, Inc. et al. | Case No.: 12-61742-CIV (S.D. Fla.) |

Appx. 088



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | Alice Williams, et a. v. H&R Block Enterprises | RG 08366506, (County of Alameda, CA) |
| | Alicia Ousley v CG Consulting d/b/a Scores Columbus | Case No. 2:19-cv-01744 SDM-KAJ (S.D. OH) |
| | Alma Anguiano v. First United Bank and Trust Co. | Case No. CIV-12-1096 (D. Okla.) |
| | Andrew R. Rondomanski, et al. v. Midwest Division, Inc. | No. 11-cv-00887 (W.D. Mo.) |
| | Antwaun Jones et al. v United American Security LLC | Case No. 1:20cv00440 JG (N.D. OH) |
| | Balandran, et al. v. Labor Ready, et al. | BC 278551 (Losa Angeles County, Cal.) |
| | Ballard, et al. v. CoreCivic of Tennessee, LLC | Case No. 3:20cv418 (M.D. Tenn.) |
| | Ballard, et al., v. Fogo de Chao, LLC | Case No. 09-cv-7621 (D. Minn.) |
| | Batiste v. TopGolf International Inc. and TopGolf USA Spring Holdings, LLC | Civil Action 4:20-cv-00655 (S.D. Tx.) |
| | Beasley, et al. v. GC Services LP | Case No. 09-cv-01748 (E.D. Mo.) |
| | Berry v. Farmers Bank & Trust, N.A. | Case No. 13-02020 |
| | Berte v. WIS Holdings Corporation | 07-cv-1932 (S.D. Cal.) |
| | Bishop et al. v. AT&T Corp. | Case No. 08-cv-00468 (W.D. Pa.) |
| | Bobbi Hardisky et al v Gateway Health LLC | Case No. 2:20-cv-01483 MPK (W.D. PA) |
| | Bobbie Jarrett v. GGNSC Holdings, LLC | Case No.: 12-CV-4105-BP (W.D. Mo.) |
| | Brenda Wickens, et al. v Thyssenkrupp Crankshaft Co. LLC | Case No. 1:19-cv-06100 (S.D. IL) |
| | Brittanee Tupitza et al. v Texas Roadhouse Management Corporation | Case No. 1:20-cv-00002 (W.D. PA) |
| | Cara Nasisi et al.v Comprehensive Health Management, Inc. | Case No. 1:19-cv-4132 KPF (S.D. N.Y.) |
| | Carlos Calderas, et al. v AK Tube, LLC | Case No. 3:19-cv-02431 JZ (W.D. OH) |
| | Chandler Glover and Dean Albrecht, et al., v. John E. Potter | EEOC No. 320-A2-8011X; Agency No. CC-801-0015-99 |
| | Charles Fravel, et al. v General Mills Operations, LLC | Case No. 2:20-cv-01094 EAS-CMV (S.D. OH) |
| | Christopher Evins v. Glow Networks, Inc. | Case No. 14-cv-00544 (W.D. Mo.) |
| | Claudine Wilfong, et al. v. Rent-A-Center, Inc. | Case No. 00-cv-680 (S.D. Ill.) |
| | Coltogirone, et al. v. Gateway Health, LLC | Case No. 2:20-cv-00605-MJH (W.D. Pa.) |
| | Copher v. Motor City Auto Transport, Inc. | 15-2500-CK (Macomb County, MI) |
| | Creed, et al. v. Benco Dental Supply Co. | 3:12-CV-1571 (E.D. Pa.) |
| | Dania Pruess, et al. v Presbyterian Health Plan, Inc. | Case No. 1:19-cv-629 KG-JFR (D. New Mexico) |
| | Dawn Bellan, et al. v Capital Blue Cross | Case No. 1:20-cv-00744 YK (M.D. PA) |
| | Day, et al. v. KASA Delivery LLC. | Case No. 01-17-0000-2142 (AAA) |
| | De La Torre v. Colburn Electric Company | Civil Action No. 4:20-cv-00127-JED-JFJ (N.D. Okla.) |
| | Doe, et al. v. Cin-Lan, Inc, et al. | Case No. 4:08-cv-12719 (E.D. Mich.) |
| | Doe, et al. v. Déjà Vu Services, Inc., et al., | No. 2:16-cv-10877 (E.D. Mich.) |
| | DuBeau et al v. Sterling Savings Bank et al. | No. 12-cv-1602 (D. Or.) |
| | Elizabeth Border et al. v Alternate Solutions Health Network LLC | Case No. 2:20-cv-01273 ALM-KAJ (S.D. OH) |
| | Equal Employment Opportunity Commission (EEOC) v. Star Tribune Company | Case No. 08-cv-5297(D. Minn.) |
| | Equal Employment Opportunity Commission v Faribault Foods, Inc. | Case No. 07-cv-3976  (D. Minn.) |

Appx. 089



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | Feiertag v. DDP Holdings, LLC d/b/a Apollo Retail Specialists, LLC, | Case No. 2:14-cv-2643 (S.D. Ohio) |
| | Felina Robinson v The Buffalo News, Inc. | Case No. 801427/2019 (Erie County, NY) |
| | Ferreras, et. al v. American Airlines, Inc. | 16-cv-2427 (D.N.J.) |
| | Fisher, et al. v. Michigan Bell Telephone Company | Case No. 09-cv-10802 (E.D. Mich.) |
| | Frank De La Paz v. Accurate Courier NCA LLC | Case No. 16CV00555 (County of Santa Cruz, CA) |
| | Frank, Peasley, Waters, and Wilhelm, v Gold'n Plump Poultry, Inc. | Case No. 04-cv-1018 (D. Minn.) |
| | French v. Midwest Health Management, Inc. | Case No.: 2:14-cv-2625 |
| | Geelan, et al. v. The Mark Travel Coporation | Case No. 03-cv-6322 (D. Minn.) |
| | Gipson, et al. v. Southwestern Bell Telephone Company | Case No. 08-cv-2017 (D. Kan.) |
| | Greene, et al. v. Shift Operations LLC, et al. | Case No. CGC 16-552307 (County of San Francisco, CA) |
| | Gregory Hernandez v. The Children's Place | No. CGC 04-4300989 (San Francisco, CA) |
| | Hawkins v.  JPMorgan Chase Bank, N.A. | Case No. 8:19-cv-02174 (M.D. Fla.) |
| | Helen Bernstein, et al. v. M.G. Waldbaum | Case No. 08-cv-0363 (D. Minn.) |
| | Holt v. Living Social | 1:2012cv00745 (D.D.C.) |
| | Jennifer Hayes, et al. v Thor Motor Coach Inc. | Case No. 3:19-cv-375 DRL-MGG (N.D. IN) |
| | Jimmy West v. PSS World Medical, Inc. | Case No. 4:13-cv-00574 (E.D. Mo.) |
| | John Alba, et al. v. Papa John's USA, Inc. | Case No. 05-cv-7487 (W.D. Cal.) |
| | Johnson, et al v. General Mills, Inc. | Case No. 10-cv-1104 (W.D. Mo.) |
| | Justice v. Associated Materials, LLC | Case No. 5:20-cv-00410-SL (N.D. Ohio) |
| | Karyn Petersen, et al. v EmblemHealth, Inc. et al. | Case No. 1:20-cv-2568 CBA-RLM (E.D.N.Y.) |
| | Kelly Marie Camp, et al. v. The Progressive Corporation, et al. | Case No. 01-cv-2680 (E.D. La.) |
| | Kelly, et al v. Bank of America, N.A. et al. | No. 10-5332 (N.D. Ill.) |
| | Kulauzovic et al. v. Citibank, N.A. | Index No. 507538/2018 (County of Kings, NY) |
| | Kusinski v. MacNeil Automotive Products Limited | Case No. 17-cv-3618 (N.D. Ill.) |
| | Lang, et al v DirecTV, Inc., et al. | No. 10-1085 (E.D. La.) |
| | Lee and Campion v. The City of Philadelphia | NO. 001125 (Court of Common Pleas, Philadelphia County) |
| | Linda J. Calhoun et al. v Aon Hewitt Health Insurance Solution, Inc. | Case No. 1:19-cv-01810 (N.D. IL) |
| | Lynn Lietz, et al. v. Illinois Bell Telephone Company, et al. | No. 1:11-cv-0108 (N.D. Ill.) |
| | Mallory v. Aclara Smart Grid Solutions, LLC | Case No. 2:20-cv-0240 (S.D. Ohio) |
| | Mary Hutkai, et al. v. Penn National Gaming, Inc., et al. | Case No. 4:16-cv-00906 (W.D. Mo.) |
| | Michael Levine, et al. v Vitamin Cottage Natural Food Markets, Inc. | Case No. 1:20-cv-00261 STV (D. CO) |
| | Michelle Jackson, et al. v. Jamba Juice Company | Case No. 8:02-cv-00381 (C.D. Cal.) |
| | Nicholas O'Neil et al. v Miller Pipeline LLC | Case No. 2:20-cv-04034 MHW-CMV (E.D. OH) |
| | OFCCP v. B&H Foto & Electronics Corp. | Case  No. 2016-OFC-0004 (Department of Labor) |
| | Owen, et al. v. Punch Bowl Minneapolis, LLC | Case No. 19-cv-0955 (D. Minn) |
| | Pamela Adams, et al., v. MedPlans Partners, Inc | Case No. 3:07-cv-259  (W.D. Ky.) |

Appx. 090



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | Parnell, et al. v. Academy Mortgage Corporation | Case No. 01-17-0004-5311 (AAA) |
| | Phillip Busler, et al. v. Enersys Energy Products Inc., et al. | Case No. 09-cv-0159 (W.D. Mo.) |
| | Powell v. The Kroger Company and Dillon Companies, LLC | Case No. 1:20-cv-01983 (D. Colo.) |
| | Robert Eddings v. General Aluminum Manufacturing Company | Case No. 1:17-CV-00362 (N.D. Ohio) |
| | Robert Stock et al. v Xerox Corporation | Case No. 6:16-cv-06256 EAW (W.D. N.Y.) |
| | Rocher, et al. v. Sav-on Drugs, et al. | Case No. BC 227551 (Los Angeles County, Cal.) |
| | Russell Cain v JB Hunt Transport, Inc. | Case No. D-202-CV-2019-00710 (Bernalillo County, NM) |
| | Russell, et al. v. Illinois Bell Telephone Company | Case No. 08-cv-1871 (N.D. Ill.) |
| | Ryan Ransom et al v Burrows Paper Corporation | Case No. 2:20-cv-03824 MHW-CMV (S.D. OH) |
| | Salamon v. Bayview Loan Servicing, LLC | No. 01-17-0002-1424 (AAA) |
| | Sequoia Moss-Clark, et al. v. New Way Services, Inc., et al. | Case No. C12-1391 (Contra Costa County, CA) |
| | Sergio Moreno et al v Silvertip Completion Services Operating LLC | Case No. 7:19-cv-00240 (W.D. TX) |
| | Shannon Wheeler v. Cobalt Mortgage, Inc. et al. | Case No. 2:14-cv-B1847-JCC (W.D. WA) |
| | Smallwood, et al. v. Illinois Bell Telephone Company, | Case No. 09-cv-4072 (N.D. Ill.) |
| | Smith v. Family Video | No. 11-cv-01773 (N.D. Ill.) |
| | Smith v. Pizza Hut, Inc. | No. 09--cv-01632-CMA-BNB (D. Colo.) |
| | Speraneo v. BJC Health Systems, Inc. d/b/a BJC HealthCare | Case No. 1322-CC09701 (St. Louis County, MO) |
| | Stephanie Sanz, et al. v. Johny Utah 51, LLC | Case No. 14-cv-4380 (S.D.N.Y.) |
| | Teeter v. NCR Corporation | Case No. 08-cv-00297 (C.D. Cal.) |
| | The Fortune Society, Inc. et al. v. Macy's, Inc. et al. | No. 19 Civ. 5961 (S.D.N.Y.) |
| | Thomas Cramer et al. v. Bank of America, N.A. et al. | Case No. 12-08681 (N.D. Ill.) |
| | Thomas Dege, et al., v. Hutchinson Technology, Inc. | Case No. 06-cv-3754 (D. Minn.) |
| | Thomas v. Kellogg Company et al. | Case No. 3:13 Civ. 05136 (W.D. Wash.) |
| | Thompson v. Qwest Corporation, et al. | Civil Action No.: 1:17-cv-1745 (D. Colo.) |
| | Tracie Ford et al v Cardinal Innovations Healthcare Solutions | Case No. 1:20-cv-00736 (M.D. NC) |
| | Trista L.Freeman, et al v Crossroads Hospice of Northeast Ohio LLC | Case No. 5:20-cv-01579 BYP (E.D. OH) |
| | Twohill, et al. v. First Acceptance Corporation | Case No. 3:17-cv-00284 (M.D. Tenn.) |
| | Watkins, et al. v. I.G. Incorporated, etl a. | Case No. 27-13-15361 (Hennepin County, MN) |
| | Weeks v. Matrix Absence Management, Inc. | Case No. 2:20-cv-884 (D. Arizona) |
| | White et al. v. Edward Jones Co., L.P. dba Edward Jones | No. 17 Civ. 02004 (N.D. Ohio) |
| | Wilkinson, et al. v. NCR Corporation | Case No. 1:08-cv-5578  (N.D. Ill.) |
| | William Perrin, et al. v. Papa John's International | No. 4:09-CV-01335 (E.D. Mo.) |
| | William Whitlock, et. al v. FSH Management, LLC, et. al. | 3:10-cv-00562-M |
| | Williams v. DH Pace | Case No. 4:14-cv-00161 (W.D. Mo.) |
| | Williams, et al. v. Dollar Financial Group, et al. | Case No. RG03099375 (Alameda County, CA) |
| | Williams, et al. v. G4S Secure Solutions (USA) Inc. | Civil Action No. 1:17-CV-00051 (M.D.N.C) |

Appx. 091



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | Williams, et al. v. H&R Block Enterprises, Inc. | No. RG 08366506 (Alameda County, CA) |
| | Wittemann, et al. v. Wisconsin Bell, Inc. | Case No. 09-cv-440 (W.D. Wisc.) |
| | Wlotkowski, et al. v. Michigan Bell | Case No. 09-cv-11898 (E.D. Mich.) |
| | EEOC v Oceanic Time Warner Cable LLC, et al. | Case No. CV -18-00357 DKW-KJM (D. Hawaii) |
| Environmental | Bernice Samples, et al. v. Conoco, Inc., et al. | Case No. 01-0631-CA-01 (Escambia Country, Fla.) |
| | Billieson, et al. v. City of New Orleans, et al. | No. 94-19231 (Orleans Parish, LA) |
| | City of Greenville, et al., v. Syngenta Crop Protection, Inc., and Syngenta AG | No. 3:10-cv-00188-JPG-PMF (S. D. Ill.) |
| | In Re: Duluth Superior Chemical Spill Litigation | Case No. 92-cv-503 (W.D. Wis.) |
| | Keltner, et al., v. SunCokeEnergy, Inc., et al. | Case No.: 2014-L-1540 (Madison County, IL) |
| | Latta, et al. v. Hannibal Board of Public Works, et al. | Case No. 16SL-CC01881 (St. Louis, MO) |
| | McGruder, et al. v. DPC Enterprises | No. CV2003-022677 (Maricopa County, AZ) |
| | Mehl v. Canadian Pacific Railway, Limited | Case No. 02-cv-009 (D.N.D.) |
| | Michelle Marshall, et al. v. Air Liquide -- Big Three, Inc. et al. | No. 2005-08706 (Orleans Parish, LA) |
| | Perrine, et al. v. E.I. Dupont De Nemours and Company, et al. | 01-0631-CA-01 (Harrison C., WV) |
| ERISA | In Re: Broadwing Inc ERISA Litigation | Case No. 02-cv-00857 (S.D. Ohio) |
| | Quince Rankin v. Charles C. Conway (Kmart ERISA Litigation) | Case No. 02-cv-71045 (E.D. Mich.) |
| ERISA - 401k/403b Fee | André Clark, et al., v. Oasis Outsourcing Holdings, Inc., et al. | Case No. 9:18-cv-81101- RLR (S.D. Fla.) |
| | Anthony Abbott, et al. v. Lockheed Martin Corp., et al. | Case No. 06-701 (S.D. Ill.) |
| | Bacon, et al., v. Board of Pensions of the Evangelical Lutheran Church in America | Case No. 27-CV-15-3425 (Hennepin County, MN) |
| | Beach, et al.v JPMorgan Chase Bank, N.A., et al. | Case No. 17-00563-JMF (S.D.N.Y.) |
| | Bhatia, et al. v. McKinsey & Company, Inc., et al. | Case No. 1:19-cv-01466-GHW-SN (S.D.N.Y.) |
| | Brotherston, et al. v. Putnam Investments, LLC, et al. | Civil Action No. 15-13825-WGY (D. Mass.) |
| | Clifton Marshall, et al. v. Northrop Grumman Corp., et al. | Case No. 16-6794 (C.D. Cal.) |
| | Cunningham, et al., v. Cornell University, et al. | Case No. 16-cv-6525 (S.D.N.Y.) |
| | David Clark, et al, v. Duke University, et al. | Case No. 1:16-CV-01044-CCE-LPA (M.D.N.C.) |
| | Dennis Gordan, et al. v. Massachusetts Mutual Life Insurance Co., et al. | Case No. 13-cv-30184-MAP (D. Mas.) |
| | Diego Cervantes v. Invesco Holding Company (US), Inc., et al. | Civil Action No. 1:18 cv-02551-AT (N.D. Ga.) |
| | Henderson et al. v. Emory University et al. | Case No. 16-cv-2920 (N.D. Ga.) |
| | In re GE ERISA Litigation | Master File No. 1:17-cv-12123-IT (D. Mass) |
| | In re M&T Bank Corporation ERISA Litigation | Case No. 1:16-cv-375 (W.D.N.Y.) |
| | In re Northrop Grumman Corporation ERISA Litigation | Case. No. 06-CV-6213 AB (JCx) (C.D. Cal.) |
| | Intravaia, et al. v. National Rural Electric Cooperative Association, et al. | Case No. 1:19-cv-00973-LO-IDD  (E.D. Va.) |
| | Johnson, et al v. Fujitsu Technology and Business of America, Inc. et al. | Case No.: 5:16-cv-03698 NC (N.D. Cal.) |
| | Karolyn Kruger, et al. v. Novant Health Inc., et al. | Case No. 14-208 (M.D.N.C.) |
| | Karpik, et al. v. Huntington Bancshares Incorporated, et al. | Case No. 2:17-cv-01153-MHW-KAJ (S.D. Ohio) |
| | Kirk, et al. v. Retirement Committee of CHS/Community Health Systems, Inc., et al. | Civil Action No. 3:19-cv-00689 (M.D. Tenn.) |

Appx. 092



| Practice Area | Engagement | Citation |
|---|---|---|
| | Lauren Bence, et al. v. Presence Health Network, et al. | Case No. 1:17-cv-08315 (N.D. Ill.) |
| | Loren L. Cassell, et al. v. Vanderbilt University, et al. | Case No. 3:16-CV-02086 (M.D. Tenn.) |
| | Main, et al. v. American Airlines, Inc. et al. | Civil Action No.: 4:16-cv-00473-O (N.D. Texas) |
| | Moitoso, et al. v. FMR LLC, et al. | Civil Action No. 1:18-cv-12122-WGY (D. Mass.) |
| | Pat Beesley, et al v. International Paper Co. et al. | Case No. 06-703-DRH (S.D. Ill.) |
| | Paul Andrus, et al. v. New York Life Insurance Company, et al. | Case. No. 1:16-cv-05698 (KPF) (S.D.N.Y.) |
| | Pledger, et al. v. Reliance Trust, et al. | Case No. 1:15-cv-4444-MHC (N.D. Ga.) |
| | Price v. Eaton Vance Corp., et al. | Civil Action No. 18-12098-WGY (D. Mass.) |
| | Ramos et al. v. Banner Health et al. | Case No. 1:15-cv-02556 (D. Colo.) |
| | Reetz v. Lowe's Companies, Inc. et al. | No. 5:18-cv-075-RJC-DCK (W.D.N.C.) |
| | Robert Sims, et al, v. BB&T Corporation, et al. | Case No. 1:15-cv-732-CCE-JEP (M.D.N.C.) |
| | Ronald Tussey, et al. v. ABB Inc., at al. | Case No. 2:06-cv-4305-NKL (W.D. Mo.) |
| | Smith, et al. v. OSF Healthcare System, et al. | Case No. 3:16-cv-00467-SMY-RJD (S.D. Ill.) |
| | Stacy Schapker v. Waddell & Reed Financial, Inc., et al. | Case No. 17-cv-2365 (D. Kan.) |
| | Stevens v. SEI Investments Company, et al. | Case No. 2:18-CV-09936 (E.D. Pa.) |
| | Todd Ramsey, et al., v. Philips North America LLC | Case No. 3:18-cv-01099-NJR-RJD (S.D. Ill.) |
| | Toomey, et al. v. Demoulas Super Markets, Inc., et al. | Case No. 1:19-CV-11633-LTS (D. Mass.) |
| | Tracey, et al. v. Massachusetts Institute of Technology, et al. | Case No. 1:16-cv-11620 (D. Mass.) |
| | Troudt et al v. Oracle Corporation et al. | Case No. 16-cv-00175 (D. Colo.) |
| | Velazquez, et al. v. Massachusetts Financial Services Company | Case No. 1:17-CV-11249 (D. Mass.) |
| FACTA | Albright v. Metrolink | No. 4:11-CV-01691AGF (E.D. Mo.) |
| | Ebert, et al. v. Warner's Stellian | No. 11-cv-02325 JRT/ SER (D. Minn.) |
| | Fouks, et al. v. Red Wing Hotel Corporation | Case No. 12-cv-02160 (D. Minn.) |
| | Jones v. Dickinson | No. 11 CV 02472 (D. Mo.) |
| | Linda Todd, et al. v. Medieval Times | Case No. 1:10-cv-00120 (D. N.J.) |
| | Masters v. Lowe's Home Centers, Inc. | Case No. 3:09-cv--255 (S.D. Ill.) |
| | Seppanen et al. v. Krist Oil Company | Case No. 2:09-cv-195 (W.D. Mich.) |
| | Waldman v. Hess Corporation | Case No. 07-cv-2221 (D. N.J.) |
| FCRA | Michael Stoner, et al. v. CBA Information Services | Case No. 04-cv-519 (E.D. Pa.) |
| Insurance | Ann Castello v. Allianz Life Insurance Company | Case No. 03-cv-20405  (D. Minn.) |
| | Boyd Demmer, et al. v. Illinois Farmers Insurance Company | Case No. MC 00-017872 (Hennepin County, Minn.) |
| | Chultem v. Ticor Title Insur. Co., et al. | Case No. 2006-CH-09488 (Circuit Court of Cook County, Ill.) |
| | Colella v. Chicago Title Insur. Co., et al. | Case No. 2006-CH-09489 (Circuit Court of Cook County, Ill.) |
| | Daluge, et. al., v. Continental Casualty Company | No. 3:15-cv-00297 (W.D. Wis.) |
| | Deborah Hillgamyer, et al. v. Reliastar Life Insurance Company, et al. | No. 11-cv-729 (W.D. Wis.) |
| | Doan v. State Farm | 108CV129264 (Santa Clara Co, CA) |

Appx. 093



| Practice Area | Engagement | Citation |
|---|---|---|
| | Dorothea Pavlov v. Continental Casualty Company | Case No. 07-cv-2580 (N.D. Ohio) |
| | Frank Rose, et al. v. United Equitable Insurance Company, et al. | Case No. 00-cv-02248 (Cass County, ND) |
| | Froeber v. Liberty Mutual Fire Insurance Company | Case No. 00C15234 (Marion County, OR) |
| | Garrison, et al., v. Auto-Owners Insurance Company | Case No. 02-cv-324076 (Cole County, Mo.) |
| | Harold Hanson, et al. v. Acceleration Life Insurance Company, et al. | Case No. 3:97-cv-152 (D.N.D.) |
| | Hofstetter, et al. v. Chase Home Finance, LLC., et al. | Case No. 10-1313 (N.D. Cal.) |
| | In Re: Lutheran Brotherhood Variable Insurance Products Co. Sales Practices Litigation | Case No. 99-md-1309 (D. Minn.) |
| | Irene Milkman, et al. v. American Travellers Life Insurance Company, et al. | No. 03775 (Philadelphia Court of Common Pleas, Pa.) |
| | Jacobs v. State Farm General Insurance Company | No. CJ-96-406 (Sequoyah County, Okla.) |
| | James M. Wallace, III, et al. v. American Agrisurance, Inc., et al. | Case No. 99-cv-669 (E.D. Ark.) |
| | James Ralston, et al. v. Chrysler Credit Corporation, et al. | Case No. 90-cv-3433 (Lucas County, Ohio) |
| | Michael T. McNellis, et al. v. Pioneer Life Insurance Company, et al. | CV 990759 (County of San Luis Obispo, Cal.) |
| | Morris v. Liberty Mutual Fire Insurance Company | CJ-03-714 (Pottawatomie County, OK) |
| | Paul Curtis, et al v. Northern Life Insurance Company | Case No. 01-2-18578 (King County, Wash.) |
| | Ralph Shaffer v. Continental Casualty Company and CNA Financial Corp | Case No. 06-cv-2253 (C.D. Cal.) |
| | Raymond Arent, et al. v. State Farm Mutual Insurance Company | Case No. 00-mc-16521 (D. Minn.) |
| | Roy Whitworth, et al. v. Nationwide Mutual Insurance Company, et al. | Case No. 00CVH-08-6980 (Franklin County, Ohio) |
| | Sonia Gonzalez, et al. v. Rooms to Go, Inc., et al. | Case No. 97-cv-3146 (S.D. Fla.) |
| | Tow Distributing, Inc., et al. v. BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota | Case No. 02-cv-9317 (D. Minn.) |
| Legal Notice | Anderson et al. v. Canada (Attorney General) | 2011 NLCA 82 |
| | Angell v. Skechers Canada | 8562-12 (Montreal, Quebec) |
| | Billieson, et al. v. City of New Orleans, et al. | No. 94-19231 (Orleans Parish, LA) |
| | Carnegie v. Household International, Inc. | No. 98-C-2178 (N.D. Ill.) |
| | Cazenave, et al. v. Sheriff Charles C. Foti, Jr., et al. | Case No. 00-cv-1246 (E.D. La.) |
| | Cazenave, et al. v. Sheriff Charles C. Foti, Jr., et al. | Case No. 00-cv-1246 (E.D. La.) |
| | City of Greenville, et al., v. Syngenta Crop Protection, Inc., and Syngenta AG | No. 3:10-cv-00188-JPG-PMF (S. D. Ill.) |
| | Evans, et al. v. Linden Research, Inc., et al. | Case No. 4:11-cv-1078-DMR (N.D. CA) |
| | F.T.C. v. NBTY, Inc. | No. 05-4793 (E.D.N.Y.) |
| | George Williams, et al. v. BestComp, Inc., et al. | No. 09-C-5242-A (Parish of St. Landry, LA) |
| | Griffin v. Dell Canada Inc | Case No. 07-cv-325223D2 (Ontario, Superio Court of Justice) |
| | In Re: Aftermarket Filters Antitrust Litigation | No. 1:08-cv-4883, MDL No. 1957 (N.D. Ill.) |
| | In Re: Asia Pulp & Paper Securities Litigation | Case No. 01-cv-7351 (S.D.N.Y.) |
| | In Re: Certainteed Fiber Cement Siding Litigation | MDL 2270 (E.D. PA) |
| | In Re: Duluth Superior Chemical Spill Litigation | Case No. 92-cv-503 (W.D. Wis.) |
| | In Re: Google Referrer Header Privacy Litigation | No. 10-04809 (N.D. Cal.) |
| | In Re: Salmonella Litigation | Case No. 94-cv-016304 (D. Minn.) |

Appx. 094



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | Jerome H. Schlink v. Edina Realty Title | Case No. 02-cv-18380 (D. Minn.) |
| | Joel E. Zawikowski, et al. v. Beneficial National Bank, et al. | Case No. 98-cv-2178 (N.D. Ill.) |
| | Joshua Wasser, et al. v. All Market, Inc., | Case No. 1:16-CV-21238 (S.D. Fla.) |
| | Kobylanski et al. v. Motorola Mobility, Inc. et al. | No. 13-CV-1181 (W.D. Pa.) |
| | Mary Plubell, et al. v. Merck and Co., Inc. | Case No. 04-cv-235817 (Jackson County, MO) |
| | McGruder, et al. v. DPC Enterprises | No. CV2003-022677 (Maricopa County, AZ) |
| | Mehl v. Canadian Pacific Railway, Limited | Case No. 02-cv-009 (D.N.D.) |
| | Michelle Marshall, et al. v. Air Liquide -- Big Three, Inc. et al. | No. 2005-08706 (Orleans Parish, LA) |
| | Pat Beesley, et al v. International Paper Co. et al. | Case No. 06-703-DRH (S.D. Ill.) |
| | Perrine, et al. v. E.I. Dupont De Nemours and Company, et al. | 01-0631-CA-01 (Harrison C., WV) |
| | Red Eagle Resources Corporation, Inc., et al. v. Baker Hughes Inc., et al. | Case No. 91-cv-627 (S.D. Tex.) |
| | Skold, et al. v Intel Corporation, et al. | Case No. 1-05-cv-039231 (County of Santa Clara, CA) |
| | The People of the State of California v. Rainbow Light Nutritional Systems, LLC, et al. | Case No. 19STCV28214 (Los Angeles County, CA) |
| | Thomas Geanacopoulos v. Philip Morris USA, Inc. | Civil Action No. 98-6002-BLS1 (MA Superior Court) |
| Medical/Drug | F.T.C. v. CHK Trading Corp. | Case No. 04-cv-8686 (S.D.N.Y.) |
| | F.T.C. v. Christopher Enterprises, Inc. | Case No. 2:01-cv-0505 (D. Utah) |
| | F.T.C. v. Conversion Marketing, Inc. | Case No. 04-cv-1264 (C.D. Cal.) |
| | F.T.C. v. Enforma Natural Products, Inc. | Case No. 00-cv-04376 (C.D. Cal.) |
| | F.T.C. v. Goen Technologies | FTC File No. 042 3127 |
| | F.T.C. v. Great American Products | Case No. 05-cv-00170 (N.D. Fla.) |
| | F.T.C. v. Kevin Trudeau, et al. | Case No. 03-cv-3904 (N.D. Ill.) |
| | F.T.C. v. Latin Hut, Inc. | Case No. 04-cv-0830 (S.D. Cal.) |
| | F.T.C. v. QT, Inc. | Case No. 03-cv-3578 (N.D. Ill.) |
| | F.T.C. v. Seasilver USA, Inc. | Case No. 03-cv-0676 (D. Nev.) |
| | F.T.C. v. Smart Inventions, Inc. | Case No. 04-cv-4431 (C.D. Cal.) |
| | F.T.C. v. Sunny Health Nutrition Technology & Products, Inc. | Case No. 06-cv-2193 (M.D. Fla.) |
| | F.T.C. v. United Fitness of America, LLC | Case No. 02-cv-0648 (D. Nev.) |
| | In Re: Guidant Corp Implantable Defibrillators Products Liability Litigation | Case No. 05-cv-1708 (D. Minn.) |
| | In re: Nuvaring Products Liability Litigation | 08-MDL-1964 |
| | Karen Wright, et al. v. Milan Jeckle | Case No. 98-2-07410-2 (Spokane County, Wash.) |
| | Mary Plubell, et al. v. Merck and Co., Inc. | Case No. 04-cv-235817 (Jackson County, MO) |
| Privacy | In Re Hudson's Bay Company Data Security Incident Consumer Litigation | Case No. 1:18-cv-08472 PKC (S.D. N.Y.) |
| Privacy/FCRA | St. Clair, et al. v MRB, et al. | Case No. 12-cv-1572 (D. Minn.) |
| Securities | Adam C. Kassab , et al. v. Francis D. John, et al. | Case No. 2:16-cv-00613-AJS (W.D. Pa.) |
| | Alan Freberg, et al. v.  Merrill Corporation, et al. | Case No. 99-cv-010063  (D. Minn.) |
| | Anderson v. Investors Diversified Services | Case No. 4:79-cv-266 (D. Minn.) |

Appx. 095



| Practice Area | Engagement | Citation |
|---|---|---|
| | Arkansas Teacher Retirement System, et al. v. Insulet Corp., et al. | Civil Action No. 15-12345-MLW (D. Mass) |
| | Bottlebrush Investments, LP, et al. v. The Lambveth Company, et al. | Case No BC 407967 (County of Los Angeles, CA) |
| | Charter Township Of Clinton v. OSI Restaurants | Case No. 06-CA-010348 (Hillsborough County, Fla.) |
| | Christopher Carmona, et al. v. Henry I. Bryant, et al. (Albertson's Securities Litigation) | Case No. 06-cv-01251 (Ada County, Idaho) |
| | Daryl L. Cooper, et al. v. Miller Johnson Steichen Kinnard, Inc. | Case No. 02-cv-1236 (D. Minn.) |
| | Dutton v. Harris Stratex Networks, Inc. et al | 08-cv-00755-LPS (D. Del.) |
| | Edith Gottlieb v. Xcel Energy, Inc., et al. | Case No. 02-cv-2931 (D. Minn.) |
| | Family Medicine Specialsts, et al. v. Abatix Corp., et al. | Case No. 3:04-cv-872B (N.D. Tex.) |
| | Fisk, et al. v. H&R Block Inc., et al. | 1216-CV20418 (Jackson County, MO) |
| | Friedman, et al. v. Penson Worldwide, Inc. | 11-cv-02098 (N.D. Tex.) |
| | In re FX Energy Stockholders Litigation | Case No. A-15-726409-B (Clark County, NV) |
| | In Re: American Adjustable Rate Term Trust Securities Litigation | Case No. 4:95-cv-666 and 4:95-cv-667 (D. Minn.) |
| | In Re: Ancor Communications, Inc Securities Litigation | Case No. 97-cv-1696 (D. Minn.) |
| | In Re: Asia Pulp & Paper Securities Litigation | Case No. 01-cv-7351 (S.D.N.Y.) |
| | In Re: Bayer AG Secuirites | Case No. 03-cv-1546 (S.D.N.Y.) |
| | In Re: Bio-One Securities Litigation | Case No. 05-cv-1859 (M.D. Fla.) |
| | In Re: Bioplasty Securities Litigation | Case No. 4:91-cv-689 (D. Minn.) |
| | In Re: Citi-Equity Group, Inc. Securities Litigation | Case No. 94-cv-012194 (D. Minn.) |
| | In Re: Citi-Equity Group, Inc., Limited Partnerships Securities Litigation | MDL No. 1082 (C.D. Cal.) |
| | In Re: Control Data Corporation Securities Litigation | Case No. 3:85-cv-1341 (D. Minn.) |
| | In Re: Cray Research Securities Litigation | Case No. 3:89-cv-508 (D. Minn.) |
| | In Re: Cybex International Securities Litigation | No. 653794/2012 (County of New York, NY) |
| | In Re: E.W. Blanch Holdings, Inc. Securities Litigation | Case No. 01-cv-258 (D. Minn.) |
| | In Re: Encore Computer Corporation Shareholder Litigation | Case No. 16044 (New Castle County, Del.) |
| | In Re: EVCI Career Colleges Holding Corp Securities Litigation | Case No. 05-cv-10240 (S.D.N.Y.) |
| | In Re: Flight Transportation | MDL No. 517 (D. Minn.) |
| | In Re: Frontier Oil Corporation | Case No. 2011-11451 (Harris County, Tex.) |
| | In Re: HeartWare International, Inc. Securities Litigation | No. 1:16-cv-00520-RA (S.D.N.Y.) |
| | In Re: Hennepin County 1986 Recycling Bond Litigation | Case No. 92-cv-22272 (D. Minn.) |
| | In Re: McCleodUSA Incorporated Securities Litigation | Case No. 02-cv-0001 (N.D. Iowa) |
| | In Re: McKesson HBOC, Inc. Securities Litigation | Case No. 99-cv-20743 (N.D. Cal.) |
| | In Re: Merrill Lynch & Co., Inc. Securities Derivative and ERISA Litigation | 07-cv-9633 (S.D.N.Y.) |
| | In Re: Merrill Lynch Research Reports Securities Litigation | Case No. 02-md-1484 (S.D.N.Y.) |
| | In Re: Micro Component Technology, Inc. Securities Litigation | Case No. 4:94-cv-346 (D. Minn.) |
| | In Re: National City Corp. Securities, Derivative and Erisa Litig. | MDL No. 2003 (N.D. Ohio) |
| | In Re: New Century | No. 07-CV-0931 (C.D. Cal.) |

Appx. 096



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | In Re: Novastar Financial, Inc. Securities Litigation | Case No. 04-cv-0330 (W.D. Mo.) |
| | In Re: OCA, Inc. Securities and Derivative Litigation | Case No. 05-cv-2165 (E.D. La.) |
| | In Re: Raytheon Company Securities Litigation | Case No. 99-cv-12142 (D. Mass.) |
| | In Re: Reliance Group Holdings, Inc. Securities Litigation | Case No. 00-cv-4653 (S.D.N.Y.) |
| | In Re: Retek Inc Securities Litigation | Case No. 02-cv-4209 (D. Minn.) |
| | In Re: Salomon Analyst Metromedia Litigation | Case No. 02-cv-7966 (S.D.N.Y.) |
| | In re: Sauer-Danfoss, Inc. Stockholder Litigation | C.A. No. 8396-VCL (Court of Chancery of the State of Delaware) |
| | In Re: Scimed Life Systems, Inc. Shareholders Litigation | Case No. 94-mc-17640 (D. Minn.) |
| | In Re: Sourcecorp Securities Litigation | Case No. 04-cv-02351 (N.D. Tex.) |
| | In re: Spectrum Pharmaceuticals Securities Litigation | Case No. 2:13-cv-00433-LDG (D. Nev.) |
| | In Re: SS&C Technologies, Inc. Shareholders Litigation | Case No. 05-cv-1525 (D. Del.) |
| | In re: SunEdison, Inc. Securities Litigation | Case No. 1:16-md-2742-PKC (S.D.N.Y) |
| | In Re: Tellium Inc Securities Litigation | Case No. 02-cv-5878  (D. N.J.) |
| | In Re: The Sportsman's Guide, Inc. Litigation | Case No. 06-cv-7903  (D. Minn.) |
| | In Re: Tonka Corporation Securities Litigation | Case No.  4:90-cv-002  (D. Minn.) |
| | In Re: Tonka II Securities Litigation | Case No. 3:90-cv-318 (D. Minn.) |
| | In Re: Tricord Systems, Inc. Securities Litigation | Case No. 3:94-cv-746 (D. Minn.) |
| | In Re: VistaCare, Inc. Securities Litigation | Case No. 04-cv-1661 (D. Ariz.) |
| | In Re: Williams Securities Litigation | Case No. 02-cv-72(N.D. Okla.) |
| | In Re: Xcel Energy, Inc. Securities Litigation | Case No. 02-cv-2677 (D. Minn.) |
| | In Re: Xcelera.Com Securities Litigation | Case No. 00-cv-11649 (D. Mass.) |
| | In Re: Xybernaut Corp. Securities MDL Litigation | Case No. 05-mdl-1705 (E.D. Va.) |
| | In the Matter of BKS Advisors, LLC | SEC Admin. Proc. File No. 3-18648 |
| | In the Matter of deVere USA, Inc. | SEC Admin. Proc. File No. 3-18527 |
| | In the Matter of Focus Media Holding Limited, et al. | SEC Admin. Proc. File No. 3-16852 |
| | In the Matter of James Goodland and Securus Wealth Management, LLC | SEC Admin. Proc. File No. 3-16878 |
| | In the Matter of JL Capital Management | SEC Admin. Proc. File No. 3-18171 |
| | In the Matter of Ross, Sinclaire & Associates, LLC, et al. | SEC Admin. Proc. File No. 3-17315 |
| | Ivy Shipp, et al. v. Nationsbank Corp. | 19,002 (TX 12th Jud Dist) |
| | Karl E. Brogen and Paul R. Havig, et al. v. Carl Pohlad, et al. | Case No. 3:93-cv-714 (D. Minn.) |
| | Lori Miller, et al. v. Titan Value Equities Group Inc., et al. | Case No. 94-mc-106432 (D. Minn.) |
| | Makor Issues & Rights, Ltd., et al. v. Tellabs, Inc., et al. | 02-C-4356 (N.D. Ill.) |
| | Montoya, et al. v. Mamma.com, Inc., et al. | Case No. 1:05-cv-02313 (S.D.N.Y.) |
| | Partridge v GreenStar Agricultural Corporation, et al. | Ontario Superior Court of Justice (Toronto Region) |
| | Paskowitz v James J. Hill | Case No. 715541/2018 (Queens County, NY) |
| | Resendes, et al.; Maher, et al.; Hawkins, et al.; Schooley, et al. v. Thorp, et al. | Case No. 84-cv-03457, 84-cv-11251, 85-cv-6074, 86-cv-1916L (D. Minn.) |

Appx. 097



Analytics Consulting LLC
Partial List of Legal Notice and Class Action Consulting Experience

4/2/2021

| Practice Area | Engagement | Citation |
|---|---|---|
| | Richard Donal Rink, et al. v. College Retirement Equities Fund | No. 07-CI-10761, (Jefferson County, KY) |
| | Robert Trimble, et al. v. Holmes Harbor Sewer District, et al. | Case No. 01-2-00751-8 (Island County, Wash.) |
| | Sandi Roper, et al. v. SITO Mobile, Ktd., et al. | NO. 2:17-CV-01106-ES-MAH (D.N.J.) |
| | Securities and Exchange Commission v Al-Raya Investment Company, et. al. | No. 109-CV-6533 |
| | Securities and Exchange Commission v. AIMSI Technologies, Inc., et al. | 05 CV 4724 (LLS) (S.D.N.Y.) |
| | Securities and Exchange Commission v. Alderson et al. | No. 18-04930 (S.D.N.Y.) |
| | Securities and Exchange Commission v. Broadwind Energy, Inc. et al. | Civ. Act. No. 1:15-cv-01142 (N.D. Ill.) |
| | Securities and Exchange Commission v. CKB168 Holdings Ltd., et al. | Civil Action No. 1:13-cv-5584 (E.D.N.Y.) |
| | Securities and Exchange Commission v. Harrison Katzen | Case No. 16-cv-06606 (E.D.N.Y.) |
| | Securities and Exchange Commission v. Intercontinental Regional Center Trust of Chicago, LLC | Civil Action No. 13-cv-982 (N.D. Ill.) |
| | Securities and Exchange Commission v. Myron Weiner | 11-CV-05731 (E.D.N.Y.) |
| | Securities and Exchange Commission v. Rockford Funding Group, LLC, et al. | 09-10047 (S.D.N.Y.) |
| | Securities and Exchange Commission v. United American Ventures, LLC, et al. | Case No. 10-cv-00568-JCH-LFG (D.N.M.) |
| | Superior Partners, et al. v. Rajesh K. Soin, et al. | Case No. 08-cv-0872 (Montgomery County, Ohio) |
| | Svenningsen, et al. v. Piper Jaffray & Hopwood, et al. | Case No. 3:85-cv-921 (D. Minn.) |
| | Three Bridges Investment Group, et al. v. Honeywell, et al. | Case No. 88-cv-22302 (D. Minn.) |
| | United States of America v. George David Gordon | Case No. 4:09-cr-00013-JHP-1 (N.D. Okla.) |
| | United States of America v. Zev Saltsman | Case No. 04-cv-641 (E.D.N.Y.) |
| | William Steiner, et al. v. Honeywell, Inc. et al. | Case No. 4:88-cv-1102 (D. Minn.) |
| Test Score | David Andino, et al. v. The Psychological Corporation, et al. | Case No. A457725 (Clark County, Nev.) |
| | Frankie Kurvers, et al. v. National Computer Systems | No. MC00-11010 (Hennepin County, Minn) |

Appx. 098

**Exhibit 2**

U.S. District Court for the Northern District of Texas

Lisa Ranieri, et al. v. AdvoCare International, L.P., Case No. 3:17-cv-00691

**NOTICE OF PROPOSED SETTLEMENT AND FAIRNESS HEARING**

**If you were a Distributor associated with AdvoCare International, L.P. ("AdvoCare") in the United States, you could get benefits from a class action settlement.**

**A settlement of the case has been proposed. Class Members may object to or opt-out of the settlement, and they may submit a claim to receive a cash payment that will be made in the event the court approves the settlement.**

**Your legal rights may be affected even if you do nothing. Please read this Notice carefully.**

*This is a court-authorized notice. This is **not** a solicitation from a lawyer.*

**File Your Claim**

**Claim Number: 0000000**                    **PIN: ABCD1234**

- A former AdvoCare Distributor has brought a class action against AdvoCare alleging that AdvoCare operated a pyramid scheme contrary to federal law.

- The Court has ordered that this case proceed as a class action for the purposes of settlement. This means that Plaintiff represents a class of AdvoCare Distributors who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme (as defined below), and whose distributorships were suspended without reinstatement or terminated (as defined below) by May 17, 2016. Distributors who meet this definition and do not opt out from membership in the Class are "**Class Members**" and individually each a "**Class Member**." Excluded from the Class are Distributors who were not, at the time they were Distributors, residents of the United States or its territories or U.S. military stationed overseas.

- The Plaintiff has been appointed by the Court to represent the interests of the class. Certain attorneys—known as "Class Counsel"—have also been appointed by the Court to represent the class. AdvoCare and Plaintiff have recently entered into a Settlement Agreement, but the Settlement Agreement will not become effective until the Court approves it at a Fairness Hearing. The Court has scheduled the Fairness Hearing for 1:00 p.m. (Central Time) on May 21, 2021.

- At the Fairness Hearing, the Court will consider the fairness, reasonableness, and adequacy of the Settlement Agreement. The Court may also consider Class Counsel's motion for an award of attorneys' fees and expenses and Plaintiff's motion for a service

Appx. 100

award, which will be filed in advance of the Fairness Hearing. Class Counsel will request no more than $3,675,000 in attorneys' fees and expenses. Plaintiff will request no more than $20,000 as a service award.

- AdvoCare's records show that you may be a member of the Class. You have received this Notice because Class Members have the right to object to the Settlement Agreement, to Class Counsel's motion for attorneys' fees and expenses, and to the Plaintiff's motion for a service award. You have also received this notice, along with a Claims Form, so that you may submit a claim for compensation in accordance with the Settlement Agreement. You also have the right to opt out of the Class.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **MAIL OR EMAIL A CLAIMS FORM OR FILE A CLAIM ON THE CLASS WEBSITE** | This is the only way to receive any compensation. The deadline to submit a Claims Form is **May 17, 2021. See Questions 8-11 below for more information.** |
| **EXCLUDE YOURSELF FROM SETTLEMENT** | Get no payment. This is the only option that allows you to ever be part of any other lawsuit against AdvoCare about the legal claims in this case. The postmark deadline to exclude yourself is **April 30, 2021. See Question 15 below for more information.** |
| **OBJECT** | Write to the Court about why you do not like the settlement. You MAY object to the Settlement Agreement and file a Claims Form. You MAY NOT object to the Settlement Agreement if you excluded yourself from the settlement. The deadline to object is **April 30, 2021. See Questions 12-13 below for more information.** |
| **GO TO A HEARING** | The Court has set the Fairness Hearing on **May 21, 2021** regarding the fairness of the Settlement Agreement. You may appear at the hearing, but don't have to. You may hire your own attorney to appear for you. **See Question 14 below for more information.** |
| **DO NOTHING** | If the Settlement Agreement is approved and you do nothing, you will receive no compensation from the Settlement Agreement and you will be bound by the settlement terms and judgment and will not be able to later sue AdvoCare about the claims in this lawsuit. To receive payment, you must file a claim. **See Question 16 below for more information.** |

**1. Why did I get this notice package?**

This notice is being sent to AdvoCare Distributors—individuals or entities—who meet the definition of Class Member: AdvoCare Distributors who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme, and whose distributorships were suspended without reinstatement or terminated by May 17, 2016.

- Distributors who made no purchases from AdvoCare after May 17, 2016, and paid no dues after May 17, 2016, will be considered terminated as of May 17, 2016.

Appx. 101

- Distributors will be considered to have lost money if the sum of the fees they paid AdvoCare, the money they paid AdvoCare for sales aids, and the money they paid AdvoCare for product (net of refunded amounts), reduced by 65% of the amount paid for product, is greater than the money they received from AdvoCare (other than for product refunds).

- Distributors are deemed to have lost money based solely on the amount of money they paid AdvoCare and the amount of money AdvoCare paid them. Other money spent or earned based on a Distributor's association with AdvoCare does not count.

- Whether a Distributor made or lost money is determined solely based on reference to a Distributor's own AdvoCare account. Money paid to AdvoCare for or on behalf of another Distributor's account is not considered.

- Whether a Distributor made or lost money is determined solely based on reference to AdvoCare's internal records.

You were sent this notice because, based on AdvoCare's records, you appear to be a Class Member. Class Members have a right to know about the proposed settlement of this class action lawsuit, and about all of their options, before the Court decides whether to approve the settlement. If the Court approves it, and after objections and appeals are resolved, the benefits provided by the Settlement Agreement will be distributed to the Class Members.

This package explains the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the Northern District of Texas and the case is known as *Ranieri, et al. v. AdvoCare International, L.P.*, Case No. 3:17-cv- 00691. Judge Karen Gren Scholer is overseeing this class action.

**2. What is this lawsuit about?**

The lawsuit was filed on March 9, 2017 on behalf of the two plaintiffs and similarly situated people (the "Class"). The plaintiffs alleged that AdvoCare operated a pyramid scheme contrary to federal law and that they suffered damages because of AdvoCare's operation of a pyramid scheme. Only one of the plaintiffs—Megan Cornelius—remains in the case. AdvoCare denies the claims made in the lawsuit and denies that it violated the law or operated as a pyramid scheme. No trial has been held on the merits of any allegations against AdvoCare or AdvoCare's defenses.

**3. What is a class action and who is involved?**

In a class action, the plaintiff as class representative sues on behalf of herself and other people who have similar claims. The people who have similar claims together are called a "class" or "class members." The plaintiff represents the interests of the rest of the class. In a class action, one court resolves the issues for everyone in the class—except for those people who exclude themselves from the class.

**4. Why is this lawsuit a class action?**

The Court decided that this lawsuit can be a class action for the purposes of settlement because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

**5. Has the Court decided who is right?**

There has been no trial, and the Court has not decided whether Plaintiff or AdvoCare is right as to whether AdvoCare was a pyramid scheme. Instead, both sides agreed to a settlement. That way, both sides avoid the cost of a trial, and the people affected can get compensation. Unless the Settlement Agreement is approved, Plaintiff must prove her claims at a trial on a date to be determined. By entering into the Settlement Agreement, AdvoCare has not admitted any wrongdoing.

**6. Is there any money available now?**

No money or other benefits are available now because the Court has not yet approved the Settlement Agreement. There is no guarantee that the Court will approve the Settlement Agreement or that you are

Appx. 102

entitled to compensation, even if it is approved. However, if you want to receive compensation from the proposed Settlement Agreement, you must participate as a class member.

**7. How do I know if I am part of the settlement?**

The Class Members are described in the Settlement Agreement. Section 1, above, summarizes the criteria for Class membership.

If you are still not sure whether you are included, you can ask for free help by contacting the Settlement Administrator at: (833) 983-2535. You can also visit www.AdvoCareDistributorClassAction.com for more information. Or you can fill out and return the Claims Form, to see if you qualify.

**8. What does the Settlement Agreement Provide?**

The proposed Settlement Agreement provides a cash "Settlement Fund" of $10,500,000 in cash to pay Class Members. This fund will also be used to pay any service award, attorneys' fees and costs, and costs to administer the settlement. The Net Settlement Amount (after deduction of any court-approved attorneys' fees and costs, administrative expenses, and service award to the class representative) will be allocated to valid claims submitted by Class Members according to the proposed Settlement Agreement to be approved by the Court (as explained further under Question 9 below).

Note: The attorneys' fees and costs, settlement administration costs, and other relevant costs will be paid from the cash Settlement Fund. The remainder of the cash Settlement Fund will be used to pay valid claims.

More details on the settlement are available in the Settlement Agreement, which is available at: www.AdvoCareDistributorClassAction.com.

**9. How do I get a cash payment from the Settlement Fund?**

To qualify for payment from the cash Settlement Fund, you must submit a Claims Form by May 17, 2021. You may fill out a Claims Form at the class action website www.AdvoCareDistributorClassAction.com or fill out the form accompanying the Notice you received and mail or email it in.

You may also complete the Claims Form online by clicking the link below:

**File Your Claim**

**Claim Number: 0000000**                    **PIN: ABCD1234**

Read the instructions carefully, fill out the form, and sign and (if not online) mail or email the form postmarked no later than May 17, 2021. If you need help filling out or filing a Claims Form, please call (833) 983-2535. The Settlement Administrator may ask you for additional information.

The base amount of your cash award will be your net loss from your association with AdvoCare. The calculation of net loss will follow the same procedure as described in Section 1, above, for determining Class membership. However, you may only recover your base claim to the extent you made payments to AdvoCare between March 9, 2013, and May 17, 2016.

AdvoCare paid a $150 million fine to the Federal Trade Commission based on allegations similar to those raised by the plaintiff in this Lawsuit. The FTC may deposit the $150 million into a fund to be distributed to former AdvoCare Distributors. Base claims may be reduced by the amount you receive (if any) from the FTC associated with AdvoCare's $150 million payment to the FTC. Class Counsel has no control over the distribution of the FTC fund and has no information regarding when the FTC will distribute the money.

Your share of the cash Settlement Fund will depend on the base amounts of other Class Members' cash awards, the amount of attorneys' fees and costs awarded by the Court, the amount of any service awards to the Plaintiffs, and the amount of costs incurred by the Settlement Administrator in administering the Settlement. All base cash awards may be reduced on a *pro rata* basis so that the total of the awards is no more than the net amount of the Settlement Fund.

Appx. 103

**10. When do I get my payment?**

Neither the Court nor the parties have this information yet. The Court will hold a Fairness Hearing on May 21, 2021 at 1:00 p.m. (Central Time), to decide whether to approve the settlement. If the Court approves the settlement, there may be appeals. It is always uncertain whether these appeals can be resolved, and resolving them can take time. Once the Settlement Agreement is finally approved, the parties and the Settlement Administrator will work quickly and efficiently to process claims and issue awards in accordance with the Settlement Agreement. In addition, the distribution of awards may be delayed until after the FTC distributes its $150 million fund.

**There will be no payments under the Settlement if the Settlement Agreement is terminated.**

**11. What are you giving up to get a payment and stay in the Class?**

The Class will release AdvoCare of any and all claims based on the alleged operation of a pyramid scheme, any consumer fraud, or any misrepresentation or omission made as of May 16, 2016.

Claims arising out of breach of any written agreement between Class Members and AdvoCare regarding the payment of bonuses or commissions earned but unpaid as of May 16, 2016 are specifically not released.

The entire release language is set forth in the Settlement Agreement, which is available at www. AdvoCareDistributorClassAction.com.

**12. Why would I object?**

If you believe the proposed Settlement Agreement is not in your best interests or the best interests of the Class, you should consider objecting. However, if the Court does not approve the proposed Settlement Agreement, then the Plaintiffs will have to prove their claims and the Class claims at trial, and there is no guarantee that they will be successful.

**13. How do I object?**

If you want to object, you must file an objection with the United States District Court for the Northern District of Texas noting the name of the case and the case number. You must set forth a statement of your objection as well as the specific reasons for each objection, including any legal or evidentiary support for the objection. An attorney may assist you with your objection, but you

will have to hire that attorney at your own expense. The deadline for filing objections is April 30, 2021. You must also send a copy of your objection to Class Counsel and Defense Counsel. Here are the addresses you will need:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of Court | R. Adam Swick | Thomas M. Melsheimer |
| U.S. District Court for the | Reid Collins & Tsai LLP | Steven H. Stodghill |
| Northern District of Texas | 1301 S. Capital of Texas Hwy | John C.C. Sanders, Jr. |
| 1100 Commerce St. | Suite C300 | Rex A. Mann |
| Dallas, TX 75242 | Austin, TX 78746 | Becca Loegering |
| | | Winston & Strawn LLP |
| | | 2121 N. Pearl Street |
| | | Suite 900 |
| | | Dallas, TX 75201 |

**14. Attending the Court's Fairness Hearing**

The Court will hold a Fairness Hearing to decide whether to approve the Settlement Agreement. You may attend and speak, but you do not have to. The Court has scheduled the Fairness Hearing on **May 21, 2021 at 1:00 p.m. (Central Time)**, at the United States District Courthouse for the Northern District of Texas, 1100 Commerce Street, Dallas, Texas 75242. At the hearing, the Court will consider whether the Settlement Agreement is fair, reasonable, and adequate. If there are objections, the Court will consider them. The Court may also listen to people who have asked to speak about an objection. At or after the hearing, the Court will decide whether to approve the Settlement Agreement. We do not know when the Court will issue its decision.

Appx. 104

If you want to appear at the Fairness Hearing regarding an objection that you made, you must deliver to Class Counsel and Defense Counsel and file with the Court by **May 7, 2021**, a notice of intention to appear and a statement identifying any documents that the Class Member will seek to introduce or witnesses the Class Member will seek to call at the Fairness Hearing. The date and time of the Fairness Hearing are subject to change by Court Order, but any changes will be posted at www.AdvoCareDistributorClassAction.com.

**15. How do I exclude myself from the Class?**

If you don't want a payment from this settlement, but you want to keep the right to sue AdvoCare on your own about the legal claims in this case, then you must take steps to get out of the Class. This is called excluding yourself or "opting out" of the Class. Excluding yourself is different than objecting to the Settlement Agreement. Objecting is simply telling the Court that you don't like something about the Settlement Agreement. Excluding yourself is telling the Court that you don't want to be part of the Class. **If you exclude yourself, you have no basis to object because the case no longer affects you. You will not get any settlement payment and you cannot object to the settlement.** You may be able to sue AdvoCare about the legal issues in this case at your own expense.

To exclude yourself, you must provide in writing to the Settlement Administrator your name, address, telephone number, and a statement that you wish to be excluded from the Class. The Settlement

Administrator's contact information is: AdvoCare Class Action Settlement Administrator, c/o Analytics Consulting LLC, P.O. Box 2007, Chanhassen MN 55317-2007. Your exclusion must be postmarked no later than **April 30, 2021**.

**16. What happens if I do nothing at all?**

If you do nothing, you will get no distribution from the cash Settlement Fund but you will be bound by the releases in the Settlement Agreement, if the Court finally approves it. And unless you exclude yourself, you will not be able to start a lawsuit, continue a lawsuit, or be part of any other lawsuit against AdvoCare about the legal issues in this case, ever again, except as permitted in the Settlement Agreement.

**17. Do I have a lawyer in this case?**

The plaintiff and the Class are represented by Reid Collins & Tsai LLP. These lawyers are called Class Counsel. You will not be charged personally for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

**18. How will the lawyers be paid?**

Class Counsel has worked on this case since late 2016 to the present and have not been paid for their work to date. Class Counsel will file a motion for an award of attorneys' fees and costs, administrative expenses, and Class Representative compensation at least 42 days prior to the Fairness Hearing. This motion will be made available at www.AdvoCareDistributorClassAction.com and be considered at the Fairness Hearing. Class Counsel will limit their application for attorneys' fees to not more than $3.675 million. Class Counsel also will seek to recover all actual and anticipated litigation costs and administrative expenses associated with the settlement. In addition, Class Counsel will also ask the Court to award the Class Representative a service award not to exceed $20,000. The service award is to compensate the Class Representative for her commitment and effort on behalf of the Class Members in this case.

**19. How do I get more information?**

This notice summarizes the proposed Settlement Agreement. You can find more details in the Settlement Agreement. You can get a copy of the Settlement Agreement, read other key case documents, and get more information at www.AdvoCareDistributorClassAction.com. You can also call (833) 983-2535, email info@AdvoCareDistributorClassAction.com, or write the Settlement Administrator at AdvoCare Class Action Settlement Administrator, c/o Analytics Consulting LLC, P.O. Box 2007, Chanhassen MN 55317-2007 for more information. Do not contact the Court, AdvoCare, or AdvoCare's counsel.

All papers filed in this lawsuit are also available via the Public Access to Court Electronic Records System (PACER), at http://www.pacer.gov, and may be reviewed in person, as allowed by the Court,

Appx. 105

during regular business hours at the Office of the Clerk of the United States District Court for the Northern District of Texas, 1100 Commerce St., Dallas, TX 75242.

AdvoCare Class Action Settlement Administrator | P.O. Box 2007, Chanhassen, MN 55317

Unsubscribe {recipient's email}

Customer Contact Data Notice

Sent by info@advocaredistributorclassaction.com

Appx. 106

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

LISA RANIERI and MEGAN CORNELIUS,
Individually and on Behalf of a Class of
Similarly Situated Persons,

        Plaintiffs,

        v.

ADVOCARE INTERNATIONAL, L.P.,

        Defendants.

Case NO. 3:17-cv-00691-S

## APRIL 7, 2021, DECLARATION OF J. BENJAMIN KING

The undersigned, J. Benjamin King, submits the following declaration pursuant to 28 U.S.C. § 1746 under penalty of perjury and states as follows:

1.      I am licensed to practice law in the State of Texas (Bar No. 24046217).  I am also licensed to practice law in the District of Columbia, and I have been admitted to the U.S. District Court for the Northern District of Texas (and other federal district courts).  I am a member in good standing of these bars.

2.      I submit this declaration in support of (i) Plaintiff Megan Cornelius's Motion for Final Approval of Class Action Settlement ("**Final Approval Motion**"); and (ii) Class Counsel's Motion for an Award of Attorneys' Fees and Expenses and Class Representative's Motion for a Service Award ("**Fee Motion**").  Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Final Approval Motion and Fee Motion.

1

## BACKGROUND

3.     I graduated summa cum laude from Cornell Law School in 1998.  I have a B.A. in English from the University of Mississippi and an M.A. in English from the University of Alabama.

4.     From 1998 to 1999 I served as a law clerk for the Honorable Allan E. Norris of the U.S. Court of Appeals for the Sixth Circuit.

5.     I have had substantial experience in handling class action cases and other complex litigations.  From 1999 to June 2004 I worked as an associate at Arnold & Porter, LLP, in Washington, DC.  I was part of the legal teams that helped Philip Morris U.S.A, Inc., successfully defeat class certification at the trial and appellate levels.

6.     From June 2004 to August 2013 I worked at Diamond McCarthy LLP ("**Diamond McCarthy**").  In January 2007 I was made a partner at Diamond McCarthy.

7.     I was the lead Diamond McCarthy lawyer on three class action litigations: *Zamora-Garcia v. Moore, et al*., C.A. No. 7:05-cv-00331 (S.D. Tex.) (contested class certification granted; subsequent settlement agreement approved); *Dominguez v. AAA Bonding Agency, Inc*., C.A. No. H-09-01681 (S.D. Tex.) (class action settlement agreement approved); *Stephenson Oil Co. v. Citgo Petroleum Corp*., Case No. 08-CV-380-TCK-TLW (N.D. Okla.) (class certification denied).

8.     I have been a partner at RCT & Tsai LLP ("**RCT**") since August 2013.  While at RCT, I was co-lead counsel (along with R. Adam Swick) in a class action against a multi-level marketing company (a "**MLM**") that resulted in an approved class action settlement: *Martinez v. MXI Corp*., Case 3:15-cv-00243-MMD-VPC (D. Nev.).  I am co-counsel in a pending putative class action against another MLM: *Smith v. LifeVantage Corp*., Case No. 2:18-cv-00621-DBB-JCB (D. Utah).  Mr. Swick and I were co-lead counsel in a putative class action against another

2

MLM that was forced to arbitration: *Dagnall v. Arbonne Int'l, Inc*., Case No.: 8:17-cv-1214 (C.D. Cal.).  In addition, I have represented objectors to a billion-dollar class action settlement (*In re Credit Default Swaps Antitrust Litig*., 13 MD 2476 (DLC) (S.D.N.Y.)) and represented the plaintiffs in a WARN Act class action (*Parker v. Forest Park Realty Partners III (In re: Forest Park Realty Partners III),* Case No. 15-34814-SGJ (Bankr. N.D. Tex.)).

9.     At both Diamond McCarthy and RCT, in addition to the class action matters referenced above, I have represented bankruptcy trustees and similar fiduciaries overseeing the litigation claims of insolvent entities.  The damages involved in these cases ranged from a few million dollars to hundreds of millions of dollars.  A copy of my bio, as well as bios for any RCT attorney that worked more than 10 hours on this case are attached as Exhibit 1 [Appx. 139-146].

10.     Adam Swick—also a partner at RCT—and I are co-lead counsel in this matter.  Mr. Swick and I have managed the day-to-day litigation in this case as well as the big-picture strategies and decisions.  As a result, I have direct knowledge of the litigation of this case, the risks facing Plaintiff Megan Cornelius and the Class, and the benefits offered by the Settlement Agreement as compared to the potential benefits of continued litigation.  Additionally, I am head of RCT's Intake Committee, which reviews every potential matter before the firm undertakes a representation, and I have knowledge of the Firm's usual fee structure and customary rates.

## OVERVIEW OF THE LITIGATION

11.     Mr. Swick and I began investigating potential claims against AdvoCare in November 2016, partly in response to an ESPN article published on March 15, 2016, that drew public attention to the AdvoCare business model and suggested that AdvoCare might operate a pyramid scheme.  Our research led us to contact various former distributors regarding their experiences with AdvoCare, and this investigation ultimately led us to the two original plaintiffs

3

Appx. 110

to this action, Lisa Ranieri and Megan Cornelius ("**Plaintiffs**").  Ms. Ranieri's claims are being resolved separately from the Class claims, and Ms. Cornelius continues as the proposed Class Representative.

12.     Because of our prior experience in cases against MLMs allegedly operating as pyramid schemes, Mr. Swick and I understood the critical issues relating to such cases.  Between November 2016 and the filing of the original complaint on March 9, 2017, we thoroughly and extensively researched how AdvoCare's business model operated.  We spoke with former distributors and others who had been associated with AdvoCare and scoured the internet for all available information regarding AdvoCare and its products.  We also thoroughly researched Texas and Fifth Circuit law specific to the potential claims against AdvoCare, including potential attacks on the arbitration provision in AdvoCare's form documents.

13.     Through our pre-suit research, we determined that the most critical issues in the case were (a) whether the case was subject to arbitration, and (b) whether Plaintiffs could state a viable legal claim without having to allege that they relied on any particular statements by AdvoCare or any Distributor promoting AdvoCare.  Both issues presented substantial risk to Plaintiffs (and to RCT, which would fully fund the litigation) and their ability to bring a class action.

14.     Our pre-litigation research indicated that Plaintiffs had viable arguments to win on both issues.  As to arbitrability, Plaintiffs had a strong argument that the arbitration provision in earlier versions of AdvoCare's contracts with its Distributors were illusory, although certainly AdvoCare had counter-arguments.  In light of the en banc Fifth Circuit's decision in *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629 (5th Cir. Sept. 30, 2016) (*en banc*) ("**Torres II**"), we believed we could state a cause of action under RICO that would not require proof of individual reliance,

4

but we knew that there was a risk that the RICO cause of action was barred by the PSLRA.  We also knew that a viable civil RICO cause of action required stating many unique elements.  If we could survive these legal hurdles, we believed this case would be ripe for class certification.  After weighing these risks and conferring with Plaintiffs, we decided to file this case, which we did on March 9, 2017.  No other class action had been filed against AdvoCare at that point, and no competing class action has ever been filed.

15.    After defendants (AdvoCare plus several Distributors at the top of the AdvoCare distribution pyramid (the "**Individual Defendants**") moved to compel arbitration on May 15, 2017, Plaintiffs agreed to arbitrate arbitrability.  The parties extensively briefed the arbitration issues and attended a lengthy in person hearing.  AdvoCare raised significant arguments regarding contract reformation, which would have allowed AdvoCare to retroactive reform its contracts to avoid Plaintiffs' illusoriness argument.  This argument required the most attention during the arbitration proceedings.  On December 27, 2017, the arbitrator issued an order determining that the arbitration provisions in AdvoCare's contract with Plaintiff Ranieri were illusory and unenforceable.  The parties had agreed that any decision as to the arbitrability of Plaintiff Ranieri's claims would apply to Plaintiff Cornelius.  The case then returned to this Court.

16.    The parties then proceeded to, what turned out to be, an extensive motion to dismiss process.  As noted above, one of the potential legal impediments to bringing a successful RICO claim was the PSLRA.  Whether the PSLRA necessarily precluded Plaintiffs from bringing RICO claims was extensively briefed and argued by the parties with respect to defendants' motions to dismiss the Original Complaint.  On August 27, 2018, this Court issued an order denying AdvoCare's motion to dismiss on PSLRA grounds.  This resolved (at least at the pleading stage) a significant impediment to Plaintiffs' class claims.  However, the Court also dismissed the claims

5

against the Individual Defendants, and the activities of the Individual Defendants in the AdvoCare system were important to Plaintiffs' ability to state a RICO claim against AdvoCare.

17.    The Court granted Plaintiffs leave to amend their original complaint, and Plaintiffs filed a First Amended Complaint on September 11, 2018.  AdvoCare was the only defendant to this complaint.  AdvoCare moved to dismiss, arguing that the First Amended Complaint failed to allege some of the required elements of a RICO claim.  After extensive briefing, this Court ultimately agreed with some of AdvoCare's arguments and dismissed the First Amended Complaint on July 16, 2019.  The Court gave Plaintiffs leave to amend again.

18.    Plaintiffs filed their Second Amended Complaint on July 31, 2019.  Therein, they sought to address the problems the Court found with the First Amended Complaint with respect to the RICO claim, and Plaintiffs added a claim under Texas' Deceptive Trade Practices Act.  On November 19, 2019, AdvoCare again moved to dismiss, again claiming that Plaintiffs' RICO claims failed to properly allege all the required elements.  That motion was fully briefed when the parties reached settlement terms, as described below.

19.    Thus, when we began this case, we recognized that we would have to overcome certain legal obstacles to bringing a successful case.  We would have to survive arbitration, which we did.  We would have to avoid the PSLRA, which we did (at least at the pleading stage).  And we would have to state a viable civil RICO cause of action, which was still subject to this Court's consideration when the parties settled.

20.    While the motions to dismiss the First and Second Amended Complaints were pending, the parties engaged in some written discovery targeted to class certification issues.  The parties exchanged initial disclosures, and each party propounded interrogatories and requests for production.  The parties have responded to those discovery requests and collectively produced over

two thousand pages of documents.  AdvoCare also produced several massive Excel spreadsheets providing data regarding Distributors' payments to and receipts from AdvoCare.

21.     Prior to the Court's vacating the scheduling order, the schedule in this case was dependent on when the Court ruled on the pending motion to dismiss, so that the deadline for class discovery and other deadlines expired based on when the Court rules.  We intended to pursue additional class certification-targeted discovery, including depositions, once the Court ruled on the pending motion to dismiss.

**SETTLEMENT NEGOTIATIONS**

22.     While the parties were in the midst of motion-to-dismiss practice, AdvoCare made two surprising announcements.  First, on May 17, 2019, AdvoCare announced that, in light of ongoing discussions with the FTC, it was abandoning its MLM business model and moving to direct-to-consumer sales and single-level marketing compensation.  This meant that AdvoCare would not be a subject to claims that it continued to operate a pyramid scheme.

23.     Before AdvoCare announced the change to its business model, Mr. Swick and I knew the FTC had been looking into AdvoCare because the FTC refused our FOIA request to provide information on any investigations of AdvoCare because the investigation was ongoing.  In addition, on April 12, 2017, our law firm's website tracker informed us that someone from the FTC had viewed the press release on our firm's website regarding this case.  However, we had had no direct contact with the FTC about its investigation or our case.

24.     In early August 2019, Mr. Swick and I began discussions regarding resolution of the case with counsel for AdvoCare.  We understood that part of the impetus for AdvoCare's interest in settling was that it was resolving the FTC's claims for a publicly undisclosed amount of money, and AdvoCare wanted to put behind it all of its pyramid scheme liability.  We agreed

Appx. 114

to mediate with Judge Royal Furgeson as our mediator. The Parties eventually set a date for a mediation on October 18, 2019. We did not know it at that time, but ultimately three mediations were necessary before the parties could resolve the case.

### The First Mediation

25.    On October 2, 2019—prior to the first mediation with Judge Furgeson—AdvoCare and the FTC announced that AdvoCare had agreed to pay $150 million to settle the FTC's claim (which was substantially identical to Plaintiffs') that AdvoCare operated a pyramid scheme.

26.    AdvoCare's settlement with the FTC greatly impacted the prospect for settlement in this case. On the one hand, the FTC settlement helped confirm for us the truth of the central proposition in our case—AdvoCare operated a pyramid scheme. It seemed very unlikely to us that AdvoCare would agree to pay $150 million to settle the FTC's claims if AdvoCare did not believe it was likely that the FTC could establish that it operated a pyramid scheme. On the other hand, the FTC's settlement obviously reduced AdvoCare's ability to pay, and the FTC's distribution of the $150 million to Distributors would likely reduce Class Member's damages. Given these factors and the continuing risk from the pending motion to dismiss the Second Amended Complaint, we believed it was appropriate to move forward with settlement negotiations.

27.    In advance of the first mediation, Mr. Swick and I met with counsel for AdvoCare at their offices to discuss settlement possibilities and issues in dispute, such as how we intended to define class membership, how to calculate individual class member damages, and the total amount of damages in dispute. No settlement terms were reached or even negotiated during this meeting.

28.    Mr. Swick and I subsequently participated in a conference call with Judge Furgeson and counsel for AdvoCare in advance of the first mediation.

8

Appx. 115

29.    Mr. Swick and I prepared, with input from Plaintiffs, lengthy confidential mediation materials in advance of the first mediation.  We submitted these materials to Judge Furgeson.  Plaintiffs Ranieri and Cornelius flew from their homes in Virginia and California to attend the mediation, held in Dallas, along with me, Mr. Swick, and a third RCT partner, P. Jason Collins.  Although the parties spent most of the day mediating on October 18, they did not reach a resolution (or even come close).

### The Second Mediation

30.    Judge Furgeson continued to confer with the Parties after the October 18 mediation, including multiple phone calls and emails with me and/or Mr. Swick.  On August 13, 2020—while the fully briefed motion to dismiss the Second Amended Complaint was pending—the Court ordered the Parties to mediate by September 4, 2020.  I understand that the Court entered this order in response to a request by Judge Furgeson made in light of progress he made through his discussions with the parties.

31.    Plaintiffs submitted a mediation statement in advance of the second mediation that supplemented their original statement.  Plaintiffs, Mr. Swick and I, along with Mr. Collins, attended a full-day mediation (via Zoom) on September 3.  I understand that AdvoCare, counsel for AdvoCare, and counsel for an insurer of AdvoCare, also attended the mediation, although we never communicated directly with any of them.  After many hours of arms' length negotiations through Judge Furgeson, we reached an agreement-in-principle to settle all claims for $10.5 million, subject to, among other matters, negotiating a complete class action settlement agreement.

### The Third Mediation

32.    After the second mediation, the parties turned to negotiating the details of a complete settlement agreement.  AdvoCare also had an insurance issue it needed to resolve.  In the

course of the parties' efforts to negotiate a settlement agreement, the parties encountered many issues of dispute, but the most significant was how to calculate Distributors' net losses for purposes of class membership and individual class member claims.

33.    The basic calculation for determining if a Distributor incurred a net loss from his participation in AdvoCare is the difference between the money the Distributor paid AdvoCare and the money AdvoCare paid the Distributor.  AdvoCare, however, contended that the product Distributors purchased from AdvoCare had value, and the value of that product should factor into the claim amount calculation.  Most of the money Distributors paid AdvoCare was paid to purchase product, so the amount of product credit was a very significant issue.  The third mediation was primarily focused on the value to attribute to the product.  The parties did not reach a resolution during the third mediation, but an agreement was finally reached a few days thereafter, thanks to Judge Furgeson's continued efforts.

34.    Ultimately, the parties agreed that the value of the product would be set at 65% of the price class members paid for the product.  Thus, the basic calculation for Distributor's net losses was the difference between the money the Distributor paid AdvoCare and the money AdvoCare paid the Distributor, plus 65% of the money the Distributor paid AdvoCare for product.

35.    At this 65% value level, Plaintiff Ranieri would no longer have a net loss, would not be in the Class, and could not be a class representative.  This is why her claims were resolved separately.  The settlement with Ms. Ranieri did not affect any right of any Class Member.

36.    Having resolved the net loss calculation issue, the parties were able to resolve the remaining issues, and they executed the Settlement Agreement on January 25, 2021.

Appx. 117

## THE SETTLEMENT AGREEMENT

37.    In this Section, I provide some explanation of the most significant aspects of the Settlement Agreement.

### The Settlement Amount

38.    The Settlement Agreement provides for AdvoCare to create a Settlement Fund of $10.5 million.    The Settlement Agreement allows AdvoCare to pay the $10.5 million in installments.  SA § X.C.1.b.  It was obligated to pay $4 million within 14 days after this Court preliminarily approved the settlement, and it will pay the rest in three installments, with the last installment being, at the latest, on January 31, 2023.  This was a concession required by AdvoCare, and AdvoCare provided an irrevocable letter of credit as security for the three installment payments.  AdvoCare has made the first $4 million payment, and it has provided the letter of credit required to assure payment of the remaining $6.5 million.

39.    The reason why the last payment may be delayed until January 2023 relates to the timing of the expected distribution by the FTC of the $150 million it received from AdvoCare. This issue is addressed in more detail herein.

40.    The Settlement Fund will cover any Fee Award to Class Counsel, Service Awards to the Plaintiffs, and administration fees and expenses.  The remainder (the "**Net Settlement Fund**") will be distributed to Class Members who file timely claims.  If the total of the claims paid to Class Members are less than the Net Settlement Fund, the remainder will revert to AdvoCare.

### Explanation of the Class Definition

41.    The Settlement Agreement calls for the certification of the following Class:

The "**Class**" shall be all Distributors who paid fees, purchased a "distributor kit," and/or purchased products from AdvoCare between March 9, 2013, and May 17, 2016, who lost money from their participation in the AdvoCare alleged scheme, and whose distributorships were suspended without reinstatement or terminated by

11

May 17, 2016. Distributors who made no purchases from AdvoCare after May 17, 2016, and paid no dues after May 17, 2016, will be considered terminated as of May 17, 2016. Distributors will be considered to have lost money if the sum of the fees they paid AdvoCare, the money they paid AdvoCare for sales aids, and the money they paid AdvoCare for product (net of refunded amounts), reduced by 65% of the amount paid for product, is greater than the money they received from AdvoCare. Distributors who meet this definition and do not opt out from membership in the Class are "**Class Members"** and individually each a "**Class Member.**" Excluded from the Class are Distributors who were not, at the time they were Distributors, residents of the United States or its territories or U.S. military stationed overseas. [1]

42.     The Class definition excludes Distributors who continued as Distributors after May 17, 2016, or made any other indication of consent to AdvoCare's Distributor Agreement amended after that date. This exclusion relates to the arbitration provision in AdvoCare's Distributor Agreement—the primary contractual document by which all Distributors are purportedly bound. AdvoCare amended the Distributor Agreement periodically over the years of its operation. The Distributor Agreement had, at all relevant times, an arbitration provision.

43.     Prior to May 17, 2016, the Distributor Agreement's arbitration provision was subject to attack as being illusory and unenforceable under Texas law because the Distributor Agreement contained another provision that allowed AdvoCare to amend the agreement at will with no real notice to Distributors. But AdvoCare amended its Distributor Agreement on May 17, 2016, such that it was no longer subject to those same attacks. AdvoCare was much more likely to be successful in requiring Distributors subject to the amended Distributor Agreement to arbitrate any claims they may have. In arbitration, class-wide treatment is not realistically possible. Thus, the Class definition excludes Distributors who continued as Distributors after May 17, 2016.

---

[1] SA at IV.C.

44.    The start of the Class period (March 9, 2013) is four years prior to the date Plaintiffs filed their Original Complaint.  Plaintiffs' primary claim is for violation of the civil RICO statute, which has a four-year limitations period.

45.    Only Distributors who lost money from their participation in AdvoCare are members of the Class.  Distributors are determined to have lost money if the amount they paid AdvoCare for fees or sales aids, plus what they paid AdvoCare for product (net of refunds), is greater than the amount AdvoCare paid them plus 65% of the amount they paid AdvoCare for product.  Money paid for taxes or shipping does not count.  This 65% calculation provides AdvoCare with a credit to recognize that the product it sold Distributors had some tangible value. The 65% number was the subject of intense negotiation between the Parties.

### Class and Class Member Recoveries

46.    Awards to Class Members will be meaningful and robust in light of the risk faced by the Class in this litigation.

47.    The data AdvoCare produced in advance of the mediation indicates that 419,265 Distributors qualify as Class Members.  The total estimated claims of all Class Members (pursuant to the formula described below) was $129,072,358, or $308 on average.

48.    Calculation of a Class Member's Base Claim is the same as the calculation used for determining if a Distributor is a Class Member:  the amount the Class Member paid AdvoCare for fees or sales aids, plus what they paid AdvoCare for product (net of refunds), less the amount AdvoCare paid them plus 65% of the amount they paid AdvoCare for product.[2]

49.    The amount of a Class Member's Base Claim is based on the Distributor's whole experience with AdvoCare, regardless of whether part of that experience took place before the

---

[2] SA § XIII.F.

13

Class Period.  However, because of the statute of limitations, recoveries are capped by the amount of payments the Class Member made within the Class Period.  We believed this was the fairest way to handle the impact of the statute of limitations.  Looking at only the payments within the Class Period would lead to situations where lifetime "net losers" were excluded from the Class because just looking at the payments during the Class Period indicated that they were "net winners."  The reverse was true as well.  Calculating Base Claims based on the Class Member's full experience with AdvoCare, while limiting recoveries to payments during the Class Period, prevented such unfair results while giving AdvoCare the protection of the statute of limitations.

50.    Class Members' recoveries from the Net Settlement Fund will be influenced by two other factors beyond their Base Claim: the FTC Payment Reduction and the Pro Rata Reduction.[3]

51.    First, each Class Member who files a claim may have their recovery reduced by the amount that Class Member recovered from the FTC Fund.[4]  We understand that the FTC is using different disbursement criteria over a different, but overlapping, group of Distributors.  Reducing recoveries to Class Members based on how much each receives from the FTC is clearly fairer than ignoring this alternate source of recovery for the same wrongdoing, and AdvoCare insisted on the FTC Payment Reduction as a term for settling.  Thus, if AdvoCare is able to obtain information from the FTC regarding its disbursements to Distributors by the FTC Distribution Deadline, the Settlement Administrator will use that information to reduce Class Member recoveries.

52.    Second, the total Class Member recoveries may be reduced on a pro rata basis so that the total disbursed does not exceed the Net Settlement Fund.[5]  The need for a Pro Rata

---

[3] *See* S.A. § XII.C, D.

[4] SA § XII.C.

[5] SA § XII.D.

Reduction will depend on the claims rate (the percentage of Class Members filing claims) and the impact of the FTC Payment Reductions.

53.    The examples below illustrate how each Class Member's awards will be calculated.

**Example 1:** Class Member A's full experience with AdvoCare occurred during the Class Period. She paid AdvoCare $18,000 to purchase product and paid $500 in fees. AdvoCare paid her $1,000 in earnings. She received a $3,000 payment from the FTC. Class Member A's claim (subject to any Pro Rata Reduction) is $2,800.[6]

**Example 2:** Class Member B's full experience with AdvoCare began before the Class Period. Over the full course of his experience, he paid $1,000 in fees and $30,000 for product, and he received $5,000 in earnings. Only $2,000 of his payments occurred within the Class Period, so although his Net Loss is $6,500,[7] his claim is capped at $2,000. He received a $500 payment from the FTC. Class Member B's claim (subject to any Pro Rata Reduction) is $1,500.

54.    If, after the FTC Payment Reductions, the total claims of Class Members who file claims exceed the Net Settlement Fund, each Class Member's claim will be reduced on a pro rata basis so that the total payments to Class Members exactly equals the Net Settlement Fund. So, in the examples above, if the total claims of Class Members who file claims is 20% higher than the Net Settlement Fund, Class Member A's claim would be reduced by 20% to $2,240 and Class Member B's claim would be reduced to $1,200.

55.    Any money remaining in the Net Settlement Fund after the payments to Class Members will revert to AdvoCare.[8]

56.    Individual Class Members should receive significant compensation. Approximately 10,000 Class Members have already filed claims. The deadline for filing claims is May 17, and the Claims Administrator will remind Class Members on May 3 regarding the upcoming deadline. We anticipate a Net Settlement Fund (the settlement fund, less fees, expenses,

---

[6] $18,000 + $500 - $1,000 – (18,000 x .65) - $3,000.

[7] $30,000 + $1,000 - $5,000 – (30,000 x .65).

[8] SA § XIII.G.4.

and any service award) of about ~$6.8 million.  It is reasonable to expect that the total Base Claim amounts will reach the amount of the Net Settlement Fund, although we will not know for sure until the claims deadline.  The FTC Payment Reduction may impact the average and total amount of the awards.

<strong>Other Provisions of the Settlement Agreement</strong>

57.    The Settlement Agreement imposes caps on the amount of any Fee Award that Class Counsel may request (35%) and on the amount of any Service Award that Plaintiff Cornelius may request ($20,000).[9]  Requests in these amounts are fully in keeping with the caselaw regarding fees to class counsel and service awards to class representatives.  In the Fee Motion, Mr. Swick and I are requesting a conservative fee award of 30%.  The amounts of any Fee Award and any Service Award will be fully subject to this Court's discretion.

58.    In return for the compensation provided under the Settlement Agreement, the Class Members will release any claim they may have against AdvoCare arising out of its operation of a pyramid scheme or any consumer fraud in the operation of its business.  Class Members will retain any other claims they may have against AdvoCare.[10]  Ms. Cornelius and AdvoCare will also give each other general mutual releases.[11]

59.    The Settlement Agreement provides that the Claims process will impose no unnecessary barriers to Class Members' successful filing of Claims.[12]  Class Members need only

---

[9] SA § XI.C.

[10] SA § XI.B.

[11] SA § III.

[12] SA § XIII.C.

provide identifying information to help ensure that non-Class Members do not receive an award.[13]

Net Loss amounts will be calculated solely based on AdvoCare's business records.[14]

60.      The Settlement Agreement calls for the Settlement Administrator to submit a final Claims Award List to the Court for approval and issuance of a Distribution Order before making any distributions to Class Members.[15]

61.      The timing of when the Settlement Administrator may seek a Distribution Order and proceed with distribution funds to Class Members likely depends on when the FTC makes its distributions from the FTC Fund.  As described above, the amount of each Class Member's claim may be affected by the amount Class Members receive from the FTC, but the FTC has not yet made any distributions.  The Settlement Agreement initially gives AdvoCare until September 30, 2022,[16] to obtain information from the FTC on its distributions before the Settlement Administrator will move forward with class distributions without taking into account the FTC payments.  This September 30, 2022 deadline may be extended for three months if AdvoCare can establish (to Class Counsel or Judge Furgeson) that it has reasonably sought to obtain the necessary information from the FTC and has good reason to believe that such information may be obtained within three months.  The deadline may be extended multiple times, so long as AdvoCare can continue to meet this standard.[17]  AdvoCare cannot unreasonably delay in seeking the information or providing it to the Settlement Administrator.[18]

---

[13] SA § XIII.C.

[14] SA § VI.A.1, XIII.F.

[15] SA § XIII.G.

[16] SA § XII.C.

[17] SA § XII.C.

[18] SA § XII.C.

62.     This system is designed to give AdvoCare the opportunity to obtain the necessary information from the FTC while providing an end date after which the Settlement Administrator may make distributions to Class Members, if information on any FTC distributions cannot be obtained.

### COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND NOTICE PROCEDURES

63.     Richard Simmons is a representative of the Settlement Administrator, and he is submitting herewith a declaration describing the notice the Settlement Administrator has provided and the reaction of Class Members thus far.   It is my understanding that the Settlement Administrator has fulfilled the notice requirements set forth in the Settlement Agreement thus far.[19] In addition, on March 4, 2021, Class Counsel emailed the 560 former Distributors who have contacted them over the years this Action has been pending requesting information about the case.

64.     The form of the notice provided to the Class Members was substantially the same as that approved by the Court.  A copy of the notice sent is attached to the Simmons Declaration. Immediately after the filing of the Motion for Final Approval and the Fee Motion, the Settlement Administrator will upload both motions (and supporting documents) to the Class website so Class Members may review the motions.

65.     The Notice Program has been robust, yet as of the filing of this Motion, no Class Member has objected to the Settlement, and only four have opted out.  The deadlines for objecting and opting out have not yet passed.  In addition, despite the Settlement Administrator providing the required notice to governmental authorities, none have yet contacted Class Counsel to note any disapproval with the Settlement Agreement.

---

[19] SA § VI.

66.    Per the Settlement Agreement, the Settlement Administrator will resend notice to the Class Members whose emails did not bounce originally, and who have not filed claims, on May 3, 2021 (14 days before the Claims Deadline).[20]    Class Counsel will provide updated information regarding the number of claims and opt out requests submitted prior to the Fairness Hearing and regarding the Settlement Administrator's further work in fulfilling the approved Notice Program.

67.    The Settlement Administrator sent initial notice on March 3, 2021, giving Class Members 56 days to decide whether to object or opt out and 75 days to decide whether to file a claim, and notice was sent 78 days before the Fairness Hearing.

### THE SETTLEMENT AGREEMENT IS THE PRODUCT OF SERIOUS, INFORMED, NON-COLLUSIVE NEGOTIATIONS

68.    The Parties reached the Settlement Agreement only after three lengthy mediations and the relentless work of Judge Furgeson between the mediations to move the case toward resolution.  The Parties have engaged in three-and-a-half years of litigation before this Court and in arbitration.  Mr. Swick and I—experienced in similar cases against MLM companies—have sufficient information to fairly and responsibly negotiate on behalf of the Class.  The parties also exchanged a significant amount of information outside the discovery process through information exchanges and disclosures in support of the settlement efforts.

69.    No fraud or collusion was involved in reaching this Settlement Agreement in any way.  This litigation has been hard fought.  Negotiations on all important matters were carried on through Judge Furgeson.  Indeed, the Settlement Agreement does not provide for any particular amount of fees and expenses for Class Counsel.  The Settlement Agreement puts a cap on the

---

[20] *See* S.A. § VI.B.3.

Appx. 126

amount of fees Class Counsel may request but does not preclude AdvoCare from challenging RCT's fee request.  We are requesting a reasonable and conservative award of 30% of the Settlement Fund (less than the cap in the Settlement Agreement), which our work created for the benefit of the Class, but the Settlement Agreement does not specify any amount of award or even that any award will be paid.

### THE SETTLEMENT AGREEMENT DOES NOT GRANT PREFERENTIAL TREATMENT TO THE CLASS REPRESENTATIVE

70.    The Settlement Agreement provides no benefit to the Class Representative that is special or unique to her, as compared to the absentee Class Members.  The Class Representative will recover from the Settlement Fund for her damages based on the same metrics and mathematical calculations as all other Class Members.

71.    The Class Representative is applying to this Court for a reasonable service award to be paid from the Settlement Fund that is standard in class action cases in the Fifth Circuit.  Such service awards are paid to reflect the risk, time, and expense class representatives incurred to pursue the rights of the Class Members.  However, the Settlement Agreement does not provide for any specific award and, in fact, puts a cap on the potential award.

72.    Every Class Member is treated identically under the Settlement Agreement.  Each Class Member who files an approved claim will be paid based on their net losses from their participation in AdvoCare (including any recovery from the FTC Fund), based on the formula described in the Settlement Agreement, and nothing else.

### THE SETTLEMENT AGREEMENT IS A VERY GOOD RESULT FOR THE CLASS

73.    Considering all relevant factors, Mr. Swick and I believe this is a very good result for the Class and the best result that could be obtained at this time.

Appx. 127

74.     Particularly given AdvoCare's decision to settle the FTC's claims for $150 million, we believe we could establish that AdvoCare operated a pyramid scheme.  However, this is not a certainty.  Establishing that AdvoCare operated a pyramid scheme depended upon establishing that Distributors made few retail sales (retail sales is the key factual inquiry for determining whether a MLM is really a pyramid scheme), and discovery could have revealed that Distributors actually made significant retail sales.

75.     A significant risk in this case was framing AdvoCare's operation of a pyramid scheme in a legal cause of action that would be likely to achieve class certification.  Torres II was extremely important to the Class claims here.  There, the Fifth Circuit established that RICO fraud claims against an alleged MLM/pyramid scheme were subject to class certification because the element of causation could be proven on a class-wide basis.  However, neither the district court in *Torres v. S.G.E. Mgmt. LLC*, Civ. A. No. 4:09-CV-2056, 2014 WL 129793 (S.D. Tex. Jan. 13, 2014), nor the Fifth Circuit in *Torres II* considered significant arguments (raised by AdvoCare here but not by the defendant there) as to whether a proper RICO fraud claim could be alleged against a MLM/pyramid scheme.

76.     We have received mixed rulings from this Court on our RICO allegations, and the Class Representative and the putative Class faced risk on the pending motion to dismiss the Second Amended Complaint.  If we could not state a proper RICO fraud claim, the odds of obtaining class certification declined significantly under Fifth Circuit and Texas precedent regarding the other potential claims, such as the Texas Deceptive Trade Practices Act or common law fraud.  When the Parties reached a settlement-in-principle, we expected the Court's decision on the pending motion to dismiss to be issued any day.  That ruling had the potential to gut the case of any value to the Class, unless reversed on appeal.

21

Appx. 128

77.    The Class Representative and the Class also faced risk in light of the FTC Settlement. We were gratified to learn that AdvoCare had agreed to pay $150 million to settle the FTC's claims, which were based on similar allegations that we had made publicly years before the FTC Settlement. This fact was something of a "stamp of approval" on the Class Representative's allegations, and it was heartening to learn that AdvoCare's victims (including the Class Representative) were likely to receive some compensation through the FTC. However, the FTC Settlement was also bad news for the Class Representative and the Class in that AdvoCare obviously now had less money to resolve the Class claims.

78.    The Class Representative and the Class also faced risk on the issue of whether the PSLRA precluded the Class Representative from bringing a claim under RICO. Although we firmly believe this Court reached the correct decision in its original motion to dismiss ruling on the PSLRA preclusion issue, certainly the Class faced risk on appeal.

79.    In addition, absent a settlement, this case might not result in a positive ruling for the Class for years. A trial would happen in 2022, at the earliest, and even if the Class Representative was successful at trial, AdvoCare could appeal on multiple issues, preventing us from making a distribution to Class Members for years.

80.    As noted above (para. 45), the total estimated claims of all Class Members (pursuant to the formula described in the Settlement Agreement) was $129,072,358, or $308 on average. As discussed, this formula includes a 65% product value credit. The Class Representative would have argued for a lower product value credit at trial, but it is likely that the jury would have assigned some product credit. Particularly when considered in light of the FTC Settlement, which will bring additional recovery to the Class Members, the $10.5 million settlement is reasonable. The settlement is even more favorable when considered on a per-Class Member basis. Not every

22

Class Member will file a claim, and based on the claims rate in prior cases and the anticipated Net Settlement Fund, Class Members who file claims may receive, on average, $234 or more. This is a great return on Class Member claims that faced the significant obstacles described herein.

81.    Class Counsel incurred about $35,575.11 in out-of-pocket expenses in pursuing the case to this stage, but had the case continued, Class Counsel would have had to incur hundreds of thousands of dollars in additional cost, and surely over a million dollars through trial, to pay for deposition costs, travel, and expert fees. The Class would likely have to ultimately bear these costs (assuming a successful outcome), and reaching a settlement allowed the Class to avoid those costs.

82.    In light of these risks, and others, Mr. Swick and I, and the Class Representative, determined that a $10.5 million settlement was very reasonable.

83.    Moreover, based on the contentious and extended settlement negotiations, I have no doubt that this is the maximum amount of money that would be available absent additional positive litigation developments, such as a denial of the pending motion to dismiss and a grant of a contested motion for class certification.

**RCT'S AND THE CLASS REPRESENTATIVE'S WORK ON THIS CASE**

84.    On February 6, 2017 and March 3, 2017, RCT entered engagement agreements with Lisa Ranieri and Megan Cornelius respectively. The engagement agreements provide, inter alia, (1) that RCT can only recover an attorneys' fee if litigation against AdvoCare and related persons and entities is successful, (2) that RCT will fund all litigation expenses, although it may recover expenses from any recovery in favor of Plaintiffs or a class they represent, and (3) that RCT will not seek a fee award of more than 40% of any recovery in favor of the Plaintiffs or the Class.

Appx. 130

85. Mr. Swick and I have devoted over 2,200 hours to this case. Other RCT attorneys have also worked on the case. RCT's accounting system indicates that, as of March 31, 2021, RCT had incurred $35,575.11 in out-of-pocket expenses in litigating this case.

86. We have interviewed dozens of witnesses regarding their experiences with AdvoCare, scoured the internet for every scrap of evidence supporting the class's claims, interviewed potential experts, drafted lengthy and detailed complaints, appeared at hearings before this Court and an arbitrator, prepared for and appeared at three mediations, counseled our clients, litigated against Winston & Strawn LLP (one of the preeminent defense firms in Texas), litigated against two defense firms preeminent in MLM representation (Winston & Strawn and Quarles & Brady LLP), and thoroughly researched and briefed complicated issues regarding the enforceability of AdvoCare's arbitration provision and stating a claim under RICO.

87. Prior to initiating this litigation, Mr. Swick and I spent many hours investigating the potential claims, including factual research regarding AdvoCare's business model and legal research regarding potential claims and which claims could be certified for class treatment. We are very familiar with this area of the law, as we have brought claims against two MLM companies before AdvoCare based on the allegation that those companies operated pyramid schemes. We were able to use the knowledge we gained in pursuing these other cases in deciding whether to bring claims against AdvoCare and in litigating this case.

88. RCT undertook a huge risk in bringing this case. RCT worked this case on a fully contingent basis. There was no guarantee that the case would be successful. RCT routinely secures contingent-fee arrangements in the 30%-40% range. I and the other attorneys working on this case are usually working at full capacity, and if I had not worked on this case, we could have invested our time in other income-generating representations.

**Hours Incurred**

89.    I and the other RCT attorneys working on this case were economically incentivized to be as efficient as possible in our work so that we could spend time on other cases, as well as this one.  RCT does not reward its associates or partners based on the number of hours they bill.  I and other RCT attorneys working this case had no incentive to expend more hours on this case than we believed were necessary to effectively litigate this case.

90.    RCT's work in this case can be divided into five time periods.  The first time period spans from initial investigation until the filing of the Original Complaint on March 9, 2017.  During this period, Class Counsel did a substantial amount of work, including many hours of legal research, witness interviews, discussions with the Plaintiffs and other Distributors, and many hours of internet research.  This work resulted in a complaint full of minute details regarding AdvoCare's MLM operation and the public and private statements of AdvoCare and the Individual Defendants promoting the business.  RCT incurred 333.5 hours during this phase of the case, representing a fee investment of $227,977.50 at RCT's normal billing rates.

91.    The second period is from the filing of the Original Complaint to the arbitrator's decision on December 27, 2017.  Shortly after Class Counsel filed the Original Complaint, AdvoCare and the Individual Defendants moved to compel arbitration.  After that point, until the arbitrator issued his decision, most of Class Counsel's work was devoted to responding to the motion to compel arbitration, briefing in the arbitration proceeding, and appearing at the arbitration hearing.  RCT incurred 669.15 hours during this phase of the case, representing a fee investment of $411,653.75 at RCT's normal billing rates.

92.    The third period spans from the arbitrator's decision until the scheduling of the first mediation on August 5, 2019.  After the arbitrator determined that the case was not arbitrable,

Class Counsel turned to responding to AdvoCare's and the Individual Defendants' motions to dismiss the Original Complaint. the hearing on those motions to dismiss, amending the Original Complaint, and filing the First Amended Complaint, responding to AdvoCare's motion to dismiss the First Amended Complaint, preparing and filing the Second Amended Complaint, and written discovery.  RCT incurred 568.43 hours during this phase of the case, representing a fee investment of $442,082.25 at RCT's billing rates.

93.    The fourth period is from the scheduling of the first mediation through the second mediation on August 13, 2020.  In early August 2019, the Parties discussed scheduling a mediation with Judge Furgeson, and the Parties first mediated on October 18, 2019.  From August 2019 until the second mediation on October 18, 2019, Class Counsel was focused on preparing for the mediations, responding to the motion to dismiss the Second Amended Complaint, and further discovery.  RCT incurred 322.8 hours during this phase of the case, representing a fee investment of $267,452.50 at RCT's normal billing rates at the time the hours were incurred.

94.    The fifth period follows the second mediation through March 31, 2021.  The second mediation resulted in an agreement-in-principle, but many details remained to be resolved.  Even with the help of Judge Furgeson, it took a third mediation and extensive discussions to resolve the Parties' disputes.  Substantial additional work was needed to draft the Settlement Agreement and its exhibits, the preliminary approval papers, and the final approval papers.  RCT incurred at least 423.34 hours during this phase of the case, through March 31, 2021, (some of the time incurred preparing the settlement papers has not been entered) representing a fee investment of $364,349.50 at their normal billing rates at the time the hours were incurred.

95.    Based on my litigation experience and close knowledge of the work that went into this case, I believe that all the time incurred by RCT in this case was reasonably necessary.

26

Redacted copies of RCT's time entries the attorneys and paralegals working on this case prepared describing the work they did are attached as Exhibit 2 [Appx. 148-230].

## Rates and Lodestar

96.     RCT's normal rates are the rates RCT's clients are willing to pay.   RCT has a national practice, and its clients regularly have claims against the nation's largest banks, law firms, and accounting firms.  Thus, RCT routinely litigates against the largest law firms in the world, and its rates must approach those of the rates charged by its opposition to attract lawyers with backgrounds and credentials similar to opposing counsel.

97.     Class Counsel's rates are consistent with the rates of counsel in this area with their reputation, skills, and experience.  J. Benjamin King and R. Adam Swick are the lead counsel on this matter, and they billed over 90% of the hours in this case.  Mr. King's billing rate was between $725 and $875 per hour during the pendency of this case, and Mr. Swick's was between $725 and $825.  Leo Oppenheimer was the main associate working on the case, and his rate varied between $425 and $575 per hour.

98.     These rates are comparable to what attorneys of similar competence charge. According to the Dallas Morning News, "[j]unior partners at many large [Texas] law firms now charge $650 an hour.  Associates only three years out of law school bill $400 an hour."[21] "[D]ozens of senior lawyers—those who handle the most complex, bet-the-company legal matters—now charge their business clients in excess of $1,000 an hour."[22]  According to this same article, Tom Melsheimer—AdvoCare's lead attorney—charged $1,105 per hour in 2015.[23]  The Dallas Business

---

[21] "Meet the Texas lawyers whose rate now exceeds $1,000 an hour," Dallas Morning News (June 3, 2015) (Ex. 3) [Appx. 233-238].

[22] *Id.*

[23] *Id.*

Journal similarly reported in 2017 that "scores of Texas lawyers now charge $1,000 or more per hour for their legal services," and "several national law firms operating in Texas now bill as much as $480 an hour for rookie lawyers only one or two years out of law school."[24]  The rates of the RCT attorneys who worked on this matter are within the range of their peer attorneys.

99.    The following chart presents RCT's total overall lodestar as well as each attorney's individual lodestar.

| Attorneys and Paralegals | Years of Experience (as of 2021) | Normal Hourly Rate Range (in $) | Hours Invested | Lodestar at Hourly Rate (in $) |
|---|---|---|---|---|
| R. A. Swick | 14 | 725 - 825 | 1056 | 829,790.00 |
| J. B. King | 22 | 725 - 875 | 816.9 | 667,147.50 |
| L. B. Oppenheimer | 4 | 425 - 575 | 282.7 | 128,457.50 |
| G. R. Tercero | 15 | 225 - 250 | 93.5 | 22,452.50 |
| P. J. Collins | 17 | 925 - 1200 | 44 | 50,587.50 |
| D. B. Thomas | 15 | 575 - 675 | 13.22 | 8,355.50 |
| J. A. Cairns | 8 | 525 | 5 | 2,625.00 |
| A. J. Somers | 34 | 875 | 4.2 | 3,675.00 |
| A. A. Durke | 15 | 250 | 1.4 | 350.00 |
| T. K. Stone | 31 | 250 | 0.3 | 75.00 |
| **TOTAL** | | | **2317.22** | **1,713,515.50** |

**Litigation Costs and Expenses**

100.    Through March 31, 2021, RCT has incurred reasonable and necessary costs and expenses totaling $35,517.11.  RCT incurred these costs in the following areas:

| Description | Amount |
|---|---|
| Transportation | $4,063.80 |
| Lodging | $308.20 |
| Online Research | $6,090.77 |
| Postage | $186.65 |
| Mediation and Arbitration Fees | $17,050.00 |
| Electronic Document Hosting | $324.28 |
| Court Reporter Expenses | $5,015.79 |
| Miscellaneous | $2,535.62 |

---

[24] "Rates for these Texas lawyers push beyond $1,000 an hour," Dallas Business Journal (March 23, 2017) (Ex. 4) [Appx. 242-244].

| TOTAL | $35,575.11 |
|---|---|

101.    Almost half of the expenses requested for reimbursement are arbitration fees and mediation fees (a combined $17,050.00), which were obviously necessary to obtain the result in this case.

102.    Because these expenses were incurred with no guarantee of recovery, RCT had a strong incentive to keep them as low as reasonably possible—and did so.

**Class Representative's Requested Service Award**

103.    Here, the Class Representative faced personal risk in bringing this suit.  AdvoCare had hundreds of thousands of Distributors, many of whom could be expected to be upset by the filing of a lawsuit alleging that AdvoCare operated a pyramid scheme.  The Class Representative's name is directly associated with AdvoCare and this lawsuit on multiple internet pages.

104.    The Class Representative was active in the preparation and litigation of this case. Her involvement included: (1) attending numerous meetings on the phone with Class Counsel to discuss fact investigation and case strategy; (2) providing information regarding AdvoCare's business model and directing Class Counsel to other Distributors who could provide information; (3) gathering factual information for inclusion in the complaints and mediation briefs; (4) traveling from her home in California to attend a full-day mediation in Dallas; and (5) attending a full-day mediation via videoconference.   The Class Representative was fully employed during this four-year case, and her participation in these activities reduced the amount of time she could spend on her jobs.  The Class Representative had to take time off from her employment to participate in the first two mediations, and she was available by phone during the third mediation.

105.    The Class Representative will receive an award as a Class Member.  Based on AdvoCare's data, the Class Representative's Base Award (subject to reduction based on any award

she receives from the FTC and based on any needed pro rata reduction) is approximately $1,600. The Settlement Agreement does not provide for any particular service award but rather caps any service award at $20,000.[25]

106.    The Class Representative's request for a $20,000 service award is reasonable and consistent with the awards in other cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

April 7, 2021
Dallas, Texas

J. Benjamin King

---

[25]*See* S.A. § XI.B.

30

Appx. 137

# Exhibit 1

# reid | collins



## J.  Benjamin King | Partner

(214) 395-6046 |  bking@reidcollins.com

Ben King, a Dallas-based litigator and Reid Collins & Tsai LLP, partner, focuses his practice on complex litigation at the trial and appellate levels arising out of the insolvency of major companies and institutions. Ben has handled actions seeking to recover multi-million dollar fraudulent transfers, as well as high-stakes cases alleging director, officer, auditor, and other professional liability. Ben also handles a variety of other commercial matters, including prosecution and defense of class actions. He prides himself on handling all matters efficiently as well as effectively.

Ben's representations arising out of insolvencies include:

❑ Representation of the bankruptcy trustee of the New York law firm Dreier LLP in bringing fraudulent transfer actions to recover hundreds of millions of dollars in payments pursuant to a Ponzi scheme.

❑ Representation of persons who invested in an alleged Dallas-based Ponzi scheme in responding to fraudulent transfer claims brought by a federal receiver.

❑ Representation of the bankruptcy trustee of the international law firm Howrey LLP in bringing fraudulent transfer claims against former partners and their new law firms.

❑ Representation of Cayman Island companies bringing billion-dollar business tort claims in a multi-district litigation arising out of the collapse of the Italian dairy giant, Parmalat S.p.A.

❑ Representation of the litigation trust of an insolvent Mississippi oil rig manufacturer in bringing multi-million dollar claims against the company's former directors, officers, and professionals.

❑ Representation of a national, Mississippi-based fabric retailer in bringing multi-million dollar auditor malpractice claims.

**Education:**
❑ Cornell Law School, 1998, summa cum laude, first-in-class

❑ University of Alabama, M.A., English, 1992

❑ University of Mississippi, B.A., English, 1990

**Admitted to Practice:**
❑ Texas
❑ District of Columbia

**Areas of Practice:**
❑ Insolvency Litigation
❑ Professional Liability Litigation
❑ Complex Business and Financial Litigation
❑ Class Actions

**Clerkships:**
❑ The Honorable Alan E. Norris U.S. Court of Appeals for the Sixth Circuit 1998-1999

© 2021 Reid Collins & Tsai LLP

# reid | collins

## J. Benjamin King | Partner

**Ben's other representations include:**

❑ Representation of a putative class of distributers of CITGO gasoline against CITGO for breach of contract in Oklahoma federal court. The class plaintiffs alleged that CITGO breached the UCC's obligation to get the open-price term of their contracts in good faith.

❑ Representation of two classes of purchasers of immigration bonds in bringing claims based on breach of contract and the charging of illegal and outrageous rates.

❑ Representation of a physician partnership in bringing multi-million fraud and breach of contract claims against Texas Health Resources.

❑ Representation of a ski lodge developer in defending claims for fraud and negligent misrepresentation brought by purchasers of land in a Colorado development.

❑ Representation of Utah's Zions Bancorp in defending claims brought by a former executive for unpaid bonus and severance pay. The litigation concluded after a week-long FINRA arbitration in New York City.

❑ Representation of Quitman County, Mississippi in a lawsuit against the State of Mississippi, in which Quitman County sought to require the State to provide a state-wide system of indigent criminal defense.

❑ Representation of one of the world's largest manufacturers of consumer goods in defending class action and third-party payer litigations.

❑ Representation of numerous clients on a pro bono basis in family law and landlord/tenant litigations.

After graduating first in his class from Cornell Law School in 1998, Ben clerked for Judge Alan E. Norris of the U.S. Court of Appeals for the 6th Circuit. He then practiced at a major firm in Washington, D.C. Prior to joining Reid Collins & Tsai LLP, Ben was a partner with Diamond McCarthy LLP.

Ben is admitted to practice in Texas and the District of Columbia.

© 2021 Reid Collins & Tsai LLP

Appx. 140

# reid | collins



## P. Jason Collins | Partner

(512) 647-6106  |  jcollins@reidcollins.com

Jason Collins, a founding partner at Reid Collins & Tsai LLP, is an attorney and CPA who handles complex business and financial litigation with a special emphasis on financial fraud cases, insolvency disputes, securities matters, professional liability cases, and cross-border financial litigation. Jason has managed some of the most prominent financial fraud and insolvency cases in the U.S. and around the world. Jason is known for efficiently managing highly complex matters with an unwavering focus on achieving successful results for his clients.

Jason was selected as one of Lawdragon's 500 Leading Lawyers in America for 2017-2021, named as a Benchmark Litigation Star for 2021, and listed as a top commercial litigator in Best Lawyers in America for 2021.

Prior to founding Reid Collins & Tsai LLP, Jason was a partner at the law firm of Diamond McCarthy LLP and a structured finance auditor at Arthur Andersen LLP, where he examined and consulted on sophisticated financial transactions. Jason is a member of the American Bar Association, the State Bar of New York, and the State Bar of Texas. Jason received his J.D., with honors, from The University of Texas School of Law and was elected to the Order of the Coif upon graduation. He received his M.S. in Finance and B.B.A. in Accounting from Texas A&M University, graduating summa cum laude, finishing as the top student in his class, and serving as a Mays Business School Fellow.

**Education:**
- ❑ University of Texas School of Law  |  J.D., Order of the Coif w/ Honors
- ❑ Texas A&M University | M.S., Finance | B.B.A., Accounting *Summa Cum Laude*

**Admitted to Practice:**
- ❑ New York
- ❑ Texas

**Areas of Practice:**
- ❑ Financial Fraud Cases
- ❑ Insolvency Disputes
- ❑ International Litigation
- ❑ Merger and Acquisition Disputes
- ❑ Professional Liability

© 2021 Reid Collins & Tsai LLP

# reid | collins

## P. Jason Collins | Partner

Jason frequently pursues claims on behalf of victims of financial fraud, including companies, hedge funds, and private equity funds. Many of Jason's representations include working on behalf of court-appointed trustees and liquidators in the context of formal insolvency or bankruptcy proceedings when the underlying companies or funds have failed. Jason's representations include the pursuit of claims arising out of the collapse of Enron, Parmalat, Stanford Investment Bank, Petters Group Worldwide, Cornerstone Ministries Investments, USA Capital, Inverworld Inc., Cedar Lane Entertainment Fund, American Pegasus Auto Loan Fund, Hawaii Medical Center, Asyst Technologies, The Money Tree Inc., iGPS Company LLC, and MoviePass, Inc.

Additionally, Jason represents governmental entities in connection with financial fraud cases. In some instances, Jason is hired directly to represent the government, such as his representations of the Tennessee Consolidated Retirement System and the Texas County and District Retirement System. In other instances, he represents whistleblowers who file suit on behalf of defrauded governmental entities (qui tam matters). These matters are filed under seal and provide governmental entities (and thus taxpayers) with the opportunity to recoup damages resulting from financial fraud. Jason's representations in this regard include serving as lead counsel to a relator who filed financial fraud claims on behalf of the Commonwealth of Virginia.

© 2021 Reid Collins & Tsai LLP

# reid | collins



## Adam Swick | Partner

(512) 647-6110  |  aswick@reidcollins.com

Adam Swick is a partner at Reid Collins & Tsai LLP.  Adam handles all types of complex commercial litigation. Adam has extensive experience with Chapter 15 bankruptcy cases, class actions, cross-border litigation, fiduciary disputes, financial fraud cases, and securities and shareholder derivative lawsuits.

Prior to joining RCT, Adam was an attorney for Baker & McKenzie LLP, Greenberg Traurig LLP, and King & Spalding LLP.

Some of Adam's recent cases include:

❑ Represents a putative class of participants against Advocare International, LP, an alleged pyramid scheme.

❑ Represents a class of participants in MXI Corporation, an alleged pyramid scheme that sells supposedly "healthy" chocolate.

❑ Represented numerous liquidators and trustees in Chapter 15 cases, including AJW Offshore Ltd, ICP Strategic Credit Income Fund Ltd., Creative Finance Ltd., Cosmorex Ltd. , and Tibanne Co., Ltd, the parent of Mt Gox.

❑ Represented foreign representatives in Chapter 15 bankruptcy of Condor Insurance Limited. Obtained favorable ruling from the Fifth Circuit in *In re Condor Ins. Ltd.*, 601 F.3d 319 (5th Cir. 2010) that subject matter jurisdiction over fraudulent transfers is not prohibited by Chapter 15.*

❑ Assisted in representation of nation's largest poultry producer in its Chapter 11 reorganization.*

❑ Counseled a Hong Kong-based electronic gaming company in a securities case filed by hedge fund investors in the Southern District of New York.*

**Education:**
❑ Southern Methodist University Dedman School of Law, 2006
J.D., *summa cum laude*
Salutatorian, Class of 2006

❑ The University of Texas at Austin, 2002. B.A., *with honors*

**Admitted to Practice:**
❑ New York
❑ Texas
❑ U.S. District Court for the Western District of Texas
❑ U.S. District Court for the Northern District of Texas
❑ U.S. District Court for the Eastern District of Texas
❑ U.S. District Court for the Southern District of Texas
❑ U.S. District Court for the Northern District of Illinois
❑ U.S. District Court for the Southern District of New York
❑ U.S. District Court for the Eastern District of New York

**Areas of Practice:**
❑ Insolvency Litigation
❑ Financial Institutions Litigation
❑ Corporate Organizations
❑ Business Tort Litigation
❑ Business/Partnership Disputes
❑ Securities/Shareholder Litigation
❑ Class and Derivative Actions
❑ Corporate governance
❑ Special committee, audit committee, and compensation committee representations

© 2021 Reid Collins & Tsai LLP

Appx. 143

# reid | collins

## Adam Swick | Partner

❑ Conducted internal investigation of a leading U.S.-listed Chinese video game company relating to internal control issues and compliance under Sarbanes-Oxley, SEC, and other regulatory provisions.*

❑ Assisted court-appointed securities litigation committee in determining whether the board of directors of a Dallas-based timeshare company breached their fiduciary duties in connection with a cash out merger transaction.*

❑ Defended individual directors of board of real estate development company in securities class action and derivative litigation in state and federal court in New Mexico.*

❑ Represented a leading company in the development of industrial real estate in Mexico as a creditor in the Chapter 11 case *In re Edscha North America, Inc.* filed in the Northern District of Illinois.*

❑ Assisted with $103.5 million acquisition of substantially all assets out of bankruptcy of an oil and gas exploration and production company.*

❑ Assisted in representation of the Preferred Shareholders' Committee for Dorado Exploration, Inc., an oil and gas exploration company.*

*\* The above representations were handled by Mr. Swick prior to his joining Reid Collins & Tsai.*

## Publications and Speaking Engagements

❑ Speaker, "Cross-Border Update," American Bankruptcy Insolvency Program, November 2017

❑ Co-Author, "Complex Cases Relying on Chapter 15 Predictability and Flexibility," American Bankruptcy Institute International Committee Newsletter, March 2017

❑ Co-Author, "Second Circuit Applies Section 109(a)'s Jurisdictional Requirements to Chapter 15," American Bankruptcy Institute Journal, March 2014

❑ Speaker, "Chapter 15: Theory & Practice," Dallas Bar Association, Bankruptcy Division, October 3, 2013.

❑ Co-Author, "Second Circuit Clarifies Chapter 15 COMI Analysis," American Bankruptcy Institute Journal, June 2013

© 2021 Reid Collins & Tsai LLP

# reid | collins

## Adam Swick | Partner

❑ Co-Author, "Securities Litigation in the Energy Sector," 33 Energy & Min. L. Inst. 356-382 (2012)

❑ Co-Author, "Developments Regarding Extraterritorial Effect of U.S. Securities Fraud Statutes," Financial Law Report, September 2012

❑ Co-author, "Securities Litigation And The Energy Sector" Law360, New York, August 21, 2012 and also featured in *The D&O Diary*, August 23, 2012

❑ Speaker, Energy and Mineral Law Foundation, 33rd Annual Institute "Securities Litigation and the Energy Sector," June 25, 2012

❑ Co-Author, "Securities Litigation," Annual Review of Business and Corporate Litigation, ABA Publishing, 2012

❑ Co-Author, "Reverse Mergers and the Rise of SEC Investigations and Shareholder Lawsuits Involving Chinese Companies Listed on U.S. Stock Exchanges," *Bloomberg Law Reports*, March 26, 2012

❑ Contributing Author, "Reverse Mergers and the Rise of SEC Investigations and Shareholder Lawsuits Involving Chinese Companies Listed on U.S. Stock Exchanges," *Bloomberg Law*, March 2012

❑ Quoted, "Investors Get Say on Pay -- Say Ok," *Smart Money*, March 2, 2012

❑ Co-Author, "Keeping Current: 2012 Outlook for Say-on-Pay Lawsuits," *ABA Business Law Today*, February 2012

❑ Co-Author, "The Rise of SEC Investigations and Shareholder Lawsuits Involving Chinese Companies Listed on the U.S. Stock Exchanges," *Insights*, Autumn 2011

❑ Co-Author, "Twombly and Iqbal's Impact On Affirmative Defenses," *Law360*, May 20, 2011

❑ Co-Author, "Directors and Officers Need Court Approval for Litigation Costs," *Daily Business Review*, January 2011

❑ Co-Author, "Getting Paid: Authorizing Advancement of Defense Costs from a Debtor-Entity's D&O Policy," *Securities Litigation Journal*, ABA, Section of Litigation, Winter 2011

❑ Co-Author, "Making Sure Defense Costs are Paid from D&O Policies in the Bankruptcy Setting," *Corporate Counsel*, November 2010

❑ Author, "Filling a Proof of Claim: A Simple Procedure or a Complicated Mess?" *American Bankruptcy Institute Journal*, July/August 2009

© 2021 Reid Collins & Tsai LLP

# reid | collins



## Leo Oppenheimer | Associate

(214) 420-8904 | loppenheimer@reidcollins.com

Leo Oppenheimer is an associate in the Dallas office of Reid Collins & Tsai LLP. He received his J.D., with honors, from Columbia Law School in May 2016, where he served as Managing Editor of the Columbia Journal of Environmental Law and participated extensively in the Columbia Environmental Litigation Clinic. Leo received his B.A., with honors, in Evolutionary Biology from Columbia College in 2010.

Prior to attending law school and joining the firm, Leo was an investment banking analyst at a private equity firm, where he gained experience in a range of industries, including transportation and logistics, oil and gas, insurance, and banking.

As a fitness and diet enthusiast, Leo stays active with exercise, martial arts, and a variety of sports. Leo also played varsity football while at Columbia.

**Education:**
- ❑ Columbia Law School
  J.D., with Honors, 2016

- ❑ Columbia College
  B.A., Evolutionary
  Biology with Honors,
  2010

**Admitted to Practice:**
- ❑ Texas
- ❑ U.S. District Court for
  the Eastern District of
  Texas

**Areas of Practice:**
- ❑ Complex Commercial
  Litigation
- ❑ Insolvency Litigation

© 2021 Reid Collins & Tsai LLP

# Exhibit 2

**1277.002 - Megan Cornelius - Advocare International, LP**

**Fee Report**

| Date | First Name | Last Name | Description | HOURS | RATE | FEES |
|------|-----------|-----------|-------------|-------|------|------|
| 11/7/2016 | Benjamin | King | Emails w/ A. Swick re: potential suit against AdvoCare; legal research re: potential claims against AdvoCare in the Fifth Circuit. | 1.50 | 725 | $ 1,087.50 |
| 12/12/2016 | Benjamin | King | Research AdvoCare's arbitration provision and arguments against enforceability. | 3.40 | 725 | $ 2,465.00 |
| 12/13/2016 | Benjamin | King | Factual research re: AdvoCare case; tcf w/ potential client; legal research re: ability to bring a class case against AdvoCare in Fifth Circuit; email A. Swick re: same. | 4.50 | 725 | $ 3,262.50 |
| 12/13/2016 | Adam | Swick | Hold call with B. King and potential client; conduct research on potential AdvoCare claims. | 3.10 | 725 | $ 2,247.50 |
| 12/15/2016 | Benjamin | King | Review emails from A. Swick re: potential case against AdvoCare; tcf w/ A. Swick re: same; draft internal analysis of viability of claims against AdvoCare. | 3.50 | 725 | $ 2,537.50 |
| 12/15/2016 | Adam | Swick | Exchange emails with B. King re potential case against AdvoCare. | 1.30 | 725 | $ 942.50 |
| 12/16/2016 | Benjamin | King | Email with and tcf w/ former distributor re: AdvoCare system | 0.50 | 725 | $ 362.50 |
| 12/18/2016 | Adam | Swick | Exchange emails with B. King re research for complaint. | 0.20 | 725 | $ 145.00 |
| 12/19/2016 | Benjamin | King | Emails with potential client; review materials re: AdvoCare system and contracts. | 0.70 | 725 | $ 507.50 |
| 12/20/2016 | Benjamin | King | Factual research regarding potential pyramid scheme claim against AdvoCare; review materials provided by former distributor; review facts specific to potential plaintiff; review materials available on 'Advo-Truth' message board; emails with former distributor. | 8.00 | 725 | $ 5,800.00 |

| Date | First | Last | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/21/2016 | Benjamin | King | Tcf w/ AdvoCare researcher re: AdvoCare system; email same; factual research regarding AdvoCare, including detailed review of contract documents and internet research to find prior versions of same; review filings from Collin County in AdvoCare matters; tcf w/ former AdvoCare distributor who sued AdvoCare and review filings from prior case; tcf w/ two discharged distributors; detailed emails to A. Swick re: same; research re: other potential witnesses about the AdvoCare system; email A. Swick re: same; review Collin County court filings regarding cases involving AdvoCare. | 9.00 | 725 | $ 6,525.00 |
| 12/21/2016 | Adam | Swick | Draft email to B. King explaining research and interviews from former distributors. | 1.80 | 725 | $ 1,305.00 |
| 12/22/2016 | Benjamin | King | Continued factual research re: claims against AdvoCare; emails with industry insider about AdvoCare; review copies of texts between AdvoCare distributors; review AdvoCare training materials; begin drafting complaint. | 4.00 | 725 | $ 2,900.00 |
| 12/23/2016 | Benjamin | King | Continued factual research re: claims against AdvoCare; legal research re: PSLRA and RICO claims; continue drafting AdvoCare complaint. | 4.00 | 725 | $ 2,900.00 |
| 12/26/2016 | Benjamin | King | Emails w/ A. Swick re: work to be done to develop AdvoCare case. | 0.30 | 725 | $ 217.50 |
| 12/26/2016 | Adam | Swick | Exchange emails with B. King re case strategy and division of work. | 0.30 | 725 | $ 217.50 |
| 12/27/2016 | Benjamin | King | Emails w/ A. Swick re: developing AdvoCare case; email with industry insider re: AdvoCare policies and procedures. | 2.20 | 725 | $ 1,595.00 |
| 12/27/2016 | Adam | Swick | Exchange emails with B. King re factual allegations; review AdvoCare internet materials; exchange emails with A. Brown re same. | 4.30 | 725 | $ 3,117.50 |
| 12/29/2016 | Benjamin | King | Emails w/ A. Swick re: factual allegations; email with industry insider re: AdvoCare policies and procedures; legal research re: enforceability of illusory arbitration provision; continue drafting complaint. | 5.00 | 725 | $ 3,625.00 |
| 12/29/2016 | Adam | Swick | Exchange emails with former distributor; review AdvoCare internet materials; exchange emails with B. King re AdvoCare case. | 1.40 | 725 | $ 1,015.00 |

Appx. 149

| Date | First | Last | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| 12/30/2016 | Benjamin | King | Emails w/ A. Swick re: enforceability of illusory arbitration provision. | 0.50 | 725 | $ | 362.50 |
| 12/30/2016 | Adam | Swick | Exchange emails with B. King re AdvoCare policies and procedures; visit industry insider re AdvoCare. | 2.20 | 725 | $ | 1,595.00 |
| 12/31/2016 | Benjamin | King | Email with industry insider re: AdvoCare policies and procedures. | 0.20 | 725 | $ | 145.00 |
| 1/2/2017 | Benjamin | King | Emails w/ A. Swick re: class definition to avoid arbitration provision. | 0.30 | 725 | $ | 217.50 |
| 1/2/2017 | Adam | Swick | Exchange emails with B. King re class definition in light of arbitration provision. | 0.30 | 725 | $ | 217.50 |
| 1/3/2017 | Benjamin | King | Tcf w/ A. Swick re: potential experts; review website of potential expert. | 0.30 | 725 | $ | 217.50 |
| 1/3/2017 | Adam | Swick | Hold call with B. King re potential experts; review website of potential expert. | 0.30 | 725 | $ | 217.50 |
| 1/3/2017 | Gina | Tercero | Search for distributor agreements online per A. Swick's request. | 0.50 | 225 | $ | 112.50 |
| 1/5/2017 | Gina | Tercero | Conference call re: case status. | 0.50 | 225 | $ | 112.50 |
| 1/9/2017 | Benjamin | King | Review settlement in Veema pyramid scheme case; email w/ A. Swick re: same; tcf w/ A. Swick re: timing of proceeding against AdvoCare. | 0.50 | 725 | $ | 362.50 |
| 1/9/2017 | Adam | Swick | Exchange intro emails to potential expert; conduct research on factual allegations; exchange emails with B. King and A. Brown re same; research previous cases involving AdvoCare; review Veema pyramid settlement; emails and calls with B. King re same. | 4.20 | 725 | $ | 3,045.00 |

| 1/10/2017 | Benjamin | King | Tcf w/ potential expert re: nutritional supplements; emails and calls w/ A. Swick re: same; research re: other potential experts; review factual research performed by Aaron Brown on AdvoCare pricing. | 2.50 | 725 | $ | 1,812.50 |
| 1/10/2017 | Adam | Swick | Hold call with potential expert; exchange emails and calls with B. King re same; research other experts; review factual research found by A. Brown. | 2.40 | 725 | $ | 1,740.00 |
| 1/11/2017 | Adam | Swick | Draft complaint; analyze AdvoCare policies and procedures and other related documents. | 7.30 | 725 | $ | 5,292.50 |
| 1/12/2017 | Adam | Swick | Exchange emails with potential expert re qualifications; draft complaint. | 6.20 | 725 | $ | 4,495.00 |
| 1/13/2017 | Gina | Tercero | Prepare list of leadership levels to insert into complaint per A. Swick's request. | 1.30 | 225 | $ | 292.50 |
| 1/17/2017 | Adam | Swick | Draft complaint. | 4.30 | 725 | $ | 3,117.50 |
| 1/18/2017 | Benjamin | King | Draft email to potential client re: arbitration provision and fees. | 0.50 | 725 | $ | 362.50 |
| 1/18/2017 | Adam | Swick | Continue to draft complaint. | 5.20 | 725 | $ | 3,770.00 |
| 1/19/2017 | Adam | Swick | Conduct research for complaint; exchange emails with mlm industry insider; review and send email to potential client. | 1.90 | 725 | $ | 1,377.50 |
| 1/19/2017 | Gina | Tercero | Various online searches to identify distributors in top 4 levels per A. Swick's request. | 1.00 | 225 | $ | 225.00 |
| 1/20/2017 | Adam | Swick | Draft complaint, including researching potential factual allegations. | 5.10 | 725 | $ | 3,697.50 |

| 1/23/2017 | Adam | Swick | Set up call with potential expert; draft complaint; conduct internet research with A. Brown; review Policies and Procedures. | 6.20 | 725 | $ | 4,495.00 |
|---|---|---|---|---|---|---|---|
| 1/24/2017 | Benjamin | King | Continue drafting complaint, including factual research supporting complaint. | 2.00 | 725 | $ | 1,450.00 |
| 1/24/2017 | Adam | Swick | Exchange emails and calls with B. King re AdvoCare Policies and Procedures; exchange emails with re complaint; draft complaint; hold call with client and exchange emails re representation. | 7.40 | 725 | $ | 5,365.00 |
| 1/25/2017 | Benjamin | King | Continue drafting complaint, including legal and factual research supporting complaint. | 5.00 | 725 | $ | 3,625.00 |
| 1/25/2017 | Adam | Swick | Draft complaint. | 3.50 | 725 | $ | 2,537.50 |
| 1/26/2017 | Benjamin | King | Factual research regarding AdvoCare's business; emails w/ A. Swick and G. Tercero re: factual research. | 1.00 | 725 | $ | 725.00 |
| 1/26/2017 | Adam | Swick | Exchange emails with potential expert; draft complaint; research AdvoCare products; exchange B. King and G. Tercero re same; exchange emails with former distributors; review AdvoCare videos on the internet; discuss internet research with A. Brown. | 3.20 | 725 | $ | 2,320.00 |
| 1/26/2017 | Gina | Tercero | Prepare chart of AdvoCare products with different pricing levels per A. Swick's request. | 0.50 | 225 | $ | 112.50 |
| 1/27/2017 | Benjamin | King | Continue drafting complaint, including legal and factual research supporting complaint. | 3.00 | 725 | $ | 2,175.00 |
| 1/27/2017 | Adam | Swick | Exchange emails with A. Brown regarding research for factual allegations; exchange emails with the team re allegations against individual defendants; hold call and exchange emails with B. King legal and factual allegations in the complaint. | 2.70 | 725 | $ | 1,957.50 |
| 1/30/2017 | Benjamin | King | Continue drafting complaint, including legal and factual research supporting complaint. | 3.00 | 725 | $ | 2,175.00 |

Appx. 152

| 1/30/2017 | Adam | Swick | Set up call with clients; conduct internet research for factual allegations; draft complaint. | 5.20 | 725 | $ | 3,770.00 |
| 1/31/2017 | Benjamin | King | Emails w/ A. Swick re: factual research on AdvoCare. | 0.30 | 725 | $ | 217.50 |
| 1/31/2017 | Adam | Swick | Hold conference call with former distributors; draft complaint; research factual allegations; exchange emails with B. King re same; exchange emails with potential expert. | 6.60 | 725 | $ | 4,785.00 |
| 1/31/2017 | Gina | Tercero | Search for complaint in Badgett v. AdvoCare; watch Danny McDaniel YouTube video and transcribe excerpt per A. Swick's request. | 0.80 | 225 | $ | 180.00 |
| 2/1/2017 | Leo | Oppenheimer | Research re: invalidating contracts under TX law. | 1.40 | 425 | $ | 595.00 |
| 2/1/2017 | Adam | Swick | Continue to do factual research; exchange emails with A. Brown re same; draft complaint. | 5.40 | 725 | $ | 3,915.00 |
| 2/2/2017 | Leo | Oppenheimer | Research re: invalidating contracts under TX law. | 1.60 | 425 | $ | 680.00 |
| 2/2/2017 | Adam | Swick | Hold call with former distributors; conduct factual research for complaint. | 2.50 | 725 | $ | 1,812.50 |
| 2/3/2017 | Benjamin | King | Review draft engagement letter for potential expert; discuss retention of potential expert internally at RCT. | 0.70 | 725 | $ | 507.50 |
| 2/3/2017 | Adam | Swick | Review expert LOE; discuss same internally. | 0.40 | 725 | $ | 290.00 |
| 2/6/2017 | P. Jason | Collins | Analysis and discussion re expert opinion needs. | 0.50 | 925 | $ | 462.50 |
| 2/6/2017 | Benjamin | King | Internal discussions and email re: hiring an expert in nutritional supplements for AdvoCare matter. | 0.40 | 725 | $ | 290.00 |

Appx. 153

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|--|--------|
| 2/6/2017 | Leo | Oppenheimer | Review Herbalife complaint and memo re: defenses raised and deliver memo to A. Swick re: same; research for parties section of complaint. | 3.70 | 425 | $ | 1,572.50 |
| 2/6/2017 | Adam | Swick | Exchange emails internally re hiring an expert before filing lawsuit; supervise investigation of potential individual defendants. | 0.90 | 725 | $ | 652.50 |
| 2/6/2017 | Gina | Tercero | Run PeopleMap reports for defendants per A. Swick's request. | 0.50 | 225 | $ | 112.50 |
| 2/7/2017 | Adam | Swick | Continue drafting and editing complaint; exchange emails with B. King and G. Tercero re same; exchange emails with former distributors. | 4.00 | 725 | $ | 2,900.00 |
| 2/7/2017 | Gina | Tercero | Insert AdvoCare products spreadsheet into complaint. | 0.50 | 225 | $ | 112.50 |
| 2/8/2017 | Benjamin | King | Continue drafting and editing complaint; legal and factual research in support of the complaint; emails with A. Swick re: allegations in complaint. | 4.00 | 725 | $ | 2,900.00 |
| 2/8/2017 | Leo | Oppenheimer | Draft parties section of complaint; research re: nullifying contracts under TX law. | 1.00 | 425 | $ | 425.00 |
| 2/8/2017 | Adam | Swick | Continue drafting and editing complaint; exchange emails with B. King and L. Oppenheimer re same; exchange texts and emails with client re updates. | 6.30 | 725 | $ | 4,567.50 |
| 2/9/2017 | Benjamin | King | Continue drafting and editing complaint; legal and factual research in support of the complaint; emails with A. Swick re: allegations in complaint. | 4.00 | 725 | $ | 2,900.00 |
| 2/9/2017 | Adam | Swick | Continue drafting and editing complaint; internet research re factual allegations; exchange emails with B. King re factual allegations; hold phone interviews with former distributors. | 5.20 | 725 | $ | 3,770.00 |
| 2/10/2017 | Benjamin | King | Continue drafting and editing complaint; legal and factual research in support of the complaint; emails with A. Swick re: allegations in complaint; discussion and emails w/ L. Oppenheimer re: legal research on tax claim. | 4.50 | 725 | $ | 3,262.50 |
| 2/10/2017 | Leo | Oppenheimer | Research re: MLM sales tax insert; memo to B. King re same; respond to B. King follow up emails re: same. | 5.70 | 425 | $ | 2,422.50 |

| 2/10/2017 | Adam | Swick | Continue drafting and editing complaint; internet research re factual allegations; exchange emails with B. King re factual allegations. | 6.80 | 725 | $ | 4,930.00 |
| 2/13/2017 | Benjamin | King | Continue drafting and editing complaint; legal and factual research in support of the complaint; emails with A. Swick and A. Brown re: allegations in complaint and factual research; teleconferences w/ potential witnesses and plaintiffs. | 3.80 | 725 | $ | 2,755.00 |
| 2/13/2017 | Adam | Swick | Continue drafting and editing complaint; internet research re factual allegations; exchange emails with B. King and A. Brown re factual allegations; hold phone interviews with former distributors. | 1.50 | 725 | $ | 1,087.50 |
| 2/14/2017 | Benjamin | King | Continue drafting and editing complaint; legal and factual research in support of the complaint; emails and calls with A. Swick re: allegations in complaint; email insider re: potential interview. | 3.00 | 725 | $ | 2,175.00 |
| 2/14/2017 | Adam | Swick | Continue drafting and editing complaint; internet research re factual allegations; exchange emails with B. King and A. Brown re factual allegations. | 3.20 | 725 | $ | 2,320.00 |
| 2/15/2017 | Benjamin | King | Continue drafting and editing complaint; factual research in support of the complaint; emails and calls with A. Swick and A. Brown re: allegations in complaint and factual research; emails with industry insider re: AdvoCare practices. | 5.00 | 725 | $ | 3,625.00 |
| 2/15/2017 | Adam | Swick | Conduct internet research for complaint; exchange emails internally re same; hold calls with client re factual allegations. | 8.40 | 725 | $ | 6,090.00 |
| 2/16/2017 | Adam | Swick | Exchange emails with former distributors; continue drafting and editing complaint; factual research in support of the complaint; exchange emails and calls with A. Brown re same. | 3.10 | 725 | $ | 2,247.50 |
| 2/17/2017 | Benjamin | King | Continue drafting and editing complaint; factual research in support of the complaint; emails and calls with A. Swick re: allegations in complaint; emails with former AdvoCare distributors. | 3.50 | 725 | $ | 2,537.50 |
| 2/17/2017 | Adam | Swick | Interview former distributors; continue drafting and editing complaint; factual research in support of the complaint; exchange emails and calls with B. King re factual allegations. | 1.80 | 725 | $ | 1,305.00 |

Appx. 155

| 2/18/2017 | Benjamin | King | Emails with former AdvoCare distributor re: meeting. | 0.30 | 725 | $ | 217.50 |
| 2/18/2017 | Adam | Swick | Exchange emails with former distributor re AdvoCare. | 0.30 | 725 | $ | 217.50 |
| 2/19/2017 | Benjamin | King | Continue drafting and editing complaint; factual research in support of the complaint; emails with A. Swick re: allegations in complaint. | 3.00 | 725 | $ | 2,175.00 |
| 2/19/2017 | Adam | Swick | Exchange emails with B. King re factual allegations. | 0.40 | 725 | $ | 290.00 |
| 2/20/2017 | Benjamin | King | Review legal filings against former AdvoCare distributor; email L. Oppenheimer re: filings; email former distributor re: filings; continue drafting and editing complaint; factual research in support of the complaint; emails with A. Swick re: allegations in complaint. | 7.00 | 725 | $ | 5,075.00 |
| 2/20/2017 | Leo | Oppenheimer | Research re: arbitration timing, procedure, forms. | 1.40 | 425 | $ | 595.00 |
| 2/20/2017 | Adam | Swick | Draft and edit complaint; exchange internal emails re same; send latest draft to client for review; hold call with client. | 6.90 | 725 | $ | 5,002.50 |
| 2/20/2017 | Gina | Tercero | Finalize and number exhibits to complaint; insert signature block, edit photos, and insert appendix page numbers into complaint. | 1.90 | 225 | $ | 427.50 |
| 2/21/2017 | Benjamin | King | Continue drafting and editing complaint; legal and factual research in support of the complaint; emails with A. Swick re: allegations in complaint; finalize for filing; emails w/ A. Swick re: client approval; tcf w/ A. Swick re: client damages. | 6.50 | 725 | $ | 4,712.50 |
| 2/21/2017 | Leo | Oppenheimer | Revise and finalize complaint in preparation for filing. | 6.30 | 425 | $ | 2,677.50 |

| Date | First | Last | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 2/21/2017 | Adam | Swick | Prepare civil cover sheet for complaint; continue drafting and editing complaint; legal and factual research in support of the complaint; emails with B. king re allegations in complaint; finalize for filing; email B. King re client approval; hold call with B. King re damages. | 7.20 | 725 | $ 5,220.00 |
| 2/21/2017 | Gina | Tercero | Prepare appendix cover page for complaint; review ECF instructions for opening a civil docket; finalize supporting documents to complaint for filing. | 1.00 | 225 | $ 225.00 |
| 2/22/2017 | Benjamin | King | Calls and email with A. Swick re: new class representative; factual research in support of complaint; email with industry insider re: AdvoCare. | 0.40 | 725 | $ 290.00 |
| 2/22/2017 | Leo | Oppenheimer | Research re: proper plaintiff when net damages but damages occur outside limitations period | 4.80 | 425 | $ 2,040.00 |
| 2/22/2017 | Adam | Swick | Calls and email with B. King re new class representative; factual research in support of complaint; email with industry insider and B. King re AdvoCare. | 0.40 | 725 | $ 290.00 |
| 2/23/2017 | Benjamin | King | Calls and email with A. Swick re: new class representative; email with former AdvoCare distributor about arbitration issues. | 1.70 | 725 | $ 1,232.50 |
| 2/23/2017 | Leo | Oppenheimer | Research re: disqualification in later court proceeding based on prior confidential arbitration. | 3.80 | 425 | $ 1,615.00 |
| 2/23/2017 | Adam | Swick | Communicate with B. King re new class rep. | 1.50 | 725 | $ 1,087.50 |
| 2/24/2017 | Adam | Swick | Conduct interviews re AdvoCare. | 2.40 | 725 | $ 1,740.00 |
| 3/1/2017 | Adam | Swick | Conduct factual support research for complaint. | 3.70 | 725 | $ 2,682.50 |

| 3/2/2017 | Adam | Swick | Communicate with former distributors re potential claims against AdvoCare; analyze losses; exchange emails with B. King re same; review emails from former distributors; interview former distributors. | 5.30 | 725 | $ | 3,842.50 |
|---|---|---|---|---|---|---|---|
| 3/6/2017 | Benjamin | King | Discuss potential new class rep with A. Swick. | 0.30 | 725 | $ | 217.50 |
| 3/6/2017 | Adam | Swick | Discuss potential new class rep with B. King. | 0.30 | 725 | $ | 217.50 |
| 3/7/2017 | Benjamin | King | Edit complaint to add allegations specific to new class rep; email A. Swick re: same. | 1.50 | 725 | $ | 1,087.50 |
| 3/7/2017 | Adam | Swick | Revise complaint. | 0.80 | 725 | $ | 580.00 |
| 3/8/2017 | Benjamin | King | Edit complaint; email complaint to client for review. | 5.00 | 725 | $ | 3,625.00 |
| 3/8/2017 | Adam | Swick | Hold calls with clients re edits to complaint. | 1.30 | 725 | $ | 942.50 |
| 3/9/2017 | Benjamin | King | Emails w/ A. Swick re: communications with clients re: complaint; calls w/ A. Swick re: finalizing and filing complaint. | 0.30 | 725 | $ | 217.50 |
| 3/9/2017 | Adam | Swick | Finalize and file lawsuit; review judge's background and procedural rules; communicate with clients re same. | 6.10 | 725 | $ | 4,422.50 |
| 3/9/2017 | Gina | Tercero | Edit civil case cover sheet and certificate of interested parties in advance of filing; efile same and complaint. | 1.50 | 225 | $ | 337.50 |

| 3/10/2017 | Benjamin | King | Emails with A. Swick re: judicial draw and client communications with media; review Judge Boyle's chambers rules. | 0.50 | 725 | $ | 362.50 |
| 3/10/2017 | Adam | Swick | Establish website re class action. | 0.80 | 725 | $ | 580.00 |
| 3/10/2017 | Gina | Tercero | Download filings and save to SharePoint. | 0.50 | 225 | $ | 112.50 |
| 3/11/2017 | Adam | Swick | Review press from lawsuit. | 0.40 | 725 | $ | 290.00 |
| 3/12/2017 | Benjamin | King | Review emails from former distributors re: filing of lawsuit. | 0.50 | 725 | $ | 362.50 |
| 3/13/2017 | Benjamin | King | Review filings in a different case against AdvoCare filed by former distributor; email A. Swick re: same; draft talking points for calls with former distributors; review emails sent by former distributors after learning of lawsuit; emails with former distributors. | 3.50 | 725 | $ | 2,537.50 |
| 3/13/2017 | Adam | Swick | Exchange calls and emails with various former distributors; exchange emails with B. King re other AdvoCare cases. | 4.10 | 725 | $ | 2,972.50 |
| 3/13/2017 | Gina | Tercero | Prepare chart of contact information received via feedback form per A. Swick's request. | 1.00 | 225 | $ | 225.00 |
| 3/14/2017 | Benjamin | King | Review media attention to lawsuit; email AdvoCare in-house counsel re: service of lawsuit; review J. Harlin notes from communications with former distributors; emails w/ AdvoCare in-house counsel re: acceptance of service; research and submit FOIA request to FTC re: investigations of AdvoCare. | 3.50 | 725 | $ | 2,537.50 |
| 3/14/2017 | Adam | Swick | Exchange emails with AdvoCare GC re extension of time to answer; exchange emails with B. King re same; review emails from former distributors. | 2.60 | 725 | $ | 1,885.00 |

Appx. 159

| 3/14/2017 | Gina | Tercero | Update chart of contact information received via feedback form. | 0.20 | 225 | $ | 45.00 |
| 3/15/2017 | Benjamin | King | Review memos from J. Harlin and G. Tercero re: contacts with former distributors; emails re: same; research waiver of service; emails re: same; review draft waivers and email to Allison Levy. | 1.50 | 725 | $ | 1,087.50 |
| 3/15/2017 | Adam | Swick | Hold call and exchange text messages with clients re lawsuit updates; hold calls with former distributors. | 1.90 | 725 | $ | 1,377.50 |
| 3/15/2017 | Gina | Tercero | Update chart of contact information received via feedback form; prepare waiver of summons form; research local rules re: same. | 1.00 | 225 | $ | 225.00 |
| 3/16/2017 | Benjamin | King | Call with A. Swick re: fixing waiver of service. | 0.10 | 725 | $ | 72.50 |
| 3/16/2017 | Adam | Swick | Email AdvoCare GC re waivers of service; exchange email with B. King re same; review emails from former distributors. | 0.80 | 725 | $ | 580.00 |
| 3/16/2017 | Gina | Tercero | Efile waivers of service. | 0.50 | 225 | $ | 112.50 |
| 3/17/2017 | Adam | Swick | Email AdvoCare GC waivers of service for individual defendants. | 0.20 | 725 | $ | 145.00 |
| 3/17/2017 | Gina | Tercero | Update chart of contact information received via feedback form. | 0.30 | 225 | $ | 67.50 |
| 3/20/2017 | Benjamin | King | Legal research re: status of Torres case in Fifth Circuit. | 0.50 | 725 | $ | 362.50 |
| 3/20/2017 | Adam | Swick | Exchange emails with AdvoCare's GC; review emails from former distributors. | 0.40 | 725 | $ | 290.00 |

| 3/20/2017 | Gina | Tercero | Efile waivers of service; download same and save to SharePoint; prepare judge's copy of same; update chart of contact information received via feedback form. | 1.00 | 225 | $ | 225.00 |
| 3/21/2017 | Benjamin | King | Review notes from calls with distributors who contacted RCT after filing of lawsuit; email to A. Swick re: contacting more distributors; attempts to contact distributors; emails with former distributor. | 1.30 | 725 | $ | 942.50 |
| 3/21/2017 | Adam | Swick | Reach out to former distributors who contacted firm; exchange email with B. King re same. | 4.90 | 725 | $ | 3,552.50 |
| 3/22/2017 | Benjamin | King | Email with the FTC re: FOIA request. | 0.40 | 725 | $ | 290.00 |
| 3/22/2017 | Adam | Swick | Listen to voicemail from another attorney representing former AdvoCare distributors; discuss same with B. King; reach out to former distributors who contacted firm; exchange email with J. Harlin re same. | 5.30 | 725 | $ | 3,842.50 |
| 3/22/2017 | Gina | Tercero | Prepare form declaration. | 0.30 | 225 | $ | 67.50 |
| 3/23/2017 | Benjamin | King | Review voicemail from attorney representing another AdvoCare distributor; forward same to A. Swick. | 0.30 | 725 | $ | 217.50 |
| 3/24/2017 | Benjamin | King | Legal research re: other cases against MLM/pyramid schemes; email former distributor re: result in case. | 1.00 | 725 | $ | 725.00 |
| 3/27/2017 | Benjamin | King | Review emails from former distributors; confer w/ A. Swick re: same; email former distributors. | 0.50 | 725 | $ | 362.50 |
| 3/27/2017 | Adam | Swick | Confer with B. King re emails from former distributors. | 0.30 | 725 | $ | 217.50 |
| 3/28/2017 | Adam | Swick | Exchange emails with client re case updates; review AdvoCare press release re lawsuit; review emails with former distributor; hold call with that distributor. | 0.20 | 725 | $ | 145.00 |

| 3/29/2017 | Benjamin | King | Review internet postings re: AdvoCare lawsuit. | 0.50 | 725 | $ | 362.50 |
| 3/29/2017 | Adam | Swick | Review internet posting re lawsuit. | 0.90 | 725 | $ | 652.50 |
| 3/31/2017 | Benjamin | King | Calls and emails w/ former distributors; email A. Swick re: same. | 2.00 | 725 | $ | 1,450.00 |
| 4/1/2017 | Benjamin | King | Legal research re: other cases filed against AdvoCare. | 0.20 | 725 | $ | 145.00 |
| 4/3/2017 | Benjamin | King | Review recently filed case against AdvoCare alleging product defects; team email re: same; research prior members of AdvoCare's medical advisory board; attempt to contact same; review AdvoCare matters in Collin County. | 3.00 | 725 | $ | 2,175.00 |
| 4/4/2017 | Benjamin | King | Draft declaration for former distributor; calls with former distributor; circulate draft declaration to team. | 2.00 | 725 | $ | 1,450.00 |
| 4/4/2017 | Adam | Swick | Review and edit declaration for person damaged by AdvoCare. | 0.80 | 725 | $ | 580.00 |
| 4/5/2017 | Benjamin | King | Review email to clients sent by A. Swick; follow up email to clients; review emails from former distributors re: AdvoCare practices; confer w/ A. Swick re: next steps. | 1.00 | 725 | $ | 725.00 |
| 4/5/2017 | Adam | Swick | Hold calls with attorneys for other people involved with litigation with AdvoCare; review emails regarding AdvoCare taking down from the internet websites and videos quoted in complaint; exchange emails with B. King re next steps in case; review emails sent by client; review other class action against AdvoCare; send email to clients re same. | 4.70 | 725 | $ | 3,407.50 |
| 4/6/2017 | Benjamin | King | Access and review documents filed in case brought by AdvoCare against another distributor in Houston; detailed review at clerk's office of file on appeal of case between former distributor and AdvoCare; email A. Swick re: helpful allegations in appeal file. | 2.50 | 725 | $ | 1,812.50 |

| 4/6/2017 | Adam | Swick | Hold call with clients; send update email; exchange emails with counsel opposing AdvoCare in another case. | 2.30 | 725 | $ | 1,667.50 |
|---|---|---|---|---|---|---|---|
| 4/7/2017 | Benjamin | King | Detailed review at clerk's office of file on appeal of case between former distributor and AdvoCare; discovery planning. | 5.00 | 725 | $ | 3,625.00 |
| 4/7/2017 | Adam | Swick | Prepare for and hold call with counsel in another case against AdvoCare. | 3.10 | 725 | $ | 2,247.50 |
| 4/11/2017 | Benjamin | King | Edit draft declaration for former distributor and email same to him; review chart detailing contacts with former distributors; attempts to contact former distributors. | 1.00 | 725 | $ | 725.00 |
| 4/11/2017 | Adam | Swick | Read trial testimony from transcripts of old AdvoCare cases; review emails re AdvoCare complaints. | 3.10 | 725 | $ | 2,247.50 |
| 4/12/2017 | Benjamin | King | Emails to former distributors to develop support for factual allegations; research regarding fending off other counsel seeking to intervene in class actions as lead counsel; calls with former distributors; calls w/ A. Swick re: same. | 2.50 | 725 | $ | 1,812.50 |
| 4/12/2017 | Adam | Swick | Discuss potential co-counsel with B. King; research potential co-counsel; review news items and internet postings re lawsuit. | 3.20 | 725 | $ | 2,320.00 |
| 4/13/2017 | Benjamin | King | Research regarding fending off other counsel seeking to intervene in class actions as lead counsel; research regarding Stream Energy/Torres case; email former distributor; email multiple former distributors; draft and email declarations to former distributors. | 5.00 | 725 | $ | 3,625.00 |
| 4/14/2017 | Benjamin | King | Research regarding former distributor; call with former distributor. | 0.60 | 725 | $ | 435.00 |
| 4/17/2017 | Adam | Swick | Review pleadings from AdvoCare v. Anderson; travel to hearing in Houston. | 3.50 | 725 | $ | 2,537.50 |
| 4/18/2017 | Leo | Oppenheimer | Research re: language in recent distributor agreement concerning ability to simultaneously participate in other MLMs. | 0.30 | 425 | $ | 127.50 |

Appx. 163

| 4/18/2017 | Adam | Swick | Attend AdvoCare v. Anderson hearing. | 8.20 | 725 | $ | 5,945.00 |
|---|---|---|---|---|---|---|---|
| 4/20/2017 | Benjamin | King | Emails w/ A. Swick re: client contacts. | 0.10 | 725 | $ | 72.50 |
| 4/25/2017 | Benjamin | King | Review decision in case AdvoCare brought against another distributor. | 1.00 | 725 | $ | 725.00 |
| 4/25/2017 | Adam | Swick | Review order in AdvoCare v. Anderson case; send email to clients re same. | 0.60 | 725 | $ | 435.00 |
| 5/4/2017 | Adam | Swick | Review transcripts in other AdvoCare cases. | 1.20 | 725 | $ | 870.00 |
| 5/8/2017 | Benjamin | King | Emails with defense counsel re: arbitration; emails w/ A. Swick and L. Oppenheimer re: same. | 0.30 | 725 | $ | 217.50 |
| 5/8/2017 | Leo | Oppenheimer | Legal research re: effect of motion to compel arbitration on timing of responsive pleading. | 1.60 | 425 | $ | 680.00 |
| 5/8/2017 | Adam | Swick | Correspond with opposing counsel for individual defendants; exchange emails with B. King re same. | 0.20 | 725 | $ | 145.00 |
| 5/9/2017 | Benjamin | King | Emails w/ L. Oppenheimer re: interplay between motions to compel arbitration and motions to dismiss; review L. Oppenheimer's analysis. | 0.30 | 725 | $ | 217.50 |
| 5/9/2017 | Leo | Oppenheimer | Legal research re: effect of motion to compel arbitration on timing of responsive pleading; deliver memo re: same to B. King. | 9.30 | 425 | $ | 3,952.50 |
| 5/9/2017 | Adam | Swick | Review and revise draft opposition to individual defendants' motion to compel arbitration; | 0.30 | 725 | $ | 217.50 |
| 5/10/2017 | Leo | Oppenheimer | Legal research re: duty to mitigate fraud damages under TX law. | 2.30 | 425 | $ | 977.50 |

Appx. 164

| 5/11/2017 | Benjamin | King | Call w/ defense counsel re: arbitration; follow up call w/ A. Swick; review arbitration demands submitted by defense; review arbitration provisions in other MLM contracts; legal research re: enforceability of illusory arbitration provision; emails w/ former distributor re: declaration. | 2.50 | 725 | $ | 1,812.50 |
|---|---|---|---|---|---|---|---|
| 5/11/2017 | Leo | Oppenheimer | Legal research re: duty to mitigate fraud damages under TX law (8.6); call with opposing counsel re: motion to compel arbitration (.4). | 9.00 | 425 | $ | 3,825.00 |
| 5/11/2017 | Adam | Swick | Hold call with opposing counsel re arbitration demand; hold call with B. King re same; legal research re determining arbitrability. | 1.70 | 725 | $ | 1,232.50 |
| 5/15/2017 | Benjamin | King | Call w/ A. Swick and clients to discuss arbitration issues; review AdvoCare's AAA filing; email AAA regarding clients' position on arbitration; review defendants' motions to compel arbitration and motions to dismiss; lengthy email to A. Swick and L. Oppenheimer re: same, strategy, and response; call w/ A. Swick and L. Oppenheimer re: same. | 3.00 | 725 | $ | 2,175.00 |
| 5/15/2017 | Leo | Oppenheimer | Legal research re: duty to mitigate fraud damages under TX law (5.1); call with B. King and A. Swick re: strategy in response to motion to compel arbitration (.5). | 5.60 | 425 | $ | 2,380.00 |
| 5/15/2017 | Adam | Swick | Review motions to compel arbitration and motions to dismiss; hold call with clients re case update. | 2.80 | 725 | $ | 2,030.00 |
| 5/16/2017 | Benjamin | King | Emails w/ L. Oppenheimer about local rules and briefing schedule; email defense counsel re: deadline to oppose motions; office conference w/ L. Oppenheimer re: duty to mitigate damages under Texas law and obtaining class certification; consider ways to avoid argument that individual retail sales preclude class certification. | 3.00 | 725 | $ | 2,175.00 |
| 5/16/2017 | Leo | Oppenheimer | Review motion to dismiss and motion to compel (1.4); legal research re: motion to stay arbitration pending resolution of motion to compel (3.8); call with B. King and A. Swick re: response to motion to dismiss and motion to compel arbitration (.4). | 5.60 | 425 | $ | 2,380.00 |
| 5/16/2017 | Adam | Swick | Further review motions to compel arbitration and motions to dismiss; conduct legal research re issues raised therein; hold calls with B. King to coordinate actions. | 7.70 | 725 | $ | 5,582.50 |
| 5/17/2017 | Benjamin | King | Review L. Oppenheimer's legal research re: duty to mitigate damages. | 0.40 | 725 | $ | 290.00 |

Appx. 165

| 5/17/2017 | Leo | Oppenheimer | Legal research re: duty to mitigate fraud damages under TX law and deliver memo re: same to B. King. | 2.20 | 425 | $ | 935.00 |
|---|---|---|---|---|---|---|---|
| 5/18/2017 | Benjamin | King | Emails w/ A. Swick re: contacting defendants re: scheduling; call defense counsel re: scheduling; legal research re: arbitrability. | 1.30 | 725 | $ | 942.50 |
| 5/18/2017 | Adam | Swick | Legal research on arbitrability issues; review email to opposing counsel re arbitration; review email from former distributor. | 8.30 | 725 | $ | 6,017.50 |
| 5/19/2017 | Benjamin | King | Legal research re: delegation of arbitrability issue; calls and emails w/ A. Swick re: same; email defense counsel re: arbitration; email L. Oppenheimer re: motion to extend time to respond to motion to dismiss. | 5.00 | 725 | $ | 3,625.00 |
| 5/19/2017 | Leo | Oppenheimer | Legal research and drafting re: response to individual defendants' motion to dismiss. | 3.30 | 425 | $ | 1,402.50 |
| 5/22/2017 | Benjamin | King | Team email re: next steps. | 0.30 | 725 | $ | 217.50 |
| 5/22/2017 | Adam | Swick | Arrange for client to call B. King re case status; exchange internal emails re case strategy. | 0.20 | 725 | $ | 145.00 |
| 5/23/2017 | Benjamin | King | Call with client re: arbitration; email A. Swick re: same; call and email defense counsel re: arbitrating arbitrability. | 0.50 | 725 | $ | 362.50 |
| 5/23/2017 | Adam | Swick | Exchange emails with B. King re arbitration. | 0.30 | 725 | $ | 217.50 |
| 5/24/2017 | Benjamin | King | Review and edit draft motion to extend time; emails w/ L. Oppenheimer re: motion to extend time. | 1.00 | 725 | $ | 725.00 |
| 5/24/2017 | Leo | Oppenheimer | Draft motion to extend time to respond to motions to compel and motions to arbitrate (2.8); implement J. King revisions (.4); file motion (.3). | 3.50 | 425 | $ | 1,487.50 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| 5/24/2017 | Adam | Swick | Hold call with former AdvoCare distributor. | 2.30 | 725 | $ | 1,667.50 |
| 5/26/2017 | Benjamin | King | Draft opposition to motion to compel arbitration; review updated AdvoCare distributor agreement and G. Tercero's comparison of old and new versions. | 4.00 | 725 | $ | 2,900.00 |
| 5/26/2017 | Gina | Tercero | Review updated distributor agreement and indicate differences to previous version per B. King's request. | 2.00 | 225 | $ | 450.00 |
| 5/29/2017 | Benjamin | King | Legal research re: arbitrability; draft opposition to motion to compel arbitration. | 4.00 | 725 | $ | 2,900.00 |
| 5/30/2017 | Benjamin | King | Draft opposition to motion to compel arbitration; circulate draft to L. Oppenheimer and A. Swick. | 2.50 | 725 | $ | 1,812.50 |
| 5/30/2017 | Leo | Oppenheimer | Legal research re: responses to "explicit agreement" section of motion to compel. | 4.50 | 425 | $ | 1,912.50 |
| 5/30/2017 | Adam | Swick | Review draft opposition to AdvoCare's motion to compel arbitration. | 4.60 | 725 | $ | 3,335.00 |
| 5/31/2017 | Benjamin | King | Review notices from AAA regarding AdvoCare arbitration. | 0.30 | 725 | $ | 217.50 |
| 5/31/2017 | Leo | Oppenheimer | Legal research re: responses to "explicit agreement" section of motion to compel (5.3); Legal research re: responses to "equitable estoppel" section of motion to compel (2.6). | 7.90 | 425 | $ | 3,357.50 |
| 5/31/2017 | Adam | Swick | Review notices from AAA re AdvoCare arbitration. | 0.20 | 725 | $ | 145.00 |
| 6/1/2017 | Leo | Oppenheimer | Call with R. Swick re: progress on response to motion to compel (.4); memo to partners regarding initial research findings (2.4); Legal research re: responses to "equitable estoppel" section of motion to compel (8.7). | 11.50 | 425 | $ | 4,887.50 |

Appx. 167

| 6/2/2017 | Leo | Oppenheimer | Draft response to "explicitly agreed" section of motion to compel. | 4.60 | 425 | $ | 1,955.00 |
|---|---|---|---|---|---|---|---|
| 6/4/2017 | Leo | Oppenheimer | Legal research and drafting of response to "equitable estoppel" section of motion to compel. | 10.80 | 425 | $ | 4,590.00 |
| 6/5/2017 | Leo | Oppenheimer | Conf. with A. Swick re: status of response to motion to compel (.3); legal research and drafting of response to motion compel (6.5). | 6.80 | 425 | $ | 2,890.00 |
| 6/5/2017 | Adam | Swick | Conduct legal research on arbitrability issues; exchange emails with B. King re communicating with opposing counsel re arbitrability. | 3.90 | 725 | $ | 2,827.50 |
| 6/6/2017 | Leo | Oppenheimer | Draft and revise response to motion to compel. | 11.10 | 425 | $ | 4,717.50 |
| 6/7/2017 | Leo | Oppenheimer | Revise response to motion to compel (.7); legal research re: when non-contract claims sound in contract (.4). | 1.10 | 425 | $ | 467.50 |
| 6/7/2017 | Adam | Swick | Edit and revise draft opposition to individual defendants' motion to compel arbitration; exchange emails with L. Oppenheimer re same. | 4.10 | 725 | $ | 2,972.50 |
| 6/8/2017 | Benjamin | King | Review new pyramid scheme class action complaint, that largely copied our AdvoCare complaint; review amicus briefs filed in support of review by Supreme Court in Stream/Torres case; email former distributors about their AdvoCare experiences; review arbitration filings in former AdvoCare distributor's case. | 2.00 | 725 | $ | 1,450.00 |
| 6/8/2017 | Adam | Swick | Further review and revise draft opposition to individual defendants' motion to compel arbitration; conduct legal research re same. | 2.80 | 725 | $ | 2,030.00 |
| 6/9/2017 | Benjamin | King | Review and edit L. Oppenheimer's draft opposition to the individual defendants' motion to compel arbitration; legal research re: arbitration issues; email L. Oppenheimer re: same. | 5.00 | 725 | $ | 3,625.00 |
| 6/12/2017 | Benjamin | King | Emails w/ A. Swick re: filings in arbitration; edit and draft opposition to the individual defendants' motion to compel arbitration; legal research re: arbitration issues. | 2.20 | 725 | $ | 1,595.00 |

| 6/12/2017 | Adam | Swick | Draft agreed motion/order staying litigation; emails with B. King re filings in arbitration; review opposition to motion to compel arbitration. | 3.10 | 725 | $ | 2,247.50 |
| 6/12/2017 | Gina | Tercero | Prepare draft motion to stay pending arbitration per A. Swick's request. | 0.50 | 225 | $ | 112.50 |
| 6/13/2017 | Adam | Swick | Hold calls with B. King re case status; hold call with former distributor; conduct legal research on arbitrability issues.. | 3.70 | 725 | $ | 2,682.50 |
| 6/14/2017 | Benjamin | King | Edit and draft opposition to the individual defendants' motion to compel arbitration; legal research re: arbitration issues. | 5.50 | 725 | $ | 3,987.50 |
| 6/14/2017 | Adam | Swick | Draft, edit, and revise opposition to motion to compel arbitration; conduct legal research re same. | 6.10 | 725 | $ | 4,422.50 |
| 6/15/2017 | Benjamin | King | Review motions to compel arbitration; legal research regarding arbitrability issue; email L. Oppenheimer re: legal research task. | 4.00 | 725 | $ | 2,900.00 |
| 6/15/2017 | Adam | Swick | Review letter from AAA acknowledging arbitration demand. | 0.20 | 725 | $ | 145.00 |
| 6/16/2017 | Benjamin | King | Legal research regarding arbitrability issue; email L. Oppenheimer re: legal research issue; call w/ A. Swick and L. Oppenheimer re: legal research issues and opposing motions to arbitrate. | 3.00 | 725 | $ | 2,175.00 |
| 6/16/2017 | Leo | Oppenheimer | Legal research re: AAA issued guidance on deciding arbitrability (.4); Legal research re: preclusive effect of arbitral findings under Texas law (2.8); Conf with A. Swick and B. King re: preliminary research findings and next steps (.8); Legal research re: whether claims may be sent piecemeal to arbitration (.7). | 4.70 | 425 | $ | 1,997.50 |
| 6/16/2017 | Adam | Swick | Legal research on arbitrability issues; exchange emails and calls with B. King and L. Oppenheimer re same. | 4.40 | 725 | $ | 3,190.00 |
| 6/16/2017 | Gina | Tercero | Save correspondence to SharePoint; calendar deadlines. | 0.10 | 225 | $ | 22.50 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 6/17/2017 | Benjamin | King | Review email from former distributor re: participation in lawsuit. | 0.20 | 725 | $ | 145.00 |
| 6/19/2017 | Benjamin | King | Internal emails re: agreeing to arbitrate arbitrability; lengthy email to defense re: failure to respond to our offer to arbitrate. | 1.50 | 725 | $ | 1,087.50 |
| 6/19/2017 | Leo | Oppenheimer | Legal research re: preclusive effect of arbitral findings under Texas law and draft memo re: same. | 8.70 | 425 | $ | 3,697.50 |
| 6/19/2017 | Adam | Swick | Exchange emails and calls internally re agreeing to arbitrate; review draft email to opposing counsel re same. | 1.50 | 725 | $ | 1,087.50 |
| 6/20/2017 | Benjamin | King | Emails with defense counsel re: arbitrating arbitrability; internal emails re: preparing joint motion to stay pending arbitration; edit joint motion; legal research re: other MLM/pyramid scheme cases. | 1.50 | 725 | $ | 1,087.50 |
| 6/20/2017 | Leo | Oppenheimer | Review response to motion to compel (.3); draft joint motion to stay (1.3); revise response to motion to compel (1.2); legal research and memo re: preclusive effect of arbitral findings under Texas law (4.5). | 7.30 | 425 | $ | 3,102.50 |
| 6/20/2017 | Adam | Swick | Revise and edit joint motion staying litigation; exchange internal emails re same. | 1.10 | 725 | $ | 797.50 |
| 6/21/2017 | Benjamin | King | Draft letter to AAA re: arbitrating arbitrability; circulate to defense counsel. | 1.00 | 725 | $ | 725.00 |
| 6/21/2017 | Leo | Oppenheimer | Legal research and memo re: preclusive effect of arbitral findings under Texas law. | 3.60 | 425 | $ | 1,530.00 |
| 6/21/2017 | Adam | Swick | Revise motion to extend time; supervise filing of same. | 0.30 | 725 | $ | 217.50 |
| 6/22/2017 | Leo | Oppenheimer | Legal research and memo re: preclusive effect of arbitral findings under Texas law, deliver memo to partners (1.2); revise response to motion to compel (5.6). | 6.80 | 425 | $ | 2,890.00 |

| 6/22/2017 | Adam | Swick | Review email from AAA. | 0.20 | 725 | $ | 145.00 |
| 6/22/2017 | Gina | Tercero | Save correspondence to SharePoint; calendar deadlines; efile motion for extension of time; prepare chambers copy of same. | 1.00 | 225 | $ | 225.00 |
| 6/23/2017 | Adam | Swick | Set up call with opposing counsel re arbitration schedule; review court order re motion to extend time. | 0.30 | 725 | $ | 217.50 |
| 6/26/2017 | Benjamin | King | Call w/ A. Swick re: desired schedule in arbitration; call w/ defense counsel re: same. | 0.70 | 725 | $ | 507.50 |
| 6/26/2017 | Adam | Swick | Call with B. King re arbitration schedule; hold call with opposing counsel re same; exchange emails with opposing counsel re same. | 0.70 | 725 | $ | 507.50 |
| 6/28/2017 | Benjamin | King | Email defense counsel re: filing joint motion to stay court proceedings. | 0.20 | 725 | $ | 145.00 |
| 6/30/2017 | Benjamin | King | Email defense counsel re: filing joint motion to stay court proceedings oversee filing of same. | 0.40 | 725 | $ | 290.00 |
| 6/30/2017 | Adam | Swick | Review opposing counsel changes to Joint Motion Staying Litigation Pending Arbitration; exchange emails with B. King re same. | 0.70 | 725 | $ | 507.50 |
| 7/5/2017 | Benjamin | King | Call w/ A. Swick re: moving arbitration forward in light of court's order sending matter to arbitration; call w/ defense counsel re; same; draft email to AAA and defense counsel re: same. | 1.50 | 725 | $ | 1,087.50 |
| 7/5/2017 | Adam | Swick | Edit draft email to AAA; exchange emails with B. King re same. | 0.60 | 725 | $ | 435.00 |
| 7/12/2017 | Benjamin | King | Email to defense counsel re: agreed email to AAA; email A. Swick re: same. | 0.30 | 725 | $ | 217.50 |

Appx. 171

| 7/12/2017 | Adam | Swick | Exchange emails internally and with opposing counsel re arbitration scheduling. | 0.20 | 725 | $ | 145.00 |
| 7/13/2017 | Benjamin | King | Review and edit proposed email to AAA drafted by defense re: arbitration schedule; internal emails re: same; send email to AAA. | 0.70 | 725 | $ | 507.50 |
| 7/13/2017 | Adam | Swick | Review and edit email proposed by defense counsel re arbitration schedule; exchange emails internally re same. | 0.40 | 725 | $ | 290.00 |
| 7/14/2017 | Adam | Swick | Set up call with clients re case update. | 0.20 | 725 | $ | 145.00 |
| 7/17/2017 | Adam | Swick | Hold call with former distributor; hold call with clients re case update. | 0.80 | 725 | $ | 580.00 |
| 7/18/2017 | Benjamin | King | Emails w/ AAA re: scheduling. | 0.10 | 725 | $ | 72.50 |
| 7/18/2017 | Adam | Swick | Emails internally and with AAA re scheduling. | 0.20 | 725 | $ | 145.00 |
| 7/19/2017 | Benjamin | King | Review list of potential arbitrators proposed by AAA; research regarding potential arbitrators; internal emails re: experience with potential arbitrators; strategize on arbitrator selection and ranking. | 3.00 | 725 | $ | 2,175.00 |
| 7/19/2017 | Adam | Swick | Review list of potential arbitrators; exchange emails internal re same.; research potential arbitrators. | 2.70 | 725 | $ | 1,957.50 |
| 7/20/2017 | P. Jason | Collins | Discussion and analysis re arbitrators. | 0.50 | 925 | $ | 462.50 |
| 7/24/2017 | Benjamin | King | Review email drafted by A. Swick to clients updating them on arbitration issues. | 0.20 | 725 | $ | 145.00 |

| 7/24/2017 | Adam | Swick | Draft letter re proposed arbitrators; draft letter to clients re case status. | 0.60 | 725 | $ | 435.00 |
| 7/27/2017 | Benjamin | King | Review conflicts list for arbitration. | 0.40 | 725 | $ | 290.00 |
| 7/27/2017 | Adam | Swick | Exchange emails internally re letters and conflicts list needed for arbitration. | 0.30 | 725 | $ | 217.50 |
| 7/27/2017 | Gina | Tercero | Prepare form letter in response to arbitrator; prepare conflicts checklist for arbitrator; various PeopleMap searches for party address info for same. | 1.00 | 225 | $ | 225.00 |
| 8/2/2017 | Adam | Swick | Review draft conflicts list and supervise sending for arbitration. | 0.40 | 725 | $ | 290.00 |
| 8/7/2017 | Benjamin | King | Review appointment of arbitrator in AdvoCare arbitration; review AdvoCare's ranking list. | 0.20 | 725 | $ | 145.00 |
| 8/7/2017 | Adam | Swick | Review appointment of arbitrator; discuss with B. King. | 0.30 | 725 | $ | 217.50 |
| 8/8/2017 | Benjamin | King | Review FOIA response; research re: appeal of FOIA decisions; draft and send appeal letter. | 3.00 | 725 | $ | 2,175.00 |
| 8/8/2017 | Adam | Swick | Exchange emails internally re arbitrator. | 0.20 | 725 | $ | 145.00 |
| 8/8/2017 | Gina | Tercero | Save correspondence to SharePoint; calendar deadlines from same. | 0.20 | 225 | $ | 45.00 |
| 8/14/2017 | Benjamin | King | Research regarding new Nerium MLM/pyramid scheme complaint. | 0.50 | 725 | $ | 362.50 |

Appx. 173

| 8/18/2017 | Benjamin | King | Review potential dates for preliminary hearing call w/ arbitrator. | 0.20 | 725 | $ | 145.00 |
| 8/18/2017 | Adam | Swick | Review potential dates for arbitration with B. King. | 0.20 | 725 | $ | 145.00 |
| 8/28/2017 | Benjamin | King | Email defense counsel and arbitrator re: date for a preliminary hearing. | 0.20 | 725 | $ | 145.00 |
| 8/29/2017 | Benjamin | King | Emails to defense and arbitrator re: date for a preliminary hearing. | 0.20 | 725 | $ | 145.00 |
| 8/30/2017 | Benjamin | King | Call w/ A. Swick to discuss strategy in arbitration scheduling; edit A. Swick's letter to arbitrator re: plaintiffs' position on scheduling. | 0.50 | 725 | $ | 362.50 |
| 8/30/2017 | Adam | Swick | Draft letter to arbitrator; exchange emails with B. King re same. | 2.10 | 725 | $ | 1,522.50 |
| 8/31/2017 | Benjamin | King | Edit letter to arbitrator re: scheduling. | 0.20 | 725 | $ | 145.00 |
| 8/31/2017 | Adam | Swick | Edit letter to arbitrator re scheduling. | 0.30 | 725 | $ | 217.50 |
| 8/31/2017 | Gina | Tercero | Finalize letter and exhibits to arbitrator; serve same via email. | 0.50 | 225 | $ | 112.50 |
| 9/5/2017 | Adam | Swick | Review emails from former distributors; exchange emails with B. King re same; review arbitration procedures and initial documents received from AAA. | 0.30 | 725 | $ | 217.50 |
| 9/6/2017 | Benjamin | King | Review correspondence from the FTC re: FOIA request. | 0.30 | 725 | $ | 217.50 |
| 9/6/2017 | Adam | Swick | Exchange emails internally and with                    counsel re her case with AdvoCare. | 0.20 | 725 | $ | 145.00 |

Appx. 174

| Date | First | Last | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| 9/8/2017 | Benjamin | King | Multiple emails internally and with defense counsel re: scheduling in arbitration; calls w/ A. Swick re: same; edit draft scheduling order. | 1.50 | 725 | $ | 1,087.50 |
| 9/8/2017 | Adam | Swick | Multiple emails internally and with opposing counsel re scheduling in arbitration; calls with B. King re same. | 1.80 | 725 | $ | 1,305.00 |
| 9/12/2017 | Benjamin | King | Emails with former distributor re: participation in lawsuit; review and edit defendants' agreed proposed exhibit list. | 0.50 | 725 | $ | 362.50 |
| 9/12/2017 | Adam | Swick | Review scheduling order from the mediator; review opposing counsel's proposed exhibit list. | 0.30 | 725 | $ | 217.50 |
| 9/12/2017 | Gina | Tercero | Prepare index of headings in arbitration brief; calendar deadlines from arbitration scheduling order. | 1.20 | 225 | $ | 270.00 |
| 9/13/2017 | Benjamin | King | Edit defendants' proposed statement of the issues for arbitration. | 0.50 | 725 | $ | 362.50 |
| 9/13/2017 | Adam | Swick | Revise opposing counsel's edits to proposed statement of facts. | 1.30 | 725 | $ | 942.50 |
| 9/13/2017 | Gina | Tercero | Pull additional documents cited in arbitration brief; update index of documents cited therein. | 0.30 | 225 | $ | 67.50 |
| 9/26/2017 | Benjamin | King | Review AdvoCare's and the individual defendants' petition to compel arbitration filed with the AAA; legal research on arbitrability issues. | 1.50 | 725 | $ | 1,087.50 |
| 9/26/2017 | Adam | Swick | Review Defendants motions to compel arbitration and supporting documents; hold internal calls re same. | 2.10 | 725 | $ | 1,522.50 |
| 9/26/2017 | Gina | Tercero | Run peoplemap searches. | 0.30 | 225 | $ | 67.50 |
| 9/27/2017 | Benjamin | King | Legal research on arbitrability issues; edit opposition to petition to compel arbitration; team emails re: same. | 6.00 | 725 | $ | 4,350.00 |

Appx. 175

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 9/28/2017 | Benjamin | King | Legal research on arbitrability issues; edit opposition to petition to compel arbitration. | 1.00 | 725 | $ | 725.00 |
| 9/29/2017 | Benjamin | King | Legal research on arbitrability issues; edit opposition to petition to compel arbitration. | 1.00 | 725 | $ | 725.00 |
| 10/2/2017 | Benjamin | King | Legal research re: Torres/Stream; legal research re: arbitrability issues. | 0.50 | 725 | $ | 362.50 |
| 10/4/2017 | Benjamin | King | Legal research re: arbitrability issues; work on arbitration opposition brief. | 1.50 | 725 | $ | 1,087.50 |
| 10/4/2017 | Adam | Swick | Revise and edit opposition to Defendants' motions to compel arbitration; exchange emails with B. King re same; conduct research for brief. | 7.10 | 725 | $ | 5,147.50 |
| 10/5/2017 | Benjamin | King | Legal research re: arbitrability issues; work on arbitration opposition brief. | 3.00 | 725 | $ | 2,175.00 |
| 10/5/2017 | Adam | Swick | Revise and edit opposition to Defendants' motions to compel arbitration; exchange emails with B. King re same; conduct research for brief. | 6.80 | 725 | $ | 4,930.00 |
| 10/7/2017 | Benjamin | King | Legal research re: arbitrability issues; work on arbitration opposition brief. | 1.50 | 725 | $ | 1,087.50 |
| 10/10/2017 | Adam | Swick | Draft opposition to motions to compel arbitration. | 3.90 | 725 | $ | 2,827.50 |
| 10/11/2017 | Leo | Oppenheimer | Review response brief sections 1 and 2; conf. with A. Swick. | 0.80 | 425 | $ | 340.00 |
| 10/11/2017 | Adam | Swick | Draft opposition to motions to compel. | 5.10 | 725 | $ | 3,697.50 |
| 10/12/2017 | Adam | Swick | Coordinate arbitration deposit with G. Tercero; hold call with B. King re arbitration issues; conduct research re same and send to B. King; draft opposition to motions to compel. | 5.20 | 725 | $ | 3,770.00 |

Appx. 176

| 10/12/2017 | Gina | Tercero | Review draft motion re: arbitrability and prepare index of authorities cited therein. | 1.00 | 225 | $ | 225.00 |
| 10/13/2017 | Benjamin | King | Legal research re: arbitrability issues and AdvoCare's prior positions re: arbitrability; edit arbitration brief. | 2.50 | 725 | $ | 1,812.50 |
| 10/13/2017 | Leo | Oppenheimer | Proof and revise response brief. | 4.00 | 425 | $ | 1,700.00 |
| 10/13/2017 | Adam | Swick | Revise and edit opposition; exchange internal emails re same. | 4.10 | 725 | $ | 2,972.50 |
| 10/16/2017 | Benjamin | King | Edit arbitration brief. | 2.00 | 725 | $ | 1,450.00 |
| 10/16/2017 | Leo | Oppenheimer | Proof and revise response brief. | 1.10 | 425 | $ | 467.50 |
| 10/16/2017 | Adam | Swick | Revise and edit opposition; exchange internal emails re same. | 5.80 | 725 | $ | 4,205.00 |
| 10/16/2017 | Gina | Tercero | Format and run tables in response to motion to compel arbitration. | 3.00 | 225 | $ | 675.00 |
| 10/17/2017 | Benjamin | King | Team emails re: edits to arbitration brief. | 0.50 | 725 | $ | 362.50 |
| 10/17/2017 | Leo | Oppenheimer | Final proof of response brief. | 0.90 | 425 | $ | 382.50 |
| 10/17/2017 | Adam | Swick | Internal emails re opposition brief. | 0.60 | 725 | $ | 435.00 |
| 10/17/2017 | Gina | Tercero | Edit and format arbitration brief; finalize same and copies of authorities for arbitrator; serve same via email; send same via FedEx. | 5.50 | 225 | $ | 1,237.50 |

Appx. 177

| 10/27/2017 | Benjamin | King | Review defendants' reply briefs in support of arbitrability. | 1.50 | 725 | $ | 1,087.50 |
|---|---|---|---|---|---|---|---|
| 10/27/2017 | Adam | Swick | Review Defendants' reply briefs. | 1.20 | 725 | $ | 870.00 |
| 10/29/2017 | Adam | Swick | Continue to review defendants' reply briefs; exchange emails with team re same. | 2.10 | 725 | $ | 1,522.50 |
| 10/30/2017 | Benjamin | King | Lengthy email analysis of arguments in defendants' reply briefs; draft surreply; team call to discuss responding to reply brief. | 8.00 | 725 | $ | 5,800.00 |
| 10/30/2017 | Leo | Oppenheimer | Review motion ISO arbitration (.5); initial response outline (2.9); call with team re: sur reply (.4); legal research re: concept of intent and meeting of the minds in form contracts of adhesion (5.5). | 9.30 | 425 | $ | 3,952.50 |
| 10/30/2017 | Adam | Swick | Analyze defendants arguments in reply brief; conduct research re same; hold team call re strategy to respond. | 8.20 | 725 | $ | 5,945.00 |
| 10/31/2017 | Benjamin | King | Draft surreply; legal research regarding arbitrability issues; review L. Oppenheimer's legal research on contract reformation. | 5.00 | 725 | $ | 3,625.00 |
| 10/31/2017 | Leo | Oppenheimer | Legal research and memo to B. King re: concept of intent in form contracts of adhesion. | 2.30 | 425 | $ | 977.50 |
| 10/31/2017 | Adam | Swick | Draft surreply; conduct research re same; exchange emails with B. King re same. | 4.50 | 725 | $ | 3,262.50 |
| 11/1/2017 | Benjamin | King | Legal research re: arbitrability issues; team emails re: legal issues needing additional research and consideration; factual research re: prior versions of AdvoCare's agreements; draft sur-reply brief. | 10.00 | 725 | $ | 7,250.00 |
| 11/1/2017 | Leo | Oppenheimer | Legal research re: outlining oral argument recordings from fifth circuit court of appeals (.5). | 0.50 | 425 | $ | 212.50 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 11/1/2017 | Adam | Swick | Draft surreply; hold calls with B. King re same; conduct legal research re same. | 6.20 | 725 | $ | 4,495.00 |
| 11/2/2017 | Jason | Cairns | Legal research re contract reformation, illusory contract provisions, and the doctrine of quasi estoppel. | 5.00 | 525 | $ | 2,625.00 |
| 11/2/2017 | Benjamin | King | Team emails re: work needed for sur-reply; legal research re: arbitrability issues; edit sur-reply; emails with former distributor about declaration; emails with former insider re: AdvoCare practices. | 6.00 | 725 | $ | 4,350.00 |
| 11/2/2017 | Leo | Oppenheimer | Legal research re: severance doctrine (4); legal research re: reformation doctrine (4.1). | 8.10 | 425 | $ | 3,442.50 |
| 11/2/2017 | Adam | Swick | Revise and edit surreply; hold calls with B. King re same; conduct legal research re same; call and email clients re arbitration status and issues. | 8.10 | 725 | $ | 5,872.50 |
| 11/3/2017 | Benjamin | King | Review L. Oppenheimer's research re: severance and reformation; factual research re: earlier versions of policies and procedures; edit sur-reply brief; legal research re: arbitrability issues. | 4.50 | 725 | $ | 3,262.50 |
| 11/3/2017 | Leo | Oppenheimer | Legal research re: severance not appropriate where proponent fails to identify specific clause to be severed and draft memo to team re: same (6); legal research re: outlining case history of 513 SW3d 543 (.6); legal research re: CA courts cannot augment but can only sever unconscionable provisions (2); revise and proof sur-reply (.4). | 9.00 | 425 | $ | 3,825.00 |
| 11/3/2017 | Adam | Swick | Draft surreply; exchange multiple emails with B. King and L. Oppenheimer re same; conduct research re same; hold calls with former distributors; review AdvoCare documents relevant to brief; exchange emails with clients re upcoming hearing. | 7.50 | 725 | $ | 5,437.50 |
| 11/4/2017 | Adam | Swick | Edit surreply; exchange emails with B. King re same. | 2.90 | 725 | $ | 2,102.50 |
| 11/5/2017 | Benjamin | King | Emails w/ A. Swick re: edits to brief. | 0.30 | 725 | $ | 217.50 |

| Date | First | Last | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 11/5/2017 | Leo | Oppenheimer | Legal research re: reformation clauses in illusory contracts are ineffective. | 1.50 | 425 | $ 637.50 |
| 11/5/2017 | Adam | Swick | Exchange emails with B. King re surreply. | 0.40 | 725 | $ 290.00 |
| 11/6/2017 | Benjamin | King | Finalize sur-reply; emails with defense counsel re: additional documents; team emails re: edits to sur-reply; legal research. | 8.00 | 725 | $ 5,800.00 |
| 11/6/2017 | Leo | Oppenheimer | Cont. legal research re: reformation clauses in illusory contracts are ineffective (1.3); revise and proof sur-reply (3.2). | 5.50 | 425 | $ 2,337.50 |
| 11/6/2017 | Adam | Swick | Review order staying case pending arbitration; draft, edit, and finalize surreply; hold calls and emails with B. King re same. | 3.20 | 725 | $ 2,320.00 |
| 11/6/2017 | Gina | Tercero | Run tables in arbitration sur-reply; pull and print cases cited to send to arbitrator. | 1.50 | 225 | $ 337.50 |
| 11/7/2017 | Benjamin | King | Finalize sur-reply; team emails re: finalizing; draft cover letter to arbitrator re: sur-reply; legal research re: other MLM/pyramid scheme cases. | 3.00 | 725 | $ 2,175.00 |
| 11/7/2017 | Adam | Swick | Finalize surreply; team emails re same; draft cover letter to arbitrator re same. | 2.10 | 725 | $ 1,522.50 |
| 11/7/2017 | Gina | Tercero | Finalize tables in arbitration sur-reply; prepare transmittal letter and materials to send to arbitrator; prepare and finalize supplemental exhibit list and exhibits; serve same via email. | 2.50 | 225 | $ 562.50 |
| 11/8/2017 | Adam | Swick | Exchange emails with B. King re arbitration location and procedures. | 0.20 | 725 | $ 145.00 |
| 11/14/2017 | Benjamin | King | Review detailed email from arbitrator re: hearing logistics; team emails re: same. | 0.50 | 725 | $ 362.50 |

| 11/14/2017 | Adam | Swick | Exchange emails with internally and with opposing counsel re arbitration procedures; conduct research to prepare for arbitration hearing; exchange emails with B. King re same; review email from arbitrator. | 3.30 | 725 | $ | 2,392.50 |
|---|---|---|---|---|---|---|---|
| 11/14/2017 | Gina | Tercero | Prepare hearing binder for A. Swick. | 0.50 | 225 | $ | 112.50 |
| 11/15/2017 | Benjamin | King | Prepare for oral argument in arbitration. | 0.50 | 725 | $ | 362.50 |
| 11/15/2017 | Adam | Swick | Exchange emails with internally and with opposing counsel re arbitration procedures and court reporter. | 0.20 | 725 | $ | 145.00 |
| 11/16/2017 | Benjamin | King | Prepare for oral argument; team emails re: preparation. | 0.50 | 725 | $ | 362.50 |
| 11/16/2017 | Adam | Swick | Exchange emails with B. King to prepare for upcoming arbitration hearing. | 0.40 | 725 | $ | 290.00 |
| 11/17/2017 | Benjamin | King | Teleconference w/ L. Oppenheimer and A. Swick re: hearing preparation; emails with defense re: sur-sur-reply; review sur-sur-reply and supporting papers; prepare for oral argument; draft oral argument outline; legal research re: arbitration issues. | 3.40 | 725 | $ | 2,465.00 |
| 11/17/2017 | Adam | Swick | Review AdvoCare's reply to sur-reply and related documents; exchange emails with B. King re same; calls with B. King and L. Oppenheimer re upcoming arbitration hearing; conduct research re same. | 4.70 | 725 | $ | 3,407.50 |
| 11/19/2017 | Adam | Swick | Conduct research for upcoming arbitration hearing; exchange emails with B. King re same. | 3.20 | 725 | $ | 2,320.00 |
| 11/20/2017 | Benjamin | King | Prepare for oral argument; draft oral argument outline; meetings with A. Swick and L. Oppenheimer. | 10.00 | 725 | $ | 7,250.00 |

Appx. 181

| 11/20/2017 | Leo | Oppenheimer | Prepare for arbitration hearing (6); travel to Austin (5.5). | 11.50 | 425 | $ | 4,887.50 |
| 11/20/2017 | Adam | Swick | Assist B. King in preparation for oral argument; review argument outline; hold several meetings with B. King and L. Oppenheimer re same; exchange emails with clients re tomorrow; exchange emails with G. Tercero re AdvoCare's Reply to Sur-Reply in Arbitration. | 8.30 | 725 | $ | 6,017.50 |
| 11/20/2017 | Gina | Tercero | Update arbitration binder; print out exhibits for arbitration hearing; print out cases cited in arbitration briefing. | 1.00 | 225 | $ | 225.00 |
| 11/21/2017 | Benjamin | King | Prepare for and attend oral argument; meetings with A. Swick and L. Oppenheimer. | 4.00 | 725 | $ | 2,900.00 |
| 11/21/2017 | Leo | Oppenheimer | Prepare for arbitration hearing (3.5); arbitration hearing (3); return travel to Dallas (4.5). | 11.00 | 425 | $ | 4,675.00 |
| 11/21/2017 | Adam | Swick | Prepare for and attend arbitration hearing. | 4.10 | 725 | $ | 2,972.50 |
| 11/29/2017 | Benjamin | King | Review decision denying motion for judgment on the pleadings in Torres case. | 0.50 | 725 | $ | 362.50 |
| 12/14/2017 | Benjamin | King | Emails with former distributor. | 0.20 | 725 | $ | 145.00 |
| 12/27/2017 | P. Jason | Collins | Review and analysis of arbitration order. | 0.75 | 925 | $ | 693.75 |
| 12/27/2017 | Benjamin | King | Review arbitrator's decision on arbitrability; team calls re: same. | 0.50 | 725 | $ | 362.50 |
| 12/27/2017 | Adam | Swick | Review arbitrator's decision; internal calls and emails re same. | 1.30 | 725 | $ | 942.50 |

Appx. 182

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|--|--------|
| 1/2/2018 | Benjamin | King | Email defense about need to notify district court about outcome of arbitration and get scheduling order in place; email A. Swick re: other AdvoCare cases. | 0.30 | 875 | $ | 262.50 |
| 1/4/2018 | Benjamin | King | Emails with former distributor. | 0.20 | 875 | $ | 175.00 |
| 1/8/2018 | Benjamin | King | Emails and calls with counsel for AdvoCare re: scheduling. | 0.30 | 875 | $ | 262.50 |
| 1/16/2018 | Benjamin | King | Emails with defense counsel re: schedule in district court; draft notice of arbitration decision and scheduling motion; emails w/ A. Swick re: same. | 1.30 | 875 | $ | 1,137.50 |
| 1/16/2018 | Adam | Swick | Exchange emails with B. King re scheduling order. | 0.20 | 825 | $ | 165.00 |
| 1/17/2018 | Benjamin | King | Emails with defense counsel re: notice of decision and scheduling motion; edits to same. | 1.50 | 875 | $ | 1,312.50 |
| 1/17/2018 | Adam | Swick | Finalize and file motion to reopen case and for scheduling order; review court ordered scheduling order; exchange emails with B. King re same. | 0.50 | 825 | $ | 412.50 |
| 2/6/2018 | Benjamin | King | Legal research re: other pyramid scheme/MLM cases. | 0.40 | 875 | $ | 350.00 |
| 2/8/2018 | Benjamin | King | Review motions to dismiss. | 1.00 | 875 | $ | 875.00 |
| 2/8/2018 | Leo | Oppenheimer | Review defendant's MTD. | 0.50 | 575 | $ | 287.50 |
| 2/9/2018 | Benjamin | King | Legal research re: PSLRA and pyramid scheme RICO claims. | 0.50 | 875 | $ | 437.50 |
| 2/12/2018 | Benjamin | King | Legal research re: PSLRA argument; draft section of motion to dismiss opposition brief re: PSLRA. | 6.00 | 875 | $ | 5,250.00 |

Appx. 183

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 2/12/2018 | Adam | Swick | Review amended motions to dismiss. | 1.60 | 825 | $ | 1,320.00 |
| 2/13/2018 | Benjamin | King | Legal research re: PSLRA argument; draft section of motion to dismiss opposition brief re: PSLRA. | 4.00 | 875 | $ | 3,500.00 |
| 2/16/2018 | Benjamin | King | Call w/ A. Swick re: briefing; legal research re: PSLRA argument; conference w/ L. Oppenheimer re: project for brief; draft section of motion to dismiss opposition brief re: PSLRA. | 8.00 | 875 | $ | 7,000.00 |
| 2/16/2018 | Leo | Oppenheimer | Legal research re: page length for responsive pleadings in N.D. TX (.3); legal research re: securities registration requirements under federal and state law (2). | 2.30 | 575 | $ | 1,322.50 |
| 2/16/2018 | Adam | Swick | Call with B. King re briefing; begin drafting opposition to motions to dismiss; review various AdvoCare-related websites. | 7.20 | 825 | $ | 5,940.00 |
| 2/19/2018 | Benjamin | King | Review L. Oppenheimer's research re: securities claim. | 0.30 | 875 | $ | 262.50 |
| 2/19/2018 | Leo | Oppenheimer | Legal research re: securities registration requirements under federal and state law. | 4.60 | 575 | $ | 2,645.00 |
| 2/20/2018 | Benjamin | King | Consider dismissal of arbitration claim; email A. Swick re: same; email with former distributor; legal research re: PSLRA issue; draft sections of opposition to motions to dismiss. | 2.50 | 875 | $ | 2,187.50 |
| 2/20/2018 | Leo | Oppenheimer | Legal research re: use of federal definition of securities used in Texas courts. | 0.40 | 575 | $ | 230.00 |
| 2/20/2018 | Adam | Swick | Draft and edit Opposition to Motions to Dismiss; conduct research re same; exchange emails with B. King re same. | 4.60 | 825 | $ | 3,795.00 |
| 2/21/2018 | Benjamin | King | Email to and call with AdvoCare counsel re: dismissing declaratory judgment claim; legal research in support of opposition to motion to dismiss; draft sections of opposition brief. | 3.30 | 875 | $ | 2,887.50 |

| 2/21/2018 | Adam | Swick | Draft and edit Opposition to Motions to Dismiss; conduct research re same; exchange emails with B. King re same; emails with opposing counsel and B. King re dismissing declaratory judgment claim. | 5.10 | 825 | $ | 4,207.50 |
| 2/21/2018 | Ben | Thomas | Research regarding securities certification requirement | 0.01 | 575 | $ | 5.75 |
| 2/21/2018 | Ben | Thomas | Research regarding securities certification requirement; conference with B. King regarding certification requirement | 2.05 | 575 | $ | 1,178.75 |
| 2/21/2018 | Ben | Thomas | Research regarding securities certification requirement | 3.62 | 575 | $ | 2,081.50 |
| 2/22/2018 | Adam | Swick | Draft and edit Opposition to Motions to Dismiss. | 0.60 | 825 | $ | 495.00 |
| 2/23/2018 | Benjamin | King | Office conference w/ L. Oppenheimer and A. Swick to discuss discovery issues. | 0.30 | 875 | $ | 262.50 |
| 2/23/2018 | Adam | Swick | Draft and edit Opposition to Motions to Dismiss; conduct research re same; exchange emails with B. King re same. | 2.10 | 825 | $ | 1,732.50 |
| 2/26/2018 | Adam | Swick | Draft and edit Opposition to Motions to Dismiss; exchange emails with B. King re same. | 8.90 | 825 | $ | 7,342.50 |
| 2/27/2018 | Gina | Tercero | Format opposition to motion to dismiss. | 0.50 | 250 | $ | 125.00 |
| 2/28/2018 | Benjamin | King | Review motion to dismiss briefing in other MLM/pyramid scheme case; draft stipulation regarding declaratory judgment count. | 1.00 | 875 | $ | 875.00 |
| 2/28/2018 | Adam | Swick | Revise opposition to motions to dismiss; exchange emails with B. King re same; review portions of brief drafted by B. King. | 3.10 | 825 | $ | 2,557.50 |

Appx. 185

| 3/2/2018 | Benjamin | King | Draft and edit motion to dismiss opposition briefs; legal research in support. | 3.00 | 875 | $ | 2,625.00 |
|---|---|---|---|---|---|---|---|
| 3/2/2018 | Adam | Swick | Draft and edit Opposition to Motions to Dismiss; conduct research re same; exchange emails with B. King re same. | 4.10 | 825 | $ | 3,382.50 |
| 3/5/2018 | Benjamin | King | Draft and edit motion to dismiss opposition briefs; legal research in support. | 3.00 | 875 | $ | 2,625.00 |
| 3/5/2018 | Leo | Oppenheimer | Revise response in opposition to MTD. | 4.50 | 575 | $ | 2,587.50 |
| 3/5/2018 | Adam | Swick | Draft and edit Opposition to Motions to Dismiss; conduct research re same; exchange emails with B. King re same. | 3.40 | 825 | $ | 2,805.00 |
| 3/6/2018 | Benjamin | King | Draft/edit/finalize motion to dismiss opposition briefs. | 4.00 | 875 | $ | 3,500.00 |
| 3/6/2018 | Adam | Swick | Draft and edit Opposition to Motions to Dismiss; exchange emails with B. King re same. | 2.40 | 825 | $ | 1,980.00 |
| 3/7/2018 | Adam | Swick | Draft and edit Opposition to Motions to Dismiss; conduct research re same. | 6.70 | 825 | $ | 5,527.50 |
| 3/8/2018 | Benjamin | King | Final edits to motion to dismiss opposition briefs. | 1.00 | 875 | $ | 875.00 |
| 3/8/2018 | Leo | Oppenheimer | Proof and revise response in opposition to independent defendant's MTD (2.5); proof and revise response in opposition to AdvoCare's MTD (3). | 5.50 | 575 | $ | 3,162.50 |
| 3/8/2018 | Adam | Swick | Revise and edit Opposition to motions to dismiss. | 3.30 | 825 | $ | 2,722.50 |
| 3/8/2018 | Gina | Tercero | Run tables in opposition to individual defendants' motion to dismiss. | 1.00 | 250 | $ | 250.00 |

Appx. 186

| 3/9/2018 | Benjamin | King | Final edits to motion to dismiss opposition briefs. | 1.00 | 875 | $ | 875.00 |
| 3/9/2018 | Adam | Swick | Finalize and file Opposition to Motions to Dismiss; exchange emails with B. King and G. Tercero re same. | 3.20 | 825 | $ | 2,640.00 |
| 3/9/2018 | Gina | Tercero | Run tables in opposition to AdvoCare's motion to dismiss; efile both oppositions to motion to dismiss; prepare chambers copies of same and accompanying transmittal letter. | 2.50 | 250 | $ | 625.00 |
| 3/23/2018 | Benjamin | King | Review order for status conference; email A. Swick re: same. | 0.30 | 875 | $ | 262.50 |
| 3/23/2018 | Adam | Swick | Review order for status conference; email B. King re same. | 0.20 | 825 | $ | 165.00 |
| 3/26/2018 | Benjamin | King | Email defense counsel for pre-status conference conferral. | 0.30 | 875 | $ | 262.50 |
| 3/27/2018 | Benjamin | King | Call with defense counsel re: scheduling; email defense counsel re: scheduling and need for discovery. | 0.80 | 875 | $ | 700.00 |
| 3/28/2018 | Benjamin | King | Prepare for and attend status conference; confer with A. Swick before and after status conference; emails with defense counsel re: withdrawing motion to dismiss the declaratory judgment claim. | 1.50 | 875 | $ | 1,312.50 |
| 3/28/2018 | Leo | Oppenheimer | Status conference hearing. | 1.50 | 575 | $ | 862.50 |
| 3/28/2018 | Adam | Swick | Attend status conference; confer with B. King re same; review emails with defense counsel re: withdrawing motion to dismiss the declaratory judgment claim. | 1.20 | 825 | $ | 990.00 |
| 3/29/2018 | Benjamin | King | Email defense counsel re: motion to dismiss hearing date. | 0.20 | 875 | $ | 175.00 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 3/30/2018 | Benjamin | King | Email defense counsel re: motion to dismiss hearing date; review defendants' reply briefs in support of motions to dismiss. | 1.50 | 875 | $ | 1,312.50 |
| 3/30/2018 | Adam | Swick | Review Defendants replies ISO motions to dismiss. | 2.10 | 825 | $ | 1,732.50 |
| 4/2/2018 | Leo | Oppenheimer | Review Defendants' MTD reply. | 0.30 | 575 | $ | 172.50 |
| 4/3/2018 | Benjamin | King | Draft letter to court re: need for a hearing date; calls and emails w/ A. Swick re: same; email defense counsel re: same. | 0.50 | 875 | $ | 437.50 |
| 4/3/2018 | Adam | Swick | Exchange calls and emails with B. King re letter to court for hearing date. | 0.20 | 825 | $ | 165.00 |
| 4/4/2018 | Benjamin | King | Emails with defense counsel re: calling court with proposed hearing date; participate in call to court. | 0.50 | 875 | $ | 437.50 |
| 4/11/2018 | Benjamin | King | Call clerk re: hearing date; email A. Swick re: same. | 0.20 | 875 | $ | 175.00 |
| 4/11/2018 | Adam | Swick | Exchange emails internally and with court re hearing date on MTD. | 0.20 | 825 | $ | 165.00 |
| 4/13/2018 | Benjamin | King | Email court clerk re: availability for motion hearing. | 0.10 | 875 | $ | 87.50 |
| 4/18/2018 | Gina | Tercero | Prepare motion to dismiss briefing and cases cited binder with index. | 1.50 | 250 | $ | 375.00 |
| 4/19/2018 | Benjamin | King | Email court clerk re: setting a date for motion hearing; research regarding other MLM/pyramid scheme cases. | 0.50 | 875 | $ | 437.50 |
| 4/19/2018 | Adam | Swick | Exchange emails internally re hearing date re MTD. | 0.20 | 825 | $ | 165.00 |

Appx. 188

| 4/23/2018 | Adam | Swick | Exchange emails internally and with opposing counsel re getting copies of MTD briefing to the court; review defendants' arguments re MTD; send email to B. King re same. | 2.40 | 825 | $ | 1,980.00 |
|---|---|---|---|---|---|---|---|
| 4/25/2018 | Adam | Swick | Conduct research re unjust enrichment; exchange emails with B. King re same. | 6.60 | 825 | $ | 5,445.00 |
| 4/29/2018 | Benjamin | King | Review A. Swick's argument outline and provide comments; begin preparing for oral argument on motions to dismiss, including drafting outline. | 4.50 | 875 | $ | 3,937.50 |
| 4/29/2018 | Adam | Swick | Prepare for AdvoCare oral argument. | 4.30 | 825 | $ | 3,547.50 |
| 4/30/2018 | Benjamin | King | Prepare for oral argument on motions to dismiss; legal research relevant to motion to dismiss issues; confer with A. Swick and L. Oppenheimer re: preparations; draft argument outline. | 8.00 | 875 | $ | 7,000.00 |
| 4/30/2018 | Adam | Swick | Prepare for and travel for hearing on motions to dismiss. | 8.10 | 825 | $ | 6,682.50 |
| 5/1/2018 | P. Jason | Collins | Discussions re hearing. | 0.50 | 975 | $ | 487.50 |
| 5/1/2018 | Benjamin | King | Prepare for and attend oral argument on motions to dismiss; confer with A. Swick and L. Oppenheimer re: preparations. | 5.00 | 875 | $ | 4,375.00 |
| 5/1/2018 | Leo | Oppenheimer | Hearing on MTD. | 4.00 | 575 | $ | 2,300.00 |
| 5/1/2018 | Adam | Swick | Prepare for and attended hearing on motions to dismiss. | 8.10 | 825 | $ | 6,682.50 |
| 5/11/2018 | Benjamin | King | Emails w/ A. Swick re: beginning discovery while motions to dismiss are pending. | 0.50 | 875 | $ | 437.50 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 5/23/2018 | Benjamin | King | Review letter to court drafted by A. Swick; emails and call re: same. | 0.50 | 875 | $ | 437.50 |
| 5/23/2018 | Adam | Swick | Draft email re misstatements at hearing. | 6.20 | 825 | $ | 5,115.00 |
| 5/29/2018 | Benjamin | King | Confer w/ A. Swick re: discovery and scheduling; review transcript from motion to dismiss hearing. | 0.50 | 875 | $ | 437.50 |
| 7/3/2018 | Benjamin | King | Legal research re: other MLM pyramid scheme cases. | 0.30 | 875 | $ | 262.50 |
| 7/6/2018 | Benjamin | King | Call with former distributor to discuss experiences with AdvoCare. | 0.50 | 875 | $ | 437.50 |
| 7/17/2018 | Benjamin | King | Legal research re: other MLM pyramid scheme cases. | 0.30 | 875 | $ | 262.50 |
| 8/13/2018 | Benjamin | King | Legal research re: other MLM pyramid scheme cases. | 0.30 | 875 | $ | 262.50 |
| 8/27/2018 | Benjamin | King | Email exchange with former AdvoCare distributor; review court's decision on motions to dismiss; strategize complaint amendment with A. Swick. | 1.30 | 875 | $ | 1,137.50 |
| 8/27/2018 | Leo | Oppenheimer | Review MTD order. | 0.30 | 575 | $ | 172.50 |
| 8/27/2018 | Adam | Swick | Review Court's decision on AdvoCare's motion to dismiss; discuss same with B. King. | 1.50 | 825 | $ | 1,237.50 |
| 8/28/2018 | P. Jason | Collins | Review, analysis, and discussions re Order on motion to dismiss. | 0.75 | 975 | $ | 731.25 |
| 8/28/2018 | Benjamin | King | Strategize regarding complaint amendment and discovery with A. Swick. | 1.00 | 875 | $ | 875.00 |

| 8/28/2018 | Adam | Swick | Continue to review Court's Order; strategize with B. King re amendment. | 1.40 | 825 | $ | 1,155.00 |
|---|---|---|---|---|---|---|---|
| 8/31/2018 | Benjamin | King | Office conference w/ L. Oppenheimer re: legal research on amending; legal research re: RICO cause of action. | 1.50 | 875 | $ | 1,312.50 |
| 8/31/2018 | Leo | Oppenheimer | Legal research re: amending complaint and preserving appeal (2.7); draft motion for leave to amend (3.1). | 5.80 | 575 | $ | 3,335.00 |
| 8/31/2018 | Adam | Swick | Hold call with B. King and L. Oppenheimer re legal research on motion to amend complaint; review case documents to use in amended complaint; call with B. King re strategy. | 1.80 | 825 | $ | 1,485.00 |
| 8/31/2018 | Gina | Tercero | Research individual defendants online presence including secretary of state entity searches. | 2.00 | 250 | $ | 500.00 |
| 9/2/2018 | Benjamin | King | Legal research re: ability to appeal dismissal of individual defendants without amending complaint to restate claims against them; call w/ A. Swick re: new allegations against individual defendants; email defense counsel re: amending complaint. | 2.50 | 875 | $ | 2,187.50 |
| 9/2/2018 | Leo | Oppenheimer | Legal research re: amending complaint and preserving appeal. | 1.50 | 575 | $ | 862.50 |
| 9/3/2018 | Adam | Swick | Review draft complaint; revise and edit same; review documents from other cases re AdvoCare wrongdoing; coordinate with M. Myers re transcript; exchange emails with D. Elms re Ramos case. | 7.10 | 825 | $ | 5,857.50 |
| 9/4/2018 | Leo | Oppenheimer | Legal research re: amending complaint and preserving appeal (0.8); draft motion for leave to amend (1.5). | 2.30 | 575 | $ | 1,322.50 |
| 9/4/2018 | Adam | Swick | Continue to draft amended complaint; setup calls with clients; exchange emails with D. Elms re Ramos case. | 8.10 | 825 | $ | 6,682.50 |
| 9/4/2018 | Gina | Tercero | Research individual defendants online presence including secretary of state entity searches. | 7.00 | 250 | $ | 1,750.00 |

| 9/5/2018 | Adam | Swick | Draft amended complaint. | 1.20 | 825 | $ | 990.00 |
| 9/5/2018 | Gina | Tercero | Search internet for testimonials re AdvoCare by V. Cuevas; add information re: same to amended complaint. | 1.50 | 250 | $ | 375.00 |
| 9/6/2018 | Leo | Oppenheimer | Legal research re necessary defendants for RICO claim. | 0.50 | 575 | $ | 287.50 |
| 9/6/2018 | Adam | Swick | Review AdvoCare's motion to Extend Time; exchange emails with opposing counsel re same. | 0.30 | 825 | $ | 247.50 |
| 9/7/2018 | Benjamin | King | Review draft of amended complaint prepared by A. Swick; edit amended complaint; call w/ A. Swick and L. Oppenheimer re: amended complaint; emails re: same. | 6.00 | 875 | $ | 5,250.00 |
| 9/7/2018 | Leo | Oppenheimer | Legal research re necessary defendants for RICO claim. | 2.70 | 575 | $ | 1,552.50 |
| 9/7/2018 | Adam | Swick | Draft complaint; exchange emails and hold calls with B. King and L. Oppenheimer re research for the amended complaint; exchange numerous emails with B. King re edits to amended complaint. | 6.70 | 825 | $ | 5,527.50 |
| 9/9/2018 | Adam | Swick | Edit and revise amended complaint; edit and revise  motion for leave to file amended complaint; review emails with opposing counsel re amended complaint; emails and calls with B. King re same. | 6.90 | 825 | $ | 5,692.50 |
| 9/10/2018 | Benjamin | King | Edit amended complaint; edit motion for leave to file amended complaint; email defense counsel re: amended complaint; emails and calls w/ A. Swick re: amended complaint. | 7.00 | 875 | $ | 6,125.00 |
| 9/10/2018 | Leo | Oppenheimer | Review and revise motion to amend. | 0.60 | 575 | $ | 345.00 |
| 9/10/2018 | Adam | Swick | Finalize amended complaint; exchange emails with B. King and G. Tercero re same; exchange emails with B. King re discovery issues and strategy. | 3.10 | 825 | $ | 2,557.50 |

| Date | First | Last | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 9/11/2018 | Benjamin | King | Final edits to amended complaint and motion for leave to file complaint; team emails re: same; review L. Oppenheimer's research re: impact of amending on schedule. | 2.00 | 875 | $ 1,750.00 |
| 9/11/2018 | Leo | Oppenheimer | Legal research re next procedural steps; memo re same. | 1.80 | 575 | $ 1,035.00 |
| 9/11/2018 | Gina | Tercero | Edit/finalize motion for leave to file amended complaint; prepare exhibits to same; efile same. | 2.50 | 250 | $ 625.00 |
| 9/14/2018 | Benjamin | King | Emails with potential class member and former distributor. | 0.20 | 875 | $ 175.00 |
| 10/1/2018 | Benjamin | King | Review email from defense counsel re: re-moving to dismiss; discuss same w/ A. Swick; reply to email. | 0.70 | 875 | $ 612.50 |
| 10/2/2018 | Benjamin | King | Review proposed stipulation re: answer deadline; email AdvoCare counsel re: same. | 0.50 | 875 | $ 437.50 |
| 10/4/2018 | Benjamin | King | Review AdvoCare's second motion to dismiss; plan response. | 2.00 | 875 | $ 1,750.00 |
| 10/5/2018 | Benjamin | King | Legal research regarding RICO enterprise issues for responding to AdvoCare's motion to dismiss. | 4.00 | 875 | $ 3,500.00 |
| 10/8/2018 | Benjamin | King | Legal research regarding RICO association-in-fact issues raised in AdvoCare's motion to dismiss. | 3.50 | 875 | $ 3,062.50 |
| 10/9/2018 | Adam | Swick | Review MTD brief. | 1.10 | 825 | $ 907.50 |
| 10/11/2018 | Benjamin | King | Review proposed scheduling order; reply to AdvoCare's counsel re: same. | 0.50 | 875 | $ 437.50 |
| 10/11/2018 | Adam | Swick | Review proposed schedule (.5); exchange emails with B. King re same (.2). | 0.70 | 825 | $ 577.50 |

| Date | First | Last | Description | Hours | Rate | Amount |
|------|-------|------|-------------|-------|------|--------|
| 10/16/2018 | Gina | Tercero | Download filings and save to system; calendar deadlines. | 0.50 | 250 | $ 125.00 |
| 10/29/2018 | Benjamin | King | Firm emails re: choosing a mediator for AdvoCare mediation ordered by court; emails re: scheduling order. | 0.50 | 875 | $ 437.50 |
| 10/29/2018 | Adam | Swick | Edit proposed scheduling order; exchange emails with B. King re same and picking a mediator. | 0.30 | 825 | $ 247.50 |
| 11/2/2018 | Benjamin | King | Call w/ A. Swick re: drafting opposition to motion to dismiss; email outline of opposition to motion to dismiss; gather and send research re: same. | 1.00 | 875 | $ 875.00 |
| 11/2/2018 | Adam | Swick | Review draft of opposition to MTD; hold call with B. King re same. | 1.80 | 825 | $ 1,485.00 |
| 11/5/2018 | Benjamin | King | Call w/ A. Swick re: drafting opposition to motion to dismiss; email ideas for grounds for responding to the motion to dismiss. | 2.00 | 875 | $ 1,750.00 |
| 11/5/2018 | Adam | Swick | Conduct research re AdvoCare's MTD; exchange emails and hold call with B. King re legal arguments re same. | 0.90 | 825 | $ 742.50 |
| 11/6/2018 | Benjamin | King | Review AdvoCare's initial disclosures; email A. Swick re: same. | 0.30 | 875 | $ 262.50 |
| 11/6/2018 | Adam | Swick | Review AdvoCare's initial disclosures; discuss same with B. King. | 0.40 | 825 | $ 330.00 |
| 11/7/2018 | Benjamin | King | Multiple calls and emails w/ A. Swick re: initial disclosures; finalize and service initial disclosures. | 1.00 | 875 | $ 875.00 |
| 11/7/2018 | Adam | Swick | Conduct research re opposition to MTD; exchange emails with B. King re same; hold call with clients; assist in drafting initial disclosures. | 5.60 | 825 | $ 4,620.00 |
| 11/7/2018 | Gina | Tercero | Download filings and save to system; calendar deadlines; format initial disclosures. | 0.50 | 250 | $ 125.00 |

Appx. 194

| Date | First | Last | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| 11/8/2018 | Benjamin | King | Draft/edit opposition to AdvoCare's motion to dismiss; legal research re: same; emails w/ A. Swick re: same. | 7.00 | 875 | $ | 6,125.00 |
| 11/8/2018 | Adam | Swick | Conduct research for, draft, and edit opposition to MTD; exchange emails with B. King and G. Tercero re same. | 6.60 | 825 | $ | 5,445.00 |
| 11/9/2018 | Benjamin | King | Draft/edit opposition to AdvoCare's motion to dismiss; emails w/ A. Swick re: same. | 3.50 | 875 | $ | 3,062.50 |
| 11/9/2018 | Adam | Swick | Conduct research for and draft opposition to MTD; exchange numerous emails with B. King and J. Cairns re same. | 8.10 | 825 | $ | 6,682.50 |
| 11/11/2018 | Leo | Oppenheimer | Revise and proof opposition to MTD. | 3.00 | 575 | $ | 1,725.00 |
| 11/11/2018 | Adam | Swick | Exchange emails with B. King and L. Oppenheimer re opposition draft. | 0.20 | 825 | $ | 165.00 |
| 11/12/2018 | Benjamin | King | Edit opposition to AdvoCare's motion to dismiss; emails w/ A. Swick re: same. | 2.00 | 875 | $ | 1,750.00 |
| 11/12/2018 | Adam | Swick | Draft and edit opposition to MTD. | 3.20 | 825 | $ | 2,640.00 |
| 11/13/2018 | Benjamin | King | Edit opposition to AdvoCare's motion to dismiss; emails w/ A. Swick re: same. | 2.00 | 875 | $ | 1,750.00 |
| 11/13/2018 | Leo | Oppenheimer | Revise and proof opposition to MTD. | 0.70 | 575 | $ | 402.50 |
| 11/13/2018 | Adam | Swick | Conduct research for, draft, and edit opposition to MTD; exchange emails with B. King, G. Tercero, and L. Oppenheimer re same. | 6.20 | 825 | $ | 5,115.00 |
| 11/14/2018 | Benjamin | King | Review final opposition to AdvoCare's motion to dismiss; call and emails w/ A. Swick re: same. | 0.30 | 875 | $ | 262.50 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 11/14/2018 | Adam | Swick | Edit and finalize opposition to AdvoCare's MTD; exchange calls and emails with B. King; G. Tercero, and L. Oppenheimer re same. | 3.40 | 825 | $ | 2,805.00 |
| 11/14/2018 | Gina | Tercero | Edit/format response to motion to dismiss; run tables in same; efile same. | 2.50 | 250 | $ | 625.00 |
| 11/15/2018 | Adam | Swick | Review case deadlines; discuss same with B. King. | 0.20 | 825 | $ | 165.00 |
| 12/5/2018 | Benjamin | King | Review AdvoCare's reply in support of its motion to dismiss. | 1.00 | 875 | $ | 875.00 |
| 12/5/2018 | Adam | Swick | Review reply ISO MTD; exchange emails with B. King re same. | 0.80 | 825 | $ | 660.00 |
| 1/3/2019 | Benjamin | King | Review discovery to AdvoCare drafted by A. Swick; email A. Swick re: same; call re: same. | 1.50 | 875 | $ | 1,312.50 |
| 1/3/2019 | Leo | Oppenheimer | Legal research re: limits on discovery requests in ND TX local rules. | 0.50 | 575 | $ | 287.50 |
| 1/3/2019 | Adam | Swick | Draft discovery requests; exchange numerous emails with B. King re same; correspond with clients re same. | 6.10 | 825 | $ | 5,032.50 |
| 1/25/2019 | Adam | Swick | Revise discovery requests to AdvoCare; exchange emails with B. King and G. Tercero re same. | 1.40 | 825 | $ | 1,155.00 |
| 1/25/2019 | Gina | Tercero | Review and finalize discovery responses; serve same via email. | 1.00 | 250 | $ | 250.00 |
| 2/13/2019 | Benjamin | King | Review draft responses to interrogatories; email A. Swick re: same. | 1.50 | 875 | $ | 1,312.50 |
| 2/13/2019 | Adam | Swick | Review AdvoCare's interrogatories and requests for production; draft email to clients re same; review comments from B. King re same; begin drafting responses. | 3.60 | 825 | $ | 2,970.00 |

Appx. 196

| 2/14/2019 | Adam | Swick | Hold call with clients re AdvoCare's discovery responses; conduct research into class certification. | 1.40 | 825 | $ | 1,155.00 |
| 2/15/2019 | Adam | Swick | Organize e-discovery conference between clients and vendor. | 0.30 | 825 | $ | 247.50 |
| 2/19/2019 | Benjamin | King | Emails w/ defense counsel re: mutual extensions on discovery. | 0.20 | 875 | $ | 175.00 |
| 2/19/2019 | Adam | Swick | Exchange emails with B. King re AdvoCare's request for an extension to respond to discovery. | 0.20 | 825 | $ | 165.00 |
| 2/20/2019 | Adam | Swick | Hold call with L. Ranieri re responding to AdvoCare's discovery requests. | 0.30 | 825 | $ | 247.50 |
| 2/21/2019 | Benjamin | King | Email with former distributor re: class membership. | 0.10 | 875 | $ | 87.50 |
| 2/26/2019 | Benjamin | King | Edit Ranieri interrogatory responses. | 0.50 | 875 | $ | 437.50 |
| 3/1/2019 | Adam | Swick | Draft responses to AdvoCare's discovery requests; begin a list of documents to produce. | 3.10 | 825 | $ | 2,557.50 |
| 3/4/2019 | Benjamin | King | Email with former distributor re: class membership. | 0.10 | 875 | $ | 87.50 |
| 3/6/2019 | Adam | Swick | Direct e-discovery provider re data collection; revise responses to AdvoCare's discovery requests. | 4.20 | 825 | $ | 3,465.00 |
| 3/7/2019 | Adam | Swick | Correspond with e-discovery vendor re data collection from clients; exchange emails with B. King re AdvoCare discovery requests; conduct further review of AdvoCare's discovery requests. | 0.90 | 825 | $ | 742.50 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| 3/8/2019 | Benjamin | King | Review AdvoCare's responses to interrogatories. | 0.50 | 875 | $ | 437.50 |
| 3/8/2019 | Adam | Swick | Review AdvoCare's responses to our discovery requests. | 0.40 | 825 | $ | 330.00 |
| 3/8/2019 | Gina | Tercero | Save discovery responses to system; download AdvoCare's production and save to system. | 0.50 | 250 | $ | 125.00 |
| 3/12/2019 | Adam | Swick | Correspond with e-discovery vendor re data collection. | 0.20 | 825 | $ | 165.00 |
| 3/13/2019 | Benjamin | King | Review discovery material produced by AdvoCare. | 2.00 | 875 | $ | 1,750.00 |
| 3/18/2019 | Adam | Swick | Exchange emails with opposing counsel re discovery deadline extension. | 0.20 | 825 | $ | 165.00 |
| 3/19/2019 | Adam | Swick | Correspond with client re same re interrogatory verification and other discovery issues; revise and edit interrogatory and RFP responses. | 3.40 | 825 | $ | 2,805.00 |
| 3/21/2019 | Adam | Swick | Confer with e-discovery provider re data collection. | 0.30 | 825 | $ | 247.50 |
| 3/25/2019 | Benjamin | King | Review proposed protective order and ESI order; confer w/ A. Swick and C. Kluck re: same; email defense re: same. | 1.50 | 875 | $ | 1,312.50 |
| 3/25/2019 | Adam | Swick | Correspond with client re discovery issues; review responsive documents before producing; coordinate with e-discovery provider; confer with B. King re proposed protective order. | 5.20 | 825 | $ | 4,290.00 |
| 3/26/2019 | Adam | Swick | Correspond with clients to receive documents to produce; review documents. | 2.90 | 825 | $ | 2,392.50 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 3/28/2019 | Adam | Swick | Coordinate with e-discovery vendor and B. King re production of documents; review outgoing production. | 2.20 | 825 | $ | 1,815.00 |
| 3/29/2019 | Benjamin | King | Review draft responses to AdvoCare's RFPs; email A. Swick re: same. | 2.00 | 875 | $ | 1,750.00 |
| 3/29/2019 | Adam | Swick | Exchange emails with B. King re discovery responses. | 0.30 | 825 | $ | 247.50 |
| 3/31/2019 | Adam | Swick | Exchange emails with clients re discovery responses. | 0.30 | 825 | $ | 247.50 |
| 4/1/2019 | Adam | Swick | Exchange emails with clients regarding discovery responses. | 0.40 | 825 | $ | 330.00 |
| 4/1/2019 | Gina | Tercero | Finalize discovery responses and document production; serve same via email. | 1.50 | 250 | $ | 375.00 |
| 4/8/2019 | Benjamin | King | Email with former distributor re: class membership. | 0.10 | 875 | $ | 87.50 |
| 4/9/2019 | Benjamin | King | Review AdvoCare's interrogatory responses. | 0.20 | 875 | $ | 175.00 |
| 4/10/2019 | Benjamin | King | Analysis of information needed for class certification; detailed email to L. Oppenheimer and A. Swick re: same; call w/ A. Swick and L. Oppenheimer re: same; review class cert briefing in other pyramid scheme/MLM cases. | 3.50 | 875 | $ | 3,062.50 |
| 4/10/2019 | Adam | Swick | Exchange emails with client re document production; hold calls with B. King and L. Oppenheimer re class certification issues.. | 2.10 | 825 | $ | 1,732.50 |
| 4/11/2019 | Adam | Swick | Draft letter to opposing counsel re discovery issues. | 1.30 | 825 | $ | 1,072.50 |

| 4/12/2019 | Benjamin | King | Review and edit A. Swick's letter to AdvoCare counsel re: discovery issues. | 0.50 | 875 | $ | 437.50 |
| 4/12/2019 | Adam | Swick | Finalize discovery letter to opposing counsel. | 1.10 | 825 | $ | 907.50 |
| 4/12/2019 | Gina | Tercero | Prepare template for letter re: discovery responses; serve same via email. | 0.50 | 250 | $ | 125.00 |
| 4/18/2019 | Benjamin | King | Prepare for and attend meet and confer with AdvoCare regarding discovery issues. | 1.00 | 875 | $ | 875.00 |
| 4/18/2019 | Adam | Swick | Exchange emails with B. King re AdvoCare meet and confer. | 0.30 | 825 | $ | 247.50 |
| 4/21/2019 | Adam | Swick | Draft letter to judge re recent order. | 2.40 | 825 | $ | 1,980.00 |
| 4/25/2019 | Benjamin | King | Review defense edits to ESI order and protective order; tcf w/ defense counsel re: same. | 0.50 | 875 | $ | 437.50 |
| 4/25/2019 | Adam | Swick | Begin drafting Rule 30(b)(6) notice to AdvoCare; | 0.50 | 825 | $ | 412.50 |
| 4/29/2019 | Benjamin | King | Review AdvoCare's complaints regarding plaintiffs' RFP and Interrogatory responses; emails w/ A. Swick re: same. | 1.50 | 875 | $ | 1,312.50 |
| 4/29/2019 | Adam | Swick | Initial review of data produced by AdvoCare; review concerns of opposing counsel re previous plaintiff productions; conduct class certification research. | 1.90 | 825 | $ | 1,567.50 |
| 4/30/2019 | Benjamin | King | Initial review of data produced by AdvoCare regarding distributors. | 1.00 | 875 | $ | 875.00 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 4/30/2019 | Adam | Swick | Begin preparing responses to opposing counsel's issues re previous productions; begin drafting second set of interrogatories and requests for production; exchange calls and emails with clients re gathering documents to produce. | 1.20 | 825 | $ | 990.00 |
| 4/30/2019 | Gina | Tercero | Save defendant's discovery responses to system; download document production and send to vendor to upload to database. | 0.70 | 250 | $ | 175.00 |
| 5/1/2019 | Benjamin | King | Review and edit protective order and ESI order; email drafts to AdvoCare counsel; review plaintiffs' prior RFPs and interrogatories; email A. Swick re: additional data needed; review and edit second set of RFPs. | 2.50 | 875 | $ | 2,187.50 |
| 5/1/2019 | Adam | Swick | Continue to draft interrogatories and requests for production; exchange emails with B. King re same. | 4.90 | 825 | $ | 4,042.50 |
| 5/2/2019 | Benjamin | King | Edit draft interrogatories and requests for production; emails w/ A. Swick re: same; draft responses to AdvoCare's complaints regarding our discovery responses. | 2.00 | 875 | $ | 1,750.00 |
| 5/2/2019 | Adam | Swick | Finalize and send interrogatories and requests for production to opposing counsel. | 3.20 | 825 | $ | 2,640.00 |
| 5/2/2019 | Gina | Tercero | Finalize discovery responses. | 1.00 | 250 | $ | 250.00 |
| 5/3/2019 | Benjamin | King | Review draft 30(b)(6) notice; emails w/ A. Swick re: same. | 0.50 | 875 | $ | 437.50 |
| 5/3/2019 | Adam | Swick | Draft, finalize, and send Rule 30(b)(6) notice to opposing counsel; discuss same with B. King. | 2.50 | 825 | $ | 2,062.50 |
| 5/6/2019 | Adam | Swick | Review documents produced by AdvoCare; draft summary re same; research class certification issues; exchange emails with B. King re same. | 2.40 | 825 | $ | 1,980.00 |
| 5/7/2019 | Benjamin | King | Review prior class cert briefs and analyze data and evidence needed for class certification; email A. Swick re: same; address need for an expert. | 2.00 | 875 | $ | 1,750.00 |

Appx. 201

| 5/7/2019 | Adam | Swick | Exchange emails and calls with B. King re need for expert. | 0.70 | 825 | $ | 577.50 |
| 5/8/2019 | Benjamin | King | Teleconference w/ counsel for AdvoCare re: schedule and staying discover pending a ruling on the motion to dismiss; legal research re: plaintiff's duty to mitigate and fraud. | 1.50 | 875 | $ | 1,312.50 |
| 5/8/2019 | Adam | Swick | Exchange emails and calls with B. King re settlement communications with opposing counsel. | 0.30 | 825 | $ | 247.50 |
| 5/13/2019 | Benjamin | King | Draft motion to stay/amend schedule; circulate to defense counsel. | 1.00 | 875 | $ | 875.00 |
| 5/13/2019 | Adam | Swick | Edit and revise motion to amend schedule. | 0.30 | 825 | $ | 247.50 |
| 5/17/2019 | Benjamin | King | Emails with former distributors re: class membership. | 0.20 | 875 | $ | 175.00 |
| 5/17/2019 | Adam | Swick | Conduct initial review of incoming emails from Advo distributors. | 0.50 | 825 | $ | 412.50 |
| 5/19/2019 | Benjamin | King | Factual research via internet re: AdvoCare's announcement that it would change its business model; draft generic response to dozens of distributors who contacted RCT after announcement; send response to distributors; field calls from distributors. | 5.00 | 875 | $ | 4,375.00 |
| 5/19/2019 | Adam | Swick | Review incoming emails; draft form response. | 2.90 | 825 | $ | 2,392.50 |
| 5/20/2019 | Benjamin | King | Factual research via internet re: AdvoCare's announcement that it would change its business mode; send generic response to distributors; field calls from distributors. | 2.00 | 875 | $ | 1,750.00 |
| 5/20/2019 | Adam | Swick | Draft and exchange emails to clients and B. King re FTC settlement and affect on class action; review incoming emails from AdvoCare distributors. | 0.80 | 825 | $ | 660.00 |

Appx. 202

| 5/20/2019 | Gina | Tercero | Prepare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request; update calendar. | 2.00 | 250 | $ | 500.00 |
|---|---|---|---|---|---|---|---|
| 5/21/2019 | Benjamin | King | Factual research via internet re: AdvoCare's announcement that it would change its business mode; call w/ counsel for AdvoCare. | 1.50 | 875 | $ | 1,312.50 |
| 5/21/2019 | Adam | Swick | Hold call with opposing counsel re FTC suit. | 0.60 | 825 | $ | 495.00 |
| 5/22/2019 | P. Jason | Collins | Discussions and analysis re impact of regulatory claims. | 1.50 | 1,200 | $ | 1,800.00 |
| 5/22/2019 | Benjamin | King | Legal research re: common fund recoveries for attorneys; email J. Collins and A. Swick re: same. | 4.00 | 875 | $ | 3,500.00 |
| 5/22/2019 | Adam | Swick | Manage incoming emails and send a response out to some as applicable; exchange calls and emails with J. Collins and B. King re FTC suit and solutions. | 3.70 | 825 | $ | 3,052.50 |
| 5/24/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 2.50 | 250 | $ | 625.00 |
| 5/29/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 1.30 | 250 | $ | 325.00 |
| 5/30/2019 | Benjamin | King | Emails w/ A. Swick re: pressing forward with settlement negotiations. | 0.50 | 875 | $ | 437.50 |
| 5/30/2019 | Adam | Swick | Review and edit email log. | 0.20 | 825 | $ | 165.00 |
| 5/31/2019 | Benjamin | King | Emails w/ A. Swick re: pressing forward with settlement negotiations; review draft email to defense counsel. | 0.50 | 875 | $ | 437.50 |
| 5/31/2019 | Adam | Swick | Review email log; create edited version to send to opposing counsel; draft and send email re same to opposing counsel; discuss same with B. King. | 3.10 | 825 | $ | 2,557.50 |

Appx. 203

| 5/31/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 1.00 | 250 | $ | 250.00 |
|---|---|---|---|---|---|---|---|
| 6/4/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 1.40 | 250 | $ | 350.00 |
| 6/7/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 0.80 | 250 | $ | 200.00 |
| 6/11/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 1.00 | 250 | $ | 250.00 |
| 6/14/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 0.60 | 250 | $ | 150.00 |
| 6/18/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 0.70 | 250 | $ | 175.00 |
| 6/21/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 1.20 | 250 | $ | 300.00 |
| 6/27/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 0.50 | 250 | $ | 125.00 |
| 7/8/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 1.00 | 250 | $ | 250.00 |
| 7/16/2019 | Benjamin | King | Review Court's decision dismissing claims; strategize regarding complaint amendment; detailed email to A. Swick and L. Oppenheimer re: same. | 1.50 | 875 | $ | 1,312.50 |
| 7/16/2019 | Adam | Swick | Review court's decision dismissing claims; review summary of recent MTD ruling. | 1.20 | 825 | $ | 990.00 |
| 7/17/2019 | Benjamin | King | Update to RCT partners re: recent decision in AdvoCare case; research and analysis re: amending the complaint. | 1.00 | 875 | $ | 875.00 |

Appx. 204

| 7/17/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request; download filing; calendar deadlines. | 1.00 | 250 | $ | 250.00 |
| 7/19/2019 | Adam | Swick | Draft email to clients re ruling on motion to dismiss; begin form and preparations for drafting a second amended complaint. | 0.70 | 825 | $ | 577.50 |
| 7/23/2019 | Benjamin | King | Emails with clients regarding events in AdvoCare case; draft Second Amended Complaint. | 3.40 | 875 | $ | 2,975.00 |
| 7/23/2019 | Adam | Swick | Hold calls with clients and exchange email re personal safety from actions from top AdvoCare distributors; edit second amended complaint. | 3.20 | 825 | $ | 2,640.00 |
| 7/24/2019 | Benjamin | King | Draft Second Amended Complaint to satisfy RICO pleading requirements. | 4.00 | 875 | $ | 3,500.00 |
| 7/24/2019 | Adam | Swick | Hold calls with clients re second amended complaint and personal safety re case; draft email re same. | 0.50 | 825 | $ | 412.50 |
| 7/26/2019 | Benjamin | King | Draft/edit Second Amended Complaint; legal research relevant to complaint. | 3.00 | 875 | $ | 2,625.00 |
| 7/29/2019 | Benjamin | King | Draft/edit Second Amended Complaint; legal research relevant to complaint. | 7.00 | 875 | $ | 6,125.00 |
| 7/29/2019 | Adam | Swick | Edit Second Amended Complaint; exchange emails with B. King re same. | 6.80 | 825 | $ | 5,610.00 |
| 7/29/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request. | 0.50 | 250 | $ | 125.00 |
| 7/30/2019 | Benjamin | King | Continued work on Second Amended Complaint; legal research; multiple emails and calls w/ A. Swick. | 2.00 | 875 | $ | 1,750.00 |
| 7/30/2019 | Adam | Swick | Edit Second Amended Complaint; exchange emails with B. King re same; research issues re same; exchange emails with A. Brown and S. Johnson re research. | 8.10 | 825 | $ | 6,682.50 |

| Date | First | Last | Description | Hours | Rate | Amount |
|------|-------|------|-------------|-------|------|--------|
| 7/31/2019 | Benjamin | King | Continued work on Second Amended Complaint; legal and factual research; multiple emails and calls w/ A. Swick; help finalize complaint. | 8.00 | 875 | $ 7,000.00 |
| 7/31/2019 | Adam | Swick | Revise, edit, and supervise filing of Second Amended Complaint; exchange emails with B. King and G. Tercero re same. | 8.70 | 825 | $ 7,177.50 |
| 7/31/2019 | Gina | Tercero | Finalize second amended complaint and exhibits; efile same. | 1.00 | 250 | $ 250.00 |
| 8/1/2019 | Benjamin | King | Strategize with A. Swick re: discovery and case schedule. | 0.20 | 875 | $ 175.00 |
| 8/1/2019 | Adam | Swick | Discuss strategy with B. King re discovery and scheduling. | 0.20 | 825 | $ 165.00 |
| 8/5/2019 | Benjamin | King | Email to AdvoCare counsel re: mediation. | 0.50 | 875 | $ 437.50 |
| 8/7/2019 | Benjamin | King | Legal research re: coupon settlements and attorneys' fees in Fifth Circuit. | 1.00 | 875 | $ 875.00 |
| 8/7/2019 | Adam | Swick | Research relevant issues from Fifth Circuit judges. | 2.40 | 825 | $ 1,980.00 |
| 8/8/2019 | Benjamin | King | Email A. Swick re: scheduling and a motion for an extension; email defense counsel re: schedule extension. | 0.40 | 875 | $ 350.00 |
| 8/8/2019 | Tina | Stone | Email and set up conference (.2). | 0.20 | 250 | $ 50.00 |
| 8/8/2019 | Adam | Swick | Review correspondence with opposing counsel re extension of tome and discovery production; draft email to clients re update with new complaint and mediation proposal. | 1.00 | 825 | $ 825.00 |
| 8/9/2019 | Tina | Stone | Emails regarding conference (.1). | 0.10 | 250 | $ 25.00 |

Appx. 206

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 8/9/2019 | Adam | Swick | Exchange emails with opposing counsel and B. King re mediation; hold call with clients to update them re same. | 0.70 | 825 | $ | 577.50 |
| 8/12/2019 | Benjamin | King | Edit defendants' proposed order and motion to extend time. | 0.40 | 875 | $ | 350.00 |
| 8/12/2019 | Adam | Swick | Edit proposed motion for extension of time; exchange emails with B. King re same. | 0.50 | 825 | $ | 412.50 |
| 8/13/2019 | Benjamin | King | Emails with AdvoCare counsel re: scheduling mediation. | 0.30 | 875 | $ | 262.50 |
| 8/19/2019 | Benjamin | King | Email to Judge Furgeson's organization re: scheduling mediation; review email from Judge Furgeson re: mediation logistics. | 0.50 | 875 | $ | 437.50 |
| 8/19/2019 | Adam | Swick | Exchange emails with B. King and mediator re scheduling mediation. | 0.40 | 825 | $ | 330.00 |
| 8/20/2019 | Gina | Tercero | Make travel arrangements for clients for upcoming mediation. | 1.00 | 250 | $ | 250.00 |
| 8/21/2019 | Adam | Swick | Exchange emails with B. King re mediation statement; begin drafting same. | 0.90 | 825 | $ | 742.50 |
| 8/26/2019 | Benjamin | King | Detailed email to Judge Furgeson and AdvoCare counsel re: additional information needed for mediation; discuss email w/ A. Swick. | 1.50 | 875 | $ | 1,312.50 |
| 8/26/2019 | Adam | Swick | Review email from B. King to mediator and opposing counsel; discuss same with B. King. | 0.50 | 825 | $ | 412.50 |
| 8/27/2019 | Benjamin | King | Detailed email to A. Swick re: points to make in mediation statement; strategize re: mediation statement. | 2.00 | 875 | $ | 1,750.00 |
| 8/27/2019 | Adam | Swick | Review email from B. King re mediation; discuss strategy with B. King re same. | 0.40 | 825 | $ | 330.00 |

Appx. 207

| 8/30/2019 | Benjamin | King | Review FTC settlement agreement at office for AdvoCare's counsel; discuss same with A. Swick. | 1.50 | 875 | $ | 1,312.50 |
| 8/30/2019 | Adam | Swick | Review FTC settlement with AdvoCare; discuss same with B. King. | 1.10 | 825 | $ | 907.50 |
| 9/3/2019 | Benjamin | King | Call w/ J. Furgeson and AdvoCare counsel to prepare for mediation; prepare for and discuss same w/ A. Swick; draft/edit mediation statement; email M. Menchaca re: legal research assignment. | 4.00 | 875 | $ | 3,500.00 |
| 9/3/2019 | Adam | Swick | Draft mediation statement; exchange emails with clients and M. Menchaca re same. | 6.90 | 825 | $ | 5,692.50 |
| 9/4/2019 | Benjamin | King | Draft/edit mediation statement; email M. Menchaca re: legal research assignment; tcf w/ counsel for AdvoCare re: mediation issues. | 5.00 | 875 | $ | 4,375.00 |
| 9/4/2019 | Adam | Swick | Draft mediation statement; exchange emails and calls with clients re same. | 8.10 | 825 | $ | 6,682.50 |
| 9/5/2019 | Benjamin | King | Emails w/ defense counsel re: postponing mediation; review M. Menchaca's research re: attorneys' fees from common funds. | 0.50 | 875 | $ | 437.50 |
| 9/5/2019 | Adam | Swick | Exchange emails with B. King and clients re rescheduling mediation; draft mediation statement. | 5.20 | 825 | $ | 4,290.00 |
| 9/10/2019 | Adam | Swick | Exchange emails with B. King re supplemental discovery and past discovery. | 0.50 | 825 | $ | 412.50 |
| 9/12/2019 | Adam | Swick | Exchange emails with B. King, clients, and opposing counsel re scheduling a mediation. | 0.30 | 825 | $ | 247.50 |
| 9/16/2019 | Benjamin | King | Emails re: scheduling new mediation date. | 0.20 | 875 | $ | 175.00 |
| 9/16/2019 | Adam | Swick | Hold call with opposing counsel re scheduling mediation; exchange emails with B. King re same. | 0.30 | 825 | $ | 247.50 |

| 9/18/2019 | Benjamin | King | Review information produced by AdvoCare re: current financial condition. | 1.00 | 875 | $ | 875.00 |
| 9/18/2019 | Adam | Swick | Exchange emails with B. King and G. Tercero re Advo production. | 0.60 | 825 | $ | 495.00 |
| 9/19/2019 | Adam | Swick | Exchange emails internally re storage of Advo production. | 0.40 | 825 | $ | 330.00 |
| 9/20/2019 | Adam | Swick | Review e-discovery invoice; exchange emails with B. King re same. | 0.20 | 825 | $ | 165.00 |
| 10/2/2019 | Benjamin | King | Watch FTC announcement of settlement with AdvoCare; review FTC's complaint against AdvoCare; email counsel from the FTC re: status of FTC matter; factual research re: FTC settlement and distributor reaction; formulate draft email to persons who contacted RCT regarding class action. | 4.50 | 875 | $ | 3,937.50 |
| 10/2/2019 | Adam | Swick | Watch FTC press conference; exchange communications with opposing counsel; review AdvoCare documents produced today; discuss same with B. King; review class settlements in other similar cases. | 8.20 | 825 | $ | 6,765.00 |
| 10/3/2019 | Benjamin | King | Review information provided by AdvoCare re: potential class members; email AdvoCare counsel re: questions about information; work on calculations of class damages; emails w/ A. Swick re: damages. | 5.00 | 875 | $ | 4,375.00 |
| 10/3/2019 | Adam | Swick | Continue to review documents produced by AdvoCare; research settlement issues; hold numerous calls with B. King re same. | 6.10 | 825 | $ | 5,032.50 |
| 10/3/2019 | Gina | Tercero | Send email re: case update to everyone who emailed us requesting lawsuit information. | 1.00 | 250 | $ | 250.00 |
| 10/4/2019 | Benjamin | King | Continued analysis of class damages; analysis of potential settlement positions; research re: settlements in other pyramid scheme cases; emails and calls w/ A. Swick re: same; email defense counsel re: logistics; email J. Furgeson re: deadline for mediation briefs. | 3.00 | 875 | $ | 2,625.00 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| 10/4/2019 | Adam | Swick | Exchange communications with B. King re settlement issues; review case law regarding settlement; communicate with potential and actual clients re case. | 4.70 | 825 | $ | 3,877.50 |
| 10/7/2019 | Benjamin | King | Work on mediation statement; work on class damages analysis; review exhibits for mediation statement prepared by G. Tercero. | 6.00 | 875 | $ | 5,250.00 |
| 10/7/2019 | Angela | Somers | Research issue re:   RICO damages; emails with A. Swick (2.5). | 2.50 | 875 | $ | 2,187.50 |
| 10/7/2019 | Adam | Swick | Conduct research re mediation statement; draft mediation statement; exchange emails and calls with B. King re same. | 7.60 | 825 | $ | 6,270.00 |
| 10/8/2019 | Angela | Somers | Continue research and review mediation statement; emails to B. King and A. Swick (1.7). | 1.70 | 875 | $ | 1,487.50 |
| 10/8/2019 | Adam | Swick | Draft mediation statement; exchange emails and calls with B. King re same. | 7.10 | 825 | $ | 5,857.50 |
| 10/9/2019 | Adam | Swick | Prepare for and attend meeting with opposing counsel re mediation. | 2.60 | 825 | $ | 2,145.00 |
| 10/9/2019 | Gina | Tercero | Update AdvoCare spreadsheet containing contact info and content of message received from AdvoCare lawsuit information request; prepare documents to send to mediator. | 1.30 | 250 | $ | 325.00 |
| 10/10/2019 | Leo | Oppenheimer | Proof mediation statement. | 1.50 | 575 | $ | 862.50 |
| 10/10/2019 | Adam | Swick | Revise and edit mediation statement. | 6.40 | 825 | $ | 5,280.00 |
| 10/11/2019 | Adam | Swick | Revise and edit mediation statement. | 7.30 | 825 | $ | 6,022.50 |
| 10/11/2019 | Gina | Tercero | Prepare/finalize exhibits to mediation statement; prepare binder of same for mediator. | 1.00 | 250 | $ | 250.00 |

Appx. 210

| 10/15/2019 | P. Jason | Collins | Discussions and analysis in preparation for mediation. | 2.00 | 1,200 | $ | 2,400.00 |
|---|---|---|---|---|---|---|---|
| 10/15/2019 | Adam | Swick | Exchange emails with J. Collins re mediation; exchange emails with FTC and B. King. | 0.60 | 825 | $ | 495.00 |
| 10/16/2019 | Adam | Swick | Exchange emails with clients to set up meeting tomorrow; assist B. King in drafting and editing email to FTC; hold call with FTC. | 2.00 | 825 | $ | 1,650.00 |
| 10/17/2019 | Benjamin | King | Meet with client to prepare for mediation. | 4.00 | 875 | $ | 3,500.00 |
| 10/17/2019 | Adam | Swick | Meet with clients to prepare for mediation. | 4.90 | 825 | $ | 4,042.50 |
| 10/18/2019 | P. Jason | Collins | Participated in all-day mediation. | 8.50 | 1,200 | $ | 10,200.00 |
| 10/18/2019 | Benjamin | King | Prepare for and attend mediation. | 8.50 | 875 | $ | 7,437.50 |
| 10/18/2019 | Leo | Oppenheimer | Legal research re: class action attorney fee structures in Fifth Circuit. | 5.10 | 575 | $ | 2,932.50 |
| 10/18/2019 | Adam | Swick | Prepare for and attend mediation. | 8.60 | 825 | $ | 7,095.00 |
| 11/22/2019 | Benjamin | King | Call with A. Swick and Judge Furgeson to discuss settlement possibilities; email to Furgeson. | 0.50 | 875 | $ | 437.50 |
| 11/22/2019 | Adam | Swick | Call with B. King and mediator re settlement; review email to Mediator. | 0.40 | 825 | $ | 330.00 |
| 12/3/2019 | Benjamin | King | Work on opposition to AdvoCare's motion to dismiss; legal research re: same; emails w/ A. Swick re: same. | 3.00 | 875 | $ | 2,625.00 |

Appx. 211

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 12/3/2019 | Adam | Swick | Exchange emails with opposing counsel, G. Tercero, and B. King about revised unopposed scheduling order. | 4.90 | 825 | $ | 4,042.50 |
| 12/4/2019 | Benjamin | King | Work on opposition to AdvoCare's motion to dismiss; legal research re: same. | 2.00 | 875 | $ | 1,750.00 |
| 12/9/2019 | Adam | Swick | Draft, edit, and revise Opposition to Motion to Dismiss; exchange emails with G. Tercero re same. | 8.30 | 825 | $ | 6,847.50 |
| 12/10/2019 | Benjamin | King | Work on opposition to AdvoCare's motion to dismiss; emails w/ A. Swick re: same. | 1.00 | 875 | $ | 875.00 |
| 12/10/2019 | Adam | Swick | Draft, edit, and revise Opposition to Motion to Dismiss. | 7.90 | 825 | $ | 6,517.50 |
| 12/11/2019 | Adam | Swick | Review research provided by T. Perry; exchange emails with T. Perry re research. | 4.20 | 825 | $ | 3,465.00 |
| 12/12/2019 | Adam | Swick | Draft, edit, and revise Opposition to Motion to Dismiss; exchange emails with B. King and T. Perry re same. | 9.30 | 825 | $ | 7,672.50 |
| 12/13/2019 | Benjamin | King | Work on opposition to AdvoCare's motion to dismiss; legal research re: same; emails w/ A. Swick re: same. | 7.00 | 875 | $ | 6,125.00 |
| 12/13/2019 | Adam | Swick | Exchange emails with B. King re Opposition to Motion to Dismiss. | 1.30 | 825 | $ | 1,072.50 |
| 12/14/2019 | Benjamin | King | Work on opposition to AdvoCare's motion to dismiss; legal research re: same. | 6.00 | 875 | $ | 5,250.00 |
| 12/14/2019 | Adam | Swick | Exchange emails with T. Perry and B. King re Opposition to Motion to Dismiss. | 0.80 | 825 | $ | 660.00 |
| 12/15/2019 | Benjamin | King | Edit opposition to AdvoCare 's motion to dismiss. | 1.00 | 875 | $ | 875.00 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 12/16/2019 | Benjamin | King | Work on opposition to AdvoCare's motion to dismiss; emails w/ A. Swick re: same. | 2.00 | 875 | $ | 1,750.00 |
| 12/16/2019 | Adam | Swick | Draft, edit, and revise Opposition to Motion to Dismiss; exchange emails with B. King re same. | 5.90 | 825 | $ | 4,867.50 |
| 12/17/2019 | Benjamin | King | Work on opposition to AdvoCare's motion to dismiss; legal research re: same; emails w/ A. Swick and Sean Johnson re: same. | 7.00 | 875 | $ | 6,125.00 |
| 12/17/2019 | Adam | Swick | Draft, edit, and revise Opposition to Motion to Dismiss; exchange emails with B. King re same; conduct research re same. | 8.30 | 825 | $ | 6,847.50 |
| 12/18/2019 | Benjamin | King | Edit opposition to AdvoCare's motion to dismiss. | 2.00 | 875 | $ | 1,750.00 |
| 12/18/2019 | Adam | Swick | Draft, edit, and revise Opposition to Motion to Dismiss; exchange emails with L. Oppenheimer and B. King re same. | 7.10 | 825 | $ | 5,857.50 |
| 12/19/2019 | Leo | Oppenheimer | Revise opposition to motion to dismiss. | 3.00 | 575 | $ | 1,725.00 |
| 12/19/2019 | Adam | Swick | Draft, edit, and revise Opposition to Motion to Dismiss. | 7.40 | 825 | $ | 6,105.00 |
| 12/20/2019 | Benjamin | King | Edit opposition to AdvoCare's motion to dismiss; call w/ A. Swick re: same. | 1.50 | 875 | $ | 1,312.50 |
| 12/20/2019 | Leo | Oppenheimer | Revise opposition to motion to dismiss. | 2.50 | 575 | $ | 1,437.50 |
| 12/20/2019 | Adam | Swick | Draft, edit, and revise Opposition to Motion to Dismiss; exchange emails with L. Oppenheimer re same. | 8.20 | 825 | $ | 6,765.00 |
| 12/22/2019 | Adam | Swick | Edit and revise Opposition to Motion to Dismiss. | 4.70 | 825 | $ | 3,877.50 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 12/23/2019 | Benjamin | King | Final edits to opposition brief. | 2.00 | 875 | $ | 1,750.00 |
| 12/23/2019 | Adam | Swick | Finalize and supervise filing of Opposition to Motion to Dismiss; exchange emails with G. Tercero and B. King re same. | 5.10 | 825 | $ | 4,207.50 |
| 12/23/2019 | Gina | Tercero | Edit/finalize opposition to motion to dismiss second amended complaint; prepare exhibits to same; efile same. | 2.00 | 250 | $ | 500.00 |
| 1/15/2020 | Benjamin | King | Review voicemail from and email to Judge Furgeson re: settlement issues; review docket in FTC v. AdvoCare matter. | 0.60 | 875 | $ | 525.00 |
| 1/15/2020 | Adam | Swick | Exchange emails with mediator re settlement. | 0.40 | 825 | $ | 330.00 |
| 1/17/2020 | Benjamin | King | Review AdvoCare's reply brief in support of its motion to dismiss. | 1.00 | 875 | $ | 875.00 |
| 1/17/2020 | Adam | Swick | Review AdvoCare Reply to Motion to Dismiss. | 4.30 | 825 | $ | 3,547.50 |
| 1/21/2020 | Adam | Swick | Discuss AdvoCare reply with B. King. | 0.40 | 825 | $ | 330.00 |
| 2/3/2020 | Benjamin | King | Review draft email from Judge Furgeson to FTC counsel; email A. Swick re: same; email Judge Furgeson and defense counsel re: same. | 0.60 | 875 | $ | 525.00 |
| 2/3/2020 | Adam | Swick | Exchange emails with opposing counsel and mediator. | 0.30 | 825 | $ | 247.50 |
| 2/12/2020 | Ashli | Durke | Draft discovery responses. | 1.40 | 250 | $ | 350.00 |
| 2/15/2020 | Adam | Swick | Exchange emails with mediator re update. | 0.20 | 825 | $ | 165.00 |

| 3/2/2020 | Adam | Swick | Exchange emails with mediator re update. | 0.20 | 825 | $ | 165.00 |
|---|---|---|---|---|---|---|---|
| 3/17/2020 | Adam | Swick | Exchange emails with L. Ranieri re case update. | 0.20 | 825 | $ | 165.00 |
| 3/30/2020 | Benjamin | King | Emails w/ Judge Furgeson; call with Judge Furgeson to discuss settlement issues. | 0.70 | 875 | $ | 612.50 |
| 3/30/2020 | Adam | Swick | Schedule and hold call with mediator. | 0.30 | 825 | $ | 247.50 |
| 4/23/2020 | Adam | Swick | Send email to mediator re update. | 0.20 | 825 | $ | 165.00 |
| 4/28/2020 | Adam | Swick | Exchange emails with mediator and B. King. | 0.60 | 825 | $ | 495.00 |
| 5/6/2020 | Adam | Swick | Exchange emails with B. King re mediator request. | 0.30 | 825 | $ | 247.50 |
| 5/7/2020 | Benjamin | King | Review email from J. Furgeson about settlement issues; email w/ A. Swick re: same. | 0.50 | 875 | $ | 437.50 |
| 5/7/2020 | Adam | Swick | Exchange emails setting up call with mediator; hold calls with clients to update on and discuss process of mediation. | 1.40 | 825 | $ | 1,155.00 |
| 5/8/2020 | Benjamin | King | Call with J. Furgeson re: settlement. | 0.50 | 875 | $ | 437.50 |
| 5/8/2020 | Adam | Swick | Hold call with mediator; hold call with B. King re mediator call. | 1.20 | 825 | $ | 990.00 |
| 5/20/2020 | Adam | Swick | Set up call with mediator via email. | 0.20 | 825 | $ | 165.00 |

Appx. 215

| 5/21/2020 | Benjamin | King | Call with J. Furgeson to discuss mediation; discuss settlement possibilities w/ A. Swick. | 0.70 | 875 | $ | 612.50 |
| 5/22/2020 | Benjamin | King | Call w/ J. Furgeson re: settlement negotiations; email A. Swick summarizing call. | 1.00 | 875 | $ | 875.00 |
| 5/22/2020 | Adam | Swick | Review email from B. King summarizing call with mediator. | 0.20 | 825 | $ | 165.00 |
| 6/15/2020 | Adam | Swick | Draft and send email to mediator. | 0.40 | 825 | $ | 330.00 |
| 6/16/2020 | Benjamin | King | Emails w/ A. Swick re: contacting Judge Furgeson. | 0.30 | 875 | $ | 262.50 |
| 6/16/2020 | Adam | Swick | Exchange emails with B. King and mediator re conference call; hold call with clients re general update. | 0.50 | 825 | $ | 412.50 |
| 6/18/2020 | Benjamin | King | Call w/ J. Furgeson re: scheduling second mediation; emails w/ A. Swick re: same. | 0.70 | 875 | $ | 612.50 |
| 6/18/2020 | Adam | Swick | Hold call with mediator and B. King. | 0.30 | 825 | $ | 247.50 |
| 6/19/2020 | Adam | Swick | Revise Rule 30(b)(6) deposition. | 0.50 | 825 | $ | 412.50 |
| 6/23/2020 | Adam | Swick | Exchange emails re setting up call with mediator. | 0.50 | 825 | $ | 412.50 |
| 6/25/2020 | Adam | Swick | Hold call with mediator. | 0.50 | 825 | $ | 412.50 |
| 6/29/2020 | Adam | Swick | Email mediator re possibility of another mediation. | 0.20 | 825 | $ | 165.00 |

Appx. 216

| Date | First | Last | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| 7/16/2020 | Adam | Swick | Exchange emails with mediator re possibility of another mediation. | 0.30 | 825 | $ | 247.50 |
| 7/20/2020 | Adam | Swick | Exchange emails with clients to update on discussions with mediator. | 0.30 | 825 | $ | 247.50 |
| 7/27/2020 | Adam | Swick | Email mediator re scheduling mediation. | 0.20 | 825 | $ | 165.00 |
| 8/3/2020 | Benjamin | King | Emails with AdvoCare counsel re: scheduling mediation. | 0.30 | 875 | $ | 262.50 |
| 8/3/2020 | Adam | Swick | Exchange emails with B. King re possibility of upcoming mediation. | 0.40 | 825 | $ | 330.00 |
| 8/12/2020 | Benjamin | King | Teleconference with A. Swick to discuss settlement issues; emails with AdvoCare's counsel re: scheduling mediation; review filings in other MLM/pyramid scheme cases regarding impact on the AdvoCare case. | 1.00 | 875 | $ | 875.00 |
| 8/12/2020 | Adam | Swick | Hold call with B. King re settlement issues; exchange emails with opposing counsel re mediation. | 0.80 | 825 | $ | 660.00 |
| 8/13/2020 | Benjamin | King | Emails re: scheduling second mediation. | 0.20 | 875 | $ | 175.00 |
| 8/17/2020 | Adam | Swick | Exchange emails with clients and B. King re settlement and mediation. | 0.20 | 825 | $ | 165.00 |
| 8/20/2020 | Benjamin | King | Analysis regarding costs of class administration in preparation for mediation; emails with Judge Furgeson re: FTC issue. | 1.00 | 875 | $ | 875.00 |
| 8/24/2020 | Adam | Swick | Hold call with B. King re mediation; exchange emails with mediator re mediation logistics; exchange emails with clients re same. | 1.20 | 825 | $ | 990.00 |

| 8/25/2020 | Benjamin | King | Edit supplemental mediation statement for second mediation. | 3.00 | 875 | $ | 2,625.00 |
|---|---|---|---|---|---|---|---|
| 8/25/2020 | Adam | Swick | Revise and edit mediation statement; exchange calls and emails with B. King and other partners re mediation strategy. | 7.50 | 825 | $ | 6,187.50 |
| 8/26/2020 | P. Jason | Collins | Prepare for mediation settlement analysis. | 0.50 | 1,150 | $ | 575.00 |
| 8/26/2020 | Benjamin | King | Edit supplemental mediation statement; emails with Judge Furgeson re: mediation. | 1.00 | 875 | $ | 875.00 |
| 8/26/2020 | Gina | Tercero | Edit/finalize mediation statement; prepare exhibits to same; send same to mediator via email. | 0.80 | 250 | $ | 200.00 |
| 8/28/2020 | Benjamin | King | Prepare for mediation; emails with A. Swick re: settlement strategies and goals. | 1.50 | 875 | $ | 1,312.50 |
| 8/28/2020 | Adam | Swick | Draft and send email to settlement coordinator; exchange emails with B. King re same; set up call with mediator for a pre-mediation conference; exchange emails with clients and B. King re mediation logistics; exchange emails internally re Zoom mediation tips. | 3.80 | 825 | $ | 3,135.00 |
| 8/29/2020 | Adam | Swick | Hold preliminary call with settlement coordinator. | 0.40 | 825 | $ | 330.00 |
| 8/31/2020 | Benjamin | King | Call with Judge Furgeson in advance of mediation; email A. Swick a summary of the call. | 1.50 | 875 | $ | 1,312.50 |
| 8/31/2020 | Adam | Swick | Set up call with mediation coordinator and clients; hold call with B. King re same. | 1.20 | 825 | $ | 990.00 |
| 9/1/2020 | P. Jason | Collins | Discussions and analysis in preparation for mediation, including mock-mediation. | 4.75 | 1,150 | $ | 5,462.50 |

| 9/1/2020 | Benjamin | King | Multiple emails and calls with A. Swick and J. Collins gaming out settlement negotiations; discussions of settlement strategies and case strength. | 5.00 | 875 | $ | 4,375.00 |
| 9/1/2020 | Adam | Swick | Exchange many emails with J. Collins and B. King re settlement negotiation strategy; hold calls with B. King re same; exchange emails with mediation coordinator re Zoom mediation; exchange emails with clients re mediation and call re logistics. | 6.30 | 825 | $ | 5,197.50 |
| 9/2/2020 | P. Jason | Collins | Discussions and analysis in preparation for mediation. | 2.25 | 1,150 | $ | 2,587.50 |
| 9/2/2020 | Benjamin | King | Continued discussions and emails re: settlement negotiations; review AdvoCare's discovery materials to prepare for mediation. | 3.00 | 875 | $ | 2,625.00 |
| 9/2/2020 | Adam | Swick | Exchange emails and calls with B. King re FTC cooperation; review AdvoCare's production from last mediation; exchange emails with J. Collins re settlement negotiations. | 2.90 | 825 | $ | 2,392.50 |
| 9/3/2020 | P. Jason | Collins | Participated in all-day mediation. Related research and analysis. | 9.00 | 1,150 | $ | 10,350.00 |
| 9/3/2020 | Benjamin | King | Participate in all day ZOOM mediation with A. Swick, J. Collins, and plaintiffs; multiple emails and research relevant to mediation; multiple video conferences re: same. | 9.00 | 875 | $ | 7,875.00 |
| 9/3/2020 | Adam | Swick | Prepare for and attended mediation. | 9.00 | 825 | $ | 7,425.00 |
| 9/4/2020 | Benjamin | King | Emails and calls re: settlement. | 0.50 | 875 | $ | 437.50 |
| 9/8/2020 | Benjamin | King | Begin work on settlement agreement; emails and calls w/ PJ Andrejkovics (class action settlement expert) to discuss settlement issues. | 2.00 | 875 | $ | 1,750.00 |
| 9/8/2020 | Adam | Swick | Prepare for and hold preliminary call with outside consultant re settlement agreement; draft settlement agreement. | 5.20 | 825 | $ | 4,290.00 |

| Date | First | Last | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 9/9/2020 | Benjamin | King | Call with defense counsel and A. Swick re: settlement issues; email Judge Furgeson. | 1.50 | 875 | $ 1,312.50 |
| 9/9/2020 | Adam | Swick | Prepare for and hold call with opposing counsel re settlement agreement; exchange calls and emails with B. King re appropriate docs to file by 9/31; hold call with outside consultant re settlement agreement. | 3.20 | 825 | $ 2,640.00 |
| 9/10/2020 | Benjamin | King | Emails w/ A. Swick and PJ Andrejkovics re: settlement issues. | 0.50 | 875 | $ 437.50 |
| 9/10/2020 | Adam | Swick | Draft settlement agreement. | 4.40 | 825 | $ 3,630.00 |
| 9/11/2020 | Benjamin | King | Draft motion for preliminary approval of settlement; email G. Tercero assignment to help with the motion. | 3.00 | 875 | $ 2,625.00 |
| 9/11/2020 | Adam | Swick | Draft settlement agreement; exchange emails with B. King re same; exchange emails with outside consultant re specific provisions in the settlement agreement. | 8.10 | 825 | $ 6,682.50 |
| 9/11/2020 | Gina | Tercero | Compare our complaint to FTC complaint and prepare chart of similarities per B. King's request. | 3.50 | 250 | $ 875.00 |
| 9/14/2020 | Benjamin | King | Draft motion for preliminary approval of settlement; legal research relevant to motion. | 2.00 | 875 | $ 1,750.00 |
| 9/14/2020 | Adam | Swick | Draft settlement agreement; hold call with opposing counsel and mediator. | 6.30 | 825 | $ 5,197.50 |
| 9/14/2020 | Gina | Tercero | Compare our complaint to FTC complaint and prepare chart of similarities per B. King's request. | 2.30 | 250 | $ 575.00 |
| 9/15/2020 | Benjamin | King | Draft motion for preliminary approval of settlement; legal research relevant to motion; edit draft settlement agreement. | 5.00 | 875 | $ 4,375.00 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 9/15/2020 | Adam | Swick | Draft, edit, and revise settlement agreement. | 8.00 | 825 | $ | 6,600.00 |
| 9/16/2020 | Benjamin | King | Edit settlement agreement. | 3.00 | 875 | $ | 2,625.00 |
| 9/16/2020 | Adam | Swick | Hold call with outside consultant re settlement agreement; exchange emails with B. King re same; draft notice of claim, proposed order, and claim form; exchange emails with paralegals re same; revise and edit settlement agreement. | 6.50 | 825 | $ | 5,362.50 |
| 9/17/2020 | Benjamin | King | Edit settlement agreement; edit motion for preliminary approval of settlement agreement. | 3.50 | 875 | $ | 3,062.50 |
| 9/17/2020 | Adam | Swick | Set up calls for tomorrow with Settlement Administrator candidates; hold call with B. King and outside consultant re settlement agreement; revise and edit settlement agreement; exchange emails with B. King re same. | 4.70 | 825 | $ | 3,877.50 |
| 9/18/2020 | Benjamin | King | Edit settlement agreement; email draft of agreement to defense counsel. | 3.00 | 875 | $ | 2,625.00 |
| 9/18/2020 | Adam | Swick | Review draft settlement agreement; exchange and calls with B. King re same; hold calls with settlement administrator candidates. | 5.10 | 825 | $ | 4,207.50 |
| 9/21/2020 | Benjamin | King | Draft motion for preliminary approval and supporting declaration. | 3.50 | 875 | $ | 3,062.50 |
| 9/21/2020 | Adam | Swick | Exchange emails with B. King re Preliminary Motion; hold call with B. King re clients; draft exhibits to Preliminary Motion. | 2.70 | 825 | $ | 2,227.50 |
| 9/22/2020 | Benjamin | King | Continued work on motion for preliminary approval; team emails re: same; email defense counsel re: needed additional data. | 2.00 | 875 | $ | 1,750.00 |
| 9/22/2020 | Adam | Swick | Review similar class action cases in N.D. Tex.; discuss same with B. King. | 0.60 | 825 | $ | 495.00 |

Appx. 221

| Date | First | Last | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| 9/23/2020 | Benjamin | King | Continued work on motion for preliminary approval. | 1.00 | 875 | $ | 875.00 |
| 9/24/2020 | Benjamin | King | Call w/ counsel for the FTC re: settlement distribution issues; call with AdvoCare counsel re: status of negotiations with the insurer; email J. Furgeson. | 2.00 | 875 | $ | 1,750.00 |
| 9/28/2020 | Benjamin | King | Lengthy email to Judge Furgeson and defense counsel re: negotiation and settlement agreement status, next steps. | 1.50 | 875 | $ | 1,312.50 |
| 9/29/2020 | Benjamin | King | Call with potential settlement administrator re: duties and costs; email update to PJ Andrejkovics; email J. Furgeson re: status of communications with the FTC. | 1.30 | 875 | $ | 1,137.50 |
| 10/22/2020 | Benjamin | King | Emails with Judge Furgeson re: settlement status. | 0.20 | 875 | $ | 175.00 |
| 11/2/2020 | Benjamin | King | Emails with Judge Furgeson and AdvoCare counsel re: settlement status. | 0.30 | 875 | $ | 262.50 |
| 11/11/2020 | Benjamin | King | Emails with potential settlement administrator; emails with Judge Furgeson. | 0.30 | 875 | $ | 262.50 |
| 11/11/2020 | Adam | Swick | Emails with potential settlement administrator; emails with Judge Furgeson. | 0.30 | 825 | $ | 247.50 |
| 11/12/2020 | Adam | Swick | Briefly review AdvoCare comments to settlement agreement. | 0.30 | 825 | $ | 247.50 |
| 11/13/2020 | Benjamin | King | Review AdvoCare's comments to settlement agreement; outline issues in dispute; discuss with A. Swick; call with AdvoCare's counsel to discuss issues. | 3.00 | 875 | $ | 2,625.00 |
| 11/13/2020 | Adam | Swick | Continue to review AdvoCare's comments to settlement agreement; discuss with B. King; call with AdvoCare's counsel to discuss issues. | 1.80 | 825 | $ | 1,485.00 |

Appx. 222

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/14/2020 | Benjamin | King | Work on class member damages calculations; lengthy email to AdvoCare counsel re: class member damages calculations and other settlement issues; discuss same w/ A. Swick; email PJ Andrejkovics re: settlement issues; email Judge Furgeson re: timing and settlement issues. | 4.00 | 875 | $ 3,500.00 |
| 11/16/2020 | Benjamin | King | Work on motion for preliminary approval; email A. Swick re: same; lengthy email to AdvoCare counsel re: multiple settlement issues. | 5.00 | 875 | $ 4,375.00 |
| 11/16/2020 | Adam | Swick | Draft settlement motion and related documents. | 5.80 | 825 | $ 4,785.00 |
| 11/17/2020 | Benjamin | King | Call with potential settlement administrator; email with same. | 1.00 | 875 | $ 875.00 |
| 11/17/2020 | Adam | Swick | Review proposals for settlement administrator role; hold call and exchange emails with a potential settlement administrator; exchange emails with B. King and opposing counsel re various settlement issues. | 2.60 | 825 | $ 2,145.00 |
| 11/18/2020 | Benjamin | King | Emails w/ Judge Furgeson and AdvoCare's counsel to address multiple settlement issues, particularly class member damages. | 4.00 | 875 | $ 3,500.00 |
| 11/18/2020 | Adam | Swick | Exchange emails with mediator and opposing counsel re settlement issues; exchange multiple emails with B. King re same.. | 2.40 | 825 | $ 1,980.00 |
| 11/19/2020 | Benjamin | King | Emails with Judge Furgeson and AdvoCare's counsel re: speaking with FTC's counsel. | 0.50 | 875 | $ 437.50 |
| 11/19/2020 | Adam | Swick | Exchange emails with mediator and opposing counsel re meeting with FTC. | 0.40 | 825 | $ 330.00 |
| 11/20/2020 | Benjamin | King | Call with counsel for AdvoCare and the FTC and A. Swick; email Judge Furgeson re: same; draft letter for Judge Furgeson to send to the FTC's counsel; call with potential settlement administrator. | 1.70 | 875 | $ 1,487.50 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|---|
| 11/20/2020 | Adam | Swick | Prepare for and hold call with counsel for the FTC and B. King; review emails to mediator re same; hold call with potential settlement administrator; edit and revise letter to FTC from mediator. | 2.30 | 825 | $ | 1,897.50 |
| 11/23/2020 | Benjamin | King | Edit letter from Furgeson to the FTC; send draft to Judge Furgeson. | 0.30 | 875 | $ | 262.50 |
| 11/30/2020 | Benjamin | King | Emails with A. Swick re: edits to settlement agreement and negotiations with AdvoCare counsel. | 0.50 | 875 | $ | 437.50 |
| 11/30/2020 | Adam | Swick | Exchange emails with B. King re settlement agreement and negotiations with opposing counsel; review proposal by potential settlement administrator. | 1.30 | 825 | $ | 1,072.50 |
| 12/1/2020 | Benjamin | King | Emails to AdvoCare counsel re: settlement issues; review recent ruling in FTC case against Daniel McDaniel. | 0.50 | 875 | $ | 437.50 |
| 12/1/2020 | Adam | Swick | Review recent ruling re Daniel McDaniel in the FTC case; discuss same with B. King via email. | 0.30 | 825 | $ | 247.50 |
| 12/2/2020 | Benjamin | King | Review AdvoCare counsel's response on damages issues; review damages information; email A. Swick re: same; analysis of class member damages calculations in other MLM cases; begin lengthy email response to AdvoCare counsel re: damages calculations. | 4.50 | 875 | $ | 3,937.50 |
| 12/2/2020 | Adam | Swick | Review AdvoCare's response on damages issue; exchange emails with B. King re same. | 0.60 | 825 | $ | 495.00 |
| 12/3/2020 | Benjamin | King | Finalize lengthy response to AdvoCare's counsel re: damages and other settlement issues. | 3.00 | 875 | $ | 2,625.00 |
| 12/3/2020 | Adam | Swick | Attend to issues re settlement; review example claims forms and notice; draft claims form and notice of settlement; consult with potential settlement administrator re same and letters of credit; edit email to opposing counsel; send AdvoCare notice of potential settlement administrator. | 5.10 | 825 | $ | 4,207.50 |

Appx. 224

| Date | First | Last | Description | Hours | Rate | Amount |
|------|-------|------|-------------|-------|------|--------|
| 12/3/2020 | Ben | Thomas | Research settlement agreements with escrow and letter of credit provisions; email B. King and A. Swick regarding same | 6.00 | 675 | $ 4,050.00 |
| 12/4/2020 | Benjamin | King | Work on AdvoCare settlement issues; call with AdvoCare counsel re: outstanding settlement issues. | 3.00 | 875 | $ 2,625.00 |
| 12/4/2020 | Adam | Swick | Call with AdvoCare counsel re outstanding settlement issues; internal call re settlement issues. | 4.00 | 825 | $ 3,300.00 |
| 12/4/2020 | Ben | Thomas | Research settlement agreements with escrow and letter of credit provisions; email B. King and A. Swick regarding same | 1.54 | 675 | $ 1,039.50 |
| 12/6/2020 | P. Jason | Collins | Discussions and analysis re settlement negotiations. | 2.50 | 1,150 | $ 2,875.00 |
| 12/7/2020 | Benjamin | King | Work on AdvoCare settlement issues, including tranched payments and letter of credit; email defense counsel re: same; edit settlement agreement. | 4.00 | 875 | $ 3,500.00 |
| 12/7/2020 | Adam | Swick | Review edits to settlement agreement; exchange emails with mediator to set up meeting tomorrow. | 1.30 | 825 | $ 1,072.50 |
| 12/8/2020 | Benjamin | King | Review AdvoCare's damages analysis; formulate response; discuss same w/ A. Swick; review class member damages data produced by AdvoCare; work on class member damages calculations; multiple emails and calls re: same. | 7.00 | 875 | $ 6,125.00 |
| 12/8/2020 | Adam | Swick | Hold call with mediator; exchange various emails with opposing counsel re settlement agreement; hold calls with B. King re same; exchange emails with potential settlement administrator re class notice; review analysis provided by opposing counsel. | 5.60 | 825 | $ 4,620.00 |
| 12/9/2020 | Benjamin | King | Calls and emails re: settlement issues, with judge Furgeson, A. Swick, and AdvoCare counsel; class member damages analysis. | 4.00 | 875 | $ 3,500.00 |
| 12/9/2020 | Adam | Swick | Hold calls with B. King and J. Collins re settlement agreement and strategy; | 8.00 | 825 | $ 6,600.00 |

Appx. 225

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 12/10/2020 | Benjamin | King | Research regarding settlement terms and class member damage calculations in other MLM/pyramid scheme cases; review data provided by AdvoCare relevant to class member damages claims; draft email to AdvoCare counsel re: questions about the data. | 6.00 | 875 | $ | 5,250.00 |
| 12/11/2020 | Benjamin | King | Edit and send lengthy email to AdvoCare's counsel re: damages data. | 1.00 | 875 | $ | 875.00 |
| 12/14/2020 | Benjamin | King | Detailed email to A. Swick re: structure and content of mediation statement; detailed analysis of AdvoCare's financial data; email memo re: same. | 3.00 | 875 | $ | 2,625.00 |
| 12/14/2020 | Adam | Swick | Review B. King's email re mediation statement and analysis of AdvoCare's financial data. | 1.10 | 825 | $ | 907.50 |
| 12/15/2020 | Benjamin | King | Analysis of AdvoCare's financial condition over time. | 1.00 | 875 | $ | 875.00 |
| 12/17/2020 | Adam | Swick | Draft mediation statement. | 6.70 | 825 | $ | 5,527.50 |
| 12/18/2020 | Adam | Swick | Draft mediation statement. | 7.10 | 825 | $ | 5,857.50 |
| 12/28/2020 | Benjamin | King | Edit supplemental mediation statement. | 3.00 | 875 | $ | 2,625.00 |
| 12/29/2020 | Benjamin | King | Edit supplemental mediation statement. | 5.00 | 875 | $ | 4,375.00 |
| 12/30/2020 | Benjamin | King | Edit supplemental mediation statement. | 1.00 | 875 | $ | 875.00 |
| 12/30/2020 | Adam | Swick | Review B. King's edits to supplemental mediation statement. | 1.40 | 825 | $ | 1,155.00 |

| 12/31/2020 | Benjamin | King | Final edits to supplemental mediation statement. | 1.50 | 875 | $ | 1,312.50 |
|---|---|---|---|---|---|---|---|
| 12/31/2020 | Adam | Swick | Finalize mediation statement. | 1.20 | 825 | $ | 990.00 |
| 1/4/2021 | P. Jason | Collins | Review and analysis of mediation brief in preparation for mediation. | 1.50 | 1,150 | $ | 1,725.00 |
| 1/4/2021 | Benjamin | King | Review additional class member damages data provided by AdvoCare; incorporate into damages model. | 3.00 | 875 | $ | 2,625.00 |
| 1/4/2021 | Adam | Swick | Review class damages data. | 0.40 | 825 | $ | 330.00 |
| 1/5/2021 | Benjamin | King | Incorporate additional damages data into class member damages model; discuss same w/ A. Swick. | 7.00 | 875 | $ | 6,125.00 |
| 1/5/2021 | Adam | Swick | Review B. King's damages information; discuss same with B. King. | 1.30 | 825 | $ | 1,072.50 |
| 1/6/2021 | P. Jason | Collins | Discussions and analysis in preparation for mediation. | 1.00 | 1,150 | $ | 1,150.00 |
| 1/6/2021 | Adam | Swick | Prepare for mediation; video meeting with J. Collins and B. King re same; analyze damage issues. | 2.30 | 825 | $ | 1,897.50 |
| 1/7/2021 | P. Jason | Collins | Participated in mediation.  Related discussion and analysis. | 4.25 | 1,150 | $ | 4,887.50 |
| 1/7/2021 | Benjamin | King | Prepare for mediation; video meeting with J. Collins and A. Swick to prepare for mediation; continued analysis of damages issues. | 2.00 | 875 | $ | 1,750.00 |
| 1/7/2021 | Adam | Swick | Attend mediation. | 2.00 | 825 | $ | 1,650.00 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 1/8/2021 | Benjamin | King | Participate in mediation; meetings, calls, etc. during mediation; continued analysis of damages issues. | 4.00 | 875 | $ | 3,500.00 |
| 1/9/2021 | P. Jason | Collins | Correspondence and discussions re settlement negotiation. | 1.75 | 1,150 | $ | 2,012.50 |
| 1/9/2021 | Benjamin | King | Analysis of potential class member damages calculations to reach settlement with AdvoCare; emails with A. Swick and J. Collins re: same. | 1.50 | 875 | $ | 1,312.50 |
| 1/11/2021 | P. Jason | Collins | Correspondence and discussions re settlement negotiation. | 1.00 | 1,150 | $ | 1,150.00 |
| 1/11/2021 | Benjamin | King | Prepare for teleconference with Judge Furgeson and A. Swick re: settlement possibilities; draft lengthy set of talking points for call with Judge. | 2.00 | 875 | $ | 1,750.00 |
| 1/11/2021 | Adam | Swick | Hold call with mediator; hold follow up calls with J. Collins and B. King re mediation strategy; draft email to mediator re same. | 2.70 | 825 | $ | 2,227.50 |
| 1/12/2021 | P. Jason | Collins | Discussions and analysis re settlement negotiation. | 0.50 | 1,150 | $ | 575.00 |
| 1/12/2021 | Benjamin | King | Participate in teleconference with Judge Furgeson. | 0.40 | 875 | $ | 350.00 |
| 1/12/2021 | Adam | Swick | Hold call with mediator; hold call with J. Collins and B. King re same. | 2.30 | 825 | $ | 1,897.50 |
| 1/13/2021 | Benjamin | King | Edit settlement agreement; team email re: same. | 1.50 | 875 | $ | 1,312.50 |
| 1/14/2021 | Benjamin | King | Edit settlement agreement; emails w/ A. Swick and J. Collins re: same; email Judge Furgeson; email AdvoCare's counsel re: finalizing settlement agreement; emails w/ PJ Andrejkovics re: settlement issues. | 4.00 | 875 | $ | 3,500.00 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|---|--------|
| 1/19/2021 | Benjamin | King | Edit motion for preliminary approval; emails w/ A. Swick re: same; email draft to AdvoCare's counsel; edit notice, claims form, and related documents. | 1.80 | 875 | $ | 1,575.00 |
| 1/20/2021 | Benjamin | King | Review AdvoCare's edits to settlement agreement; detailed email response to AdvoCare's counsel; discuss settlement issues w/ A. Swick. | 2.30 | 875 | $ | 2,012.50 |
| 1/21/2021 | Benjamin | King | Further edits to settlement agreement, notice, claims form, proposed preliminary approval order, proposed final order; emails w/ A. Swick and AdvoCare's counsel re: same. | 5.50 | 875 | $ | 4,812.50 |
| 1/22/2021 | Benjamin | King | Further edits to motion for preliminary approval; edit motion for page extension; email documents to AdvoCare's counsel; emails with settlement administrator; lengthy email to PJ Andrejkovics re: settlement agreement issues; draft declaration in support of motion for preliminary approval; research papers filed in other class action settlements. | 7.00 | 875 | $ | 6,125.00 |
| 1/23/2021 | Benjamin | King | Analysis of deadlines for filing claims, opting out, etc.; email AdvoCare's counsel about changing timeline. | 0.70 | 875 | $ | 612.50 |
| 1/25/2021 | Benjamin | King | Finalize motion for preliminary approval; finalize settlement agreement and related documents; execute settlement agreement; finalize page extension motion; oversee filing of motions. | 7.00 | 875 | $ | 6,125.00 |
| 1/25/2021 | Adam | Swick | Finalize draft documents and file motion for preliminary approval of settlement documents; exchange multiple emails and calls with opposing counsel and B. King. | 9.40 | 825 | $ | 7,755.00 |
| 1/26/2021 | Benjamin | King | Email counsel for FTC copy of settlement agreement and motion for preliminary approval. | 0.30 | 875 | $ | 262.50 |
| 1/27/2021 | Benjamin | King | Emails with AdvoCare's counsel re: class data spreadsheets. | 0.30 | 875 | $ | 262.50 |
| 2/2/2021 | Benjamin | King | Emails with Judge Furgeson and AdvoCare's counsel re: letter of credit requirement. | 0.30 | 875 | $ | 262.50 |
| 2/4/2021 | Benjamin | King | Map out dates/deadlines for settlement in light of Court's grant of motion for preliminary approval; email defense counsel, settlement administrator, and internally re: dates; review and email settlement notice to settlement administrator. | 0.70 | 875 | $ | 612.50 |

Appx. 229

| 2/16/2021 | Adam | Swick | Review draft motion and proposed order for extension of time re letter of credit; exchange emails with B. King and opposing counsel re same. | 0.30 | 825 | $ | 247.50 |
| 2/19/2021 | Benjamin | King | Email settlement administrator re: upcoming dates, website. | 0.50 | 875 | $ | 437.50 |
| 2/22/2021 | Benjamin | King | Emails w/ settlement administrator re: notice and claims form. | 1.00 | 875 | $ | 875.00 |
| 2/23/2021 | Adam | Swick | Review proposed class notice and claims form; exchange emails with settlement administrator re edits. | 0.20 | 825 | $ | 165.00 |
| 2/24/2021 | Benjamin | King | Edit email to persons who contacted RCT re: the class action; edit notice and email AdvoCare re: edits needed. | 1.30 | 875 | $ | 1,137.50 |
| 2/24/2021 | Adam | Swick | Review case deadlines; contact e-discovery provider re email addresses; exchange emails internally re same; review proposed class notice and claims form from settlement administrator. | 0.50 | 825 | $ | 412.50 |
| 3/4/2021 | Benjamin | King | Emails with settlement administrator about claims process. | 0.20 | 875 | $ | 175.00 |
| 3/23/2021 | Benjamin | King | Draft motion for final approval; legal research in support of motion. | 6.00 | 875 | $ | 5,250.00 |
| 3/24/2021 | Benjamin | King | Draft motion for final approval; legal research in support of motion; call w/ settlement administrator and A. Swick re: claims processing. | 5.00 | 875 | $ | 4,375.00 |
| 3/25/2021 | Benjamin | King | Draft motion for final approval; draft motion for fees and class representative award; legal research in support of motions. | 5.00 | 875 | $ | 4,375.00 |
| 3/26/2021 | Benjamin | King | Draft motion for fees and class representative award; legal research in support of motion; factual research in support of motion. | 5.00 | 875 | $ | 4,375.00 |

| Date | First | Last | Description | Hours | Rate | | Amount |
|------|-------|------|-------------|-------|------|--|--------|
| 3/30/2021 | Benjamin | King | Draft motion for fees and class representative award; legal research in support of motion. | 4.00 | 875 | $ | 3,500.00 |
| 3/31/2021 | Benjamin | King | Draft motion for fees and class representative award; legal research in support of motion. | 4.00 | 875 | $ | 3,500.00 |
| | | | TOTALS | 2317.22 | | $ | 1,713,515.50 |

Appx. 231

# Exhibit 3

## The Dallas Morning News

🔍    ☰ SECTIONS                                                                                    SUBSCRIBE        ☀ 80°F

**MORE FROM HOMEPAGE**

‹

Escobar joins lawsuit against
Trump and Proud Boys, says Jan.
6 riot left 'violent nightmares' and
insomnia

Judge orders release of former
Dallas police Officer Bryan Riser
after arrest on capital murder
charges

There's a new richest man in
Texas, and he's a California
transplant

›

BUSINESS

# Meet the Texas lawyers whose rate now exceeds $1,000 an hour



Attorneys Tom Melsheimer (left) of Fish & Richardson and Jeff Champan of
Gibson Dunn are among Texas lawyers whose hourly rates exceed $1,000 an
hour. Dozens of senior lawyers — those who handle the most complex, bet-the-
company legal matters — now charge their business clients upward of $1,000

<u>**Featured**</u>

TODAY'S EPAPER  ›

YOUR CITY'S NEWS  ›

ELECTIONS  ›

TEXT WITH OUR JOURNALISTS  ›

50+ FREE NEWSLETTERS  ›

CORONAVIRUS UPDATES  ›

TIMELESS IN TEXAS  ›

CURIOUS TEXAS  ›

PUBLIC NOTICES  ›

NEWSPAPER ARCHIVES  ›

PUZZLES AND GAMES  ›

AL DÍA - NOTICIAS EN ESPAÑOL  ›

OBITUARIES  ›

Appx. 233

an hour. （Tony Gutierrez - The Associated Press）

   

By dallasnews Administrator
8:58 PM on Jun 3, 2015

 Listen to this article now
05:29    🌐 Powered by Trinity Audio

Texas lawyers this year notified hundreds of corporate clients that their hourly rates were going up.

Junior partners at many large law firms now charge $650 an hour. Associates only three years out of law school bill $400 an hour.

And dozens of senior lawyers — those who handle the most complex, bet-the-company legal matters — now charge their business clients in excess of $1,000 an hour.

It's a rate that was almost unheard of only a few years ago.

Two lawyers — Steve Susman in Houston and Bill Brewer in Dallas — post their hourly rate at $1,400 an hour.

"Putting a lawyer at $1,000 an hour or more is a way for a law firm to state that the lawyer is the best at what they do," said Tom Melsheimer, managing principal at Fish & Richardson in Dallas, whose hourly rate is $1,105.



SPONSORED CONTENT

## ArtsBridge programming continues to provide art education and entertainment to West Dallas

BY 

"Companies doing a $50 billion merger or involved in a $1 billion lawsuit are not going to quibble over whether the

**TOP BUSINESS STORIES**

**Uline, distributor of boxes and supplies for e-commerce, is hiring with starting pay at $23 an hour**


**Newly-formed Dallas Venture Capital invests in Texas growth-stage companies**


**Airlines hustling to unwind pandemic cutbacks with surge in summer travel ahead**


Appx. 234

lawyer's rate is $950 an hour or $1,100," Melsheimer said. "I've rarely had any pushback on my rate."

Just three years ago, the number of Texas lawyers with four-digit hourly rates was few — even though corporate attorneys in New York, Chicago, Los Angeles and Washington blew past $1,000 an hour years earlier.

Today, at least 70 lawyers based in Dallas and Houston alone charge their business clients $1,000 or more per hour, according to research and interviews conducted by The Texas Lawbook.

**Another warehouse developer is headed east to Forney**



**Blame it on COVID: D-FW still missing construction jobs**



ADVERTISING

More than 200 other Texas business lawyers charge an hourly rate between $900 and $995.

The Texas Lawbook obtained the lawyer fees data through the examination of bankruptcy records, litigation fee applications and interviews with law firm leaders and corporate in-house counsel.

"If my mother knew that I charge $950 an hour, she would never talk to me," said Tim Powers, managing partner at Haynes and Boone in Dallas.

Haynes and Boone has 25 lawyers who bill between $850 and $975 an hour. While none of the firm's Texas-based lawyers charge $1,000, it does have attorneys in its New York office charging four figures.

Appx. 235

Legal industry analysts and corporate general counsel say that rates were flat or stagnant from 2008 through 2012 but that law firms steadily raised their fees between 2 percent and 5 percent each of the past three years.

As a result, Texas law firms reported record revenue and profit in 2014.

The biggest rate increases came from lawyers in the Texas offices of large out-of-state law firms. Also, large Texas corporate law practices that represent less price-sensitive clients, including private equity firms, hit $1,000, according to legal industry consultants.

**Elite firms**

A handful of elite out-of-state law firms — Gibson Dunn, Sidley Austin, and Weil Gotshal in Dallas, and King & Spalding, Kirkland & Ellis, Latham & Watkins, Simpson Thacher & Bartlett and Skadden Arps in Houston — employ the large majority of lawyers in the state who charge $1,000 or more per hour. Many of those were with Texas-based law firms only three or four years ago and charged $200 or so less per hour than they do now.

"National law firms moving into Texas allowed the market to recognize and accept the higher national rates," said Bret Baccus, senior director at the consulting firm Huron Legal in Houston.

Some say the infusion of national law firms is actually the cause of the rate increases.

"Law firms moved into Texas, buying lawyers with $4 million profits per partner. ... With those salaries come New York rates," said Thompson & Knight managing partner Emily Parker, who is widely considered one of the best tax lawyers in the Southwest and charges business clients $995 an hour.

Two Houston-based law firms, Baker Botts and Vinson & Elkins, have more than a dozen $1,000-an-hour lawyers,

Appx. 236

by far the most among the Texas law firms.

Independent legal industry analysts say corporations care more about results than cost.

"The No. 1 reason that a business engages outside counsel is not money, but subject matter expertise," Baccus said, citing his firm's recent research.

The client's relationship with outside counsel is the second reason behind most decisions to hire a specific lawyer, while cost came in third, he said.

"Hourly rates don't mean a lot to the corporate general counsel, who cares much more about getting a good value for the bottom-line, total bill," said Jeff Chapman, a corporate lawyer at Gibson Dunn in Dallas who charges an hourly rate of $1,065.

### 10 minutes, $50,000

Powers recalls a Middle Eastern client who had a significant regulatory issue in Washington, D.C. Haynes and Boone contacted famed lawyer Robert Strauss, who was able to resolve the client's problem in one 10-minute phone call.

Strauss billed the client $50,000, which the client paid without hesitation, Powers said.

"That's value billing," he said.

Houston lawyer Mark Lanier, who normally represents plaintiffs on a contingency fee basis, said he charges $1,250 to clients who choose to hire him by the hour.

"It's about the opportunity lost," Lanier said. "This is time that I am not spending doing something else. It is about a stewardship of my time."

Chapman and others say there would be even more lawyers in the $1,000 club, but many older partners with rates in the upper $900s are resisting the jump into four digits.

Appx. 237

"$1,000 an hour is a lot of money — there should be some resistance," said Mike McKool, founding partner of McKool Smith, who charges $1,050 an hour.

"These escalating legal costs ought to make lawyers go way beyond what is ethically required in service to their clients," he said.

*For a longer version of this article, visit* **TexasLawbook.net**.



dallasnews Administrator

newsfeedback@dallasnews.com



## Business Briefing

Become a business insider. Get the latest headlines delivered to your inbox every weekday.

Email Address                    →

By signing up you agree to our privacy policy

### Real. Local. Journalism.

Stand with us in our mission to discover and uncover the story of North Texas

BECOME A MEMBER >

| THE LATEST | MOST POPULAR ON DALLASNEWS.COM |
|---|---|
| **Escobar joins lawsuit against Trump and Proud Boys, says Jan. 6 riot left 'violent nightmares' and insomnia**<br>BY TODD J. GILLMAN | 1 **Judge orders release of former Dallas police Officer Bryan Riser after arrest on capital murder charges** |
| **Judge orders release of former Dallas police Officer Bryan Riser after arrest on capital murder charges**<br>BY KRISTA M. TORRALVA AND CASSANDRA JARAMILLO | 2 **6 people killed in apparent murder-suicide at Allen home, police say** |
| **There's a new richest man in Texas, and he's a California transplant**<br>BY PAUL O'DONNELL | 3 **Two Dallas-area communities rank among nation's top suburban locations** |
| **Some Dallas seniors could start getting COVID vaccines at home next week**<br>BY EVERTON BAILEY JR. | 4 **Plano gives thumbs down on Bush Turnpike mixed-use project** |
|  | 5 **There's a new richest man in Texas, and he's a California transplant** |

Appx. 238

**Dallas County reports 22 deaths, 378 coronavirus cases; Tarrant adds 9 fatalities**

BY NATALY KEOMOUNGKHOUN

**6** **Richardson parents clash over LGBTQ books in school libraries**



# The Dallas Morning News

Texas' Leading News Source
Est. October 1, 1885

   

**COMPANY**

About *The Dallas Morning News*

Contact us

Careers     FAQ

**ADVERTISE WITH US**

Autos

Classifieds

Jobs

Obituaries

Public Notices

**BUY**

Photo reprints

Archived articles

Back copies

Commercial reprints

Licensing

**CUSTOMER SUPPORT**

Help and feedback

Manage your account

Newspaper subscription

ePaper

ePaper (Al Día)

Email Newsletters

Daily audio briefing

Vacation hold/billing

**WEBSITE SUPPORT**

Terms of service

Privacy policy

Do Not Sell My Personal Information

Site index

**Real.** *local.* **Journalism.**

Copyright © 2021 The Dallas Morning News. All rights reserved.

Appx. 239

# Exhibit 4

**Subscribe now** — Limited time offer

From the Dallas Business Journal:
https://www.bizjournals.com/dallas/news/2017/03/23
/rates-for-these-texas-lawyers-push-beyond-1-000-
an.html

# Rates for these Texas lawyers push beyond $1,000 an hour

Mar 23, 2017, 7:02am CDT **Updated: Mar 23, 2017, 1:53pm CDT**

Corporate lawyers based in Texas have announced they are raising the hourly rates they charge their business clients by 10 percent or more for the most experienced attorneys whose legal specialties are in high demand.



As a result, scores of Texas lawyers now charge $1,000 or more per hour for their legal services. Another 200 business attorneys practicing in the state are likely to cross the $1,000 threshold during the next two years.

The Texas Lawbook, a content partner with the Dallas Business Journal, is a digital publication serving lawyers who represent businesses in litigation, transactional and regulatory matters in Texas. Visit their website at TexasLawbook.net.

In fact, several national law firms operating in Texas now bill

Appx. 241

as much as $480 an hour for rookie lawyers only one or two years out of law school – a fact that disturbs corporate general counsel even more than the $1,000 an hour for seasoned attorneys.

Businesses across Texas received letters during the past few weeks from the law firms that represent them delivering news that hourly rates are going up as much as 10 percent or even more in 2017.

More than two-dozen corporate general counsel told The Texas Lawbook in exclusive interviews that the law firms they use for litigation, regulatory and transactional matters have announced rate increases ranging from five to 10 percent.

"Quite frankly, some of the rate increases are even larger than 10 percent," says Carlos Hernandez, who is the chief legal officer at Irving-based Fluor Corp. "It is crazy that $900 an hour is commonplace and $1,000 is no longer shocking."

AT&T General Counsel David McAtee says it is "a fact of life that lawyer rates will go up," but he says the amount of the increases in Texas during the past couple years "has been startling."

Six years ago, the number of Texas lawyers who charged $1,000 could be counted on one hand.

Today, there are more than 100 business attorneys practicing in Dallas, Houston and Austin who bill their corporate clients between $1,000 and $1,400 an hour, according to Texas Lawbook research of federal bankruptcy records, court fee applications and interviews with law firm insiders and corporate general counsel.

The Texas Lawbook identified two-dozen Texas lawyers who list $995 as their billable rates. More than 180 lawyers practicing in the state have hourly rates between $900 and $995 and another 220 attorneys who charge between $800 and $895 an hour.

"Rates have blown up in recent years," says Rudy Rodriguez,

Appx. 242

the general counsel at CEC Entertainment, the parent company of Chuck E. Cheese. "You can still find reasonable rates in Texas, but you have to shop around."

Texas Lawbook research found that about 20 Texas trial lawyers, including Tom Melsheimer at Winston & Strawn, Rob Walters and Bill Dawson at Gibson Dunn, Yvette Ostolaza at Sidley Austin and Steve Susman at Susman Godfrey, garner $1,000 an hour or more.

A great majority of $1,000 an hour lawyers in Texas are in the corporate transactional law practice: Mark Kelly at V&E, Michael O'Leary at Andrews Kurth, Michael Dillard of Latham, Courtney Marcus at Weil and Jeff Chapman of Gibson Dunn.

"Rates at the large law firms have definitely risen the past year or two. It makes you re-assess what work needs to be done by these top tier firms and what can be handled by regional firms with lower rates," says RSP Permian General Counsel James Mutrie. "Only a small portion of the legal work I have requires the services of $1,000-an-hour lawyers."

Mutrie and others say that the rates of legal specialists, such as those practicing tax law, advising on securities offerings and IPOs or bet-the-company intellectual property disputes, seem to have gone up disproportionately.

"I have a difficult time grasping that $1,000 an hour is deserved, but I will pay it if I need that specific lawyer for a specific case," says Chris Luna, senior legal director at MetroPCS in Richardson. "There is still a difference in the fees of New York versus Texas lawyers, but that difference has decreased dramatically in the past two or three years."

Legal industry analysts and corporate general counsel say that rates were flat or stagnant from 2008 through 2012, but that started changing as elite national law firms opened outpost in Dallas and Houston.

Texas Lawbook research found that more than two-thirds of the $1,000 an hour lawyers are partners at those national law firms, including Gibson Dunn, Kirkland, Latham, Sidley

Appx. 243

Austin, Simpson Thatcher and Weil.

The national law firms charged higher rates, which gave Texas-based law firms the necessary cover to significantly raise their own rates.

Baker Botts and Vinson & Elkins are the two Texas-based firms that have the most $1,000-an-hour lawyers. Both firms have more than twenty lawyers charging four figures, according to court records and interviews with legal industry analysts.

*Mark Curriden is the the founder of The Texas Lawbook and is the publication's senior legal affairs writer. Mark can be reached at mark.curriden@texaslawbook.net. For a longer version of this story, visit TexasLawbook.net(subscription required).*

Appx. 244

## SAMPLING OF TEXAS LAWYERS & THEIR HOURLY RATES

| LAWYER | FIRM | HOURLY RATE | |
|--------|------|-------------|---|
| Steve Susman | Susman Godfrey | $1,400 | |
| Bill Brewer | Brewer Attorneys | $1,400 | |
| Andrew Calder | Kirkland & Ellis | $1,380 | |
| Mark Lanier | Lanier Law Firm | $1,250 | |
| Michael Rosenthal | Gibson Dunn | $1,215 | |
| Gary Huffman | Vinson & Elkins | $1,200 | |
| Tom Melsheimer | Winston & Strawn | $1,150 | |
| Stephen Youngman | Weil | $1,145 | |
| Courtney Marcus | Weil | $1,125 | |
| Jeff Chapman | Gibson Dunn | $1,100 | |
| David Sinak | Gibson Dunn | $1,100 | |
| Steve Davis | Akin Gump | $1,095 | |
| Shane Tucker | Vinson & Elkins | $1,080 | |
| Paul Genender | Weil | $1,035 | |
| Bill Dawson | Gibson Dunn | $1,030 | |
| Eugene Cowell | Akin Gump | $1,025 | |
| Doug Glass | Akin Gump | $1,025 | |
| Emily Parker | Thompson & Knight | $995 | |
| Mike Boone | Haynes and Boone | $995 | |
| Ron Kirk | Gibson Dunn | $975 | |

Source: Texas Lawbook Research

Appx. 245

# Exhibit D

(https://www.directsellingnews.com/)

# AdvoCare Announces Revision of Business Model

By DSN Staff (https://www.directsellingnews.com/author/dsnstaff/)  |  May 17, 2019



Privacy • Terms

Appx. 247

# AdvoCare (https://www.directsellingnews.com/?p=14503&preview=true) International today announced a revision of its business model from multi-level marketing to a direct-to-consumer and single-level marketing compensation plan.

AdvoCare has been in confidential talks with the Federal Trade Commission about the AdvoCare business model and how AdvoCare compensates its Distributors. The planned change will impact Distributors who have participated in the multi-level aspect of the business. Those who currently sell only to customers will not be impacted and there will be no impact on Preferred Customers or retail customers' ability to purchase products.

"Over the years, we have made many changes to the AdvoCare policies as the regulatory environment has shifted. Based on recent discussions, it became clear that this change is the only viable option," says Patrick Wright, AdvoCare's chief executive officer. "Regardless of the model, we remain steadfastly committed to providing our high-quality nutritional products to our loyal customers who are seeking to live healthier lives. We stand behind the integrity and values of this company and will continue to work with our dedicated Distributors to provide the best customer service to ensure AdvoCare products are available for decades to come."

The company gave notice to its more than 100,000 Distributors on May 17 that, effective July 17, 2019, AdvoCare will revise the business model to a single-level distribution model, paying compensation based solely on sales to direct customers. The Retail and Preferred Customer programs will remain intact with discounts ranging from 20–40 percent. This new business model will allow the company to explore new and innovative ways to bring their premium products to market.

"AdvoCare Distributors have been helping change lives since its founding in 1993, by providing premium wellness products to those looking to reach new health and fitness goals—and that will not change," says AdvoCare's former CEO and current Chairman of the Board Reid Ward. "We're proud of the growth of our Preferred Customer program we launched in 2016, which has grown to almost 400,000 discount customers. We look forward to reaching even more customers with a new business model."

For more details, visit facts.advocare.com (http://facts.advocare.com)

| Share | Tweet | Share | Like 6.3K |
|-------|-------|-------|-----------|

---

*Posted in Advocare (https://www.directsellingnews.com/category/by-company/advocare/), I (https://www.directsellingnews.com/category/news/insights/), News*

Privacy • Terms

Appx. 248

*(https://www.directsellingnews.com/category/news/), US News
(https://www.directsellingnews.com/category/news/us-news/), World News
(https://www.directsellingnews.com/category/news/world-news/) and tagged AdvoCare
(https://www.directsellingnews.com/tag/advocare/), Federal Trade Commission
(https://www.directsellingnews.com/tag/federal-trade-commission/), Patrick Wright
(https://www.directsellingnews.com/tag/patrick-wright/), Preferred Customer program
(https://www.directsellingnews.com/tag/preferred-customer-program/), Reid Ward
(https://www.directsellingnews.com/tag/reid-ward/), Retail Customer programs
(https://www.directsellingnews.com/tag/retail-customer-programs/)*

Search

# Archives

Select Month

# Read August DSN Digital Format

Privacy • Terms



(https://issuu.com/directsellingnews/docs/dsn_august_2020)

# Subscribe to Print



(https://www.directsellingnews.com/subscribe/)

September 2020

# Sponsored Content



(https://www.directsellingnews.com/mastering-order-fulfillment-in-

## Mastering Order Fulfillment in Direct Sales

By Amware | May 27, 2020

direct-sales/)

## Sponsored Content



## Shopify PLUS Firestorm®: A Powerful Combination for the Future

(https://www.directsellingnews.com/?p=23018&preview=true)

By Jerry Reynolds | March 20, 2020

## Sponsored Content

Privacy • Terms

Appx. 251



**Penny: The Intelligent Personal Assistant For Direct Sales**

By Penny | March 17, 2020

(https://www.directsellingnews.com/penny-the-intelligent-personal-assistant-for-direct-sales/)

---

# Direct Selling News

5800 Democracy Dr.
Plano, TX 75024
United States of America

# Menu

Home Page (https://www.directsellingnews.com/)

Articles (https://www.directsellingnews.com/category/news/)

DSN Global 100 (https://www.directsellingnews.com/global-100/)

Vendor Directory (https://www.directsellingnews.com/vendor-directory-2/)

Subscribe (https://www.directsellingnews.com/subscribe/)

Store (http://store.directsellingnews.com/)

# Categories

Select Category



Appx. 252

# Subscribe to Print



(https://www.directsellingnew
s.com/subscribe/)

September 2020

---

© 2019 Direct Selling News | All rights reserved.

Privacy Policy (/privacy-policy) | Terms of Use (/terms-of-use) | Advertise With Us (/advertise-with-us) | Contact Us (/contact-us)

Privacy • Terms

# Exhibit E

**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

# Multi-Level Marketer AdvoCare Will Pay $150 Million To Settle FTC Charges it Operated an Illegal Pyramid Scheme

October 2, 2019

## The company, its former CEO, and two top promoters are permanently banned from multi-level marketing

FOR RELEASE

TAGS:  deceptive/misleading conduct  |  Bureau of Consumer Protection  |  Southwest Region  |  Consumer Protection  |  Going into Business

Multi-level marketer AdvoCare International, L.P. and its former chief executive officer agreed to pay $150 million and be banned from the multi-level marketing business to resolve Federal Trade Commission charges that the company operated an illegal pyramid scheme that deceived consumers into believing they could earn significant income as "distributors" of its health and wellness products. Two top promoters also settled charges that they promoted the illegal pyramid scheme and misled consumers about their income potential, agreeing to a multi-level marketing ban and a judgment of $4 million that will be suspended when they surrender substantial assets.

The FTC complaint filed in federal court also charges two other top AdvoCare promoters, Danny and Diane McDaniel, with unlawfully promoting a pyramid scheme, making deceptive earnings claims, and providing others with the means and instrumentalities to do the same.



**FTC SETTLEMENT WITH ADVOCARE**

☑ **Immediate end** to the pyramid scheme

☑ **Ban** on all future multi-level marketing

☑ **$150 million** for consumers

Source: Federal Trade Commission | FTC.gov

The FTC alleged that Texas-based AdvoCare promoted a business opportunity distributing health and wellness products, such as its Spark energy drink, through a network of hundreds of thousands of participants, known in the company as distributors. AdvoCare pitched its business opportunity through conferences, webinars, conference calls, podcasts, social media posts, videos, and print materials, according to the FTC's complaint.

In its complaint against AdvoCare, former CEO Brian Connolly, and distributors Carlton and Lisa Hardman and Danny and Diane McDaniel, the FTC alleged that the parties falsely claimed to offer a life-changing financial solution that would allow any ordinary person to earn unlimited income, attain financial freedom, and quit their regular job.

In reality, the FTC alleged, the vast majority of AdvoCare distributors have earned no money or lost money.

Appx. 255

"Legitimate businesses make money selling products and services, not by recruiting. The drive to recruit, especially when coupled with deceptive and inflated income claims, is the hallmark of an illegal pyramid." said Andrew Smith, Director of the Bureau of Consumer Protection. "The FTC is committed to shutting down illegal pyramid schemes like this and getting money back for consumers whenever possible."

According to the FTC, AdvoCare operated an illegal pyramid scheme that pushed distributors to focus on recruiting new distributors rather than retail sales to customers. The compensation structure also incentivized distributors to purchase large quantities of AdvoCare products to participate in the business and to recruit a downline of other participants with the same incentives. The clear directive of this structure was, as one AdvoCare distributor explained during the company's Success School training, to "recruit business builders who recruit business builders who recruit business builders. . . ."

The FTC alleged that under the AdvoCare compensation plan, participants were charged $59 to become a distributor, making them eligible to receive discounts on products, and to sell products to the public. To earn all possible forms of compensation, however, participants had to become "advisors," which typically required them to spend between $1,200 and $2,400 purchasing AdvoCare products and accumulate thousands of dollars of product purchase volume each year, according to the complaint. The FTC alleged that the income of AdvoCare advisors was based on their success at recruiting, with the highest rewards going to those who recruited the most advisors and generated the most purchase volume from their downline.

To recruit people, the FTC alleged, AdvoCare and the other defendants told distributors to make exaggerated claims about how much money average people could make—as much as hundreds of thousands or millions of dollars a year. The FTC alleged that distributors were told to create emotional narratives in which they struggled financially before they joined AdvoCare, but obtained financial success through AdvoCare. Distributors were also allegedly told to instill fears in potential recruits that they would suffer from regrets later if they declined to invest in AdvoCare.

The FTC alleged that the defendants told consumers that they could realize large incomes by promoting AdvoCare and that their earning capacity was limited only by their effort. For example, AdvoCare promoter Diane McDaniel told consumers that "the sky is the limit. I'm the variable. I get to decide what I truly want according to the effort I put forth" and that "there is incredible profit that can be made through infinity."

In reality, the FTC alleged, AdvoCare did not offer consumers a viable path to financial freedom. In 2016, 72.3 percent of distributors did not earn any compensation from AdvoCare; another 18 percent earned between one cent and $250; and another 6 percent earned between $250 and $1,000. The annual earnings distribution was nearly identical for 2012 through 2015.

In addition to a $150 million judgment and a permanent ban on multi-level marketing, the settlement order with AdvoCare and Connolly requires them to notify all AdvoCare distributors about the FTC's lawsuit and settlement, and to advise them that:

> they will no longer be able to earn compensation based on purchases of distributors in their downline;

> if they had significant losses pursuing their AdvoCare business, they may get some of their money back from the FTC; and

> if they decide to discontinue their participation in the business opportunity, AdvoCare offers a 100 percent refund on unused products under existing refund policies.

The Commission vote authorizing the staff to file the complaint and stipulated final order/injunction was 5-0. The FTC filed the complaint and final order/injunction in the U.S. District Court for the Eastern District of Texas.

**NOTE:** The Commission files a complaint when it has "reason to believe" that the named defendants are violating or are about to violate the law and it appears to the Commission that a proceeding is in the public interest. Stipulated final injunctions/orders have the force of law when approved and signed by the District Court judge.

The Federal Trade Commission works to promote competition, and protect and educate consumers. You can learn more about consumer topics and file a consumer complaint online or by calling 1-877-FTC-HELP (382-4357). Like the FTC on

Facebook, follow us on Twitter, read our blogs, and subscribe to press releases for the latest FTC news and resources.

# Contact Information

MEDIA CONTACTS:
Peter Kaplan
*Office of Public Affairs*
202-326-2334

Jay Mayfield
*Office of Public Affairs*
202-326-2656

STAFF CONTACT(S):
Aaron Haberman
*FTC's Southwest Region*
214-979-9381

M. Hasan Aijaz
*FTC's Southwest Region*
214-979-9386



ftc.gov

# Exhibit F

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                Plaintiff,<br><br>             v.<br><br>ADVOCARE INTERNATIONAL, L.P., a limited partnership,<br><br>BRIAN CONNOLLY,<br><br>DANNY McDANIEL,<br><br>DIANE McDANIEL,<br><br>CARLTON HARDMAN, and<br><br>LISA HARDMAN,<br><br>              Defendants. | )<br>)<br>)<br>)  **Case No. _____**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S COMPLAINT FOR
## <u>PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF</u>

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.  The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) in connection with the advertising, marketing, promotion, and operation of a multi-level marketing business opportunity.

1

## JURISDICTION AND VENUE

2.　　This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.　　Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (c)(2) and 15 U.S.C. § 53(b).

## PLAINTIFF

4.　　The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5.　　The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b).

## DEFENDANTS

6.　　Defendant AdvoCare International, L.P. ("AdvoCare") is a Delaware limited partnership with its principal place of business at 2801 Summit Avenue, Plano, Texas 75074. In connection with the matters alleged herein, AdvoCare transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, AdvoCare has advertised, marketed, distributed, or sold a business opportunity to consumers throughout the United States.

7.　　Defendant Brian Connolly is a former Chief Executive Officer of AdvoCare and former Executive Chair of AdvoCare's Board of Directors, having resigned from these roles in April 2019. At times material to this Complaint, acting alone or in concert with others, he has

2

Appx. 260

formulated, directed, controlled, had the authority to control, or participated in the acts and practices of AdvoCare set forth in this Complaint. Defendant Connolly resides in New Jersey and, in connection with the matters alleged herein, transacts or has transacted business in this District.

8.      Defendant Daniel McDaniel, also known as Danny McDaniel, is a leading promoter of the AdvoCare business opportunity. At all times material to this Complaint, he has participated in the acts and practices set forth in this Complaint. Danny McDaniel is married to Defendant Diane McDaniel, resides in Texas, and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

9.      Defendant Diane McDaniel (together with Danny McDaniel, "the McDaniels") is a leading promoter of the AdvoCare business opportunity. At all times material to this Complaint, she has participated in the acts and practices set forth in this Complaint. Diane McDaniel resides in Texas and, in connection with the matters alleged herein, she transacts or has transacted business in this District and throughout the United States.

10.     Defendant Carlton Hardman is a leading promoter of the AdvoCare business opportunity. At all times material to this Complaint, he has participated in the acts and practices set forth in this Complaint. Carlton Hardman is married to Defendant Lisa Hardman, resides in Alabama, and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

11.     Defendant Lisa Hardman (together with Carlton Hardman, "the Hardmans") is a leading promoter of the AdvoCare business opportunity. At all times material to this Complaint, she has participated in the acts and practices set forth in this Complaint. Lisa Hardman resides in

Appx. 261

Alabama and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMERCE

12.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

### INTRODUCTION AND OVERVIEW

13.     Founded in 1993, AdvoCare is a multi-level marketing company that promotes health and wellness products through a network of business opportunity participants—called Distributors—who can purportedly earn compensation by selling AdvoCare products and by recruiting participants into their "downline."

14.     To convince consumers to pursue AdvoCare's business opportunity, Defendants claim that AdvoCare offers the average person a financial solution that will enable them to earn unlimited income, attain financial freedom, and eliminate the constraint of traditional employment. In reality, the overwhelming majority of Distributors never earn compensation from the company.

15.     AdvoCare charges consumers $59 to become a Distributor. Distributors can recruit a downline and earn wholesale commissions ranging from five to twenty percent of purchases by certain members of their downline. Distributors receive a discount on products and are eligible to sell products to the public.

16.     However, to earn all possible forms of compensation AdvoCare offers, consumers must become Advisors. In addition to earning wholesale commissions and being eligible to sell

Appx. 262

products, Advisors are eligible to earn overrides, leadership bonuses, and incentives (collectively, "Advisor income").  Advisor income is based on the purchase volumes of downline Advisors and their recruits, with the highest rewards going to those who recruit the most Advisors and generate the most volume from Advisors in their downline. The clear directive of this structure is—as a leading Distributor instructed consumers at Success School, AdvoCare's marquee annual training event, which all of the Individual Defendants regularly attend and present at—for consumers to "recruit business builders who recruit business builders who recruit business builders. . . ."

17.     To reach Advisor, consumers must pay the Distributorship fee and meet certain AdvoCare product purchase requirements, measured as personal and group volume ("PGV"). Consumers typically spend between $1,200 and $2,400 purchasing AdvoCare products to reach Advisor.

18.     AdvoCare's compensation plan contains recurring incentives to encourage business opportunity participants to purchase large quantities of product. Advisors must accumulate thousands of dollars of product purchase volume each year to become and remain Advisors. They must meet volume thresholds to earn Advisor income each pay period and to advance to higher ranks in AdvoCare, where they can receive bigger bonuses.

19.     Given the incentives for business opportunity participants to continually purchase large volumes of product, product purchases are driven by the compensation plan and not by consumer demand for AdvoCare products, leading a recent AdvoCare CEO to observe that he was "not concerned about retailing the product . . . . If you package dirt right and it's got PGV on it, the Distributors will buy it."

Appx. 263

**DEFENDANTS PROMOTE ADVOCARE'S BUSINESS OPPORTUNITY THROUGH DECEPTION**

20.      To recruit consumers to join AdvoCare, Defendants regularly host events and disseminate materials featuring deceptive income claims. These events and materials include in-person meetings and conferences, webinars, conference calls, podcasts, social media posts, videos, and print materials. Two of the most prominent recruiting materials are *Solutions for Your Success*, a DVD of income testimonials that the company encourages all Distributors to use to recruit new participants, and *Impact*, a magazine the company produces biannually and sends to all new Distributors. Through these events and materials, Defendants promote AdvoCare as a financial solution through which consumers can attain financial freedom and eliminate the constraint of traditional employment.

21.      AdvoCare's network includes hundreds of thousands of Distributors, and the company coordinates its marketing and training efforts with prominent Distributors who can reach large audiences. In particular, AdvoCare relies on Distributors who reach the Diamond rank to market the AdvoCare business opportunity and train others. According to AdvoCare, Diamond Distributors are the "best of the best in AdvoCare" and are "the leaders in the field and from the field's perspective represent AdvoCare." Diamonds Distributors routinely record recruiting and training videos for AdvoCare; create print testimonials for AdvoCare; host AdvoCare recruiting and training calls and podcasts; and attend, speak at, and host AdvoCare events.

*Defendants Promote AdvoCare as a Life-Changing Financial Solution*

22.      Since at least 2014, Defendants have marketed the AdvoCare business opportunity through personal stories touting the improved lifestyle and unlimited income

Appx. 264

opportunity purportedly available through AdvoCare. Defendants have published thousands of deceptive income claims, and the below claims are mere examples of their conduct:

a. In an August 2018 recruiting video that the company posted on its Facebook and YouTube pages, an AdvoCare General Manager said that she asks consumers, "What's that amount per month that you'd like to earn? And then a year from now let's look at that and let's decide: is that the same amount or maybe you want to give yourself a raise? The great thing about owning your own business is that you can." She then showed a graphic of a Distributor with annual earnings of more than $413,000, which she referred to as "astounding income." Closing the video, she stated that if consumers wanted "a part-time income . . . a full-time income, [had] a desire to be at home with your family, a desire to travel, or to be able to take your family on trips—whatever reason . . . a year from now you will wish you had started today."

b. At a July 2018 corporate event that was simulcast on one of AdvoCare's Facebook pages, a Diamond Distributor spoke of earning $182,000 in her second year, and asked viewers, "where in corporate America can you give yourself a $100,000 raise by working side-by-side with your best friend?" In the same presentation, the Diamond Distributor's husband spoke of earning $48,000 over six weeks while qualifying for Diamond, and said he asks consumers what they could do with that kind of income.

c. In a June 2018 episode of AdvoCare's podcast, a Diamond Distributor told listeners his first-year earnings were "between four and five thousand dollars a month" and that he has gone on to earn a "significant seven figure income." He

Appx. 265

also told Distributors success is just about emulating successful people—and that

if they do that, "[they are] likely to get the same or similar results."

d.  In an October 2015 video currently available on AdvoCare's YouTube page, a

Diamond Distributor states, "literally, you could point to a number and say I need

to earn that, and we can teach you how to do that."

e.  On a 2012 recorded corporate call to recruits, a Distributor told consumers that

"[t]he sky's the limit. There is no ceiling on our income."

f.  In a June 2018 Instagram post, Diane McDaniel asked consumers what they

would "say yes to" if time, health, and money were not issues, with hashtags

including "#beachhouse," "#dreamcar," "#louisvuitton," and

"#financialfreedom."

g.  In a video posted on the McDaniels' website until at least April 2017, Diane

McDaniel stated, "the sky is the limit. I'm the variable. I get to decide what I truly

want according to the effort I put forth" and that "there is incredible profit that

can be made through infinity."

h.  In a video on the McDaniels' website until at least December 2016, Diane

McDaniel stated, "whether it's a little or a lot, anywhere from 200 to 500 to 5,000

to 50,000 dollars a month—the sky is the limit here."

i.  Lisa Hardman stated at a recorded 2014 recruiting event that AdvoCare "has the

potential, with very little overhead, to pay you millions and millions of dollars"

and that "nowhere else in America can you go and earn the kind of income that's

possible here."

Appx. 266

23.     Other prominent AdvoCare Distributors routinely make similar deceptive claims about unlimited earning opportunities through AdvoCare in widely disseminated recruitment videos and on social media:

a.  In June 2018, a Diamond Distributor posted on Facebook about a Distributor who "left college and decided to work for herself," earned a $10,740 check, and "qualified for a level that pays on average $300k per year." She stated the Distributor "believed she could, [s]o she DID," and used hashtags such as "#residualincome" and "#whynotyou."

b.  In May 2018, a Diamond Distributor posted on his Facebook page, "$2,833,355.94 What if this figure was possible for you to earn with a part-time income opportunity?" In other 2018 social media posts, this Distributor also posted about other Distributors earning nearly $30,000 per month and asked, "what if [this] was possible for you to earn MONTHLY with a part-time opportunity?"; wrote of Distributors getting a $1,000 per month "raise" after just two months in AdvoCare; wrote of showing recruits a "road map to an income that pays out an average of $38,000 a year"; wrote of Distributors pinning levels that he claimed paid an average of $42,000 and $81,000, respectively; and wrote of Distributors earning more than $31,000 in five weeks. In February 2019, AdvoCare named this Distributor its 2018 Distributor of the Year.

c.  In May 2018, a Diamond Distributor posted on her Facebook page about her lifetime earnings of $1.94 million and asked, "[w]hat if this figure was possible for you to earn with a part-time income opportunity?"

d.  In May 2018, a Diamond Distributor stated in a YouTube video that consumers could earn $76,800 per year by recruiting 40 Advisors. "Where else in the world, on a part-time basis, can you do that? . . . There's people that have done this in 90 days. You're the variable."

e.  In a January 2018 video available on YouTube, a Diamond Distributor stated that consumers could make "one-hundred dollars a month . . . a thousand . . . ten-thousand, or a hundred-thousand," as AdvoCare "will pay you as much as you're willing to put into it."

f.  In January 2018, a Diamond Distributor wrote on her Facebook page that consumers could "do anything [they] want with [AdvoCare]," and could earn $10,000 "or MORE" per month.

24.  To convince consumers that they, too, can attain financial freedom as AdvoCare Distributors, Defendants frequently claim that successful Distributors are simply ordinary people who chose to pursue AdvoCare's business opportunity:

a.  In a May 2018 video posted on AdvoCare.com, a Distributor who purportedly made more than $155,000 in 2017 said that he was drawn to the business after "seeing all of these amazing people" who were "also just ordinary people like [me]."

b.  In a May 2018 training, a Diamond Distributor told consumers he was "an average person . . . We're just average people, right?"

c.  In a May 2018 video, a Diamond Distributor told consumers, "we all started at the same spot. Just like you. We are no different. I am no different from you."

Appx. 268

> d.   In a May 2015 training currently available on AdvoCare's YouTube page, a
> Diamond Distributor called AdvoCare "the average person's best chance," after
> stating that he made $229,000 the previous month. "We're just regular folks,
> guys. There's nothing special about us."

25.    Defendants train consumers who become Distributors to develop their own stories with earnings claims to recruit new participants into the business opportunity. Defendants teach Distributors to create a narrative of struggling before joining AdvoCare; seeing AdvoCare as an opportunity to change their lives; quickly earning significant income; and being on their way to earning even more money.

26.    Central to Defendants' pitch is the prospect of earning substantial income through AdvoCare. In training events, Defendants teach Distributors to cite dollar amounts. At Success School, one Diamond Distributor called failing to talk about money an "epic fail" because "if you don't talk about money . . . people . . . might think that you're just trying to sell them something . . . . So talk about money."

27.    Similarly, Diane McDaniel told Distributors at a recorded 2014 training event that "[i]f your stories don't have any numbers attached to it, your story stinks. . . . If you don't have numbers, people aren't hearing your stinky story."  She also told Distributors to convince consumers they would "make more money. Because that's the lingo they're looking for—more money. . . . More money. More money."

28.    At a 2014 company event, a Diamond Distributor trained Distributors that they did not need to believe their income projections—they just needed recruits to.

> It shocked me how when we said, "this time next year, we're gonna replace our
> income, be able to leave our jobs," I didn't quite believe it in the back of my mind
> . . . . But when we would say it, people would say, "really?" and I'm like, oh my
> gosh, they believed me.

11

29.     Similarly, AdvoCare's "Notes on Success" training program, currently available on AdvoCare.com, models a story ending with, "right now, I'm on track for replacing my full-time income over the next 60 days . . . . If it keeps going . . . I'm gonna be full-time by the end of the year." AdvoCare calls the training an "absolute must-have instructional tool." Most recently, in July 2018, a Diamond Distributor posted on Facebook about the need to project future earnings. "Even at $60k a month we are still telling people where we are GOING, which is $150,000 a month within the next 3 years."

30.     Defendants instruct Distributors to tell "emotional," rather than "factual," stories. In a training document used until at least June 2014, the McDaniels provide the following example of emotional storytelling:

> After 5 years, we have the potential of earning a 2-week pay check, even if we decide to retire from the business. One of the ways the company pays is residual income, which means you and I can earn money for a lifetime if we build it right.

31.     Finally, Defendants teach Distributors to create a "fear of loss" in recruits, which reinforces the deceptive message that recruits are likely to earn substantial income. For example, at AdvoCare's Leadership School, a Diamond Distributor told participants, "'You can lose $50,000 by not going' works better than, 'Hey, you can gain $50,000 by going.'"

32.     The Hardmans and McDaniels also teach their downlines to use the fear of loss. In a PowerPoint training presentation used until at least 2015, they told Distributors to tell prospects that "that they have the opportunity to invest in a company that has the potential to move & grow like a 'Nike' or a 'Bill Gates[.]' Your Prospect does not want . . . regrets 3 years down the road because they did not invest in Advocare!"

33.     After representing that consumers can earn unlimited income through AdvoCare, Defendants have used purported income disclosures to further misrepresent the AdvoCare

business opportunity. Until at least June 2015, AdvoCare excluded non-earners—more than 70 percent of Distributors—from its income disclosure statement, claiming they were not "active." By excluding these Distributors, Defendants severely inflated the percentage of Distributors in each purported income range.

34.     The income ranges on AdvoCare's income disclosure statement were reported as "annual average income" but were actually annualized earnings based only on pay periods where Distributors earned checks. For example, if a Distributor participated in AdvoCare for a full year and earned just one check, AdvoCare multiplied the check by the number of pay periods in the year to calculate the annual average income. One year of income consisting of one $100 check would thereby count as $2,400 in average annual income.  The company printed these purported income disclosures onto posters and sold them to Distributors to use as sales aids.

35.     With AdvoCare's help and approval, the McDaniels created a version of the income disclosure statement that—like AdvoCare's version—reported annualized earnings as averages and ignored Distributors without earnings.



The McDaniels' version also omitted the percentage of Distributors at each pay level and favorably compared purported earnings at AdvoCare to salaries in prestigious careers. Incomes were color-coded, and presenters frequently told consumers they could pick the color of the income they wanted to earn. The McDaniels' income disclosure statement was popular among Distributors. For a number of years, many Diamond Distributors used this form of income disclosure statement in their business opportunity presentations, and by 2013 one version of this form had been downloaded more than 10,000 times from the McDaniels' website.

36.     Both the Hardmans and the McDaniels used versions of this income disclosure statement in their business opportunity presentations until at least mid-2015. The below image is a modified version that the Hardmans used in 2015:



## COMPARABLE SALARIES

| Leadership Level | Amount of Retail Volume | Approximate Override | Leadership Bonus % | Average Total Income 2014 | | Average US Salaries 2013 | |
|---|---|---|---|---|---|---|---|
| Silver | $3,000 | $100 | +3% | $12,817 | | Bank Teller | $25,790 |
| Gold | $15,000 | $500 | +2% | $38,444 | | Dental Assistants | $35,080 |
| Gold 3 Star | $15,000 | $500 | +2% | $42,104 | | Graphic Designer | $48,783 |
| Ruby | $30,000 | $1,000 | +2% | $85,848 | | Teachers | $49,430 |
| Ruby 6 Star | $30,000 | $1,000 | +2% | $105,477 | | Real Estate Agent | $51,930 |
| Emerald | $60,000 | $2,000 | +2% | $198,801 | | Insurance Agent | $63,400 |
| Emerald 9 Star | $60,000 | $2,000 | +2% | $296,935 | | Register Nurse | $67,930 |
| Diamond | $120,000 | $4,000 | +4% | $636,953 | | Accountant | $71,040 |
| Platinum + | $240,000 | $8,000 | +.25% | | $1,486,830 | Pharmacist | $114,950 |
| Double Diamond + | $360,000 | $12,000 | +.25% | | | Lawyer | $126,860 |
| | | | | | | Nurse Anesthetist | $154,390 |
| | | | | | | CEO | $176,840 |
| | | | | | | Family Doctor | $180,850 |

37.     In many instances, Defendants accompany their misleading income representations with purported disclaimers.  These purported disclaimers, which often appear in small print and not in close proximity to the claims made, do not alter the net impression created by Defendants' misleading representations— namely, that Distributors are likely to earn substantial income. For example, AdvoCare's spring 2018 issue of *Impact* magazine includes

large, bolded text announcing earnings as high as $1.1 million per year. Meanwhile, disclosures, which appear in fine print at the bottom of pages, inflate earnings by reporting average earnings among Distributors who earned compensation, excluding non-earners from the calculation. The section also states that earnings depend on "a number of factors, including your individual effort and the area in which you live" and "do not include earnings from retail sales"—implying that actual earnings may be higher than reported.

38.     In recruiting videos and presentations, speakers often negate income disclosures with claims that Distributors "are the variable,"a popular phrase used by Distributors including the Hardmans and McDaniels; "get paid what [they're] worth," as used in a 2018 corporate income video; or "financially . . . are in complete control of where [they] are going to go," which appears in an August 2018 income video currently available on AdvoCare's YouTube page.

*Defendants' Earnings Claims are False or Misleading*

39.     Contrary to Defendants' claims, AdvoCare does not offer consumers a viable path to financial freedom. In 2016, 72.3 percent of Distributors did not earn any compensation from AdvoCare; another 18 percent earned between one cent and $250; and another 6 percent earned between $250 and $1,000. The annual earnings distribution is nearly identical for 2012 through 2015.

40.     In 2017, AdvoCare launched a program allowing consumers to sign up as Preferred Customers in order to purchase products at a discount without pursuing the business opportunity. Thus, with the Preferred Customer program in place, consumers who are not interested in pursuing the business opportunity do not need to become Distributors. Even with this option in place, more than 67 percent of Distributors did not earn compensation from

Appx. 273

AdvoCare in the year, while another of 20 percent of Distributors earned between one cent and $200.

41.     The opportunity to earn compensation retailing product is similarly limited. As will be detailed in Paragraphs 62–67, the company discourages Distributors from attempting to sell products. AdvoCare does not allow Distributors to publicly offer a discount on products and does not allow Distributors to sell products through ecommerce channels other than AdvoCare.com.

42.     Departure rates demonstrate that Distributors struggle to retail products. In 2013 and 2014, just 37 percent of Distributors without a downline—who therefore needed to retail products to earn compensation—remained in AdvoCare past one year.

43.     AdvoCare's compensation structure requires participants to make large purchases to qualify and remain eligible to participate fully in the business opportunity. However, the opportunity to earn compensation as an AdvoCare Distributor is limited. As a result, AdvoCare's compensation structure ensures that most participants will lose money or will not realize significant income.

### ADVOCARE OPERATES AS AN UNLAWFUL PYRAMID SCHEME

#### *AdvoCare's Compensation Plan*

44.     AdvoCare's compensation plan is based on becoming an Advisor and recruiting others to do the same. AdvoCare allows all Distributors to earn retail and wholesale commissions.  However, only Advisors are eligible to earn overrides, leadership bonuses, and incentives (collectively, "Advisor income"). In turn, Advisor income can only be earned from product purchases generated by downline Advisors.

Appx. 274

45.     To become an Advisor, a Distributor must accumulate 2,000 PGV—a term for the suggested retail value of that Distributor's purchases and the purchases of certain members of their downline—within four pay periods.

46.     Once they become Advisors, Distributors must keep meeting PGV requirements to earn compensation and to remain Advisors. Each pay period, Distributors must accrue at least 500 PGV to earn overrides and at least 1,000 PGV to earn leadership bonuses.  Each year, Distributors must requalify as Advisors, either by accruing 2,000 PGV within four pay periods or 6,000 PGV over the year.

47.     Through this structure, AdvoCare encourages consumers to (a) purchase large volumes of products regardless of retail demand in order to participate fully in the business opportunity and to (b) "duplicate" themselves by recruiting business opportunity participants who will also make large purchases.

48.     AdvoCare encourages Distributors to personally purchase products to satisfy compensation plan requirements. AdvoCare requires Distributors to either purchase large quantities of product or convince others to do so in order to (a) qualify for Advisor and be eligible to earn Advisor income; (b) requalify for Advisor and remain eligible to earn Advisor income; and (c) earn Advisor income in a given pay period.

49.     Most Advisors personally purchase the vast majority of their qualifying volume. In fact, for years, Defendants have instructed Distributors to personally purchase products to qualify for Advisor. For example, in 2013, AdvoCare instructed Distributors at Success School, its largest annual event, and which often features the Individual Defendants, to become Advisors in one order because they could generate bigger paychecks by spending more money—illustrated

by a slide comparing what could result for Distributors who purchased 3,000 PGV and 500 PGV, respectively, in their first pay periods.



50.    Diamond Distributors continue to teach participants this message. For example, in an April 2018 training available on YouTube, one Diamond Distributor told participants to purchase their Advisor order immediately because "people will often do what you do . . . it duplicates, it's a stronger position . . . and it's just statistically more successful."

51.    AdvoCare has also instructed Distributors to personally purchase products in order to qualify for Advisor in its compensation plan. Until at least November 2014, the plan instructed Distributors "to purchase at least $500 yourself" and to always "track your volume . . . and if necessary, cover the $500 Personal Volume with your own purchases" to ensure they would have the volume needed to qualify for Advisor.

52.    The McDaniels pressured recruits to take financial risks to reach Advisor. In 2013, when one Distributor said he could not afford Advisor because he had just $2,000 saved, Diane McDaniel asked that he "go [half] in with $1,050" and purchase the remaining volume the next pay period. In 2015, a Distributor wrote of "putting [her] faith in [the McDaniels'] hands" while using credit cards she was "hoping not to use" to reach Advisor.

53.     Similarly, the Hardmans taught their downline to convince recruits to purchase their Advisor status outright. In at least eight 2012 newsletters, the Hardmans told their downline, "[m]oving people to Advisor . . . in ONE order . . . is ALWAYS BEST!" In a training document used from at least 2012 to 2014, the Hardmans wrote that "[h]ow quickly a person achieves Advisor is very important since the speed of the leader determines the speed of the pack."

54.     Defendants have also trained and encouraged Distributors to personally purchase products apart from Advisor qualification. In a corporate training video still available on YouTube, a former AdvoCare CEO told Distributors to buy 1,000 PGV of product the first day of each period. The Hardmans, meanwhile, told Distributors to stay awake past 1:00 a.m. on the last night of each pay period in order to purchase products to fill any gap in PGV that would otherwise prevent them from earning Advisor income. The Hardmans and McDaniels also frequently ran incentives offering cash bonuses and prizes to Distributors with certain amounts of PGV.

55.     Distributors, including at least 35 Diamond Distributors, also often purchase products on other Distributors' accounts in order to maximize their own bonuses. Some did this for years with the company's knowledge; one even received Distributors' passwords from a company employee in order to place orders in his downline. Others used offline reimbursements, as when the McDaniels promised one Distributor "a check tomorrow" if he placed a $550 order to help them maximize their bonus. These purchases are untethered to retail sales activity or demand and are instead made only to qualify for increased compensation.

56.     Once consumers have made large purchases to qualify for Advisor, Defendants teach consumers to attempt to recruit a downline full of Advisors pursuing the business

opportunity. The below images blueprint what Defendants tell Distributors is the "ideal

organizational structure"—a downline of three Advisors who multiply themselves ad infinitum.



*2015 corporate training*　　　　*May 2018 Diamond training (border added)*

57.　　As Defendant Brian Connolly instructed Distributors during a 2016 call, "the

leading indicator of [AdvoCare's] future success . . . is the growth of qualifying Advisors."

58.　　Recruiting is so critical to AdvoCare's success that the company carefully tracks

its recruiting numbers and regularly reports those figures to key executives and board members,

including Brian Connolly during his tenure at AdvoCare. AdvoCare reinforces its emphasis on

recruiting business opportunity participants through periodic incentives. For example, between

2014 and 2016, the company ran a Rookie Bonus incentive rewarding Distributors who became

Advisors, recruited at least three Distributors, and generated at least 3,000 PGV from new

recruits. To encourage Distributors to focus on recruiting business opportunity participants, the

company excluded volume from Distributors' retail customers who ordered product directly

from AdvoCare.

59.　　The Hardmans and McDaniels share this focus on recruiting business opportunity

participants. Until at least November 2016, they regularly contacted members of their downline

to attempt to convince them to become Advisors. To do so, they used a "prequalification report"

AdvoCare provided to all Distributors. The report tracked how close downline were to becoming

Advisors.

Appx. 278

60.    Danny McDaniel also sent Distributors notes in December 2013 with the instruction that "if an organization is just bringing in Distributors [it has] no value . . . there has to be [Advisors]."

61.    Similarly, until at least October 2015, the Hardmans used and posted to their website a document instructing new Distributors to focus on recruiting Advisors, claiming Advisor "is always in a person's best interest." And in at least eight newsletters in 2012, the Hardmans taught their downline they could "build staggering income" if they became experts at "moving people to Advisor & [trained their] teams to do the same." They also told Distributors at Success School that getting recruits "to Advisor right now" is "Plan A."

62.    To keep Distributors focused on recruiting Advisors, Defendants discourage Distributors from focusing on selling product. As a Diamond Distributor told the audience at Success School in 2011, "[a]ll of you guys that haven't moved on to where you want to be are selling Spark. I'm not selling Spark [AdvoCare's energy drink]. . . .  I'm selling stay at home mommies. . . . We sell freedom. We don't sell Spark."

63.    Other Diamond Distributors have similarly discouraged consumers from focusing on retail sales. At a 2018 corporate event simulcast on one of AdvoCare's Facebook pages, a Diamond Distributor stated that one month of selling products "gave [her] the confidence to go out and share the business opportunity, because I realized that's the best part of what we have our hands on." In an April 2018 webinar, a Diamond Distributor told recruits that "for about two and a half years, I was building a business—but the wrong way. While [another Distributor] was building a residual income, I was selling retail—I was retailing product."

64.     Another Diamond Distributor instructed Distributors in a 2015 Facebook post that they would "never earn significant income by retailing products" because "retail profits are the LEAST of the five ways we earn income!"

65.     In a training call available on the Hardmans' website until at least November 2016, a Diamond Distributor said that if Distributors attempt to recruit someone into the business but the timing is not right, "that's where products come in." In a 2016 corporate call, the same Diamond Distributor told listeners products were a "fallback" to the business opportunity.

66.     AdvoCare frequently approved materials with this message, such as a September 2013 training document stating that AdvoCare's business was the main course; its products were the appetizers; selling product over the business was "like going into [a] Steak House and . . . ordering cheese sticks"; and that Distributors could not "create wealth . . . being a professional retailer."

67.     The McDaniels and Hardmans frequently instructed Distributors to focus on selling the business opportunity and to treat products as a fallback.

a.  The McDaniels frequently tell recruits that Danny McDaniel "knew about AdvoCare for a year, but . . . didn't want to have anything to do with it" until a Distributor said to him, "coach I'm gonna make 90k this year in AdvoCare."

b.  Diane McDaniel also frequently dismissed retail earnings as "fun," rather than "real," money. In 2014, she told a Distributor that recruiting customers was "fun but a very slow way to build anything." In 2015, she trained Distributors at a corporate event to never assume people know about the fun money versus the real money in AdvoCare.

c.   In 2012, Danny McDaniel taught Distributors to lead with the business
opportunity and treat products as a fallback, and called AdvoCare "a leadership
factory disguised as a nutrition company."

d.   In a 2012 training document on how to run a business opportunity meeting, the
McDaniels told Distributors to quickly show recruits how to earn retail and
wholesale commissions—and to then "let them know that you are going to show
them how we really earn money in this business . . . through the two types of
RESIDUAL income that Advocare provides."

e.   In a corporate training video available on the Hardmans' website until at least
November 2016, Lisa Hardman told Distributors not to hide behind products in
recruiting consumers.

f.   Until at least May 2014, the Hardmans also instructed Distributors to order
posters featuring deceptive annualized income because Distributors otherwise
might be tempted to "hide behind the products" rather than sell the business
opportunity.

g.   In a 2013 email to Distributors, the Hardmans referred to leading with products
rather than the business opportunity as one of the most commonly made rookie
mistakes.

h.   In a 2012 Facebook training, Lisa Hardman taught Distributors to "BE IN THE
HABIT of handing out OPPORTUNITY brochures, RATHER than Spark
brochures" so that prospects "know what you're most passionate about!"

Appx. 281

*AdvoCare Relies on Business Opportunity Participants' Purchases*

68.    AdvoCare maintains a vast network of Distributors who make large purchases to participate fully in its compensation plan. Business opportunity participants—conservatively defined as anyone who became an Advisor, purchased 500 PGV of products in a pay period to qualify for Advisor, recruited a downline, or purchased a sales aid—purchased more than $2.87 billion of products between January 2014 and February 2018, totaling more than 80 percent of AdvoCare's product revenue in the period. Of this revenue, $1.98 billion came from business opportunity participants who spent more than they earned from AdvoCare. These participants received back from AdvoCare less than 10 percent of the amount they paid the company, incurring significant losses.

69.    This remains the case despite AdvoCare's introduction of its Preferred Customer program. Preferred Customers accounted for just 18 percent of product revenues in 2017. In addition, because Preferred Customers can convert to Distributors and count their purchases as Preferred Customers toward Advisor qualification, their purchases are often made in pursuit of the business opportunity. AdvoCare even offers a "New Distributor Bonus" to encourage consumers to pursue the business as Preferred Customers. Distributors have three pay periods to earn the bonus—excluding time spent as a Preferred Customer. AdvoCare has instructed consumers to extend their window to earn the bonus by waiting until they have recruits before converting to Distributor.

70.    AdvoCare continues to train Distributors that product users are secondary to business opportunity participants. When AdvoCare introduced the Preferred Customer program, Defendant Connolly told Distributors that he feared "that [they] might think that recruiting a lot of Preferred Customers is somehow going to fill the gap of the

Appx. 282

recruitment of bona fide business building Distributors." He emphasized that Preferred

Customers are merely "what we get on our way to finding business builders," and when a

consumer decides they only want products, the goal is to "harvest a Distributor down the

road."

71.     Based on the facts and violations of law alleged in this Complaint, the FTC has

reason to believe that Defendants AdvoCare International, L.P., Brian Connolly, Carlton

Hardman, and Lisa Hardman are violating or are about to violate laws enforced by the

Commission due to their continued roles operating and promoting AdvoCare, a deceptively

marketed recruitment scheme.

72.     Based on the facts and violations of law alleged in this Complaint, the FTC has

reason to believe that Defendants Danny McDaniel and Diane McDaniel are violating or are

about to violate laws enforced by the Commission because, among other things:

a.      The McDaniels engaged in deceptive acts and practices through their participation

in AdvoCare, which they promoted over a period of more than 20 years;

b.      The McDaniels' deception was widespread and permeated their business

practices, including their sales and recruitment presentations, their social media feeds, their

marketing and training activities, and their creation and distribution of sales aides and materials;

c.      The McDaniels have no significant income other than their income from

AdvoCare;

d.      The McDaniels continued to deceptively promote AdvoCare after learning of and

throughout the FTC's investigation and after the company was sued in a 2017 class action

lawsuit that alleged the company was a pyramid scheme;

Appx. 283

e.      The McDaniels never voluntarily ceased their deceptive conduct; instead, they continued to engage in deception until AdvoCare abandoned its multi-level marketing structure in July 2019 during its negotiations with the FTC;

f.      The McDaniels have never acknowledged their culpability or shown remorse for their roles in promoting an unlawful pyramid scheme, for making materially deceptive earnings claims, or for sharing the means and instrumentalities for violating Section 5 of the FTC Act, 15 U.S.C. § 45.

## VIOLATIONS OF THE FTC ACT

73.      Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

74.      Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

### Illegal Pyramid

75.      As alleged above, Defendants operate or promote participation in an unlawful scheme in which participants pay money to the company in return for which they receive (1) the right to sell products, and (2) in return for recruiting other participants into the program, the right to receive rewards that are unrelated to the sale of products to ultimate users.

76.      Defendants' operation or promotion of this type of scheme, often referred to as a pyramid scheme, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

Appx. 284

## COUNT II

### Income Misrepresentations

77.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the right to participate in the AdvoCare program, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who become AdvoCare Distributors are likely to earn substantial income.

78.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 77, consumers who become AdvoCare Distributors are not likely to earn substantial income.

79.     Therefore, Defendants' representations as set forth in Paragraph 77 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### Means and Instrumentalities

80.     By furnishing AdvoCare Distributors with promotional materials and instructions to be used in recruiting new participants that contain false or misleading representations, Defendants have provided the means and instrumentalities for the commission of deceptive acts and practices.

81.     Therefore, Defendants' practices, as set forth in Paragraph 80, constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### CONSUMER INJURY

82.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of Section 5(a) of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent

Appx. 285

injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

83.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions;

B.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

Appx. 286

D.      Award Plaintiff the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.

Respectfully submitted,

Alden F. Abbott
General Counsel

Dated:   October 2, 2019                              /s/ Aaron Haberman
                                                      AARON HABERMAN (lead attorney)
                                                      Texas Bar No. 24092468
                                                      M. HASAN AIJAZ
                                                      Virginia Bar No. 80073
                                                      THOMAS B. CARTER
                                                      Texas Bar No. 03932300
                                                      REID TEPFER
                                                      Texas Bar No. 24079444

                                                      Federal Trade Commission
                                                      1999 Bryan Street, Suite 2150
                                                      Dallas, Texas 75201
                                                      (214) 979-9381; ahaberman@ftc.gov
                                                      (214) 979-9386; maijaz@ftc.gov
                                                      (214) 979-9372; tcarter@ftc.gov
                                                      (214) 979-9395; rtepfer@ftc.gov

                                                      Fax: (214) 953-3079

                                                      Attorneys for Plaintiff
                                                      FEDERAL TRADE COMMISSION

# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. _____ |
| Plaintiff, | |
| | **STIPULATED ORDER FOR** |
| v. | **PERMANENT INJUNCTION AND** |
| | **MONETARY JUDGMENT AGAINST** |
| ADVOCARE INTERNATIONAL, L.P., a limited partnership, | **DEFENDANTS ADVOCARE** |
| | **INTERNATIONAL, L.P. AND BRIAN** |
| BRIAN CONNOLLY, | **CONNOLLY** |
| DANNY McDANIEL, | |
| DIANE McDANIEL, | |
| CARLTON HARDMAN, and | |
| LISA HARDMAN, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("Commission"), filed its Complaint for

Permanent Injunction and Other Equitable Relief ("Complaint") in this matter, pursuant to

Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b). The

Commission and Defendants AdvoCare International, L.P., and Brian Connolly stipulate to the

entry of this Stipulated Order for Permanent Injunction and Monetary Judgment ("Order") to

resolve all matters in dispute in this action between them.

**THEREFORE, IT IS ORDERED** as follows:

**FINDINGS**

1.      This Court has jurisdiction over this matter.

Page 1 of 16

Appx. 289

2.      The Complaint charges that Defendants participated in deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, by operating a pyramid scheme; making false or misleading income representations; and providing participants in Defendants' scheme with the means and instrumentalities to engage in deceptive acts and practices.

3.      Settling Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Settling Defendants admit the facts necessary to establish jurisdiction.

4.      Settling Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.      Settling Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.      "**Business Venture**" means any written or oral business arrangement, however denominated, whether or not covered by 16 C.F.R. Part 437, that consists of providing payment or other consideration for the right or means to offer, sell, or distribute a product or service.

B.      "**Defendants**" means all of the Individual Defendants and the Corporate Defendant, individually, collectively, or in any combination.

1.      "**Corporate Defendant**" means AdvoCare International, L.P., and its successors and assigns.

2.      **"Individual Defendants"** means Brian Connolly, Danny McDaniel, Diane McDaniel, Carlton Hardman, and Lisa Hardman.

3.      **"Settling Defendants"** means AdvoCare International, L.P., and Brian Connolly, individually, collectively, or in any combination.

C.      **"Multi-Level Marketing Program"** means any plan or program in which a participant has the right to (1) recruit others into the program or have others placed in the participant's downline and (2) receive payment or other compensation that is based, in whole or in part, upon purchases, sales, or any other activities of the participant's downline. Downline refers to the collection of participants whom a participant has personally recruited (first level), any participants and customers recruited by first level participants (second level), any participants and customers recruited by second level participants (third level), and so forth, however denominated.

## ORDER

### I. BAN ON MULTI-LEVEL MARKETING

**IT IS ORDERED** that Settling Defendants, whether acting directly or indirectly, are permanently restrained and enjoined from engaging, participating, or assisting others in the advertising, marketing, promoting, or operating of any Multi-Level Marketing Program, including any product- or service-based pyramid scheme.

### II. PROHIBITED MARKETING SCHEMES

**IT IS FURTHER ORDERED** that Settling Defendants, whether acting directly or indirectly, are permanently restrained and enjoined from engaging, participating, or assisting

others in the advertising, marketing, promoting, or operating of any Ponzi scheme or chain referral scheme.

## III. PROHIBITED COMPENSATION

**IT IS FURTHER ORDERED** that Settling Defendants, Settling Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or operating of any Business Venture, are permanently restrained and enjoined from providing payment or other compensation to any Business Venture participant unless: (A) the compensation is based solely on the purchase of product directly from the company operating the Business Venture by a customer; (B) only one participant is compensated for the customer's purchase; and (C) the customer whose purchase generates the compensation has not been a participant in the Business Venture within 3 months of the purchase.

## IV. PROHIBITION AGAINST MISREPRESENTATIONS OR UNSUBSTANTIATED CLAIMS

**IT IS FURTHER ORDERED** that Settling Defendants, Settling Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or operating of any Business Venture, are permanently restrained and enjoined from:

     A.     Misrepresenting or assisting others in misrepresenting, including by providing others with the means and instrumentalities with which to misrepresent, expressly or by

implication, including through discussion of lifestyle changes tied to compensation from the Business Venture:

      1.      That participants will or are likely to achieve substantial sales, income, or profit;

      2.      The amount of sales, income, or profit that participants have actually earned;

      3.      The amount of time or effort required to earn an amount of compensation or to advance in a Business Venture;

      4.      The reason participants do not earn substantial compensation, including representations that participants fail because they do not devote substantial or sufficient effort or are not active; or

      5.      Any other fact material to consumers concerning the Business Venture, such as: the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

B.      Making any representation, expressly or by implication, regarding the amount of sales, income, or profits that a participant can expect to earn unless the representation is non-misleading and, at the time such representation is made, Settling Defendants possess and rely upon competent and reliable evidence sufficient to substantiate that the representation is true. Implied representations regarding the amount of sales, income, or profits that a participant can expect to earn include using lifestyle representations or images.

## V. MONITORING BY SETTLING DEFENDANTS

**IT IS FURTHER ORDERED** that

Settling Defendants, Settling Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or offering of any Business Venture, are permanently restrained and enjoined from:

A.     Failing to monitor and take all reasonable steps necessary to ensure that that Settling Defendant's officers, agents, employees, and all other persons in active concert or participation with any of them act in compliance with the requirements of Sections I–IV of this Order.

B.     Failing to promptly and thoroughly investigate any complaint received by that Settling Defendant relating to compliance with this Order.

## VI. MONETARY JUDGMENT

**IT IS FURTHER ORDERED** that:

A.     Judgment in the amount of One Hundred Fifty Million Dollars ($150,000,000) is entered in favor of the Commission against Defendants AdvoCare International, L.P., and Brian Connolly, jointly and severally, as equitable monetary relief.

B.     Defendants AdvoCare International, L.P., and Brian Connolly are ordered to pay to the Commission One Hundred Fifty Million Dollars ($150,000,000) within 7 days of entry of this Order. All payments required by this Subsection must be made by electronic fund transfer in accordance with instructions to be provided by a representative of the Commission.

C.      Settling Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

D.      The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission against Settling Defendants, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

E.      The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission against Settling Defendants pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

F.      Settling Defendants acknowledge that their Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), which Settling Defendants must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. §7701.

G.      All money paid to the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint. Any

money not used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement. Settling Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## VII. CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Corporate Defendant, its officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are permanently restrained and enjoined from directly or indirectly failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. Corporate Defendant represents that it has provided this redress information to the Commission. If a representative of the Commission requests in writing any information related to redress, Corporate Defendant must provide it, in the form prescribed by the Commission, within 14 days.

## VIII. NOTICE TO DISTRIBUTORS

**IT IS FURTHER ORDERED** that, within 7 days of entry of this Order, Corporate Defendant shall email notice in the form shown in Attachment A to all persons who were AdvoCare International, L.P., distributors any time between January 1, 2014, and the date of the entry of this Order with the subject line "What the FTC Settlement Means for AdvoCare Distributors Like You." Within 15 days of entry of this Order, Corporate Defendant shall mail the form shown in Attachment A via first-class mail, postage prepaid with address forwarding requested, to the last known mailing address of any intended email recipient whose emailed message delivery fails. No information other than that contained in Attachment A shall be

included in or added to the notice required by this Section, nor shall any other materials be transmitted with the notice.

## IX. COOPERATION

**IT IS FURTHER ORDERED** that Settling Defendants must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint. Such Defendants must provide truthful and complete information, evidence, and testimony. Such Individual Defendant must appear and such Corporate Defendant must cause its officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings that a Commission representative may reasonably request upon 10 days written notice, or other reasonable notice, at such places and times as a Commission representative may designate, without the service of a subpoena.

## X. ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Settling Defendants obtain acknowledgments of receipt of this Order:

A.      Each Settling Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 5 years after entry of this Order, Individual Defendant Brian Connolly for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, and Corporate Defendant must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all

employees, agents, and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which a Settling Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XI. COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Settling Defendants make timely submissions to the Commission:

A.     One-hundred and eighty (180) days after entry of this Order, each Settling Defendant must submit a compliance report, sworn under penalty of perjury:

1.     Each Settling Defendant must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with that Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the products and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Individual Defendant Brian Connolly must describe if he knows or should know due to his own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of

this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

      2.      Additionally, Individual Defendant Brian Connolly must: (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest; and (c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.      For 10 years after entry of this Order, Individual Defendant Brian Connolly must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

      1.      Individual Defendant Brian Connolly must report any change in: (a) any designated point of contact; or (b) the structure of any entity that Defendant Connolly has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

      2.      Additionally, Individual Defendant Brian Connolly must report any change in: (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Defendant performs

services whether as an employee or otherwise and any entity in which such Defendant has direct or indirect control, and identify the name, physical address, and any Internet address of the business or entity.

C.    For 15 years after entry of this Order, Corporate Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following, Corporate Defendant must report any change in: (a) any designated point of contact or (b) the structure of Corporate Defendant or any entity that Corporate Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

D.    Each Settling Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

E.    Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

F.    Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement,

Appx. 300

Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW,

Washington, DC 20580. The subject line must begin: *FTC v. AdvoCare International, L.P., et al.*,

Matter No. 1623109.

## XII. RECORDKEEPING

**IT IS FURTHER ORDERED** that Defendant Brian Connolly must create certain records

for 10 years after entry of the Order and Defendant AdvoCare International, L.P., must create

certain records for 15 years after entry of the Order, and Settling Defendants shall retain each

such record for 5 years. Specifically, Corporate Defendant and Individual Defendant Brian

Connolly, for any business such Defendant, individually or collectively with any other

Defendants, is a majority owner or controls directly or indirectly must create and retain the

following records:

A.      Accounting records showing the revenues from all products or services sold;

B.      Personnel records showing, for each person providing services, whether as an

employee or otherwise, that person's: name; addresses; telephone numbers; job title or position;

dates of service; and (if applicable) the reason for termination;

C.      Records of all consumer complaints and refund requests, whether received directly

or indirectly, such as through a third party, and any response;

D.      All records necessary to demonstrate full compliance with each provision of this

Order, including all submissions to the Commission;

E.      A copy of each unique advertisement or other marketing or training material used

or disseminated by Corporate Defendant relating to AdvoCare International, L.P., including

videos and calls; and

F.       Copies of all contracts, agreements, and payment records between Corporate Defendant and any participant in AdvoCare International, L.P. or any other Business Venture.

## XIII. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Settling Defendants' compliance with this Order and any failure to transfer any assets as required by this Order:

A.       Within 14 days of receipt of a written request from a representative of the Commission, each Settling Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.       For matters concerning this Order, the Commission is authorized to communicate directly with each Settling Defendant. Such Defendant must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C.       The Commission may use all other lawful means, including posing through its representatives as consumers, suppliers, or other individuals or entities to Settling Defendants or any individual or entity affiliated with Settling Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.      Upon written request from a representative of the Commission, any consumer

reporting agency must furnish consumer reports concerning Individual Defendant Brian Connolly,

pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

## XIV. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**

**FEDERAL TRADE COMMISSION**

Aaron J. Haberman, Texas Bar No. 24092468
M. Hasan Aijaz, Virginia Bar No. 80073
Thomas B. Carter, Texas Bar No. 03932300
Reid Tepfer, Texas Bar No. 24079444
*Attorneys for Plaintiff Federal Trade Commission*
Federal Trade Commission
Dallas, Texas 75201
(214) 979-9381
AHaberman@ftc.gov

Page 15 of 16

Appx. 303

**FOR DEFENDANT ADVOCARE INTERNATIONAL, L.P.:**

Date: 7/18/19

J. Robert Robertson
DLA Piper LLP
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
robby.robertson@dlapiper.com

COUNSEL for AdvoCare International, L.P.

**DEFENDANT ADVOCARE INTERNATIONAL, L.P.**

Date: 7/19/19

PATRICK WRIGHT , Corporate Representative
AdvoCare International, L.P.

**FOR DEFENDANT BRIAN CONNOLLY:**

Date: 7/16/19

Richard G. Parker
Joshua Lipton
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
rparker@gibsondunn.com
jlipton@gibsondunn.com

COUNSEL for Brian Connolly

**DEFENDANT BRIAN CONNOLLY**

Date: 7/17/19

Brian Connolly

Page 16 of 16

Appx. 304

Attachment A

[Minimum 12 point Times New Roman font]

[AdvoCare International, L.P. Letterhead]

[Date]

[Name]
[Address]
[City/State/Zip]

RE:  What the FTC Settlement Means for AdvoCare Distributors Like You

Dear AdvoCare Distributor:

The Federal Trade Commission (FTC), the nation's consumer protection agency, has filed a lawsuit against AdvoCare and several AdvoCare distributors alleging that AdvoCare was operating as a pyramid scheme. AdvoCare does not admit to or deny these allegations but has agreed to a court order that will change how we do business.

Here are some key parts of the order:

1. **AdvoCare is banned from multi-level marketing.** We are prohibited from compensating distributors based on activity in their downline. (That doesn't include purchases by customers directly beneath them who aren't eligible for compensation from AdvoCare—for example, retail customers and preferred customers.)

2. **AdvoCare cannot make misrepresentations.**  AdvoCare and it officers, agents, employees, and distributors, are prohibited from making false, deceptive, or unsubstantiated claims about the amount of sales, income, or profits a participant can expect to earn.

3. **AdvoCare must pay $150 million.**  The FTC will use the money to provide refunds.

This order affects you in these ways:

- You cannot earn compensation based on the activity of distributors you recruit or based on the activity of customers recruited by another distributor, including those in your downline.

- You can continue to buy products at a discount for personal use or for sale to retail customers.

- If you had significant losses in pursuing an AdvoCare business, you may get some of your money back from the FTC. The FTC will contact eligible distributors.

- If you decide the AdvoCare business opportunity is not for you, we offer a 100% refund on unused products. To ask for a refund, visit [insert URL to AdvoCare's refunds page.]

For more information about our settlement with the FTC, visit [insert ftc.gov URL]. Before you spend money on a business opportunity, read [insert links to the FTC's MLM guidance for consumers]. To learn more about your consumer rights, visit consumer.ftc.gov or call 1-877-FTC-HELP (1-877-382-4357), or TTY at 1-866-653-4261.

Respectfully,


AdvoCare International, L.P.

# Exhibit H

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| LISA RANIERI and MEGAN CORNELIUS, Individually and on Behalf of a Class of Similarly Situated Persons,<br><br>Plaintiffs,<br><br>v.<br><br>ADVOCARE INTERNATIONAL, L.P.,<br><br>Defendants. | Case NO. 3:17-cv-00691-S |

## DECLARATION OF W. ROYAL FURGESON, JR.

The undersigned, W. Royal Furgeson, Jr., submits the following declaration pursuant to 28 U.S.C. § 1746 under penalty of perjury and states as follows:

1.      My name is W. Royal Furgeson, Jr.  I am a licensed, practicing attorney in the State of Texas.  I served as the mediator in the above-captioned case.

### Personal Background

2.      I currently practice law with FurgesonMalouf Law PLLC, primarily in the areas of mediation and arbitration.  From 1994 to 2013, I served as a U.S. District Court Judge in the Western District of Texas and the Northern District of Texas.

3.      In 2012, I became the founding dean of the UNT Dallas College of Law.  I retired in 2018, becoming Dean Emeritus, to resume the practice law with FurgesonMalouf Law PLLC.

4.      I graduated from Texas Tech University with a Bachelor of Arts in English, and I earned my law degree from the University of Texas School of Law (with honors), where I was an Associate Editor of the Texas Law Review.  After law school, I served in the U.S. Army for two

1

Appx. 308

years, attaining the rank of captain.   Following a tour in Vietnam, I was a law clerk to the Honorable Halbert O. Woodward.

5.      Before taking the bench, I practiced law for twenty-four years with the Kemp Smith firm in El Paso, Texas.  I was a fellow of the American College of Trial Lawyers, a member of the American Law Institute, and Board Certified by the Texas Board of Legal Specialization in Civil Trial Law.  While in private practice, I was general campaign chair and president of the El Paso United Way, president of the El Paso chapter of the American Board of Trial Advocates, and president of the El Paso Bar Association.

6.      During my time on the bench, in addition to my ongoing district court obligations, I was a panel judge on the Judicial Panel on Multidistrict Litigation, President of the Federal Judges Association, and a member of the Judicial Branch Committee of the Judicial Conference of the United States. I also served as chair of the Judicial Resources Committee of the Judicial Conference of the United States.

## My Work in This Litigation

7.      I write this declaration in support of (i) Plaintiff Megan Cornelius's Motion for Final Approval of Class Action Settlement, and (ii) Class Counsel's Motion for an Award of Attorney's Fees and Expenses and Class Representative's Motion for a Service Award.

8.      The parties in this case, at least as of the time I became involved, are Megan Cornelius and Lisa Ranieri (together, "Plaintiffs"), on one side, and AdvoCare International, L.P. ("AdvoCare"), on the other.  This is a putative class action case in which Plaintiffs allege that AdvoCare operated a pyramid scheme, defrauding thousands of people of millions of dollars. AdvoCare contends that it was a legitimate multi-level marketing company that ran its business in an ethical and legal manner.

Appx. 309

9.      On October 16, 2018, the Court approved a schedule proposed by the parties and ordered that I serve as mediator in the case, unless the parties determined to use another mediator. The parties agreed to mediate with me and eventually set a date for a first mediation on October 18, 2019.  Plaintiffs' counsel and AdvoCare's counsel participated in a joint conference call with me in advance of the mediation, and I had multiple calls with the parties separately.

10.     The parties submitted lengthy confidential mediation materials in advance of the first mediation.  Plaintiffs flew from their homes in Virginia and California to attend the mediation, held in Dallas, along with their counsel.  Although the parties spent most of the day mediating on October 18, they did not reach a resolution.

11.     After the first mediation, I continued to have periodic calls and emails with the parties to gauge their interest in settlement.   In the fall of 2020, the parties indicated their willingness to have a second mediation.

12.     The parties attended another full-day mediation on September 3, 2020 via Zoom after submitting mediation statements to supplement their original statements.  Both Plaintiffs attended, with their counsel.  After many hours of arms' length negotiations through me, the mediation resulted in an agreement-in-principle.

13.     In the process of drafting a complete settlement agreement, the parties discovered that they had several points of disagreement that needed to be resolved before a settlement agreement could be executed and a settlement proposed to this Court.  The most critical of these disagreements was the calculation of individual class member damages and specifically the amount of "credit" that should be attributed to the products class members purchased from AdvoCare.  I discussed these disagreements via email and telephone with the parties, but they could not be resolved without a third mediation.  We conducted a third mediation on January 25,

3

Appx. 310

2021, and the parties ultimately came to an agreement in the days after that third mediation, based on a "mediator's proposal" that I made.

14.     Both Plaintiffs were full participants in the first two mediations.  At no time did they seek a settlement that would benefit themselves above other class members.  It is my belief that they sought to achieve the best result possible for the class.

15.     As discussed above, the primary issue in the third mediation was the manner of damages calculation.  The amount of credit to attribute to product class members purchased would impact both class membership (as no person without damages would be in the class) and the amount of individual damages awards.  The resolution of this issue resulted in one of the Plaintiffs—Ms. Ranieri—being excluded from the class.  The parties settled her claims separately in a settlement that I mediated.  This settlement in no way impacted the amount of recovery for the class and is not an agreement affecting the class.

16.     The settlement of this matter was undoubtedly a product of vigorous negotiations. The negotiations were complex because the case involved complex legal matters, such as Plaintiffs' claims under the federal Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq.*; issues related to AdvoCare's settlement with the Federal Trade Commission; issues related to class certification; and issues relating to the calculation of individual class member damages.  During the mediation, both sides adamantly supported their individual clients' positions, and Plaintiffs' counsel zealously advocated for the absentee class members.  Each side advanced their respective arguments and demonstrated a willingness to continue to litigate rather than accept a settlement that was not in the best interest of their respective clients.  During the mediation, the parties exchanged numerous offers and counter-offers, always through me and after extensive discussions with me.

4

17.     Although the parties were confident in the strength of their respective positions, it was clear that continued litigation carried substantial risks for both sides. Based on my review of the mediation briefing, documents filed with the Court, and supporting documentation supplied to me by the parties, and calls and meetings with counsel to the parties, it is my opinion that continued litigation posed great risks for both sides.

18.     In my opinion, in light of the risks both sides faced, the settlement is advantageous to all parties. If the settlement is approved by the Court, the class will receive a real and meaningful benefit in the form of monetary relief without the need for continued litigation where the claims might not have been certified or might have been found deficient by the Court or on appeal. At the same time, the parties avoided further litigation and its attendant burden and expense. Based on the facts and circumstances presented by the parties and my experience as a mediator and former district court judge, it is my opinion that the settlement is an excellent result that reflets the strenuous negotiations between highly skilled and professional class counsel and defense counsel. It is also my firm belief that the amount of money AdvoCare agreed to pay is the most money it would agree to pay without further litigation developments in Plaintiffs' favor.

19.     The Court, of course, will make determinations as to the "fairness, reasonableness, and adequacy" of the settlement under applicable legal standards, but I can attest that the proposed settlement is a reasonable result, obtained at arm's length, after a difficult, protracted, and adversarial negotiation, and is consistent with the risks and potential rewards of the claims asserted when measured against the risks of continued litigation.

20.     I understand that Plaintiffs' counsel seeks an award of attorneys' fees in the amount of $3,150,000 (or 30% of the settlement fund) plus reimbursement of expenses. This is certainly fair and reasonable in light of my experience with Plaintiffs' counsel in this litigation and the

Appx. 312

results achieved by the settlement agreement. At no point did they seek to obtain a benefit for themselves at the expense of the class. Throughout the process, Plaintiffs' counsel advocated ethically and zealously for the class.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

April 7ᵗʰ, 2021
Dallas, Texas

_Royal Furgeson_
Royal Furgeson

6

Appx. 313